## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| BYJU'S ALPHA, INC.,[1] | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 24-10140 (JTD) |
| | ) |
| | ) |
| BYJU'S ALPHA, INC., | ) Adv. Pro. Case No. 24-50013 (JTD) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CAMSHAFT CAPITAL FUND, LP, | ) |
| CAMSHAFT CAPITAL ADVISORS, LLC, and | ) |
| CAMSHAFT CAPITAL MANAGEMENT, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

Plaintiff BYJU's Alpha, Inc. (the "Debtor"), for its Complaint against Defendants Camshaft Capital Fund, LP ("Camshaft Fund"), Camshaft Capital Advisors, LLC ("Camshaft Advisors"), and Camshaft Capital Management, LLC ("Camshaft Management," and together with Camshaft Advisors and Camshaft Fund, "Camshaft"), alleges as follows:

## PRELIMINARY STATEMENT

1.    This action is perhaps the most valuable asset of the Debtor's estate.  It arises from the fraudulent transfer and concealment of *over half a billion dollars* of cash away from the Debtor and its creditors, the troubling details of which are still coming to light.

---

[1]  The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is:  BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this Chapter 11 Case is: 16192 Coastal Highway, Lewes, Delaware 19958.

2.      The Debtor was a special purpose financing vehicle formed in September 2021 by "BYJU's," the trade name of the self-proclaimed world's largest education technology conglomerate, to borrow $1.2 billion in five-year term loans in November 2021. Mere months later, in April 2022, the Debtor, under the control of its former management and former ultimate corporate parent in India, made the first of six transfers in the total amount of just over $533 million, nearly half of the original loan amount, to Camshaft Fund. The Debtor made those transfers on the heels of two defaults and the entry into one temporary waiver of the second default, as the following illustration shows. After the transfers, the Debtor was left woefully undercapitalized and deeply insolvent, with assets less than a tenth of its liabilities.



| 1st Default | 2nd Default | Temporary Waiver | Fraudulent Transfers #1-3 | Fraudulent Transfers #4-6 |
| --- | --- | --- | --- | --- |
| Mar. 16, 2022 | April 1, 2022 | Apr. 5, 2022 | Apr. 27-28, 2022 | Jul. 12-13, 2022 |

3.      There is no dispute that the transfers occurred, as they are acknowledged by both the Debtor's former management and Camshaft, as well as bank statements of the Debtor showing the transfers to Camshaft. Yet no legitimate reason has been given for them, *ever*, including throughout the course of several pre-petition litigations. The Debtor's currently-available books and records, following a contested change of control in March 2023, do not reveal that the Debtor received any consideration from Camshaft in exchange for the $533 million. Even assuming the Debtor received a limited partnership interest in Camshaft Fund, there was no legitimate reason for the Debtor to have chosen an unknown and unproven hedge fund to manage over half a billion of its capital. Indeed, there is no reason to believe that Camshaft Fund was chosen for its

investment acumen or track record, or because the Debtor wanted to deploy its cash to maximize a return on investment.  If those were the goals, there were far superior options.

4.      Rather, it appears Camshaft Fund was selected in furtherance of a deliberate scheme to hinder, delay, and defraud creditors.  Camshaft Fund, for its part, was founded in August 2020 by William Cameron Morton—then 23 years old with no formal training in investing and money management and no apparent qualification to manage a hedge fund, let alone one with over half a billion dollars in assets under management (in fact, the Fund's reported minimum investment threshold is only $50,000).  Moreover, based on Camshaft's public disclosures, it appears that Camshaft Advisors and Camshaft Management continuously have charged a 3% per annum management fee and 30% performance fee subject to a 12% hurdle rate—significantly higher than many top-tier, established hedge funds—directly from the Debtor's capital account since the purported investment was made.   And Morton, despite having no apparent compliance background, appointed himself as Camshaft's Chief Compliance Officer with the U.S. Securities and Exchange Commission.

5.      All told, the Debtor apparently exchanged cash for a highly illiquid and uncertain asset: a limited partnership interest in a fly-by-night hedge fund that is not registered under the U.S. federal securities laws and, upon information and belief, has extensive restrictions on investors' governance, transfer, pledge, and redemption or withdrawal rights, together with few limited partner protections.  That interest would likely trade at a substantial discount to $533 million, ignoring the effect of potentially substantial fees and expenses, and is accordingly not reasonably equivalent in value.

6.      That is just the first set of the fraudulent transfers.  There is more that absolutely cements the conclusion that the transfers were fraudulent and voidable.  In the first couple of

3

months of 2023, tensions between the Debtor, its corporate affiliates, and its Lenders were rising. There were four outstanding Events of Default, and business negotiations were at an impasse. The Lenders began telling the Debtor that, unless near-term progress towards a resolution was made, the Lenders intended to exercise remedies as soon as the parties' forbearance agreement expired on February 10, 2023. The reasonable inference from admissions that have trickled out in prepetition litigations is that, around that time, the Debtor—under its former management— apparently moved, *again*, that same $533 million (or the resulting limited partnership interest in Camshaft Fund attributable to the apparent investment) to an undisclosed affiliate, so that the money would be outside of the Lenders' reach when the Lenders exercised remedies.

7.      The admitted purpose of this second transfer was to conceal the $533 million from the Debtor and, derivatively, the Lenders. The Debtor's common stock had been pledged as loan collateral, and BYJU's knew that the Lenders could exercise remedies, taking control of the Debtor then having possession of its cash.

8.      The Lenders exercised remedies in March 2023. The Lenders' agent, GLAS Trust Company LLC (or "GLAS," for short), accelerated the loans based on the four acknowledged Events of Default, causing over $1.2 billion to become immediately due and payable, and took control of the pledged equity in the Debtor, appointing Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director and officer. When GLAS took those actions, the Lenders were unaware of the Camshaft transfers and believed that the Debtor had over $500 million in its cash and accounts. In fact, BYJU's Alpha had repeatedly disclosed in quarterly financial statements that the Debtor had well over $██ million in "Cash and Bank," a gross mischaracterization of where the money actually sat.

9.      The Debtor's former management and affiliates refused to recognize GLAS's exercise of control.  In May 2023, GLAS commenced litigation in the Delaware Court of Chancery to affirm Pohl's appointment.  *See GLAS Tr. Co. v. Ravindran¸* No. 2023-0488-MTZ (Del. Ch. 2023).  Five days later, BYJU's eponymous founder, Byju Raveendran, reeling from the lawsuit, mocked the Lenders' exercise of remedies.  In essence conceding an actual fraudulent transfer, he quipped: "**the money is someplace the Lenders will never find it**."  That is how the Lenders came to learn that over $500 million in loan proceeds was no longer at the Debtor.  Days later, at a hearing in that same Delaware lawsuit regarding Pohl's appointment, counsel for the Debtor's former management, Riju Ravindran, admitted in open court that the Debtor had "moved the funds" to an undisclosed third-party entity "based on fear of lenders acting expeditiously."  These are blatant admissions of actual fraudulent transfers.  The Delaware court was not persuaded by counsel's comments.  The court issued a *Status Quo* Order on May 18, 2023, allowing Pohl to remain in charge of the Debtor on an interim basis (with certain restrictions, including on Pohl's authority to file for bankruptcy) and ultimately issued a thoughtful ruling on November 2, 2023 (with the final order granted on November 13, 2023), upholding Pohl's appointment as director and officer, as a valid Event of Default had occurred.

10.      Upon learning of the transfers, the Debtor, now acting through Pohl, undertook an investigation to find the Debtor's money.  But Pohl had almost no records because former management, who facilitated the fraudulent transfers, was recalcitrant.  It took until July 2023 before Pohl was able to obtain complete bank statements for five of the Debtor's bank accounts.  Relatively soon thereafter, Pohl preliminarily determined that $533 million had gone to Camshaft Fund, and he informed the Lenders and GLAS of that finding.

11.     GLAS acted quickly and, on September 5, 2023, sued Camshaft in Florida state court, seeking to avoid the $533 million in transfers, among other relief.  *See GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, No. 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023).  At the time, the Debtor lacked the standing and the financing to pursue those claims.  And, under the Delaware court's interim order, Pohl could not have filed the Debtor for bankruptcy; the Delaware court did not dissolve that restriction until it issued its final decision on November 13, 2023.  No material progress on the merits has been made in GLAS's lawsuit against Camshaft, as Camshaft made blanket objections to all of GLAS's discovery requests, refusing to even confirm if it still had the $533 million.  It is now the Debtor that has the power to pursue avoidance and recovery of fraudulent transfers, and GLAS's Florida lawsuit is now subject to the automatic stay.

