## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (JTD) |
| | ) | |
| | ) | |
| BYJU'S ALPHA, INC., | ) | Adv. Pro. Case No. 24-50013 (JTD) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAMSHAFT CAPITAL FUND, LP, | ) | |
| CAMSHAFT CAPITAL ADVISORS, LLC, | ) | |
| CAMSHAFT CAPITAL MANAGEMENT, LLC, | ) | |
| RIJU RAVINDRAN, and INSPILEARN LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEBTOR'S BRIEF IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .....................................................................................................5

    A.    Within four months of executing the Credit Agreement, the Debtor defaulted on $1.2 billion in Term Loans....................................................5

    B.    Shortly thereafter, the Debtor made $533 million in transfers to Camshaft Fund, rendering it insolvent, if not already so. ........................................8

    C.    The Debtor did not receive reasonably equivalent value from Camshaft Fund in exchange for the $533 million, as a robust fact investigation confirms. ..........................................................................................8

    D.    There is no indication that Riju Ravindran conducted any due diligence or investigation into Camshaft Fund before transferring the $533 million...............17

    E.    Riju Ravindran then transferred the $533 million to Inspilearn and concealed the fraudulent transfer for months.........................................18

    F.    Only upon its bankruptcy filing did the Debtor begin to receive *some* meaningful information about the location of the $533 million. ..........................22

LEGAL STANDARD...........................................................................................................23

ARGUMENT .......................................................................................................................24

I.    THE DEBTOR HAS A LIKELIHOOD OF SUCCESS OF PREVAILING ON THE MERITS. ..................................................................................................24

    A.    Count I:  Defendants repeatedly moved the $533 million with the actual intent to hinder, delay, or defraud the Debtor's creditors. ....................................24

    B.    Counts II-III:  Defendants' transfer of $533 million was a constructive fraudulent transfer. ...................................................................................29

    C.    Count IV:  Riju Ravindran breached his non-waivable fiduciary duties to the Debtor by transferring $533 million to a sham hedge fund and then to Inspilearn.......................................................................................32

II.    THERE IS A RISK OF IRREPARABLE HARM.............................................33

    A.    There is a material risk that Defendants will further conceal the $533 million. .......................................................................................34

    B.    Even if the Debtor ultimately finds the $533 million, there is a material risk that it will not be able to practically recover the funds.........................................37

III.    THERE IS NO MEANINGFUL HARM TO ANY OTHER INTERESTED
PARTY. .............................................................................................................38

IV.    THE PUBLIC INTEREST IS SERVED BY GRANTING AN INJUNCTION................40

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Energy, Inc. v. DQE, Inc.*,
    171 F.3d 153 (3d Cir. 1999)..................................................................39

*In re Am. Film Techs., Inc.*,
    175 B.R. 847 (Bankr. D. Del. 1994) ...................................................40

*In re Am. Tissue, Inc.*,
    2006 WL 3498065 (Bankr. D. Del. Dec. 4, 2006)...............................34, 37, 39, 40

*In re Charys Holding Co., Inc.*,
    2010 WL 2774852 (Bankr. D. Del. July 14, 2010)..............................27, 29, 31

*EBC I, Inc. v. Am. Online, Inc.*
    (*In re EBC I Inc.*),
    356 B.R. 631 (Bankr. D. Del. 2006) ...................................................28

*EHT US1, Inc. v. EHT Asset Mgmt, LLC*,
    2021 WL 3828556 (Bankr. D. Del. Aug. 27, 2021) ...........................33, 36

*In re Focus Media Inc.*,
    387 F.3d 1077 (9th Cir. 2004) ............................................................36, 37

*Friedman v. Heart Inst. of Port St. Lucie, Inc.*,
    863 So.2d 189 (Fla. 2003).....................................................................37

*In re Grandparents.com, Inc.*,
    614 B.R. 625 (Bankr. S.D. Fla. 2020)..................................................28, 29

*Hoxworth v. Blinder, Robinson & Co.*,
    903 F.2d 186 (3d Cir. 1990)..................................................................33

*Kos Pharms. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)....................................................................5

*Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc.*
    (*In re R.M.L., Inc.*),
    92 F.3d 139 (3d Cir. 1996)....................................................................31

*Mishkin v. Kenney & Branisel, Inc.*,
    609 F.Supp. 1254 (S.D.N.Y. 1985) .....................................................38

*In re Netia Holdings S.A.*,
    278 B.R. 344 (Bankr. S.D.N.Y. 2002) .................................................38

iii

*O'Malley v. Boris*,
  2002 WL 453928 (Del. Ch. Mar. 18, 2002)............................................................31

*Opioid Master Disbursement Tr. II v. Covidien Unlimited Co.*
(*In re Mallinckrodt PLC*),
  2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) (Dorsey, J.) ...................................25, 26, 27

*In re PWS Holding Corp.*,
  303 F.3d 308 (3d Cir. 2002)........................................................................37

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017).....................................................................23, 24, 38

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015)........................................................................39

*In re Soundview Elite Ltd.*,
  543 B.R. 78 (Bankr. S.D.N.Y. 2016) ...............................................................39

*Takeda Pharm. USA, Inc. v. W.-Ward Pharm. Corp.*,
  2014 WL 5088690 (D. Del. Oct. 9, 2014) ...........................................................23

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*,
  222 F.3d 132 (3d Cir. 2000)........................................................................33

*In re Team Sys. Int'l, LLC*,
  2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...................................... *passim*

*In re TOUSA, Inc.*,
  437 B.R. 447 (Bankr. S.D. Fla. 2010)...............................................................32

*Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*,
  906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Tr. v.*
  *Billett*, 931 A.2d 438 (Del. 2007) .................................................................32

*Variant Holding Co. v. Gettel*
(*In re Variant Holding Co.*),
  Case No. 15-50931-BLS (Bankr. D. Del. July 27, 2015) ...........................................39

*In re Victor Int'l, Inc.*,
  97 Fed. App'x. 365 (3d Cir. 2004)..................................................................25

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)................................32

**Statutes**

11 U.S.C. § 105(a) .................................................................................23, 40

11 U.S.C. § 362(a)(3) ....................................................................................................32

11 U.S.C. § 548(a)(1)(A) ..............................................................................................24

11 U.S.C. § 548(a)(1)(B) ..............................................................................................29

Fla. Stat. § 726.105(1)(a) ..............................................................................................24

Fla. Stat. § 726.105(1)(b) ..............................................................................................29

Fla. Stat. §726.106(1) ...................................................................................................29

Investment Company Act of 1940 Section 3(C)(1) .....................................................12

**Rules**

Fed. R. Bankr. P. 7065 .............................................................................................23, 40

Federal Rule of Civil Procedure 65 .........................................................................23, 40

**Other Authorities**

17 C.F.R. § 230.502(c) ..................................................................................................12

17 C.F.R. § 230.506(b) ..................................................................................................12

## INTRODUCTION

1.       On February 16, 2024, after due process, this Court ordered the three Camshaft Defendants and the Debtor's former director and officer, Riju Ravindran, to provide expedited discovery within 10 days into the $533 million (the "Alpha Funds"), the principal asset of the Debtor's estate.  Although the Camshaft Defendants flaunted this Court's order and did not identify (and still have not identified) the location of the funds, what little the Debtor learned is deeply troubling.  Though the money still appears to exist, the Debtor does not know where the money is located, when Ravindran may seek to again move the funds, or how much of it remains.  On the Petition Date, Defendants, in disregard of the automatic stay and this Court's *in rem* jurisdiction, moved the funds outside of the United States, apparently at Ravindran's direction.  These revelations warrant the Court's **immediate** intervention to prevent Defendants' ongoing efforts to not only conceal the $533 million (or whatever of it remains) once again, but also to further place the money beyond the reach of this Court, or any court in the United States.  The Debtor, therefore, requests that the Court order Defendants to deposit the entirety of the funds with associated accrued interest, which currently sits *in an undisclosed offshore trust*, into the Court's registry.[2]  Otherwise, that money may never be recoverable, as Ravindran has repeatedly proven his willingness to flaunt Court orders in order to fulfill his older brother's promise of putting the "money [] someplace the Lenders will never find it."

2.       Specifically, per Camshaft's sworn Interrogatory answers (Exhibit 1):  on February 1, 2024—*the Petition Date*—a former affiliate of the Debtor's called Inspilearn, a Delaware LLC for which ███████ serves as the sole manager (*see* Exhibit 2), transferred its limited partnership

---

[2]      Alternatively, in the event the offshore trust holds securities on account of the $533 million, the Debtor requests that the securities be deposited with a nationally-recognized brokerage firm approved by the U.S. Trustee and the Debtor, and that the Debtor's sole director and officer, Timothy Pohl, be given exclusive control over such account.  Mr. Pohl will not make any transactions out of such account absent further order of the Court.

("LP") interest in Camshaft Fund "to a non-US trust on behalf of Inspilearn." Ex. 1 at 4, Answer to Interrog. No. 1.  To this day, Camshaft still refuses to disclose (despite multiple meet and confers and two Court orders) the name and jurisdiction of this "non-US trust," which it incredibly claims is "not relevant," and further has taken the position that it "cannot value the Camshaft LP interest transferred[,]" leaving the Debtor with no visibility into where or in what form the $533 million exist.  *Id.* at 6, Answer to Interrog. No. 4.  According to Camshaft, this "transfer process started in November 2023," the very same month the Delaware Chancery Court issued its ruling finding Ravindran's removal and Timothy Pohl's appointment as the Debtor's sole director and officer "valid."  *Id.* at 4, Answer to Interrog. No. 1.  Upon receiving the LP interest on the Petition Date, the non-US trust "immediately redeemed" its interest.  *Id.* at 6, Answer to Interrog. No. 4. Camshaft also failed to disclose whether this was a redemption in cash or in-kind (*i.e.*, securities). *See id.* at 9, Answer to Interrog. No. 8 (claiming that the Alpha Funds were invested in "a fixed income portfolio").