12.     Today, the Debtor believes that bankruptcy provides the best vehicle for maximizing the value of the estate.  Among other benefits, bankruptcy provides the tools to precisely locate the $533 million and provides for a centralized forum to house the litigation arising from the potentially extensive prepetition misconduct, while simultaneously staying value-destructive litigation, including Camshaft's separate prepetition lawsuit against the Debtor.  *See Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023).

13.     With those considerations in mind, the Debtor brings this action to locate, secure, and obtain the return of the $533 million—perhaps the most valuable asset of its bankruptcy estate. Among other relief, the Debtor seeks to avoid the actually and constructively fraudulent transfers of $533 million to Defendant Camshaft Fund and to avoid any and all above-market management and performance fees, and any other expenses, paid by or on account of the Debtor to the Fund's sole investment manager and general partner, Defendants Camshaft Advisors and Camshaft Management, respectively.

14.    Additionally, if the $533 million in fraudulently-transferred funds (or any limited partnership interest held in Camshaft Fund as the proceeds of those funds) in fact was further transferred or redeemed in early 2023 or thereafter, the Debtor intends to amend this Complaint to name any subsequent transferees or recipients of redemption proceeds as defendants.  To be certain, even in that scenario, Camshaft Fund (and any immediate or mediate transferees) will remain independently liable for the actual and constructive fraudulent transfers as the initial recipient and beneficiary of the fraudulently-transferred money.

15.    Finally, during the course of discovery, either in this action or as part of the Debtor's main chapter 11 case, the Debtor may learn of additional transfers or redemptions made, or obligations incurred, to Camshaft or to others that are avoidable under the Bankruptcy Code. Indeed, because the Debtor's current management does not possess the entity's complete books and records (even assuming former management maintained complete and accurate books and records), the Debtor could discover additional avoidable transfers, as well as potentially other claims.  The Debtor expressly reserves the right to amend this Complaint and/or file additional actions against Camshaft and others, as appropriate, to protect and preserve the interests of the Debtor's bankruptcy estate.

## JURISDICTION AND VENUE

16.    On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

17.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

18.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).  This Court also has personal jurisdiction over Camshaft Fund because it is a limited partnership organized and existing under the laws of the State of Delaware.  Camshaft Advisors and Camshaft Management also have a substantial relationship to the underlying claims and the State of Delaware, as Camshaft Advisors is the sole investment manager of Camshaft Fund and Camshaft Management is the sole general partner of Camshaft Fund.

19.     In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334(b).  The Debtor's fraudulent transfer claims are related to its bankruptcy case, and this lawsuit may constitute the Debtor's estate's most valuable asset.

20.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21.     This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(1) and (9) and 28 U.S.C. § 2201.

22.     Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **THE PARTIES**

23.     The Debtor, BYJU's Alpha, is a Delaware corporation with its principal place of business in the State of Illinois.  The Debtor was formed on September 27, 2021 as a special purpose financing vehicle of its Indian ultimate corporate parent, Think and Learn Pvt. Ltd. ("T&L").  The Debtor has never had any active business operations.  From formation until March 3, 2023, upon information and belief, the Debtor's sole director and officer was Riju Ravindran, the younger brother of T&L's founder, Byju Raveendran.  As discussed above, Pohl became the

Debtor's sole director and sole officer on March 3, 2023, and has remained in that role through and including the Petition Date.

24.     The hedge fund at the center of this lawsuit, Camshaft Fund, is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

25.     As noted, Camshaft Advisors is the sole investment manager of Camshaft Fund, while Camshaft Management is the sole general partner for Camshaft Fund.  Camshaft Advisors and Camshaft Management are affiliates of one another through Morton's common ownership and control, and are both Florida limited lability companies with their principal places of business both at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

## FACTUAL BACKGROUND

### A.     The Debtor's Underlying Term Loan Arrangement.

26.     This dispute traces back to a November 2021 term loan arrangement.   On November 24, 2021, GLAS, as Administrative and Collateral Agent, the Lenders, the Debtor, and certain other BYJU's entities as guarantors closed on a $1.2 billion term loan facility that would mature in five years.   The definitive terms of the term loans are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement"), Ex. 1 (filed under seal), and various security and collateral assignment agreements.

27.     The Credit Agreement contains legal promises from the Debtor, which motivated the fraudulent transfers at issue here.  In exchange for $1.2 billion, the Debtor and its affiliated guarantors undertook various covenants so that GLAS and the Lenders could carefully monitor and protect the term loans.  Each relevant covenant is clear and unambiguous; they are the result of extensive negotiations by sophisticated parties, with advice of experienced counsel and

investment bankers.  Most relevant here are the financial reporting and guarantee covenants.  As of November 24, 2021, the Debtor, T&L, and the other BYJU's guarantors owed the following obligations to GLAS and the Lenders under the Credit Agreement:

28.    **Audited Financial Disclosures:**  Under Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L had to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing.  Ex. 1 at 89.

29.    **Unaudited Financial Disclosures:**  Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, T&L was required to furnish to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year.  *Id.* at 90.

30.    **Whitehat Guarantee:**  Under Section 5.9(c) of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign onto an Onshore Guarantee Deed by no later than April 1, 2022, to guarantee the full amount of the Debtor's term loans.  *Id.* at 94.  This April 1, 2022 deadline was specifically negotiated.  During negotiations, counsel for the lead lenders, known as the "Arrangers," had pressed for Whitehat India to issue a guarantee at the outset.  When BYJU's resisted, the Arrangers offered a compromise:  "OK to live without guarantee from Whitehat on day 1 provided it accedes after [Reserve Bank of India] approval is granted or if such approval is not obtained, on 1 April 2022."  BYJU's agreed to that revised structure, as is reflected in the ultimate Credit Agreement.

31.    The Debtor and its former management apparently understood soon after signing the Credit Agreement—and well before April 28, 2022, when it made the first of the fraudulent

transfers to Camshaft Fund—that there were going to be multiple defaults on the Credit Agreement's financial reporting and guarantee covenants.  Those defaults ultimately entitled GLAS to exercise remedies, as they rightfully did in March 2023.  As discussed below, in November 2023, the Delaware Chancery Court held that the "Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" then "seat[]" Pohl.

**B.    The Debtor's Fraudulent Transfers to Camshaft Fund in April and July 2022.**

32.    In a series of six wire transfers in April and July 2022, the Debtor transferred a total of $533,000,100.00 to Camshaft Fund with the purported purpose of subscribing for a limited partnership interest.  The Debtor made each one of those transfers without notice to or consent of the Lenders or GLAS.

33.    Specifically, on April 27-28, 2022, the Debtor made three transfers in the total amount of $318,000,000.00 from one of its checking accounts to "Camshaft Capital Fund, Lp" and "Apex Fund Camshaft Capital Lp."  Ex. 2 at 16.  Fewer than three months later, on July 12-13, 2022, the Debtor made three more transfers in the total amount of $215,000,100.00 from another checking account of Debtor to "CAMSHAFT CAPITAL FUND LP."  Ex. 3 at 15, 17.

34.    Once the last of these transfers was completed, the Debtor had around $100 million in available funds across its known bank and brokerage accounts.  It had no other known assets.  Among other uses, the Debtor used these remaining funds to make interest payments to the Lenders, while there also were multiple transfers to and from related entities.  As of the Petition Date, aside from a DIP loan and the loans the Debtor obtained from certain Lenders in late January 2024 to pursue its legal rights (including this fraudulent transfer action) and maximize its estate value, the Debtor had less than $20,000 in cash on hand with no other known assets, liquid or illiquid.  As a result, and setting aside that the term loans had been validly accelerated as of March

3, 2023, the Debtor was financially unable to make scheduled interest and amortization payments on the term loans, including tens of millions of dollars of interest and amortization payments that would have come due in the ordinary course in May and September 2023 had the term loans not been accelerated.