3.      Camshaft claims that the ███████-governed Inspilearn "represented to Camshaft that it had the right to transfer the Alpha Funds," *i.e.*, the $533 million, through "representations and warrants that . . . are robust and comparable to an opinion letter."  It is hard to believe how Inspilearn, as an extension of ███████ could give those "representations and warrants," or how Camshaft could believe them in good faith.  At the time the Alpha Funds were transferred, the Chancery Court already had found that a valid Event of Default had occurred and that Pohl—not Ravindran—exclusively controlled the Debtor and its assets.  Moreover, as of the Petition Date, Camshaft itself was defending against a fraudulent transfer lawsuit in Florida brought by the Lenders' Agent, seeking the return of the same $533 million.  *See GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023).  And, as part of its defense in the

Florida litigation, Camshaft took the position that *the Debtor* was the "beneficial owner of the more than $500M in investments that [the Lenders' Agent] seeks to seize in this litigation." That is an astonishing 180 degree turn from what Camshaft now asserts was happening behind the scenes.

4.     The reason Ravindran has gone to such extreme lengths to conceal the money is he knows the money is subject to turnover and/or avoidance to the Debtor's estate. And this is not the first time. Indeed, Ravindran has displayed a pattern of practice of unlawfully moving funds when his control over such funds is threatened, notwithstanding the law. Prior to the Petition Date, whenever faced with the prospect of the Lenders potentially exercising remedies, Ravindran and his cohorts move the $533 million. The cause and effect is unmistakable:

- **Fraudulent Transfer #1.** On March 16 and April 1, 2022, the Debtor twice defaulted on the Credit Agreement. Four days later, on April 5, 2022, it entered into a Limited Waiver Agreement. Three weeks later, on April 27, 2022, the Debtor began transferring hundreds of millions of dollars to Camshaft Fund.

- **Preparation for Fraudulent Transfer #2.** There were two more defaults in September 2022, and negotiations on the terms of a permanent Credit Agreement amendment had begun. On October 12, 2022, the Debtor and the Lenders entered into Amendment No. 2, agreeing that the 45-day cure period for the four outstanding defaults had commenced as of October 10, 2022. If not cured by November 24, 2022, those defaults, called the "Specified Defaults," would mature into Events of Default. Unbeknownst to the Lenders (who were seeking to work towards a negotiated resolution), the "transfer process" of the Debtor's limited partnership interest in Camshaft Fund to Inspilearn had already "started in October 2022." Ex. 1 at 4, Answer to Interrog. No. 1.

- **Fraudulent Transfer #2.** The parties had entered into multiple forbearance agreements, and, on February 10, 2023, the parties' final forbearance agreement expired. As February 10th approached with no resolution in sight, the Lenders made clear their intention to begin exercising remedies, which they ultimately did on March 3, 2023. But Defendants acted first. On March 1, 2023, Ravindran moved the Debtor's limited partnership interest in Camshaft Fund to Inspilearn, an affiliate controlled by ███████ *Id.* In an apparent reference to the value of the LP interest being transferred, Camshaft has described this as a "$539,790,047.44 transfer." *Id.* at 5, Answer to Interrog. No. 2; *see also id.* at 7, Answer to Interrog. No. 5 (valuing to this as a "$539,790,047.44 investment interest").

- **Preparation for Fraudulent Transfer #3.**  On May 3, 2023, the Lenders' Agent and Pohl filed suit in Delaware Chancery Court, seeking confirmation of their control of the Debtor.  The Chancery Court held a bench trial on August 4, 2023, and, on October 18, 2023, told the parties it would be issuing its telephonic bench ruling in early November 2023 (which ultimately became November 2nd).  Meanwhile, Pohl had discovered the transfers to Camshaft Fund, and, in September 2023, the Lenders' Agent sued Camshaft.  Having lost in Delaware and with Camshaft mired in fraudulent transfer litigation in Florida brought by the Debtor's creditors, Defendants' "transfer process" of moving the $533 million to a "non-US trust on behalf of Inspilearn" "started in November 2023."  *Id.* at 4, Answer to Interrog. No. 1.

- **Fraudulent Transfer #3.**  On December 14, 2023, the Florida court scheduled oral argument for February 2, 2024.  Around the same time, the Debtor, under Pohl's exclusive control, was evaluating a bankruptcy filing.  On February 1, 2024, Inspilearn transferred its LP interest in Camshaft Fund, which was "processed from the Camshaft Capital Fund Capital Account[,]" to a non-US trust on its behalf, which then "immediately" redeemed the LP interest.  *Id.* at 4, 5-6, Answer to Interrog. Nos. 1, 3-4.  Stunningly, the transfer was effectuated on the Petition Date.  *Id.* at 4, Answer to Interrog. No. 1.  Though Camshaft states that it "transferred *the funds* out of Camshaft's custody to a non-US trust on behalf of Inspilearn LLC," *id.* at 5-6, Answer to Interrog. No. 3 (emphasis added), it is unclear from the entirety of Camshaft's answers whether the non-US trust's redemption was paid out in cash or securities.

5.      Defendants are without substantive defenses.  The actual fraudulent intent and lack of reasonably equivalent value are plain and obvious.  At this point, Defendants only have two remaining sources of leverage:  dominion over $533 million and time.  And to preserve that leverage, they are willing to flagrantly disregard the law, engage in fraudulent conduct, and manipulate the legal process, even flaunt this Court's own discovery orders, to grind it to a halt.  In fact, Defendants have proven they will go to the ends of the earth to hide the money every time the Debtor and its creditors get close to recovering it.

6.      This Motion asks the Court to put an end to all of these machinations.  The extent of the misconduct, deception, and fraud that has been uncovered to date, which is laid bare on the following pages, is chilling.  It is time to secure the money once and for all.  Too much is at risk for there to be a fourth fraudulent transfer.

## STATEMENT OF FACTS

7.      The evidence in support of this Motion, including from Timothy Pohl's first day declaration, will incontrovertibly establish the following facts:[3]

### A. Within four months of executing the Credit Agreement, the Debtor defaulted on $1.2 billion in Term Loans.

8.      On November 24, 2021, the Debtor as borrower, the Lenders, and the Lenders' Agent, GLAS Trust Company LLC ("GLAS"), among others, closed on $1.2 billion in five-year term loans ("Term Loans"). Ex. 3 (Pohl First Day Decl. [D.I. 7]) ("FDD") ¶ 34. The terms of the parties' lending relationship are memorialized in several agreements, including a Credit Agreement. Ex. 4 (Credit Agreement). The Debtor's former sole director and officer, Riju Ravindran, signed the Credit Agreement on behalf of the Debtor, among others. *Id.* at 166.

9.      Soon thereafter, the Debtor defaulted. *See* FDD ¶¶ 37–41 (detailing the defaults, as outlined here). In exchange for $1.2 billion, the Debtor and its guarantors had agreed to several additional covenants so that the Lenders could continuously monitor and protect their Loans. Ex. 4 §§ 5.1(a)–(b), 5.9(c). The Debtor and its affiliates (which collectively do business under the tradename, "BYJU's"), however, began breaching those promises within four months. From March to October 2022, BYJU's failed to satisfy three covenants at least four times, each of which empowered the Lenders to accelerate the Term Loans and to exercise remedies, as they soon thereafter did.

10.     **Default #1:** By March 16, 2022, the Debtor's then-ultimate corporate parent, Think and Learn Private Ltd. ("T&L"), was required to issue unaudited consolidated financial statements

---

[3]    In deciding whether to grant an injunction, this Court is "not limited to considering only evidence that is strictly admissible but may also 'exercise [its] discretion' to consider 'affidavits or other hearsay materials' based on the 'facts and circumstances of a given case.'" *In re Team Sys. Int'l, LLC*, 2023 WL 1428572, at *2 (Bankr. D. Del. Jan. 31, 2023) (quoting *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004)).

for Q3 FY 2021-22 (October 1-December 31, 2021) and the then-elapsed portion of FY 2021-22 (April 1-December 31, 2021), along with comparative figures for the prior fiscal year. *Id.* § 5.1(b). But T&L only provided financials for the then-elapsed portion of its fiscal year. FDD ¶ 38.

11.   **Default #2:**  Whitehat Education Technology Private Ltd. ("Whitehat India") had to guarantee the Debtor's loan by April 1, 2022. Ex. 4 § 5.9(c).  But that deadline was missed. FDD ¶ 39.  On April 5, 2022, the Debtor and the Lenders, among others, entered into a First Limited Waiver of Credit Agreement, agreeing to temporarily waive Whitehat India's obligation until October 8, 2022.  Ex. 5 (First Limited Waiver) at 1.  Whitehat India failed to meet that extended deadline, too, and it never guaranteed the Debtor's loans.  FDD ¶ 39.  As this Court is aware, the Delaware Chancery Court later found that this default constituted a valid Event of Default, pursuant to which GLAS, acting at the Lenders' direction, was entitled to exercise remedies. *Id.* ¶ 76.

12.   **Default #3:**  On September 13, 2022, when the financials for Q1 FY 2022-23 (April 1-June 30, 2022) were due, T&L failed to provide comparative figures for the prior fiscal year (*i.e.*, Q1 FY 2021-22, that is, April 1-June 30, 2021), again breaching the Credit Agreement. FDD ¶ 40.

13.   **Default #4:**  On September 27, 2022, T&L failed to deliver audited annual financials for its 2021-22 fiscal year.  Ex. 4 § 5.1(a); FDD ¶ 41.

14.   The Debtor and its corporate affiliates acknowledged these four defaults in three Amendments to the Credit Agreement, executed between October 2022 and January 2023.  Ex. 6 (Amendment No. 2); Ex. 7 (Amendment No. 3); Ex. 8 (Amendment No. 7); *see generally* FDD ¶¶ 42–46 (discussing these amendments and the surrounding negotiations).  On October 12, 2022, the Debtor, its guarantors, and the Lenders executed Amendment No. 2.  Ex. 6, Preamble.  They

agreed to add to the Credit Agreement the defined term "Specified Defaults," memorializing that the four aforementioned breaches constituted "Defaults," which would mature into "Events of Default" if not cured by November 24, 2022.  Ex. 6 §§ 1(a) and 1(c).

15.     As of November 24, 2022, the Debtor had not cured any Specified Default, which then matured into four independent Events of Default.  FDD ¶ 44.  Therefore, Amendment No. 3 "acknowledged and agreed" that the cure period had expired and agreed that the Lenders were "**<u>entitled to</u>**" deliver to the "Loan Parties" (the Debtor and its affiliated guarantors) a "Specified Notice of Default and Acceleration[,]" meaning "a notice of default and acceleration with respect to the Specified Defaults[.]"  Ex. 7, Recitals, § 1(a) (emphasis added).  However, the Lenders agreed to forbear through December 1, 2022.  *Id.* § 1(b).