### C. The Debtor's Insolvency as of April 2022 and Acknowledged Events of Default.

35.     Before the April and July 2022 transfers to Camshaft Fund, the Debtor had defaulted on the Credit Agreement twice, and already had entered into one waiver agreement with its Lenders.  In the coming months, there would be at least two more Defaults.  Those four Defaults eventually matured into four separate Events of Defaults, and they were the basis upon which, on March 3, 2023, GLAS accelerated the term loans, which at the time had over $1.2 billion outstanding.  As of the Petition Date, over $1.4 billion in premium, interest, and fees is due and owing.

36.     To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year.  T&L did not furnish any information for only the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

37.     Then, on April 1, 2022, Whitehat India failed to provide a Guarantee as of that date. Nevertheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that Guarantee until October 8, 2022.  Whitehat India failed to meet that extended deadline.

38.     Shortly thereafter, there would be two more Defaults.  As for its third Default, on September 13, 2023, T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period.  Therefore, T&L failed to furnish a material amount of required information across this and the earlier quarterly period.  What T&L did furnish on that date showed that the Debtor had

an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $██ million (based on prevailing exchange rates) at the time.[2]

39.     As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year, as of the September 27, 2022 deadline.  T&L's failure to provide audited annual financials was so significant that, in June 2023, its auditor Deloitte publicly resigned, citing T&L's failure to provide financial information necessary to complete the audit.[3]  T&L's audited financial statements for its 2021-22 fiscal year, which ended March 31, 2022, did not become public until January 2024, at which point the financial results in those statements were nearly two years outdated.

**D.     The Lenders' Patient, Yet Unsuccessful, Negotiations with BYJU's.**

40.     In summer and fall 2022, around the same time as the third and fourth Defaults, an *ad hoc* group of Lenders engaged legal and financial advisors, and contacted the Debtor's representatives and its legal and financial advisors in an effort to resolve the outstanding Defaults and restructure the term loans.  Over the next eight months, the Lenders and their advisors spent countless hours and incurred significant expense, negotiating and implementing nine separate Amendments to the Credit Agreement, all in a good faith, yet unsuccessful, effort to reach a negotiated solution.  As part of that process and so that the negotiations did not prejudice the

---

[2]     The transfer had to have been made with the prior consent of Camshaft Management, as the sole general partner of Camshaft Fund, and/or Camshaft Advisors, as the Fund's sole investment manager and an affiliate of Camshaft Management.  As Camshaft Advisors disclosed in its registered investment advisor brochure (the "Camshaft Brochure")—a document that is publicly filed with the SEC in its investment adviser public disclosure database, which is intended to be distributed to prospective investors, and which outlines Camshaft Fund's commercial terms, investment strategy, and risks, among other information—"[a]lthough amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, *shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm*[,]" *i.e.*, Camshaft Advisors.  Ex. 4 at 10 (emphasis added).  Moreover, there is "no market for the shares/interests, and none is expected to develop."  *Id.*

[3]     *See* Alex G. Simon and Anto Antony, *Deloitte Quits as Byju's Auditor Piling Pressure on Tech Startup*, BLOOMBERG (Jun. 22, 2023, 9:35 AM), https://www.bloomberg.com/news/articles/2023-06-22/deloitte-resigns-as-auditor-for-byju-s-on-filings-delay.

Lenders' rights to exercise remedies, the Debtor and its guarantors acknowledged the four Defaults, which matured into Events of Default, in numerous Amendments to the Credit Agreement, and further memorialized the Lenders' entitlement to exercise remedies as a result of those Events of Default.

41.     Specifically, the Lenders, through counsel, first wrote to BYJU's on August 29, 2022.  In their letter, the Lenders expressed their concern about the "inadequate amount of information being shared," and BYJU's repeated failures to "strictly adhere to the terms of the Credit Agreement."  So they could evaluate BYJU's overall financial condition and "establish a constructive dialogue," the Lenders requested various categories of financial information. Among other information, the Lenders sought "[c]ash balances by entity & region, as of August 26, 2022, including a list of all bank accounts, current balances, location and name of account holding entity with respect to the Parent Guarantor and any of its Subsidiaries[.]"  Understanding BYJU's overall cash position was critical, the Lenders plainly stated that they "fully expect . . . that cash sitting at the Borrower or any Guarantor under the Credit Agreement remain with such entities in the accounts where the cash currently resides[,]" and not be transferred abroad.  If BYJU's made "intercompany transactions," the Lenders previewed that they would view such moves as "aggressive and unnecessary[.]"

42.     The Lenders continued to send correspondences in September and October 2022, expressing their growing frustration with BYJU's failure to meaningfully engage on a constructive resolution.  On October 3, 2022, the Lenders sent BYJU's a five-page term sheet to resolve the outstanding defaults under the Credit Agreement, either through a complete paydown of the term loans or a partial paydown coupled with a permanent amendment to the Credit Agreement.

43.     To preserve the Lenders' rights during the pendency of negotiations, T&L, on behalf of itself and the Debtor, among others, and the Lenders, also began entering into a series of forbearance agreements.  On October 4, 2022, the parties entered into Amendment No. 1, which provided for an extension of the Applicable Premium periods in the Credit Agreement to extend call protections for the Lenders so they would not be financially disadvantaged by continuing negotiations.  The following week, on October 12th, the parties entered into Amendment No. 2. Ex. 5 (filed under seal).  In it, the parties agreed to add to the Credit Agreement the defined term "Specified Defaults," memorializing that BYJU's' four reporting and guarantee breaches constituted Defaults.  *Id*. at 1–2.   The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would begin on October 10, 2022 and expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default.  *Id.* at 2.

44.     As of November 24, 2022, none of the Specified Defaults had been cured. Therefore, they matured into Events of Default, entitling GLAS and the Lenders to exercise remedies.  Also on November 24th, T&L executed Amendment No. 3,  Ex. 6 (filed under seal), in which it "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured. *Id.* at 2.  Significantly, T&L went one step further: it agreed that the Lenders were "**entitled**" to deliver to the "Loan Parties" (*i.e.*, the Debtor and its guarantors) a "Specified Notice of Default and Acceleration," *Id.* at 2 (emphasis added), meaning "a notice of default and acceleration with respect to the Specified Defaults." *Id.* at 1.  T&L agreed:

> 1.      Agreements.
>
> (a)     It is hereby acknowledged and agreed by the parties hereto that (i) the Cure Period for each of the Specified Defaults referred to in the Amendment No. 2 will expire or has expired on November 24, 2022, without any of the Specified Defaults being cured by the Loan Parties, and (ii) the Required

<mark>Lenders will be or are therefore entitled to, on and from November 25, 2022, request the Administrative Agent to deliver to the Loan Parties the Specified Notice of Default and Acceleration</mark>.

*Id.* at 2 (emphasis added).

45.    The Lenders nevertheless agreed to forbear through December 1, 2022.  *Id.* at 2.

46.    When that forbearance expired, T&L (again, on behalf of the Debtor, among others) and the Lenders entered into a final forbearance agreement (*i.e.*, Amendment No. 7) dated as of January 6, 2023.  Ex. 7 (filed under seal).  Under Amendment No. 7, the Lenders agreed to forbear from exercising remedies, including accelerating the term loans, until February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then.  *Id*. at 3.

47.    As a condition to the Lenders' forbearance agreement, Amendment No. 7 included several important milestones and promises:

- **Capital raise:**  T&L promised that BYJU's would raise at least $150 million of new equity capital.

- **Quality of Earnings Report:**  T&L promised to facilitate in good faith GLAS's retention of an auditor, Ernst & Young LLP, which then would be provided with a copy of BYJU's's quality of earnings report.

- **Response to Lenders' Term Sheet:**  T&L promised to deliver a response to the Lenders' October 3, 2022 restructuring term sheet.

- **Financial Reporting:**  T&L agreed to disclose various important financial information and updates for itself and its subsidiaries, including their "balances of cash, Cash Equivalents and Marketable Securities, and transactions with respect to each Material U.S. Bank Account on a weekly basis[.]"  As part of that obligation, T&L further agreed that the Lenders' financial advisor could visit its offices in India to "review and authenticate . . . the accuracy of the balances of cash, Cash Equivalents and Marketable Securities[.]"

- **No Dispositions:**  T&L agreed that, during the Forbearance Period, there shall be "no Disposition of . . . any cash, Cash Equivalents, Marketable Securities or any other assets held on deposit in, or maintained with, any Designated Account" (other than certain ordinary course payments).

*Id.* at 12–15.