16.     One month later, the Debtor received a final forbearance, through February 10, 2023.  FDD ¶ 45.  In exchange, in Amendment No. 7, the Debtor and its guarantors reaffirmed that their failure to cure the Specified Defaults "**<u>entitles</u>**" the Lenders to exercise remedies.  Ex. 8, Recitals (emphasis added).  Underscoring that point, they further agreed to amend the Credit Agreement to explicitly state—*four times* in an 18-page contract—that the Specified Defaults could no longer be cured.  *Id.* § 5(h) ("[N]one of the Specified Defaults can be cured or remedied (or deemed to be cured or remedied) until specifically waived by the Required Lenders[.]"); *see also id.* §§ 3(a)(ii), 6(c), 7(a).  According to the Delaware Chancery Court, Amendment No. 7 plainly "gave GLAS the right to send to BYJU's Alpha a default notice."  Ex. 9 (Del. Ruling) at 29:17–20.  It was "a contractual stipulation that Whitehat's failure to accede as a guarantor by November 24 was an event of default."  *Id.* at 29:11–13.

7

**B.**     **Shortly thereafter, the Debtor made $533 million in transfers to Camshaft Fund, rendering it insolvent, if not already so.**

17.     Mere weeks after twice defaulting on the Credit Agreement and entering into one forbearance agreement, on April 27–28, 2022, the Debtor (under control of Ravindran) made three wire transfers to Camshaft Capital Fund, LP ("Camshaft Fund") in the amount of $318,000,000. Ex. 10 at 2 (Bank Statement Excerpts).  There would be three more wire transfers on July 12–13, 2022 to Camshaft Fund in the aggregate of $215,000,100, with the Debtor altogether transferring $533,000,100.00 in the aggregate to Camshaft Fund.  *Id*. at 5, 7.  Following these transfers, the Debtor then was left with around $100 million in total assets.  The transfer of the $533 million is the **first** of at least three fraudulent transfers at issue in this case.

18.     Moreover, as a result of these transfers, the Debtor was rendered insolvent, if not already so. Its liabilities (approximately $1.194 billion in outstanding principal on loans in default as of July 12–13, 2022) far exceeded its assets (around $100 million in cash).

**C.**     **The Debtor did not receive reasonably equivalent value from Camshaft Fund in exchange for the $533 million, as a robust fact investigation confirms.**

19.     Based on clearly acknowledged Events of Default, on March 3, 2023, GLAS, acting at the Lenders' direction, accelerated the Loans and took control of 100% of the common stock in the Debtor, becoming its sole shareholder.  FDD ¶¶ 32–33, 49–50.  GLAS then appointed Pohl, an experienced restructuring professional, to serve as the Debtor's sole director, *id.* ¶ 50 which the Delaware Chancery Court found to be valid, as noted.  Ex. 9 at 41:4–6.

20.     Based on the Debtor's records (to the extent Pohl has been able to obtain them) and the discovery obtained to date, the Debtor's current management understands that, in exchange for the $533 million, the Debtor received a limited partnership interest in Camshaft Fund.  FDD ¶¶ 78–80.  That interest was worth far less than $533 million.

21.     The Debtor's creditors have been investigating Camshaft and its young founder, William Cameron Morton, for several months.  They have pulled regulatory filings, run background checks, scrubbed social media, visited physical locations associated with Camshaft, knocked on doors, and picked up the phone to speak with former and/or purported Camshaft personnel and boyhood friends of Morton.  The conclusions from this sweeping investigation are inescapable:  *Camshaft is a sham.*

22.     *First*, Camshaft's original offices were at 285 NW 42nd Avenue in Miami.  Ex. 11 (Camshaft Fund's Form D) at 1 (disclosing 285 NW 42nd Avenue as Camshaft Fund's "Principal Place of Business," and listing the same address for Morton, the Fund's "Executive Officer").  285 NW 42nd Avenue is an IHOP.  This is a recent photo of 285 NW 42nd Avenue (Ex. 12):



23.     *Second*, in January 2024, Camshaft Advisors updated its Investment Adviser Brochure filed with the U.S. Securities and Exchange Commission, listing 1200 Brickell Avenue, Suite 310, in Miami as its address.  Ex. 13 (Camshaft Advisors' Jan. 2024 Brochure) at 1.  Shortly thereafter, on February 9, 2024, Morton signed and filed a "2024 Florida Limited Liability Company Annual Report" for each of Camshaft Capital Advisors, LLC ("Camshaft Advisors") and Camshaft Capital Management, LLC ("Camshaft Management") (the sole investment

manager and general partner, respectively, of Camshaft Fund). Exs. 14–15 (2024 Florida LLC Annual Reports). Those Reports listed both entities' "Current Principal Place of Business" as 1200 Brickell Avenue, Suite 310, too. Ex. 14 at 2; Ex. 15 at 2.

24.     As shown by the pictures in Exhibits 16 to 19, 1200 Brickell Avenue, Suite 310, is a WeWork-style office space, where Camshaft leased a single, sparsely-furnished room, with a "CAMSHAFT" placard on the door:



25.     On each of February 15, 16, 20, 21, and 22, 2024, private investigators visited Camshaft's room during normal business hours. No one was ever there; not even the furniture appeared to have been touched. Suffice to say, this is not the office space of a *bona fide* hedge fund that managed over half a billion dollars for institutional investors.

26.     *Third*, Camshaft does not appear to have its own working business telephone number; instead, the business appears to just be an extension of Morton. Specifically, Camshaft Fund and Camshaft Advisors publicly disclosed two phone numbers in their regulatory filings. In its August 2020 Form D, the Fund disclosed (406) 552-3828 as the "Phone Number of Issuer[,]"

*i.e.*, Camshaft Fund.  Ex. 11 at 1.  And, on the cover page of both its April 2023 and January 2024 Investment Adviser Brochures, Camshaft Advisors disclosed its phone number as (305) 619-1383. Ex. 13 at 1; Ex. 20 (Camshaft Advisors' April 2023 Brochure) at 1; *see also* Ex. 21 (Camshaft Advisors' Form ADV) at 1 (disclosing this same phone number).

27.     The first number—(406) 552-3828—appears to be Morton's personal cell phone number.  According to public searches, since 2011, the number has been associated with both Morton and a woman who appears to be his mother.  The number is <u>not</u> registered in Camshaft's name.  A private investigator called it twice, on February 10 and 13, 2024.  Both times, the phone rang four times then disconnected.

28.     As for the second number—(305) 619-1383—the investigator dialed it on February 13, 2024, and the call went straight to voicemail.  A male voice said:  "You've reached Camshaft Capital.  Please leave a detailed message and someone will get back to you as soon as possible." The investigator did not leave a voicemail.  According to the investigation, this is a cell phone number associated with Morton.

29.     *Fourth*, Camshaft Fund's portfolio manager and "key person[,]" Ex. 20 at 10, Morton, is immature and inexperienced, with a questionable character and a checkered past.  To wit:

- **Morton lacks any formal investment or money management experience.** Morton founded Camshaft Fund in the summer of 2020 at the age of 23, without any formal training in investing and money management, let alone a college degree. FDD ¶ 69.

- **Morton has no background to serve as Camshaft Fund's Chief Compliance Officer.**  Morton has served as Camshaft's Chief Compliance Office since becoming registered with the SEC as an investment adviser, despite having no apparent experience in this role, let alone regulatory compliance generally.  Ex. 21 at 26 (listing Morton as the CEO and CCO)[4].

---

[4]    Not surprisingly, Camshaft Fund may be in violation of applicable U.S. federal securities laws.  Through its Form D filed in September 2020, right after Camshaft Fund launched, Camshaft Fund claimed reliance on the Rule

- **Morton has a criminal record.**  In December 2015, Morton was arrested in connection with a domestic disturbance involving his mom and sister, to which he later pled guilty.  Ex. 23 (Compilation of Morton's Criminal Records).  According to statements made by his mom and sister to the authorities, Morton was "running around the house yelling that [his sister] and their mother, Alexandra Morton, were demons, that he (the Defendant) was the messiah, and 'the time had come' and 'the end is near.'"  *Id.* at 3.  Morton's sister "feared for her life," and "locked herself in her bedroom."  *Id.*  Morton's mother told him "to leave the house."  *Id.* at 4.  While being transported to a detention center, Morton "spoke of visions, Harry Potter movies, demons, aliens, and secret organizations."  *Id.*

- **Morton is acting unprofessionally.**  Morton sent the following unprompted, passive aggressive email to Debtor's/GLAS's counsel (copying his own counsel) following the conclusion of the February 27, 2024 discovery hearing (Ex. 24):

---

506(b) of Regulation D exemption to sell securities without registration.  Ex. 11 at 2.  Under Rule 506(b), an issuer is prohibited from relying on "general solicitation or general advertising" to sell securities or otherwise engaging in activities that condition the market for such sales.  17 C.F.R. §§ 230.502(c), 230.506(b).  Under SEC guidance, "general solicitation" includes "the use of an unrestricted, and therefore publicly available, website."  U.S. Securities and Exchange Commission, *Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A Offerings*, SEC (Sept. 20, 2013), *available at* https://www.sec.gov/info/smallbus/secg/general-solicitation-small-entity-compliance-guide#P9_40.

Here, Camshaft Fund appears to be engaging in an improper general solicitation to sell securities, including through its publicly-available LinkedIn page.  Ex. 22 (Camshaft Fund's LinkedIn Page).  Among other claims, the LinkedIn page makes unsubstantiated claims about Camshaft Fund's performance, indicating that it has "consistent, diverse, low risk returns modeling, after fees, 18-25%+ yearly to investors[,]" and "has never posted a negative quarter, or even consecutive negative months, while achieving extremely high returns[,]" which are further characterized as "astounding alpha."  *Id.* at 1–2.  These claims are particularly troubling given that Camshaft Fund targets retail investors, noting on its LinkedIn page (and consistent with its Form D filing specifying a $50,000 minimum investment requirement, Ex. 11 at 3, like many registered funds such as mutual funds) that it is "organized under section 3(C)(1) of the Investment Company Act of 1940."  Ex. 22 at 2.  Funds organized under section 3(C)(1) are generally regarded as funds that are targeted to retail investors, given the lower financial qualification required.