16

48.     The weekly cash disclosures were critical to enable the Lenders to understand the availability of cash collateral and monitor its current location.

49.     However, T&L and its subsidiaries, including the Debtor, defaulted on Amendment No. 7's milestones.  Further, on January 23, 2023, T&L furnished to the Lenders incomplete unaudited financial statements for Q2 FY 2022-23 (the period ended September 30, 2022).  Those financials had been due over a month earlier, by December 14, 2022.  The financials showed that the Debtor had an amount of Indian Rupees in  "Cash and Bank" that was equivalent to well over $██ million (based on prevailing exchange rates) as of September 30, 2022.

50.     The next day, on January 24, 2023, counsel for the Lenders sent a letter to the board of each of the Debtor and its immediate and ultimate corporate parents.  The Lenders raised their concern with BYJU's "level of engagement . . . over the past five months."  There had been no engagement on the October 3, 2022 term sheet and, "perhaps most troublingly," T&L's ongoing financing reporting failures "frustrated" the Lenders' "efforts to monitor one of its most significant categories of collateral—cash and liquid investments."   Rather than provide "the account information required under the terms of the Forbearance Agreement[,]" all T&L had provided was a "two-line summary of cash residing in accounts inside and outside of India."  The Lenders stated their expectation that "cash residing within [BYJU's] account(s) in the United States will remain there[.]"  While the Lenders still wanted to find a "commercial resolution," counsel ended the letter by signaling that, if progress was not made, "the Lenders are united in their willingness to take adversarial action against the Loan Parties[.]"

51.     Three days later, on January 27, 2023, counsel for the Lenders followed up with an email to the board members.  The Lenders' frustration was apparent.  They stated that, absent progress, "the Lenders will have no choice but to re-evaluate the current course of action and

determine whether their interests are better served by terminating the forbearance . . . and exercising rights and remedies against [BYJU's]."

52.     Nothing changed.  T&L continued to fail to meaningfully respond to the Lenders' term sheet.  On February 8, 2023, counsel for the Lenders followed up on its earlier email, ratcheting up the tone of its communication.  As a result of BYJU's "utter disregard of [its] obligations under the Credit Agreement and Forbearance Agreement," "the Lenders are now in the process of preparing to pursue alternative options, including exercise of their rights and remedies under the Credit Agreement[.]"

53.     Two days later, on February 10, 2023, the forbearance period expired by its own terms.  Less than a month later, the Lenders directed their agent, GLAS, to exercise remedies, as discussed below.

**E.      The Debtor's Apparent Transfer or Redemption of Its Limited Partnership Interest in Camshaft Fund to a Third-Party Entity.**

54.     As of February 2023, the parties had entered into nine formal waivers and amendments to their Credit Agreement to address the outstanding Defaults, which then had matured into Events of Default (after the Defaults were not cured).

55.     At that time, the Debtor had misled the Lenders to believe that it had well over $500 million in liquid assets.  As disclosed on January 23, 2022, T&L's unaudited financial statements for the period ended September 30, 2022 showed that the Debtor had well over $██ million in "Cash and Bank" balances at that time.  Consistent with earlier financial disclosures, T&L's unaudited financial statements for the period ended December 31, 2022, which were disclosed in mid-March 2023, similarly showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $██ million (based on prevailing exchange rates).  To state the obvious, both of these financial statements showed that the Debtor—the borrower on a

defaulted loan—had ███████████ of dollars in liquid cash or cash equivalents available to it to service its debt.

56.     Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by the Debtor in cash or in one of its bank or brokerage accounts, as the "Cash and Bank" label suggested.  Instead, those funds already had been transferred to Camshaft Fund.  Further, whatever interest in Camshaft Fund that the Debtor held or received on account of its $533 million in transfers was itself apparently soon to be transferred or redeemed, again unbeknownst to the Lenders and GLAS.

57.     After the final forbearance expired on February 10, 2023, GLAS, at the Lenders' direction, began exercising remedies.  On March 3, 2023, GLAS accelerated all amounts outstanding—over $1.2 billion in principal and outstanding interest and fees—under the term loans to become due and payable immediately.  That same day, GLAS also exercised control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Pohl as the Debtor's sole director.  At the direction of GLAS, the sole shareholder of the Debtor, Pohl then appointed himself as the Debtor's sole officer.

58.     As laid out in this Complaint, the Debtor, through Pohl, understands that, sometime between December 31, 2022 and Pohl's appointment on March 3, 2023, the Debtor apparently transferred or redeemed, *again*, the $533 million—or the limited partnership interests (or their equivalent) in Camshaft Fund that had been received on account of the April and July 2022 transfers—to an undisclosed BYJU affiliate in the United States.  As the Debtor's former sole director and officer, Riju Ravindran, admitted in a declaration under oath filed in the earlier Delaware state court litigation, "[p]rior to the commencement of the present action [*i.e.*, May 3, 2023], **the amount to the credit of Alpha with the Investment Fund was moved to another**

**BYJU's-affiliated entity within the United States**." Ex. 8, June 25, 2023 R. Ravindran Decl. ¶ 10 (emphasis added). Based on a detailed review of the Debtor's bank statements, the referenced "Investment Fund" is Camshaft Fund.

59. Additionally, in a lawsuit that Camshaft filed prepetition against the Debtor in Florida, Camshaft alleged that the Debtor had transferred its entire limited partnership interest in Camshaft Fund (what Riju Ravindran called "the amount to the credit of Alpha with the Investment Fund") "[i]n the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's [Alpha]." Those allegations are consistent with T&L's financial disclosures as of September 30 and December 31, 2022, and Ravindran's sworn statements. If true, Camshaft's allegations place the date of this transfer at sometime between December 31, 2022 and March 3, 2023.

60. What is abundantly clear is the Debtor's former management's motivation for transferring or redeeming the Debtor's interest in Camshaft Fund: to conceal the assets from the Lenders and GLAS. The Debtor made the transfer with the express intention of frustrating GLAS's and the Lenders' contractual rights under the term loan agreements. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1.2 billion outstanding on the term loans. Further, the parties had just entered into a forbearance agreement expiring on February 10, 2023, at which point GLAS, acting at the Lenders' direction, could exercise those remedies. Commercial discussions were breaking down and reaching an impasse, and the Lenders had clearly signaled their intention to begin exercising remedies. The logical inference, if the sworn statement of Riju Ravindran and allegations of Camshaft are to be believed, is that the Debtor made the transfer on or about February 10, 2023, before the Lenders could exercise remedies. The Debtor's former representatives knew they had no defense to the Lenders exercising remedies. Amendment No. 7 reaffirmed that the Debtor's

20

failure to cure the Specified Defaults "**entitles**" the Lenders to exercise remedies, and *three times* acknowledged that "*none* of the Specified Defaults can be cured or remedied." Ex. 7 at 6, 11–12 (emphasis added). This is a classic fraudulent transfer fact pattern: a borrower concealing virtually all of its assets just as a forbearance agreement is about to expire or has expired.

61.     Riju Ravindran's own counsel later admitted to such a fraudulent motive in a public hearing in a Delaware court, with numerous Lenders listening in:

> [GLAS and Pohl] raised this issue of the $500 million transfer as a reason to rule against defendants, and obviously this is -- you know, when first hearing about it, it raises [*sic*] antenna. I understand that, Your Honor.
>
> . . . **Byju's moved the funds, and Byju's moved the funds to an entity that it controls in the United States**. The money is in the United States. I don't know exactly when it was done.
>
> **To be candid, these were based on fear of lenders acting expeditiously** with these unconscionable tactics to assets without a proper determination and due process under the credit agreement. **Byju's felt the need to protect the cash**.

62.     Regardless of where and when the money was moved, the Debtor's currently-available bank statements record no transfer of funds or redemption of interests back to the Debtor from any Camshaft entity. Nor has Riju Ravindran or any other current or former representative of T&L or the Debtor ever shared with Pohl any record of the Debtor receiving consideration for any purported transfer or redemption of the Debtor's limited partnership interest in Camshaft Fund.

**F.      The Debtor's Concealment of the Transfers or Redemptions from the Lenders and GLAS.**

63.     At the beginning of 2023, the Lenders continued to work towards a negotiated resolution, if one could be had. But those efforts were exhausted without success and with only more concerns, including regarding the BYJU's enterprise's overall financial condition and the predicted risk that the Debtor would move the vast majority of the money it held to frustrate the Lenders' remedies. In light of the lack of meaningful progress and responsiveness by their

21

borrower and its affiliates, the Lenders exercised their contractual remedies to address the acknowledged Events of Default and to protect their collateral.