30.     *Fifth*, Camshaft has publicly misrepresented its management team.   Camshaft included on its two public websites the profiles of individuals who either no longer worked there or never worked there, creating the misimpression that Camshaft had size, expertise, and legitimacy.   Specifically, across two websites, Camshaft listed the profiles of ten individuals, in addition to Morton.   *See* Ex. 25 (camshaftcapital.com)[5]; Ex. 26 (camshaftgroup.com).   Since the Petition Date, an investigator has been able to speak to four of these individuals.   By way of summary:

31.     **Jason Perz**.   As part of its SEC filings, on April 18, 2023, Camshaft Advisors (the Fund's sole investment manager) disclosed its website as camshaftcapital.com.   Ex. 21 at 3.   The cover page of Camshaft Advisors' April 2023 Brochure also gave the same website (which was not changed until January 2024).   Ex. 20 at 1; Ex. 13 at 1.   At the time, camshaftcapital.com listed

---

[5]     This website link now automatically redirects a visitor to camshaftgroup.com, which requires permission to access the site.   A copy of this website, as of June 2023, is archived at https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/#partners.

the titles and biographies of just two individuals:  William Morton ("Founder CEO") and Jason Perz ("Co-CIO").  Ex. 25 at 4–6.

32.    The following is Perz's biography from the website:



33.    Anyone reading the webpage and deciding to invest in Camshaft would believe Perz to be an integral part of the Fund, its operations, and its investment program; his title and background indicated as much.  And, of course, it was only him and Morton.

34.    The private investigator met in person with, and spoke on the phone with, Perz on February 2 and 3, 2024, respectively.  Perz said he had joined Camshaft in the winter of 2020, after learning of a remote job opening online, and left towards the end of 2021—16-plus months *before* the Camshaft Capital website, as listed on SEC filings and in Camshaft Advisors' Brochure, continued to name him as Co-CIO.  Perz was completely unaware of holding a formal title while employed by Camshaft, and thought of himself as a mere "analyst," not the Co-Chief Investment Officer.

14

35.     The investigator handed Perz the same excerpt as above of his work profile.  Perz read it over, studying it.  While he had provided the biographical information used in this profile, Perz had never actually seen the profile before; he was surprised by what it said.  In fact, Perz's *first time* learning that he had apparently been Camshaft's Co-CIO was the interview.  He had absolutely no knowledge that Camshaft had publicly held him out in that role, and he never discussed serving in such a role with Morton.

36.     Perz never met Morton in person and described him as "secretive."  Though purportedly Co-CIO, Perz did not know the names of Camshaft's clients or investors.  When asked how he came to be introduced to Morton, Perz declined to answer, expressing reticence to discuss that topic.  Ultimately, Perz felt uncomfortable with his role at Camshaft—without even knowing he was being held out by Morton as Co-CIO—lacked a clear purpose, and was frustrated at what he described as an "inconsistent" salary.  Given those circumstances, he departed the firm.

37.     **Sean Teeling.**  Sean Teeling was listed on camshaftgroup.com as Camshaft's Co-General Partner of Real Estate.  Ex. 26 at 3.  On February 15, 2024, Teeling was briefly telephonically interviewed by the investigator.  Teeling knew Camshaft and Morton and acknowledged having had some discussions about potentially working at Camshaft.  But those discussions did not "pan out," and Teeling never worked for Camshaft.  Given the importance of this point, the investigator asked Teeling to confirm that he, in fact, had never worked for Camshaft.  Teeling confirmed, then promptly said that any further discussion on these topics should be through counsel.  The interview then ended.

38.    **Jamey Jacob.**  Jamey Jacob was listed on camshaftgroup.com as Camshaft's "SME" (subject matter expert) in "Aerospace Engineering and Robotics[.]"  Ex. 26 at 3.  Jacob is a professor at Oklahoma State University.[6]

39.    On February 21, 2024, Jacob was telephonically interviewed.  Jacob said that he had met Morton on a plane about a year prior, and he ultimately agreed to advise Camshaft on certain prospective aerospace investments.  Based on the interview, the scope of the engagement was limited;  Jacob described his work as a one-off consulting project in the summer of 2023, for which he received a single payment (the amount of which he did not disclose).  Jacob said he had not heard from Camshaft in the past "four months."

40.    Significantly, Jacob was completely unaware that he was on Camshaft's webpage and was being held out as one of Camshaft's subject matter experts.  For a professor with a variety of consulting projects over the years, Camshaft did not appear to leave a lasting impression on Jacob—*e.g.*, he could not remember Morton's first name until prompted.[7]

41.    *Sixth*, Camshaft Fund has few investors outside of the Debtor, whose funds apparently constituted approximately 90% of Camshaft Fund's capital, according to its latest SEC disclosure of its regulatory assets under management ("AUM").  Ex. 21 at 7–8, 15, 22 (disclosing approximately $595,845,395 in AUM as of April 2023).   Accordingly, T&L, through its

---

[6]    *See* https://ceat.okstate.edu/mae/faculty-staff/faculty-bios/jamey-jacob.html.

[7]    Additionally, Matthew Burks was listed on camshaftgroup.com as Camshaft's VP of Operations.  Ex. 26 at 3.  On February 10, 2024, the investigator interviewed Burks by phone.  At the outset, the investigator asked if Burks had worked for Morton or Camshaft.  Burks answered that while he was happy to discuss the topics of Morton and Camshaft, he preferred not to answer questions about his employment.  The investigator explained that he would not speak to current employees of Camshaft, then asked if it would be fair to say that Burks no longer worked for either Camshaft or Morton.  Burks reiterated that he would not answer that question, and the investigator promptly ended the call.

subsidiaries (including Inspilearn, LLC ("Inspilearn"))), would have accounted for the vast majority of the $595 million of Camshaft's AUM at this time.[8]

42.   *Seventh*, according to Camshaft Advisors' Brochure, any limited partnership interest in Camshaft Fund would have been subject to significant restrictions on its withdrawal, transfer, or sale.  Ex. 20 at 10.  Camshaft itself admits that there is "no market for the shares/interests [in Camshaft Fund], and none is expected to develop." *Id.*  That means the Debtor exchanged the most liquid asset (cash) for a highly illiquid asset:  a limited partnership interest in a sham hedge fund, which has no market for resale and significant restrictions on its withdrawal and transfer, not to mention well above-market fees and expenses, as discussed next.

43.   *Finally*, Camshaft Advisors and Camshaft Management have been charging a 3% annual management fee, far more than many top-tier hedge funds charge. *Id.* at 4.  Depending on the exact structure of the fee and net asset value fluctuations, over $20 million in fees attributable to the Debtor's $533 million investment may have been paid out to Camshaft since the transfers were initially made in mid-2022, while additional payments may have been made to cover various overhead expenses of Camshaft associated with operating Camshaft Fund—effectively an additional management fee.

**D.     There is no indication that Riju Ravindran conducted any due diligence or investigation into Camshaft Fund before transferring the $533 million.**

44.   In contrast to this extensive investigation, there are no records in the Debtor's possession of former management, Ravindran, having conducted *any* diligence or investigation

---

[8]   Of the approximately $60 million in AUM that did not presumably derive from the Debtor's $533 million investment, it appears that a substantial portion came from T&L's subsidiary, Inspilearn.  *See* Ex. 1 at 5, Answer to Interrog. No. 2 (stating that Inspilearn had "a separate Camshaft LP interest that was significant in nature" from March 31, 2023 to June 15, 2023).  The full nature and extent of the relationship between T&L and Camshaft is not yet known, and these matters will be an important component of go-forward discovery.

into Camshaft or Morton.  This includes no Board minutes or presentations, solicitation materials, internal memoranda, written resolutions, investment models, financial analyses, etc.

45.      Rather, it appears from his earlier deposition in the Delaware Chancery Court, which came out at trial, that Ravindran completely abdicated his non-waivable fiduciary duties as the Debtor's sole director and officer, instead allowing the Debtor's then-ultimate corporate parent, T&L, to make the Debtor's decisions for it.  Ex. 27 (Del. Trial Tr.) at 22:14-20.[9]  Ravindran's decision—or, really, T&L's—to "invest" in Camshaft Fund was reckless, imprudent, and value destructive—a fundamental breach of his fiduciary duties.  The Debtor is a Delaware corporation for which fiduciary duties cannot be waived; yet T&L—not Ravindran—was calling the shots.

**E.      Riju Ravindran then transferred the $533 million to Inspilearn and concealed the fraudulent transfer for months.**

46.      There is extensive evidence that Ravindran, after the Debtor defaulted, paid Camshaft millions of dollars to leverage its obscurity and pliability so that the Debtor's Lenders never would, or could, locate their loan proceeds.

47.      As noted, the original transfers to Camshaft Fund began in April 2022, on the heels of two defaults and one forbearance agreement.  After the last of the six transfers to Camshaft was completed in July 2022, the Debtor's former management concealed their occurrence from the Debtor's creditors for months.  T&L, in fact, affirmatively misled its Lenders into believing that the funds were still in one of the Debtor's bank accounts.  Under the Credit Agreement, T&L had an obligation to furnish unaudited quarterly financials.  Ex. 4 § 5.1(b).  Those unaudited financials reported the amount (in Rupees) of "Cash and Bank" balances for T&L and each of its subsidiaries, including the Debtor.  Here, T&L specifically represented in unaudited financial statements dated June 30, September 30, and December 31, 2022 that the Debtor possessed the equivalent of over

---

[9]      Ravindran is in the process of reproducing his prior deposition transcript in this Adversary Proceeding.

$█ million in "Cash and Bank."  *See, e.g.*, FDD ¶ 59.  T&L furnished the last of these unaudited financials in mid-March 2023, *after* GLAS, acting at the Lenders' direction, had exercised remedies.  *Id.*

48.     Meanwhile, as noted, on January 6, 2023, T&L and the Debtor, among others, entered into a forbearance agreement with the Lenders.  Ex. 8.  Under this agreement, the Lenders agreed to forbear from exercising remedies through February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then.  *Id.* § 6(a).  But the parties remained far away from reaching agreement, and, in the weeks leading up to February 10th, the Lenders' counsel sent the Debtor's and T&L's boards, including Ravindran, among others, a series of letters/emails expressing their frustration.  These exchanges culminated with a warning on February 8, 2023 that "the Lenders are now in the process of preparing to pursue alternative options, including exercise of their rights and remedies under the Credit Agreement."