64.    As mentioned, on March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default and began exercising remedies.   Immediately, T&L's founder and CEO Byju Raveendran reached out to the Lenders, requesting that the parties reengage on a potential resolution.   The Lenders were willing to engage, which then prompted several weeks of negotiation.   During those negotiations, an area of focus for the Lenders was on cash verification.

65.    On March 16, 2023, T&L posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that the Debtor had the equivalent of well over $███ million in "Cash and Bank" balances as of December 31, 2022.

66.    Also in March 2023, in support of broader negotiations among the parties, the Lenders' counsel requested that BYJU's confirm the funds available to the Debtor.  In response to this cash verification request, BYJU's representatives agreed to a roundabout cash verification process with the Lenders.   To that end, on or about March 27, 2023, BYJU's outside counsel informed one of the Lenders' advisors that, on a recent Zoom call, he watched his client virtually log into a bank portal and saw a cash statement showing that the account held a substantial amount of cash, which counsel said was in the United States.   Counsel disclosed the exact amount of funds he saw, an amount that is consistent with the aggregate amount of the April and July 2022 transfers. Counsel did not disclose the account holder's identity, and he did not disclose which bank held the account.

67.    The Lenders sought comfort as part of broader negotiations that substantial liquid assets in the United States were available for debt service, and BYJU's statements naturally—and

very likely intentionally—led the Lenders to believe that the Debtor continued to hold or have access to this cash.  It now appears that BYJU's counsel may have shown the Lenders' advisor a bank account belonging to a BYJU's entity other than BYJU's Alpha, without disclosing that critical fact.

68.    The Lenders' hopes for a negotiated resolution turned out to be misplaced, however.  BYJU's would frequently go incommunicado during the negotiations and ultimately appeared insincere about trying to enter into a completed amendment.

69.    Then, on May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery, seeking confirmation that, pursuant to the Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control of the Debtor.  *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023).  Upon commencing that action, the Lenders had every reason to believe that the Debtor had in its possession a significant sum of money:



70.    Five days later, during a May 8, 2023 call, Byju Raveendran, with his General Counsel on the line, told one of the Lenders' advisors that the Debtor no longer had the money.  Rather, "**the mon[ey] is someplace the Lenders will never find it**."

71. Byju Raveendran's comments were so shocking that the Lenders' advisor wrote them down on a piece of scratch paper:



72. On May 18, 2023, the Chancery Court issued a *Status Quo* Order—an interim order similar to a temporary injunction—authorizing Pohl to remain in control of the Debtor as sole director and officer pending a final case decision and requiring the BYJU's defendants in that lawsuit to provide Pohl with access to and control of the Debtor's open bank and other accounts. Other than the Debtor's bank statements reflecting the Camshaft Fund transfers, BYJU's never shared and, in fact, flatly refused to disclose, any information about the transfers to Camshaft with the Debtor's current director and officer, Pohl.

73. On August 4, 2023, the Chancery Court held a bench trial.  On November 2, 2023, it found that "the Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" then "seat[]" Pohl.

74. On November 13, 2023, the Chancery Court issued its Final Order and Judgment declaring that GLAS's enforcement steps on March 3, 2023 were valid and effective as to the removal of Riju Ravindran as the preexisting director and officer of the Debtor, and the appointment of Pohl to serve as the Debtor's sole replacement director and officer.

**G.    The Debtor's Reasons for Transferring $533 Million to Camshaft Fund.**

75.    There is no readily apparent legitimate reason for why the Debtor would "invest" over half a billion dollars in Camshaft Fund, particularly after multiple loan defaults had occurred. Camshaft Fund is an unknown and unproven hedge fund founded in August 2020 by Morton—then a 23-year old with no formal training in investing and money management, and no apparent qualification to manage a hedge fund—and which previously listed on federal and state regulatory filings the address of an International House of Pancakes in Miami as its principal place on business.

76.    Specifically, Camshaft Fund was formed on August 13, 2020, as a Delaware limited partnership.  Its sole general partner is Camshaft Management, which had been formed two weeks earlier, on July 28, 2020.  Its investment manager, Camshaft Advisors, also was formed on July 28, 2020.

77.    All three Camshaft entities have disclosed an affiliation with Morton.  Morton controls Camshaft.  According to public filings, Morton is the managing member and sole owner of both the Camshaft general partner and the investment manager.  Moreover, Camshaft Advisors' brochure states that Camshaft relies upon Morton as a "[k]ey [p]erson."  Ex. 4 at 10.

78.    Hedge funds file a so-called "Form D" with the SEC in connection with an exempt offering of securities under the federal securities laws.  In its Form D filed on September 11, 2020, when it launched, Camshaft Fund disclosed an address at 285 NW 42nd Avenue in Miami. Camshaft Fund disclosed the same address for Morton.  Camshaft Advisors' Form ADV, filed on October 26, 2023, identified Morton as the Chief Executive Officer and Chief Compliance Officer.



79.     Likewise, Camshaft Management, as General Partner, and Camshaft Advisors, as Investment Manager, disclosed their offices as being located at the same address in their 2020 and 2021 filings with the Florida Secretary of State.

80.     Since at least the 1990s, that address—285 NW 42nd Avenue—has been home to an IHOP.  IHOP's distinctive blue awning can be seen from this satellite image of the address:



81.     This is a ground-level picture of the location taken a few months ago:



26

82.     This IHOP was the principal place of business of the Fund, General Partner, and Investment Manager, to which the Debtor transferred over half a billion dollars.

83.     More recently, Camshaft Advisors publicly disclosed that, as of April 2023, it had $595,845,395 in regulatory assets under management in Camshaft Fund, the only investment advisory client it had under management. Ex. 4 at 4. Camshaft Advisors publicly reported this same amount in regulatory assets under management again in its Form ADV on October 26, 2023. Based on the Debtor's bank statements, it appears that almost 90% of this amount is attributable to the Debtor's April and July 2022 fraudulent transfers.

84.     There is no disclosed evidence of the Debtor having received *any* return accruing from its enormous investment in the Camshaft Fund, and no capital account balances, financial statements, investor updates, or other reports or information from Camshaft have been shared with the Debtor or GLAS. Instead, it appears that the Debtor's former management chose to "invest" half a billion dollars in an unproven, high-risk hedge fund managed by a young and unknown portfolio manager with no reputation in the industry, at a time when the Debtor was in default on billion-dollar secured loans.

85.     Alarmingly, there are no material restrictions on Camshaft Fund's investment activities. As disclosed in the Camshaft Brochure, Camshaft Fund relies upon numerous high-risk and uncertain trading strategies, including those that rely on leverage and short selling, distressed and illiquid securities, derivative instruments, and emerging markets investments. Ex. 4 at 8–9, 17. Not surprisingly, one of Camshaft's self-disclosed risks is that investors must be "prepared to lose their entire investment" and for this reason, an investment in the Camshaft Fund "is not a complete investment program" (*id.* at 10):



> ***Potential Loss of Investment***. An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

86.     While the Debtor and its stakeholders have hundreds of millions of dollars at risk, Camshaft does not.  It is profiting at its client's expense with an above-market fee structure.  Upon information and belief based on Camshaft's disclosures, Camshaft has charged a 3% per annum management fee—substantially higher than many top-tier, established hedge funds[4]—directly from the Debtor's (or the new holder's) capital account continuously since the investment was first made.  *Id.* at 4, 6.  Based on the Debtor's investment activity, a 3% annual fee would result in **over $20 million** in aggregate management fees to date having been paid out of the Debtor's capital account (assuming no profits, losses or distributions), a direct diminution in the value of its investment in Camshaft.  Additionally, upon information and belief, Camshaft charges an above-market performance fee: 30% subject to a 12% hurdle (*i.e.*, 30% of the net returns achieved by a capital account in excess of 12%).  Camshaft charges these high fees even though, in Morton's own view, trading is "a lot more simple than people make it out to be," in fact, "it's really simple."[5]

---

[4]     *See e.g.*, Jacob Wolinsky, *Institutionsare Dumping Their Hedge Fund Allocations on a Massive Scale*, FORBES (Nov. 28, 2022, 03:54 PM), https://www.forbes.com/sites/jacobwolinsky/2022/11/28/institutions-are-dumping-their-hedge-fund-allocations-on-a-massive-scale/?sh=3bbf343836f2 ("According to HFR data, the average management fee was 1.5%[.]"); *Hedge Fund Launches Surge Through Mid-Year, Dominated by Multi Strategy inflation Trading*, Hedge Fund Rsch. (Oct. 4, 2023), https://www.hfr.com/news/hedge-fund-launches-surge-through-mid-year-dominated-by-multi-strategy-inflation-trading ("The average industry-wide management fee was unchanged from the prior quarter at 1.36 percent[.]").