49.     Two days later, on February 10, 2023, the forbearance period expired by its own terms.  FDD ¶ 46.

50.     On March 1, 2023—*just two days before GLAS took ownership of the Debtor* (and with constructive knowledge of forthcoming remedies)—Ravindran moved the money.  This is the **<u>second</u>** actual fraudulent transfer at issue (with the Debtor's initial, mid-2022 transfers of the $533 million to Camshaft Fund being the first).  As Camshaft admitted under oath on February 23, 2024: "On March 1, 2023, a 100% transfer was processed from the Camshaft Capital Fund Capital Account of the Debtor to Inspilearn LLC, a U.S. entity and 100% Think and Learn subsidiary."  Ex. 1 at 4, Answer to Interrog. No. 1.  That transfer is valued in the amount of $539,790,047.44.  *Id.* at 5, Answer to Interrog. No. 2.

51.     As noted, two days later, on March 3, 2023, GLAS accelerated the Term Loans, took ownership of the Debtor, and appointed Pohl.  FDD ¶ 49–50.  On May 3, 2023, GLAS and Pohl filed suit in Delaware Chancery Court, seeking confirmation that their exercise of remedies had effectuated a proper change of control of the Debtor.  *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023); FDD ¶ 57.  Upon commencing that action, Pohl (who did not yet have access to the Debtor's bank accounts) still believed it to be likely that the Debtor had a significant sum of money in its possession.  FDD ¶¶ 58–59.

52.     Five days later, during a May 8, 2023 call, Byju Raveendran (the Debtor's founder and older brother of Riju Ravindran) incredibly told one of the Lenders' advisors that Debtor no longer had the funds.  *Id.* ¶ 60.  Rather, "the money is someplace the Lenders will never find it." *Id.*

53.     Ten days later, during a public hearing on Pohl's motion for a *Status Quo* Order in the Delaware action, Riju Ravindran's counsel (who also represents Ravindran in these bankruptcy proceedings) admitted to that fraudulent motive in open court:

> [GLAS and Pohl] raised this issue of the $500 million transfer as a reason to rule against defendants, and obviously this is — you know, when first hearing about it, it raises [sic] antenna.  I understand that, Your Honor.
>
> . . . **Byju's moved the funds, and Byju's moved the funds to an entity that it controls in the United States.**  The money is in the United States.  I don't know exactly when it was done.
>
> **To be candid, these were based on fear of lenders acting expeditiously** with these unconscionable tactics to assets without a proper determination and due process under the credit agreement.  **Byju's felt the need to protect the cash.** . . . .

Ex. 28 (May 18, 2023 Hr'g Tr.) at 34–35 (emphasis added).

54.     In late August 2023, Pohl determined that $533 million of the Debtor's proceeds had gone to Camshaft Fund.  FDD ¶¶ 9, 68.  Less than two weeks later, on September 5, 2023, the

Lenders' Agent sued Camshaft in state court in Miami, seeking to avoid the $533 million in transfers, among other relief. *Id.* ¶ 71.

55.    The following week, after months of silence, T&L released an opaque and abstract statement that only confirmed an insider (now known to be Defendant Inspilearn) was the beneficiary of the second fraudulent transfer and the money was, as threatened, outside the reach of the Debtor's creditors.  FDD ¶ 75.

56.    Also in September 2023, T&L stopped providing financial statements despite an obligation to do so under the Credit Agreement. *See, e.g.*, Ex. 4 § 10.5 (describing the survival of T&L's covenants post-default).  Those reports presumably would have showed what had happened to the $533 million of fraudulently transferred loan proceeds—*i.e.*, that it had been moved to Inspilearn (which, as of December 31, 2022, was reported to have ███████████ of "Cash and Bank").  However, on September 13, 2023, T&L failed to furnish unaudited financials for Q2 FY 2023-24 (April 1-June 30, 2023).  FDD ¶ 40.  On September 27, 2023, T&L failed to furnish audited financials for FY 2022-23 (April 1, 2022 to March 31, 2023). *Id.* ¶ 41.  And on December 14, 2023, T&L failed to furnish unaudited financials for Q3 FY 2023-24 (July 1-September 30, 2023).

57.    Then on November 21, 2023, GLAS formally invoked its inspection rights under the Credit Agreement and, pursuant to its right to request "such other information regarding the financial condition, business and operations of [T&L] or any of its subsidiaries as the Lenders may reasonably request[,]" Ex. 4 § 5.1(g), GLAS requested "a detailed written explanation of the business reasons for and purposes" of the $533 million in transfers to Camshaft Fund and "a detailed written explanation of the current status of the funds[,]" among other information about the Camshaft transfers.  FDD ¶ 79 n.5.  T&L never substantively responded to those questions. *Id.*

**F.    Only upon its bankruptcy filing did the Debtor begin to receive *some* meaningful information about the location of the $533 million.**

58.    On February 1, 2024, the Debtor filed its bankruptcy petition.  [D.I. 1].  At the first day hearing on February 5, 2024, the Debtor focused on the importance of immediately locating the $533 million.  *See, e.g.*, Ex. 29 (Feb. 5, 2024 Hr'g Tr.) at 24:4–12.  Later, Ravindran's counsel spoke, accusing the Debtor of "gamesmanship" and claiming that the Debtor filed for bankruptcy because the Lenders "[didn't] like the way" the Florida fraudulent transfer action "had been going" and that the bankruptcy petition was improper.  *Id.* at 44:7–20.  The Court made the "request" that "the parties start talking to each other," as "[t]here really is no reason the debtors, at this point, shouldn't know where that money is and I don't understand why that hasn't been disclosed."  *Id.* at 48:8–12.  In response, Ravindran's counsel answered:  "Yes, Your Honor."  *Id.* at 48:19.  Camshaft's counsel likewise agreed to the Court's direction that the parties "meet and confer" on discovery issues.  *Id.* at 51:10–13.  As will be discussed in a moment, neither counsel for Ravindran nor counsel for Camshaft informed the Court that the money already had been moved offshore, *a mere four days earlier on the Petition Date*.

59.    Two days later, Ravindran's counsel said that his "client is not prepared to make any disclosures" about the $533 million on the purported basis that it "would likely lead to further unjustified actions by the lenders," and he specifically refused to engage with the Debtor's request to freeze the funds pending a subsequent order in this action.  Camshaft's counsel, despite acknowledging the Court's direction to meet and confer, said it could not do so, because it still needed to "finalize the engagement" with Camshaft.

60.    After motion practice, on February 16, 2024, the Court ordered expedited discovery from Camshaft and Ravindran.  [Adv. Pro. D.I. 22.]  Since then, the Debtor has received and

reviewed incomplete answers to eight interrogatories and 32 documents provided by Camshaft. Ravindran refused to provide any documents regarding the location of the $533 million.

61.     As a result of that discovery, for the first time, Camshaft disclosed that it had consented to the transfer of the Debtor's $533 million (or securities on account of those funds) to a "non-US trust," which it did not identify and still has refused to identify, on February 1, 2024, the Petition Date:  "On February 1, 2024, there was a 100% transfer processed from the Camshaft Capital Fund Capital Account to a non-US trust on behalf of Inspilearn LLC, a 100% Think and Learn subsidiary."  Ex. 1 at 4, Answer to Interrog. No. 1.  This is the **third** fraudulent transfer at issue here.

62.     There was no lawful justification for this transfer.  It is nothing more than a transparent attempt to move the money outside of the jurisdiction of the United States and its courts, and away from Camshaft, which at that point had been sued and was susceptible to a judgment by a U.S. court compelling the return of the $533 million.

## LEGAL STANDARD

63.     Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Civil Procedure 65, as made applicable herein by Bankruptcy Rule 7065, the Debtor seeks an order requiring Defendants to, within two business days of the Court's Order, transfer the entire amount of the Debtor's funds, and any interest that has accrued on those funds, into the registry of the U.S. Bankruptcy Court for the District of Delaware, pending further order of the Court.

64.     The standard for injunctive relief in the Third Circuit is settled.  The Debtor, as the movant, must:  (i) have a "reasonable probability of eventual success in the litigation" and (ii) show that it will be "irreparably injured" if an injunction is not granted.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 n.3 (3d Cir. 2017); *see also Takeda Pharm. USA, Inc. v. W.-Ward Pharm. Corp.*, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) ("A request for a TRO is

governed by the same general standards that govern the issuance of a preliminary injunction.").
These two factors are the "most critical," and a stronger case of the merit requires less by way of
irreparable harm (and *vice versa*). *Reilly*, 858 F.3d at 179. If they are met, then the Court should
also evaluate (iii) the possibility of harm to other interested persons from a grant or denial of the
injunction, and (iv) the public interest, then balance all four factors together. *Id.* at 176, 179.

## ARGUMENT

## I. THE DEBTOR HAS A LIKELIHOOD OF SUCCESS OF PREVAILING ON THE MERITS.

65.     To obtain a TRO, the Debtor must demonstrate that it can win on the merits, "which
requires a showing significantly better than negligible *but not necessarily more likely than not*."
*Reilly*, 858 F.3d at 179 (emphasis added); *see also id.* at n.3 (again emphasizing that "likelihood
of success on the merits does not mean more likely than not") (cleaned-up); *Team Systems*, 2023
WL 1428572, at *10 (only requiring the plaintiff to make out "a *prima facie* case" to satisfy the
first factor).

66.     Here, this standard is easily met for each of the Amended Complaint's five causes
of action, any one of which provides a sufficient basis for the relief sought. Indeed, unlike in most
fraudulent transfer and fiduciary duty breach actions, the actual intent of the Debtor's former
management and the Debtor's failure to receive reasonably equivalent value have all but been
conceded through brazen and boastful concessions and behavior, followed by months refusing to
disclose what happened to the money.

### A.     Count I:  Defendants repeatedly moved the $533 million with the actual intent to hinder, delay, or defraud the Debtor's creditors.