[5]     *See* Uptown Creation, *William C. Morton "Lessons From a 24 yo Hedge Fund Manager" on Social Seller w Conor Paulsen Ep 29.1*, YOUTUBE (Aug. 31, 2021), https://www.youtube.com/watch?v=S6Z3u8Ka_TA.

87.     With these fees extracted from the Camshaft Fund, Morton appears to have dramatically upgraded his own personal living standard.   Morton appears to have recently purchased three luxury cars for himself: a 2023 Ferrari Roma, a 2020 Lamborghini Huracán EVO, and a 2014 Rolls-Royce Wraith.   Additionally, upon information and belief, another Florida-domiciled entity Morton controls, Camshaft, LLC, lists its principal place of business at 18555 Collins Avenue, Suite #5405, Sunny Isles Beach, Florida 33160—a multi-million dollar, residential condominium overlooking the ocean and commonly known as the Porsche Design Tower.   The Lenders are owed over $1.2 billion, and Morton is extravagantly spending their money on himself.

**H.     Camshaft's Refusal to Provide Discovery about the $533 million.**

88.     As noted above, upon learning that the $533 million had been invested in Camshaft Fund, on September 5, 2023, GLAS sued Camshaft in Florida state court.   Concurrently, GLAS served targeted document requests and interrogatories on Camshaft, and also filed an *ex parte* emergency motion seeking to expedite Camshaft's response deadlines.

89.     GLAS focused on the factual issues central to its fraudulent transfer claims. GLAS's six interrogatories and twelve document requests were aimed at understanding the reasons for and circumstances behind the Debtor's original transfers to Camshaft Fund, along with what happened to those funds, including whether Camshaft Fund still held all or a portion of the original $533 million investment.   In particular, GLAS sought, with key portions highlighted:

> Interrogatory No. 1.   Identify the details of each transfer of money from BYJU's Alpha or BYJU's to Camshaft, including but not limited to:  (i) the date of the transfer, (ii) the transferor and transferee, (iii) the exact amount of funds transferred, (iv) the Person that authorized the transfer, (v) the purpose of the transfer, (vi) where those funds currently are located, and (vii) in whose name those funds are currently held.

> Request for Production No. 3. All account records—including but
> not limited to (i) capital account statements, (ii) custodial
> statements, (iii) financial statements, and (iv) statements of
> management fees, transaction fees, placement fees, expenses, and
> other compensation charged (including performance-based
> compensation)—associated with any of BYJU's Alpha, BYJU's, or
> any Money Transfer.
>
> Request for Production No. 6. All agreements entered into between
> Camshaft, on the one hand, and BYJU's Alpha, BYJU's, or their
> representatives, on the other hand, including limited partnership
> agreements, subscription agreements, side letters, and due diligence
> confirmations.

90.    On September 11, 2023, the Florida court granted GLAS's expedition motion.

91.    On September 12, 2023, GLAS served Camshaft Fund.  Service on Camshaft

Advisors and Camshaft Management trailed until September 20 and 22, 2023, respectively, as

those two entities had originally improperly designated a P.O. Box as their registered agent.

92.    Then, the gamesmanship by Camshaft began.  Over the next four months, Camshaft

used every trick in the book to stall having to provide basic discovery:

- On September 18th, Camshaft Fund claimed it had not been served six days earlier.
  Though GLAS had served the Fund's registered agent, Legalinc Corporate
  Services—the registered agent disclosed in Camshaft Fund's filings with the
  Delaware Secretary of State—the Fund nonetheless claimed that it had not actually
  engaged Legalinc "due to an oversight by the [formation] law firm."

- On September 21st, the three Camshaft Defendants moved to have the Court vacate
  its expedition order, then set GLAS's discovery requests on a regular, 45-day
  schedule.

- On October 8th, the Florida court reset the discovery deadlines on a regular
  schedule.  As a result, the first of Camshaft's responses were due on October 26,
  2023.

- On October 10th, Camshaft moved to transfer and to dismiss.  Camshaft made
  numerous misstatements of law, claiming that GLAS "lacks standing to assert its
  claims because it itself does not stand in the position of a creditor" of the transferee
  Camshaft (as opposed to the transferor, the Debtor), GLAS lacks a "claim" under
  Florida's fraudulent transfer statutes because it is "not pursuing such a claim against
  BYJU's in any litigation" (even though the Delaware Chancery Court found that a
  valid Event of Default occurred, empowering GLAS to take control of the Debtor),
  and that the Credit Agreement somehow preempted GLAS's claim for fraudulent
  transfer.

- On October 25th, Camshaft moved to stay discovery.

- Camshaft did not serve any discovery responses on the October 26th due date, but instead waited until November 6th, which was the separate deadline for Camshaft Advisors and Camshaft Management.  On that date, Camshaft served three pages of boilerplate objections.  Ex. 9.  Camshaft generically claimed that GLAS's requests were objectionable for twelve reasons, but only identified one interrogatory specifically as being objectionable.  *Id.* at 2.

93.     For its part, GLAS filed two motions to compel, making every effort to locate the $533 million.  However, during the initial case management conference on December 14, 2023, the Florida court declined to entertain argument on the pending discovery motions, instead deciding that it would resolve Camshaft's motions to dismiss and transfer first.  With agreement of the parties, the Florida court set argument on those motions for February 2, 2024, a date subject to the automatic stay resulting from the Debtor's bankruptcy filing.

**I.     The Debtor's Information Demands to Camshaft Fund.**

94.     Following the Delaware Chancery's November 13, 2023 final judgment that Pohl is the "valid" sole director and officer of the Debtor, Pohl—on behalf of the Debtor—promptly requested Camshaft Fund to provide information concerning to the Debtor's fraudulent transfers. Ex. 10.  Pohl explained that "former management of [Borrower] . . . failed to provide to [Pohl] information regarding the [Camshaft] Transfers and Documents," thus "[Pohl] lack[s] this information."  *Id.* at 1.  Pohl then requested "any and all information in the possession or control of Camshaft regarding the Investment, the Transfers, and Documents," and listed specific categories of requests, including (i) all account records associated with the Debtor and (ii) copies of Camshaft Fund's limited partnership agreement and any related agreements between the Debtor and Camshaft Fund.  *Id.* at 1–3.

95.     On December 4, 2023, Camshaft responded, flatly rejecting Pohl's information demand on the purported grounds that the Debtor was no longer a limited partner in Camshaft

Fund. Ex. 11.  Specifically, Camshaft acknowledged for the first time that "BYJU's Alpha is a former limited partner of Camshaft Capital Fund," and that the Debtor currently has a "zero-balance capital account," without specifying why that was the case, *i.e.*, as a result of a transfer or a redemption. *Id.* at 1.   Accordingly, Camshaft provided Pohl with none of the requested information regarding the Debtor's once held interest in Camshaft Fund.

96.     On the very same day, Camshaft sued the Debtor without notice, seeking a declaratory judgment that it would not have to provide any such documents or information. *See Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, Case No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023).  In its Complaint, Camshaft claimed for first time that, sometime in the first quarter of 2023, "BYJU's [Alpha] transferred all of its investment interest as a limited partner in Camshaft Capital Fund to a third party."  Camshaft conspicuously failed to identify that third party by name, or any other details about that transfer.  Pohl does not have any record of the transfer, let alone the Debtor receiving any consideration for it.

**J.      Camshaft's Misrepresentation of Who Owns the $533 million.**

97.     It is not clear that Camshaft and its recent allegations should be believed.  Camshaft has opportunistically flipped between the Debtor still owning the $533 million—*and not*—depending on which position allows it to avoid having to disclose what happened to the money. Weeks before Pohl requested the Debtor's account records related to Camshaft Fund, Camshaft represented to the Florida court that the Debtor "owned" the $533 million.  Camshaft used that purported fact to argue that GLAS's lawsuit had to be dismissed, because the Debtor was an indispensable missing party to the Florida litigation.