67.     In Count I of the Amended Complaint, the Debtor alleged that Riju Ravindran and
Inspilearn *twice* transferred $533 million, or the limited partnership interest in Camshaft Fund
attributable to those funds, with the "actual intent to hinder, delay, or defraud" the Lenders. *See,*

*e.g.*, 11 U.S.C. § 548(a)(1)(A); Fla. Stat. § 726.105(1)(a).  Those transfers occurred:  (i) in mid-2022, when the Debtor, acting at Ravindran's direction, originally moved the money to Camshaft Fund, then (ii) on March 1, 2023, when Ravindran had the Debtor transfer its limited partnership interest in Camshaft Fund to an then-affiliate, Inspilearn (and, of course, that LP interest was then transferred again mere weeks ago, on the Petition Date, to an offshore trust).  *See* Statement of Facts §§ C and E, *supra*.

68.     Though the Debtor only needs to prove a single actual fraudulent transfer to establish a likelihood of success, both of these transfers were fraudulent.  The evidence is overwhelming.

69.     This is the rare case where the Debtor has <u>direct evidence</u> of fraudulent intent.  *See In re Victor Int'l, Inc.*, 97 Fed. App'x. 365, 369 (3d Cir. 2004) ("direct proof of the transferor's fraudulent intent will rarely be available"); *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co.* (*In re Mallinckrodt PLC*), 2024 WL 206682, at *24 (Bankr. D. Del. Jan. 18, 2024) (Dorsey, J.) ("The law does not require direct evidence alone because people do not frequently declare their intent to do something unlawful.").  The Debtor's founder (who is also Ravindran's older brother) shamelessly admitted that former management has been hiding the money from the Lenders:  "the money is someplace the Lenders will never find it."  *See* Statement of Facts § E, *supra*.  Ravindran's own counsel reinforced that admission in open court, expressing former management's "fear of lenders acting expeditiously."  Ex. 28 at 34:21-35:4.  Admissions of intent do not get clearer than that.

70.     What's more, there is a mountain of <u>circumstantial evidence</u> of that fraudulent intent.  The evidence supports numerous "badges of fraud," including at least:

- **The fact of the transfers was concealed (badge 3).** Defendants hid the occurrence of both transfers from the Debtor's current management and creditors. *See* Statement of Facts §§ E and F, *supra*.

- **The transfers were of substantially all of the Debtor's assets (badge 5).** In mid-2022, the Debtor transferred $533 million—over 80% of its liquid assets—an amount that is clearly of "relative significance to the debtor." *Mallinckrodt*, 2024 WL 206682, at *30. Then, in March 2023, the Debtor transferred the limited partnership interest in Camshaft Fund on account of the $533 million to Inspilearn. *See* Statement of Facts §§ C and E, *supra*. Thus, by the time Pohl obtained control of the Debtor's assets in May 2023, the Debtor had less than $1 million in cash left, and no other assets. It had been stripped barren.

- **The transferred assets were concealed (badge 7).** Defendants have taken every opportunity to conceal the location of the $533 million, including flaunting the Court's own discovery instructions. *See* Statement of Facts §§ E-F, *supra*. As the Court itself recognized, the fact that no one "disclosed" the location of the $533 million raises "serious concerns that there's something happening that shouldn't be happening." Ex. 30 (Feb. 16, 2024 Hr'g Tr.) at 34:21-35:8.

- **The Debtor received less than reasonably equivalent value in return (badge 8).** Upon information and belief, in exchange for the $533 million, the Debtor at first received a limited partnership interest in a sham hedge fund. Then, that limited partnership interest itself was transferred to an affiliate, with the Debtor receiving absolutely no consideration in return. *See* Statement of Facts §§ C and E, *supra*.

- **The Debtor became insolvent post-transfers (badge 9).** At the conclusion of both sets of transfers, the Debtor had over $1 billion in liabilities against a *de minimis* amount of money in the bank (and no ability to generate revenue going forward). It was plainly insolvent. *See* Statement of Facts § B, *supra*.

- **The Debtor made the transfers shortly after incurring substantial debt (badge 10).** The Debtor began making the fraudulent Camshaft transfers within six months of entering into the Credit Agreement, on the heels of defaulting multiple times. Then, after conceding that four Events of Default had occurred and shortly after a forbearance agreement expired—and just two days before GLAS took ownership of the Debtor—the Debtor transferred the limited partnership interest in Camshaft Fund to an affiliate, Defendant Inspilearn, for no value in order to further conceal the money. *See* Statement of Facts §§ C and E, *supra*.

71.    Moreover, with respect to the second transfer—of the limited partnership interest in Camshaft Fund to Inspilearn—the first, second, and fourth badges are also met. These were transfers to an insider, with Ravindran continuing to control the funds, made right after the Lenders had stated their intention to exercise legal remedies.

72.     It takes only a handful of badges of fraud to establish a likelihood of success on the merits.  *See, e.g.*, *Team Systems*, 2023 WL 1428572, at *10 (finding a likelihood of success "amply" met on the basis of just four badges of fraud); *see generally Mallinckrodt*, 2024 WL 206682, at *26 ("the confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud"); *In re Charys Holding Co.*, *Inc.*, 2010 WL 2774852, at *5 (Bankr. D. Del. July 14, 2010) (similar).  Here, the evidence is far more compelling.  It includes nearly every badge of fraud—nine out of eleven—*and additionally*, direct evidence of fraud.

73.     There is still more:  beyond just the direct evidence of actual intent and the badges of fraud, the "natural consequence" of Defendants' actions has been that the Debtor's "creditors were hindered, delayed or defrauded."  *Mallinckrodt*, 2024 WL 206682, at *33 (finding that "actual intent" is "satisfied when the consequences of an act are substantially certain to result from it").

74.     As outlined in the Introduction and below, as soon as the Lenders had the contractual right and then were contemplating exercising remedies, Defendants moved the $533 million, *first* to Camshaft Fund, after the Debtor defaulted; *then* to a U.S. affiliate, after a forbearance agreement expired and the Lenders were about to exercise remedies; *and finally* offshore to a non-U.S. trust on behalf of such U.S. affiliate, potentially outside the reach of the United States and its courts, once the Delaware Chancery Court ruled that Pohl was validly appointed and Camshaft was mired in litigation:

| Date | Transfer | Precipitating Events |
|---|---|---|
| *Transfer of Debtor's $533 Million to Camshaft Fund* | | |
| April 27, 2022 | Ravindran began transfers to Camshaft Fund, ultimately totaling $533,000,100. | • <u>Mar. 16, April 1, 2022</u>: Defaults #1-2.<br>• <u>Apr. 5, 2022</u>: Limited Waiver Agreement. |
| *Transfer of Debtor's LP Interest in Camshaft Fund to Inspilearn* | | |
| Oct. 2022 | Ravindran and Camshaft began transferring Debtor's LP interest in Camshaft Fund to Inspilearn. | • <u>Sept. 2022</u>: Defaults #3-4.<br>• <u>Oct. 12, 2022</u>: BYJU's acknowledged four Defaults, maturing into Events of Default by Nov. 24, 2022 if not cured. |
| Mar. 1, 2023 | Debtor's LP interest in Camshaft Fund transferred to Inspilearn. | • <u>Nov. 24, 2022</u>: Four EODs.<br>• <u>Feb. 10, 2023</u>: Forbearance agreement with Lenders expired.<br>• <u>March 3, 2023</u>: Lenders' Agent takes control of Debtor. |
| *Transfer of $533 Million Offshore* | | |
| Nov. 2023 | Inspilearn and Camshaft began transferring Inspilearn's LP interest in Camshaft Fund offshore. | • <u>Sept. 5, 2023</u>: Lenders' Agent sued Camshaft in Florida.<br>• <u>Nov. 2, 2023</u>: Chancery Court found Pohl validly appointed. |
| Feb. 1, 2024 | Inspilearn's LP interest in Camshaft Fund transferred to a "non-US trust of Inspilearn[,]" then immediately redeemed. | • <u>Feb. 1, 2024</u>: Petition Date.<br>• <u>Feb. 2, 2024</u>: Oral argument in Camshaft suit in Florida scheduled. |

*See* Statement of Facts §§ C, E, F, *supra*.

75.     Altogether, the evidence here presents an extraordinary record—far more compelling than what the court had in *Team Systems*, when it granted a preliminary injunction freezing further asset transfers.  It goes without saying that the Debtor's actual fraudulent transfer claims do, in fact, have a "significantly better than negligible" chance to succeed.[10]

---

[10]     Camshaft claims there was no fraudulent transfer, because "the credit agreement does not restrict the use of the loan proceeds." Ex. 30 at 17:15-23.  That is not actually a defense to a fraudulent transfer.  Fraudulent transfer is a statutory cause of action arising out of the Bankruptcy Code, which exists independently of the terms of the Credit Agreement, and which protects all creditors of a debtor's estate whether they were parties to the Credit Agreement or not.  *See EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I Inc.*), 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties."); *see also In re Grandparents.com, Inc.*, 614 B.R. 625, 631 (Bankr. S.D. Fla. 2020) (citing *EBC I* for the same conclusion:  "The existence of a binding contract does not foreclose a fraudulent conveyance claim if the

**B.**      **Counts II-III:**  **Defendants' transfer of $533 million was a constructive fraudulent transfer.**

76.      In Counts II and III of the Amended Complaint, the Debtor alleged three constructive fraudulent transfers:  (i) Defendants' transfers of the $533 million to Camshaft Fund in exchange for a limited partnership interest in Camshaft Fund, (ii) the subsequent transfer of that limited partnership interest to Inspilearn (which then was transferred to an offshore trust and redeemed), and (iii) the payment of fees and expenses to Camshaft Management and Camshaft Advisors.  The Debtor received less than reasonably equivalent value in exchange for those transfers, was insolvent on the date of the transfers, became insolvent as a result of such transfers, and/or was left with unreasonably small capital.  *See, e.g.*, 11 U.S.C. § 548(a)(1)(B); Fla. Stat. §§ 726.105(1)(b), 726.106(1).

77.      Again, the evidence overwhelmingly establishes the fraudulent transfers, as the Debtor did not receive reasonably equivalent value and was insolvent:

*Mid-2022 Transfer of the $533 Million to Camshaft Fund*

78.      **Reasonably equivalent value.**  For there to be reasonably equivalent value, the Debtor must have received from Camshaft Fund "roughly the value [the Debtor] gave."  *Charys Holding*, 2010 WL 2774852, at *7.  Assuming that, in mid-2022, the Debtor received a limited partnership interest in Camshaft Fund in exchange for the original $533 million transfers, that interest was not of reasonably equivalent value.  The only inference from all of the evidence that the Debtor and its creditors have marshalled is that the entire purpose of former management's "investment" in Camshaft was to conceal money, not generate investment returns.  Otherwise, Ravindran would have chosen PIMCO, BlackRock, Wellington Management, or any one of a

---

elements of the cause of action for constructive fraud are met.").  In any event, the Credit Agreement also requires the Debtor "to[] comply with all laws (including Environmental Laws), rules, regulations . . . and orders of any Governmental Authority applicable to it or its property."  Ex. 4 § 5.7.  That covenant was breached.

number of reputable and established asset management firms, as any responsible fiduciary would have done.