98.     As laid out below, it is impossible to square this with Camshaft's inconsistent representations about the current ownership of the $533 million.  If the Debtor did not still own

the $533 million, then Camshaft misrepresented the salient facts to the Florida court when it characterized the Debtor as an indispensable party.  Whoever else owned the money would have an interest in the litigation, but Camshaft did not argue that party was indispensable in an apparent effort to hide that third party's identity.

| What Camshaft claimed then: | What Camshaft claims now: |
|---|---|
| **(1)** GLAS's specious Complaint purports to ask the Court to seize $533 million in assets owned by BYJU's Alpha Inc. ("BYJU's") a non-party to this litigation invested into Camshaft Fund, based on statutory fraudulent transfer claims that require Plaintiff to prove, among other things, that BYJU's [Alpha] is "liable" to GLAS. Camshaft MTD at 1. | **(5)** More specifically, Camshaft is in doubt as to the absence of an statutory obligations it may have to disclose books and records information to BYJU's [Alpha], a former limited partner of Camshaft Capital Fund, because BYJU's [Alpha] has transferred all of its investment interest to another entity, resulting in BYJU's [Alpha] having a zero-balance capital account in Camshaft Capital Fund, thereby terminating its relationship with Camshaft.  Camshaft Compl. ¶ 3. |
| **(2)** It is clear on the face of GLAS's Complaint that BYJU's [Alpha] is "materially interested, either legally or beneficially, in the subject-matter of the suit" so as to be an indispensable party.  After all, it is BYJU's [Alpha]'s funds that GLAS is seeking to obtain. Camshaft MTD at 11. | **(6)** In the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's [Alpha], BYJU's [Alpha] transferred one hundred percent of its interest in Camshaft to a third party pursuant to the terms of the LPA.  As of the date of the transfer, BYJU's [Alpha] has a zero-balance capital account, thus terminating its Investment and making it a ***former*** limited partner of Camshaft Capital Fund.  Camshaft Compl. ¶¶ 25–26 (emphasis in original). |
| **(3)** And third, Plaintiff's position further illustrates that the thrust of this action is not a [sic] set a trial, or sue BYJU's [Alpha] for breach of contract to obtain a judgment establishing Plaintiff's entitlement to the funds, but instead to obtain discovery that Plaintiff otherwise would not be entitled to in the prior pending litigations, in other fora, between Plaintiff and BYJU's [Alpha]—the actual party in interest and beneficial owner of the more than $500M in investments that Plaintiff seeks to seize in this litigation. Case Management Rep. at 9. | |
| **(4)** The borrower BYJU's [Alpha] is an indispensable party because Plaintiff is requesting that the Court seize BYJU's[] [Alpha's] approximately $500 million investment in Camshaft, and it is impossible to adjudicate that relief without affecting BYJU's[] [Alpha's] material interests in that property.  Plaintiff's Response completely fails to address the straightforward issue that BYJU's [Alpha] has an interest in the investment property and has clear due process rights under Florida law to defend that interest.  Camshaft MTD Reply at 10. | |

## K.     BYJU's' Ongoing Obfuscation of What Happened to the $533 million.

99.     On information and belief, as with Camshaft, BYJU's also refused to come clean with what happened to the $533 million.  As noted, GLAS had filed the Florida Action on September 5, 2023.  Eight days later, T&L was obligated to furnish unaudited quarterly financial

information for the Q1 FY 2023-24 (*i.e.*, the fiscal quarter ended June 30, 2023). However, as relayed to BYJU's Alpha by the Lenders, T&L refused to furnish that financial information on that date, and still has not furnished it. This marked the first time that T&L failed to furnish any unaudited financial information for a fiscal quarter. Presumably, the reason for T&L's decision not to share unaudited financials is because those financials would reveal what had happened to the $533 million Camshaft investment. As compared to the December 31, 2022 unaudited financial statements, some other BYJU's entity presumably should be reporting an additional $533 million in "Cash and Bank" as of June 30, 2023—if Camshaft's allegations are to be believed.

100.  After months of saying nothing, BYJU's finally released an opaque and abstract statement on September 13, 2023, that only confirmed an insider was somehow the beneficiary of the fraudulent transfers and the money was, as threatened, outside the reach of BYJU's creditors.

101.  On November 21, 2023, GLAS, acting at the Lenders' direction, noticed a default for T&L's failure to furnish the Q1 FY 2023-24 unaudited financial statements. On the same day, GLAS also formally invoked its inspection rights under the Credit Agreement and demanded an investor call (which T&L had contractually agreed to hold each quarter). Pursuant to its right to request "such other information regarding the financial condition, business and operations of [T&L] or any of its subsidiaries as the Lenders may reasonably request," Ex. 1 at 91, GLAS further requested "a detailed written explanation of the business reasons for and purposes" of the $533 million in transfers to Camshaft Fund" and "a detailed written explanation of the current status of the funds wired to the Camshaft Fund," among other information about the Camshaft transfers.

102.  On information and belief, BYJU's never directly responded to those default notices and information requests. Instead, in an amended complaint filed with a New York state

court on December 11, 2023, BYJU's claimed that "the above notices have been issued in complete bad-faith," but made no effort to explain how.  BYJU's has no reasonable explanation.

103.    On information and belief, most recently, on Sunday, January 14, 2024, Byju Raveendran and his Chief Strategy Officer, Anita Kishore, requested a call with three of the Lenders, after GLAS, at the Lenders' direction, had sent a letter to T&L's shareholders informing them of the Lenders' imminent filing of the Indian equivalent to an involuntary bankruptcy petition against T&L in India (which ultimately was commenced on January 22, 2024).  That call occurred the next day, and, among other topics, the Lenders directly asked about the $533 million in transfers of their loan proceeds to Camshaft Fund—the questions that were at the top of their minds.  As the Lenders have relayed about the call:

104.    When asked if the $533 million still "exist[s]," Raveendran and Kishore both went silent.  Raveendran eventually asked Kishore to answer, but she continued to remain silent.  As the silence dragged on, Raveendran stepped in: "We have not touched that money."  Raveendran later doubled down on that representation.  When asked "[h]ow much cash is still in [BYJU's] that is attributable to [the Lenders'] $1.2 billion term loan," Raveendran answered "more than $500 million," which he promptly confirmed was "in cash and cash equivalents."  Yet when Ms. Kishore was asked if she agreed, she caveated her response: the "only source of information" she had about the $533 million was "the audit," later clarifying that she was referencing information received "as of October [2023] end" showing that the money was there.

105.    When asked why BYJU's had not provided the Lenders with verification of the cash's existence (which the Lenders had repeatedly requested, including in fall of 2023), Raveendran again went silent.  Later in the call, Raveendran disclosed that BYJU's' auditor—presumably the same source of information that Ms. Kishore had relied upon for her own

knowledge about the purported existence of the $533 million—would not agree to providing a cash verification certificate.

106.     When asked for the first time why the $533 million, if it in fact existed, was not being applied to paydown the term loans, Raveendran did not answer the question.  He instead pivoted to describing his efforts to sell certain of BYJU's' assets to pay down the loans.  When asked the same question for a second time, Raveendran again did not answer.  When asked the same question for a third time, he blamed the Lenders: "because of all your actions, we lost all the value."  If the Lenders continued to take "further action," Raveendran threatened that they would not get "max answer".  Near the end of the call, Raveendran finally offered that, after 1-2 asset sales to raise cash, he would be willing to negotiate with the Lenders about the application of the $533 million to their term loans.

107.     When asked why the $533 million was sent to Camshaft in the first place, Raveendran said it was to "protect" the money.  In Raveendran's own words, "I am not siphoning money."  Later, Raveendran alluded to there being an explanation for the Camshaft transfers, but he simply was not going to reveal it: "I can tell you that it was done for a reason and I don't want to tell you what that reason was."

108.     When asked to arrange a call with Morton, Raveendran could not do it.  He said: "I don't know William Morton, for me to arrange a call."

109.     Ultimately, Raveendran chastised the Lenders for acting "like only [Byju's] did anything incorrect."  It was Raveendran who had "suffered the most."