79.    Instead, they selected *Camshaft, a sham*.  The findings of the investigation into Camshaft, its principal, and its business practices are harrowing.  *See* Statement of Facts § C, *supra*.  Camshaft called an IHOP its first home in filings with the SEC and the State of Florida. Today, it still lacks a real office—one desk, two plants, and three chairs do not add up to an office. Camshaft lacks a working phone number.  Its "key person" has a disturbing past.  Camshaft lacks a proper compliance function.  It has misrepresented its management team to the general public. It appears to be engaging in prohibited general solicitation and marketing practices with respect to Camshaft Fund.  The list goes on and on.

80.    Nor has the Debtor ever received any explanation from Ravindran or anyone else as to how or why Camshaft was selected as the recipient of the initial transfer.  One is only left to speculate.  Yet for all the unknowns, one thing is clear:  *this was a terribly misguided investment.*

81.    **Insolvency.**  Pre-transfers, the Debtor had twice defaulted on the Credit Agreement, had entered into one forbearance agreement with its Lenders, and former management knew it was unable to comply with its contractual obligations and would continue to default (and did continue to default).  *See* Statement of Facts §§ A and E, *supra*.  As a result and as illustrated below, post-transfers, the Debtor had approximately $1.194 billion in principal owed on defaulted loans and a tenth of that amount in assets.



82.     As a result, the Debtor was plainly insolvent.  *See Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 157 (3d Cir. 1996) (affirming a bankruptcy court's finding of the debtor's insolvency based upon a multi-million-dollar negative net worth); *Charys Holding*, 2010 WL 2774852, at *6-7 (finding allegations of liabilities exceeding net assets sufficient to satisfy the insolvency requirement).

### *March 1, 2023 Transfer of the Debtor's LP Interest in Camshaft Fund to Inspilearn*

83.     With respect to the Debtor's transfer of its limited partnership interest in Camshaft Fund to Inspilearn, the Debtor received *zero* consideration for this transfer, which is obviously not reasonably equivalent value.  *See Mellon Bank*, 92 F.3d at 149 ("before determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all").  And, as of March 1, 2023, the Debtor had less than $1 million remaining in its bank accounts against approximately $1.2 billion in total liabilities.[11]

---

[11]     Additionally, as set forth in Count VI of the Amended Complaint, Inspilearn held this limited partnership interest in Camshaft Fund in a constructive trust on behalf of the Debtor.  *See, e.g., O'Malley v. Boris*, 2002 WL 453928, at *7 (Del. Ch. Mar. 18, 2002) ("A constructive trust is generally imposed when a party's 'fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another.').  Accordingly, the automatic stay was violated by the February 1, 2024 transfer to an offshore trust by Defendants' "act to obtain

**C.** **Count IV:** **Riju Ravindran breached his non-waivable fiduciary duties to the Debtor by transferring $533 million to a sham hedge fund and then to Inspilearn.**

84.     In Count IV of the Amended Complaint, the Debtor alleged that Ravindran breached his duties of care and loyalty under Delaware law.

85.     A fraudulent transfer amounts to a breach of fiduciary duties. *Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, 203 n.96 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) ("A purposeful fraudulent transfer to stockholders who are 'out of the money' is obviously inconsistent with the best interest of the creditors, the firm's new residual claimants."); *In re TOUSA, Inc.*, 437 B.R. 447, 465 (Bankr. S.D. Fla. 2010) (applying Delaware law) ("The finding that a fraudulent transfer was conveyed does not negate a cause of action that directors breached their fiduciary duties in connection with approving that same fraudulent transfer."); *see generally In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 753 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ("[A]n action taken with the intent to harm the corporation is a disloyal act in bad faith."). Because "Delaware law is clear that directors and officers of an insolvent, wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors," breaches of the duties of care and loyalty occur when the "insolvent subsidiary . . . [is] plundered for its parent's benefit," as here. *TOUSA*, 437 B.R. at 457, 462.

86.     Ravindran flagrantly disregarded, and discarded, his non-waivable fiduciary duties, abdicating his decision making to T&L (on whose board Ravindran sits). Ex. 27 at 22:14-20. As discussed at length, *see* Statement of Facts §§ B-F, *supra*, while the Debtor was distressed, Ravindran, its sole director and officer, acting at the direction of the Debtor's corporate parents, authorized the transfers to a sham hedge fund in mid-2022, on the heels of two defaults and one

_____

possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

forbearance, and without apparently have conducted any meaningful diligence or investigation. He then transferred the Debtor's limited partnership interest in Camshaft Fund on account of those funds to Inspilearn—*i.e.*, a *second* actual fraudulent transfer—on March 1, 2023, again to frustrate the Debtor's creditors.  Both sets of transfers were concealed in T&L's financial disclosures, including a disclosure in March 2023 that Ravindran himself certified (on behalf of T&L) as having presented "fairly in all material respects . . . the financial condition and results of operations of the Parent Guarantor and its Restricted Subsidiaries on a consolidated basis."  Once the Lenders learned that the money had been moved, Ravindran concealed where the $533 million had gone. Then, on the Petition Date, Ravindran moved the money away from Camshaft Fund—a Delaware limited partnership that had been sued and was under the jurisdiction of the U.S. courts—to an undisclosed offshore trust.  His intention plainly was to hinder, delay, and defraud the Debtor's creditors, and the effect of his actions has massively depleted the Debtor to this day.

## II.    THERE IS A RISK OF IRREPARABLE HARM.

87.    As noted, the Debtor must show that, without injunctive relief, "it more likely than not will be unable to recover damages from the Defendant."  *EHT US1, Inc. v. EHT Asset Mgmt, LLC*, 2021 WL 3828556, at *2 (Bankr. D. Del. Aug. 27, 2021).  This could be because "the defendant intended to frustrate any judgment on the merits."  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (cleaned up).  Or, it could be because the Debtor will be left "unable to recover damages," as "the [d]efendants' assets will dissipate."  *EHT US1*, 2021 WL 3828556, at *2; *see also Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 141 (3d Cir. 2000) (agreeing with "a number of district courts in this circuit[] that have held that trust dissipation can satisfy this [irreparable harm] factor if, absent such relief, ultimate recovery is rendered unlikely").  The Court should be "especially sensitive" to either scenario, because it

"could result in the dissipation of estate assets." *In re Am. Tissue, Inc.*, 2006 WL 3498065, at *3 (Bankr. D. Del. Dec. 4, 2006). For each of these reasons, there is irreparable harm here:

**A.      There is a material risk that Defendants will further conceal the $533 million.**

88.      Defendants have spent two years actively moving and concealing the $533 million to frustrate the Debtor's and its creditors' valid exercise of remedies, and there is every reason to believe they will continue doing so.

89.      To begin, T&L clandestinely made six transfers to Camshaft Fund in April and July 2022, without notice to the Lenders or their Agent. Once made, T&L used deception to actively conceal the transfers' occurrence. Beginning in summer of 2022 and continuing through spring of 2023, T&L furnished the Lenders' Agent with three sets of unaudited quarterly financials, each of which gave the false impression that the Debtor still had over $█ million in cash or cash equivalents sitting in its bank accounts—or, as T&L's unaudited financials described the location, in "Cash and Bank." *See* Statement of Facts §§ B and E, *supra*. The Debtor's limited partnership interest in Camshaft Fund had significant restrictions on its withdrawal, transfer, or sale, coupled with significant fees and expenses, and yet it was being reported as equivalent to cash.

90.      Then, on March 1, 2023, Ravindran transferred the Debtor's limited partnership interest in Camshaft Fund to an undisclosed affiliate (now known to be Inspilearn) to prevent the Debtor's creditors from taking control of the interest and, in turn, the funds. Tensions at this time between the Debtor, its corporate affiliates, and its Lenders were running high. There were at least four outstanding Events of Default, and negotiations were at an impasse. As quoted above, the Lenders began informing former management that, unless near-term progress towards a resolution was made, they intended to exercise remedies once the parties' forbearance agreement expired on February 10, 2023. *See* Statement of Facts § E, *supra*. The admitted purpose of this second

transfer was to conceal the $533 million from the Lenders acting "expeditiously."  Ex. 28 at 34:21-35:4.

91.    In fall of 2023, Camshaft conveniently changed its characterization of the holder of the $533 million, so as to avoid having to disclose what the Debtor actually did with the money. Weeks before Pohl requested the Debtor's account records related to Camshaft Fund, Camshaft called the Debtor the "actual party in interest and beneficial owner of the more than $500M in investments that [GLAS] seeks to seize in this litigation."  Ex. 31 (Case Management Rep.) at 9. But when Pohl requested the Debtor's investment records, Camshaft did a 180 degree pivot:  the Debtor was "a *former* limited partner of Camshaft Capital Fund."  Ex. 32 (Camshaft Compl.) ¶ 26 (emphasis in original).

92.    Then, on the Petition Date itself, Defendants—knowing that Camshaft already had been sued and was subject to the jurisdiction of U.S. courts—moved the money offshore, to a "non-US trust on behalf of Inspilearn."  Ex. 1 at 4, Answer to Interrog. No. 1.

93.    And finally, four days later, counsel for Ravindran and Camshaft appeared before this Court at the first day hearing.  Ravindran accused the Debtor of "gamesmanship," Ex. 29 at 44:7-20, and said he was going to move to dismiss the bankruptcy petition.  Both sets of counsel agreed to meet and confer with Debtor about what happened to the $533 million—but they never did.  No one disclosed that the funds had just been moved offshore.  *See* Statement of Facts § F, *supra*.