110.     This lawsuit now ensues.

*     *     *

## CAUSES OF ACTION

### COUNT ONE
### ACTUAL FRAUDULENT TRANSFERS
### (AGAINST CAMSHAFT FUND)

111.     The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

112.     Over the course of April and July 2022, the Debtor transferred approximately $533 million to Camshaft Fund, with the intent to hinder, delay, and/or defraud present or future creditors.  Those transfers constituted a transfer of property of the Debtor.

113.     There is direct evidence of the Debtor's actual fraudulent intent.  Byju Raveendran admitted that money had been moved to "someplace the Lenders will never find it" and that the transfers were made to "protect" the funds, and his brother Riju Ravindran's own counsel publicly acknowledged his clients' intent in moving the money was to frustrate the Lenders' remedies.

114.     Additionally, through the "badges of fraud" recognized by bankruptcy law and state fraudulent transfer law, including the Florida Uniform Fraudulent Transfer Act, there is significant circumstantial evidence of actual fraudulent intent:

- The transfers were concealed.  The Debtor's former representatives never disclosed the transfers to the Lenders, and, in fact, concealed the transfers in quarterly financial reports by disclosing that the Debtor purported to have over $██ million in "Cash and Bank."  The transfers to Camshaft Fund were neither "cash" nor "bank."

- The transfers were of substantially all of the Debtor's assets.

- The Debtor received less than reasonably equivalent value in return.  Pohl has no record of the Debtor receiving any consideration from Camshaft; even if there was consideration in the form of an illiquid limited partnership interest, it was inadequate, as summarized in Count Two.

- The Debtor immediately became insolvent post-transfers, if it was not already insolvent.  Post-transfers, the Debtor had over $1.2 billion in liabilities against less than a tenth of that amount in assets (and no ability to generate ongoing revenue). It was plainly insolvent.

37

- <u>The Debtor made the transfers shortly after incurring substantial debt</u>.  The Debtor began making the fraudulent Camshaft transfers within six months of entering into the Credit Agreement, on the heels of defaulting multiple times and entering into a temporary waiver agreement.

115.    The fact that the Debtor's former representatives and Camshaft have gone to such extreme lengths to conceal and confuse critical details about the transfers and what happened to the $533 million corroborates the actual fraudulent intent.

116.    Should the Debtor have subsequently transferred or redeemed the approximately $533 million invested—or, alternatively, the limited partnership interest held—in Camshaft Fund, such that the interest is now held by a third party, Camshaft Fund is still liable as the initial recipient and beneficiary of the investment.

117.    In light of the foregoing, the transfers should be avoided as fraudulent pursuant to Sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. § 726.105(1)(a)), and the Debtor should recover from Camshaft Fund pursuant to Section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT TWO**
**CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AGAINST CAMSHAFT FUND)**

118.    The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

119.    Over the course of April and July 2022, the Debtor transferred approximately $533 million to Camshaft Fund.  Those transfers were a transfer of property of the Debtor.

120.    At the time of those transfers, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of making the transfers, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the

Petition Date.  Specifically, the Debtor (a) was a special purpose financing vehicle with no active operations; (b) had defaulted on the term loans as early as March 2022, before the first transfer was made, and could foresee further defaults; (c) had no ability to comply with its obligations under the Credit Agreement, subsequent forbearance agreements, and other loan documents; and (d) owed the Lenders an amount of money, which would soon be accelerated, exceeding $1.2 billion, for which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

121.    The Debtor did not receive reasonably equivalent value in exchange for the April and July 2022 transfers to Camshaft Fund, an unproven high-risk hedge fund run by a young and unknown portfolio manager.  Any limited partnership interest that the Debtor received in Camshaft Fund—which is not registered under the securities laws and subject to strict restrictions on resale and transferability, along with well above-market fees and expenses—was not reasonably equivalent to the approximately $533 million that the Debtor invested.  Simply, the Debtor exchanged the most liquid asset on its balance sheet—cash sitting in checking and brokerage accounts—for a highly *illiquid* asset—a limited partnership interest in a no-name hedge fund, which has a thin market and accordingly would be expected to trade at a substantial discount. Indeed, the purpose of the Debtor's purported "investment" in Camshaft was to conceal assets, not to generate investment returns while minimizing risk of loss.

122.    Should that limited partnership interest and/or the approximately $533 million now be held by a third-party entity, Camshaft Fund remains liable because it is the initial recipient and beneficiary of the investment.

123.    In light of the foregoing, the Camshaft Fund transfers should be avoided as fraudulent pursuant to Sections 544(b)[6] and 548(a)(1)(B) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. §§ 726.105(1)(b) and 726.106(1)), and the Debtor may recover from Camshaft Fund pursuant to Section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

### COUNT THREE
### CONSTRUCTIVE FRAUDULENT TRANSFERS
### (AGAINST CAMSHAFT ADVISORS AND CAMSHAFT MANAGEMENT)

124.    The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

125.    Over the course of April and July 2022, the Debtor transferred $533 million to Camshaft Fund.  Since the Debtor transferred approximately $533 million to Camshaft Fund in April and July 2022, upon information and belief based on Camshaft's public disclosures, Camshaft Advisors and Camshaft Management have been charging an above-market 3% annual management fee directly from the Debtor's capital account (or any third-party's capital account holding some or all of the Debtor's approximately $533 million) on a monthly basis, along with an above-market performance fee of 30% subject to a 12% hurdle and potentially other expenses. Based on the Debtor's investments, a 3% annual fee would result in **over $20 million** in fees to date having been paid out of the Debtor's capital account (assuming no profits and losses or distributions).  Those transfers constituted a transfer of property of the Debtor.

---

[6]    Section 544(b) of the Bankruptcy Code authorizes the Debtor to avoid any transfer of an interest in its property that is voidable under applicable law by any creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Section 544(b) of the Bankruptcy Code and other applicable law, including the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101 *et seq*.

126.    At the time that it paid the fees in question, the Debtor, under applicable law, was insolvent or became insolvent as a result of initiating the transfers to Camshaft that resulted in these fee payments, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date.  Specifically, the Debtor (a) was a special purpose financing vehicle with no active operations; (b) had defaulted on the Term Loans before the first transfer was made and could foresee further defaults; (c) had no ability to comply with its obligations under the Credit Agreement, the subsequent forbearance agreements, and the other loan documents; and (d) owed the Lenders an amount of money, which would soon be accelerated, exceeding $1.2 billion, for which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

127.    The Debtor did not receive reasonably equivalent value in exchange for the payment of the alleged management or performance fees, particularly where the fees being charged are so substantial, including in relation to prevailing market fees and particularly in light of the information uncovered about Camshaft, its operations, and its Chief Executive Officer and Chief Compliance Officer Morton, as set forth above.  Camshaft Fund is simply an unproven, high-risk hedge fund run by a young and unknown portfolio manager that apparently was chosen by the Debtor's prior management specifically for its anonymity.  As a result, the Debtor has suffered millions of dollars in damages, with the exact amount to be determined at trial.

128.    In light of the foregoing, the transfers should be avoided as fraudulent pursuant to Sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. §§ 726.105(1)(b) and 726.106(1)), and the Debtor should recover from Camshaft Advisors and Camshaft Management pursuant to Section 550 of the Bankruptcy Code the full amount of such

transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the

benefit of the Debtor's bankruptcy estate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BYJU's Alpha, Inc. requests that this Court enter judgment and

granting the following relief:

a. Avoidance of the actual and constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550 and the Florida Uniform Fraudulent Transfer Act (or any other applicable state law);

b. Award of (a) the return of property to the Debtor's estate that is the subject of the avoidable fraudulent transfers alleged herein; or (b) monetary damages under 11 U.S.C. § 550 reflecting the value of the avoidable transfers alleged herein (plus the value of any additional avoidable transfers the Debtor learns, through discovery or otherwise, were made to one or more of the Camshaft Defendants);

c. Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

d. Pre- and post-judgment interest up to the statutory maximum; and

e. Any other relief that this Court may deem just, proper, or equitable under the circumstances.

Dated: February 2, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (pro hac vice forthcoming)
Benjamin Finestone (pro hac vice forthcoming)
Daniel Holzman (pro hac vice forthcoming)
Jianjian Ye (pro hac vice forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

Proposed Counsel for Debtor, BYJU's Alpha, Inc.

43