94.    Simply, every time the Debtor and its creditors get anywhere close to recovering the money, Defendants proceed to move it again:

**Defendants repeatedly moved the $533 million before the Debtor and its creditors could recover it**

| **First Transfer** (April/July 2022) | **Second Transfer** (Mar. 1, 2023) | **Third Transfer** (Feb. 1, 2024) |
|---|---|---|
| **Debtor transfers $533M to Camshaft for LP Interest** | **Debtor transfers LP Interest to Inspilearn for no value** | **Inspilearn transfers LP Interest to offshore trust, which immediately redeems it** |
| This transfer was made:<br><br>• After two defaults<br><br>• After Lenders gave a limited waiver | This transfer was made:<br><br>• After four Events of Default<br><br>• After Lenders' forbearance agreement expired<br><br>• Two days before Lenders' Agent took control of Debtor | This transfer was made:<br><br>• After Debtor identified Camshaft<br><br>• After Lenders' Agent sued Camshaft<br><br>• After Chancery Court found Pohl validly in charge of Debtor<br><br>• On the Petition Date |

\*     \*     \*

95.    As the Court has recognized, "money moves quickly." Ex. 30 at 39:13-18. There can be no doubt that Defendants will move the Debtor's money (or the securities on account of that money) again, *for at least the fourth time*, if they have not done so already, to unlawfully frustrate the Debtor's efforts to recover its assets in this bankruptcy. Ravindran and his companies are based abroad, and they will continue their shell game—moving the money from one entity to the next, from one jurisdiction to another. That plainly constitutes irreparable harm. *See Team Systems*, 2023 WL 1428572, at \*12 (finding irreparable harm, because "without an injunction restraining the use of such transfers, defendants may move or conceal assets"); *EHT US1*, 2021 WL 3828556, at \*2 (same—defendants had "a history of wrongful acts and have proven that they are capable of shuffling assets," including with "a lack of remorse for so doing"); *see also In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (same—there was evidence that the

defendant had "in the past [] made away with [the debtor's] funds, suggesting that he may do the same" again).

**B.      Even if the Debtor ultimately finds the $533 million, there is a material risk that it will not be able to practically recover the funds.**

96.      Fraudulent conveyance law "aims to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." *In re PWS Holding Corp.*, 303 F.3d 308, 313 (3d Cir. 2002) (cleaned up).  Hence, the doctrine is designed to locate and freeze assets in the hands of transferees early on, before the assets are moved again or further dissipated; otherwise, the statute's creditor-protection "goal of protecting creditors from wrongful asset transfers *would likely be nearly entirely frustrated*." *Friedman v. Heart Inst. Of Port St. Lucie, Inc.*, 863 So.2d 189, 193 (Fla. 2003) (emphasis added).

97.      That is a very real concern for the Debtor and its creditors, as the Debtor has no practical recourse if the $533 million is not deposited into the Court's registry account and secured. *See Am. Tissue*, 2006 WL 3498065, at *4 (finding irreparable harm, because the evidence establish that the defendants would lack the "financial capacity to satisfy a money judgment" post-transfers, meaning the trustee's success at trial would be "an empty one").  Defendants are possibly judgment proof:

- **Camshaft.**  At this point in time, Camshaft Fund does not appear to have sufficient assets under management to satisfy a money judgment.[12]

- **Riju Ravindran.**  Upon information and belief, Ravindran resides in Dubai, with no known insurance coverage while serving as the Debtor's director and officer. Even setting aside the challenges of collection from a foreign national, it is doubtful

---

[12]     As noted, Camshaft Fund appears to have attracted few third-party investors outside of the $533 million invested by the Debtor's former management.  As of its most recent public AUM disclosure, dated April 2023, Camshaft Fund had only 42 investors and approximately $595 million in AUM—or just over $60 million in AUM, if the Debtor's $533 million is excluded. Ex. 21 at 7-8, 15, 22.  And, it appears that a "significant" amount of the $60 million derived from a separate investment made by Inspilearn (which was purportedly redeemed in June 2023).  *See* Ex. 1 at 5, Answer to Interrog. No. 2.  Accordingly, over 90% of Camshaft Fund's capital as of April 2023 is now withdrawn, which, upon information and belief, has left Camshaft a shell of what it once was.

that Ravindran individually has close to enough independent wealth to satisfy a $533 million judgment.

- **Inspilearn.** Based on BYJU's' prior financial disclosures, the Debtor does not presently believe that Inspilearn has material assets outside of the $533 million residing in an undisclosed "non-US trust." Ex. 1 at 4, Answer to Interrog. No. 1.

98.     Unable to be made whole by the Defendants, either individually or collectively, the Debtor and its creditors will be left searching for the $533 million, *once again*. But there is no guarantee that the Debtor will ever locate those funds. Even assuming it does, depending on the number of subsequent transferees, the cost of recovering found funds could become exorbitant, making finding the money nothing more than a Pyrrhic victory. *See In re Netia Holdings S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) ("If the funds leave State Street, they will be distributed to diverse parties, and be difficult or impossible to recover."); *Mishkin v. Kenney & Branisel, Inc.*, 609 F.Supp. 1254, 1257 (S.D.N.Y. 1985) (finding irreparable harm, because requiring the trustee to chase the transfer of its assets to three other creditors "would entail tremendous delay and require [it] to commence three separate actions in three separate jurisdictions, with needless duplication of time, effort, and expense").

99.     For all of these reasons, the entirety of the funds that remain, along with associated accrued interest, should be immediately placed into the Court-supervised registry account (or a nationally-recognized brokerage firm approved by the U.S. Trustee and the Debtor, if the non-US trust is holding securities on account of the Debtor's $533 million).

## III.     THERE IS NO MEANINGFUL HARM TO ANY OTHER INTERESTED PARTY.

100.     As discussed, the first two factors are the "most critical." *Reilly*, 858 F.3d at 179. Here, they weigh heavily in favor of an injunction, and balancing the final two factors does not change the analysis.

101.    When balancing the harms, the "question to be addressed is not whether [Defendants] would suffer some harm, or whether there is a possibility of harm, but which of two potential harms—[the Debtor's] or [Defendants']—is greater." *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 (3d Cir. 1999) (cleaned up).  The Debtor's harm is clearly greater in this case.  The occurrence of fraudulent transfers is not meaningfully in dispute, nor is the history of the $533 million's whereabouts being concealed.  Further, Ravindran never transferred the $533 million to Camshaft Fund because he believed it to be a safe and prudent investment; that was not the point.  And since the funds were first moved, the reported net appreciation on the $533 million (at least as of March 1, 2023) has been minimal.  *See* Ex. 1 at 4, 9, Answer to Interrog. Nos. 1, 8.  Therefore, requiring that the funds be placed in a registry account cannot be value destructive.  Nor is the Debtor aware of evidence that would demonstrate undue harm to Defendants following an injunction.  *See In re Revel AC, Inc.*, 802 F.3d 558, 572 (3d Cir. 2015) ("Absent some sort of declaration or other evidence in the record that a stay would cause substantial harm, the harm to [the non-movant] was at best speculative.").[13]  After all, the funds are purportedly merely sitting in a trust.

---

[13]    The Debtor acknowledges that, all else equal, obtaining a mandatory preliminary injunction altering the *status quo* carries with it a heavier burden than obtaining a "freezing" injunction.  But, *first*, there is ample precedent from this District requiring funds to be placed in escrow with the Court.  *See, e.g.*, *Variant Holding Co. v. Gettel* (*In re Variant Holding Co.*), Case No. 15-50931-BLS (Bankr. D. Del. July 27, 2015) [Adv. Pro. D.I. 15]; *Am. Tissue*, 2006 WL 3498065, at *5 (granting motion for preliminary injunction and requiring certain funds be escrowed pending trial and the court's ruling).  *Second*, requiring the Debtor's funds to be placed in the Court's registry is practically the same as freezing the funds in the "non-US trust."  *And finally*, a freezing injunction is simply inadequate under the facts here, as Defendants could move the money, which is already offshore, without the knowledge of the Court and the parties, leaving the Debtor with no practical recourse.  *See, e.g.*, *In re Soundview Elite Ltd.*, 543 B.R. 78, 116 (Bankr. S.D.N.Y. 2016) (finding that the debtor would be "irreparably injured" absent injunctive relief because, as here, the "risk of dissipation of [debtor's] assets in the absence of an injunction barring such is very real").

## IV.    THE PUBLIC INTEREST IS SERVED BY GRANTING AN INJUNCTION.

102.    As the final factor, the public interest strongly weighs in favor of granting the requested relief.  "In the context of bankruptcy proceedings, the 'public interest' element means the promoting of a successful reorganization."  *In re Am. Film Techs., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (cleaned-up); *see also id.* ("It is one of the paramount interests of this court to assist the Debtor in its reorganization efforts.") (cleaned-up).  Additionally, "[t]he public interest is served when the Court imposes relief which maintains integrity in financial and business dealings and *protects bankrupt estates from misappropriation of assets*."  *Am. Tissue*, 2006 WL 3498065, at *5 (emphasis added); *accord Team Systems*, 2023 WL 1428572, at *13.

103.    Here, the public interest is served for both of these reasons by an injunction.  The $533 million, as perhaps the most valuable asset of the estate, is necessarily a key component of this bankruptcy, while the Debtor and its estate have been significantly depleted by Defendants' misappropriation of the Debtor's funds.[14]

### CONCLUSION

104.    For all of these reasons, the Court, pursuant to 11 U.S.C. § 105(a) and/or Bankruptcy Rule 7065, should enter the Proposed Order attached as **Exhibit A** to the Motion, among other things, requiring Defendants to, within two business days of the Court's Order, transfer the entirety of the Debtor's funds, with associated accrued interest, into the registry of the U.S. Bankruptcy Court for the District of Delaware, pending further order of the Court, and granting such further relief as the Court deems just and appropriate.

---

[14]    Bankruptcy Rule 7065 expressly exempts the security requirement of Federal Rule of Civil Procedure 65(c).  Fed. R. Bankr. P. 7065.  In particular, no security is required for a debtor in possession, as here, to obtain a TRO (or preliminary injunction) absent an order specifically requiring such security.  *Id.*  Accordingly, the Debtor should not be required to post a bond or other security as a condition of the injunctive relief that they seek.

Dated: Wilmington, Delaware
February 28, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (pro hac vice granted)
Benjamin Finestone (pro hac vice granted)
Daniel Holzman (pro hac vice granted)
Jianjian Ye (pro hac vice granted)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.:  (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

*Proposed Counsel for Debtor, BYJU's Alpha, Inc.*