# EXHIBIT 11

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.

The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

Previous Names  [X] None

Entity Type

0001822044

- [ ] Corporation
- [X] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

Name of Issuer
Camshaft Capital Fund, LP

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2020
- [ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
Camshaft Capital Fund, LP

Street Address 1
285 NW 42ND AVENUE

Street Address 2

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| MIAMI | FLORIDA | 33126 | 4065523828 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Morton | William | |

Street Address 1
285 NW 42nd Avenue

Street Address 2

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Miami | FLORIDA | 33126 |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

---

### 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [X] Pooled Investment Fund

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology

[X] Hedge Fund
[ ] Private Equity Fund
[ ] Venture Capital Fund
[ ] Other Investment Fund

Is the issuer registered as
an investment company under
the Investment Company
Act of 1940?

[ ] Yes          [X] No

[ ] Other Banking & Financial Services

[ ] Business Services

Energy

[ ] Coal Mining

[ ] Electric Utilities

[ ] Energy Conservation

[ ] Environmental Services

[ ] Oil & Gas

[ ] Other Energy

[ ] Manufacturing

Real Estate

[ ] Commercial

[ ] Construction

[ ] REITS & Finance

[ ] Residential

[ ] Other Real Estate

Travel

[ ] Airlines & Airports

[ ] Lodging & Conventions

[ ] Tourism & Travel Services

[ ] Other Travel

[ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [X] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

[ ] Rule 504(b)(1) (not (i), (ii) or (iii))
[ ] Rule 504 (b)(1)(i)
[ ] Rule 504 (b)(1)(ii)
[ ] Rule 504 (b)(1)(iii)
[ ] Rule 505
[X] Rule 506(b)
[ ] Rule 506(c)
[ ] Securities Act Section 4(a)(5)

[X] Investment Company Act Section 3(c)

[X] Section 3(c)(1)          [ ] Section 3(c)(9)
[ ] Section 3(c)(2)          [ ] Section 3(c)(10)
[ ] Section 3(c)(3)          [ ] Section 3(c)(11)
[ ] Section 3(c)(4)          [ ] Section 3(c)(12)
[ ] Section 3(c)(5)          [ ] Section 3(c)(13)
[ ] Section 3(c)(6)          [ ] Section 3(c)(14)
[ ] Section 3(c)(7)

## 7. Type of Filing

[X] New Notice   Date of First Sale  [X] First Sale Yet to Occur
[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?  [X] Yes  [ ] No

**9. Type(s) of Securities Offered (select all that apply)**

☐ Equity

☐ Debt

☐ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests

☐ Tenant-in-Common Securities

☐ Mineral Property Securities

☐ Other (describe)

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?    ☐ Yes ☒ No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $ 50,000 USD

**12. Sales Compensation**

Recipient

(Associated) Broker or Dealer ☒ None

Street Address 1

City

Recipient CRD Number ☒ None

(Associated) Broker or Dealer CRD Number ☒ None

Street Address 2

State/Province/Country                                   ZIP/Postal Code

State(s) of Solicitation (select all that apply) Check "All States" or check individual States    ☐ All States    ☐ Foreign/non-US

**13. Offering and Sales Amounts**

Total Offering Amount          USD  or ☒ Indefinite

Total Amount Sold          $ 0 USD

Total Remaining to be Sold          USD  or ☒ Indefinite

Clarification of Response (if Necessary):

**14. Investors**

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    0

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $ 0 USD ☒ Estimate

Finders' Fees $ 0 USD ☒ Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$ 0 USD ☒ Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking**

**SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Camshaft Capital Fund, LP | /William Morton/ | William Morton | Manager of General Partner | 2020-09-11 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT 12



# EXHIBIT 13



CAMSHAFT CAPITAL ADVISORS, LLC
1200 BRICKELL AVE SUITE 310
MIAMI, FL 33131
TELEPHONE:  305-619-1383

WWW.CAMSHAFTGROUP.COM

**January 2024**

This brochure provides information about the qualifications and business practices of Camshaft Capital Advisors. LLC ("<u>Camshaft</u>" or the "<u>Firm</u>"). If you have any questions about the contents of this brochure, please contact us at (305) 619-1383 and/or email: william@camshaftcapital.com The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("<u>SEC</u>") or by any state securities authority.

Additional information about Camshaft also is available on the SEC's website at www.adviserinfo.sec.gov.

**Camshaft is registered as an investment adviser with the SEC. Registration with the SEC does not imply a certain level of skill or training.**

CPAM: 10312599.5
AmericasActive:9411525.6

**Item 2.** Material Changes

This is the initial Brochure filing for Camshaft Capital Advisors, LLC. Going forward this Item will be updated with each annual amendment.

*The information set forth in this Brochure is qualified in its entirety by reference to a Client's Governing Documents (as defined herein) and/or offering documents.  In the event of a conflict between the information set forth in this Brochure and the information set forth in a Client's Governing Documents and/or offering documents, the Client's Governing Documents and/or offering documents shall take precedence.*

**Item 3.** Table of Contents

**Topic:**                                                                                                          **Page**

**Item 2. Material Changes** ................................................................................................ **2**

**Item 3. Table of Contents** ................................................................................................ **3**

**Item 4. Advisory Business** ................................................................................................ **4**

**Item 5. Fees and Compensation** ...................................................................................... **4**

**Item 6. Performance-Based Fees and Side-By-Side Management** ........................... **6**

**Item 7. Types of Clients** ................................................................................................ **7**

**Item 8. Methods of Analysis, Investment Strategies and Risk of Loss** ................... **8**

**Item 9. Disciplinary Information** .................................................................................... **38**

**Item 10. Other Financial Industry Activities and Affiliations** ................................... **38**

**Item 11. Code of Ethics, Participation or Interest in Client Transactions
    and Personal Trading** ...................................................................................... **39**

**Item 12. Brokerage Practices** .......................................................................................... **40**

**Item 13. Review of Accounts** .......................................................................................... **42**

**Item 14. Client Referrals and Other Compensation** .................................................... **42**

**Item 15. Custody** .............................................................................................................. **42**

**Item 16. Investment Discretion** ...................................................................................... **43**

**Item 17. Voting Client Securities** .................................................................................... **43**

**Item 18. Financial Information** ........................................................................................ **44**

**Item 4.** Advisory Business

For the purposes of this Brochure, the "**Adviser**", "Camshaft: or the "**Investment Manager"** means Camshaft Capital Advisors, LLC.  The Investment Manager, owned by William Morton, is a limited liability company organized under the laws of the State of Florida and has been providing investment advisory services since 2020. Camshaft Capital Management, LLC is the General Partner of Camshaft Capital Fund LP. Mr. Morton acts as the managing member of Camshaft Capital Management, LLC.

Currently, Camshaft manages and provides discretionary investment advisory services to the Camshaft Capital Fund, LP (as defined below in this Item 4 under "**Funds**"). In addition, Camshaft may serve as a discretionary investment adviser to invest the assets of a privately offered pooled investment vehicle managed by an unaffiliated third-party pursuant to a trading advisory agreement (the "**Third-Party Fund**" and, together with the Camshaft Funds, the "**Funds**"). Camshaft may also provide investment advisory services to entities or pooled investment vehicles on a managed account basis (each such arrangement, a "**Managed Account**," and the entity(ies) funding a Managed Account, a "**Managed Account Client**"). For the purposes of this brochure, a "**Client**" refers to a Fund (but not the investors in a Fund) and/or a Managed Account Client, as the context requires.

As of December 31, 2022, Camshaft had $595,845,395 in regulatory assets under management. Camshaft does not currently manage any Client assets on a non-discretionary basis. Camshaft does not participate in any wrap fee programs.

<u>Managed Account Arrangements</u>

As of the date of this brochure, Camshaft has no Managed Account arrangements. However, in the event that Camshaft were to enter into a Managed Account arrangement in the future, then Camshaft would develop investment guidelines based upon the Managed Account Client's specific investment objectives. Managed Account advisory services would be governed by a written agreement ("**Managed Account Agreement**") between Camshaft and the Managed Account Client. Camshaft would manage any such Managed Accounts under a broad range of potential mandates. Managed Account Clients would be permitted to amend their investment guidelines as their needs change or impose restrictions or limitations on investing in certain securities or types of securities.

**Item 5.** Fees and Compensation

A management fee is paid monthly in advance to the General Partner. The management fee is equal to three percent (3%) per annum of the beginning capital account balance of each Limited Partner for such month. The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the management fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

To the extent that there is a shared expense among any of the Camshaft Funds, on the one hand, and Camshaft, on the other hand, Camshaft will allocate the expense among such Camshaft Fund(s) and itself in a manner that it determines is fair and equitable under the circumstances to all parties.

See Item 6 below for more information concerning performance-based fees.

<u>Managed Accounts</u>

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. In the event that Camshaft were to advise a Managed Account in the future, it may be paid a management fee and/or a performance fee by such Managed Account in accordance with the terms of the applicable Managed Account Agreement.

<u>Additional Expenses</u>

In addition to the management fees and the performance-based fees described above, the Camshaft Funds (and, indirectly, the investors therein) will pay such additional expenses as are disclosed in the Camshaft Funds' applicable offering documents. The expenses to be paid by each Camshaft Fund vary and may include, among others, the following: transaction costs and investment-related expenses incurred in connection with the Funds' trading activities, including securities and futures brokerage, clearing, margin interest (if any), custodial expenses, and any non-U.S. mutual fund expenses; all U.S. and non-U.S. legal, regulatory and compliance fees and expenses (including, but not limited to, blue sky compliance, compliance with the Alternative Investment Fund Managers Directive, MIFID, the EEA and FATCA), accounting, auditing, tax preparation, expenses relating to the offering and sale of the Shares, and registration fees and expenses as well as related fees and expenses (including, but not limited to, legal fees or other fees and expenses related to: the preparation and filing of Form PF, CFTC and NFA Form CPO-PQR, NFA Form CTA-PR and NFA Form PR, the applicable portion of Camshaft's fees and expenses incurred in connection with preparing and filing Form ADV that are allocable to a Camshaft Fund, and any other SEC, CFTC and/or NFA filings and registrations or other filings that are made with respect to the Funds or assets of the Funds; related requirements under the Dodd-Frank Act, and U.S. Department of the Treasury and U.S. Department of Commerce regulations; and registrations and related requirements of foreign regulators); expenses associated with the continued offering of shares, which include, but are not limited to, marketing, travel and other solicitation expenses; operational expenses such as the administrator's charges, fees and expenses, trade support systems, the directors' charges and expenses, photocopying, facsimile, postage, and telephone expenses; research and research-related costs, consulting fees, fees and charges (such as data feeds, news, Fund reports, brokerage reports, software licenses, ongoing development, implementation, updating and support of software licenses, bank service fees, third-party trading and/or portfolio-related services and support, including software costs such as order management, risk management and similar systems, software costs relating to order management, and Bloomberg terminals and services); legal fees and due diligence expenses, related to the analysis purchase or sale of investments, whether or not the investment is consummated; Camshaft Fund related insurance costs (including a portion of D&O and E&O insurance for Camshaft, if applicable), extraordinary expenses (such as, litigation costs and indemnification obligations), if any; the Performance Fee and the Management Fee (defined below) paid to Camshaft; Cayman Islands government fees and director registration fees and other equivalent expenses; and interest in connection with

investment-related borrowings. In addition, each Fund will bear its *pro rata* share of all expenses related to any pooled investment vehicle(s) (including, but not limited to, the Master Fund) in which such Fund invests; such charges may include management fees, performance fees, ordinary operating expenses (such as administration, legal, accounting and other operational costs) and extraordinary expenses (such as litigation costs and indemnification obligations), provided that such Fund will not bear a double-layering of asset-based fees or performance-based compensation in connection with its investment in another Camshaft Fund. Therefore, it is possible that a Fund may bear a portion of any such expense even though it may not directly benefit therefrom. Funds also pay the fees and expenses of their prime brokers, futures commission merchants and administrators.

As described further in the respective offering documents for the Camshaft Funds, generally, Camshaft will bear certain overhead expenses of operating the Camshaft Funds which otherwise would be allocable to the Camshaft Funds.

Although Camshaft presently does not have any Managed Account Clients, any future Managed Account Clients of Camshaft may be expected to pay additional expenses similar to those described above, to the extent applicable, subject to the specific terms of the applicable Managed Account Agreement.

Please see Item 12 below for a discussion of Camshaft's brokerage practices.

<u>Additional Information About Fees and Expenses</u>

The specific manner in which Camshaft charges management fees, performance-based fees, and expenses is established in each Client's written agreement with Camshaft. Camshaft investors may consult the applicable Fund's offering memorandum and governing documents for a description of these charges. Generally, pursuant to the applicable governing documents for each Fund, management fees and performance-based fees are deducted directly from each investor's account with the relevant Fund. Management fees, if any, are generally paid monthly in arrears. Performance fees, if any, are paid at the end of the fiscal year to which the fee pertains or upon a redemption from a Fund or a termination of a Managed Account.

The foregoing fees and expenses may be negotiable, reduced, rebated or waived in certain circumstances, including with respect to Clients or Fund investors that are employees of Camshaft and other persons that are affiliated with Camshaft or its affiliates.

**Item 6.** Performance-Based Fees and Side-By-Side Management

Currently, Camshaft's Clients are generally charged both a management fee and a performance fee. The performance fees are structured to comply with Section 205 of the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

Performance-based compensation arrangements may create an incentive for Camshaft to make investments that are riskier or more speculative than would be the case in the absence of a financial incentive based on the performance of a Client's account. Performance-based compensation arrangements may also create an incentive for Camshaft to favor higher fee paying accounts over other accounts in the allocation of investment opportunities. When Camshaft

6

transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties. Camshaft will not necessarily purchase or sell the same securities at the same time or in the same proportionate amounts for all eligible portfolios, particularly if different portfolios have materially different amounts of capital under management by Camshaft or different amounts of investable cash available or different investment guidelines, financing arrangements and/or dealer relationships. As a result, although Camshaft manages portfolios with similar or identical investment objectives, or may manage accounts with different objectives that trade in the same securities, the portfolio decisions relating to these accounts, and the performance resulting from such decisions, may differ from portfolio to portfolio.

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. If in the future Camshaft were to advise a Managed Account alongside the Camshaft Funds, it is possible that Camshaft may take different positions in the same or related securities for such Clients, such as selling certain securities short for a Camshaft Fund while a Managed Account simultaneously holds the same or related securities long. In such case, Camshaft will adopt and execute side-by-side management procedures in an effort to mitigate these potential conflicts.

## Item 7. Types of Clients

Camshaft currently provides investment advice only to the Camshaft Funds. However, Camshaft may advise additional or different types of entities in the future.

Each Camshaft Fund is not registered under the Investment Company Act of 1940, as amended (the "**1940 Act**"), in reliance on the exemption provided by Section 3(c)(7) of the 1940 Act. In addition, each Camshaft Fund's interests or shares (as applicable) are not registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state "blue-sky" laws; rather, they are privately offered only to qualified purchasers and accredited investors pursuant to an exemption from registration under Regulation D under the Securities Act. Each investor in the Fund must be (1) an "accredited investor" as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" as defined in the 1940 Act and the regulations under the 1940 Act, and (3) a "United States person" as defined under the Internal Revenue Code of 1986, as amended (the "Code"). Each investor in the Fund that is a "United States person" (as defined in the Code) must be (1) an "accredited investor," as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" or "knowledgeable employee" as defined in the 1940 Act and the rules under the 1940 Act (and thus a "qualified client" within the meaning of the Advisers Act), and (3) exempt from U.S. federal income tax under Section 501 of the Code or otherwise. Each other investor in the Fund must not be a "U.S. person," as defined in Regulation S under the Securities Act, or a "United States person" as defined in the Code, and must be a "Non-United States person" as defined in Regulation 4.7 under the U.S. Commodity Exchange Act, as amended. The minimum investment in each Fund, subject to waiver, is $2,500,000.

If a Client or potential Client would like to open a Managed Account, the conditions for starting and maintaining a Managed Account will vary with the circumstances of each Managed Account and be negotiated and set forth on an individual basis in the relevant Managed Account Agreement.

**Item 8.** Methods of Analysis, Investment Strategies and Risk of Loss

The methods of analysis and investment strategies used by Camshaft in managing Camshaft Fund assets are summarized below. The methods of analysis and investment strategies that Camshaft would use to manage assets of any Managed Account Clients would vary depending on the needs of each Managed Account Client, but are expected to be comparable to those summarized below for the Camshaft Funds. In addition, the material risks involved with each significant investment strategy and method of analysis is explained below.

<u>Methods of Analysis and Investment Strategies</u>

The methods of analysis and investment strategies used by Camshaft in managing assets are summarized below. Investors and prospective investors in a Camshaft Fund should review the offering memorandum Fund in which they are invested (or are seeking to invest) for additional information about the strategies and risks associated with an investment in such Fund. For information concerning the sub-strategies identified below, please refer to the confidential offering memorandum of the applicable Camshaft Fund.

- *Leverage and Short Selling*. The Fund may from time to time engage in short selling. Selling securities short runs the risk of losing an amount greater than the amount invested. Short selling is subject to theoretically unlimited risk of loss because there is no limit on how much the price of the stock may appreciate before the short position is closed out. A short sale may result in a sudden and substantial loss if, for example, an acquisition proposal is made for the subject company at a substantial premium over market price. Furthermore, the Fund at times will trade securities on a leveraged basis, i.e., where the security can be purchased by putting up only a portion of the instrument's face value and borrowing the remainder (margin). As a result, a relatively small price movement in a security may result in immediate and substantial losses to the Fund. In addition, trading on margin will result in interest charges to the Fund which may be substantial. Leveraged investments, including any purchase or sale of securities on margin, may result in losses in excess of the amount invested.

- *Trading in Distressed Securities and Highly Leveraged Companies*. The strategies of the General Partner and the Investment Advisers may entail investments in distressed securities and highly leveraged companies. An investment in these types of securities and companies, by the nature of their leveraged capital structure, will involve a high degree of financial risk. Such risks include, but are not limited to, the following: (a) difficulty in identifying attractive investment opportunities; (b) subordination to substantial amounts of senior indebtedness, all or a signification portion of which may be secured; (c) the possibility of substantial changes in rights and covenants which could result in less protection for the Fund with respect to securities purchased in proceedings under Chapter 11 of the US Bankruptcy Code; and (d) the lack of regulation of the OTC Market (in which distressed securities often are traded) by any exchange, and the lack of any established market-making, margin or other requirements that would help to insure a viable trading market exists for a particular security.

- *Illiquidity of Markets*. At various times, the markets for securities interests purchased or sold by the Fund may be "thing" or illiquid, making purchase or sale of securities at desired prices or in desired quantities difficult or impossible. For example, securities exchanges and the

SEC have authority to suspend trading in a particular security without notice. In addition, the Fund may invest in private placements of securities that are not registered under the Act and may have little to no trading market.

- *Investing in Illiquid Securities*. The Fund may from time to time invest in unregistered securities of public companies and at times in the securities of private companies, including without limitation, limited partnerships, the securities of which may be, and often are, illiquid. While no more that 10% of the Fund's portfolio may be invested in illiquid securities, the Fund may be forced to hold a larger cash reserve than normal as a precaution in the event of a large number of withdrawal requests by Limited Partners within a short period of time.

- *Other Investment Strategies*. Camshaft may also pursue other investment strategies as it deems appropriate, including, but not limited to: long/short equity investing, investing and trading in futures, foreign currency instruments, options, total-return swaps, stock indices and exchange-traded funds or other derivative financial instruments.

<u>Material Risks</u>

*An investment in the Camshaft Funds involves substantial risks, including, but not limited to, those described below. The following information is not intended to be an exhaustive listing of all potential risks associated with an investment in the Camshaft Funds. There can be no assurance that the Camshaft Funds will realize their investment objective or return any capital. Shares/interests are a potentially suitable investment only for sophisticated investors for whom an investment in the Camshaft Funds does not represent a complete investment program and who, in consultation with their own investment and tax advisors, fully understand and are capable of assuming the risks of an investment in the shares/interests.*

*Note that, while this section may refer to risks of trading by the Camshaft Funds, all of the Camshaft Funds' trading activities occur at the level of the Master Fund. In addition, references in this section to possible actions undertaken by the Camshaft Funds and the risks related to the operation of the Camshaft Funds should be read to include references to possible actions undertaken by the Master Fund and the risks related to the operation of the Master Fund.*

*Prospective investors should give careful consideration to the following factors in evaluating the merits and suitability of an investment in the Camshaft Funds:*

**<u>Risks Relating to the Camshaft Funds and the Offering of Shares/Interests</u>**

*Limitations on Past Performance*. Camshaft Funds' past performance is by no means necessarily representative of how the Camshaft Funds will perform. While certain individuals of the Firm have substantial experience investing in certain types of opportunities that the Camshaft Funds pursues, there can be no assurance that the Camshaft Funds or the Master Fund will generate performance results equivalent to the past results generated by the Firm or that the Camshaft Funds will avoid losses. Market conditions and trading approaches are continually changing, and the fact that certain individuals of the Firm may have achieved certain positive performance in the past may be largely irrelevant to the Camshaft Funds' prospects for profitability. The Camshaft Funds'

past performance has been, and is expected to continue to be, highly volatile. PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

*Potential Loss of Investment*. An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

*No Market for Shares/Interests*. Although amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm. There is no market for the shares/interests, and none is expected to develop. Shares/interests will not be registered under the securities laws of any jurisdiction and will be subject to strict restrictions on resale and transferability. Therefore, investors must be prepared to bear the risk of their investment in the Camshaft Funds for a substantial period of time.

*Reliance on Key Person*. The Camshaft Funds is substantially dependent on the services of Camshaft. In the event of the death, disability, departure or insolvency of Mr. Morton, the business of the Camshaft Funds may be adversely affected. Mr. Morton will devote such time and effort as he deems necessary for the management and administration of the Camshaft Funds' business. However, Mr. Morton may engage in various other business activities in addition to managing the Camshaft Funds, and consequently Mr. Morton may not devote his complete time to the business of the Camshaft Funds.

*Effect of Substantial Redemptions/Withdrawals*. A number of events could result in substantial redemptions/withdrawals from the Camshaft Funds. Actions taken to meet such redemptions/withdrawals requests could result in a decrease in the prices of equities (listed and unlisted, private and public, common and preferred), fixed income securities, sovereign debt, futures (including commodity futures), over-the-counter physical commodities, foreign exchange forward and spot contracts, digital assets and digital asset derivatives, American Depositary Receipts ("ADRs"), foreign exchange currencies, and other derivative contracts and transactions such as swaps (including interest rate swaps, credit default swaps, index credit default swaps, equity total return swaps, volatility or variance swaps, correlation swaps and commodity swaps), options, warrants, convertible securities, and cash or cash equivalents (such as treasury notes and bills, certificates of deposit, commercial paper, broker balances, bankers acceptances or repurchase agreements) (collectively, "Financial Instruments") held by the Camshaft Funds and an increase in expenses (*e.g.*, transaction costs and the costs of terminating agreements). The overall value of the Camshaft Funds may also decrease because the liquidation value of certain assets may be materially less than their mark-to-market value. The Camshaft Funds may be forced to sell its more liquid positions, may need to maintain greater amounts of cash and cash-equivalent investments than it would otherwise maintain and may also be restricted in its ability to obtain financing or derivatives counterparty relationships needed for certain investment and trading strategies, any of which could affect the Camshaft Funds adversely.

***Performance-Based Compensation.*** In addition to sharing in profits on the basis of its capital, the Firm will be entitled to receive from each investor's account (paid by the Master Fund) a performance fee based on a percentage of the new net income, if any, in respect of such investor's account during a performance period. The performance fee can be characterized as creating an incentive to the Firm to make speculative investments and thus a potential conflict with the investments of the investors. Since the performance fee will be based upon portfolio gains, both realized and unrealized (net of realized and unrealized losses), it is possible that the Firm may receive a performance fee based upon unrealized appreciation in particular positions which is not in fact achieved upon eventual disposition of such positions. The fact that the performance fee is based on capital appreciation of the Camshaft Funds may create an incentive for the Firm to make investments that are more speculative than would be the case in the absence of such performance-based advisory compensation.

***Share Value Calculation.*** The value of the dollar class shares will be calculated in U.S. Dollars.

***Limited Regulatory Oversight***. The Camshaft Funds is not registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended (the "**Company Act**") or any comparable regulatory requirements and does not intend to do so. Accordingly, the provisions of such regulations, which among other things generally require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be maintained in segregated accounts and regulate the relationship between the investment company and its asset manager, are not applicable to an investment in the Camshaft Funds. Notwithstanding the foregoing, the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") imposes burdensome reporting and recordkeeping requirements on the Camshaft Funds. The Camshaft Funds intends to trade with dealers who will be required by regulation or will undertake to fulfill the Camshaft Funds' Dodd-Frank mandated reporting requirements. The costs associated with such compliance may result in certain investment strategies in which the Camshaft Funds engages, or may have otherwise engaged, becoming non-viable or non-economic to implement.

***Investors Do Not Participate in Management***. Except as outlined in the applicable offering documents investors, in their capacity as such, do not have the right to participate in the management of the Camshaft Funds or in the conduct of its business, whether by voting or otherwise. In general, the Firm is solely responsible for managing the Camshaft Funds and for the investment, sale and reinvestment of the Camshaft Funds' assets.

***Risk of Litigation***. In the ordinary course of business, the Camshaft Funds may be subject to litigation from time to time. In addition, as a result of certain investments, the Camshaft Funds could be named as a defendant in a lawsuit or regulatory action. The outcome of such proceedings, which may materially adversely affect the value of the Camshaft Funds, may be impossible to anticipate, and such proceedings may continue without resolution for long periods of time. Any litigation may consume substantial amounts of the Firm's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation.

*Service Provider Risks*. The Camshaft Funds and the Firm are also reliant upon the proper performance of duties and obligations of their respective service providers. The Camshaft Funds may be adversely impacted in a material manner if one or more of the service providers to the Camshaft Funds or the Firm fail to adequately perform their functions. In addition, key activities undertaken in connection with the Firm's and the Camshaft Funds' operations may be concentrated in one or more service providers, which may expose the Camshaft Funds to risks if one or more of such service providers does not provide, or becomes incapable of providing services, in the normal course of business.

*Institutional and Counterparty Risk*. Institutions, such as brokerage firms, banks and broker dealers, generally have custody of the Camshaft Funds' portfolio assets and may hold such assets in "street name." The Camshaft Funds is subject to the risk that these firms and other brokers, counterparties or clearinghouses with which the Camshaft Funds deals may default on their obligations to the Camshaft Funds. Any default by any of such parties could result in material losses to the Camshaft Funds. Bankruptcy or fraud at one of these institutions could also impair the operational capabilities or the capital position of the Camshaft Funds. In addition, securities and other assets deposited with custodians or brokers may not be clearly identified as being assets of the Camshaft Funds, causing the Camshaft Funds to be exposed to a credit risk with regard to such parties. The Camshaft Funds generally will only be an unsecured creditor of its trading counterparties in the event of bankruptcy or administration of such counterparties. In some jurisdictions, the Camshaft Funds may also only be an unsecured creditor of its brokers in the event of bankruptcy or administration of such brokers. The Camshaft Funds will attempt to limit its brokerage and custody transactions to well capitalized and established banks and brokerage firms in an effort to mitigate such risks, but the collapse of the seemingly well capitalized and established Bear Stearns and Lehman Brothers demonstrates the limits on the effectiveness of this approach in avoiding counterparty losses.

The Camshaft Funds may effect transactions in over-the-counter ("**OTC**") and "interdealer" markets. The participants in such markets are typically not subject to the same level of credit evaluation and regulatory oversight as are members of "exchange based" markets. This exposes the Camshaft Funds to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Camshaft Funds to suffer a loss. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or in instances where the Camshaft Funds has concentrated its transactions with a single or small group of counterparties. The inability to make complete and "foolproof" evaluations of the financial capabilities of the Camshaft Funds' counterparties and the absence of a regulated market to facilitate settlement increases the risk to the Camshaft Funds.

The Camshaft Funds are likely to have exposure to trading counterparties other than its prime brokers. If the Camshaft Funds deliver collateral to its trading counterparties under the terms of its ISDA Master Agreements and any other trading agreements, either by posting initial margin or on a daily mark-to-market basis, circumstances may arise where a counterparty may be over-collateralized and/or the Camshaft Funds may from time to time have uncollateralized mark-to-market exposure to a counterparty in relation to its rights to receive securities and cash. In both circumstances the Camshaft Funds will be exposed to the creditworthiness of any such

counterparty and, in the event of the insolvency of a trading counterparty, the Camshaft Funds will rank as an unsecured creditor in relation to amounts equivalent to any such over-collateralization and any uncollateralized exposure to such trading counterparty. In such circumstances it is likely that the Camshaft Funds will be unable to recover any debt in full, or at all.

The Camshaft Funds' contractual arrangements with its trading counterparties will typically contain termination provisions in the event of, among other things, a significant decline in the net asset value of the Camshaft Funds, calculated on a periodic basis, and/or a decline in the net asset value of the Camshaft Funds to an absolute floor. Termination of any such contractual arrangements could seriously impair the ability of the Camshaft Funds to carry on its investment activities.

In addition to the foregoing risks associated with a counterparty or prime broker defaulting or entering into a dispute, there is also the risk that major institutional investors in the Camshaft Funds may be compelled to withdraw or redeem or that the Camshaft Funds' counterparties or brokers will be required to restrict the amount of credit previously granted to the Camshaft Funds due to their own financial difficulties, resulting in forced liquidation of substantial portions of the Camshaft Funds' investments.

The Camshaft Funds' brokers and other counterparties may hold the Camshaft Funds' assets, including assets held as collateral for margin loans or other financing provided to the Camshaft Funds. Under the terms of such arrangements and under applicable law, a secured party may be permitted to rehypothecate such assets in connection with securities lending or other transactions entered into by the secured party. Depending upon the types of instruments traded, the Camshaft Funds may be subject to risk of loss of its assets on deposit with a counterparty in the event of the bankruptcy or insolvency of such counterparty, any clearing broker through which such counterparty executes and clears transactions (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty), any affiliate of such counterparty or any clearinghouse or exchange on which such counterparty trades (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty).

The Camshaft Funds are not restricted from dealing with any particular counterparty or from concentrating any or all transactions with one counterparty. The ability of the Firm to transact business with any one or number of counterparties, the lack of any meaningful or independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Camshaft Funds.

***Illiquid Financial Instruments***. Financial Instruments purchased by the Camshaft Funds may lack a liquid trading market, which may result in the inability of the Camshaft Funds to sell any such security or portfolio investment or to close out a transaction or to cover the short sale of a position, thereby forcing the Camshaft Funds to incur potentially unlimited losses in such instruments. This lack of liquidity and depth could be a disadvantage to the Camshaft Funds both in the realization of the prices that are quoted and the execution of orders at desired prices. In addition, Financial Instruments that are at one time marketable could become unmarketable (or more difficult to market) for a number of reasons. For example, in the case of securities traded on the NASDAQ National Market System, Inc., if the price of the securities falls below the minimum price required for continued trading, their marketability is likely to be adversely affected or

effectively eliminated altogether. In addition, most U.S. futures exchanges have established "daily price fluctuation limits" which preclude the execution of trades at prices outside of the limit, and, from time to time, the CFTC or the exchanges may suspend trading in market disruption circumstances. The daily limits establish the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily limit has been reached in a particular futures contract, no trades may be made at a price beyond the limit. In these cases, it is possible that the Camshaft Funds could be required to maintain a losing position that it otherwise would close and incur significant losses or be unable to establish a position and miss a profit opportunity. Illiquid Financial Instruments may also be more difficult to value. Liquidity risk arises in the general funding of the Camshaft Funds' trading activities. It includes the risk of the Camshaft Funds not being able to fund trading activities at settlement dates, or liquidate Financial Instrument positions in a timely manner at a reasonable price. The sale of illiquid Financial Instruments often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the OTC markets. The Camshaft Funds may not be able to readily dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time. Finally, if a substantial number of investors were to redeem/withdraw from the Camshaft Funds and the Camshaft Funds did not have a sufficient amount of cash and liquid securities to satisfy in cash such requests, the Camshaft Funds might have to meet such redemption/withdrawal requests through distributions of illiquid Financial Instruments.

Certain positions are typically liquidated on or shortly before the effective redemption/withdrawal date. If there is a market dislocation, including a daily price fluctuation limit, affecting such position(s) on such date, the price of the position(s) used to determine the net asset value of the investor account may be substantially different than the amount for which the position(s) can ultimately be sold by the Master Fund (or the price that would have been in effect without such market dislocation). Shorter notice for a redemption/withdrawal may exacerbate this result. If a market dislocation exists on a date on which the Camshaft Funds attempts to liquidate positions to satisfy redemptions/withdrawals, the non- redeeming/withdrawing investors (and new subscribers, if any) would be adversely affected if the relevant portfolio positions are subsequently sold for less than the price assigned to the positions as of the redemption/withdrawal date. Alternatively, if the relevant portfolio positions are subsequently sold for greater value, then the redeeming/withdrawing investor would be adversely affected. These effects are exacerbated in the case of redemptions/withdrawals representing a significant percentage of the net asset value of the Camshaft Funds.

Where appropriate, certain positions in the Camshaft Funds' investment portfolio that are illiquid and do not actively trade are marked to market by the Firm, taking into account actual market prices, market prices of comparable investments and/or such other factors (*e.g.*, the tenor of the respective instrument) as the Firm deems appropriate. To the extent that marking an illiquid investment to market is not practicable, an investment will be carried at fair value, as reasonably determined by the Firm. There is no guarantee that fair value will represent the value that will be realized by the Camshaft Funds on the eventual disposition of the investment or that would, in fact, be realized upon an immediate disposition of the investment. As a result, an investor redeeming/withdrawing its investment from the Camshaft Funds prior to realization of such an investment may not participate in gains or losses therefrom.

*Cybersecurity Breaches.* The Camshaft Funds and the Firm are subject to risks associated with a breach in their cybersecurity. Cybersecurity is a generic term used to describe the technology, processes and practices designed to protect networks, systems, computers, programs and data from "hacking" by other computer users, other unauthorized access and the resulting damage and disruption of hardware and software systems, loss or corruption of data, as well as misappropriation of confidential information. If a cybersecurity breach occurs, the Camshaft Funds may incur substantial costs, including those associated with: forensic analysis of the origin and scope of the breach; investment losses from sabotaged trading systems; identity theft; unauthorized use of proprietary information; litigation; adverse investor reaction; the dissemination of confidential and proprietary information; reputational damage; and increased and upgraded cybersecurity. Any such breach could expose the Firm and/or the Camshaft Funds to civil liability, as well as regulatory inquiry and/or action. In addition, any such breach could cause substantial redemptions/withdrawals from the Camshaft Funds. In addition, investors could be exposed to additional losses as a result of unauthorized use of their personal information.

*Evolving Privacy Laws.* In the ordinary course of business, the Firm collects, processes, receives, shares and maintains personal information, including data relating to personnel and investors. As a result, the Firm is subject to various U.S. federal and state privacy and information security laws regulating personal information and creating potential liability for the mishandling, misuse or compromise of that personal information. These laws are evolving, and new legislation may be enacted over time. New privacy laws add additional complexity to compliance programs and alternative data use that may require additional investment in resources, and could impact trading strategies.

*Limits of Disclosure.* The descriptions in the Camshaft Funds' offering documents of the Firm's investment strategies, the markets and Financial Instruments in which the Camshaft Funds trades, the risk factors and conflicts of interest involved in doing so and other aspects of the Camshaft Funds' operations are subject to material inherent limitations and do not purport to be either complete or comprehensive. In investing in the Camshaft Funds, investors are entrusting their capital to the subjective, discretionary market judgment of the Firm, trading in changing, volatile and uncertain markets. No prospective investor should invest in the Camshaft Funds if such investor is not capable of understanding and evaluating the risks of such investment.

## Risks Associated with the Camshaft Funds' Investment Strategies

*Global Macro Strategies.* The success of the Camshaft Funds' global macro investment strategy depends upon the Firm's ability to identify and exploit perceived fundamental, economic, financial and political imbalances that may exist in and between global markets across a variety of Financial Instruments and asset classes. The identification and exploitation of such imbalances and the prediction of price movements in these instruments involves significant uncertainties due to their reliance on various factors, including political, economic, international and environmental trends and events. There can be no assurance that the Firm will be able to identify investment opportunities or exploit such imbalances. The Camshaft Funds may incur substantial losses if the investment theses underlying the investment strategies or positions fail to develop as expected by the Firm.

***Relative Value Strategy Risks***. The success of the Camshaft Funds' relative value trading is dependent on the Firm's ability to exploit relative mispricing's among interrelated instruments. Although relative value positions may be considered to have a lower risk profile than directional trades as the former attempt to exploit price differentials not overall price movements, relative value investment strategies are by no means without risk. Mispricing's, even if correctly identified, may not converge within the time frame within which the Camshaft Funds maintains its positions. Even pure "riskless" arbitrage—which is rare—can result in significant losses if the arbitrage cannot be sustained (due, for example, to margin calls). International securities and markets may not move in correlation with each other or in directions anticipated by the Firm, so that hedging and arbitrage activities may not be successful. The Camshaft Funds' relative value investment strategies are subject to the risks of disruptions in historical price relationships, the restricted availability of credit and the obsolescence or inaccuracy of its algorithms. Market disruptions may also force the Camshaft Funds to close out one or more positions. Such disruptions have in the past resulted in substantial losses for funds employing relative value investment strategies.

The profitability of relative value trading has been materially reduced in certain asset classes in the past decade— in part due to the number of market participants seeking to exploit the same mispricings.

***Long/Short Strategies***. The success of the Camshaft Funds' long/short investment strategy depends upon the Firm's ability to identify and purchase securities that are undervalued and identify and sell short securities that are overvalued. The identification of investment opportunities in the implementation of the Camshaft Funds' long/short investment strategies is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. In the event that the perceived opportunities underlying the Camshaft Funds' positions were to fail to converge toward, or were to diverge further from, values expected by the Firm, the Camshaft Funds may incur losses. In the event of market disruptions, significant losses can be incurred which may force the Camshaft Funds to close out one or more positions. Furthermore, any valuation models used by the Firm, if applicable, to determine whether a position presents an attractive opportunity consistent with the Firm's long/short investment strategies may become outdated and inaccurate as market conditions change.

***Currency Risk – FX Hedging***. The Camshaft Funds intends to trade currencies for speculative or hedging purposes and may (but is not required to) use forward contracts and other Financial Instruments to seek to hedge against fluctuations in the relative value of the Fund's investments in respect of the Euro class shares and the GBP class shares. Hedging does not eliminate fluctuations in the value of the U.S. Dollar relative to the Euro or British Pounds Sterling or vice versa, or prevent losses if their relative values change, but rather establishes other positions designed to gain from those same developments, and such hedging transactions may also limit the opportunity for gain if the value of the U.S. Dollar should increase in relation to the Euro or British Pounds Sterling. As with other hedging transactions, currency hedging may result in a poorer overall performance and increased (rather than reduced) risk for the Camshaft Funds, the Euro class shares and the GBP class shares. There can be no guarantee that the Firm will be able to enter into suitable currency hedging transactions at a price and terms sufficient to protect the Camshaft Funds from a decline in the value of a particular currency and that such hedging transactions will be able to be executed at a time when the Camshaft Funds wishes to do so.

16

The Camshaft Funds may also invest a portion of its assets in equity securities, fixed income securities and other investments denominated in currencies other than the U.S. Dollar and in other Financial Instruments, the prices of which are determined with reference to currencies other than the U.S. Dollar. Currency markets are highly volatile, and currency trading is highly leveraged. For example, governments from time to time intervene, directly and by regulation, in the currency markets, with the specific intention of influencing the exchange rates. Currency markets are also, in general, highly interest rate sensitive, and may also be affected by trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Camshaft Funds may invest in currencies of Emerging Markets (as defined below), which may be less liquid than currencies of developed countries. There can be no guarantee that instruments suitable for hedging currency exchange rate changes will be available at the time when the Camshaft Funds wishes to use them or will be able to be liquidated when the Fund wishes to do so. Some currency risks are difficult or impossible to hedge, including for example the impact of exchange rate fluctuations on portfolio companies' businesses and macroeconomies. In some countries, the markets for certain of these hedging instruments are not highly developed or do not exist. To the extent certain currency exposure is not part of the Camshaft Funds' investment strategy as described above, the Firm may hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Opportunistic Investing*. The Camshaft Funds will build a portfolio of both long and short equity investments where the investment team has identified potential for value from misunderstood or mispriced opportunities. Although the investment team conducts rigorous analysis of these opportunities, even if such an opportunity is correctly identified, such opportunity may not materialize within the time frame of which the Camshaft Funds maintains its positions, may take considerable time to occur or may result in an alternative strategic action that will result in closing the investment at a lower value than entry. Market liquidity constraints, borrowing availability and short squeezes can all have a material impact on the Camshaft Funds' investments and can require action to liquidate or exit positions at less than optimal levels.

General market disruptions may force the Camshaft Funds to close out one or more positions before the Camshaft Funds can capture gains or when the Camshaft Funds' trades would result in losses. Such disruptions have in the past resulted in substantial losses for investment funds.

Any long investments in financially troubled issuers carry a potential risk of loss by the Camshaft Funds. Among the problems involved in assessing and making investments in troubled issuers is the fact that it frequently may be difficult to obtain information as to the condition of such issuer. The market prices of the securities of such issuers are also subject to abrupt and erratic market movements and above average price volatility, and the spread between the bid and asked prices of such securities may be greater than normally expected. It may take a number of years for the market prices of such securities to reflect their intrinsic values. It is anticipated that some of such securities in the portfolio of the Camshaft Funds may not be widely traded, and that the Camshaft Funds' position in such securities may be substantial in relation to the market for such securities.

These types of investing requires active monitoring and may, in rare instances, require participation in bankruptcy or reorganization proceedings by the Firm. To the extent that the Firm becomes involved in such proceedings, the Camshaft Funds may have a more active participation in the affairs of the issuer than that assumed generally by an investor. In addition, the Firm's participation in such proceedings may restrict or limit the Camshaft Funds' ability to trade securities of the subject company. The Camshaft Funds may have limited ability to influence the management of the issuer or to elect a representative to the issuer's board of directors or other governing body, potentially increasing the risk of such investments. In addition, the management of the issuer or its shareholders may have economic or business interests which are inconsistent with those of the Camshaft Funds, and they may be in a position to take action contrary to the Camshaft Funds' objectives.

*Special Situations*. The Camshaft Funds may have investments in issuers involved in (or the target of) acquisition attempts or tender offers or issuers involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of business enterprise, there exists the risk that the transaction in which such business enterprise is involved will be unsuccessful, will take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Camshaft Funds of the security or other Financial Instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Camshaft Funds may be required to sell its investment at a loss. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled issuers in which the Camshaft Funds may invest, there is a potential risk of loss by the Camshaft Funds of its entire investment in such issuers.

*Short Selling*. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the seller to profit from declines in market prices of the sold securities to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Camshaft Funds of buying those securities to cover the short position. There can be no assurance that the Camshaft Funds will be able to maintain the ability to borrow securities sold short. In particular, (i) a tender offer or similar transaction with respect to a company whose securities the Camshaft Funds has sold short or (ii) an unexpected shortage in an underlying commodity with respect to commodity futures that the Camshaft Funds has sold short, could cause the value of such Financial Instruments to rise dramatically, resulting in substantial losses to the Camshaft Funds. Regulators have, and may in the future, suspend short sales in Financial Instruments traded by the Camshaft Funds, which may cause the price of such securities to rise, resulting in a loss to the Camshaft Funds. Brokers may also require the Camshaft Funds to "cover" a short position at an inopportune time thereby forcing the Camshaft Funds to purchase the security at the then-prevailing market price which may be higher than the price at which such security was originally sold short by the Camshaft Funds.

*Market Data.* The Firm's and the Camshaft Funds' investment strategies depend on a wide variety and large quantity of market data obtained from numerous hosts of different suppliers, including multiple exchanges. Notwithstanding the Firm's reliance on large quantities of market

data, sources of market data may decline over time, which could adversely impact the investment program of the Camshaft Funds. In addition, market data contract pricing and terms are complex and subject to change without prior notice in many cases; increases in market data contract pricing could make the acquisition of certain data cost-prohibitive for the Firm which would negatively impact the Camshaft Funds' net performance. If data that the Camshaft Funds relies on is corrupted, compromised or discontinued in any material manner, the Camshaft Funds may suffer material losses or be exposed to the risk of loss of investment opportunities.

*Credit Ratings.* Credit ratings of structured finance products, other fixed-income instruments and investments represent the rating agencies' opinions regarding their credit quality and are not a guarantee of future credit performance of such securities. Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value. Therefore, the ratings assigned to securities by rating agencies may not fully reflect the true risks of an investment. Further, in recent years many highly rated structured securities have been subject to substantial losses.

*Discretionary Aspects of the Firm's Investment Approach.* The Firm's strategies and research methodologies retain certain discretionary aspects. In particular, the discretion of the Firm is expected to be used throughout the research and creation of models, in interpreting data, choosing signals and ranking their importance. In addition, from time to time, the Firm may determine to make investment decisions or reallocate the Camshaft Funds' capital in respect of a particular asset class or investment strategy in anticipation of, or in reaction to, what the Firm deems to be certain "material events" in the global economy. Such "material events" include, but are not limited to, economic turning points, market regime changes, central bank announcements, geopolitical shifts and other material economic and market or risk events underlying the Camshaft Funds' investment strategies and in the Firm's view represent opportunities to enhance returns, reduce volatility or protect against potential drawdowns. There can be no assurances that such interventions will be successful or not increase the Camshaft Funds' losses attributable to such external events.

*Use of Leverage*. The investment strategies utilized on behalf of the Camshaft Funds generally involve the use of borrowed funds and otherwise obtaining leveraged exposures to Financial Instruments. Leverage in respect of certain investment strategies employed on behalf of the Camshaft Funds may be significant. Such leverage may be employed at the strategy level or the portfolio level. Use of leverage for investment purposes entails significant risks. Use of leverage tends to magnify the gains or losses from investment activities and the overall volatility of the Camshaft Funds. In addition, leverage results in interest expense and other costs and premiums. If gains earned by the Camshaft Funds' portfolio fail to cover such costs, the net asset value of the Camshaft Funds may decrease faster than if there had been no borrowings.

If securities pledged to brokers or other financial institutions to secure the Camshaft Funds' margin accounts decline in value, the Camshaft Funds could be subject to a "margin call," pursuant to which the Camshaft Funds must either deposit additional funds with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. The prime brokers and dealers that provide financing to the Camshaft Funds will determine the margin, haircut and collateral valuation policies that will apply to the Camshaft Funds from time to time.

Changes by prime brokers and dealers in margin, haircut, financing and valuation policies may result in margin calls, loss of financing and forced liquidations of positions at disadvantageous prices. There can be no assurance that the Camshaft Funds will be able to maintain any financing, and at times, especially during distressed market conditions, brokers and dealers have substantially reduced the availability of credit. If the Camshaft Funds is unable to obtain financing on terms acceptable to the Firm, the Camshaft Funds could be forced to liquidate portfolio investments on a schedule that the Firm would not otherwise follow and incur significant losses.

*Hedging*. Hedging techniques involve one or more of the following risks: (i) imperfect correlation between the performance and value of the instrument and the value of the Camshaft Funds securities or other objective of the Firm; (ii) possible lack of a secondary market for closing out a position in such instrument; (iii) losses resulting from interest rate, spread or other market movements not anticipated by the Firm; (iv) the possible obligation to meet additional margin or other payment requirements, all of which could worsen the Camshaft Funds' position; and (v) default or refusal to perform on the part of the counterparty with which the Camshaft Funds trade. Furthermore, to the extent that any hedging strategy involves the use of OTC derivatives transactions, such a strategy would be affected by implementation of various regulations, including those adopted pursuant to Dodd-Frank.

The Firm will not, in general, attempt to hedge all market or other risks inherent in the Camshaft Funds' positions, and hedges certain risks, if at all, only partially. Specifically, the Firm may choose not, or may determine that it is economically unattractive, to hedge certain risks—either in respect of particular positions or in respect of the Camshaft Funds' overall portfolio. The Camshaft Funds' portfolio composition will commonly result in various directional market risks remaining unhedged. The Firm may rely on diversification to control such risks to the extent that the Firm believes it is desirable to do so; however, the Camshaft Funds is not subject to formal diversification policies.

The ability of the Camshaft Funds to hedge successfully will depend on the ability of the Firm to predict pertinent price movements or the underlying causes of such price movements, which cannot be assured. The Firm is not required to hedge and there can be no assurance that hedging transactions will be available or, even if undertaken, will be effective. In addition, it is not possible to hedge fully or perfectly against currency fluctuations affecting the value of securities denominated in non-U.S. currencies because the value of those securities is likely to fluctuate as a result of independent factors not related to currency fluctuations. Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged, such as counterparty credit risk. Furthermore, by hedging a particular position, any potential gain from an increase in the value of such position may be limited.

*Emerging Market Investing*. The Camshaft Funds may invest a portion of its assets in the securities of, or instruments providing exposure to, less developed countries or countries with new or developing capital markets ("Emerging Markets"), as well as trade the currencies of such countries to hedge currency exposure. The value of Emerging Markets currencies and securities may be drastically affected by political developments in the country of issuance. In addition, the existing governments in the relevant countries could take actions that could have a negative impact on the Camshaft Funds, including nationalization, expropriation, sudden imposition of capital

controls, imposition of confiscatory taxation or regulatory or imposition of withholding or other taxes on interest payments.

Some of the countries in which the Camshaft Funds may invest have experienced political, economic and/or social instability. Many such countries have also experienced dramatic swings in the value of their national currency. There can be no assurance that such instability or such fluctuations will not occur in the future and, if they do occur, that they will not have a substantial adverse effect on the performance of the Camshaft Funds.

The economies of many of the Emerging Markets countries are still in the early stages of modern development and are subject to abrupt and unexpected change. In many cases, governments retain a high degree of direct control over the economy and may take actions having sudden and widespread effects. Also, many Emerging Markets country economies have a high dependence on a small group of markets or even a single market. Emerging Markets countries also tend to have periods of high inflation and high interest rates, as well as substantial volatility in interest rates, which could affect the Camshaft Funds adversely.

Foreign investment in the Emerging Markets countries is in some cases restricted. Many of these countries have non-convertible currencies and the value of investments may be affected by fluctuation in available currency rates and exchange control regulations. The remittance of profits may therefore be restricted, and the Camshaft Funds may utilize swaps and other forms of indirect investment to access such markets. Moreover, the banking systems in these countries are not fully developed and considerable delays may occur in the transfer of funds within, and the remittance of monies out of, Emerging Markets countries.

Certain Emerging Markets countries are particularly likely to require identifying information about entities and persons who have direct, or even indirect, exposure to the securities of issuers in those countries. This may result in the Camshaft Funds being asked to provide information about investors to Emerging Markets regulators or to the brokers who are providing services to the Camshaft Funds in connection with trading activities. Such information may include, but may not be limited to, the identities, addresses and countries of origin of the investors.

*Volatility*. The market value of certain investments held by the Camshaft Funds may be volatile, and will generally fluctuate due to a variety of factors that are inherently difficult to predict, including, among other things, the macro business and economic environment, specific developments or trends in respect of a company or in any particular industry, the market's overall perception of risk, general economic conditions, the condition of certain financial markets, domestic and international economic and political events, prevailing credit spreads, changes in prevailing interest rates and the financial condition of counterparties.

*Interest Rate Risk*. The Camshaft Funds is subject to interest rate risk. Generally, the value of fixed income securities will change inversely with changes in interest rates. As interest rates rise, the market value of fixed income securities tends to decrease. Conversely, as interest rates fall, the market value of fixed income securities tends to increase. This risk will be greater for long-term securities than for short-term securities. The Firm may attempt to minimize the exposure of its portfolio to interest rate changes through the use of interest rate swaps, interest rate futures

and/or interest rate options. However, there can be no guarantee that the Firm will be successful in mitigating the impact of interest rate changes on its portfolio.

*Potential Inability to Trade or Report Due to Systems Failure*. The Firm's investment strategies rely extensively on a wide range of information technology systems, including computer hardware and software systems and will be dependent to a significant degree on the proper functioning of such internal and external computer systems. Information technology systems are subject to a number of inherent and unpredictable risks. Accordingly, systems failures, whether due to third-party failures upon which such systems are dependent or the failure of the Firm's hardware or software, could disrupt trading or make trading impossible until such failure is remedied. Any such failure, and consequential inability to trade (even for a short time), could, in certain market conditions, cause the Camshaft Funds to experience significant trading losses or to miss opportunities for profitable trading. Any such failures also could cause a temporary delay in reports to investors.

*Availability of Investment Opportunities*. There can be no assurance that the Firm will be able to find suitable opportunities consistent with its investment approach or that it believes will likely to provide the desired returns. Market conditions may limit the availability of investment opportunities. Such limitations may cause delays in deploying the Camshaft Funds' capital, concentration of the Camshaft Funds' investments and may negatively impact the Camshaft Funds' returns.

*No Material Restrictions*. The Firm will opportunistically implement whatever investment strategies it believes from time to time may be best suited to prevailing market conditions and to the Firm's investment approach, without material restrictions. Such investment strategies may involve higher levels of risk than the ones discussed herein. There can be no assurance that the Firm will be successful in applying any strategy to the Camshaft Funds' investing.

## Risks Relating to Financial Instruments Traded

*Futures*. The rapid fluctuations in the market prices of futures interests make an investment in the Camshaft Funds volatile. Volatility is caused by changes in supply and demand relationships; weather; agricultural, trade, fiscal, monetary and exchange control programs; U.S. and non-U.S. political and economic events and policies; and changes in interest rates. If the Firm incorrectly predicts the direction of the price in a futures interest, large losses may occur and the Camshaft Funds could lose all or substantially all of its assets.

Futures prices are highly volatile and are affected by a wide variety of complex and hard to predict factors; consequently, a primary risk in trading these instruments is rapid fluctuations in market prices in a short time period. Price fluctuations may affect the Firm's ability to earn investment returns for the Camshaft Funds. Market volatility may also depart significantly from historical averages, which could affect performance. Volatility could create adverse results for the performance of the Camshaft Funds in several ways. A period of substantial volatility shortly after an investor's initial investment, or additional investments thereafter, could adversely affect performance and cause a significant reduction in such investor's equity, making it more difficult to achieve profitability. Substantial volatility prior to the time of a planned redemption/withdrawal

adversely affect performance, and could reduce the amount of proceeds actually received when the redemption/withdrawal has been completed.

Futures exchanges may impose position accountability limits (the "Position Accountability Limits") with respect to certain futures contracts traded on each particular futures exchange. Position Accountability Limits are triggers that would bring the Camshaft Funds' position(s) to the attention of the exchange. Through the application of Position Accountability Limits, exchanges can prohibit an investor from holding a position of more than a specific number of futures contracts. Under the rules of a futures exchange, if the Camshaft Funds holds a certain number of futures contracts approaching the Position Accountability Limit, the Camshaft Funds may be required by the futures exchange to limit or decrease its holdings of such futures contracts pursuant to the futures exchange's Position Accountability Limits. If the Camshaft Funds is required to either limit or decrease its holdings of such futures contracts, or if an exchange lowers its Position Accountability Limits, the Camshaft Funds may be adversely affected and may not be able to achieve its investment objective.

***Non-U.S. Futures***. Foreign futures transactions involve executing and clearing trades on non-U.S. futures exchanges. This is the case even if the foreign exchange is formally "linked" to a U.S. futures exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No U.S. organization regulates the activities of a foreign exchange, including the execution, delivery and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country. Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs. For these reasons, the Camshaft Funds may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures. In particular, funds received from customers to margin foreign futures transactions may not be provided the same protections as funds received to margin futures transactions on domestic exchanges. In addition, the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the time the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

***Credit Default Swaps***. The Camshaft Funds may invest in credit default swaps ("**CDS**"). A credit default swap is a contract between two parties which transfers the risk of loss if a company fails to pay principal or interest on time or files for bankruptcy. Credit default swaps can be used to hedge a portion of the default risk on a single corporate bond or a portfolio of bonds. In addition, credit default swaps can be used to implement the Firm's view that a particular credit, or group of credits, will experience credit improvement or credit impairment. Swap transactions dependent upon credit events are priced incorporating many variables including the pricing and volatility of the common stock, and potential loss upon default, among other factors. As such, there are many factors upon which market participants may have divergent views.

The Camshaft Funds may also purchase or sell CDS on a basket of reference entities or an index. In circumstances in which the Camshaft Funds is the credit default swap buyer and does not own the debt securities that are deliverable under a CDS, the Camshaft Funds is exposed to the risk that deliverable securities will not be available in the market, or will be available only at

unfavorable prices, as would be the case in a so-called "short squeeze." While the credit default swap market auction protocols reduce this risk, it is still possible that an auction will not be organized or will not be successful. As a seller of CDS, the Camshaft Funds incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity. However, the Camshaft Funds will not have any legal recourse against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations. In addition, in the event that a cash settlement auction to identify the relevant deliverable securities, is not established the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to the Camshaft Funds following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Camshaft Funds.

*Equity Investments*. The Camshaft Funds intends to invest in equity markets, which may involve substantial risks. Investments in equity markets are highly volatile and may be subject to wide and sudden fluctuations, with a resulting fluctuation in the Camshaft Funds' performance. Equity markets may decline due to factors affecting equity securities markets generally or particular industries represented in those markets. Factors affecting the equity markets include, without limitation, real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, political events or adverse investor sentiment generally. They may also decline due to factors that affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry. Equity markets tend to be cyclical and may experience periods of turbulence. For the foregoing reasons, investments in equity markets can be highly speculative and carry a substantial risk of loss of principal.

The Camshaft Funds' single name equity investments may involve substantial risks and may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. There are no absolute restrictions in regard to the size or operating experience of the companies in which the Camshaft Funds may invest. Relatively small companies may lack management depth or the ability to generate internally, or obtain externally, the funds necessary for growth. Companies with new products or services could sustain significant losses if projected markets do not materialize. Equity prices are directly affected by issuer specific events, as well as general market conditions. In addition, in many countries investing in common stocks is subject to heightened regulatory and self-regulatory scrutiny as compared to investing in debt or other Financial Instruments. Changes in the structure of the equity markets or new market participants may materially impede the Camshaft Funds' investment strategy.

*Fixed Income Investments*. The Camshaft Funds intends to invest in bonds and other fixed income securities of U.S. and non-U.S. issuers. The value of the fixed income securities in which the Camshaft Funds may invest changes both as general market conditions change and as the general levels of interest rates fluctuate. When interest rates decline, the value of the Camshaft Funds' fixed income securities can be expected to rise. Conversely, when interest rates rise, the value of such securities is generally expected to decline. Investments in lower rated or unrated fixed income securities in which the Camshaft Funds may invest, while generally providing greater opportunity for gain and income than investments in higher rated securities, usually entail greater risk (including the possibility of default or bankruptcy of the issuers of such securities). Fixed

24

income securities are generally not exchange traded and therefore, usually carry a higher level of liquidity and mark-to-market risk potential than most exchange-traded equity securities.

The Camshaft Funds may take positions in debt securities which rank junior to other outstanding securities and obligations of the issuer, all or a significant portion of which may be secured on substantially all of that issuer's assets. The Camshaft Funds may take positions in debt securities which are not protected by financial covenants or limitations on additional indebtedness. The Camshaft Funds may invest in securities which are moral obligations of issuers or subject to appropriations. The Camshaft Funds will therefore be subject to credit and liquidity risks. In addition, evaluating credit risk for debt securities of issuers in some jurisdictions involves uncertainty because credit rating agencies throughout the world have different standards, making comparison across countries difficult.

*Prepayment Risk.* The frequency at which prepayments (including voluntary prepayments by the obligors and accelerations due to defaults) occur on debt instruments will be affected by a variety of factors including the prevailing level of interest rates and spreads as well as economic, demographic, tax, social, legal and other factors. Generally, obligors tend to prepay their fixed rate obligations when prevailing interest rates fall below the coupon rates on their obligations. Similarly, floating rate issuers and borrowers tend to prepay their obligations when spreads narrow.

In general, "premium" securities (securities whose market values exceed their principal or par amounts) are adversely affected by faster than anticipated prepayments, and "discount" securities (securities whose principal or par amounts exceed their market values) are adversely affected by slower than anticipated prepayments. Since many fixed rate obligations will be discount instruments when interest rates and/or spreads are high, and will be premium instruments when interest rates and/or spreads are low, such debt instruments may be adversely affected by changes in prepayments in any interest rate environment.

The adverse effects of prepayments may impact the Camshaft Funds' portfolio in two ways. First, particular investments may experience outright losses, as in the case of an interest-only instrument in an environment of faster actual or anticipated prepayments. Second, particular investments may underperform relative to hedges that the Firm may have constructed for these investments, resulting in a loss to the Camshaft Funds' overall portfolio. In particular, prepayments (at par) may limit the potential upside of many instruments to their principal or par amounts, whereas their corresponding hedges often have the potential for unlimited loss.

*High-Yield Securities.* The Camshaft Funds may invest in high yield securities. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower-rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available

25

to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

*Corporate Debt.* Bonds, notes and debentures issued by corporations may pay fixed, variable or floating rates of interest, and may include zero-coupon obligations. Corporate debt instruments may be subject to credit ratings downgrades. Other instruments may have the lowest quality ratings or may be unrated. In addition, the Camshaft Funds may be paid interest in kind in connection with its investments in corporate debt and related Financial Instruments (*e.g.*, the principal owed to the Camshaft Funds in connection with a debt investment may be increased by the amount of interest due on such debt investment). Such investments may experience greater market value volatility than debt obligations that provide for regular payments of interest in cash and, in the event of a default, the Camshaft Funds may experience substantial losses.

*Mezzanine Debt.* Mezzanine debt is typically junior to the obligations of a company to senior creditors, trade creditors and employees. The ability of the Master Fund to influence a company's affairs, especially during periods of financial distress or following an insolvency, will be substantially less than that of senior creditors. Mezzanine debt instruments are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. Default rates for mezzanine debt instruments have historically been higher than for investment-grade instruments. In the event of the insolvency of a portfolio company of the Master Fund or similar event, the Master Fund's debt investment therein will be subject to fraudulent conveyance, subordination and preference laws.

*Non-Performing Nature of Debt.* Certain debt instruments may be non-performing or in default. Furthermore, the obligor or relevant guarantor may also be in bankruptcy or liquidation. There can be no assurance as to the amount and timing of payments, if any, with respect to such debt instruments.

*Troubled Origination.* When financial institutions or other entities that are insolvent or in serious financial difficulty originate debt, the standards by which such instruments were originated, the recourse to the selling institution, or the standards by which such instruments are being serviced or operated may be adversely affected.

**Obligations of Governments, their Agencies and Instrumentalities.** The Camshaft Funds intends to invest in government securities. Government securities are obligations of, or are guaranteed by, governments, their agencies or instrumentalities. These instruments include bills, certificates of indebtedness and notes and bonds issued by governments, states, municipalities or by government agencies or instrumentalities. Some government securities, such as U.S. Treasury bills and bonds, are supported by the full faith and credit of the government treasury; others are supported by the right of the issuer to borrow from the government treasury; others are supported by the discretionary authority of the government to purchase the agency's obligations; still others

are supported only by the credit of the instrumentality. Certain events, including bankruptcy filings by certain municipalities, have highlighted the risks inherent in investing in government securities. It is difficult, if not impossible, to determine the extent to which such filings will become more common. Bankruptcy laws applicable to governments are relatively untested and may not provide the same protections to creditors as those contained in bankruptcy laws applicable to non-government debtors. It is impossible to predict whether the Partnership will be able to successfully avoid losses relating to defaults by issuers of governmental securities.

Various factors may adversely affect the value and yield of municipal securities. These factors include imbalances in demand, potential legislative changes, as well as uncertainties related to the tax status of municipal bonds or the rights of others holding these securities. Returns will depend on a positively sloped yield curve and the relationship between the tax-exempt and taxable yield curves. Adverse changes in the slope of the municipal bond yield curve as well as its relationship to the taxable yield curve, among other things, could have a material adverse effect on performance. Investments in municipal securities may be subject to liquidity risk because of the fragmentation of the municipal bond market and the unique effect that political, legislative and/or regulatory actions can have on the municipal bond market, compared to the taxable markets.

The Camshaft Funds intends to invest in sovereign debt issued or guaranteed by U.S. and non-U.S. governments, their agencies and instrumentalities either in the currency of their domicile or in a foreign currency. Investors in sovereign debt may be asked to participate in debt restructuring, including the deferral of interest and principal payments, and may also be requested by the issuer to extend additional loans. Investments in sovereign debt are subject to varying degrees of credit risk depending on the level of government support. Certain sovereign debt securities are supported by the full faith and credit of the national government or political subdivision or agency, while others lack such support. Investments in sovereign debt are also subject to varying degrees of credit risk as a result of financial or political instability in the relevant countries. Certain events, such as the political and economic instability in various European Union (the "EU") countries, have highlighted the risks inherent in investing in sovereign debt, including an EU member choosing to leave the Eurozone and redenominating its debt. The unwillingness of one or more EU countries to provide assistance to distressed sovereigns within the EU underlines the unexpected political dynamics that may arise to undermine investor expectations regarding the safety of sovereign debt.

Additionally, the financial markets are roiled from time to time by evolving developments relating to possible sovereign defaults or moratoriums. A sovereign's financial condition is subject to numerous factors—social programs, political pressure, supra-national economic actions—all or many of which may be exogenous to the Firm's analysis and research and may from time to time dominate market pricing (even if contrary to fundamental/trading dynamic pricing correctly identified by the Firm). It is impossible to predict whether the Camshaft Funds will be able to successfully avoid losses relating to sovereign default. There is no current means of collecting on defaulted sovereign debt as part of bankruptcy or other proceedings.

In addition to general default risk relating to sovereign debt, if the Camshaft Funds invests in sovereign debt denominated in a currency other than U.S. Dollars (or in respect of which payments of principal or interest are paid in a currency other than U.S. Dollars), the Camshaft Funds will be exposed to the risk that one or more jurisdictions may impose currency controls that

27

would limit the Camshaft Funds' ability to convert such payments of principal or interest to U.S. Dollars. It is impossible to predict whether any such currency controls will be imposed.

Countries or territories (including Venezuela, Russia, Argentina, Puerto Rico, Turkey and Lebanon) have encountered, or are currently encountering, difficulties in servicing their external national or government debt obligations, which led to defaults on government obligations and the restructuring of certain indebtedness. One sovereign default may have an adverse effect on the markets of both the defaulting country or territory and non-defaulting countries and/or territories.

***Repurchase and Reverse Repurchase Agreements.*** The Camshaft Funds may enter into repurchase and reverse repurchase agreements. When the Camshaft Funds enters into a repurchase agreement, it "sells" securities to a broker-dealer or financial institution, and agrees to repurchase such securities on a mutually agreed date for the price paid by the broker-dealer or financial institution, plus interest at a negotiated rate. In a reverse repurchase transaction, the Camshaft Funds "buys" securities from a broker-dealer or financial institution, subject to the obligation of the broker-dealer or financial institution to repurchase such securities at the price paid by the Camshaft Funds, plus interest at a negotiated rate. The use of repurchase and reverse repurchase agreements by the Camshaft Funds involves certain risks. For example, if the seller of securities to the Camshaft Funds under a reverse repurchase agreement defaults on its obligation to repurchase the underlying securities, as a result of its bankruptcy or otherwise, the Camshaft Funds will seek to dispose of such securities, which action could involve costs or delays. If the seller becomes insolvent and subject to liquidation or reorganization under applicable bankruptcy or other laws, the Camshaft Funds' ability to dispose of the underlying securities may be restricted. It is possible, in a bankruptcy or liquidation scenario, that the Camshaft Funds may not be able to substantiate its interest in the underlying securities. Finally, if a seller defaults on its obligation to repurchase securities under a reverse repurchase agreement, the Camshaft Funds may suffer a loss to the extent that it is forced to liquidate its position in the market, and proceeds from the sale of the underlying securities are less than the repurchase price agreed to by the defaulting seller.

***Distressed Securities***. The fact that certain of the companies in whose securities the Camshaft Funds may invest are in transition, out of favor, financially leveraged or troubled, or potentially troubled, and may be or have recently been involved in major strategic actions, restructurings, bankruptcy, reorganization or liquidation, means that their securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry, or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Camshaft Funds' investment in any instrument, and a significant portion of the obligations and preferred stock in which the Camshaft Funds invests may be less than investment grade.

Investment in the securities of financially troubled issuers and operationally troubled issuers involves a high degree of credit and market risk. Although the Camshaft Funds invests in select companies that, in the view of the Firm, have the potential over the long-term for capital growth, there can be no assurance that such financially troubled issuers or operationally troubled issuers can be successfully transformed into profitable operating companies. There is a possibility

that the Camshaft Funds may incur substantial or total losses on its investments. During an economic downturn or recession, securities of financially troubled or operationally troubled issuers are more likely to go into default than securities of other issuers. In addition, it may be difficult to obtain information about financially troubled issuers and operationally troubled issuers.

Securities of financially troubled issuers and operationally troubled issuers are less liquid and more volatile than securities of companies not experiencing financial difficulties. The market prices of such securities are subject to erratic and abrupt market movements and the spread between bid and asked prices may be greater than normally expected. In addition, it is anticipated that many of the Camshaft Funds' portfolio investments may not be widely traded and that the Camshaft Funds' investment in such securities may be substantial relative to the market for such securities. As a result, the Camshaft Funds may experience delays and incur losses and other costs in connection with the sale of its portfolio securities.

***Derivative Instruments***. The Camshaft Funds will use various derivative financial instruments for both hedging and synthetic investing. Derivative financial instruments include credit derivatives, interest rate swaps, total return swaps, options, forward currency contracts and futures. In addition, the Camshaft Funds may from time to time use both exchange-traded and OTC futures and options as part of its investment strategy and for hedging purposes. Such derivative instruments may be highly volatile, involve certain special risks and expose investors to a high risk of loss.

The risks relating to OTC derivatives that are not otherwise cleared through a central clearing party include, but are not limited to, the following: (i) credit risk (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations); (ii) market risk (adverse movements in the price of a financial asset or commodity); (iii) legal risk (the characterization of a transaction or a party's legal capacity to enter into it could render the financial contract unenforceable, and the insolvency or bankruptcy of a counterparty could preempt otherwise enforceable contract rights); (iv) operational risk (inadequate controls, deficient procedures, human error, system failure or fraud); (v) documentation risk (exposure to losses resulting from inadequate documentation); (vi) liquidity risk (exposure to losses created by inability to prematurely terminate the derivative); (vii) systemic risk (the risk that financial difficulties in one institution or a major market disruption will cause uncontrollable financial harm to the financial system); (viii) concentration risk (exposure to losses from the concentration of closely related risks such as exposure to a particular industry or exposure linked to a particular entity); and (ix) settlement risk (the risk faced when one party to a transaction has performed its obligations under a contract but has not yet received value from its counterparty).

Use of derivatives and other techniques such as short sales for hedging purposes involves certain additional risks, including (i) dependence on the ability to predict movements in the price of the Financial Instruments hedged; (ii) imperfect correlation between movements in the Financial Instruments on which the derivative is based and movements in the assets of the underlying portfolio; and (iii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of a portfolio's assets segregated to cover its obligations. In addition, by hedging a particular position, any potential gain from an increase in value of such position may be limited. See also "*Short Selling*," "*Options*" and "*Leverage*."

Transactions in OTC derivatives may involve other risks as well. It may be impossible to liquidate an existing position, to assess the value of a position or to assess the exposure to risk. The low initial margin deposits normally required to establish a position in such instruments permit a high degree of leverage. As a result, a relatively small movement in the price of a contract may result in a profit or a loss which is high in proportion to the amount of funds actually placed as initial margin and may result in unquantifiable further losses exceeding any margin deposited. Further, when used for hedging purposes there may be an imperfect correlation between these instruments and the investments or market sectors being hedged. Lastly, regulatory restraints may restrict the notional amount of instruments that the Camshaft Funds may trade.

***Swaps.*** The Camshaft Funds may enter into swap agreements (including total return and foreign exchange swaps) and other types of OTC transactions with broker-dealers or other financial institutions. Depending on their structures, swap agreements may increase or decrease the Camshaft Funds' exposure to various securities, commodities, indices, currencies or other investments or units of measure. The values of the Camshaft Funds' swap positions would increase or decrease depending on the changes in value of the underlying asset.

Total return swaps typically involve commitments to pay interest in exchange for a market-linked return, both based on notional amounts. Depending on the change in the value or level of the underlying instrument, basket of instruments, or index, the Camshaft Funds will either receive or make a payment based on the amount of the change. To the extent the total return of the instrument, basket of instruments, or index underlying the transaction exceeds or falls short of the offsetting interest rate obligation, the Camshaft Funds will receive a payment from or make a payment to the counterparty, respectively.

The use of swaps involves investment techniques and risks different from and potentially greater than those associated with ordinary securities transactions. Swaps involve the risk that the price of the swap used by the Camshaft Funds to calculate net asset value does not accurately reflect its fair market value, which could have a favorable or unfavorable effect on the net asset value of the Camshaft Funds. Some swaps are complex and, in the case of bilateral (uncleared) swaps, may be valued based on quotations given by the Camshaft Funds' swap counterparty, who has adverse interests to the Camshaft Funds with respect to the value of the swap. In certain cases related to bilateral (uncleared) swaps, the Camshaft Funds' swap counterparty may be the only source of value quotations for a swap, while in other cases, multiple quotes may be available. There are also different methodologies that may be used to determine the value of a credit default swap and credit default swap spreads may be wide. As a result of the foregoing factors, the Camshaft Funds may not be able to close out swaps at the price used by the Camshaft Funds to calculate its net asset value. Also, under certain circumstances related to bilateral (uncleared) swaps, if a swap counterparty undervalues the Camshaft Funds' interest in a swap, it could require the Camshaft Funds to transfer greater amounts of collateral to the counterparty than if the swap was valued at fair market value.

Because the master and credit support agreements for bilateral (uncleared) OTC swap transactions are individually negotiated with a specific counterparty, there exists the risk that the parties may interpret contractual terms (*e.g.*, the definition of default) differently when the Camshaft Funds seeks to enforce its contractual rights. If that occurs, the Camshaft Funds may be

forced to seek to enforce its contractual rights through legal proceedings, which may be costly and time consuming.

There is currently little case law characterizing total rate of return swaps and other derivatives, interpreting their provisions and characterizing their tax treatment. There can be no assurance that future decisions construing similar provisions to those in many of the Camshaft Funds' swap agreements or other related documents or additional regulations and laws governing such derivatives will not have a material adverse effect on the Camshaft Funds.

The CFTC requires certain derivative transactions that were previously executed on a bilateral basis in the OTC markets to be executed through a regulated futures or swap exchange or execution facility. The SEC is also expected to impose similar requirements on certain security-based derivatives in the near future, though it is not yet clear when these parallel SEC requirements will go into effect. Such requirements may make it more difficult and costly for investment funds, including the Camshaft Funds, to enter into highly tailored or customized transactions. They may also render certain strategies in which the Camshaft Funds might otherwise engage impossible or so costly that they will no longer be economical to implement. If the Camshaft Funds decides to execute derivatives transactions through such exchanges or execution facilities—and especially if it decides to become a direct member of one or more of these exchanges or execution facilities—the Camshaft Funds would be subject to the rules of the exchange or execution facility, which would bring additional risks and liabilities, and potential requirements under applicable regulations and under rules of the relevant exchange or execution facility.

With respect to cleared OTC derivatives, the Camshaft Funds will not face a clearinghouse directly but rather through an OTC derivatives dealer that is registered with the CFTC or SEC to act as a clearing member. The Camshaft Funds may face the indirect risk of the failure of another clearing member customer to meet its obligations to its clearing member. Such scenario could arise due to a default by the clearing member on its obligations to the clearinghouse, triggered by a customer's failure to meet its obligations to the clearing member.

***Options***. The Camshaft Funds may engage in the trading of options. Trading options is highly speculative and may entail risks that are greater than investing in other securities. The value of options will be affected by market volatility and prices of options are generally more volatile than prices of other securities. Furthermore, specific market movements of the securities underlying an option cannot accurately be predicted.

In trading options, the Firm speculates on market fluctuations of securities and securities indices (or other indices, such as credit indices) while investing only a small percentage of the value of the securities underlying such option. A change in the market price of the underlying securities or underlying market index will cause a much greater change in the price of the option contract. In addition, to the extent that the Camshaft Funds purchases options that it does not sell or exercise, the Camshaft Funds will suffer the loss of the premium paid in such purchase. To the extent the Camshaft Funds sells uncovered options and must deliver the underlying securities at the option price, the Camshaft Funds has a theoretically unlimited risk of loss if the price of such underlying securities increases. If the Camshaft Funds must buy those underlying securities, the Camshaft Funds risks the loss of the difference between the market price of the underlying securities and the option price. Any gain or loss derived from the sale or exercise of an option will

31

be reduced or increased, respectively, by the amount of the premium paid. The expenses of option investing include commissions payable on the purchase and on the exercise or sale of an option.

*Stock Index Options*. The Camshaft Funds may purchase and sell call and put options on stock indices listed on securities exchanges or traded in the over-the-counter market for the purpose of realizing its investment objectives or for the purpose of hedging its portfolio. A stock index fluctuates with changes in the market values of the stocks included in the index. The effectiveness of purchasing or writing stock index options for hedging purposes will depend upon the extent to which price movements in the Camshaft Funds' portfolio correlates with price movements of the stock indices selected. Because the value of an index option depends upon movements in the level of the index rather than the price of a particular stock, whether the Camshaft Funds realizes gains or losses from the purchase or writing of options on indices depends upon movements in the level of prices in the stock market generally or, in the case of certain indices, in an industry or market segment, rather than movements in the price of particular stocks. Accordingly, successful use by the Camshaft Funds of options on stock indices will be subject to the Firm's ability to correctly predict movements in the direction of the stock market generally or of particular industries or market segments.

*Forward Contracts*. The Camshaft Funds may enter into forward contracts, generally for currency hedging purposes. In the absence of exchange trading and the involvement of clearing houses, there are no standardized terms for forward contracts. Accordingly, the parties are free to establish such settlement times and underlying amounts of a security or currency as desirable, which may vary from the standardized provisions available through any futures contract. In addition, as two party obligations for which there is no secondary market, forward contracts involve counterparty risk not present with futures.

*Foreign Securities and Foreign Currencies*. The Camshaft Funds may invest in securities of foreign issuers (including by entering into total return swap and similar Financial Instruments), securities denominated in foreign currencies, and depository receipts, such as ADRs, which are receipts typically issued by a U.S. bank or trust company and which evidence ownership of underlying securities of non-U.S. corporations. Investing in foreign securities, currencies, and/or ADRs may present a greater degree of risk than investing in domestic securities and currencies due to possible exchange rate fluctuations, a change in trade balances, possible exchange controls, less publicly-available information, more volatile markets, less regulation, less favorable tax provisions (including possible withholding taxes), war or expropriation. In particular, the dollar value of portfolio securities of non-U.S. issuers fluctuates with changes in market and economic conditions abroad and with changes in relative currency values. The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.

The Camshaft Funds may trade on exchanges located outside the United States. Trading on U.S. exchanges is subject to SEC and CFTC regulation and oversight, as applicable, including, for example, minimum capital requirements for commodity brokers, regulation of trading practices on the exchanges, prohibitions against trading ahead of customer orders, prohibitions against filling orders off exchanges, prescribed risk disclosure statements, testing and licensing of industry sales personnel and other industry professionals, and recordkeeping requirements. Trading on foreign exchanges is not regulated by the SEC, CFTC or any other U.S. governmental agency or

instrumentality and may be subject to regulations that are different from those to which U.S. exchange trading is subject, provide less protection to investors than trading on U.S. exchanges, and may be less vigorously enforced than regulations in the United States. Positions on foreign exchanges also are subject to the risk of exchange controls, expropriation, excessive taxation or government disruptions.

*Commodities*. Trading commodities and commodity interests (e.g., futures contracts on commodities, securities indices or currencies) is highly speculative and may entail risks that are greater than the risks associated with investing in equity securities. Prices of commodity interests are generally more volatile than prices of equity securities and such volatility is expected to reoccur in the future. Because of the low margin deposits typically required in commodity contract trading, a relatively small movement in the market price of a commodity contract may result in a disproportionately large profit or loss to the Camshaft Funds. Market movements can be volatile and are difficult to predict. Weather, inflation, trade policies, geopolitical events and other unforeseen events can also have a significant impact upon commodity prices. A variety of possible actions by various government agencies also can inhibit profitability or can result in losses. Such events could result in large market movements and volatile market conditions and create the risk of significant losses for the Camshaft Funds.

## Market-Related and Regulatory Risks

*Market Disruptions; Governmental Intervention*. The global financial markets have in the past decade undergone pervasive and fundamental disruptions that have led to extensive and unprecedented governmental intervention. Such intervention has in certain cases been implemented on an "emergency" basis, suddenly and substantially eliminating market participants' ability to continue to implement certain strategies or manage the risk of their outstanding positions. In addition—as one would expect given the complexities of the financial markets and the limited time frame within which governments have felt compelled to take action— these interventions have typically been unclear in scope and application, resulting in confusion and uncertainty which in itself has been materially detrimental to the efficient functioning of the markets as well as previously successful investment strategies.

The Camshaft Funds may incur major losses in the event of disrupted markets and other extraordinary events in which historical pricing relationships become materially distorted. The risk of loss from pricing distortions is compounded by the fact that in disrupted markets many positions become illiquid, making it difficult or impossible to close out positions against which the markets are moving. The financing available to the Camshaft Funds from its banks, dealers and other counterparties is typically reduced in disrupted markets. Such a reduction may result in substantial losses to the Camshaft Funds. Market disruptions may from time to time cause dramatic losses for the Camshaft Funds, and such events can result in otherwise historically low-risk strategies performing with unprecedented volatility and risk.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") seeks to regulate markets, market participants and Financial Instruments that previously have been unregulated and substantially alters the regulation of many other markets, market participants and Financial Instruments. Because the implementation of Dodd-Frank is ongoing, it is difficult to predict the ultimate impact of Dodd-Frank on the Camshaft Funds, the Firm and the markets in

which they trade and invest. Dodd-Frank and regulations adopted pursuant to Dodd-Frank could have a material adverse impact on the profit potential of the Camshaft Funds.

*Effect of Speculative Position Limits*. The CFTC and the United States commodities exchanges impose limits referred to as "speculative position limits" on the maximum net long or net short speculative positions that any person may hold or control in any particular futures or options contracts traded on United States commodities exchanges. For example, the CFTC currently imposes speculative position limits on a number of agricultural commodities (e.g., corn, oats, wheat, soybeans and cotton) and United States commodities exchanges currently impose speculative position limits on many other commodities. Dodd-Frank significantly expands the CFTC's authority to impose position limits with respect to futures contracts and options on futures contracts, swaps that are economically equivalent to futures or options on futures, and swaps that are traded on a regulated exchange and certain swaps that perform a significant price discovery function. In response to this expansion of its authority, in 2012, the CFTC proposed a series of new speculative position limits with respect to futures and options on futures on so-called "exempt commodities" (which includes most energy and metals contracts) and with respect to agricultural commodities. Those proposed speculative position limits were vacated by a United States District Court, but the CFTC has again proposed a new set of speculative position limit rules which are not yet finalized (or effective). If the CFTC is successful in its second attempt to establish speculative position limits, the size or duration of positions available to the Camshaft Funds may be severely limited. All accounts owned or managed by the Firm are likely to be combined for speculative position limit purposes. Thus, the Camshaft Funds could be required to liquidate positions it holds in order to comply with such limits, or may not be able to fully implement trading instructions in order to comply with such limits. Any such liquidation or limited implementation could result in substantial costs to the Camshaft Funds.

*European Market Infrastructure Regulation*. The European Market Infrastructure Regulation ("EMIR") introduced certain requirements in respect of derivative contracts, which apply to varying degrees to entities established in the EU, regardless of whether they are transacting with counterparties established in the EU or outside of the EU. As such, where the Camshaft Funds transacts with EU counterparties, they will likely require the transaction to be EMIR-compliant, with the result that the Camshaft Funds becomes subject to additional obligations and/or costs that may not otherwise have applied.

Broadly, EMIR's requirements in respect of derivative contracts are (i) mandatory clearing of OTC derivative contracts declared subject to the clearing obligation; (ii) risk mitigation techniques in respect of uncleared OTC derivative contracts; and (iii) reporting and record-keeping requirements in respect of all derivative contracts. The application of these requirements is dependent on the classification of the counterparties as financial counterparties ("FCs"), non-financial counterparties above the clearing threshold ("NFC+s") or non-financial counterparties below the clearing threshold ("NFC-s").

The EU regulatory framework and legal regime relating to derivatives comprises not only EMIR but also includes a package of legislation, technical standards and related guidance collectively known as MiFID II as described below.

Prospective investors should be aware that there may be ongoing costs (whether direct or indirect) of compliance with EMIR, and that EMIR may adversely affect the Camshaft Funds' ability to engage in certain derivative transactions.

*MiFID II*. The European Union Markets in Financial Instruments Directive ("MiFID") governs the provision of investment services and activities in relation to, as well as the organized trading of, financial instruments such as shares, bonds, units in collective investment schemes and derivatives. MiFID will be comprehensively revised and replaced by a new EU directive and regulation, collectively referred to as "MiFID II", from January 3, 2018. Although the Camshaft Funds is not organized in the EU, and is not authorized or regulated by any EU member state financial services regulator, certain aspects of MiFID II may have an impact on the Camshaft Funds.

MiFID II imposes certain restrictions as to the trading of shares and derivatives, which could apply to transactions made by or with the Camshaft Funds. Subject to certain conditions and exceptions, the Camshaft Funds may be unable to trade shares or derivatives with affected counterparties other than as provided by MiFID II. MiFID II also applies position limits to the size of a net position that a person can hold at all times in commodity derivatives traded on EU trading venues and in "economically equivalent" OTC derivatives.

More generally, EU regulated firms that have trading relationships with the Camshaft Funds may be obliged by MiFID II to impose certain requirements on the Camshaft Funds, or they may seek to do so contractually, with a view to satisfying their own compliance obligations. It is difficult to predict the full impact of MiFID II on the Camshaft Funds. Prospective investors should also be aware that there may be costs (whether direct or indirect) of compliance with MiFID II.

*EU Short Selling Regulation*. On November 1, 2012, the EU Regulation on Short Selling and Certain Aspects of Credit Default Swaps (the "SSR") became directly applicable in all member states of the EU. The SSR applies to short sales of, and short positions relating to, the issued share capital of companies whose shares are admitted to trading on a regulated market or multilateral-trading facility in the EU (unless the principal trading venue for the relevant shares is located in a country outside the EU) ("EU listed shares"), among other types of investments. The SSR imposes certain private and public disclosure obligations in respect of short positions in EU listed shares which apply to all natural or legal persons, irrespective of regulatory status, located inside or outside the EU. The SSR also contains prohibitions on uncovered short sales of EU listed shares in certain circumstances. National regulators, and in certain circumstances, the European Securities and Markets Authority, are able to take certain additional emergency measures (including complete bans on short-selling activities) if certain conditions are met. The SSR may prevent the Firm from fully expressing negative views in relation to EU listed shares. Accordingly, the ability of the Firm to implement the investment approach and fulfill the investment objective of the Camshaft Funds may be constrained.

*International Investing*. Investing outside the United States may involve greater risks than investing in the United States. Investing in emerging and certain non-U.S. markets involves additional risks and special considerations not typically associated with investing in other more established economies or markets. Such risks may include, without limitation: (i) increased risk of nationalization or expropriation of assets or confiscatory taxation; (ii) greater social, economic and

political uncertainty, including civil and ethnic unrest, war, abrupt changes in political and economic power, changes in government institutions and policies or famine; (iii) potentially higher dependence on exports and the corresponding importance of international trade; (iv) greater volatility, less liquidity and smaller capitalization of markets; (v) greater volatility in currency exchange rates; (vi) greater risk of inflation; (vii) capital controls, such as limitations on the ability to exchange local currencies for U.S. Dollars, and trade restrictions, including quotas, tariffs, customs, duties and other assessments, which may lead to significant costs and delays in obtaining licenses, approvals and authorizations; (viii) increased likelihood of governmental involvement in and control over the economy, issuers and financial markets; (ix) governmental decisions to cease support of economic reform programs or to impose centrally planned economies; (x) preferential treatment of local interests over foreign interests by the government, including legislators, regulators and courts; (xi) differences in auditing and financial reporting standards which may result in the unavailability of reliable, current or detailed information about issuers; (xii) less extensive or more extensive regulation of the markets; (xiii) longer settlement periods for transactions and less reliable clearance and custody arrangements; (xiv) greater correlation to commodity price movements; (xv) imposition of withholding or other taxes on dividends, interest, capital gains, gross sales or disposition proceeds or other income; (xvi) higher transaction costs; and (xvii) certain considerations regarding the maintenance of the Camshaft Funds' securities with non-U.S. brokers and securities depositories. Moreover, non-U.S. companies are generally not subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies.

Non-U.S. markets may also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions. Delays in settlement could result in periods when assets of the Camshaft Funds are uninvested and no return is earned thereon. The inability of the Camshaft Funds to make intended security purchases due to settlement problems or the risk of intermediary counterparty failures could cause the Camshaft Funds to miss investment opportunities. The inability to dispose of a security due to settlement problems could result either in losses to the Camshaft Funds due to subsequent declines in the value of such security or, if the Camshaft Funds has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling non-U.S. securities, including brokerage, tax and custody costs, may be higher than those involved in U.S. transactions. Furthermore, many non-U.S. financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many non-U.S. companies are historically less liquid and their prices historically more volatile than securities of comparable U.S. companies.

The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, interest rates, resources, self-sufficiency and balance of payments position.

***United Kingdom Membership of the European Union***. The United Kingdom ("**UK**") ceased to be a member of the EU on January 31, 2020 ("Brexit"). During a prescribed period (the "**Transition Period**"), certain transitional arrangements were in effect, such that the UK continued to be treated, in most respects, as if it were still a member of the EU, and generally remained

subject to EU law. On December 24, 2020, the EU and the UK reached an agreement in principle on the terms of certain agreements and declarations governing the ongoing relationship between the EU and the UK, including the EU-UK Trade and Cooperation Agreement (the "**Agreement**"), and on December 30, 2020, the Council of the European Union adopted a decision authorizing the signature of the Agreement and its provisional application for a limited period between January 1, 2021 to February 28, 2021, pending ratification of the Agreement by the European Parliament. The Transition Period ended on December 31, 2020. The Agreement is limited in its scope primarily to the trade of goods, transport, energy links and fishing, and uncertainties remain relating to certain aspects of the UK's future economic, trading and legal relationships with the EU and with other countries. The actual or potential consequences of Brexit, and the associated uncertainty, could adversely affect economic and market conditions in the UK, in the EU and its member states and elsewhere, and could contribute to instability in global financial markets.

*Current Political Uncertainty*. Some of the results of recent elections and referenda have been unexpected and resulted in material market changes and increases in market uncertainty. Given recent changes in administrations and applicable law following such recent elections and referenda, the future of current regulations, or the adopting of new regulations, is also uncertain. While these uncertainties may create investments opportunities for the Camshaft Funds, such uncertainties could alternatively have adverse impacts on the Camshaft Funds. Predicting the outcome of political processes and events is inherently difficult and uncertain. If the Firm fails to anticipate political events or predicts them incorrectly, it may cause the Camshaft Funds to miss investment opportunities or incur losses. There may be detrimental implications for the value of certain of the Camshaft Funds' investments in certain markets, its ability to enter into transactions or to value or realize its investments or otherwise to implement its investment program or the Firm's investment strategies.

*Risk of Natural Disasters, Epidemics and Terrorist Attacks.* Countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business are susceptible to natural disasters (e.g., fire, flood, earthquake, storm and hurricane) and epidemics, pandemics or other outbreaks of serious contagious diseases. The occurrence of a natural disaster or epidemic could adversely affect and severely disrupt the business operations, economies and financial markets of many countries (even beyond the site of the natural disaster or epidemic) and could adversely affect the Camshaft Funds' investment program or the Firm's ability to do business. In addition, terrorist attacks, or the fear of or the precautions taken in anticipation of such attacks, could, directly or indirectly, materially and adversely affect certain industries in which the Camshaft Funds invests or could affect the countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business. Other acts of war (e.g., war, invasion, acts of foreign enemies, hostilities and insurrection, regardless of whether war is declared) could also have a material adverse impact on the financial condition of industries or countries in which the Camshaft Funds invests.

*COVID-19.* The recent global outbreak of the novel coronavirus (COVID-19) is currently creating unprecedented economic and social uncertainty throughout the world. The ultimate impact of the COVID 19 outbreak is difficult to predict, but it is likely that COVID-19 will have a materially adverse impact on global, national and local economies in the immediate future and that such negative impact is likely to persist for some time. In particular, disruptions to commercial

activity across economies due to the imposition of quarantines, remote working policies, "social distancing" practices and travel restrictions, and/or failures to contain the outbreak despite these measures, could materially and adversely impact the Camshaft Funds' investments. Similar disruptions may occur in respect of the Firm's and the Camshaft Funds' service providers and counterparties (including providers of financing), which could also negatively impact the Camshaft Funds. While there are indications of various governmental responses to the potential negative effects of COVID-19, it is unclear how effective these responses will be and what other impacts such responses may have on the overall performance of markets or the Camshaft Funds.

***ERISA Matters***. Most pension and profit sharing plans, individual retirement accounts and other tax-advantaged retirement funds are subject to provisions of the Code, ERISA, or both, which may be relevant to a decision as to whether such an investor should invest in the Camshaft Funds. There may, for example, be issues as to whether such an investment is "prudent." Legal counsel should be consulted by such an investor before investing in the Camshaft Funds.

AN INVESTMENT IN CAMSHAFT AND THE CAMSHAFT FUNDS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. INVESTMENTS INCLUDING THE RISK THAT THE ENTIRE INVESTMENT MAY BE LOST.   NO GUARANTEE OR REPRESENTATION IS MADE THAT THE FUNDS' INVESTMNENT OBJECTIVES WIL BE ACHIEVED.

**Item 9.** Disciplinary Information

This Brochure, as dated on page 1, reflects that there are no material legal or disciplinary events that have occurred with respect to Camshaft or management persons within the past 10 years.

**Item 10.** Other Financial Industry Activities and Affiliations

Camshaft is exempt from registration as a commodity pool operator ("**CPO**") and a commodity trading advisor ("**CTA**") with the Commodities Future Trading Commission ("CFTCF").

As described above in Items 5 and 6, Camshaft receives asset-based and performance-based compensation from the Funds. The amounts payable to Camshaft are based directly on the net asset value of the Funds. To the extent that valuation of assets is determined based upon information provided by Camshaft, because there is, for example, no public market price available, there may be a conflict of interest. Camshaft will value such assets in accordance with its valuation policies and procedures.

Camshaft, and other professionals of Camshaft (directly or through  its affiliates) may make, and in some cases have made, a capital contribution to one or more of the Funds and, therefore, may be viewed as having an incentive to favor such Funds over other Clients, including pooled investment vehicles in which Camshaft or such persons are not invested (which may include other Camshaft Funds). Camshaft routinely waives the applicable management fees and performance fees for Camshaft-affiliated investors.

Certain of the above conflicts may also be generally addressed through adherence with Camshaft's compliance policies and procedures and its Code of Ethics.

**Item 11.** Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

Camshaft has adopted a Code of Ethics pursuant to Rule 204A-1 under the Advisers Act (the "**Code of Ethics**"). All "access persons" (including employees, managers and officers) of Camshaft must comply with the Code of Ethics. The Code of Ethics states that Camshaft personnel must always place the interests of Camshaft's Clients first. The Code of Ethics sets forth standards of conduct expected of Camshaft's personnel, which reflect the fiduciary obligations of Camshaft and its personnel to its Clients, and requires Camshaft's personnel to comply with applicable federal securities laws. The Code of Ethics also requires each employee of Camshaft to report potential violations of the Code of Ethics promptly to Camshaft's Chief Compliance Officer (the "**CCO**"). Camshaft provides each employee with a copy of the Code of Ethics upon commencement of employment and any amendments as required., Employees are required to provide a written acknowledgement that they have received the Code of Ethics, including any amendments no less than annually.

Camshaft's CCO receives copies account statements for all of its access persons who maintain brokerage accounts no less than quarterly. In addition, each access person must submit to the CCO an annual acknowledgement and certification stating that the access person will comply with the Code of Ethics. The Code of Ethics further requires access persons to submit quarterly transaction reports (or duplicate brokerage statements) that detail the access person's securities transactions for each quarter, for the CCO to review. Finally, the Code of Ethics also contains restrictions on the use of insider information and material non-public information regarding Clients.

Camshaft keeps records of reports and other information that access persons are required to submit under the Code of Ethics. The CCO reports on issues that arise under the Code of Ethics to Camshaft's senior management at least annually. Clients and prospective Clients can obtain a copy of the Code of Ethics upon request by contacting Camshaft by telephone at (305) 619-1383 or by email william@camshaftcapital.com.

As described above in Item 10, Camshaft and certain of its management personnel, employees or affiliates will have a financial interest in investments made by one or more of the Camshaft Funds through their participation in such Funds as a managing member, investment manager, administrative member, director or investor, as applicable. Camshaft and such persons may, therefore, be viewed as having an incentive to favor such Funds over other Clients, including Funds in which such persons are not invested.

In addition, Camshaft may solicit Clients to invest in Camshaft Funds for which Camshaft and certain of its management personnel, employees or affiliates serve as managing member, administrative member, investment manager or director, as applicable, and/or have a financial interest. Additionally, because certain of the Funds for which Camshaft acts as managing member, investment manager or director may invest in other Funds for which Camshaft acts in a similar capacity, Camshaft may be deemed to be recommending to such Funds that they buy securities in which Camshaft and such Camshaft-related persons have a financial interest and/or securities that

Camshaft and such Camshaft-related persons also buys for themselves (*i.e.*, interests in other Funds). To address these potential conflicts, Funds will not bear a double-layering of asset-based fees or performance-based fees in connection with their investment in other Camshaft Funds. Each Fund will, however, be responsible for its *pro rata* share of the expenses of the other Fund in which it invests.

Certain of the above conflicts are generally addressed through adherence to Camshaft's Compliance Manual and its Code of Ethics.

**Item 12.** Brokerage Practices

Camshaft is responsible for determining what securities will be purchased and sold for each Client and selecting the broker-dealer to execute transactions on behalf of Clients. Purchases and sales of securities for a Client must be made in accordance with the investment objectives, strategies and policies of such Client.

It is Camshaft's policy to seek best execution on behalf of its Clients – that is, Camshaft seeks to achieve the best overall qualitative execution for a Client in a particular circumstance. Best execution is not synonymous with the lowest brokerage commission. Camshaft may cause a Client to pay a brokerage commission in excess of that which another broker might have charged for executing the same transaction if it determines that the commission paid was reasonable in relation to the value of the services provided by the broker.

In seeking to achieve best execution, Camshaft considers the full range and quality of services a broker may provide, including ,but not limited to, the experience and skill of the broker's securities traders; the broker's accessibility to primary markets and quotation services; for NASDAQ securities, whether a broker makes a market in that security; a broker's past history of successful, prompt and reliable execution of client trades; the financial strength and stability of the broker; the broker's administrative efficiency; commission rates; the overall net economic result to a client (involving both price paid or received and any commissions and other costs paid); the security price and its volatility; the size of the transaction, including the ability to effect the transaction at all where a large block is involved; the broker's availability to execute possibly difficult transactions in the future; and the receipt of research services. In addition, for purposes of monitoring best execution, Camshaft generally performs comparisons between executed prices and volume-weighted average prices each trading day for each broker.

Camshaft generally does not utilize "soft dollars" or "pay-up" for research. "Soft dollars" refers to Camshaft's receipt of research or other products or services other than execution from brokers. Camshaft may receive, without cost and unrelated to the execution of securities transactions, a broad range of research services from broker-dealers, including information on the economy, industries, groups of securities and individual companies, statistical information, market data, accounting and legal interpretations, political developments, pricing and appraisal services, credit analysis, risk measurement analysis, performance analysis and other information which may affect the economy and/or security prices. Camshaft may also pay broker-dealers and their affiliates for certain specialized data and services, such as benchmark information, that are also unrelated to the execution of securities transactions.

In the event that Camshaft were to receive any "soft dollar" benefits, however, Camshaft expects that they would qualify under the safe harbor provided for under Section 28(e) of the Securities Exchange Act of 1934, as amended. If Camshaft were to use Client brokerage commissions (or markups or markdowns) to obtain "soft dollar" benefits, such as research or other products or services, it would receive a benefit because it does not have to produce or pay for the research, products or services. Consequently, Camshaft would have an incentive to select or recommend a broker-dealer based on its interest in receiving "soft dollar" benefits, rather than on its Clients' interest in receiving most favorable execution.

Camshaft does not consider, in selecting or recommending broker-dealers, any Client referrals it may receive from a broker-dealer or third party. Camshaft does not recommend, request or require that a Client direct the execution of transactions through a specified broker-dealer, nor does it have any arrangement in which it permits a Client to direct transactions to a specific broker-dealer.

Despite the highly customized nature of its advice, Camshaft may on occasion purchase or sell the same securities for more than one Client account at the same time or same day, and in so doing will allocate investment opportunities and trades fairly. "Fair" treatment does not mean identical treatment of all Clients. Rather, it means that Camshaft does not discriminate on an impermissible basis against one Client or group of Clients. When Camshaft transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties and in accordance with the Firm's investment allocation procedures.

Camshaft may combine or "bunch" orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among Camshaft's Clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Camshaft's determination with respect to allocations will be based on what is appropriate under the particular circumstances, and the allocation may be made based upon relevant factors, which may include: (i) cash availability and need; (ii) suitability; (iii) when only a small percentage of the order is executed, shares may be allocated to the account with the smallest order or the smallest position or to an account that is out of line with respect to security or sector weightings relative to other portfolios, with similar mandates; (iv) allocations may be given to one account when one account has limitations in its investment guidelines which prohibit it from purchasing other securities which are expected to produce similar investment results and can be purchased by other accounts; (v) if an account reaches an investment guideline limit and cannot participate in an allocation, shares may be reallocated to other accounts (this may be due to unforeseen changes in an account's assets after an order is placed); (vi) with respect to sale allocations, allocations may be given to accounts low in cash; (vii) in cases when a *pro rata* allocation of a potential execution would result in a *de minimis* allocation in one or more accounts, Camshaft may exclude the account(s) from the allocation and the transactions may be executed on a *pro rata* basis among the remaining accounts; or (viii) in cases where a small proportion of an order is executed in all accounts, shares may be allocated to one or more accounts on a random basis. For equity investments, generally, each Client will receive the same average price as other participants in the bunched transaction.

Clients may pay more when Camshaft does not aggregate trades, as seeking to place separate, non-simultaneous transactions in the same security for multiple Clients may negatively affect market price, transaction commissions and/or trade execution. A Client's non-participation in bunched trades may result in lost opportunities to execute securities transactions for such Client's account that other Clients participating in bunched trades were able to execute.

**Item 13.** Review of Accounts

Camshaft's Managing Director and one or more members of Camshaft's investment team review positions in Camshaft Fund accounts on an ongoing basis to monitor the Camshaft Funds' compliance with the investment objectives and guidelines described in the Funds' offering documents. The accounts of Camshaft Fund investors are valued monthly by the administrator, who forwards an account statement to Fund investors on a monthly basis. Investors in the Funds may receive other periodic and annual written reports as set forth in the applicable Fund's offering documents. Camshaft also conducts meetings with Clients and investors in the Funds upon request. Any Managed Account Clients will receive the written reporting provided for in the Managed Account Agreement governing such accounts, if applicable.

**Item 14.** Client Referrals and Other Compensation

Camshaft does not receive an economic benefit from any person who is not a Client for providing investment advice or other advisory services.

Camshaft may, from time to time, enter into arrangements with third parties for marketing and solicitation activities. If Camshaft pays a cash fee to anyone for soliciting separate account Clients on its behalf, Camshaft will comply with the requirements of the SEC's Marketing Rule (Rule 206(4)-1 under the Advisers Act) to the extent applicable. This rule requires, among other things, a written agreement between the investment adviser and the person soliciting Clients on its behalf, and that the soliciting person provide a disclosure document to the potential Client at the time that the solicitation is made. Camshaft may pay a portion or percentage of the compensation that it receives from Clients for investment advisory services to a third-party, but this will not result in any Client being charged fees at a rate in excess of the rate of fees that Camshaft customarily charges for similar services to comparable accounts, nor will Camshaft charge any Client any other amount for the purpose of offsetting the cost of obtaining an account through a third-party referral.

**Item 15.** Custody

Generally, Camshaft does not have custody of Client assets other than the assets of the Camshaft Funds. Camshaft acts as managing member or investment manager of the Camshaft Funds and is authorized under the Funds' governing documents to deduct fees from each Fund investor's account. Such powers cause Camshaft to be deemed to have custody of the Camshaft Funds' assets for purposes of the SEC's custody rule. Accordingly, to meet the requirements of the custody rule, the Camshaft Funds are subject to an annual audit in accordance with generally accepted accounting principles conducted by an independent public accountant registered with the Public Company Accounting Oversight Board and the audited financial statements are distributed to investors in the Funds within 90 days of the Funds' fiscal year end (in accordance with rules required of registered commodity pool operators).

In the event that Camshaft has any Managed Account Clients in the future, it generally expects that it will not have custody over the assets of such accounts. Managed Account Clients will receive quarterly account statements from the qualified custodian for their accounts and should carefully review those statements. Camshaft generally will not provide statements to Managed Account Clients, except if specifically requested or in certain limited circumstances. Any Managed Account Clients who receive account statements from Camshaft should compare those statements with the account statements received from the qualified custodian.

**Item 16.** Investment Discretion

Camshaft has discretionary authority over the investment activities of its Clients. In the case of the Funds, this discretionary authority is generally granted to Camshaft pursuant to the organizational documents of each Fund and/or pursuant to Camshaft's investment advisory agreement with such Fund. For any Managed Account Clients, discretionary authority is granted to Camshaft pursuant to a Managed Account Agreement, which may impose restrictions on this discretion and specify the types of investments permitted. Camshaft is obligated to exercise its investment discretion in a manner consistent with the stated investment objectives, policies, guidelines and restrictions/limitations for a particular Client account.

**Item 17.** Voting Client Securities

Camshaft has the authority to vote all proxy proposals and corporate actions (collectively, "**proxies**") on behalf of the Funds it advises, and may be delegated the authority to vote proxies held in any Managed Accounts that it may advise in the future. However, depending on the securities in which its Clients are invested, Camshaft may not frequently vote proxies. To the extent that Camshaft invests in a security for a Client for which a proxy vote may arise and Camshaft receives timely notice of such proxy from the Client's prime broker under the terms of the applicable prime broker agreement, Camshaft is guided by general fiduciary principles and will seek to treat proxies in a manner intended to enhance the overall economic value of the applicable Client's assets. Camshaft may (and often does) refrain from voting a Client's proxy under certain circumstances, including, but not limited to, when (i) the economic effect on shareholder's interests or the value of the portfolio holding is indeterminable or insignificant; (ii) voting the proxy would unduly impair the investment management process; or (iii) the cost of voting the proxies outweighs the benefits or is otherwise impractical. In addition, Camshaft may refrain from voting a proxy on behalf of its Clients' accounts due to (1) *de minimis* holdings; (2) *de minimis* impact on the portfolio; (3) items relating to non-U.S. issuers (such as those described below); (4) contractual arrangements with Clients; and/or (5) their authorized delegates or the failure of a proxy to provide sufficient information to allow for informed decision making. For example, Camshaft may refrain from voting a proxy of a non-U.S. issuer due to logistical considerations that may have a detrimental effect on Camshaft's ability to vote the proxy. These issues may include, but are not limited to: (a) proxy statements and ballots being written in a foreign language; (b) untimely notice of a shareholder meeting; (c) requirements to vote proxies in person; (d) restrictions on non-U.S. person's ability to exercise votes; (e) restrictions on the sale of securities for a period of time in proximity to the shareholder meeting (*e.g.*, share blocking); or (f) requirements to provide local agents with power of attorney to facilitate the voting instructions. Any actual or apparent conflict of interest between the interests of Camshaft and its Clients is

resolved in a manner that is consistent with the best interests of Clients and in a manner not affected by such actual or apparent conflict of interest.

Camshaft currently does not permit Clients to direct its vote in a particular solicitation.

**Item 18.** Financial Information

Currently, there is no financial condition that is reasonably likely to impair our ability to meet contractual commitments to Clients.

# EXHIBIT 14



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the annual report(s)/uniform business report(s) for the year(s) 2024 for CAMSHAFT CAPITAL ADVISORS, LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L20000224206.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Twenty-seventh day of February, 2024



*Cord Byrd*
*Secretary of State*

CR2E022 (01-11)

## 2024  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L20000224206

**Entity Name:** CAMSHAFT CAPITAL ADVISORS, LLC

**FILED**
**Feb 09, 2024**
**Secretary of State**
**9999846985CC**

**Current Principal  Place of Business:**

1200 BRICKELL AVE, SUITE 310
MIAMI,  FL  33131

**Current Mailing Address:**

16850 COLLINS AVE #112408
SUNNY ISLES BEACH,  FL  33160  US

**FEI Number:** 85-2638234                                                **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                                                                      Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MORTON, WILLIAM |
| Address | 16850 COLLINS AVE #112408 |
| City-State-Zip: | SUNNY ISLES BEACH  FL  33160 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIAM MORTON                                     MANAGER                         02/09/2024

Electronic Signature of Signing Authorized Person(s) Detail                                                   Date

# EXHIBIT 15



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the annual report(s)/uniform business report(s) for the year(s) 2024 for CAMSHAFT CAPITAL MANAGEMENT, LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L20000224176.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-seventh day of February, 2024





Cord Byrd
Secretary of State

CR2E022 (01-11)

## 2024 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L20000224176

**FILED**
**Feb 09, 2024**
**Secretary of State**
**6881969539CC**

**Entity Name:** CAMSHAFT CAPITAL MANAGEMENT, LLC

**Current Principal Place of Business:**

1200 BRICKELL AVE
SUITE 310
MIAMI, FL 33131

**Current Mailing Address:**

16850 COLLINS AVE #112408
SUNNY ISLES BEACH, FL 33160 US

**FEI Number:** 85-2568572                     **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

　　　　　Electronic Signature of Registered Agent　　　　　　　　　　　　　　　　　Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MORTON, WILLIAM |
| Address | 16850 COLLINS AVE #112408 |
| City-State-Zip: | SUNNY ISLES BEACH FL 33160 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIAM MORTON                              MANAGER                  02/09/2024

　　　　　Electronic Signature of Signing Authorized Person(s) Detail　　　　　　　　　　　　　　Date

# EXHIBIT 16



# EXHIBIT 17



# EXHIBIT 18



# EXHIBIT 19



# EXHIBIT 20



CAMSHAFT CAPITAL ADVISORS, LLC
18555 COLLINS AVE SUITE #5405
SUNNY ISLES BEACH, FL 33160
TELEPHONE: 305-619-1383


WWW.CAMSHAFTCAPITAL.COM

**April 2023**

    This brochure provides information about the qualifications and business practices of Camshaft Capital Advisors. LLC ("<u>Camshaft</u>" or the "<u>Firm</u>"). If you have any questions about the contents of this brochure, please contact us at **(305) 619-1383 and/or email: william@camshaftcapital.com** The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("<u>SEC</u>") or by any state securities authority.

Additional information about Camshaft also is available on the SEC's website at www.adviserinfo.sec.gov.

**Camshaft is registered as an investment adviser with the SEC. Registration with the SEC does not imply a certain level of skill or training.**

CPAM: 10312599.5
AmericasActive:9411525.6

**Item 2.** Material Changes

This is the initial Brochure filing for Camshaft Capital Advisors, LLC. Going forward this Item will be updated with each annual amendment.

*The information set forth in this Brochure is qualified in its entirety by reference to a Client's Governing Documents (as defined herein) and/or offering documents.  In the event of a conflict between the information set forth in this Brochure and the information set forth in a Client's Governing Documents and/or offering documents, the Client's Governing Documents and/or offering documents shall take precedence.*

**Item 3.** Table of Contents

**Topic:**                                                                                               **Page**

**Item 2. Material Changes** ................................................................................................. **2**

**Item 3. Table of Contents** ............................................................................................... **3**

**Item 4. Advisory Business** .............................................................................................. **4**

**Item 5. Fees and Compensation** .................................................................................... **4**

**Item 6. Performance-Based Fees and Side-By-Side Management** ........................... **6**

**Item 7. Types of Clients** .................................................................................................. **7**

**Item 8. Methods of Analysis, Investment Strategies and Risk of Loss** ................... **8**

**Item 9. Disciplinary Information** .................................................................................. **38**

**Item 10. Other Financial Industry Activities and Affiliations** ................................ **38**

**Item 11. Code of Ethics, Participation or Interest in Client Transactions
     and Personal Trading** ................................................................................... **39**

**Item 12. Brokerage Practices** ....................................................................................... **40**

**Item 13. Review of Accounts** ........................................................................................ **42**

**Item 14. Client Referrals and Other Compensation** ................................................. **42**

**Item 15. Custody** ............................................................................................................ **42**

**Item 16. Investment Discretion** .................................................................................... **43**

**Item 17. Voting Client Securities** ................................................................................. **43**

**Item 18. Financial Information** ..................................................................................... **44**

**Item 4.** Advisory Business

For the purposes of this Brochure, the "**Adviser**", "Camshaft: or the "**Investment Manager**" means Camshaft Capital Advisors, LLC.  The Investment Manager, owned by William Morton, is a limited liability company organized under the laws of the State of Florida and has been providing investment advisory services since 2020. Camshaft Capital Management, LLC is the General Partner of Camshaft Capital Fund LP. Mr. Morton acts as the managing member of Camshaft Capital Management, LLC.

Currently, Camshaft manages and provides discretionary investment advisory services to the Camshaft Capital Fund, LP (as defined below in this Item 4 under "**Funds**"). In addition, Camshaft may serve as a discretionary investment adviser to invest the assets of a privately offered pooled investment vehicle managed by an unaffiliated third-party pursuant to a trading advisory agreement (the "**Third-Party Fund**" and, together with the Camshaft Funds, the "**Funds**"). Camshaft may also provide investment advisory services to entities or pooled investment vehicles on a managed account basis (each such arrangement, a "**Managed Account**," and the entity(ies) funding a Managed Account, a "**Managed Account Client**"). For the purposes of this brochure, a "**Client**" refers to a Fund (but not the investors in a Fund) and/or a Managed Account Client, as the context requires.

As of December 31, 2022, Camshaft had $595,845,395 in regulatory assets under management. Camshaft does not currently manage any Client assets on a non-discretionary basis. Camshaft does not participate in any wrap fee programs.

<u>Managed Account Arrangements</u>

As of the date of this brochure, Camshaft has no Managed Account arrangements. However, in the event that Camshaft were to enter into a Managed Account arrangement in the future, then Camshaft would develop investment guidelines based upon the Managed Account Client's specific investment objectives. Managed Account advisory services would be governed by a written agreement ("**Managed Account Agreement**") between Camshaft and the Managed Account Client. Camshaft would manage any such Managed Accounts under a broad range of potential mandates. Managed Account Clients would be permitted to amend their investment guidelines as their needs change or impose restrictions or limitations on investing in certain securities or types of securities.

**Item 5.** Fees and Compensation

A management fee is paid monthly in advance to the General Partner. The management fee is equal to three percent (3%) per annum of the beginning capital account balance of each Limited Partner for such month. The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the management fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

4

To the extent that there is a shared expense among any of the Camshaft Funds, on the one hand, and Camshaft, on the other hand, Camshaft will allocate the expense among such Camshaft Fund(s) and itself in a manner that it determines is fair and equitable under the circumstances to all parties.

See Item 6 below for more information concerning performance-based fees.

Managed Accounts

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. In the event that Camshaft were to advise a Managed Account in the future, it may be paid a management fee and/or a performance fee by such Managed Account in accordance with the terms of the applicable Managed Account Agreement.

Additional Expenses

In addition to the management fees and the performance-based fees described above, the Camshaft Funds (and, indirectly, the investors therein) will pay such additional expenses as are disclosed in the Camshaft Funds' applicable offering documents. The expenses to be paid by each Camshaft Fund vary and may include, among others, the following: transaction costs and investment-related expenses incurred in connection with the Funds' trading activities, including securities and futures brokerage, clearing, margin interest (if any), custodial expenses, and any non-U.S. mutual fund expenses; all U.S. and non-U.S. legal, regulatory and compliance fees and expenses (including, but not limited to, blue sky compliance, compliance with the Alternative Investment Fund Managers Directive, MIFID, the EEA and FATCA), accounting, auditing, tax preparation, expenses relating to the offering and sale of the Shares, and registration fees and expenses as well as related fees and expenses (including, but not limited to, legal fees or other fees and expenses related to: the preparation and filing of Form PF, CFTC and NFA Form CPO-PQR, NFA Form CTA-PR and NFA Form PR, the applicable portion of Camshaft's fees and expenses incurred in connection with preparing and filing Form ADV that are allocable to a Camshaft Fund, and any other SEC, CFTC and/or NFA filings and registrations or other filings that are made with respect to the Funds or assets of the Funds; related requirements under the Dodd-Frank Act, and U.S. Department of the Treasury and U.S. Department of Commerce regulations; and registrations and related requirements of foreign regulators); expenses associated with the continued offering of shares, which include, but are not limited to, marketing, travel and other solicitation expenses; operational expenses such as the administrator's charges, fees and expenses, trade support systems, the directors' charges and expenses, photocopying, facsimile, postage, and telephone expenses; research and research-related costs, consulting fees, fees and charges (such as data feeds, news, Fund reports, brokerage reports, software licenses, ongoing development, implementation, updating and support of software licenses, bank service fees, third-party trading and/or portfolio-related services and support, including software costs such as order management, risk management and similar systems, software costs relating to order management, and Bloomberg terminals and services); legal fees and due diligence expenses, related to the analysis purchase or sale of investments, whether or not the investment is consummated; Camshaft Fund related insurance costs (including a portion of D&O and E&O insurance for Camshaft, if applicable), extraordinary expenses (such as, litigation costs and indemnification obligations), if any; the Performance Fee and the Management Fee (defined below) paid to Camshaft; Cayman Islands government fees and director registration fees and other equivalent expenses; and interest in connection with

investment-related borrowings. In addition, each Fund will bear its *pro rata* share of all expenses related to any pooled investment vehicle(s) (including, but not limited to, the Master Fund) in which such Fund invests; such charges may include management fees, performance fees, ordinary operating expenses (such as administration, legal, accounting and other operational costs) and extraordinary expenses (such as litigation costs and indemnification obligations), provided that such Fund will not bear a double-layering of asset-based fees or performance-based compensation in connection with its investment in another Camshaft Fund. Therefore, it is possible that a Fund may bear a portion of any such expense even though it may not directly benefit therefrom. Funds also pay the fees and expenses of their prime brokers, futures commission merchants and administrators.

As described further in the respective offering documents for the Camshaft Funds, generally, Camshaft will bear certain overhead expenses of operating the Camshaft Funds which otherwise would be allocable to the Camshaft Funds.

Although Camshaft presently does not have any Managed Account Clients, any future Managed Account Clients of Camshaft may be expected to pay additional expenses similar to those described above, to the extent applicable, subject to the specific terms of the applicable Managed Account Agreement.

Please see Item 12 below for a discussion of Camshaft's brokerage practices.

<u>Additional Information About Fees and Expenses</u>

The specific manner in which Camshaft charges management fees, performance-based fees, and expenses is established in each Client's written agreement with Camshaft. Camshaft investors may consult the applicable Fund's offering memorandum and governing documents for a description of these charges. Generally, pursuant to the applicable governing documents for each Fund, management fees and performance-based fees are deducted directly from each investor's account with the relevant Fund. Management fees, if any, are generally paid monthly in arrears. Performance fees, if any, are paid at the end of the fiscal year to which the fee pertains or upon a redemption from a Fund or a termination of a Managed Account.

The foregoing fees and expenses may be negotiable, reduced, rebated or waived in certain circumstances, including with respect to Clients or Fund investors that are employees of Camshaft and other persons that are affiliated with Camshaft or its affiliates.

**<u>Item 6.</u>** Performance-Based Fees and Side-By-Side Management

Currently, Camshaft's Clients are generally charged both a management fee and a performance fee. The performance fees are structured to comply with Section 205 of the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

Performance-based compensation arrangements may create an incentive for Camshaft to make investments that are riskier or more speculative than would be the case in the absence of a financial incentive based on the performance of a Client's account. Performance-based compensation arrangements may also create an incentive for Camshaft to favor higher fee paying accounts over other accounts in the allocation of investment opportunities. When Camshaft

transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties. Camshaft will not necessarily purchase or sell the same securities at the same time or in the same proportionate amounts for all eligible portfolios, particularly if different portfolios have materially different amounts of capital under management by Camshaft or different amounts of investable cash available or different investment guidelines, financing arrangements and/or dealer relationships. As a result, although Camshaft manages portfolios with similar or identical investment objectives, or may manage accounts with different objectives that trade in the same securities, the portfolio decisions relating to these accounts, and the performance resulting from such decisions, may differ from portfolio to portfolio.

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. If in the future Camshaft were to advise a Managed Account alongside the Camshaft Funds, it is possible that Camshaft may take different positions in the same or related securities for such Clients, such as selling certain securities short for a Camshaft Fund while a Managed Account simultaneously holds the same or related securities long. In such case, Camshaft will adopt and execute side-by-side management procedures in an effort to mitigate these potential conflicts.

**Item 7.** Types of Clients

Camshaft currently provides investment advice only to the Camshaft Funds. However, Camshaft may advise additional or different types of entities in the future.

Each Camshaft Fund is not registered under the Investment Company Act of 1940, as amended (the "**1940 Act**"), in reliance on the exemption provided by Section 3(c)(7) of the 1940 Act. In addition, each Camshaft Fund's interests or shares (as applicable) are not registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state "blue-sky" laws; rather, they are privately offered only to qualified purchasers and accredited investors pursuant to an exemption from registration under Regulation D under the Securities Act. Each investor in the Fund must be (1) an "accredited investor" as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" as defined in the 1940 Act and the regulations under the 1940 Act, and (3) a "United States person" as defined under the Internal Revenue Code of 1986, as amended (the "Code"). Each investor in the Fund that is a "United States person" (as defined in the Code) must be (1) an "accredited investor," as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" or "knowledgeable employee" as defined in the 1940 Act and the rules under the 1940 Act (and thus a "qualified client" within the meaning of the Advisers Act), and (3) exempt from U.S. federal income tax under Section 501 of the Code or otherwise. Each other investor in the Fund must not be a "U.S. person," as defined in Regulation S under the Securities Act, or a "United States person" as defined in the Code, and must be a "Non-United States person" as defined in Regulation 4.7 under the U.S. Commodity Exchange Act, as amended. The minimum investment in each Fund, subject to waiver, is $2,500,000.

If a Client or potential Client would like to open a Managed Account, the conditions for starting and maintaining a Managed Account will vary with the circumstances of each Managed Account and be negotiated and set forth on an individual basis in the relevant Managed Account Agreement.

**Item 8.** Methods of Analysis, Investment Strategies and Risk of Loss

The methods of analysis and investment strategies used by Camshaft in managing Camshaft Fund assets are summarized below. The methods of analysis and investment strategies that Camshaft would use to manage assets of any Managed Account Clients would vary depending on the needs of each Managed Account Client, but are expected to be comparable to those summarized below for the Camshaft Funds. In addition, the material risks involved with each significant investment strategy and method of analysis is explained below.

<u>Methods of Analysis and Investment Strategies</u>

The methods of analysis and investment strategies used by Camshaft in managing assets are summarized below. Investors and prospective investors in a Camshaft Fund should review the offering memorandum Fund in which they are invested (or are seeking to invest) for additional information about the strategies and risks associated with an investment in such Fund. For information concerning the sub-strategies identified below, please refer to the confidential offering memorandum of the applicable Camshaft Fund.

- *Leverage and Short Selling*. The Fund may from time to time engage in short selling. Selling securities short runs the risk of losing an amount greater than the amount invested. Short selling is subject to theoretically unlimited risk of loss because there is no limit on how much the price of the stock may appreciate before the short position is closed out. A short sale may result in a sudden and substantial loss if, for example, an acquisition proposal is made for the subject company at a substantial premium over market price. Furthermore, the Fund at times will trade securities on a leveraged basis, i.e., where the security can be purchased by putting up only a portion of the instrument's face value and borrowing the remainder (margin). As a result, a relatively small price movement in a security may result in immediate and substantial losses to the Fund. In addition, trading on margin will result in interest charges to the Fund which may be substantial. Leveraged investments, including any purchase or sale of securities on margin, may result in losses in excess of the amount invested.

- *Trading in Distressed Securities and Highly Leveraged Companies*. The strategies of the General Partner and the Investment Advisers may entail investments in distressed securities and highly leveraged companies. An investment in these types of securities and companies, by the nature of their leveraged capital structure, will involve a high degree of financial risk. Such risks include, but are not limited to, the following: (a) difficulty in identifying attractive investment opportunities; (b) subordination to substantial amounts of senior indebtedness, all or a signification portion of which may be secured; (c) the possibility of substantial changes in rights and covenants which could result in less protection for the Fund with respect to securities purchased in proceedings under Chapter 11 of the US Bankruptcy Code; and (d) the lack of regulation of the OTC Market (in which distressed securities often are traded) by any exchange, and the lack of any established market-making, margin or other requirements that would help to insure a viable trading market exists for a particular security.

- *Illiquidity of Markets*. At various times, the markets for securities interests purchased or sold by the Fund may be "thing" or illiquid, making purchase or sale of securities at desired prices or in desired quantities difficult or impossible. For example, securities exchanges and the

8

SEC have authority to suspend trading in a particular security without notice. In addition, the Fund may invest in private placements of securities that are not registered under the Act and may have little to no trading market.

- *Investing in Illiquid Securities*. The Fund may from time to time invest in unregistered securities of public companies and at times in the securities of private companies, including without limitation, limited partnerships, the securities of which may be, and often are, illiquid. While no more that 10% of the Fund's portfolio may be invested in illiquid securities, the Fund may be forced to hold a larger cash reserve than normal as a precaution in the event of a large number of withdrawal requests by Limited Partners within a short period of time.

- *Other Investment Strategies*. Camshaft may also pursue other investment strategies as it deems appropriate, including, but not limited to: long/short equity investing, investing and trading in futures, foreign currency instruments, options, total-return swaps, stock indices and exchange-traded funds or other derivative financial instruments.

<u>Material Risks</u>

*An investment in the Camshaft Funds involves substantial risks, including, but not limited to, those described below. The following information is not intended to be an exhaustive listing of all potential risks associated with an investment in the Camshaft Funds. There can be no assurance that the Camshaft Funds will realize their investment objective or return any capital. Shares/interests are a potentially suitable investment only for sophisticated investors for whom an investment in the Camshaft Funds does not represent a complete investment program and who, in consultation with their own investment and tax advisors, fully understand and are capable of assuming the risks of an investment in the shares/interests.*

*Note that, while this section may refer to risks of trading by the Camshaft Funds, all of the Camshaft Funds' trading activities occur at the level of the Master Fund. In addition, references in this section to possible actions undertaken by the Camshaft Funds and the risks related to the operation of the Camshaft Funds should be read to include references to possible actions undertaken by the Master Fund and the risks related to the operation of the Master Fund.*

*Prospective investors should give careful consideration to the following factors in evaluating the merits and suitability of an investment in the Camshaft Funds:*

**<u>Risks Relating to the Camshaft Funds and the Offering of Shares/Interests</u>**

*Limitations on Past Performance*. Camshaft Funds' past performance is by no means necessarily representative of how the Camshaft Funds will perform. While certain individuals of the Firm have substantial experience investing in certain types of opportunities that the Camshaft Funds pursues, there can be no assurance that the Camshaft Funds or the Master Fund will generate performance results equivalent to the past results generated by the Firm or that the Camshaft Funds will avoid losses. Market conditions and trading approaches are continually changing, and the fact that certain individuals of the Firm may have achieved certain positive performance in the past may be largely irrelevant to the Camshaft Funds' prospects for profitability. The Camshaft Funds'

past performance has been, and is expected to continue to be, highly volatile. PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

*Potential Loss of Investment*. An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

*No Market for Shares/Interests*. Although amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm. There is no market for the shares/interests, and none is expected to develop. Shares/interests will not be registered under the securities laws of any jurisdiction and will be subject to strict restrictions on resale and transferability. Therefore, investors must be prepared to bear the risk of their investment in the Camshaft Funds for a substantial period of time.

*Reliance on Key Person*. The Camshaft Funds is substantially dependent on the services of Camshaft. In the event of the death, disability, departure or insolvency of Mr. Morton, the business of the Camshaft Funds may be adversely affected. Mr. Morton will devote such time and effort as he deems necessary for the management and administration of the Camshaft Funds' business. However, Mr. Morton may engage in various other business activities in addition to managing the Camshaft Funds, and consequently Mr. Morton may not devote his complete time to the business of the Camshaft Funds.

*Effect of Substantial Redemptions/Withdrawals*. A number of events could result in substantial redemptions/withdrawals from the Camshaft Funds. Actions taken to meet such redemptions/withdrawals requests could result in a decrease in the prices of equities (listed and unlisted, private and public, common and preferred), fixed income securities, sovereign debt, futures (including commodity futures), over-the-counter physical commodities, foreign exchange forward and spot contracts, digital assets and digital asset derivatives, American Depositary Receipts ("ADRs"), foreign exchange currencies, and other derivative contracts and transactions such as swaps (including interest rate swaps, credit default swaps, index credit default swaps, equity total return swaps, volatility or variance swaps, correlation swaps and commodity swaps), options, warrants, convertible securities, and cash or cash equivalents (such as treasury notes and bills, certificates of deposit, commercial paper, broker balances, bankers acceptances or repurchase agreements) (collectively, "Financial Instruments") held by the Camshaft Funds and an increase in expenses (*e.g.*, transaction costs and the costs of terminating agreements). The overall value of the Camshaft Funds may also decrease because the liquidation value of certain assets may be materially less than their mark-to-market value. The Camshaft Funds may be forced to sell its more liquid positions, may need to maintain greater amounts of cash and cash-equivalent investments than it would otherwise maintain and may also be restricted in its ability to obtain financing or derivatives counterparty relationships needed for certain investment and trading strategies, any of which could affect the Camshaft Funds adversely.

***Performance-Based Compensation.*** In addition to sharing in profits on the basis of its capital, the Firm will be entitled to receive from each investor's account (paid by the Master Fund) a performance fee based on a percentage of the new net income, if any, in respect of such investor's account during a performance period. The performance fee can be characterized as creating an incentive to the Firm to make speculative investments and thus a potential conflict with the investments of the investors. Since the performance fee will be based upon portfolio gains, both realized and unrealized (net of realized and unrealized losses), it is possible that the Firm may receive a performance fee based upon unrealized appreciation in particular positions which is not in fact achieved upon eventual disposition of such positions. The fact that the performance fee is based on capital appreciation of the Camshaft Funds may create an incentive for the Firm to make investments that are more speculative than would be the case in the absence of such performance-based advisory compensation.

***Share Value Calculation.*** The value of the dollar class shares will be calculated in U.S. Dollars.

***Limited Regulatory Oversight***. The Camshaft Funds is not registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended (the "**Company Act**") or any comparable regulatory requirements and does not intend to do so. Accordingly, the provisions of such regulations, which among other things generally require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be maintained in segregated accounts and regulate the relationship between the investment company and its asset manager, are not applicable to an investment in the Camshaft Funds. Notwithstanding the foregoing, the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") imposes burdensome reporting and recordkeeping requirements on the Camshaft Funds. The Camshaft Funds intends to trade with dealers who will be required by regulation or will undertake to fulfill the Camshaft Funds' Dodd-Frank mandated reporting requirements. The costs associated with such compliance may result in certain investment strategies in which the Camshaft Funds engages, or may have otherwise engaged, becoming non-viable or non-economic to implement.

***Investors Do Not Participate in Management***. Except as outlined in the applicable offering documents investors, in their capacity as such, do not have the right to participate in the management of the Camshaft Funds or in the conduct of its business, whether by voting or otherwise. In general, the Firm is solely responsible for managing the Camshaft Funds and for the investment, sale and reinvestment of the Camshaft Funds' assets.

***Risk of Litigation***. In the ordinary course of business, the Camshaft Funds may be subject to litigation from time to time. In addition, as a result of certain investments, the Camshaft Funds could be named as a defendant in a lawsuit or regulatory action. The outcome of such proceedings, which may materially adversely affect the value of the Camshaft Funds, may be impossible to anticipate, and such proceedings may continue without resolution for long periods of time. Any litigation may consume substantial amounts of the Firm's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation.

*Service Provider Risks*. The Camshaft Funds and the Firm are also reliant upon the proper performance of duties and obligations of their respective service providers. The Camshaft Funds may be adversely impacted in a material manner if one or more of the service providers to the Camshaft Funds or the Firm fail to adequately perform their functions. In addition, key activities undertaken in connection with the Firm's and the Camshaft Funds' operations may be concentrated in one or more service providers, which may expose the Camshaft Funds to risks if one or more of such service providers does not provide, or becomes incapable of providing services, in the normal course of business.

*Institutional and Counterparty Risk*. Institutions, such as brokerage firms, banks and broker dealers, generally have custody of the Camshaft Funds' portfolio assets and may hold such assets in "street name." The Camshaft Funds is subject to the risk that these firms and other brokers, counterparties or clearinghouses with which the Camshaft Funds deals may default on their obligations to the Camshaft Funds. Any default by any of such parties could result in material losses to the Camshaft Funds. Bankruptcy or fraud at one of these institutions could also impair the operational capabilities or the capital position of the Camshaft Funds. In addition, securities and other assets deposited with custodians or brokers may not be clearly identified as being assets of the Camshaft Funds, causing the Camshaft Funds to be exposed to a credit risk with regard to such parties. The Camshaft Funds generally will only be an unsecured creditor of its trading counterparties in the event of bankruptcy or administration of such counterparties. In some jurisdictions, the Camshaft Funds may also only be an unsecured creditor of its brokers in the event of bankruptcy or administration of such brokers. The Camshaft Funds will attempt to limit its brokerage and custody transactions to well capitalized and established banks and brokerage firms in an effort to mitigate such risks, but the collapse of the seemingly well capitalized and established Bear Stearns and Lehman Brothers demonstrates the limits on the effectiveness of this approach in avoiding counterparty losses.

The Camshaft Funds may effect transactions in over-the-counter ("**OTC**") and "interdealer" markets. The participants in such markets are typically not subject to the same level of credit evaluation and regulatory oversight as are members of "exchange based" markets. This exposes the Camshaft Funds to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Camshaft Funds to suffer a loss. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or in instances where the Camshaft Funds has concentrated its transactions with a single or small group of counterparties. The inability to make complete and "foolproof" evaluations of the financial capabilities of the Camshaft Funds' counterparties and the absence of a regulated market to facilitate settlement increases the risk to the Camshaft Funds.

The Camshaft Funds are likely to have exposure to trading counterparties other than its prime brokers. If the Camshaft Funds deliver collateral to its trading counterparties under the terms of its ISDA Master Agreements and any other trading agreements, either by posting initial margin or on a daily mark-to-market basis, circumstances may arise where a counterparty may be over-collateralized and/or the Camshaft Funds may from time to time have uncollateralized mark-to-market exposure to a counterparty in relation to its rights to receive securities and cash. In both circumstances the Camshaft Funds will be exposed to the creditworthiness of any such

counterparty and, in the event of the insolvency of a trading counterparty, the Camshaft Funds will rank as an unsecured creditor in relation to amounts equivalent to any such over-collateralization and any uncollateralized exposure to such trading counterparty. In such circumstances it is likely that the Camshaft Funds will be unable to recover any debt in full, or at all.

The Camshaft Funds' contractual arrangements with its trading counterparties will typically contain termination provisions in the event of, among other things, a significant decline in the net asset value of the Camshaft Funds, calculated on a periodic basis, and/or a decline in the net asset value of the Camshaft Funds to an absolute floor. Termination of any such contractual arrangements could seriously impair the ability of the Camshaft Funds to carry on its investment activities.

In addition to the foregoing risks associated with a counterparty or prime broker defaulting or entering into a dispute, there is also the risk that major institutional investors in the Camshaft Funds may be compelled to withdraw or redeem or that the Camshaft Funds' counterparties or brokers will be required to restrict the amount of credit previously granted to the Camshaft Funds due to their own financial difficulties, resulting in forced liquidation of substantial portions of the Camshaft Funds' investments.

The Camshaft Funds' brokers and other counterparties may hold the Camshaft Funds' assets, including assets held as collateral for margin loans or other financing provided to the Camshaft Funds. Under the terms of such arrangements and under applicable law, a secured party may be permitted to rehypothecate such assets in connection with securities lending or other transactions entered into by the secured party. Depending upon the types of instruments traded, the Camshaft Funds may be subject to risk of loss of its assets on deposit with a counterparty in the event of the bankruptcy or insolvency of such counterparty, any clearing broker through which such counterparty executes and clears transactions (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty), any affiliate of such counterparty or any clearinghouse or exchange on which such counterparty trades (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty).

The Camshaft Funds are not restricted from dealing with any particular counterparty or from concentrating any or all transactions with one counterparty. The ability of the Firm to transact business with any one or number of counterparties, the lack of any meaningful or independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Camshaft Funds.

***Illiquid Financial Instruments***. Financial Instruments purchased by the Camshaft Funds may lack a liquid trading market, which may result in the inability of the Camshaft Funds to sell any such security or portfolio investment or to close out a transaction or to cover the short sale of a position, thereby forcing the Camshaft Funds to incur potentially unlimited losses in such instruments. This lack of liquidity and depth could be a disadvantage to the Camshaft Funds both in the realization of the prices that are quoted and the execution of orders at desired prices. In addition, Financial Instruments that are at one time marketable could become unmarketable (or more difficult to market) for a number of reasons. For example, in the case of securities traded on the NASDAQ National Market System, Inc., if the price of the securities falls below the minimum price required for continued trading, their marketability is likely to be adversely affected or

effectively eliminated altogether. In addition, most U.S. futures exchanges have established "daily price fluctuation limits" which preclude the execution of trades at prices outside of the limit, and, from time to time, the CFTC or the exchanges may suspend trading in market disruption circumstances. The daily limits establish the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily limit has been reached in a particular futures contract, no trades may be made at a price beyond the limit. In these cases, it is possible that the Camshaft Funds could be required to maintain a losing position that it otherwise would close and incur significant losses or be unable to establish a position and miss a profit opportunity. Illiquid Financial Instruments may also be more difficult to value. Liquidity risk arises in the general funding of the Camshaft Funds' trading activities. It includes the risk of the Camshaft Funds not being able to fund trading activities at settlement dates, or liquidate Financial Instrument positions in a timely manner at a reasonable price. The sale of illiquid Financial Instruments often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the OTC markets. The Camshaft Funds may not be able to readily dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time. Finally, if a substantial number of investors were to redeem/withdraw from the Camshaft Funds and the Camshaft Funds did not have a sufficient amount of cash and liquid securities to satisfy in cash such requests, the Camshaft Funds might have to meet such redemption/withdrawal requests through distributions of illiquid Financial Instruments.

Certain positions are typically liquidated on or shortly before the effective redemption/withdrawal date. If there is a market dislocation, including a daily price fluctuation limit, affecting such position(s) on such date, the price of the position(s) used to determine the net asset value of the investor account may be substantially different than the amount for which the position(s) can ultimately be sold by the Master Fund (or the price that would have been in effect without such market dislocation). Shorter notice for a redemption/withdrawal may exacerbate this result. If a market dislocation exists on a date on which the Camshaft Funds attempts to liquidate positions to satisfy redemptions/withdrawals, the non- redeeming/withdrawing investors (and new subscribers, if any) would be adversely affected if the relevant portfolio positions are subsequently sold for less than the price assigned to the positions as of the redemption/withdrawal date. Alternatively, if the relevant portfolio positions are subsequently sold for greater value, then the redeeming/withdrawing investor would be adversely affected. These effects are exacerbated in the case of redemptions/withdrawals representing a significant percentage of the net asset value of the Camshaft Funds.

Where appropriate, certain positions in the Camshaft Funds' investment portfolio that are illiquid and do not actively trade are marked to market by the Firm, taking into account actual market prices, market prices of comparable investments and/or such other factors (*e.g.*, the tenor of the respective instrument) as the Firm deems appropriate. To the extent that marking an illiquid investment to market is not practicable, an investment will be carried at fair value, as reasonably determined by the Firm. There is no guarantee that fair value will represent the value that will be realized by the Camshaft Funds on the eventual disposition of the investment or that would, in fact, be realized upon an immediate disposition of the investment. As a result, an investor redeeming/withdrawing its investment from the Camshaft Funds prior to realization of such an investment may not participate in gains or losses therefrom.

14

*Cybersecurity Breaches.* The Camshaft Funds and the Firm are subject to risks associated with a breach in their cybersecurity. Cybersecurity is a generic term used to describe the technology, processes and practices designed to protect networks, systems, computers, programs and data from "hacking" by other computer users, other unauthorized access and the resulting damage and disruption of hardware and software systems, loss or corruption of data, as well as misappropriation of confidential information. If a cybersecurity breach occurs, the Camshaft Funds may incur substantial costs, including those associated with: forensic analysis of the origin and scope of the breach; investment losses from sabotaged trading systems; identity theft; unauthorized use of proprietary information; litigation; adverse investor reaction; the dissemination of confidential and proprietary information; reputational damage; and increased and upgraded cybersecurity. Any such breach could expose the Firm and/or the Camshaft Funds to civil liability, as well as regulatory inquiry and/or action. In addition, any such breach could cause substantial redemptions/withdrawals from the Camshaft Funds. In addition, investors could be exposed to additional losses as a result of unauthorized use of their personal information.

*Evolving Privacy Laws.* In the ordinary course of business, the Firm collects, processes, receives, shares and maintains personal information, including data relating to personnel and investors. As a result, the Firm is subject to various U.S. federal and state privacy and information security laws regulating personal information and creating potential liability for the mishandling, misuse or compromise of that personal information. These laws are evolving, and new legislation may be enacted over time. New privacy laws add additional complexity to compliance programs and alternative data use that may require additional investment in resources, and could impact trading strategies.

*Limits of Disclosure.* The descriptions in the Camshaft Funds' offering documents of the Firm's investment strategies, the markets and Financial Instruments in which the Camshaft Funds trades, the risk factors and conflicts of interest involved in doing so and other aspects of the Camshaft Funds' operations are subject to material inherent limitations and do not purport to be either complete or comprehensive. In investing in the Camshaft Funds, investors are entrusting their capital to the subjective, discretionary market judgment of the Firm, trading in changing, volatile and uncertain markets. No prospective investor should invest in the Camshaft Funds if such investor is not capable of understanding and evaluating the risks of such investment.

## Risks Associated with the Camshaft Funds' Investment Strategies

*Global Macro Strategies*. The success of the Camshaft Funds' global macro investment strategy depends upon the Firm's ability to identify and exploit perceived fundamental, economic, financial and political imbalances that may exist in and between global markets across a variety of Financial Instruments and asset classes. The identification and exploitation of such imbalances and the prediction of price movements in these instruments involves significant uncertainties due to their reliance on various factors, including political, economic, international and environmental trends and events. There can be no assurance that the Firm will be able to identify investment opportunities or exploit such imbalances. The Camshaft Funds may incur substantial losses if the investment theses underlying the investment strategies or positions fail to develop as expected by the Firm.

***Relative Value Strategy Risks***. The success of the Camshaft Funds' relative value trading is dependent on the Firm's ability to exploit relative mispricing's among interrelated instruments. Although relative value positions may be considered to have a lower risk profile than directional trades as the former attempt to exploit price differentials not overall price movements, relative value investment strategies are by no means without risk. Mispricing's, even if correctly identified, may not converge within the time frame within which the Camshaft Funds maintains its positions. Even pure "riskless" arbitrage—which is rare—can result in significant losses if the arbitrage cannot be sustained (due, for example, to margin calls). International securities and markets may not move in correlation with each other or in directions anticipated by the Firm, so that hedging and arbitrage activities may not be successful. The Camshaft Funds' relative value investment strategies are subject to the risks of disruptions in historical price relationships, the restricted availability of credit and the obsolescence or inaccuracy of its algorithms. Market disruptions may also force the Camshaft Funds to close out one or more positions. Such disruptions have in the past resulted in substantial losses for funds employing relative value investment strategies.

The profitability of relative value trading has been materially reduced in certain asset classes in the past decade— in part due to the number of market participants seeking to exploit the same mispricings.

***Long/Short Strategies***. The success of the Camshaft Funds' long/short investment strategy depends upon the Firm's ability to identify and purchase securities that are undervalued and identify and sell short securities that are overvalued. The identification of investment opportunities in the implementation of the Camshaft Funds' long/short investment strategies is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. In the event that the perceived opportunities underlying the Camshaft Funds' positions were to fail to converge toward, or were to diverge further from, values expected by the Firm, the Camshaft Funds may incur losses. In the event of market disruptions, significant losses can be incurred which may force the Camshaft Funds to close out one or more positions. Furthermore, any valuation models used by the Firm, if applicable, to determine whether a position presents an attractive opportunity consistent with the Firm's long/short investment strategies may become outdated and inaccurate as market conditions change.

***Currency Risk – FX Hedging***. The Camshaft Funds intends to trade currencies for speculative or hedging purposes and may (but is not required to) use forward contracts and other Financial Instruments to seek to hedge against fluctuations in the relative value of the Fund's investments in respect of the Euro class shares and the GBP class shares. Hedging does not eliminate fluctuations in the value of the U.S. Dollar relative to the Euro or British Pounds Sterling or vice versa, or prevent losses if their relative values change, but rather establishes other positions designed to gain from those same developments, and such hedging transactions may also limit the opportunity for gain if the value of the U.S. Dollar should increase in relation to the Euro or British Pounds Sterling. As with other hedging transactions, currency hedging may result in a poorer overall performance and increased (rather than reduced) risk for the Camshaft Funds, the Euro class shares and the GBP class shares. There can be no guarantee that the Firm will be able to enter into suitable currency hedging transactions at a price and terms sufficient to protect the Camshaft Funds from a decline in the value of a particular currency and that such hedging transactions will be able to be executed at a time when the Camshaft Funds wishes to do so.

The Camshaft Funds may also invest a portion of its assets in equity securities, fixed income securities and other investments denominated in currencies other than the U.S. Dollar and in other Financial Instruments, the prices of which are determined with reference to currencies other than the U.S. Dollar. Currency markets are highly volatile, and currency trading is highly leveraged.  For example, governments from time to time intervene, directly and by regulation, in the currency markets, with the specific intention of influencing the exchange rates.  Currency markets are also, in general, highly interest rate sensitive, and may also be affected by trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.  The Camshaft Funds may invest in currencies of Emerging Markets (as defined below), which may be less liquid than currencies of developed countries. There can be no guarantee that instruments suitable for hedging currency exchange rate changes will be available at the time when the Camshaft Funds wishes to use them or will be able to be liquidated when the Fund wishes to do so.  Some currency risks are difficult or impossible to hedge, including for example the impact of exchange rate fluctuations on portfolio companies' businesses and macroeconomies.  In some countries, the markets for certain of these hedging instruments are not highly developed or do not exist.  To the extent certain currency exposure is not part of the Camshaft Funds' investment strategy as described above, the Firm may hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Opportunistic Investing*. The Camshaft Funds will build a portfolio of both long and short equity investments where the investment team has identified potential for value from misunderstood or mispriced opportunities. Although the investment team conducts rigorous analysis of these opportunities, even if such an opportunity is correctly identified, such opportunity may not materialize within the time frame of which the Camshaft Funds maintains its positions, may take considerable time to occur or may result in an alternative strategic action that will result in closing the investment at a lower value than entry. Market liquidity constraints, borrowing availability and short squeezes can all have a material impact on the Camshaft Funds' investments and can require action to liquidate or exit positions at less than optimal levels.

General market disruptions may force the Camshaft Funds to close out one or more positions before the Camshaft Funds can capture gains or when the Camshaft Funds' trades would result in losses. Such disruptions have in the past resulted in substantial losses for investment funds.

Any long investments in financially troubled issuers carry a potential risk of loss by the Camshaft Funds. Among the problems involved in assessing and making investments in troubled issuers is the fact that it frequently may be difficult to obtain information as to the condition of such issuer. The market prices of the securities of such issuers are also subject to abrupt and erratic market movements and above average price volatility, and the spread between the bid and asked prices of such securities may be greater than normally expected. It may take a number of years for the market prices of such securities to reflect their intrinsic values. It is anticipated that some of such securities in the portfolio of the Camshaft Funds may not be widely traded, and that the Camshaft Funds' position in such securities may be substantial in relation to the market for such securities.

These types of investing requires active monitoring and may, in rare instances, require participation in bankruptcy or reorganization proceedings by the Firm. To the extent that the Firm becomes involved in such proceedings, the Camshaft Funds may have a more active participation in the affairs of the issuer than that assumed generally by an investor. In addition, the Firm's participation in such proceedings may restrict or limit the Camshaft Funds' ability to trade securities of the subject company. The Camshaft Funds may have limited ability to influence the management of the issuer or to elect a representative to the issuer's board of directors or other governing body, potentially increasing the risk of such investments. In addition, the management of the issuer or its shareholders may have economic or business interests which are inconsistent with those of the Camshaft Funds, and they may be in a position to take action contrary to the Camshaft Funds' objectives.

*Special Situations*. The Camshaft Funds may have investments in issuers involved in (or the target of) acquisition attempts or tender offers or issuers involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of business enterprise, there exists the risk that the transaction in which such business enterprise is involved will be unsuccessful, will take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Camshaft Funds of the security or other Financial Instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Camshaft Funds may be required to sell its investment at a loss. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled issuers in which the Camshaft Funds may invest, there is a potential risk of loss by the Camshaft Funds of its entire investment in such issuers.

*Short Selling*. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the seller to profit from declines in market prices of the sold securities to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Camshaft Funds of buying those securities to cover the short position. There can be no assurance that the Camshaft Funds will be able to maintain the ability to borrow securities sold short. In particular, (i) a tender offer or similar transaction with respect to a company whose securities the Camshaft Funds has sold short or (ii) an unexpected shortage in an underlying commodity with respect to commodity futures that the Camshaft Funds has sold short, could cause the value of such Financial Instruments to rise dramatically, resulting in substantial losses to the Camshaft Funds. Regulators have, and may in the future, suspend short sales in Financial Instruments traded by the Camshaft Funds, which may cause the price of such securities to rise, resulting in a loss to the Camshaft Funds. Brokers may also require the Camshaft Funds to "cover" a short position at an inopportune time thereby forcing the Camshaft Funds to purchase the security at the then-prevailing market price which may be higher than the price at which such security was originally sold short by the Camshaft Funds.

*Market Data.* The Firm's and the Camshaft Funds' investment strategies depend on a wide variety and large quantity of market data obtained from numerous hosts of different suppliers, including multiple exchanges. Notwithstanding the Firm's reliance on large quantities of market

data, sources of market data may decline over time, which could adversely impact the investment program of the Camshaft Funds. In addition, market data contract pricing and terms are complex and subject to change without prior notice in many cases; increases in market data contract pricing could make the acquisition of certain data cost-prohibitive for the Firm which would negatively impact the Camshaft Funds' net performance. If data that the Camshaft Funds relies on is corrupted, compromised or discontinued in any material manner, the Camshaft Funds may suffer material losses or be exposed to the risk of loss of investment opportunities.

**Credit Ratings.** Credit ratings of structured finance products, other fixed-income instruments and investments represent the rating agencies' opinions regarding their credit quality and are not a guarantee of future credit performance of such securities. Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value. Therefore, the ratings assigned to securities by rating agencies may not fully reflect the true risks of an investment. Further, in recent years many highly rated structured securities have been subject to substantial losses.

**Discretionary Aspects of the Firm's Investment Approach.** The Firm's strategies and research methodologies retain certain discretionary aspects. In particular, the discretion of the Firm is expected to be used throughout the research and creation of models, in interpreting data, choosing signals and ranking their importance. In addition, from time to time, the Firm may determine to make investment decisions or reallocate the Camshaft Funds' capital in respect of a particular asset class or investment strategy in anticipation of, or in reaction to, what the Firm deems to be certain "material events" in the global economy. Such "material events" include, but are not limited to, economic turning points, market regime changes, central bank announcements, geopolitical shifts and other material economic and market or risk events underlying the Camshaft Funds' investment strategies and in the Firm's view represent opportunities to enhance returns, reduce volatility or protect against potential drawdowns. There can be no assurances that such interventions will be successful or not increase the Camshaft Funds' losses attributable to such external events.

**Use of Leverage.** The investment strategies utilized on behalf of the Camshaft Funds generally involve the use of borrowed funds and otherwise obtaining leveraged exposures to Financial Instruments. Leverage in respect of certain investment strategies employed on behalf of the Camshaft Funds may be significant. Such leverage may be employed at the strategy level or the portfolio level. Use of leverage for investment purposes entails significant risks. Use of leverage tends to magnify the gains or losses from investment activities and the overall volatility of the Camshaft Funds. In addition, leverage results in interest expense and other costs and premiums. If gains earned by the Camshaft Funds' portfolio fail to cover such costs, the net asset value of the Camshaft Funds may decrease faster than if there had been no borrowings.

If securities pledged to brokers or other financial institutions to secure the Camshaft Funds' margin accounts decline in value, the Camshaft Funds could be subject to a "margin call," pursuant to which the Camshaft Funds must either deposit additional funds with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. The prime brokers and dealers that provide financing to the Camshaft Funds will determine the margin, haircut and collateral valuation policies that will apply to the Camshaft Funds from time to time.

Changes by prime brokers and dealers in margin, haircut, financing and valuation policies may result in margin calls, loss of financing and forced liquidations of positions at disadvantageous prices. There can be no assurance that the Camshaft Funds will be able to maintain any financing, and at times, especially during distressed market conditions, brokers and dealers have substantially reduced the availability of credit. If the Camshaft Funds is unable to obtain financing on terms acceptable to the Firm, the Camshaft Funds could be forced to liquidate portfolio investments on a schedule that the Firm would not otherwise follow and incur significant losses.

*Hedging*. Hedging techniques involve one or more of the following risks: (i) imperfect correlation between the performance and value of the instrument and the value of the Camshaft Funds securities or other objective of the Firm; (ii) possible lack of a secondary market for closing out a position in such instrument; (iii) losses resulting from interest rate, spread or other market movements not anticipated by the Firm; (iv) the possible obligation to meet additional margin or other payment requirements, all of which could worsen the Camshaft Funds' position; and (v) default or refusal to perform on the part of the counterparty with which the Camshaft Funds trade. Furthermore, to the extent that any hedging strategy involves the use of OTC derivatives transactions, such a strategy would be affected by implementation of various regulations, including those adopted pursuant to Dodd-Frank.

The Firm will not, in general, attempt to hedge all market or other risks inherent in the Camshaft Funds' positions, and hedges certain risks, if at all, only partially. Specifically, the Firm may choose not, or may determine that it is economically unattractive, to hedge certain risks—either in respect of particular positions or in respect of the Camshaft Funds' overall portfolio. The Camshaft Funds' portfolio composition will commonly result in various directional market risks remaining unhedged. The Firm may rely on diversification to control such risks to the extent that the Firm believes it is desirable to do so; however, the Camshaft Funds is not subject to formal diversification policies.

The ability of the Camshaft Funds to hedge successfully will depend on the ability of the Firm to predict pertinent price movements or the underlying causes of such price movements, which cannot be assured. The Firm is not required to hedge and there can be no assurance that hedging transactions will be available or, even if undertaken, will be effective. In addition, it is not possible to hedge fully or perfectly against currency fluctuations affecting the value of securities denominated in non-U.S. currencies because the value of those securities is likely to fluctuate as a result of independent factors not related to currency fluctuations. Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged, such as counterparty credit risk. Furthermore, by hedging a particular position, any potential gain from an increase in the value of such position may be limited.

*Emerging Market Investing*. The Camshaft Funds may invest a portion of its assets in the securities of, or instruments providing exposure to, less developed countries or countries with new or developing capital markets ("Emerging Markets"), as well as trade the currencies of such countries to hedge currency exposure. The value of Emerging Markets currencies and securities may be drastically affected by political developments in the country of issuance. In addition, the existing governments in the relevant countries could take actions that could have a negative impact on the Camshaft Funds, including nationalization, expropriation, sudden imposition of capital

20

controls, imposition of confiscatory taxation or regulatory or imposition of withholding or other taxes on interest payments.

Some of the countries in which the Camshaft Funds may invest have experienced political, economic and/or social instability. Many such countries have also experienced dramatic swings in the value of their national currency. There can be no assurance that such instability or such fluctuations will not occur in the future and, if they do occur, that they will not have a substantial adverse effect on the performance of the Camshaft Funds.

The economies of many of the Emerging Markets countries are still in the early stages of modern development and are subject to abrupt and unexpected change. In many cases, governments retain a high degree of direct control over the economy and may take actions having sudden and widespread effects. Also, many Emerging Markets country economies have a high dependence on a small group of markets or even a single market. Emerging Markets countries also tend to have periods of high inflation and high interest rates, as well as substantial volatility in interest rates, which could affect the Camshaft Funds adversely.

Foreign investment in the Emerging Markets countries is in some cases restricted. Many of these countries have non-convertible currencies and the value of investments may be affected by fluctuation in available currency rates and exchange control regulations. The remittance of profits may therefore be restricted, and the Camshaft Funds may utilize swaps and other forms of indirect investment to access such markets. Moreover, the banking systems in these countries are not fully developed and considerable delays may occur in the transfer of funds within, and the remittance of monies out of, Emerging Markets countries.

Certain Emerging Markets countries are particularly likely to require identifying information about entities and persons who have direct, or even indirect, exposure to the securities of issuers in those countries. This may result in the Camshaft Funds being asked to provide information about investors to Emerging Markets regulators or to the brokers who are providing services to the Camshaft Funds in connection with trading activities. Such information may include, but may not be limited to, the identities, addresses and countries of origin of the investors.

*Volatility*. The market value of certain investments held by the Camshaft Funds may be volatile, and will generally fluctuate due to a variety of factors that are inherently difficult to predict, including, among other things, the macro business and economic environment, specific developments or trends in respect of a company or in any particular industry, the market's overall perception of risk, general economic conditions, the condition of certain financial markets, domestic and international economic and political events, prevailing credit spreads, changes in prevailing interest rates and the financial condition of counterparties.

*Interest Rate Risk*. The Camshaft Funds is subject to interest rate risk. Generally, the value of fixed income securities will change inversely with changes in interest rates. As interest rates rise, the market value of fixed income securities tends to decrease. Conversely, as interest rates fall, the market value of fixed income securities tends to increase. This risk will be greater for long-term securities than for short-term securities. The Firm may attempt to minimize the exposure of its portfolio to interest rate changes through the use of interest rate swaps, interest rate futures

21

and/or interest rate options. However, there can be no guarantee that the Firm will be successful in mitigating the impact of interest rate changes on its portfolio.

*Potential Inability to Trade or Report Due to Systems Failure*. The Firm's investment strategies rely extensively on a wide range of information technology systems, including computer hardware and software systems and will be dependent to a significant degree on the proper functioning of such internal and external computer systems. Information technology systems are subject to a number of inherent and unpredictable risks. Accordingly, systems failures, whether due to third-party failures upon which such systems are dependent or the failure of the Firm's hardware or software, could disrupt trading or make trading impossible until such failure is remedied. Any such failure, and consequential inability to trade (even for a short time), could, in certain market conditions, cause the Camshaft Funds to experience significant trading losses or to miss opportunities for profitable trading. Any such failures also could cause a temporary delay in reports to investors.

*Availability of Investment Opportunities*. There can be no assurance that the Firm will be able to find suitable opportunities consistent with its investment approach or that it believes will likely to provide the desired returns. Market conditions may limit the availability of investment opportunities. Such limitations may cause delays in deploying the Camshaft Funds' capital, concentration of the Camshaft Funds' investments and may negatively impact the Camshaft Funds' returns.

*No Material Restrictions*. The Firm will opportunistically implement whatever investment strategies it believes from time to time may be best suited to prevailing market conditions and to the Firm's investment approach, without material restrictions. Such investment strategies may involve higher levels of risk than the ones discussed herein. There can be no assurance that the Firm will be successful in applying any strategy to the Camshaft Funds' investing.

## Risks Relating to Financial Instruments Traded

*Futures*. The rapid fluctuations in the market prices of futures interests make an investment in the Camshaft Funds volatile. Volatility is caused by changes in supply and demand relationships; weather; agricultural, trade, fiscal, monetary and exchange control programs; U.S. and non-U.S. political and economic events and policies; and changes in interest rates. If the Firm incorrectly predicts the direction of the price in a futures interest, large losses may occur and the Camshaft Funds could lose all or substantially all of its assets.

Futures prices are highly volatile and are affected by a wide variety of complex and hard to predict factors; consequently, a primary risk in trading these instruments is rapid fluctuations in market prices in a short time period. Price fluctuations may affect the Firm's ability to earn investment returns for the Camshaft Funds. Market volatility may also depart significantly from historical averages, which could affect performance. Volatility could create adverse results for the performance of the Camshaft Funds in several ways. A period of substantial volatility shortly after an investor's initial investment, or additional investments thereafter, could adversely affect performance and cause a significant reduction in such investor's equity, making it more difficult to achieve profitability. Substantial volatility prior to the time of a planned redemption/withdrawal

adversely affect performance, and could reduce the amount of proceeds actually received when the redemption/withdrawal has been completed.

Futures exchanges may impose position accountability limits (the "Position Accountability Limits") with respect to certain futures contracts traded on each particular futures exchange. Position Accountability Limits are triggers that would bring the Camshaft Funds' position(s) to the attention of the exchange. Through the application of Position Accountability Limits, exchanges can prohibit an investor from holding a position of more than a specific number of futures contracts. Under the rules of a futures exchange, if the Camshaft Funds holds a certain number of futures contracts approaching the Position Accountability Limit, the Camshaft Funds may be required by the futures exchange to limit or decrease its holdings of such futures contracts pursuant to the futures exchange's Position Accountability Limits. If the Camshaft Funds is required to either limit or decrease its holdings of such futures contracts, or if an exchange lowers its Position Accountability Limits, the Camshaft Funds may be adversely affected and may not be able to achieve its investment objective.

***Non-U.S. Futures***. Foreign futures transactions involve executing and clearing trades on non-U.S. futures exchanges. This is the case even if the foreign exchange is formally "linked" to a U.S. futures exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No U.S. organization regulates the activities of a foreign exchange, including the execution, delivery and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country. Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs. For these reasons, the Camshaft Funds may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures. In particular, funds received from customers to margin foreign futures transactions may not be provided the same protections as funds received to margin futures transactions on domestic exchanges. In addition, the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the time the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

***Credit Default Swaps***. The Camshaft Funds may invest in credit default swaps ("**CDS**"). A credit default swap is a contract between two parties which transfers the risk of loss if a company fails to pay principal or interest on time or files for bankruptcy. Credit default swaps can be used to hedge a portion of the default risk on a single corporate bond or a portfolio of bonds. In addition, credit default swaps can be used to implement the Firm's view that a particular credit, or group of credits, will experience credit improvement or credit impairment. Swap transactions dependent upon credit events are priced incorporating many variables including the pricing and volatility of the common stock, and potential loss upon default, among other factors. As such, there are many factors upon which market participants may have divergent views.

The Camshaft Funds may also purchase or sell CDS on a basket of reference entities or an index. In circumstances in which the Camshaft Funds is the credit default swap buyer and does not own the debt securities that are deliverable under a CDS, the Camshaft Funds is exposed to the risk that deliverable securities will not be available in the market, or will be available only at

23

unfavorable prices, as would be the case in a so-called "short squeeze." While the credit default swap market auction protocols reduce this risk, it is still possible that an auction will not be organized or will not be successful. As a seller of CDS, the Camshaft Funds incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity. However, the Camshaft Funds will not have any legal recourse against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations. In addition, in the event that a cash settlement auction to identify the relevant deliverable securities, is not established the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to the Camshaft Funds following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Camshaft Funds.

*Equity Investments*. The Camshaft Funds intends to invest in equity markets, which may involve substantial risks. Investments in equity markets are highly volatile and may be subject to wide and sudden fluctuations, with a resulting fluctuation in the Camshaft Funds' performance. Equity markets may decline due to factors affecting equity securities markets generally or particular industries represented in those markets. Factors affecting the equity markets include, without limitation, real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, political events or adverse investor sentiment generally. They may also decline due to factors that affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry. Equity markets tend to be cyclical and may experience periods of turbulence. For the foregoing reasons, investments in equity markets can be highly speculative and carry a substantial risk of loss of principal.

The Camshaft Funds' single name equity investments may involve substantial risks and may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. There are no absolute restrictions in regard to the size or operating experience of the companies in which the Camshaft Funds may invest. Relatively small companies may lack management depth or the ability to generate internally, or obtain externally, the funds necessary for growth. Companies with new products or services could sustain significant losses if projected markets do not materialize. Equity prices are directly affected by issuer specific events, as well as general market conditions. In addition, in many countries investing in common stocks is subject to heightened regulatory and self-regulatory scrutiny as compared to investing in debt or other Financial Instruments. Changes in the structure of the equity markets or new market participants may materially impede the Camshaft Funds' investment strategy.

*Fixed Income Investments*. The Camshaft Funds intends to invest in bonds and other fixed income securities of U.S. and non-U.S. issuers. The value of the fixed income securities in which the Camshaft Funds may invest changes both as general market conditions change and as the general levels of interest rates fluctuate. When interest rates decline, the value of the Camshaft Funds' fixed income securities can be expected to rise. Conversely, when interest rates rise, the value of such securities is generally expected to decline. Investments in lower rated or unrated fixed income securities in which the Camshaft Funds may invest, while generally providing greater opportunity for gain and income than investments in higher rated securities, usually entail greater risk (including the possibility of default or bankruptcy of the issuers of such securities). Fixed

income securities are generally not exchange traded and therefore, usually carry a higher level of liquidity and mark-to-market risk potential than most exchange-traded equity securities.

The Camshaft Funds may take positions in debt securities which rank junior to other outstanding securities and obligations of the issuer, all or a significant portion of which may be secured on substantially all of that issuer's assets. The Camshaft Funds may take positions in debt securities which are not protected by financial covenants or limitations on additional indebtedness. The Camshaft Funds may invest in securities which are moral obligations of issuers or subject to appropriations. The Camshaft Funds will therefore be subject to credit and liquidity risks. In addition, evaluating credit risk for debt securities of issuers in some jurisdictions involves uncertainty because credit rating agencies throughout the world have different standards, making comparison across countries difficult.

*Prepayment Risk.* The frequency at which prepayments (including voluntary prepayments by the obligors and accelerations due to defaults) occur on debt instruments will be affected by a variety of factors including the prevailing level of interest rates and spreads as well as economic, demographic, tax, social, legal and other factors. Generally, obligors tend to prepay their fixed rate obligations when prevailing interest rates fall below the coupon rates on their obligations. Similarly, floating rate issuers and borrowers tend to prepay their obligations when spreads narrow.

In general, "premium" securities (securities whose market values exceed their principal or par amounts) are adversely affected by faster than anticipated prepayments, and "discount" securities (securities whose principal or par amounts exceed their market values) are adversely affected by slower than anticipated prepayments. Since many fixed rate obligations will be discount instruments when interest rates and/or spreads are high, and will be premium instruments when interest rates and/or spreads are low, such debt instruments may be adversely affected by changes in prepayments in any interest rate environment.

The adverse effects of prepayments may impact the Camshaft Funds' portfolio in two ways. First, particular investments may experience outright losses, as in the case of an interest-only instrument in an environment of faster actual or anticipated prepayments. Second, particular investments may underperform relative to hedges that the Firm may have constructed for these investments, resulting in a loss to the Camshaft Funds' overall portfolio. In particular, prepayments (at par) may limit the potential upside of many instruments to their principal or par amounts, whereas their corresponding hedges often have the potential for unlimited loss.

*High-Yield Securities.* The Camshaft Funds may invest in high yield securities. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower-rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available

25

to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

*Corporate Debt*. Bonds, notes and debentures issued by corporations may pay fixed, variable or floating rates of interest, and may include zero-coupon obligations. Corporate debt instruments may be subject to credit ratings downgrades. Other instruments may have the lowest quality ratings or may be unrated. In addition, the Camshaft Funds may be paid interest in kind in connection with its investments in corporate debt and related Financial Instruments (*e.g.*, the principal owed to the Camshaft Funds in connection with a debt investment may be increased by the amount of interest due on such debt investment). Such investments may experience greater market value volatility than debt obligations that provide for regular payments of interest in cash and, in the event of a default, the Camshaft Funds may experience substantial losses.

*Mezzanine Debt*. Mezzanine debt is typically junior to the obligations of a company to senior creditors, trade creditors and employees. The ability of the Master Fund to influence a company's affairs, especially during periods of financial distress or following an insolvency, will be substantially less than that of senior creditors. Mezzanine debt instruments are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. Default rates for mezzanine debt instruments have historically been higher than for investment-grade instruments. In the event of the insolvency of a portfolio company of the Master Fund or similar event, the Master Fund's debt investment therein will be subject to fraudulent conveyance, subordination and preference laws.

*Non-Performing Nature of Debt*. Certain debt instruments may be non-performing or in default. Furthermore, the obligor or relevant guarantor may also be in bankruptcy or liquidation. There can be no assurance as to the amount and timing of payments, if any, with respect to such debt instruments.

*Troubled Origination*. When financial institutions or other entities that are insolvent or in serious financial difficulty originate debt, the standards by which such instruments were originated, the recourse to the selling institution, or the standards by which such instruments are being serviced or operated may be adversely affected.

**Obligations of Governments, their Agencies and Instrumentalities.** The Camshaft Funds intends to invest in government securities. Government securities are obligations of, or are guaranteed by, governments, their agencies or instrumentalities. These instruments include bills, certificates of indebtedness and notes and bonds issued by governments, states, municipalities or by government agencies or instrumentalities. Some government securities, such as U.S. Treasury bills and bonds, are supported by the full faith and credit of the government treasury; others are supported by the right of the issuer to borrow from the government treasury; others are supported by the discretionary authority of the government to purchase the agency's obligations; still others

26

are supported only by the credit of the instrumentality. Certain events, including bankruptcy filings by certain municipalities, have highlighted the risks inherent in investing in government securities. It is difficult, if not impossible, to determine the extent to which such filings will become more common. Bankruptcy laws applicable to governments are relatively untested and may not provide the same protections to creditors as those contained in bankruptcy laws applicable to non-government debtors. It is impossible to predict whether the Partnership will be able to successfully avoid losses relating to defaults by issuers of governmental securities.

Various factors may adversely affect the value and yield of municipal securities. These factors include imbalances in demand, potential legislative changes, as well as uncertainties related to the tax status of municipal bonds or the rights of others holding these securities. Returns will depend on a positively sloped yield curve and the relationship between the tax-exempt and taxable yield curves. Adverse changes in the slope of the municipal bond yield curve as well as its relationship to the taxable yield curve, among other things, could have a material adverse effect on performance. Investments in municipal securities may be subject to liquidity risk because of the fragmentation of the municipal bond market and the unique effect that political, legislative and/or regulatory actions can have on the municipal bond market, compared to the taxable markets.

The Camshaft Funds intends to invest in sovereign debt issued or guaranteed by U.S. and non-U.S. governments, their agencies and instrumentalities either in the currency of their domicile or in a foreign currency. Investors in sovereign debt may be asked to participate in debt restructuring, including the deferral of interest and principal payments, and may also be requested by the issuer to extend additional loans. Investments in sovereign debt are subject to varying degrees of credit risk depending on the level of government support. Certain sovereign debt securities are supported by the full faith and credit of the national government or political subdivision or agency, while others lack such support. Investments in sovereign debt are also subject to varying degrees of credit risk as a result of financial or political instability in the relevant countries. Certain events, such as the political and economic instability in various European Union (the "<u>EU</u>") countries, have highlighted the risks inherent in investing in sovereign debt, including an EU member choosing to leave the Eurozone and redenominating its debt. The unwillingness of one or more EU countries to provide assistance to distressed sovereigns within the EU underlines the unexpected political dynamics that may arise to undermine investor expectations regarding the safety of sovereign debt.

Additionally, the financial markets are roiled from time to time by evolving developments relating to possible sovereign defaults or moratoriums. A sovereign's financial condition is subject to numerous factors—social programs, political pressure, supra-national economic actions—all or many of which may be exogenous to the Firm's analysis and research and may from time to time dominate market pricing (even if contrary to fundamental/trading dynamic pricing correctly identified by the Firm). It is impossible to predict whether the Camshaft Funds will be able to successfully avoid losses relating to sovereign default. There is no current means of collecting on defaulted sovereign debt as part of bankruptcy or other proceedings.

In addition to general default risk relating to sovereign debt, if the Camshaft Funds invests in sovereign debt denominated in a currency other than U.S. Dollars (or in respect of which payments of principal or interest are paid in a currency other than U.S. Dollars), the Camshaft Funds will be exposed to the risk that one or more jurisdictions may impose currency controls that

would limit the Camshaft Funds' ability to convert such payments of principal or interest to U.S. Dollars. It is impossible to predict whether any such currency controls will be imposed.

Countries or territories (including Venezuela, Russia, Argentina, Puerto Rico, Turkey and Lebanon) have encountered, or are currently encountering, difficulties in servicing their external national or government debt obligations, which led to defaults on government obligations and the restructuring of certain indebtedness. One sovereign default may have an adverse effect on the markets of both the defaulting country or territory and non-defaulting countries and/or territories.

***Repurchase and Reverse Repurchase Agreements.*** The Camshaft Funds may enter into repurchase and reverse repurchase agreements. When the Camshaft Funds enters into a repurchase agreement, it "sells" securities to a broker-dealer or financial institution, and agrees to repurchase such securities on a mutually agreed date for the price paid by the broker-dealer or financial institution, plus interest at a negotiated rate. In a reverse repurchase transaction, the Camshaft Funds "buys" securities from a broker-dealer or financial institution, subject to the obligation of the broker-dealer or financial institution to repurchase such securities at the price paid by the Camshaft Funds, plus interest at a negotiated rate. The use of repurchase and reverse repurchase agreements by the Camshaft Funds involves certain risks. For example, if the seller of securities to the Camshaft Funds under a reverse repurchase agreement defaults on its obligation to repurchase the underlying securities, as a result of its bankruptcy or otherwise, the Camshaft Funds will seek to dispose of such securities, which action could involve costs or delays. If the seller becomes insolvent and subject to liquidation or reorganization under applicable bankruptcy or other laws, the Camshaft Funds' ability to dispose of the underlying securities may be restricted. It is possible, in a bankruptcy or liquidation scenario, that the Camshaft Funds may not be able to substantiate its interest in the underlying securities. Finally, if a seller defaults on its obligation to repurchase securities under a reverse repurchase agreement, the Camshaft Funds may suffer a loss to the extent that it is forced to liquidate its position in the market, and proceeds from the sale of the underlying securities are less than the repurchase price agreed to by the defaulting seller.

***Distressed Securities.*** The fact that certain of the companies in whose securities the Camshaft Funds may invest are in transition, out of favor, financially leveraged or troubled, or potentially troubled, and may be or have recently been involved in major strategic actions, restructurings, bankruptcy, reorganization or liquidation, means that their securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry, or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Camshaft Funds' investment in any instrument, and a significant portion of the obligations and preferred stock in which the Camshaft Funds invests may be less than investment grade.

Investment in the securities of financially troubled issuers and operationally troubled issuers involves a high degree of credit and market risk. Although the Camshaft Funds invests in select companies that, in the view of the Firm, have the potential over the long-term for capital growth, there can be no assurance that such financially troubled issuers or operationally troubled issuers can be successfully transformed into profitable operating companies. There is a possibility

that the Camshaft Funds may incur substantial or total losses on its investments. During an economic downturn or recession, securities of financially troubled or operationally troubled issuers are more likely to go into default than securities of other issuers. In addition, it may be difficult to obtain information about financially troubled issuers and operationally troubled issuers.

Securities of financially troubled issuers and operationally troubled issuers are less liquid and more volatile than securities of companies not experiencing financial difficulties. The market prices of such securities are subject to erratic and abrupt market movements and the spread between bid and asked prices may be greater than normally expected. In addition, it is anticipated that many of the Camshaft Funds' portfolio investments may not be widely traded and that the Camshaft Funds' investment in such securities may be substantial relative to the market for such securities. As a result, the Camshaft Funds may experience delays and incur losses and other costs in connection with the sale of its portfolio securities.

***Derivative Instruments***. The Camshaft Funds will use various derivative financial instruments for both hedging and synthetic investing. Derivative financial instruments include credit derivatives, interest rate swaps, total return swaps, options, forward currency contracts and futures. In addition, the Camshaft Funds may from time to time use both exchange-traded and OTC futures and options as part of its investment strategy and for hedging purposes. Such derivative instruments may be highly volatile, involve certain special risks and expose investors to a high risk of loss.

The risks relating to OTC derivatives that are not otherwise cleared through a central clearing party include, but are not limited to, the following: (i) credit risk (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations); (ii) market risk (adverse movements in the price of a financial asset or commodity); (iii) legal risk (the characterization of a transaction or a party's legal capacity to enter into it could render the financial contract unenforceable, and the insolvency or bankruptcy of a counterparty could preempt otherwise enforceable contract rights); (iv) operational risk (inadequate controls, deficient procedures, human error, system failure or fraud); (v) documentation risk (exposure to losses resulting from inadequate documentation); (vi) liquidity risk (exposure to losses created by inability to prematurely terminate the derivative); (vii) systemic risk (the risk that financial difficulties in one institution or a major market disruption will cause uncontrollable financial harm to the financial system); (viii) concentration risk (exposure to losses from the concentration of closely related risks such as exposure to a particular industry or exposure linked to a particular entity); and (ix) settlement risk (the risk faced when one party to a transaction has performed its obligations under a contract but has not yet received value from its counterparty).

Use of derivatives and other techniques such as short sales for hedging purposes involves certain additional risks, including (i) dependence on the ability to predict movements in the price of the Financial Instruments hedged; (ii) imperfect correlation between movements in the Financial Instruments on which the derivative is based and movements in the assets of the underlying portfolio; and (iii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of a portfolio's assets segregated to cover its obligations. In addition, by hedging a particular position, any potential gain from an increase in value of such position may be limited. See also "*Short Selling*," "*Options*" and "*Leverage*."

29

Transactions in OTC derivatives may involve other risks as well. It may be impossible to liquidate an existing position, to assess the value of a position or to assess the exposure to risk. The low initial margin deposits normally required to establish a position in such instruments permit a high degree of leverage. As a result, a relatively small movement in the price of a contract may result in a profit or a loss which is high in proportion to the amount of funds actually placed as initial margin and may result in unquantifiable further losses exceeding any margin deposited. Further, when used for hedging purposes there may be an imperfect correlation between these instruments and the investments or market sectors being hedged. Lastly, regulatory restraints may restrict the notional amount of instruments that the Camshaft Funds may trade.

*Swaps.* The Camshaft Funds may enter into swap agreements (including total return and foreign exchange swaps) and other types of OTC transactions with broker-dealers or other financial institutions. Depending on their structures, swap agreements may increase or decrease the Camshaft Funds' exposure to various securities, commodities, indices, currencies or other investments or units of measure. The values of the Camshaft Funds' swap positions would increase or decrease depending on the changes in value of the underlying asset.

Total return swaps typically involve commitments to pay interest in exchange for a market-linked return, both based on notional amounts. Depending on the change in the value or level of the underlying instrument, basket of instruments, or index, the Camshaft Funds will either receive or make a payment based on the amount of the change. To the extent the total return of the instrument, basket of instruments, or index underlying the transaction exceeds or falls short of the offsetting interest rate obligation, the Camshaft Funds will receive a payment from or make a payment to the counterparty, respectively.

The use of swaps involves investment techniques and risks different from and potentially greater than those associated with ordinary securities transactions. Swaps involve the risk that the price of the swap used by the Camshaft Funds to calculate net asset value does not accurately reflect its fair market value, which could have a favorable or unfavorable effect on the net asset value of the Camshaft Funds. Some swaps are complex and, in the case of bilateral (uncleared) swaps, may be valued based on quotations given by the Camshaft Funds' swap counterparty, who has adverse interests to the Camshaft Funds with respect to the value of the swap. In certain cases related to bilateral (uncleared) swaps, the Camshaft Funds' swap counterparty may be the only source of value quotations for a swap, while in other cases, multiple quotes may be available. There are also different methodologies that may be used to determine the value of a credit default swap and credit default swap spreads may be wide. As a result of the foregoing factors, the Camshaft Funds may not be able to close out swaps at the price used by the Camshaft Funds to calculate its net asset value. Also, under certain circumstances related to bilateral (uncleared) swaps, if a swap counterparty undervalues the Camshaft Funds' interest in a swap, it could require the Camshaft Funds to transfer greater amounts of collateral to the counterparty than if the swap was valued at fair market value.

Because the master and credit support agreements for bilateral (uncleared) OTC swap transactions are individually negotiated with a specific counterparty, there exists the risk that the parties may interpret contractual terms (*e.g.*, the definition of default) differently when the Camshaft Funds seeks to enforce its contractual rights. If that occurs, the Camshaft Funds may be

30

forced to seek to enforce its contractual rights through legal proceedings, which may be costly and time consuming.

There is currently little case law characterizing total rate of return swaps and other derivatives, interpreting their provisions and characterizing their tax treatment. There can be no assurance that future decisions construing similar provisions to those in many of the Camshaft Funds' swap agreements or other related documents or additional regulations and laws governing such derivatives will not have a material adverse effect on the Camshaft Funds.

The CFTC requires certain derivative transactions that were previously executed on a bilateral basis in the OTC markets to be executed through a regulated futures or swap exchange or execution facility. The SEC is also expected to impose similar requirements on certain security-based derivatives in the near future, though it is not yet clear when these parallel SEC requirements will go into effect. Such requirements may make it more difficult and costly for investment funds, including the Camshaft Funds, to enter into highly tailored or customized transactions. They may also render certain strategies in which the Camshaft Funds might otherwise engage impossible or so costly that they will no longer be economical to implement. If the Camshaft Funds decides to execute derivatives transactions through such exchanges or execution facilities—and especially if it decides to become a direct member of one or more of these exchanges or execution facilities— the Camshaft Funds would be subject to the rules of the exchange or execution facility, which would bring additional risks and liabilities, and potential requirements under applicable regulations and under rules of the relevant exchange or execution facility.

With respect to cleared OTC derivatives, the Camshaft Funds will not face a clearinghouse directly but rather through an OTC derivatives dealer that is registered with the CFTC or SEC to act as a clearing member. The Camshaft Funds may face the indirect risk of the failure of another clearing member customer to meet its obligations to its clearing member. Such scenario could arise due to a default by the clearing member on its obligations to the clearinghouse, triggered by a customer's failure to meet its obligations to the clearing member.

***Options***. The Camshaft Funds may engage in the trading of options. Trading options is highly speculative and may entail risks that are greater than investing in other securities. The value of options will be affected by market volatility and prices of options are generally more volatile than prices of other securities. Furthermore, specific market movements of the securities underlying an option cannot accurately be predicted.

In trading options, the Firm speculates on market fluctuations of securities and securities indices (or other indices, such as credit indices) while investing only a small percentage of the value of the securities underlying such option. A change in the market price of the underlying securities or underlying market index will cause a much greater change in the price of the option contract. In addition, to the extent that the Camshaft Funds purchases options that it does not sell or exercise, the Camshaft Funds will suffer the loss of the premium paid in such purchase. To the extent the Camshaft Funds sells uncovered options and must deliver the underlying securities at the option price, the Camshaft Funds has a theoretically unlimited risk of loss if the price of such underlying securities increases. If the Camshaft Funds must buy those underlying securities, the Camshaft Funds risks the loss of the difference between the market price of the underlying securities and the option price. Any gain or loss derived from the sale or exercise of an option will

be reduced or increased, respectively, by the amount of the premium paid. The expenses of option investing include commissions payable on the purchase and on the exercise or sale of an option.

*Stock Index Options*. The Camshaft Funds may purchase and sell call and put options on stock indices listed on securities exchanges or traded in the over-the-counter market for the purpose of realizing its investment objectives or for the purpose of hedging its portfolio. A stock index fluctuates with changes in the market values of the stocks included in the index. The effectiveness of purchasing or writing stock index options for hedging purposes will depend upon the extent to which price movements in the Camshaft Funds' portfolio correlates with price movements of the stock indices selected. Because the value of an index option depends upon movements in the level of the index rather than the price of a particular stock, whether the Camshaft Funds realizes gains or losses from the purchase or writing of options on indices depends upon movements in the level of prices in the stock market generally or, in the case of certain indices, in an industry or market segment, rather than movements in the price of particular stocks. Accordingly, successful use by the Camshaft Funds of options on stock indices will be subject to the Firm's ability to correctly predict movements in the direction of the stock market generally or of particular industries or market segments.

*Forward Contracts*. The Camshaft Funds may enter into forward contracts, generally for currency hedging purposes. In the absence of exchange trading and the involvement of clearing houses, there are no standardized terms for forward contracts. Accordingly, the parties are free to establish such settlement times and underlying amounts of a security or currency as desirable, which may vary from the standardized provisions available through any futures contract. In addition, as two party obligations for which there is no secondary market, forward contracts involve counterparty risk not present with futures.

*Foreign Securities and Foreign Currencies*. The Camshaft Funds may invest in securities of foreign issuers (including by entering into total return swap and similar Financial Instruments), securities denominated in foreign currencies, and depository receipts, such as ADRs, which are receipts typically issued by a U.S. bank or trust company and which evidence ownership of underlying securities of non-U.S. corporations. Investing in foreign securities, currencies, and/or ADRs may present a greater degree of risk than investing in domestic securities and currencies due to possible exchange rate fluctuations, a change in trade balances, possible exchange controls, less publicly-available information, more volatile markets, less regulation, less favorable tax provisions (including possible withholding taxes), war or expropriation. In particular, the dollar value of portfolio securities of non-U.S. issuers fluctuates with changes in market and economic conditions abroad and with changes in relative currency values. The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.

The Camshaft Funds may trade on exchanges located outside the United States. Trading on U.S. exchanges is subject to SEC and CFTC regulation and oversight, as applicable, including, for example, minimum capital requirements for commodity brokers, regulation of trading practices on the exchanges, prohibitions against trading ahead of customer orders, prohibitions against filling orders off exchanges, prescribed risk disclosure statements, testing and licensing of industry sales personnel and other industry professionals, and recordkeeping requirements. Trading on foreign exchanges is not regulated by the SEC, CFTC or any other U.S. governmental agency or

instrumentality and may be subject to regulations that are different from those to which U.S. exchange trading is subject, provide less protection to investors than trading on U.S. exchanges, and may be less vigorously enforced than regulations in the United States. Positions on foreign exchanges also are subject to the risk of exchange controls, expropriation, excessive taxation or government disruptions.

*Commodities*. Trading commodities and commodity interests (e.g., futures contracts on commodities, securities indices or currencies) is highly speculative and may entail risks that are greater than the risks associated with investing in equity securities. Prices of commodity interests are generally more volatile than prices of equity securities and such volatility is expected to reoccur in the future. Because of the low margin deposits typically required in commodity contract trading, a relatively small movement in the market price of a commodity contract may result in a disproportionately large profit or loss to the Camshaft Funds. Market movements can be volatile and are difficult to predict. Weather, inflation, trade policies, geopolitical events and other unforeseen events can also have a significant impact upon commodity prices. A variety of possible actions by various government agencies also can inhibit profitability or can result in losses. Such events could result in large market movements and volatile market conditions and create the risk of significant losses for the Camshaft Funds.

## Market-Related and Regulatory Risks

*Market Disruptions; Governmental Intervention*. The global financial markets have in the past decade undergone pervasive and fundamental disruptions that have led to extensive and unprecedented governmental intervention. Such intervention has in certain cases been implemented on an "emergency" basis, suddenly and substantially eliminating market participants' ability to continue to implement certain strategies or manage the risk of their outstanding positions. In addition—as one would expect given the complexities of the financial markets and the limited time frame within which governments have felt compelled to take action— these interventions have typically been unclear in scope and application, resulting in confusion and uncertainty which in itself has been materially detrimental to the efficient functioning of the markets as well as previously successful investment strategies.

The Camshaft Funds may incur major losses in the event of disrupted markets and other extraordinary events in which historical pricing relationships become materially distorted. The risk of loss from pricing distortions is compounded by the fact that in disrupted markets many positions become illiquid, making it difficult or impossible to close out positions against which the markets are moving. The financing available to the Camshaft Funds from its banks, dealers and other counterparties is typically reduced in disrupted markets. Such a reduction may result in substantial losses to the Camshaft Funds. Market disruptions may from time to time cause dramatic losses for the Camshaft Funds, and such events can result in otherwise historically low-risk strategies performing with unprecedented volatility and risk.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") seeks to regulate markets, market participants and Financial Instruments that previously have been unregulated and substantially alters the regulation of many other markets, market participants and Financial Instruments. Because the implementation of Dodd-Frank is ongoing, it is difficult to predict the ultimate impact of Dodd-Frank on the Camshaft Funds, the Firm and the markets in

which they trade and invest. Dodd-Frank and regulations adopted pursuant to Dodd-Frank could have a material adverse impact on the profit potential of the Camshaft Funds.

*Effect of Speculative Position Limits*. The CFTC and the United States commodities exchanges impose limits referred to as "speculative position limits" on the maximum net long or net short speculative positions that any person may hold or control in any particular futures or options contracts traded on United States commodities exchanges. For example, the CFTC currently imposes speculative position limits on a number of agricultural commodities (e.g., corn, oats, wheat, soybeans and cotton) and United States commodities exchanges currently impose speculative position limits on many other commodities. Dodd-Frank significantly expands the CFTC's authority to impose position limits with respect to futures contracts and options on futures contracts, swaps that are economically equivalent to futures or options on futures, and swaps that are traded on a regulated exchange and certain swaps that perform a significant price discovery function. In response to this expansion of its authority, in 2012, the CFTC proposed a series of new speculative position limits with respect to futures and options on futures on so-called "exempt commodities" (which includes most energy and metals contracts) and with respect to agricultural commodities. Those proposed speculative position limits were vacated by a United States District Court, but the CFTC has again proposed a new set of speculative position limit rules which are not yet finalized (or effective). If the CFTC is successful in its second attempt to establish speculative position limits, the size or duration of positions available to the Camshaft Funds may be severely limited. All accounts owned or managed by the Firm are likely to be combined for speculative position limit purposes. Thus, the Camshaft Funds could be required to liquidate positions it holds in order to comply with such limits, or may not be able to fully implement trading instructions in order to comply with such limits. Any such liquidation or limited implementation could result in substantial costs to the Camshaft Funds.

*European Market Infrastructure Regulation*. The European Market Infrastructure Regulation ("EMIR") introduced certain requirements in respect of derivative contracts, which apply to varying degrees to entities established in the EU, regardless of whether they are transacting with counterparties established in the EU or outside of the EU. As such, where the Camshaft Funds transacts with EU counterparties, they will likely require the transaction to be EMIR-compliant, with the result that the Camshaft Funds becomes subject to additional obligations and/or costs that may not otherwise have applied.

Broadly, EMIR's requirements in respect of derivative contracts are (i) mandatory clearing of OTC derivative contracts declared subject to the clearing obligation; (ii) risk mitigation techniques in respect of uncleared OTC derivative contracts; and (iii) reporting and record-keeping requirements in respect of all derivative contracts. The application of these requirements is dependent on the classification of the counterparties as financial counterparties ("FCs"), non-financial counterparties above the clearing threshold ("NFC+s") or non-financial counterparties below the clearing threshold ("NFC-s").

The EU regulatory framework and legal regime relating to derivatives comprises not only EMIR but also includes a package of legislation, technical standards and related guidance collectively known as MiFID II as described below.

Prospective investors should be aware that there may be ongoing costs (whether direct or indirect) of compliance with EMIR, and that EMIR may adversely affect the Camshaft Funds' ability to engage in certain derivative transactions.

***MiFID II***. The European Union Markets in Financial Instruments Directive ("<u>MiFID</u>") governs the provision of investment services and activities in relation to, as well as the organized trading of, financial instruments such as shares, bonds, units in collective investment schemes and derivatives. MiFID will be comprehensively revised and replaced by a new EU directive and regulation, collectively referred to as "<u>MiFID II</u>", from January 3, 2018. Although the Camshaft Funds is not organized in the EU, and is not authorized or regulated by any EU member state financial services regulator, certain aspects of MiFID II may have an impact on the Camshaft Funds.

MiFID II imposes certain restrictions as to the trading of shares and derivatives, which could apply to transactions made by or with the Camshaft Funds. Subject to certain conditions and exceptions, the Camshaft Funds may be unable to trade shares or derivatives with affected counterparties other than as provided by MiFID II. MiFID II also applies position limits to the size of a net position that a person can hold at all times in commodity derivatives traded on EU trading venues and in "economically equivalent" OTC derivatives.

More generally, EU regulated firms that have trading relationships with the Camshaft Funds may be obliged by MiFID II to impose certain requirements on the Camshaft Funds, or they may seek to do so contractually, with a view to satisfying their own compliance obligations. It is difficult to predict the full impact of MiFID II on the Camshaft Funds. Prospective investors should also be aware that there may be costs (whether direct or indirect) of compliance with MiFID II.

***EU Short Selling Regulation***. On November 1, 2012, the EU Regulation on Short Selling and Certain Aspects of Credit Default Swaps (the "<u>SSR</u>") became directly applicable in all member states of the EU. The SSR applies to short sales of, and short positions relating to, the issued share capital of companies whose shares are admitted to trading on a regulated market or multilateral-trading facility in the EU (unless the principal trading venue for the relevant shares is located in a country outside the EU) ("<u>EU listed shares</u>"), among other types of investments. The SSR imposes certain private and public disclosure obligations in respect of short positions in EU listed shares which apply to all natural or legal persons, irrespective of regulatory status, located inside or outside the EU. The SSR also contains prohibitions on uncovered short sales of EU listed shares in certain circumstances. National regulators, and in certain circumstances, the European Securities and Markets Authority, are able to take certain additional emergency measures (including complete bans on short-selling activities) if certain conditions are met. The SSR may prevent the Firm from fully expressing negative views in relation to EU listed shares. Accordingly, the ability of the Firm to implement the investment approach and fulfill the investment objective of the Camshaft Funds may be constrained.

***International Investing***. Investing outside the United States may involve greater risks than investing in the United States. Investing in emerging and certain non-U.S. markets involves additional risks and special considerations not typically associated with investing in other more established economies or markets. Such risks may include, without limitation: (i) increased risk of nationalization or expropriation of assets or confiscatory taxation; (ii) greater social, economic and

political uncertainty, including civil and ethnic unrest, war, abrupt changes in political and economic power, changes in government institutions and policies or famine; (iii) potentially higher dependence on exports and the corresponding importance of international trade; (iv) greater volatility, less liquidity and smaller capitalization of markets; (v) greater volatility in currency exchange rates; (vi) greater risk of inflation; (vii) capital controls, such as limitations on the ability to exchange local currencies for U.S. Dollars, and trade restrictions, including quotas, tariffs, customs, duties and other assessments, which may lead to significant costs and delays in obtaining licenses, approvals and authorizations; (viii) increased likelihood of governmental involvement in and control over the economy, issuers and financial markets; (ix) governmental decisions to cease support of economic reform programs or to impose centrally planned economies; (x) preferential treatment of local interests over foreign interests by the government, including legislators, regulators and courts; (xi) differences in auditing and financial reporting standards which may result in the unavailability of reliable, current or detailed information about issuers; (xii) less extensive or more extensive regulation of the markets; (xiii) longer settlement periods for transactions and less reliable clearance and custody arrangements; (xiv) greater correlation to commodity price movements; (xv) imposition of withholding or other taxes on dividends, interest, capital gains, gross sales or disposition proceeds or other income; (xvi) higher transaction costs; and (xvii) certain considerations regarding the maintenance of the Camshaft Funds' securities with non-U.S. brokers and securities depositories. Moreover, non-U.S. companies are generally not subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies.

Non-U.S. markets may also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions. Delays in settlement could result in periods when assets of the Camshaft Funds are uninvested and no return is earned thereon. The inability of the Camshaft Funds to make intended security purchases due to settlement problems or the risk of intermediary counterparty failures could cause the Camshaft Funds to miss investment opportunities. The inability to dispose of a security due to settlement problems could result either in losses to the Camshaft Funds due to subsequent declines in the value of such security or, if the Camshaft Funds has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling non-U.S. securities, including brokerage, tax and custody costs, may be higher than those involved in U.S. transactions. Furthermore, many non-U.S. financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many non-U.S. companies are historically less liquid and their prices historically more volatile than securities of comparable U.S. companies.

The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, interest rates, resources, self-sufficiency and balance of payments position.

***United Kingdom Membership of the European Union***. The United Kingdom ("**UK**") ceased to be a member of the EU on January 31, 2020 ("Brexit"). During a prescribed period (the "**Transition Period**"), certain transitional arrangements were in effect, such that the UK continued to be treated, in most respects, as if it were still a member of the EU, and generally remained

subject to EU law. On December 24, 2020, the EU and the UK reached an agreement in principle on the terms of certain agreements and declarations governing the ongoing relationship between the EU and the UK, including the EU-UK Trade and Cooperation Agreement (the "**Agreement**"), and on December 30, 2020, the Council of the European Union adopted a decision authorizing the signature of the Agreement and its provisional application for a limited period between January 1, 2021 to February 28, 2021, pending ratification of the Agreement by the European Parliament. The Transition Period ended on December 31, 2020. The Agreement is limited in its scope primarily to the trade of goods, transport, energy links and fishing, and uncertainties remain relating to certain aspects of the UK's future economic, trading and legal relationships with the EU and with other countries. The actual or potential consequences of Brexit, and the associated uncertainty, could adversely affect economic and market conditions in the UK, in the EU and its member states and elsewhere, and could contribute to instability in global financial markets.

*Current Political Uncertainty*. Some of the results of recent elections and referenda have been unexpected and resulted in material market changes and increases in market uncertainty. Given recent changes in administrations and applicable law following such recent elections and referenda, the future of current regulations, or the adopting of new regulations, is also uncertain. While these uncertainties may create investments opportunities for the Camshaft Funds, such uncertainties could alternatively have adverse impacts on the Camshaft Funds. Predicting the outcome of political processes and events is inherently difficult and uncertain. If the Firm fails to anticipate political events or predicts them incorrectly, it may cause the Camshaft Funds to miss investment opportunities or incur losses. There may be detrimental implications for the value of certain of the Camshaft Funds' investments in certain markets, its ability to enter into transactions or to value or realize its investments or otherwise to implement its investment program or the Firm's investment strategies.

*Risk of Natural Disasters, Epidemics and Terrorist Attacks.* Countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business are susceptible to natural disasters (e.g., fire, flood, earthquake, storm and hurricane) and epidemics, pandemics or other outbreaks of serious contagious diseases. The occurrence of a natural disaster or epidemic could adversely affect and severely disrupt the business operations, economies and financial markets of many countries (even beyond the site of the natural disaster or epidemic) and could adversely affect the Camshaft Funds' investment program or the Firm's ability to do business. In addition, terrorist attacks, or the fear of or the precautions taken in anticipation of such attacks, could, directly or indirectly, materially and adversely affect certain industries in which the Camshaft Funds invests or could affect the countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business. Other acts of war (e.g., war, invasion, acts of foreign enemies, hostilities and insurrection, regardless of whether war is declared) could also have a material adverse impact on the financial condition of industries or countries in which the Camshaft Funds invests.

*COVID-19.* The recent global outbreak of the novel coronavirus (COVID-19) is currently creating unprecedented economic and social uncertainty throughout the world. The ultimate impact of the COVID 19 outbreak is difficult to predict, but it is likely that COVID-19 will have a materially adverse impact on global, national and local economies in the immediate future and that such negative impact is likely to persist for some time. In particular, disruptions to commercial

activity across economies due to the imposition of quarantines, remote working policies, "social distancing" practices and travel restrictions, and/or failures to contain the outbreak despite these measures, could materially and adversely impact the Camshaft Funds' investments. Similar disruptions may occur in respect of the Firm's and the Camshaft Funds' service providers and counterparties (including providers of financing), which could also negatively impact the Camshaft Funds. While there are indications of various governmental responses to the potential negative effects of COVID-19, it is unclear how effective these responses will be and what other impacts such responses may have on the overall performance of markets or the Camshaft Funds.

*ERISA Matters*. Most pension and profit sharing plans, individual retirement accounts and other tax-advantaged retirement funds are subject to provisions of the Code, ERISA, or both, which may be relevant to a decision as to whether such an investor should invest in the Camshaft Funds. There may, for example, be issues as to whether such an investment is "prudent." Legal counsel should be consulted by such an investor before investing in the Camshaft Funds.

AN INVESTMENT IN CAMSHAFT AND THE CAMSHAFT FUNDS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. INVESTMENTS INCLUDING THE RISK THAT THE ENTIRE INVESTMENT MAY BE LOST.   NO GUARANTEE OR REPRESENTATION IS MADE THAT THE FUNDS' INVESTMNENT OBJECTIVES WIL BE ACHIEVED.

**Item 9.** Disciplinary Information

This Brochure, as dated on page 1, reflects that there are no material legal or disciplinary events that have occurred with respect to Camshaft or management persons within the past 10 years.

**Item 10.** Other Financial Industry Activities and Affiliations

Camshaft is exempt from registration as a commodity pool operator ("**CPO**") and a commodity trading advisor ("**CTA**") with the Commodities Future Trading Commission ("CFTCF").

As described above in Items 5 and 6, Camshaft receives asset-based and performance-based compensation from the Funds. The amounts payable to Camshaft are based directly on the net asset value of the Funds. To the extent that valuation of assets is determined based upon information provided by Camshaft, because there is, for example, no public market price available, there may be a conflict of interest. Camshaft will value such assets in accordance with its valuation policies and procedures.

Camshaft, and other professionals of Camshaft (directly or through  its affiliates) may make, and in some cases have made, a capital contribution to one or more of the Funds and, therefore, may be viewed as having an incentive to favor such Funds over other Clients, including pooled investment vehicles in which Camshaft or such persons are not invested (which may include other Camshaft Funds). Camshaft routinely waives the applicable management fees and performance fees for Camshaft-affiliated investors.

Certain of the above conflicts may also be generally addressed through adherence with Camshaft's compliance policies and procedures and its Code of Ethics.

**Item 11.** Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

Camshaft has adopted a Code of Ethics pursuant to Rule 204A-1 under the Advisers Act (the "**Code of Ethics**"). All "access persons" (including employees, managers and officers) of Camshaft must comply with the Code of Ethics. The Code of Ethics states that Camshaft personnel must always place the interests of Camshaft's Clients first. The Code of Ethics sets forth standards of conduct expected of Camshaft's personnel, which reflect the fiduciary obligations of Camshaft and its personnel to its Clients, and requires Camshaft's personnel to comply with applicable federal securities laws. The Code of Ethics also requires each employee of Camshaft to report potential violations of the Code of Ethics promptly to Camshaft's Chief Compliance Officer (the "**CCO**"). Camshaft provides each employee with a copy of the Code of Ethics upon commencement of employment and any amendments as required., Employees are required to provide a written acknowledgement that they have received the Code of Ethics, including any amendments no less than annually.

Camshaft's CCO receives copies account statements for all of its access persons who maintain brokerage accounts no less than quarterly. In addition, each access person must submit to the CCO an annual acknowledgement and certification stating that the access person will comply with the Code of Ethics. The Code of Ethics further requires access persons to submit quarterly transaction reports (or duplicate brokerage statements) that detail the access person's securities transactions for each quarter, for the CCO to review. Finally, the Code of Ethics also contains restrictions on the use of insider information and material non-public information regarding Clients.

Camshaft keeps records of reports and other information that access persons are required to submit under the Code of Ethics. The CCO reports on issues that arise under the Code of Ethics to Camshaft's senior management at least annually. Clients and prospective Clients can obtain a copy of the Code of Ethics upon request by contacting Camshaft by telephone at (305) 619-1383 or by email to william@camshaftcapital.com.

As described above in Item 10, Camshaft and certain of its management personnel, employees or affiliates will have a financial interest in investments made by one or more of the Camshaft Funds through their participation in such Funds as a managing member, investment manager, administrative member, director or investor, as applicable. Camshaft and such persons may, therefore, be viewed as having an incentive to favor such Funds over other Clients, including Funds in which such persons are not invested.

In addition, Camshaft may solicit Clients to invest in Camshaft Funds for which Camshaft and certain of its management personnel, employees or affiliates serve as managing member, administrative member, investment manager or director, as applicable, and/or have a financial interest. Additionally, because certain of the Funds for which Camshaft acts as managing member, investment manager or director may invest in other Funds for which Camshaft acts in a similar capacity, Camshaft may be deemed to be recommending to such Funds that they buy securities in which Camshaft and such Camshaft-related persons have a financial interest and/or securities that

39

Camshaft and such Camshaft-related persons also buys for themselves (*i.e.*, interests in other Funds). To address these potential conflicts, Funds will not bear a double-layering of asset-based fees or performance-based fees in connection with their investment in other Camshaft Funds. Each Fund will, however, be responsible for its *pro rata* share of the expenses of the other Fund in which it invests.

Certain of the above conflicts are generally addressed through adherence to Camshaft's Compliance Manual and its Code of Ethics.

<u>**Item 12.**</u> Brokerage Practices

Camshaft is responsible for determining what securities will be purchased and sold for each Client and selecting the broker-dealer to execute transactions on behalf of Clients. Purchases and sales of securities for a Client must be made in accordance with the investment objectives, strategies and policies of such Client.

It is Camshaft's policy to seek best execution on behalf of its Clients – that is, Camshaft seeks to achieve the best overall qualitative execution for a Client in a particular circumstance. Best execution is not synonymous with the lowest brokerage commission. Camshaft may cause a Client to pay a brokerage commission in excess of that which another broker might have charged for executing the same transaction if it determines that the commission paid was reasonable in relation to the value of the services provided by the broker.

In seeking to achieve best execution, Camshaft considers the full range and quality of services a broker may provide, including ,but not limited to, the experience and skill of the broker's securities traders; the broker's accessibility to primary markets and quotation services; for NASDAQ securities, whether a broker makes a market in that security; a broker's past history of successful, prompt and reliable execution of client trades; the financial strength and stability of the broker; the broker's administrative efficiency; commission rates; the overall net economic result to a client (involving both price paid or received and any commissions and other costs paid); the security price and its volatility; the size of the transaction, including the ability to effect the transaction at all where a large block is involved; the broker's availability to execute possibly difficult transactions in the future; and the receipt of research services. In addition, for purposes of monitoring best execution, Camshaft generally performs comparisons between executed prices and volume-weighted average prices each trading day for each broker.

Camshaft generally does not utilize "soft dollars" or "pay-up" for research. "Soft dollars" refers to Camshaft's receipt of research or other products or services other than execution from brokers. Camshaft may receive, without cost and unrelated to the execution of securities transactions, a broad range of research services from broker-dealers, including information on the economy, industries, groups of securities and individual companies, statistical information, market data, accounting and legal interpretations, political developments, pricing and appraisal services, credit analysis, risk measurement analysis, performance analysis and other information which may affect the economy and/or security prices. Camshaft may also pay broker-dealers and their affiliates for certain specialized data and services, such as benchmark information, that are also unrelated to the execution of securities transactions.

In the event that Camshaft were to receive any "soft dollar" benefits, however, Camshaft expects that they would qualify under the safe harbor provided for under Section 28(e) of the Securities Exchange Act of 1934, as amended. If Camshaft were to use Client brokerage commissions (or markups or markdowns) to obtain "soft dollar" benefits, such as research or other products or services, it would receive a benefit because it does not have to produce or pay for the research, products or services. Consequently, Camshaft would have an incentive to select or recommend a broker-dealer based on its interest in receiving "soft dollar" benefits, rather than on its Clients' interest in receiving most favorable execution.

Camshaft does not consider, in selecting or recommending broker-dealers, any Client referrals it may receive from a broker-dealer or third party. Camshaft does not recommend, request or require that a Client direct the execution of transactions through a specified broker-dealer, nor does it have any arrangement in which it permits a Client to direct transactions to a specific broker-dealer.

Despite the highly customized nature of its advice, Camshaft may on occasion purchase or sell the same securities for more than one Client account at the same time or same day, and in so doing will allocate investment opportunities and trades fairly. "Fair" treatment does not mean identical treatment of all Clients. Rather, it means that Camshaft does not discriminate on an impermissible basis against one Client or group of Clients. When Camshaft transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties and in accordance with the Firm's investment allocation procedures.

Camshaft may combine or "bunch" orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among Camshaft's Clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Camshaft's determination with respect to allocations will be based on what is appropriate under the particular circumstances, and the allocation may be made based upon relevant factors, which may include: (i) cash availability and need; (ii) suitability; (iii) when only a small percentage of the order is executed, shares may be allocated to the account with the smallest order or the smallest position or to an account that is out of line with respect to security or sector weightings relative to other portfolios, with similar mandates; (iv) allocations may be given to one account when one account has limitations in its investment guidelines which prohibit it from purchasing other securities which are expected to produce similar investment results and can be purchased by other accounts; (v) if an account reaches an investment guideline limit and cannot participate in an allocation, shares may be reallocated to other accounts (this may be due to unforeseen changes in an account's assets after an order is placed); (vi) with respect to sale allocations, allocations may be given to accounts low in cash; (vii) in cases when a *pro rata* allocation of a potential execution would result in a *de minimis* allocation in one or more accounts, Camshaft may exclude the account(s) from the allocation and the transactions may be executed on a *pro rata* basis among the remaining accounts; or (viii) in cases where a small proportion of an order is executed in all accounts, shares may be allocated to one or more accounts on a random basis. For equity investments, generally, each Client will receive the same average price as other participants in the bunched transaction.

Clients may pay more when Camshaft does not aggregate trades, as seeking to place separate, non-simultaneous transactions in the same security for multiple Clients may negatively affect market price, transaction commissions and/or trade execution. A Client's non-participation in bunched trades may result in lost opportunities to execute securities transactions for such Client's account that other Clients participating in bunched trades were able to execute.

**Item 13.** Review of Accounts

Camshaft's Managing Director and one or more members of Camshaft's investment team review positions in Camshaft Fund accounts on an ongoing basis to monitor the Camshaft Funds' compliance with the investment objectives and guidelines described in the Funds' offering documents. The accounts of Camshaft Fund investors are valued monthly by the administrator, who forwards an account statement to Fund investors on a monthly basis. Investors in the Funds may receive other periodic and annual written reports as set forth in the applicable Fund's offering documents. Camshaft also conducts meetings with Clients and investors in the Funds upon request. Any Managed Account Clients will receive the written reporting provided for in the Managed Account Agreement governing such accounts, if applicable.

**Item 14.** Client Referrals and Other Compensation

Camshaft does not receive an economic benefit from any person who is not a Client for providing investment advice or other advisory services.

Camshaft may, from time to time, enter into arrangements with third parties for marketing and solicitation activities. If Camshaft pays a cash fee to anyone for soliciting separate account Clients on its behalf, Camshaft will comply with the requirements of the SEC's Marketing Rule (Rule 206(4)-1 under the Advisers Act) to the extent applicable. This rule requires, among other things, a written agreement between the investment adviser and the person soliciting Clients on its behalf, and that the soliciting person provide a disclosure document to the potential Client at the time that the solicitation is made. Camshaft may pay a portion or percentage of the compensation that it receives from Clients for investment advisory services to a third-party, but this will not result in any Client being charged fees at a rate in excess of the rate of fees that Camshaft customarily charges for similar services to comparable accounts, nor will Camshaft charge any Client any other amount for the purpose of offsetting the cost of obtaining an account through a third-party referral.

**Item 15.** Custody

Generally, Camshaft does not have custody of Client assets other than the assets of the Camshaft Funds. Camshaft acts as managing member or investment manager of the Camshaft Funds and is authorized under the Funds' governing documents to deduct fees from each Fund investor's account. Such powers cause Camshaft to be deemed to have custody of the Camshaft Funds' assets for purposes of the SEC's custody rule. Accordingly, to meet the requirements of the custody rule, the Camshaft Funds are subject to an annual audit in accordance with generally accepted accounting principles conducted by an independent public accountant registered with the Public Company Accounting Oversight Board and the audited financial statements are distributed to investors in the Funds within 90 days of the Funds' fiscal year end (in accordance with rules required of registered commodity pool operators).

In the event that Camshaft has any Managed Account Clients in the future, it generally expects that it will not have custody over the assets of such accounts. Managed Account Clients will receive quarterly account statements from the qualified custodian for their accounts and should carefully review those statements. Camshaft generally will not provide statements to Managed Account Clients, except if specifically requested or in certain limited circumstances. Any Managed Account Clients who receive account statements from Camshaft should compare those statements with the account statements received from the qualified custodian.

**Item 16.** Investment Discretion

Camshaft has discretionary authority over the investment activities of its Clients. In the case of the Funds, this discretionary authority is generally granted to Camshaft pursuant to the organizational documents of each Fund and/or pursuant to Camshaft's investment advisory agreement with such Fund. For any Managed Account Clients, discretionary authority is granted to Camshaft pursuant to a Managed Account Agreement, which may impose restrictions on this discretion and specify the types of investments permitted. Camshaft is obligated to exercise its investment discretion in a manner consistent with the stated investment objectives, policies, guidelines and restrictions/limitations for a particular Client account.

**Item 17.** Voting Client Securities

Camshaft has the authority to vote all proxy proposals and corporate actions (collectively, "**proxies**") on behalf of the Funds it advises, and may be delegated the authority to vote proxies held in any Managed Accounts that it may advise in the future. However, depending on the securities in which its Clients are invested, Camshaft may not frequently vote proxies. To the extent that Camshaft invests in a security for a Client for which a proxy vote may arise and Camshaft receives timely notice of such proxy from the Client's prime broker under the terms of the applicable prime broker agreement, Camshaft is guided by general fiduciary principles and will seek to treat proxies in a manner intended to enhance the overall economic value of the applicable Client's assets. Camshaft may (and often does) refrain from voting a Client's proxy under certain circumstances, including, but not limited to, when (i) the economic effect on shareholder's interests or the value of the portfolio holding is indeterminable or insignificant; (ii) voting the proxy would unduly impair the investment management process; or (iii) the cost of voting the proxies outweighs the benefits or is otherwise impractical. In addition, Camshaft may refrain from voting a proxy on behalf of its Clients' accounts due to (1) *de minimis* holdings; (2) *de minimis* impact on the portfolio; (3) items relating to non-U.S. issuers (such as those described below); (4) contractual arrangements with Clients; and/or (5) their authorized delegates or the failure of a proxy to provide sufficient information to allow for informed decision making. For example, Camshaft may refrain from voting a proxy of a non-U.S. issuer due to logistical considerations that may have a detrimental effect on Camshaft's ability to vote the proxy. These issues may include, but are not limited to: (a) proxy statements and ballots being written in a foreign language; (b) untimely notice of a shareholder meeting; (c) requirements to vote proxies in person; (d) restrictions on non-U.S. person's ability to exercise votes; (e) restrictions on the sale of securities for a period of time in proximity to the shareholder meeting (*e.g.*, share blocking); or (f) requirements to provide local agents with power of attorney to facilitate the voting instructions. Any actual or apparent conflict of interest between the interests of Camshaft and its Clients is

resolved in a manner that is consistent with the best interests of Clients and in a manner not affected by such actual or apparent conflict of interest.

Camshaft currently does not permit Clients to direct its vote in a particular solicitation.

**Item 18.** Financial Information

Currently, there is no financial condition that is reasonably likely to impair our ability to meet contractual commitments to Clients.

# EXHIBIT 21

# FORM ADV

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS**

| | |
|---|---|
| **Primary Business Name: CAMSHAFT CAPITAL ADVISORS LLC** | **CRD Number: 322577** |
| **Other-Than-Annual Amendment - All Sections** | **Rev. 10/2021** |
| **4/18/2023 4:07:32 PM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.    Your full legal name (if you are a sole proprietor, your last, first, and middle names):
    **CAMSHAFT CAPITAL ADVISORS LLC**

B.    (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
    **CAMSHAFT CAPITAL ADVISORS LLC**

    *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

    (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

    *If you check this box, complete a Schedule R for each relying adviser.*

C.    If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
    ☐ your legal name or ☐ your primary business name:

D.    (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-127451**
    (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
    (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1822044 |

E.    (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **322577**

    *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

    (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
                                No Information Filed

F.    *Principal Office and Place of Business*
    (1) Address (do not use a P.O. Box):
        Number and Street 1:                    Number and Street 2:
        City:            State:            Country:            ZIP+4/Postal Code:

        If this address is a private residence, check this box: ☑

        *List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

    (2) Days of week that you normally conduct business at your *principal office and place of business*:
        ⦿ Monday - Friday ○ Other:
        Normal business hours at this location:
        9-5
    (3) Telephone number at this location:
        305-619-1383
    (4) Facsimile number at this location, if any:
    (5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
        0

G.  Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                                   Number and Street 2:

City:                      State:                      Country:              ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.  If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                                   Number and Street 2:

City:                      State:                      Country:              ZIP+4/Postal Code:

|  |  | Yes | No |
|---|---|---|---|

I.  Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?     ◉ Yes   ○ No

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.  Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                                  Other titles, if any:

Telephone number:                                      Facsimile number, if any:

Number and Street 1:                                   Number and Street 2:

City:                      State:                      Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K.  Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                                  Titles:

Telephone number:                                      Facsimile number, if any:

Number and Street 1:                                   Number and Street 2:

City:                      State:                      Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  | Yes | No |
|---|---|---|

L.  Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?     ◉ Yes   ○ No

*If "yes," complete Section 1.L. of Schedule D.*

|  | Yes | No |
|---|---|---|

M.  Are you registered with a *foreign financial regulatory authority*?     ○ Yes   ◉ No

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  | Yes | No |
|---|---|---|

N.  Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?     ○ Yes   ◉ No

|  | Yes | No |
|---|---|---|

O.  Did you have $1 billion or more in assets on the last day of your most recent fiscal year?     ○ Yes   ◉ No
If yes, what is the approximate amount of your assets:

○ $1 billion to less than $10 billion

○ $10 billion to less than $50 billion

○ $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.  Provide your *Legal Entity Identifier* if you have one:
    2549009MHH5W7AC6Y541

    A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:    https://www.camshaftcapital.com/

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
APEX FUND SERVICES

Number and Street 1:                                      Number and Street 2:
150 E 52ND STREET                                        SUITE 4003

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| NEW YORK | New York | United States | 10022 |

If this address is a private residence, check this box:  ☐

Telephone Number:                        Facsimile number, if any:
646-517-1490

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
CERTAIN BOOKS AND RECORDS RELATED TO THE MANAGEMENT OF THE FIRM, INCLUDING CERTAIN OF THOSE RELATED TO REGULATORY COMPLIANCE. ALSO, AS AN ADMINISTRATOR FOR THE FIRM'S CLIENT, APEX FUND SERVICES KEEPS SEVERAL TYPES OF BOOKS AND RECORDS INCLUDING BUT NOT LIMITED TO: REGISTER OF INVESTORS, THE RECORDS OF INVESTORS CONTRIBUTIONS, ORIGINAL CORRESPONDENCE OR OTHER COMMUNICATIONS THAT ARE IN POSSESSION OF APEX FUND SERVICES, CLIENT'S GENERAL LEDGER AND AUDITED FINANCIAL STATEMENTS.

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

## Item 2 SEC Registration/Reporting

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.  To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1) are a **large advisory firm** that either:

    (a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

    (b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2) are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

    (a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

    (b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

    *Click* **HERE** *for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

    (3) Reserved

☐ (4) have your *principal office and place of business* **outside the United States**;

☐ (5) are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6) are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7) are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8) are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

    *If you check this box, complete Section 2.A.(8) of Schedule D.*

☐ (9) are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

    *If you check this box, complete Section 2.A.(9) of Schedule D.*

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

    *If you check this box, complete Section 2.A.(10) of Schedule D.*

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

☐ (12) have **received an SEC order** exempting you from the prohibition against registration with the SEC;

    *If you check this box, complete Section 2.A.(12) of Schedule D.*

☐ (13) are **no longer eligible** to remain registered with the SEC.

---

### State Securities Authority Notice Filings and State Reporting by *Exempt Reporting Advisers*

C.  Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☐ TX |
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☐ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |

| | | | |
|---|---|---|---|
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

---

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

---

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

---

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.    How are you organized?

   ○  Corporation

○ Sole Proprietorship

○ Limited Liability Partnership (LLP)

○ Partnership

◉ Limited Liability Company (LLC)

○ Limited Partnership (LP)

○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B.  In what month does your fiscal year end each year?
DECEMBER

C.  Under the laws of what state or country are you organized?

State   Country

Florida  United States

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

|  | Yes | No |
|---|---|---|

A.  Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)?    ○   ◉

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B.  Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

**SECTION 4 Successions**

No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

*Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A.  Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.
5

B.  (1)  Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?
2

(2)  Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?
0

(3)  Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?
0

(4)  Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?
0

(5)  Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?
0

(6) Approximately how many firms or other persons solicit advisory clients on your behalf?

    0

*In your response to Item 5.B.(6), do not count any of your employees* **and count a firm only once – do not count each of the firm's** *employees that solicit on your behalf.*

## Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

    0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

    0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | ☐ | $ |
| (b) *High net worth individuals* | | ☐ | $ |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 1 | | $ 595,845,395 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | ☐ | $ |
| (h) Charitable organizations | | ☐ | $ |
| (i) State or municipal *government entities* (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☐ | $ |
| (n) Other: | | ☐ | $ |

## Compensation Arrangements

E. You are compensated for your investment advisory services by (check all that apply):

    ☑ (1) A percentage of assets under your management
    ☐ (2) Hourly charges
    ☐ (3) Subscription fees (for a newsletter or periodical)
    ☐ (4) Fixed fees (other than subscription fees)
    ☐ (5) Commissions
    ☑ (6) *Performance-based fees*
    ☐ (7) Other (specify):

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**
Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 122 of 410

**Regulatory Assets Under Management**

|  |  | **Yes** | **No** |
|---|---|---|---|

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?                     ⦿   ○

(2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

|  | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a) | $ 595,845,395 | (d)   1 |
| Non-Discretionary: | (b) | $ 0 | (e)   0 |
| Total: | (c) | $ 595,845,395 | (f)   1 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3)   What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

---

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G.   What type(s) of advisory services do you provide? Check all that apply.

- ☐   (1)   Financial planning services
- ☐   (2)   Portfolio management for individuals and/or small businesses
- ☐   (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑   (4)   Portfolio management for pooled investment vehicles (other than investment companies)
- ☐   (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐   (6)   Pension consulting services
- ☐   (7)   Selection of other advisers (including *private fund* managers)
- ☐   (8)   Publication of periodicals or newsletters
- ☐   (9)   Security ratings or pricing services
- ☐   (10)  Market timing services
- ☐   (11)  Educational seminars/workshops
- ☐   (12)  Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○   0
- ○   1 - 10
- ○   11 - 25
- ○   26 - 50
- ○   51 - 100
- ○   101 - 250
- ○   251 - 500
- ○   More than 500

If more than 500, how many?
(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

|  |  | **Yes** | **No** |
|---|---|---|---|

I.   (1) Do you participate in a *wrap fee program*?                     ○   ⦿

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$

(b) portfolio manager for a *wrap fee program*?
$

(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

|  | | Yes | No |
|---|---|:---:|:---:|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ⦿ |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ⦿ |

**K. Separately Managed Account *Clients***

|  | Yes | No |
|---|:---:|:---:|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ⦿ |
| *If yes, complete Section 5.K.(1) of Schedule D.* | | |
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ○ |
| *If yes, complete Section 5.K.(2) of Schedule D.* | | |
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ○ |
| *If yes, complete Section 5.K.(2) of Schedule D.* | | |
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ○ |
| *If yes, complete Section 5.K.(3) of Schedule D for each custodian.* | | |

**L. Marketing Activities**

|  | Yes | No |
|---|:---:|:---:|
| (1) Do any of your *advertisements* include: | | |
| (a) Performance results? | ⦿ | ○ |
| (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ⦿ |
| (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⦿ |
| (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⦿ |
| (e) *Third-party ratings*? | ○ | ⦿ |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance*? | ○ | ⦿ |
| (4) Do any of your *advertisements* include *predecessor performance*? | ○ | ⦿ |

---

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

---

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

---

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under

management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize regulatory assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % |
| (xi) | Cash and Cash Equivalents | % |
| (xii) | Other | % |

Generally describe any assets included in "Other"

---

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☐ No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b) In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| Less than 10% | $ | $ |
| 10-149% | $ | $ |
| 150% or more | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which borrowings and derivatives are used in the management of the separately managed accounts that you advise.

---

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

---

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):

- ☐ (1)  broker-dealer (registered or unregistered)
- ☐ (2)  registered representative of a broker-dealer
- ☑ (3)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4)  futures commission merchant
- ☐ (5)  real estate broker, dealer, or agent
- ☐ (6)  insurance broker or agent
- ☐ (7)  bank (including a separately identifiable department or division of a bank)
- ☐ (8)  trust company
- ☐ (9)  registered municipal advisor
- ☐ (10)  registered security-based swap dealer
- ☐ (11)  major security-based swap participant
- ☐ (12)  accountant or accounting firm
- ☐ (13)  lawyer or law firm
- ☐ (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  |  | Yes | No |
|---|---|---|---|---|
| B. | (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
|  | (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  |  | Yes | No |
|---|---|---|---|---|
|  | (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ● |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

---

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.  This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your advisory affiliates and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1)  broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2)  other investment adviser (including financial planners)

- ☐ (3)  registered municipal advisor
- ☐ (4)  registered security-based
- ☐ (5)  major security-based swap participant
- ☐ (6)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7)  futures commission merchant
- ☐ (8)  banking or thrift institution
- ☐ (9)  trust company
- ☐ (10)  accountant or accounting firm
- ☐ (11)  lawyer or law firm
- ☐ (12)  insurance company or agency
- ☐ (13)  pension consultant
- ☐ (14)  real estate broker or dealer
- ☐ (15)  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☑ (16)  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

**SECTION 7.A. Financial Industry Affiliations**

Complete a separate Schedule D Section 7.A. for each *related person* listed in Item 7.A.

1. Legal Name of *Related Person*:
   CAMSHAFT CAPITAL MANAGEMENT LLC

2. Primary Business Name of *Related Person*:
   CAMSHAFT CAPITAL MANAGEMENT LLC

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4. *Related Person's*
   (a)  *CRD* Number (if any):

   (b)  CIK Number(s) (if any):
   
   No Information Filed

5. *Related Person* is: (check all that apply)
   (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b)  ☐  other investment adviser (including financial planners)
   (c)  ☐  registered municipal advisor
   (d)  ☐  registered security-based swap dealer
   (e)  ☐  major security-based swap participant
   (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g)  ☐  futures commission merchant
   (h)  ☐  banking or thrift institution
   (i)  ☐  trust company
   (j)  ☐  accountant or accounting firm
   (k)  ☐  lawyer or law firm
   (l)  ☐  insurance company or agency
   (m)  ☐  pension consultant
   (n)  ☐  real estate broker or dealer

(o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles

(p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ⦿ | ○ |
| 7. | Are you and the *related person* under common *control*? | ⦿ | ○ |

|  |  |  | Yes | No |
|---|---|---|---|---|
| 8. | (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ⦿ |
|  | (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |
|  | (c) | If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets: |  |  |

Number and Street 1:                          Number and Street 2:

City:                    State:                    Country:                    ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

|  |  |  | Yes | No |
|---|---|---|---|---|
| 9. | (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
|  | (b) | If the answer is yes, under what exemption? |  |  |
| 10. | (a) | Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ⦿ |
|  | (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. |  |  |

No Information Filed

|  |  | Yes | No |
|---|---|---|---|
| 11. | Do you and the *related person* share any *supervised persons*? | ⦿ | ○ |
| 12. | Do you and the *related person* share the same physical location? | ⦿ | ○ |

---

**Item 7 *Private Fund* Reporting**

|  | Yes | No |
|---|---|---|
| B. Are you an adviser to any *private fund*? | ⦿ | ○ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

---

**SECTION 7.B.(1) *Private Fund* Reporting**

Funds per Page:  15 ▾  Total Funds: 1

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

CAMSHAFT CAPITAL FUND, LP

(b)  *Private fund* identification number:
(include the "805-" prefix also)

805-3297616498

2.  Under the laws of what state or country is the *private fund* organized:

State:                    Country:

Delaware                    United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

**Name of General Partner, Manager, Trustee, or Director**

CAMSHAFT CAPITAL MANAGEMENT LLC

(b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

> No Information Filed

4.  The *private fund* (check all that apply: you must check at least one):

☑  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☐  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

> No Information Filed

          **Yes  No**

6.  (a)  Is this a "master fund" in a master-feeder arrangement?  ○  ⦿

(b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

> No Information Filed

          **Yes  No**

(c)  Is this a "feeder fund" in a master-feeder arrangement?  ○  ⦿

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

> No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

          **Yes  No**

8.  (a)  Is this *private fund* a "fund of funds"?  ○  ⦿

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?  ○  ○

          **Yes  No**

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?  ○  ⦿

10.  What type of fund is the *private fund*?

⦿ hedge fund  ○ liquidity fund  ○ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 595,845,395

## Ownership

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 2,500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

42

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

3%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

                                                                          **Yes  No**

    (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment   ◉  ○
Company Act of 1940, are sales of the fund limited to *qualified clients*?

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

0%

**Your Advisory Services**

                                                                          **Yes  No**

17. (a)  Are you a subadviser to this *private fund*?   ○  ◉

    (b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                                                                          **Yes  No**

18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?   ○  ◉

    (b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                                                                          **Yes  No**

19. Are your *clients* solicited to invest in the *private fund*?   ○  ◉

    *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

                                                                          **Yes  No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ◉  ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-37532 |

B. SERVICE PROVIDERS

**Auditors**

                                                                          **Yes  No**

23. (a)  (1) Are the *private fund's* financial statements subject to an annual audit?   ◉  ○

       (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ◉  ○

    If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| Additional Auditor Information : 1 Record(s) Filed. |
|---|
| If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm. |
| (b)  Name of the auditing firm:<br>    DELOITTE AND TOUCHE LLP |

(c) The location of the auditing firm's responsible office (for a *private fund*) (city, state and country):

City:                           State:                          Country:
COSTA MESA                      California                      United States

|                                                                                                                    | Yes | No |
|--------------------------------------------------------------------------------------------------------------------|-----|----|
| (d) Is the auditing firm an *independent public accountant*?                                                       | ◉   | ○  |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?                            | ◉   | ○  |

If yes, Public Company Accounting Oversight Board-Assigned Number:
34

|                                                                                                                                                                        | Yes | No |
|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|----|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?            | ◉   | ○  |

|                                                                                                                                                                        | Yes | No |
|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|----|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?                   | ○   | ◉  |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

○ Yes  ◉ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

|                                                                                                                                                                        | Yes | No |
|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|----|
| 24. (a) Does the *private fund* use one or more prime brokers?                                                                                                          | ◉   | ○  |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

### Additional Prime Broker Information : 3 Record(s) Filed.

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

(b) Name of the prime broker:
INTERACTIVE BROKERS LLC

(c) If the prime broker is registered with the SEC, its registration number:
8 - 47257
CRD Number (if any):
36418

(d) Location of prime broker's office used principally by the *private fund* (city, state and country):

City:                           State:                          Country:
GREENWICH                       Connecticut                     United States

|                                                                                                                    | Yes | No |
|--------------------------------------------------------------------------------------------------------------------|-----|----|
| (e) Does this prime broker act as custodian for some or all of the *private fund's* assets?                        | ◉   | ○  |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

(b) Name of the prime broker:
J.P. MORGAN SECURITIES LLC

(c) If the prime broker is registered with the SEC, its registration number:
8 - 35008
CRD Number (if any):
79

(d) Location of prime broker's office used principally by the *private fund* (city, state and country):

City:                           State:                          Country:

**Yes  No**

(e)  Does this prime broker act as custodian for some or all of the *private fund's* assets?          ⦿   ○

---

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

(b)  Name of the prime broker:
MAREX CAPITAL MARKETS INC.

(c)  If the prime broker is registered with the SEC, its registration number:
8 - 69039

CRD Number (if any):
161014

(d)  Location of prime broker's office used principally by the *private fund* (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

**Yes  No**

(e)  Does this prime broker act as custodian for some or all of the *private fund's* assets?          ⦿   ○

---

## Custodian

**Yes  No**

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?          ⦿   ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 4 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
J.P. MORGAN SECURITIES LLC

(c)  Primary business name of custodian:
J.P. MORGAN SECURITIES LLC

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEWARK | Delaware | United States |

**Yes  No**

(e)  Is the custodian a *related person* of your firm?          ○   ⦿

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 35008

CRD Number (if any):
79

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
MIDLAND TRUST COMPANY

(c)   Primary business name of custodian:
      MIDLAND TRUST COMPANY

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| FORT MYERS | Florida | United States |

                                                                                        **Yes  No**

(e)   Is the custodian a *related person* of your firm?                                      ○    ⦿

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):

      -

      CRD Number (if any):

(g)   If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)   Legal name of custodian:
      NORTHERN TRUST SECURITIES, INC.

(c)   Primary business name of custodian:
      NORTHERN TRUST SECURITIES, INC.

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| CHICAGO | Illinois | United States |

                                                                                        **Yes  No**

(e)   Is the custodian a *related person* of your firm?                                      ○    ⦿

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):

      8 - 23689

      CRD Number (if any):
      7927

(g)   If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)   Legal name of custodian:
      TEXAS CAPITAL BANK

(c)   Primary business name of custodian:
      TEXAS CAPITAL BANK

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| RICHARDSON | Texas | United States |

                                                                                        **Yes  No**

(e)   Is the custodian a *related person* of your firm?                                      ○    ⦿

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):

      -

      CRD Number (if any):

(g)  If the custodian is not a *broker-dealer*, or is a *broker-dealer* but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

**Yes  No**

26.  (a)  Does the *private fund* use an administrator other than your firm?   ◉  ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> **Additional Administrator Information : 1 Record(s) Filed.**
>
> If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.
>
> (b)  Name of administrator:
> APEX FUND SERVICES
>
> (c)  Location of administrator (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | NEW YORK CITY | New York | United States |
>
> **Yes  No**
>
> (d)  Is the administrator a *related person* of your firm?   ○  ◉
>
> (e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?
> ◉ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)
>
> (f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

**Yes  No**

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?   ◉  ○

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> **Additional Marketer Information : 1 Record(s) Filed.**
>
> You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer, you must complete questions (b) through (g) separately for each marketer.
>
> **Yes  No**
>
> (b)  Is the marketer a *related person* of your firm?   ○  ◉
>
> (c)  Name of the marketer:
> HYDE AND UNION
>
> (d)  If the marketer is registered with the SEC, its file number (*e.g.*, 801-, 8-, or 866-):
> -
>
> and CRD Number (if any):

(e) Location of the marketer's office used principally by the *private fund* (city, state and country):

| City: | State: | Country: |
|---|---|---|
| PORTLAND | Oregon | United States |

|  | Yes | No |
|---|---|---|
| (f)  Does the marketer market the *private fund* through one or more websites? | ○ | ◉ |

(g)  If the answer to question 28.(f) is "yes," list the website address(es):

No Information Filed

---

**Funds per Page:**  15 ▼  Total Funds: 1

---

**SECTION 7.B.(2)** *Private Fund* Reporting

No Information Filed

---

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

A.  Do you or any *related person*:

|  | Yes | No |
|---|---|---|
| (1)  buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| (2)  buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ○ | ◉ |
| (3)  recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ○ | ◉ |

**Sales Interest in *Client* Transactions**

B.  Do you or any *related person*:

|  | Yes | No |
|---|---|---|
| (1)  as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| (2)  recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ○ | ◉ |
| (3)  recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

C.  Do you or any *related person* have *discretionary authority* to determine the:

|  | Yes | No |
|---|---|---|
| (1)  securities to be bought or sold for a *client's* account? | ○ | ◉ |
| (2)  amount of securities to be bought or sold for a *client's* account? | ○ | ◉ |
| (3)  broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ○ | ◉ |
| (4)  commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ○ | ◉ |
| D.  If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? | ○ | ○ |
| E.  Do you or any *related person* recommend brokers or dealers to *clients*? | ○ | ◉ |
| F.  If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? | ○ | ○ |
| G.  (1)  Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? | ○ | ◉ |
| (2)  If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? | ○ | ○ |
| H.  (1)  Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? | ○ | ◉ |
| (2)  Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? | ○ | ◉ |

I. Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? ○ ◉

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

### Item 9 Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

|  |  |  | **Yes** | **No** |
|---|---|---|---|---|
| A. | (1) | Do you have *custody* of any advisory *clients'*: | | |
| | | (a) cash or bank accounts? | ◉ | ○ |
| | | (b) securities? | ◉ | ○ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 595,845,395 | (b) 1 |

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

|  |  |  | **Yes** | **No** |
|---|---|---|---|---|
| B. | (1) | In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: | | |
| | | (a) cash or bank accounts? | ○ | ◉ |
| | | (b) securities? | ○ | ◉ |

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ | (b) |

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

| | | |
|---|---|---|
| (1) | A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. | ☑ |
| (2) | An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools. | ☑ |
| (3) | An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. | ☐ |
| (4) | An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. | ☑ |

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

|  |  | **Yes** | **No** |
|---|---|---|---|
| D. | Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*? | | |
| | (1) you act as a qualified custodian | ○ | ◉ |
| | (2) your *related person(s)* act as qualified custodian(s) | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YY

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons,* including, but not limited to, you and your *related persons,* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients?*
1

---

### SECTION 9.C. *Independent Public Accountant*

You must complete the following information for each *independent public accountant* engaged to perform a surprise examination, perform an audit of a pooled investment vehicle that you manage, or prepare an internal control report. You must complete a separate Schedule D Section 9.C. for each *independent public accountant.*

(1) Name of the *independent public accountant:*
DELOITTE AND TOUCHE LLP

(2) The location of the *independent public accountant's* office responsible for the services provided:

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 695 TOWN CENTER DR | | SUITE 1000 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| COSTA MESA | California | United States | 92626 |

                                                                                                              **Yes  No**
(3) Is the *independent public accountant* registered with the Public Company Accounting Oversight Board?              ⦿    ○

If "yes," Public Company Accounting Oversight Board-Assigned Number:
34

(4) If "yes" to (3) above, is the *independent public accountant* subject to regular inspection by the Public Company Accounting Oversight Board in   ⦿    ○
accordance with its rules?

(5) The *independent public accountant* is engaged to:
A. ☑ audit a pooled investment vehicle
B. ☐ perform a surprise examination of *clients'* assets
C. ☑ prepare an internal control report

(6) Since your last *annual updating amendment,* did all of the reports prepared by the *independent public accountant* that audited the pooled investment vehicle or that examined internal controls contain unqualified opinions?

⦿ Yes

○ No

○ Report Not Yet Received

*If you check "Report Not Yet Received", you must promptly file an amendment to your Form ADV to update your response when the accountant's report is available.*

---

### Item 10 Control Persons

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration,* the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

                                                                                                              **Yes  No**
A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?              ○    ⦿

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete *Section 10.B. of Schedule D.*

---

### SECTION 10.A. *Control Persons*

No Information Filed

No Information Filed

---

## Item 11 Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed: you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

_For "yes" answers to the following questions, complete a Criminal Action DRP:_

| A. In the past ten years, have you or any *advisory affiliate*: | Yes | No |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2) been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| B. In the past ten years, have you or any *advisory affiliate*: | | |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

_For "yes" answers to the following questions, complete a Regulatory Action DRP:_

| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | Yes | No |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |

| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
|---|---|---|
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |

| E. Has any *self-regulatory organization* or commodities exchange ever: | | |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ◉ |

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted         ○  ◉

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?         ○  ◉

F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?         ○  ◉

G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?         ○  ◉

---

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

|  |  | Yes | No |
|---|---|---|---|
| H. (1) | Has any domestic or foreign court: | | |
| | (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ◉ |
| | (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ◉ |
| | (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ◉ |
| (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ◉ |

---

## Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | Yes | No |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B. Do you: | | |
| (1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. Are you: | | |
| (1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

---

## Schedule A
### Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
    (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions:
    (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act):
    Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence: or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to

(c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?  ○ Yes  ● No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6.  Ownership codes are:     NA - less than 5%          B - 10% but less than 25%     D - 50% but less than 75%
                             A - 5% but less than 10%     C - 25% but less than 50%     E - 75% or more

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| MORTON, WILLIAM, CAMERON | I | CHIEF EXECUTIVE OFFICER, CHIEF COMPLIANCE OFFICER | 08/2020 | E | Y | N | 7692554 |

## Schedule B

### Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

(a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation:

For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

(b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

(c) in the case of an owner that is a trust, the trust and each trustee; and

(d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6.  Ownership codes are:     C - 25% but less than 50%     E - 75% or more
                             D - 50% but less than 75%     F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

No Information Filed

## Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

## Schedule R

No Information Filed

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

| | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ◉ |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 376579 | CAMSHAFT CAPITAL ADVISORS LLC - ADV PART 2A | Private funds or pools |

---

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

---

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:
WILLIAM MORTON

Printed Name:
WILLIAM MORTON

Adviser *CRD* Number:
322577

Title:
CEO, CCO

---

### *NON-RESIDENT* INVESTMENT ADVISER EXECUTION PAGE

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

### 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

### 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

### 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

### Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                          Date: MM/DD/YYYY

Printed Name:                                       Title:

Adviser *CRD* Number:
322577

# EXHIBIT 22



Join now     Sign in



## Camshaft Capital Fund, LP

Investment Management

Miami, Florida · 48 followers

Camshaft Capital Fund, LP is a DE registered Hedge Fund.

Follow

## About us

Camshaft's investment strategies focus on consistent, diverse, low risk returns modeling, after fees, 18-25%+ yearly to investors. Camshaft Capital has never posted a negative quarter, or even consecutive negative months, while achieving extremely high returns. This is due to the multi-layered diversification of the Fund.

The Fund pursues a mixture of strategies, including trend, contrarian, momentum, swing, and volatility trading. Similarly, the Fund uses intraday, short, mid, and long-term trades to maximize returns. Camshaft Capital finds profits in positive, negative, and even non directional market movements by using arbitrage, options, volatility and derivatives through Indices, Commodities, Futures, Currencies, Bonds, Global Markets, Private Equity, Derivatives, and Debt. Blending non correlated strategies, timeframes, directions, products, sectors, and investment classes minimizes volatility and risk, but not performance.

**Join to see who you already know at Camshaft Capital Fund, LP**

Join now       Sign in

ensure minimal maximum positional loss of the Fund's capital. This reduces the Fund's risk in a steep market/underlying downturn. Each trade intrinsically has a reward skewed upside significantly greater than the risk taken, allowing Camshaft Capital to achieve an astounding alpha.

Camshaft Capital Fund, LP is a Hedge Fund registered in Delaware organized under section 3(C)(1) of the Investment Company Act of 1940.

| | |
|---|---|
| **Website** | [http://camshaftcapital.com](http://camshaftcapital.com) 🗗 |
| **Industry** | Investment Management |
| **Company size** | 2-10 employees |
| **Headquarters** | Miami, Florida |
| **Type** | Privately Held |
| **Founded** | 2020 |

**Specialties**

Investment Management, Asset Management , Quantitative Analysis, and Relationship Management

---

## Locations

Primary
Miami, Florida, US
[Get directions](#) 🗗

---

## Similar pages

 **Estas USA Camshaft Industry**

**Join to see who you already know at Camshaft Capital Fund, LP**

| Join now | Sign in |
|---|---|





### Ball Engine
Automotive

Lilburn, Georgia


### Precision Camshaft Limited
Appliances, Electrical, and Electronics Manufacturing

Pune, Maharashtra


### Precision Camshafts Limited
Industrial Machinery Manufacturing

Solapur, Maharashtra


Show more similar pages ⌄

# Browse jobs

### Infrastructure Analyst jobs
13,865 open jobs

### Quality Assurance Engineer jobs
34,617 open jobs

### Salesforce Administrator jobs
11,040 open jobs

### Android Developer jobs
41,511 open jobs

### Scrum Master jobs
146,132 open jobs

### Developer jobs
344,797 open jobs

### Engineer jobs
608,159 open jobs

### Senior Test Engineer jobs
15,562 open jobs

### User Experience Designer jobs
23,764 open jobs

**Join to see who you already know at Camshaft Capital Fund, LP**

| Join now | Sign in |

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language ⌄

Join to see who you already know at Camshaft Capital Fund, LP

Join now

Sign in

# EXHIBIT 23

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 24

**From:** William Morton <william@camshaftcapital.com>
**Sent:** February 27, 2024 11:47 AM
**To:** Jianjian Ye; Susheel Kirpalani; *benjaminfinestone@quinnemanuel.com; Christine Botvinnik; *danielholzman@quinnemanuel.com; 'Enos, Kenneth'; 'RBRADY@ycst.com'; Cc: Massey, David B; Schartz, Brian; Howell, Richard U. S.; Bryant, Chris; Shang, Christine; Rathe, Colin B.; Welch, Katie J.; Scherer, Christine; Carter, Elizabeth C; Townsell, Andrew; Terry, Claire; Miller, Evan T.; Shankar, Ravi Subramanian
**Subject:** Thank you ☺

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

Good afternoon all,

I just heard how the 11am hearing went, and it would be a cardinal disrespect to my religious beliefs (which is centered in gratitude), to not express the following. With deepest respect and gratefulness, I express my utmost appreciation to whomever elected (or to the process that resulted in) Quinn Emanual as first chair, <u>and not</u> Kirkland & Ellis in representation of the Plaintiff in the DE Byju's-Camshaft Bankruptcy matter.

It would be an honor to send this person some of the grass fed, free range, Longhorn beef from our family's Montana ranch. Of which, I grew up on, attending to the mother cows who today produce the younglings resulting in the beef I would send.

With highest regards☺



William C. Morton
CEO & CO-CIO

# EXHIBIT 25



HOME    ABOUT US    STRATEGY    CONTACT

- HOME

- EXPOSURES

- METHODOLOGY

- CONTRARIAN
  TRADING

- TREND
  TRADING

- PARTNERS

# CAMSHAFT CAPITAL FUND, LP

Consistently outperforming the best through risk averse non-correlated return streams.

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM

HOME ABOUT US STRATEGY CONTACT

# ASSET ALLOCATIONS



- HOME
- EXPOSURES
- METHODOLOGY
- CONTRARIAN TRADING
- TREND TRADING
- PARTNERS

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM



HOME    ABOUT US    STRATEGY    CONTACT



DAY TRADING
Momentum, volatility
arbitrage and pivots



SHORT TERM
Option writing, Volatility
trading, Swing
positioning

- HOME
- EXPOSURES
- METHODOLOGY
- CONTRARIAN
  TRADING
- TREND
  TRADING
- PARTNERS

## OUR RISK DIVERSIFIED
## NON-CORRELATED FOCUS

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM

Page 3 of 8



https://www.camshaftcapital.com/

HOME    ABOUT US    STRATEGY    CONTACT



MEDIUM TERM
Trend, Break out and
Swing trading.



LONG TERM
Cyclical and value
investing

- HOME

- EXPOSURES

- METHODOLOGY

- CONTRARIAN
  TRADING

- TREND
  TRADING

- PARTNERS

# CONTRARIAN TRADING



**William Morton**
*Founder CEO*

### Trading Experience:

- Equities 17 years
- Options 13 years
- Futures 5 years
- Commodities 4 years

### Hobbies:

self-improvement, fitness,
basketball, cooking, traveling,
trading, reading, writing,
storytelling, fine dining, skiing,
water activities,
hiking/backpacking, meditating,
learning new skills, fashion, social
gatherings

### Time Focus:
Day Trading / Short Term

### Methods:
Option writing, volatility trading, swing positions

### Favorite instruments:

Long and short: naked puts, calls, /ES, /NQ, /VX, /GC, /CL, /ZT, /ZN,
/ZB SPX, NDX, VIX, AAPL, TSLA, GLD, NFLX, BABA, BA, AMZN, NVDA,
FB, GOOG, CMG, TLT

### Favorite market conditions to trade:

Long and short: naked puts, calls, Earning seasons, panic sell offs, high
volatility, news and announcements, 3 day weekend holidays

### Strategies Used:

Long and short: naked puts, calls, synthetic long/short, straddles,
single/double diagonals, single/double calendars, strangles,
skip/iron/long/short butterflies, front ratios, Iron condors, spreads,
back ratios, futures, future options, stock shares

### Known For:

Contrarian trader: looks to take trades that everyone is afraid to

Shorting the VIX when markets panic

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM



trading, reading, writing,
stock trading, fine dining, skiing,
water activities,
hiking/backpacking, meditating,
learning new skills, fashion, social
gatherings.

back ratios, futures, future options, stock shares

**First Trade:**
7 years old - long gold

### Known For:

Contrarian trader: looks to take trades that everyone is afraid to

Shorting the VIX when markets panic

Selling intra day expiring index options including condors

Selling ITM options after an earnings report

Fundamental trades taking the opposite side during moments of
panic/ high uncertainty

Buying and selling volatility going into earning reports

Selling weekly options

Rolling options into new trade set ups, involving numerous legs and
sometimes different securities

Taking only the highest quality trade opportunities- focus is to only
lose a trade when an unforeseen outside variable results in a losing
trade.

Every trade taken has a planned profit, exit, adjustment, continuation

- HOME

- EXPOSURES

- METHODOLOGY

- CONTRARIAN
  TRADING

- TREND
  TRADING

- PARTNERS

# TREND TRADING



**Jason Perz**
*Co-CIO*

### Trading Experience:
- Equities 13 years
- Options 7 years
- Futures 6 years
- Blockchain 5 years
- Commodities 13 years

**Time Focus:**
Position trading (3-12 months). Swing trading(2 weeks-2 months)

**Methods:**
Systematic fundamentals, Quant strategies, back testing, Cross asset
class and intermarket analysis.

**Favorite instruments:**
Anything and everything. I trade sugar and treasury bonds exactly the
same.

**Favorite market conditions to trade:**
A smooth trending market. (I can dream)

**Strategies Used:**
Agriculture arbitrage. Inverse correlations in products-(cattle/corn)

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM



- Equities 13 years
  - Options 7 years
  - Futures 6 years
  - Blockchain 5 years
  - Commodities 13 years

### Hobbies:

BMX, skiing, philosophy, history, reading, traveling

### First Trade:

I have silver and gold that i got when I was 11 years old.

### Favorite market conditions to trade:

A smooth trending market. (I can dream)

### Strategies Used:

Agriculture arbitrage. Inverse correlations in products-(cattle/corn) for example Event driven Macro trades (Fukushima, unexpected weather events, geopolitical changes) Trend following-buying the highs and selling the lows. (Catches big moves that others won't hold on to) Cyclical mean reversion-the world moves in cycles and trends. At a certain point everything changes --which leads myself to constantly search for value. Market timing-using breadth indicators, sentiment and price.

### Known For:

Finding asymmetrical returns in choppy markets.

Cyclical trade ideas. Finding something that is over extended and buying something that is extremely undervalued. (In January 2018 our signals said that Bitcoin was extremely extended and sold our Bitcoin and bought gold and gold miners.)

Taking advantage of extreme market sentiment-Shorting the Nasdaq in the crash of 2020.

Selling puts on gold and gold miners after the crash.

Buying December penny puts on Apple in 2018.

Finding what countries will outperform each year: In 2019 we chose Russia, Greece and Brazil.

Using demographics to find new and exciting countries to invest in.

- HOME
- EXPOSURES
- METHODOLOGY
- CONTRARIAN TRADING
- TREND TRADING
- PARTNERS

## OUR PARTNERS

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM

https://www.camshaftcapital.com/    Go

7 captures
20 Nov 2021 - 6 Jun 2023

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 158 of 410

MAR **JUN** JUL
◀ **06** ▶
2021 **2023** 2024
About this capture

HOME    ABOUT US    STRATEGY    CONTACT



- HOME
- EXPOSURES
- METHODOLOGY
- CONTRARIAN TRADING
- TREND TRADING
- PARTNERS

## ABOUT CAMSHAFT CAPITAL

Camshaft Capital Fund, LP is a Hedge
Fund. The Fund's primary asset exposure
includes Indices, equities, commodities,
forex, bonds, global markets and debt.

Contact Us

## STRATEGIES

Contrarian Trading
Trend Trading

## ABOUT US

Methodology
Exposures

## PRESENCE

Miami, FL
San Diego, CA
Mexico, Brazil, Australia

Camshaft Capital Fund, LP © 2022



- HOME
- EXPOSURES
- METHODOLOGY
- CONTRARIAN TRADING
- TREND TRADING
- PARTNERS

### ABOUT CAMSHAFT CAPITAL

Camshaft Capital Fund, LP is a Hedge Fund. The Fund's primary asset exposure includes Indices, equities, commodities, forex, bonds, global markets and debt.

Contact Us

### STRATEGIES

Contrarian Trading
Trend Trading

### ABOUT US

Methodology
Exposures

### PRESENCE

Miami, FL
San Diego, CA
Mexico, Brazil, Australia

Camshaft Capital Fund, LP © 2022
All Rights Reserved.

Document title: Camshaft Capital
Capture URL: https://web.archive.org/web/20230606004505/https://www.camshaftcapital.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 23:31:13 GMT
Estimated post date: 06/06/2023 12:45:05 AM

# EXHIBIT 26



HOME    HEDGE FUNDS    BROKER DEALER    CONSULTING    CONTACT    APEX



# Camshaft Group

HEDGE FUND    BROKER DEALER    CONSULTING

# <u>Outperforming</u> our peers with risk-averse, diversified return streams.

Camshaft Group provides comprehensive financial solutions across three core verticals: Hedge Funds, Broker Dealer Services, and Consulting.

The Hedge Fund division specializes in delivering true diversification. We curate a portfolio that encompasses Liquid Portfolio, Private Credit, Life Sciences, and Commercial Real Estate - optimizing returns through rigorous risk tests.





The Hedge Fund division specializes in delivering true diversification. We curate a portfolio that encompasses Liquid Portfolio, Private Credit, Life Sciences, and Commercial Real Estate - optimizing returns through rigorous risk tests.

Our Broker Dealer service offers capital markets, structuring, consulting, and upcoming IPO capacity. Our experienced team and extensive network identify opportunities that meet our stringent risk criteria, providing top-notch guidance to clients.

The Consulting division caters to diverse needs, offering services such as Synthetic Debt, Service Partners, Consumer Data, Middle Office, Automation, Recruiting, and Marketing. Leveraging our growing network, we enhance portfolio value and empower businesses to thrive.

*"Much like a camshaft generates power to an engine, the Camshaft Group generates alpha across financial markets with efficiency, fluidity, and precision execution" - William Morton CEO*

## Partn

We are co
secure, ef
achieve th
leaders fr
range of

      

Document title: Camshaft Group | Hedge Fund | Broker Dealer | Consulting
Capture URL: https://www.camshaftgroup.com/
Capture timestamp (UTC): Thu, 31 Aug 2023 22:51:53 GMT



APEX

# Meet the *people* behind Camshaft

Specialized backgrounds make the team innovative, and our laser-focus on finding market opportunities drives success



**William Morton**
FOUNDER CEO · CAMSHAFT GROUP



**Robert Forte**
MANAGING DIRECTOR · CAPITAL MARKETS




**Rajiv Khatau**
CIO & CO-GP · LIFE SCIENCES



**Juan Carlos G Gallego**
MANAGING DIRECTOR, HEAD OF MEXICO



**Luiz Phelipe Zobgi**
DIRECTOR, HEAD OF BRAZIL



**Monique Morley**
CHIEF OF STAFF · CAMSHAFT GROUP



**Matthew Burks**
VP OPERATIONS · CAMSHAFT GROUP



**Joseph Shuster**
CO GENERAL PARTNER · REAL ESTATE



**Sean Teeling**
CO GENERAL PARTNER · REAL ESTATE



**Jamey Jacob**
SME — AEROSPACE ENGINEERING & ROBOTICS



**Luiz Phelipe Zobgi**
DIRECTOR, HEAD OF BRAZIL

**Monique Morley**
CHIEF OF STAFF - CAMSHAFT GROUP

**Matthew Burks**
VP OPERATIONS - CAMSHAFT GROUP

**Joseph Shuster**
CO-GENERAL PARTNER - REAL ESTATE

**Sean Teeling**
CO-GENERAL PARTNER - REAL ESTATE

**Jamey Jacob**
SME – AEROSPACE ENGINEERING & ROBOTICS

# Let's talk about what we can do together.

St.Thomas, USVI
Miami, FL, USA
Pittsburg, PA, USA
San Diego, CA, USA
Monterrey, Mexico
Sao Paulo, Brazil
London, United Kingdom

support@camshaftgroup.com

First Name

Last Name

Email *

Message

Send

---

© 2023 CAMSHAFT GROUP

Camshaft Capital Advisers ADV Filing

# EXHIBIT 27

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 166 of 410

**Page 1**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
GLAS TRUST COMPANY LLC, in its      :
capacity as Administrative Agent and :
Collateral Agent, and TIMOTHY R. POHL,:
                                      :
            Plaintiffs,               :
                                      :
      v                               :  C. A. No.
                                      :  2023-0488-MTZ
RIJU RAVINDRAN, BYJU'S ALPHA, INC.,   :
and TANGIBLE PLAY, INC.,              :
                                      :
            Defendants.               :
```

- - -

Chancery Court Chambers
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Friday, August 4, 2023
9:15 a.m.

- - -

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

- - -

SECTION 225 TRIAL TRANSCRIPT

------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0526

**Page 2**

1  APPEARANCES:
2
3       BROCK E. CZESCHIN, ESQ.
        NICOLE M. HENRY, ESQ.
4       Richards, Layton & Finger, PA
          for Plaintiff Timothy R. Pohl
5
        LAUREN K. NEAL, ESQ.
6       ELIZABETH A. MULLIN, ESQ.
        Morris, Nichols, Arsht & Tunnell LLP
7           -and-
        PATRICK C. ASHBY, ESQ.
8       of the New York Bar
        Linklaters LLP
9           for Plaintiff GLAS Trust Company LLC
10      JOSEPH B. CICERO, ESQ.
        Chipman Brown Cicero & Cole LLP
11          -and-
        SHERON KORPUS, ESQ.
12      DAVID M. MAX, ESQ.
        SONDRA GRIGSBY, ESQ.
13      of the New York Bar
        Kasowitz Benson Torres LLP
14          for Defendants
15
16
17                  ---
18
19
20
21
22
23
24

CHANCERY COURT REPORTERS

**Page 3**

1           THE COURT:   Good morning.
2           VARIOUS COUNSEL:   Good morning, Your
3   Honor.
4           ATTORNEY CICERO:   Good morning, Your
5   Honor.  Joe Cicero from Chipman Brown Cicero & Cole on
6   behalf of the defendants.  Thank you for having us
7   today.
8           I wanted to first do introductions of
9   my co-counsel.  Sheron Korpus, David Max, and Sondra
10  Grigsby from Kasowitz Benson Torres.
11          THE COURT:   Welcome.
12          ATTORNEY CICERO:   Thank you.
13          ATTORNEY NEAL:   Good morning, Your
14  Honor.  Lauren Neal from Morris Nichols
15  Arsht & Tunnell.  And with me today is my co-counsel
16  from Linklaters, Patrick Ashby, and my colleague
17  Elizabeth Mullin.
18          THE COURT:   Thank you, good morning.
19          ATTORNEY CZESCHIN:   Good morning, Your
20  Honor.  Brock Czeschin from Richards, Layton & Finger
21  on behalf of plaintiff Timothy Pohl.  With me in the
22  courtroom today is my colleague Nicole Henry and also
23  Sean Quigley, who will be helping with the
24  presentation.

CHANCERY COURT REPORTERS

**Page 4**

1           THE COURT:   Thank you.  Good morning.
2           ATTORNEY CZESCHIN:   And with Your
3   Honor's permission, I can present the argument on
4   behalf of the plaintiffs.
5           THE COURT:   Yes, thank you.
6           ATTORNEY CZESCHIN:   So as Your Honor
7   is aware --
8           THE COURT:   Do you have a copy of
9   these slides?
10          ATTORNEY CZESCHIN:   I do.  We have
11  several copies.  They were provided to the other side
12  last evening.
13          So as Your Honor is aware, the
14  plaintiffs brought this action pursuant to Section 225
15  of the Delaware General Corporation Law to confirm
16  that actions that were taken by GLAS to assume control
17  of 100 percent of the stock of BYJU's Alpha and use
18  that control to remove Mr. Ravindran as the sole
19  director and appoint Mr. Pohl as the sole director of
20  the company, that those actions were valid and
21  effective; as well as certain related actions that
22  happened after that, such as Mr. Pohl executing a
23  written consent to remove the existing officers --
24  which, again -- was Mr. Ravindran, and appoint himself

CHANCERY COURT REPORTERS

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 167 of 410

Page 5

1  to that role.
2          So the validity of these actions turns
3  on two key issues. And we have them there on the
4  slide. The first is were there events of default
5  under the BYJU's Alpha credit agreement that entitled
6  GLAS to exercise its contractual right to assume
7  control of the company; and, second, whether GLAS
8  properly exercised its contractual rights from a
9  mechanical point of view to remove Ravindran and
10  appoint Pohl.
11          And unlike many 225 cases, the
12  defendants do not challenge or make any arguments with
13  respect to the second point, the mechanical steps.
14  Instead, the defendants only focus on the first point,
15  which is whether or not there were events of default
16  that entitled GLAS to take the actions that it did.
17          And on that point, we think that the
18  key legal principle that the Court should focus on is
19  that sophisticated parties with sophisticated advisors
20  should be held to the terms of their agreement.
21          Now, that's the principle that decides
22  this case. That's a bedrock principle of New York and
23  Delaware law. And it's particularly applicable here
24  because we have sophisticated parties. We have BYJU's

Page 6

1  on the other side. That's the conglomerate that's
2  made up of Think and Learn, is the parent entity, and
3  its subsidiaries. And you have BYJU's Alpha, which
4  was an indirect, wholly owned subsidiary; and Tangible
5  Play, which is another, I believe, wholly owned
6  subsidiary. And together they are referred to as
7  "BYJU's."
8          It's the world's largest education
9  technology company. They were recently valued at
10  $22 billion. They had the best lawyers that money
11  could buy. They were represented by White & Case
12  during the negotiation of the credit agreement. They
13  also had Indian counsel that is noted on the slide.
14          And this -- the underlying transaction
15  is a big transaction. It's a $1.2 billion syndicated
16  term loan. And because it's a syndicated term loan,
17  that means it's -- well, originally there were 37
18  large financial institutions that invested into the
19  term loan. But because it's syndicated, it trades,
20  and new investors come in and old investors go out of
21  the facility over time.
22          And I think the syndicated nature of
23  that term loan highlights why it's so important to
24  apply the contract as it's written. Because new

Page 7

1  investors coming into the term loan, the only thing
2  that they have to understand their rights is to look
3  at the credit agreement itself.
4          Now, going to the next slide --
5          THE COURT: Does that aspect of these
6  new investors coming around, and the fact that this is
7  syndicated, is there a foothold for that in the New
8  York law that has to do with unconscionability and the
9  estoppel doctrine and some of these other squishier
10  aspects that we're going to be talking about?
11          ATTORNEY CZESCHIN: There is. There
12  is a case that we cite in our brief. I don't have it
13  off the top of my head, but that says -- I don't know
14  if it's exactly in the context of talking about some
15  of the squishy doctrines, but it highlights the fact
16  that when you have a syndicated facility, loan, that
17  it's important to apply the words as they are written.
18  And I can get you that cite when I get back up. But
19  that is something that the New York courts have
20  recognized.
21          And I'm just going to grab my water.
22          THE COURT: Sure.
23          ATTORNEY CZESCHIN: We think the key
24  facts here that decide the case are, you know, BYJU's

Page 8

1  has repeatedly conceded that the events of default
2  occurred, and they have conceded GLAS's right to
3  exercise the remedies. Defendants try to ignore the
4  amendments that have been entered into over the past
5  year to the credit agreement. They don't even address
6  them in the brief. They're in two footnotes, is where
7  they're mentioned.
8          But over this past year, while the
9  parties were trying to negotiate a resolution, they
10  entered into a series of eight amendments to the
11  credit agreement. And in those amendments, the
12  defendants admit that there have been events of
13  default. They also admit that those events of default
14  don't get cured and that they become -- well, there
15  were defaults that matured into events of default that
16  entitle -- that's the word that's used in the
17  amendments -- entitle GLAS to exercise its contractual
18  remedies.
19          And those are concessions that we
20  think, you know, resolve this case. And we're going
21  to get to those in more detail.
22          So the first amendment that is really
23  important is Amendment No. 2, and it was entered into
24  on October 12th, 2022, and it adds a new definition to

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 168 of 410

Page 9

1  the credit agreement. And that's JX 168. It adds a
2  new definition to the credit agreement for "Specified
3  Defaults." And the parties also agree that those
4  specified defaults will effectively be governed by an
5  amended cure period, which extends the cure period in
6  the original agreement.
7            So, Sean, if you could pull up JX 168,
8  we will take a look at the actual language. So here's
9  the document. You see it's Amendment No. 2, dated
10  October 12, 2022. And if we could focus on Section 1
11  at the bottom.
12            Section 1 says, "Amendments to the
13  Credit Agreement." This is amending the credit
14  agreement. And it says, "Specified Defaults." And
15  they use the term "Specified Defaults." They don't
16  use the term "Specified Nonmaterial Breaches of
17  Contract," which is what the other side is trying to
18  say. They use the term "Defaults."
19            And if you then look at (a), the first
20  listed default is "the failure to deliver to the
21  Administrative Agent, as required under Section 5.1(a)
22  [of the credit agreement], the audited financials and
23  other information for the fiscal year of the Parent
24  Guarantor ended March 31, []."

Page 10

1            So this refers back to the credit
2  agreement the obligation for BYJU's to provide audited
3  financial statements every year within, I believe it's
4  180 days of the end of their fiscal year. And that
5  time period had expired on September 27th of 2022. So
6  at the time this amendment is being entered into, that
7  default has already occurred. That's why they're
8  referring to it here as a specified default, because
9  it had already happened.
10            They did not provide their audited
11  financials on time -- and there's no dispute about
12  that. It's actually a stipulation in the pretrial
13  order stipulated facts. There's no dispute. They
14  were required to provide the audited financials by
15  September 27, 2022. They didn't do it. They haven't
16  even provided them as of today. More than ten months
17  later, we still don't have those audited financials.
18  And that is another stipulated fact in the pretrial
19  order. There's no dispute, we just don't have them.
20            So then you go on to (b), and you see
21  "the failure to deliver to the Administrative Agent,
22  as required under Section 5.1(b), the full and
23  complete unaudited financials ...."
24            So what this is referring to is in the

Page 11

1  credit agreement, on a quarterly basis, they are also
2  obligated to provide unaudited financials. And they
3  failed to provide complete audited financials in --
4  during two of the quarters.
5            So if you keep going and flip over to
6  the next page, Sean.
7            So at the top there, you see it
8  references the fiscal quarters for the parent
9  guarantor ended on December 31 and on June 30th, 2022.
10  And those quarterly financials are due 75 days at the
11  end, after the end of the quarter. And again, those
12  periods had already run at the time this document was
13  signed. And those documents -- those financials that
14  were provided were not compliant with the contract.
15  They didn't include all of the information we were
16  supposed to get.
17            And there's really no dispute about
18  that either. Actually, in their answer in this case,
19  they admit that in the first -- the first quarter
20  that's mentioned there, they didn't provide us
21  everything that they said they would provide us. They
22  deny it as to the second quarter, but you can just
23  look at the document and it's clear they didn't give
24  us everything that we were entitled to.

Page 12

1            So that's the second specified
2  default. And then if you go down to subpart (c), you
3  see the third specified default. And this refers to
4  Whitehat India, which is another subsidiary of Think
5  and Learn, and that it had failed to accede to the
6  agreement and the onshore guarantee deed as a
7  guarantor, pursuant to Section 5.9(c) of the credit
8  agreement.
9            What this refers to is in the credit
10  agreement, 5.9(c), this additional subsidiary of Think
11  and Learn was supposed to sign on as an additional
12  guarantor of the loan by April 1, 2022, and it failed
13  to do so.
14            Now, that date, the lenders in
15  Amendment No. 1, which we skipped over, the lenders
16  had agreed not to enforce that obligation until
17  October 8th, 2022. But, again, they missed that date
18  as well. And, again, both of those things are
19  stipulated facts in the pretrial order. They did not
20  get the Whitehat guarantee by April 1. They didn't
21  get the Whitehat guarantee by October 8th. And they
22  still don't have the Whitehat guarantee as of today.
23  So none of those things are disputed.
24            Now, if we can bring that down and go

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 169 of 410

Page 13

1   to the bottom of that page, you see Section (c).
2   Section (c) amends Section 8.1(e) of the credit
3   agreement. And what this language essentially does is
4   provides an extended cure period for the specified
5   defaults. It says no matter when the specified
6   defaults occurred or when notice was given of them,
7   you had 45 days to cure them. And basically that's
8   giving them an extended cure period for the specified
9   defaults. But I think it's important to look at what
10  this is amending. So, again, this is amending Section
11  8.1(e) of the credit agreement. And let's take a look
12  at that section of the credit agreement.
13              Sean, can you bring this document down
14  and then bring up JX 21.
15              And if you could scroll to the second
16  page. So this, Your Honor, is the credit agreement,
17  the primary document. It's dated November 24, 2021.
18  That's JX 21. If you could jump to page 129 of the
19  JX. That's it. This is the article that's being
20  amended, the other article that's being amended by
21  that amendment. And it's called "Article VIII Events
22  of Default."
23              And it starts out "Events of Default.
24  If any of the following events (each, an 'Event of

Page 14

1   Default') shall occur:" And then the new language
2   from the amendment that we looked at gets added to
3   paragraph (e) down there, that's where the new
4   language would be added, with regards to the
5   "Specified Defaults."
6               So the fact that they put the
7   reference to the "Specified Defaults" in the section
8   of the contract that deals with events of default,
9   that proves that the parties intended those to be
10  defaults. And if they weren't cured, they would
11  become events of defaults. That's the way the
12  contract works. If you breach it, that's a default.
13  But then there's a cure period. And if you don't cure
14  within that period, it matures into an event of
15  default.
16              So the argument that we have from the
17  other side today that, well, these things weren't real
18  defaults is clearly wrong. The parties put the
19  language right in the section of the contract that
20  deals with events of default.
21              THE COURT:   I understood your argument
22  when you began, under Section 1(a) of the second
23  amendment, to say, well, look, these are defined
24  already as specified defaults, so the rabbit is in the

Page 15

1   hat and they are defaults and we're moving on.
2               ATTORNEY CZESCHIN:   Yes.
3               THE COURT:   But now I understand this
4   to be slightly different, which is when we're looking
5   at 8.1(e), that because we're amending 8.1(e), which
6   provides the cure period, it's not a default until
7   such time as we get to the end of the amended cure
8   period.
9               ATTORNEY CZESCHIN:   That's exactly
10  right. So the way the contract distinguishes between
11  defaults -- so something is a default when you don't
12  do what you're supposed to do. It's a breach. But
13  then that default matures into an event of default
14  once the cure period has expired. And once you have
15  an event of default, then GLAS, as the agent for the
16  lenders, is able to send a notice of default and
17  acceleration. And that's what triggers the
18  contractual remedies.
19              So they have these specified defaults,
20  things that have already happened. They define them
21  as defaults, and they stick the cure period in the
22  section of the contract that expressly deals with
23  events of default.
24              And then, as Your Honor mentioned, it

Page 16

1   doesn't actually become a default until the cure
2   period expires.
3               So could we go back to the PowerPoint.
4               So here, we were on Amendment No. 2.
5   Let's go to Amendment No. 3. Amendment No. 3 is
6   exactly 45 days after Amendment No. 2. And that's
7   because the 45-day period expired on November 24th,
8   2022, and there was no cure of the specified defaults.
9   And so, therefore, on that day, the parties enter into
10  Amendment No. 3.
11              And in Amendment No. 3, BYJU's
12  acknowledges and agrees that the cure period has
13  expired without the specified defaults being cured.
14  And then it goes on and it says that they acknowledge
15  and agree that, therefore, GLAS is entitled to send a
16  notice of default and acceleration. So they recognize
17  right there that it's an event of default and we're
18  entitled to accelerate the loan. And then, but
19  nonetheless, the lenders agree to forbear.
20              So just to look at the actual language
21  of the document, it's JX 175. Here you see Amendment
22  No. 3, November 24th, 2022. If we go to page 2. And
23  you have Section 1(a) at the top.
24              And it says, "It is hereby

Page 17

1  acknowledged and agreed by the parties hereto that (i)
2  the Cure Period for ... the Specified Defaults
3  referred to in Amendment No. 2 will expire or has
4  expired on November 24, 2022" -- that's the date of
5  this No. 3 amendment -- "without any of the Specified
6  Defaults being cured by the Loan Parties, and (ii)
7  [says] the Required Lenders will be or are therefore
8  entitled -- entitled -- "to, on or from November 25,
9  2022, request the Administrative Agent to deliver to
10  the Loan Parties the Specified Notice of Default and
11  Acceleration."
12              So they admit that they didn't cure
13  within the period, and, therefore, GLAS is entitled to
14  call the notice of default and accelerate the loan.
15              Now, this document is actually signed
16  by the defendant.  And if we can go to page 5.  This
17  document is signed by -- that's Riju's signature, Riju
18  Ravindran.  And it's signed by him on behalf of Think
19  and Learn, which is the parent entity, and on behalf
20  of all the loan parties, and that includes BYJU's
21  Alpha and Tangible Play.  So, again, we think they
22  have just simply conceded these events of default.
23              So if we could go back to the
24  PowerPoint, the parties throughout this entire period

Page 18

1  have been trying to negotiate a resolution.  The
2  lenders, advisors have been engaging with the advisors
3  for the company trying to negotiate terms of a revised
4  credit agreement that resolves these defaults and
5  resolves the concerns of the lenders.  And we saw that
6  there was, you know, the extended cure period, then
7  there was a forbearance to December 1st.  We get to
8  December 1st, and the forbearance period expires, but
9  the parties are still talking.  So they decide to
10  enter into another amendment on January 6th.
11              And this is called Amendment No. 7.
12  And in this amendment, the other side again
13  acknowledges and agrees that the lenders are entitled
14  to send the notice of default and acceleration.  And
15  they further agree that none of the specified defaults
16  can be cured or remedied or deemed to be cured and
17  remedied after the date of that amendment.  And then
18  the lenders and GLAS agree to forbear again.  They
19  push it out by another -- a little over a month, to
20  February 10.
21              So let's look at the actual document,
22  Sean.  It's JX 187.
23              So here is the actual document.  It's
24  called "Amendment No. 7 ... and Forbearance

Page 19

1  Agreement."  It's dated January 6.  And if you go down
2  to the bottom whereas clause, you see it refers to the
3  "Specified Defaults" that we looked at in Amendment
4  No. 2.  It refers to the "Cure Period" from Amendment
5  No. 3.
6              And then if you go to kind of in the
7  middle, it says -- where you see "and such Cure
8  Period."  "And such Cure Period expired without the
9  specified defaults being cured, and, therefore, from
10  November 25th, the Lenders are" -- I lost my spot --
11  "which entitles," I'm sorry.  There it is, "which
12  entitles the Required Lenders to, [or] on ...
13  November 25, 2022, [to] request the Administrative
14  Agent to deliver to the Loan Parties a notice of
15  acceleration with respect to the Specified Defaults
16  ...."
17              It's very similar to the language we
18  saw before, admitting that GLAS is entitled to send
19  the notice.  And it's that notice that triggers all of
20  the contractual remedies.
21              If we could then go to page 6 of the
22  document.  You see paragraph 3.  If we could blow that
23  up.
24              It says, "It is hereby acknowledged

Page 20

1  and agreed by the parties ...."  Again, that the cure
2  period has expired.
3              And then if you go to (ii), it says,
4  "notwithstanding any actions or otherwise by the
5  Parent Guarantor or any other Person following the
6  date of this Agreement" -- I will skip down, skip the
7  parenthetical -- it says, "none of the Specified
8  Defaults as referred to in the Amendment No. 2 can be
9  cured or remedied (or deemed to be cured or remedied)
10  following the date of this Agreement other than by
11  waiver by the Required Lenders in accordance with
12  Section 10.2 of the Credit Agreement."
13              And what this means is the parties
14  agreed it's now just too late.  It's too late to cure.
15  It's been going on too long, and the other side no
16  longer has the right to cure these defaults.  And as
17  we saw earlier, it says that they -- that GLAS is
18  entitled to send the notice of default and
19  acceleration.
20              And if we could go to the end of this
21  document, you will see that it, too, is signed by
22  Mr. Riju.  That's page 19.  So it signed by Riju
23  Ravindran in the same manner as the prior document.
24              And I want to pause here with regards

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 171 of 410

Page 21

1  to this signature by Mr. Riju, Riju Ravindran, and
2  make a note that I took his deposition in this matter
3  and I asked him about this amendment, and I asked him
4  about the prior amendment that he signed. And he
5  disavowed any understanding of the documents that he
6  signed. He said they are prepared by counsel; I don't
7  know what these mean. And that's at deposition pages
8  125 to 127, page 129, and page 144 to 147.
9          Mr. Ravindran also walked away from
10 the credit agreement itself, which he signed four
11 times. He signed it on behalf of four different
12 entities. But when I tried to ask him about it, he
13 said, "I just glanced at it," was the language that he
14 used, and that he relied on others. And that's at
15 page 51 of the deposition.
16         Mr. Ravindran, also under the credit
17 agreement, provided certain compliance certificates to
18 GLAS and the lenders. And those compliance
19 certificates were supposed to say that the financial
20 statements that were provided -- you know, they did
21 provide some financial information, and those
22 compliance certificates were supposed to verify that
23 that information is true and correct. And Mr. Riju
24 Ravindran signed them.

CHANCERY COURT REPORTERS

Page 22

1          And he signed them as an officer, a
2  financial officer of Think and Learn, is what it says,
3  on the document. And I asked him, are you a financial
4  officer of Think and Learn?
5          He said, no, I'm not part of the
6  finance department.
7          I asked him probably three times, are
8  you a financial officer?
9          No.
10         And I said, well, why did you sign
11 this as a financial officer?
12         He said, I was relying on the finance
13 team. And that's at page 170 of the transcript.
14         And finally, Mr. Ravindran also
15 testified that even though he was the sole officer and
16 director of BYJU's Alpha, which is the borrower, he
17 said the decisions weren't made by him. He said the
18 decisions with respect to BYJU's Alpha were made by
19 the parent at Think and Learn. And that is at
20 deposition transcript cite page 155.
21         So Mr. Ravindran apparently has a
22 habit of signing documents that he does not understand
23 and that he doesn't read.
24         So if we could take that down and go

CHANCERY COURT REPORTERS

Page 23

1  back to the PowerPoint.
2          THE COURT:    Your last point about the
3  role of Think and Learn in all of this, is it -- it
4  seemed to be, though, that everyone agreed that this
5  entity that signed these agreements is essentially
6  just a holdco for the loan.
7          ATTORNEY CZESCHIN:    Yes, BYJU's Alpha
8  is a wholly owned, indirect subsidiary of Think and
9  Learn. It was formed for the sole purpose of being
10 the borrower under the loan.
11         THE COURT:    So it's not surprising
12 that it's not the one actually making sort of the
13 business decisions about how to handle the loan.
14         ATTORNEY CZESCHIN:    Perhaps. But it
15 is surprising that Mr. Riju Ravindran, who is also a
16 director of Think and Learn, he is on the board of
17 Think and Learn, as well, and he signed a lot of these
18 documents. And he literally said, I don't know. I
19 can't tell you what this means. I have no
20 understanding of this document. And he just
21 disallowed them completely.
22         I think that becomes relevant to the
23 extent we might hear from the other side that they are
24 going to rely on some of his declarations that have

CHANCERY COURT REPORTERS

Page 24

1  been signed in this case. And we object to those
2  declarations as hearsay. The parties agreed in the
3  pretrial order that depositions could be relied on.
4  We didn't say anything about the declarations that
5  Mr. Ravindran signed. And we think it's pretty clear
6  he just signs things that are drafted by other people.
7  So that's why we are objecting to those declarations.
8          THE COURT:    Does the record contain
9  any testimony or exhibits from the Think and Learn
10 decision-makers?
11         ATTORNEY CZESCHIN:    I mean, certainly
12 there are exhibits that show the Think and Learn. I
13 mean, the other side was represented by White & Case
14 as their counsel, very sophisticated law firm. So
15 there's a lot of back and forth between the parties
16 that's in the documents. White & Case is also counsel
17 for Think and Learn.
18         The parties have pretty much agreed
19 that it's a -- it's a conglomerate. It's essentially
20 one entity that is referred to as BYJU's by both
21 sides, being Think and Learn and its wholly owned
22 subsidiaries. And they were represented by
23 White & Case, and they -- there's a lot of documents
24 in the record with White & Case negotiating with the

CHANCERY COURT REPORTERS

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 172 of 410

Page 25

1  law firm on the other side, which was Linklaters.
2        THE COURT:   I suppose what I was
3  trying to figure out -- and again, when we do these
4  trials on a paper record, and especially because I
5  only have one round of briefing, you-all know a lot
6  more than I do.  What I'm trying to figure out is,
7  I've heard you say, well, Mr. Ravindran, he signed
8  these things; he's disallowing responsibility.  The
9  responsibility goes up the chain to Think and Learn.
10  And to what extent was the significance or meaning of
11  these documents explored with Think and Learn
12  decision-makers in this action?
13        ATTORNEY CZESCHIN:   Well, again, other
14  than Mr. Ravindran, there were no other depositions of
15  the other side.  But Mr. Ravindran is a director of
16  Think and Learn.  And he's a founder of Think and
17  Learn, and he signs the documents.  I think he -- I
18  mean, he has authority at Think and Learn.  He just
19  didn't want to answer my questions.  So he just said
20  he didn't understand any of the documents.
21        So going on to the PowerPoint, if that
22  addressed Your Honor's concern.
23        THE COURT:   Thank you.
24        ATTORNEY CZESCHIN:   Again, as I said

Page 26

1  before, there were negotiations going on for an
2  extended period of time, and that's when all of these
3  amendments were being signed, as the parties were
4  trying to get to a negotiated resolution.  And during
5  that time period, the lenders had very legitimate
6  concerns.
7        And these were testified to and are in
8  the record, because they took the deposition of
9  Mr. Stephen Spencer, and he was the financial advisor
10  to the lenders from Houlihan Lokey.  And he was
11  involved in the negotiations when these amendments
12  were signed.  And he explained the concerns of the
13  lenders.
14        And the lenders were concerned by the
15  lack of financial reporting that they were getting
16  from the other side, and they were concerned about
17  potential performance issues at the company,
18  particularly cash flow.  They were worried that maybe
19  the cash flow wasn't what they initially had been
20  told, and they were worried that they weren't getting
21  updated financials and that the cash flow had been
22  declining.
23        And Mr. Spencer also said that the
24  longer it took them to provide financials -- they

Page 27

1  didn't get the audited financials on time, and they
2  weren't getting compliant quarterly financials.  So he
3  makes clear in these quotes on the slide that as a
4  financial professional, and the lenders as lenders,
5  the longer this went on that they weren't getting the
6  information from BYJU's, the more concerned they
7  became about the financial condition of the company.
8        And I think that's a very
9  legitimate -- legitimate concern on behalf of the
10  lenders.
11        So then, eventually, the parties had
12  been discussing for over eight months, and the
13  negotiations had just ceased to be productive.  So the
14  "Required Lenders" -- and that's a defined term in the
15  credit agreement, and it means lenders holding more
16  than 50 percent of the outstanding term loans.
17  Remember, the loan is syndicated, so there's a lot of
18  different holders, and you have to get more than
19  50 percent to sign on to direct GLAS to exercise
20  contractual remedies.
21        So on March 3rd, they go ahead and do
22  that.  And GLAS then sends to BYJU's a notice of
23  default and a notice of acceleration.  And upon the
24  delivery of that document is when the principal

Page 28

1  balance of the term loans, which was nearly
2  $1.2 billion, became due and payable immediately.
3        And then we go to the next slide --
4        THE COURT:   Before we move on, could
5  you explain to me your understanding of BYJU's ability
6  to disqualify lenders up until this point.
7        ATTORNEY CZESCHIN:   Sure.  Under the
8  credit agreement, there is a disqualification
9  provision.  And they are able to send a notice, I
10  believe, to GLAS and identify a lender that they want
11  to be disqualified.  They never did that during this
12  entire eight months of negotiation.  Even though, you
13  know, today they're saying, oh, the lenders were being
14  mean to us, they were oppressing us, they were acting
15  like vulture funds; they had the power back then to
16  disqualify lenders, or at least try to disqualify
17  lenders.  They didn't do it.
18        THE COURT:   Did any of the amendments
19  speak to the power to disqualify?
20        ATTORNEY CZESCHIN:   None of the
21  amendments took that power away.
22        THE COURT:   Did they speak to it?
23        ATTORNEY CZESCHIN:   I don't know.  I'd
24  have to double-check, Your Honor, but I'm pretty sure

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 173 of 410

Page 29

1  that they don't take that power away.  I will confirm
2  whether or not there's any mention of the
3  disqualification in the amendments.
4           But they didn't exercise that right
5  until after this litigation was filed.  After the
6  litigation was filed, a couple months after, they
7  purport to send a notice of disqualification.  But
8  during the time period when they say the oppression
9  was happening, they didn't do anything to exercise
10  their disqualification right that, you know, could
11  affect the lender's rights.  So I think that's
12  significant as to the merits of their duress
13  arguments.
14           So moving on to the next slide.
15           The notice of default -- so the notice
16  of default, when it gets delivered, it has a number of
17  effects.  One is it causes the loan to accelerate.
18  But the other is that it's a trigger event under the
19  security agreement and the pledge agreement.  So when
20  that notice of default gets delivered, GLAS becomes
21  authorized to vote all of the pledged shares.  And the
22  pledged shares are 100 percent of the stock of BYJU's
23  Alpha.
24           Now, in the documents, BYJU's Pte. --

Page 30

1  which is the direct parent of BYJU's Alpha, and then
2  Think and Learn is above that -- BYJU's Pte. also said
3  in the documents that it irrevocably appoints GLAS as
4  its attorney-in-fact to take all actions necessary to
5  accomplish all purposes of the pledge agreement.  And
6  then, in Section 7.1 of the pledge agreement, it
7  expressly says that GLAS has the power to transfer all
8  or any portion of the pledged collateral to its own
9  name.
10           And then we go to the next slide and
11  we see that GLAS actually goes ahead and does each of
12  these things.  It completes a stock certificate that
13  had been provided in the documents in blank form; it
14  goes ahead and fills it out.  It fills out a stock
15  power and it delivers it to BYJU's, which transfers
16  the shares to GLAS.
17           In case that transfer was delayed in
18  being recognized, they also signed a -- an irrevocable
19  proxy appointing GLAS as BYJU's attorney-in-fact, with
20  power over the shares.  They then sign a stockholder
21  written consent that removes Mr. Ravindran and
22  appoints Mr. Pohl, and then Mr. Pohl, as the sole
23  director, signs a written consent that, again, removes
24  Mr. Ravindran as an officer and appoints himself.

Page 31

1           And those are the mechanical steps
2  that he talked about at the beginning, the point
3  number 2.  And unlike a lot of Section 225 actions
4  where you talk about the mechanical steps, there's no
5  challenge from the other side as to how GLAS went
6  about executing under the documents.  So that is not
7  an issue in this case.
8           So then we go on.  After the exercise
9  of remedies -- so after we sent them the notice that
10  there was a default and an acceleration of the loan,
11  and that Mr. Riju Ravindran was removed -- Mr. Byju
12  Raveendran, who is Riju's brother and is the founder
13  and CEO of the whole company BYJU's, he requests that
14  negotiations start up again.  So the parties say, the
15  lenders say, okay, we're happy to negotiate.  And they
16  start negotiating again for several weeks.  And during
17  that period, the plaintiffs determine that it didn't
18  make sense to file the lawsuit if there were
19  productive negotiations going on.  And Mr. Pohl
20  testified to that.
21           And so they delayed in filing the
22  lawsuit so that these discussions could go on between
23  the parties, but by May 3rd, those discussions had
24  failed again, and so the plaintiffs go ahead and file

Page 32

1  this action.
2           And then just one significant
3  post-filing event that occurred is that Mr. Pohl, once
4  he comes in as the designated sole director under the
5  status quo order, he gains access to the bank
6  accounts, and he discovers that each of the accounts
7  has less than a million dollars in it.  And as a
8  result, BYJU's Alpha, which is the borrower entity,
9  wasn't able to pay the next interest payment on the
10  loan that was due on -- at the end of May, and then
11  there's a grace period of so many days that ran into
12  early June.  And that was a $38 million interest
13  payment that was due.  And he wasn't able to pay it.
14           So he sent a letter to the Think and
15  Learn team and said, hey, I don't have the money to
16  pay this.  Are you guys, as guarantors, going to pay
17  it?  And they never wrote back.  And then the date
18  comes and goes, and that interest payment was not
19  made.  GLAS, therefore, sent a supplemental notice of
20  default and executes a new written consent confirming
21  the same actions that it took in the first written
22  consent, saying that Mr. Ravindran is removed and
23  Mr. Pohl is appointed.
24           So that's kind of the factual

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 174 of 410

Page 33

1    background of what happened here. And to turn to the
2    legal argument, again, we think that the key point is
3    that unambiguous agreements among sophisticated
4    parties ought to be enforced. And the defendants want
5    you, as the Court, to abandon that bedrock principle.
6              They ask you to ignore the amendments.
7    They pretend like they didn't exist. They misconstrue
8    some of the language in the original credit agreement.
9    They rely on this equitable exception that we think is
10   inapplicable here, from New York law. They raise a
11   duress argument. I don't think I've ever seen an
12   economic duress argument before. They raise
13   impossibility. And, finally, they rely heavily on
14   unclean hands, which is, I think, indicative of just
15   how weak their case is, if you are relying so heavily
16   on unclean hands when it clearly doesn't apply.
17             So going on to the next slide, just to
18   deal with the specific arguments that the other side
19   is making. Starting with their contract arguments,
20   they rely on this Section 111 of the credit agreement.
21   And Section 111 says that if there's a default that's
22   occurring because of the failure to provide
23   information by the required date, that shall --
24   provided that there has not been any acceleration of

Page 34

1    the loan, shall be deemed cured upon the delivery of
2    the information.
3              So this is a provision of the credit
4    agreement that says, for delivery of financial
5    information, for example, there is only a 45-day cure
6    period in the contract, if you look at Section 8.1.
7    And this says, well, if you miss that cure period, you
8    can still cure after that date goes by or it will be
9    deemed cured if you actually provide the information.
10   And they rely heavily on this to say, well, this means
11   that we didn't default by not providing you the
12   information because we're able to cure at any time.
13             But what they ignore is Amendment
14   No. 7 that we looked at earlier. And Amendment No. 7
15   says, no, none of the specified defaults can be cured
16   or remedied or deemed to be cured or remedied after
17   the date of that amendment.
18             So Amendment No. 7 trumps Section 111.
19   It's a very specific provision and specifically says
20   that you can no longer cure. Too much time has gone
21   by. And this -- this is such an important point. I
22   want to stress this. This is such an important point
23   in Amendment No. 7 that they include it four times.
24             Sean, if you could pull up Amendment

Page 35

1    No. 7.
2              I will show you that this provision
3    appears four times in the agreement.
4              Amendment No. 7. I forget the JX
5    number. 187. Can you go to the front page just to
6    make sure we're on the same document.
7              All right. So this is Amendment
8    No. 7. And then if you go to page 6. Page 6, you see
9    what we looked at before, 3(a)(ii), there's a
10   reference that "none of the Specified Defaults as
11   referred to in [] Amendment No. 2 can be cured or
12   remedied ... following the date of this
13   Agreement ...."
14             That trumps Section 111. And that's
15   so important that they include it again on page 11.
16   Let's go to page 11. And you see Section 5(h) at the
17   top of that page. And, there again it says, "none" --
18   if you look down at the bottom of that paragraph --
19   about the middle of the paragraph, "none of the
20   Specified Defaults can be cured or remedied (or deemed
21   to be cured [and] remedied) until specifically waived
22   by the [] Lenders ...."
23             So they put it in there a second time.
24             Then let's go to the next page, and

Page 36

1    you have Section 6(c). And let's blow up that
2    all-caps language at the bottom of that paragraph.
3              So the all-caps language at the bottom
4    says, "The parent guarantor (for itself and as agent
5    for the other loan parties ...)" -- that would be
6    Tangible Play and BYJU's Alpha -- "hereby irrevocably
7    and unconditionally waives in all respects any right
8    that may exist now or in the future under the credit
9    agreement or any other loan document or at law or in
10   equity to cure any of the Specified Defaults []
11   referred to in [] Amendment No. 2."
12             So they lost their cure right, and
13   they very, very clearly put it in this agreement.
14             And, Sean, if you could bring that --
15   close that box.
16             And if you look at just the very next
17   paragraph, 7(a), you have the same point again for a
18   fourth time. None of the specified defaults can be
19   cured or remedied following the forbearance effective
20   date, unless waived by the required lenders.
21             So it was so important to them that
22   they were trumping Section 111, that the other side
23   relies on, they put it in the amendment four times.
24             If we could go back to the PowerPoint,

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 175 of 410

Page 37

1  Sean.
2          So their Section 111 argument also
3  fails, because by the terms of Section 111 itself, it
4  doesn't apply once the loans are accelerated. And
5  here, the loan has been accelerated. The notice of
6  acceleration was sent on March 3rd. And there hasn't
7  been any cure. As we stand here today, they haven't
8  provided us the audited financial statements. They
9  haven't provided us the quarterly information that
10  they failed to provide. And they haven't had Whitehat
11  accede to the agreement. So all of the defaults are
12  still in effect. They've never been cured. And
13  there's been an acceleration of the loan. So even
14  without Amendment No. 7, this Section 111 does not
15  apply.
16          So that takes us to their next
17  contract argument. The next provision that they --
18  lost it. There it goes.
19          The next provision that they rely on
20  in the contract is Section 5.17(d). And this is in
21  the original credit agreement. And this concerns the
22  Whitehat India guarantee. It's the requirement that
23  Whitehat India sign on as an additional guarantor by
24  April 1st, 2022. And they rely on the first sentence

Page 38

1  here that says, "Without prejudice to the Guarantee
2  Maintenance Requirement, the Parent Guarantor will use
3  its reasonable commercial efforts to procure the RBI
4  Approval on or prior to April 1, 2022 ...."
5          And "RBI Approval," that refers to the
6  Reserve Bank of India. That's a governmental entity
7  in India that has to approve whenever an Indian entity
8  signs on for a loan or a guarantee of this magnitude.
9  And so they rely on that sentence, and then they also
10  rely on the second sentence. But let's focus on the
11  first sentence first.
12          They say, well, we only had to use
13  commercial reasonable efforts. But what they -- and
14  they say that so long as they used commercially
15  reasonable efforts, there can be no breach. But
16  there's a significant difference between the efforts
17  that they had to use and the outcome that they agreed
18  to in the contract.
19          While they didn't have to use more
20  than commercially reasonable efforts, Section 5.9 is
21  clear that if -- well, that the guarantee has to be
22  delivered by April 1, 2022. If it's not delivered by
23  April 1, 2022, that's a breach. And you actually see
24  that in the second sentence of this provision, Section

Page 39

1  5.17, which the other side relies upon. They actually
2  quote this in their brief. And they say that it says,
3  "For avoidance of doubt, [] any failure to obtain the
4  RBI approval prior to April 1, 2022 ... shall not
5  cause a breach of the Guarantee Maintenance
6  Requirement or require any mandatory prepayment of the
7  Term Loans ...."
8          And they cite this as if it's helpful
9  for them, but it's not. Because what it says is that
10  if you fail to get this guarantee prior to April 1,
11  it's not a breach. It doesn't say anything about on
12  April 1 or after April 1. The obligation under the
13  contract is to get the additional guarantee by
14  April 1. If you don't get it by April 1, it's a
15  breach. That's the only way to read the language.
16  This is referring to prior to April 1, it's not a
17  breach.
18          THE COURT:  Can you back up on this
19  point.
20          ATTORNEY CZESCHIN:  Sure.
21          THE COURT:  And just explain to me
22  your broader theory of how 5.9(c) and 5.17(d) either
23  work together or don't.
24          ATTORNEY CZESCHIN:  Yeah. They work

Page 40

1  together because in 5.9(c), it says that the Whitehat
2  entity must accede to the guarantee and become an
3  additional guarantor by April 1. It is a
4  hard-and-fast date that was negotiated by the parties.
5          THE COURT:  April 1. And then it says
6  "and" within five business days of the date RBI
7  approval is received.
8          ATTORNEY CZESCHIN:  Right. It's the
9  earlier of. So it's April 1 or the earlier of five
10  business days after RBI approval. So that means that
11  you have to have it, at the latest, by April 1.
12          And that is a hard-and-fast date that
13  the parties negotiated. And we have a document
14  concerning the negotiations, where we show that the
15  parties -- the lenders wanted that guarantee up front
16  because a lot of the subsidiaries provide guarantees.
17  Again, BYJU's Alpha, the borrower, is just a shell
18  company. So it was important to get guarantees from
19  the other subsidiaries. And we got a bunch of
20  guarantees from other subsidiaries, like Tangible
21  Play.
22          And the lenders wanted a guarantee
23  from Whitehat because Whitehat is an operating
24  company. It had just been purchased by Think and

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 176 of 410

Page 41

1  Learn a few months earlier for $300 million. And so
2  it was important to get that guarantee from Whitehat,
3  and they wanted it on day one. But the parties
4  negotiated, the lenders agreed, that, well, you can
5  have until April 1 to get us that guarantee. And that
6  is a hard-and-fast date.
7        What Section 5.17 refers to is, well,
8  you have to use reasonable commercial efforts to try
9  to get the approval, and if you don't get it before
10  April 1, that's not a breach. But it doesn't say
11  anything about what happens on April 1. What happens
12  on April 1 is what's in 5.9(c).
13        I just want to make sure that Your
14  Honor doesn't have any more questions about that.
15        THE COURT:  This is probably a really
16  basic question. 5.17(d), when it says it "shall not
17  cause a breach of the Guarantee Maintenance
18  Requirement or require any mandatory prepayment of the
19  Term Loans ...," are either of those coterminous with
20  5.9(c)?
21        ATTORNEY CZESCHIN:  Sorry. I'm just
22  trying to get -- what was the language Your Honor is
23  on?
24        THE COURT:  It's the "any failure to

Page 42

1  obtain the RBI approval prior to April 1 ... shall not
2  cause a breach of ...," and then there's two things
3  that are enumerated: the guarantee maintenance
4  requirement, and then it says, and it shall not
5  "require any mandatory prepayment of the term loans."
6        ATTORNEY CZESCHIN:  Right.
7        THE COURT:  So just to kind of unpack
8  what that means, is the guarantee maintenance
9  requirement, is that 5.9(c), or is that something
10  else?
11        ATTORNEY CZESCHIN:  That's something
12  else. That's the -- I think the -- there's a minimum
13  requirement of total amount of guarantee. We're not
14  arguing based on the guarantee maintenance
15  requirement. But it is still a breach of 5.9(c),
16  because there was a specific obligation by the
17  borrower to get this additional guarantee by April 1.
18        THE COURT:  Well, that's what I'm
19  trying to figure out. Okay. So let me stop before we
20  move on to that.
21        My second question in 5.17(d), "any
22  failure to obtain [] RBI approval ... shall not ...
23  require any mandatory prepayment of the Term
24  Loans ...."

Page 43

1        ATTORNEY CZESCHIN:  Yep.
2        THE COURT:  Is that acceleration?
3        ATTORNEY CZESCHIN:  That's
4  acceleration. And that's what happened here. But
5  that exception that Your Honor is reading from, if you
6  look at the language, it says prior to April 1, 2022.
7  It doesn't say anything about on April 1, 2022. On
8  April 1, 2022, and thereafter, it is a breach. And
9  that's how Section 5.17 --
10        THE COURT:  In a world in which parent
11  guarantor used reasonable commercial efforts and it
12  just didn't work out, where does it say that that's a
13  breach?
14        ATTORNEY CZESCHIN:  Well, then you go
15  back to 5.1(c). 5.9(c). Sorry, 5.9(c). That says,
16  "On [or] from the earlier of [] April 1, 2022 [or] []
17  within five Business Days of ... RBI approval ...."
18  So "the earlier of" would mean -- because they didn't
19  get RBI approval. That's the issue, that they're not
20  able to get RBI approval, they say. And, therefore,
21  "the earlier of" would be April 1. And that's --
22  that's a breach, if you don't have it by April 1.
23        And they can't rely on 5.17, because
24  that's just saying the failure to get it before

Page 44

1  April 1 isn't a breach. And that's because the
2  lenders originally wanted this on day one. They
3  originally wanted this guarantee on November 24th,
4  2021. But they agreed to push the date out to
5  April 1.
6        They later, also, in Amendment No. 1,
7  they push it out another six months to October 8th.
8  But they wanted that guarantee. And the failure to
9  get that guarantee is a breach under 5.9(c).
10        THE COURT:  So I agree with you that
11  Whitehat India not acceding to the agreement by
12  April 1, or the other deadline under RBI approval, is
13  a breach. What I'm not quite understanding is how you
14  read the covenant to use reasonable commercial efforts
15  in 5.14(d) to say that if -- let's pretend that they
16  did use reasonable commercial efforts -- why a failure
17  to procure RBI approval is itself a breach.
18        ATTORNEY CZESCHIN:  So what the
19  parties agreed to in 5.17(d) is because the lenders
20  wanted this as soon as possible, that they had to use
21  commercially reasonable efforts to try to get it. And
22  so that's what they had to do in that period up until
23  April 1. If they weren't using commercially
24  reasonable efforts, that would have been a breach even

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 177 of 410

Page 45

1  before April 1. But it doesn't say anything -- that
2  doesn't mean that if you get to April 1 and you don't
3  have the guarantee, that it's not a breach.
4          THE COURT:   But I think your position
5  requires something slightly different, which is for
6  you to show me in this contract that the mere fact of
7  not having RBI approval by April 1 is a breach.
8          ATTORNEY CZESCHIN:   And that is
9  5.1(c). That's --
10         THE COURT:   5.9(c)?
11         ATTORNEY CZESCHIN:   5.9(c), yes.
12 5.9(c). It says on the earlier of April 1 or five
13 business days from RBI approval. That's a
14 hard-and-fast deadline that the parties agreed to.
15 And we refer to a document in the negotiations -- I
16 think it's JX No. 8 at page 3 -- that shows that the
17 parties agreed that that was a hard-and-fast date.
18         THE COURT:   Again, I follow you there,
19 that April 1 is a hard-and-fast date. But it seems to
20 me that there's kind of a black box between -- I think
21 we agree they have an obligation to use RCEs on or
22 before April 1 to get that approval. And I think we
23 also agree that RBI approval is sort of a
24 prerequisite, if you will, to Whitehat India acceding

Page 46

1  to the agreement and that if Whitehat India does not
2  accede, that is a breach. But that intermediate step
3  of RBI approval itself being a breach, the lack of RBI
4  approval by April 1 being a breach, that's where I'm
5  not quite seeing that jump off the page to me.
6          ATTORNEY CZESCHIN:   Yeah, no. The
7  lack of RBI approval is not the breach. The breach is
8  the failure to get the guarantee.
9          THE COURT:   Okay. Thank you.
10         ATTORNEY CZESCHIN:   Sorry if that
11 wasn't clear before. And that's the breach under
12 Section 5.9(c), and there's nothing in 5.17(d) that
13 trumps that very clear deadline in 5.9(c).
14         THE COURT:   But the breach -- sorry.
15 This poor dead horse. Just the absence of RBI
16 approval on or before April 1, 2022, that's not the
17 breach; that's not the default. It's Whitehat India
18 not acceding. And perhaps that happened because they
19 didn't have RBI approval.
20         ATTORNEY CZESCHIN:   Exactly. That is
21 correct.
22         THE COURT:   All right. Thank you.
23         ATTORNEY CZESCHIN:   Okay. Going on
24 to -- another reason why their Section 5.17(d)

Page 47

1  argument doesn't work is the amendments that we looked
2  at earlier. The amendments define as part of the
3  specified defaults their failure to have Whitehat
4  accede to the loan by April 1.
5          If we, you know, go back to Amendment
6  No. 2, Sean -- that is JX 168 -- and if you take a
7  look at page 2 or -- well, page 1 first. Sorry. Do
8  you see that it says "Specified Defaults," and it has
9  an (a), a (b), and if you go to (c) on page 2, one of
10 the specified defaults is "the failure of Whitehat
11 India to accede to this Agreement and [to] the []
12 Guarantee [] as a Guarantor ...." So the other reason
13 that their reliance on Section 5.17(d) doesn't work is
14 because they've already agreed that their failure to
15 get the -- the guarantee from Whitehat is a specified
16 default in the amendments.
17         And again, as I mentioned, the record
18 shows, this was an intentionally negotiated point, and
19 we refer to JX 8 at page 3.
20         So if Your Honor doesn't have any
21 other questions on that 5.17 point, I will go forward.
22         THE COURT:   No. Thank you.
23         ATTORNEY CZESCHIN:   Okay. So if we go
24 back to the PowerPoint, so those are all of their

Page 48

1  contract arguments, 111 and 117(d). Then they switch
2  to these extra-contractual arguments. And the first
3  one is that they rely on an equitable doctrine in New
4  York that trivial defaults can't support the
5  acceleration of debt. But that just simply isn't
6  applicable here. Here, equity should not intervene
7  where you have a sophisticated party who expressly
8  agreed that the conduct at issue constitutes a
9  specified default. And they expressly agreed that
10 that default provides for acceleration.
11         All -- none of the cases that they
12 cite to have a situation in which the borrower had
13 agreed that the conduct at issue was, indeed, a
14 default and was, indeed, something that entitled
15 acceleration. Most of their cases, frankly, in
16 the landlord-tenant area, where somebody fails to make
17 a payment on time, and they say, well, the landlord
18 can't kick you out.
19         This is a very, very different
20 situation between highly sophisticated parties,
21 represented by sophisticated counsel. And they
22 entered into an agreement that says these things are
23 defaults and that these things entitle acceleration.
24 So I think it's a very different situation.

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 178 of 410

Page 49

1        THE COURT:   So let's pretend for a
2   moment, which I understand is not your position, that
3   these are trivial defaults and that they under New
4   York law would not support acceleration of the debt.
5        ATTORNEY CZESCHIN:   Okay.
6        THE COURT:   Do you have any authority
7   in New York law that says that that conclusion can
8   effectively be contracted around?
9        ATTORNEY CZESCHIN:   Yes, we have a
10  number of cases that we cite to in our brief, and I'm
11  going to get to, that say where you have sophisticated
12  parties, that you shouldn't be applying that
13  principle; and that even -- even a relatively minor
14  breach or a breach, in particular, of failing to
15  provide financial information, what we have here, at
16  least for three of the instances, is something that
17  can accelerate the debt.  There's a number of cases
18  that say that.  I don't think any of those cases have
19  a situation where they later amended and admitted to
20  the defaults.  But they certainly recognized the
21  principle that sophisticated parties should be held to
22  the language of their agreement.
23       THE COURT:   But that line of law
24  starts sort of *ab initio* from this to say we shouldn't

Page 50

1   even engage with this idea of trivial defaults and
2   acceleration because these are sophisticated parties,
3   as opposed to let's pretend that we sort of started
4   down that road, and then an amendment said, you know
5   what, I will agree that this is a default that would
6   support acceleration.
7        ATTORNEY CZESCHIN:   Right.  And there
8   are some cases -- I take that back.  There are some
9   cases that we had where someone would sign an
10  acknowledgment of a default after the fact, and the
11  court says, too bad.  You signed an acknowledgment.
12  It's over.  If you sign an acknowledgement of the
13  default, then game over; we don't need to talk about
14  the materiality of the breach because you've admitted
15  that it is a material breach in a subsequent document.
16  So I had forgotten about that.  There are some cases
17  that say that.
18       We also don't think their position
19  holds water just under the original agreement.  So the
20  first bullet point here is referring to the specified
21  default in the amendments.  The second bullet point is
22  referring to the agreement itself, the original credit
23  agreement.  That agreement has clauses where certain
24  breaches don't provide the right to accelerate the

Page 51

1   debt.  5.17(b), another paragraph that we didn't look
2   at.  But that language is absent from the financial
3   reporting covenants, and it's absent from the Whitehat
4   guarantee.  So we think even the language of the
5   original agreement.
6        And here are the cases that I was
7   referring to, Your Honor.  So this is just a sampling
8   of cases.  We have several more in our brief.  And it
9   says that under New York law, the failure to provide
10  timely and complete financial reporting is material.
11  And there's a case from the New York appeals court
12  that finds a nonmonetary breach, including failure to
13  provide financial reporting, was material.
14       And the *Natixis* case, the second one
15  cited there, is particularly on point.  And I just
16  wanted to read from it so Your Honor can see what the
17  New York law is.  It says, "To be sure, 'in rare
18  cases, agreements providing for the acceleration of
19  the entire debt upon the default of the obligor may be
20  circumscribed or denied enforcement by utilization of
21  equitable principles ....' But '[i]n the vast
22  majority of instances,' '[a]bsent some element of
23  fraud, exploitive overreaching or unconscionable
24  conduct on the part of the [creditor] to exploit a

Page 52

1   technical breach, there is no warrant, either in law
2   or equity, for a court to refuse enforcement of the
3   [parties' agreement]' .... Even if [the] 'provisions
4   requiring strict compliance ... turn[] out to be
5   harsh,' they 'must be enforced' as 'important,
6   negotiated term[s] of the agreement' ...."
7        And the Court notes that "['h[olding]
8   that the doctrine of insubstantial or de minimis
9   default has no application in measuring the
10  performance of the terms of commercial paper'] ....
11  ['[T]he "technical" nature of [the] default does not
12  change the fact that Defendants defaulted under the
13  Agreements ... A default is a default is a
14  default.']."
15       And so that's when you're dealing with
16  sophisticated parties, you've got to hold them to the
17  letter of the agreement.
18       The next point is, they're trying to
19  argue that these things are not material.  But they --
20  it's hard to imagine a more material breach than
21  failing to provide the audited financial statements.
22  Mr. Ravindran did admit at his deposition that audited
23  financial statements are important to investors and to
24  lenders.  And then we have another event that happened

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 179 of 410

Page 53

1  just last -- or in June, I guess. The outside audit
2  firm for BYJU's, which is Deloitte, they resigned.
3  And they resigned because the financial statements
4  were long delayed.
5              Sean, if you could bring up JX 311.
6              ATTORNEY KORPUS:   Your Honor, I'm
7  sorry. Sheron Korpus. I don't want to interrupt
8  Mr. Czeschin's presentation. We do have objections to
9  introducing evidence after the time that Mr. Pohl
10 purportedly took over the company. But given that
11 this is a paper trial, I intend to just address that
12 in my presentation. I didn't want to waive any rights
13 by not ...
14             THE COURT:   Thank you.
15             ATTORNEY CZESCHIN:   So, Your Honor, in
16 June, here you see a letter. This is a public
17 document. Deloitte in June, just over a month ago,
18 resigns as the auditor. They say, "We have been
19 appointed [] statutory auditors [for] Think & Learn
20 Private Limited ...." If you skip down there, for a
21 five-year period, commencing on April 1, 2020, to the
22 financial year March 31, 2025. So they are in the
23 middle of their term as auditor.
24             But then if you go down to the second

Page 54

1  paragraph, they say, "The financial statements of the
2  Company for the year ended March 31, 2022 are long
3  delayed." That's the same thing we're complaining
4  about in our action. They further say that -- you go
5  to the next sentence -- "We have also not received any
6  communication on the resolution of the audit report
7  modifications in respect of the year ended
8  March 31" -- that's the prior year -- "March 31, 2021,
9  [the] status of [the] audit readiness of the financial
10 statements and the underlying books and records for
11 the year ended March 31, 2022" -- that's the
12 information that we haven't gotten yet -- "and we have
13 not been able to commence the audit ...."
14             This is just a month ago, and they
15 haven't even been able to commence the audit that is
16 already ten months overdue under the credit agreement.
17 And they go on to say, "As a result, there will be
18 significant impact on our ability to plan, design,
19 perform and complete the audit in accordance with the
20 applicable auditing standards.
21             "In view of the aforesaid, we are
22 tendering our resignation as statutory auditors of the
23 Company with immediate effect."
24             So we've been waiting over ten months

Page 55

1  for these audited financials, and now their auditor
2  just resigned because of the audited financials being
3  delayed. That is clearly material. In fact, if we
4  can go back to the slide, on the same day, or on or
5  about the same day -- maybe a day one way or the
6  other -- that Deloitte issued its resignation, all of
7  Think and Learn's outside directors resigned from the
8  board. There were three of them. And they all
9  resigned at the same time that Deloitte resigned. And
10 that leaves on the board only Mr. Riju Ravindran,
11 Mr. Byju Raveendran, and his wife. And we think it
12 lacks credibility to say that those things were not
13 connected, given that they happened on the same day.
14             So I think that this shows plainly
15 audited financials are important. Audits matter. You
16 have an outsider come in and look at the books and
17 records. You are not relying solely on the company.
18 And they are not able to give us anything that's been
19 audited from outside, and the auditor itself has
20 walked away.
21             That is material, and that's why you
22 have covenants in the credit agreement that say
23 lenders are entitled to audited financials, so that
24 they have the comfort that a recognized firm -- and it

Page 56

1  actually says in the credit agreement, it has to be a
2  reputable, large audit firm, like Deloitte, that signs
3  off on the numbers. They can't give that to us, and
4  they haven't been to able to give it to us for over
5  ten months. And they're not going to be able to give
6  it to us. At his deposition he said, well, we think
7  we can get it to you by the end of September, but we
8  will see if that actually happens. They have been
9  saying things like that for some time.
10             I just want to finish up on the last
11 few things. The other defaults are also material. We
12 can go through those quickly. It's important to get
13 adequate financials on a timely basis. And,
14 obviously, the failure of Whitehat to accede to the
15 guarantee is important.
16             Defendants also have this economic
17 duress point. It's in their briefs, in the background
18 section, but they actually don't even make a legal
19 argument for economic duress. And if you look at the
20 case law in New York that we cite, it's an incredibly
21 high burden to get out of your contract on economic
22 duress, which they don't even try to meet. So I
23 think, frankly, the argument is waived, but they don't
24 meet it.

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 180 of 410

Page 57

1    They don't have a witness. They don't
2    have Mr. Ravindran here in court today. And he didn't
3    testify beyond -- or with any detail as to this duress
4    point at his deposition.
5        If you are claiming duress, you have
6    an obligation to promptly bring up the duress argument
7    and repudiate the contract under New York law. They
8    never did that. They're claiming that all seven or
9    all eight of these amendments were signed under
10    duress. Well, they never raised duress until the
11    litigation was filed. And you can't do that. You
12    can't wait.
13        THE COURT:    What's the authority for
14    that?
15        ATTORNEY CZESCHIN:    There are New York
16    cases cited in our brief that say if you are going to
17    claim duress, you must act to repudiate the contract
18    promptly. I can find the cites for Your Honor when we
19    come back.
20        Also, the factual record here just
21    doesn't support duress. The lenders provided repeated
22    forbearances and extensions. This has been going on
23    for over a year at this point. That's not a situation
24    where you are under duress. There are actually cases

Page 58

1    that say where the lender was providing extensions and
2    forbearances, that's not a lender acting in a manner
3    that's causing economic duress.
4        Finally, the New York law says that
5    the risk that a party might exercise its contract
6    rights isn't a basis for duress. And Mr. Ravindran
7    said, well, what he was referring to when they say
8    "duress" in their brief is the risk that GLAS would
9    exercise remedies. Well, as a matter of law, the risk
10    that somebody is going to exercise their contract
11    rights is not duress.
12        This is what I was talking to -- or
13    talking with regards to earlier; that there are some
14    cases that I will get for Your Honor that says if a
15    borrower acknowledges a default in writing, then it's
16    waived to come back later, and it should be estopped
17    from coming back later and saying that that default is
18    somehow invalid. And that's exactly what we have
19    here.
20        We also have a situation that they
21    never told us when we entered into these amendments
22    and the lenders gave them these extensions and
23    forbearances, they never told us, hey, we don't think
24    this is really valid. They took the forbearance.

Page 59

1    They took the extension. That was valuable
2    consideration for them. It gave them the opportunity
3    to try to go out and raise financing. It gave them
4    the opportunity to try to negotiate an amendment to
5    the credit agreement. And they never said, well,
6    we're acting under duress until we get to this
7    litigation.
8        Defendants also can't excuse the
9    Whitehat India default on the basis of impossibility.
10    This is an issue, we put in affidavits, both sides,
11    from experts in law in India. And the other side says
12    that, well, on August 22nd, the RBI adopted new
13    regulations that effectively made it impossible for
14    Whitehat India to accede as an additional guarantor.
15        Well, there's several problems with
16    that argument. They say, therefore, we can't do it,
17    so legal impossibility. The first problem with that
18    argument is the doctrine of impossibility only applies
19    to unforeseen, intervening events. And here, two
20    months after the new RBI obligations were put in place
21    is when they signed up the first of the amendments
22    that recognizes the specified defaults, including the
23    failure of Whitehat to accede to the guarantee.
24        So it wasn't an intervening event.

Page 60

1    It's something that had already happened. So the
2    doctrine of impossibility doesn't apply on its face.
3        Also, even putting aside the
4    amendments, it was foreseeable, this rule change was
5    foreseeable at the time the original credit agreement
6    was entered into on November 24, 2021. That's because
7    a few months earlier, in August of 2021, the RBI
8    posted online new proposed regulations. And those new
9    regulations omitted the language that permits a
10    subsidiary to borrow net worth from their parent. And
11    it's that omission, it's that change in the law that
12    supports their legal impossibility argument. So that
13    was something that was certainly knowable and, we
14    believe, likely known at this time.
15        Also, it's clear that just the
16    parties, as you saw in the contract, recognized that
17    there was a risk that you might not get RBI approval.
18    And that risk was assumed by the other side. If they
19    didn't get the RBI approval by the date specified in
20    the contract, that's a risk that they assumed. And it
21    doesn't matter what the reason is. Because that was
22    an identified risk.
23        They also, as I said at the beginning,
24    they have this unclean hands argument that they

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 181 of 410

Page 61

1  basically say that it was unclean hands for us to file
2  this action at all in Delaware under Section 225. I
3  think that is just plainly wrong. Section 225
4  provides a legal mechanism for exactly this type of
5  lawsuit.
6           They have this whole vulture lender
7  story, but it's really just lawyer argument. It's
8  unsupported by any evidence. The actual facts show
9  that BYJU's consented to the participation in the term
10  loans by the lenders that they now call distress debt
11  lenders.
12          So when a lender comes into the debt,
13  and when the original lenders came into the debt,
14  BYJU's has to consent to them coming into that debt as
15  an original lender. And they signed something called
16  a master consent. And in that master consent, they
17  consent to Redwood, which is the lender they focus
18  most on, becoming a lender. There's no question about
19  that.
20          And as I said before, when that
21  oppressive treatment that they're talking about was
22  allegedly happening, they didn't try to exercise their
23  disqualification rights. They didn't do anything
24  until after the litigation was filed. So I think the

Page 62

1  unclean hands argument is clearly wrong.
2           So that just takes us back to the key
3  legal principle, sophisticated parties should be held
4  to their agreement. Here, we clearly have
5  sophisticated parties and sophisticated counsel.
6           And then the last argument from the
7  other side is that this is not a proper forum, the
8  forum selection clause. But that is plainly wrong.
9  So JX 21, Section 10.9(c) is the forum clause. And it
10  does have language that says the exclusive forum will
11  be New York.
12          But if you look at the bottom of the
13  paragraph it says, "Nothing in this Agreement or in
14  any other Loan Document shall affect [the] right that
15  any Agent" -- "Agent" is a defined term, it refers to
16  GLAS in its capacity as the "Collateral Agent" and the
17  "Administrative Agent" -- "or any Lender may otherwise
18  have to bring any action or proceeding relating to
19  this Agreement against any Loan Party or its
20  properties in the courts of any jurisdiction."
21          The language couldn't be more clear
22  that this does not bind GLAS and prevent this action.
23  And, in fact, if you go to the related agreements that
24  were signed on the same date as the credit

Page 63

1  agreement -- so the pledge agreement and the security
2  agreement. That's JX 18 and JX 19 -- they have
3  similar provisions. They all say that GLAS can sue
4  wherever it wants.
5           In fact, let's pull up JX 18. This is
6  the security agreement. Go to page 23. Paragraph 30,
7  "Enforcement." You see here they picked the courts of
8  Singapore to have exclusive jurisdiction. But then if
9  you go down to paragraph (c), it says,
10  "Notwithstanding paragraphs (a) and (b) above, the
11  Collateral Agent" -- that's GLAS -- "shall not be
12  prevented from taking proceedings relating to a
13  Dispute in any other courts with jurisdiction. To the
14  extent allowed by law, the Collateral Agent may take
15  concurrent proceedings in any number of
16  jurisdictions."
17          So all of the related documents that
18  were signed at the same time, the key agreements, have
19  this exception that allows GLAS to sue wherever GLAS
20  wants.
21          So if we go back to the PowerPoint,
22  there, the forum also -- argument also lacks merit
23  under Delaware law. Delaware law is actually that if
24  you are going to have an exclusive forum provision,

Page 64

1  the language has to be crystalline. It has to be
2  crystal clear, is what the courts say in Delaware, if
3  it's going to be exclusive for another jurisdiction.
4           And this is, by any measure, not a
5  crystal-clear provision. Well, it is crystal clear.
6  It's crystal clear that it says that GLAS can go
7  anywhere. But to the extent they're saying that it
8  means something different, it doesn't.
9           And, finally, the point is that
10  Mr. Pohl, my client, he's not a party to the credit
11  agreement. He's not closely related to the parties to
12  the credit agreement. He's not bound by the forum
13  selection clause, and he has an independent statutory
14  right to pursue this action.
15          THE COURT:  This is where I felt like
16  I was on the astral plane a little bit. Because
17  Mr. Pohl, obviously, when this was signed, he wasn't a
18  party. When this was signed, perhaps he wasn't
19  closely related. But he's here now in his capacity as
20  the sole director of one of the parties.
21          ATTORNEY CZESCHIN:  That's correct.
22          THE COURT:  And he's here not even *in*
23  *personam.* He's here in an *in rem* proceeding where
24  we're talking about sort of colloquially who sits in

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 182 of 410

Page 65

1  the seat of the director. And the director's seat is
2  the property that's here in Delaware.
3            ATTORNEY CZESCHIN:   Right.
4            THE COURT:   So I'm trying to figure
5  out, Mr. Pohl, he's not bringing this action in his
6  individual capacity; he's bringing it because he
7  thinks he's -- because he is, in fact, the incumbent
8  director of a party.
9            ATTORNEY CZESCHIN:   Well, I think he
10 is -- I think he's bringing it in his individual
11 capacity. He's bringing it as he's been appointed the
12 director and officer, and he's seeking to have that
13 confirmed. And I think that even though it's an *in
14 rem* proceeding, I think that is still in his personal
15 capacity.
16            THE COURT:   He's not saying, I,
17 Timothy Pohl, would really like to, you know. He's
18 doing it as the director. If he wasn't acting as a
19 director of BYJU's Alpha, he wouldn't be able to bring
20 the suit at all.
21            ATTORNEY CZESCHIN:   That's right. I
22 mean, he's -- he was an outsider. You know, he's a
23 sophisticated former attorney and investment banker.
24 He wasn't involved at all at the time the credit

CHANCERY COURT REPORTERS

Page 66

1  agreement was signed. But, you know, years later,
2  when the lenders and GLAS are thinking about
3  exercising their remedies and they want to remove the
4  director, they need somebody to put in the seat. And
5  so they found someone who has a stellar reputation,
6  like Mr. Pohl, and said, well, that's who we're going
7  to put in for our director.
8            And they contacted and asked him if he
9  was willing to do it. There was a negotiation.
10 You're going to hear something about that from the
11 other side. And he agreed to do it. And he has now
12 the statutory right to say that what he did, and what
13 GLAS did that put him in that office, is effective and
14 valid. And they can't tie him to the forum --
15            THE COURT:   He has that statutory
16 right, perhaps -- and this is sort of the odd thing
17 about 225s. He has that statutory right because he
18 has, I guess, a colorable claim that he is a BYJU's
19 Alpha director.
20            ATTORNEY CZESCHIN:   Yes.
21            THE COURT:   And so he's acting only as
22 a BYJU's Alpha director.
23            ATTORNEY CZESCHIN:   As someone with a
24 colorable claim to the office, yes. But he wasn't

CHANCERY COURT REPORTERS

Page 67

1  related at all to the credit agreement. He wasn't
2  around when the credit agreement was signed. You
3  know, he has nothing to do --
4            THE COURT:   But his rights to speak as
5  a director of BYJU's Alpha arise out of the credit
6  agreement.
7            ATTORNEY CZESCHIN:   That's true. But
8  if you're going to bind someone to a forum clause, the
9  law is pretty clear that they have to be related to
10 the contract. Just the fact that that contract may
11 give him some rights, but he wasn't related to it at
12 the time, it wasn't foreseeable -- I think one of the
13 standards is whether or not it was foreseeable.
14            THE COURT:   But I think what I'm stuck
15 on is whether what we're talking about are his rights
16 or BYJU's Alpha's rights, when we're talking about an
17 *in rem* proceeding brought by a human being acting as a
18 director of the entity.
19            ATTORNEY CZESCHIN:   Right. I
20 understand, Your Honor. I mean, there was -- there
21 was -- there was a case that we cite to -- Ms. Henry
22 just reminded me -- in New York, the *Pegasus Strategic
23 Partners* case, that found that a director was not a
24 director at the time of the stock purchase agreement,

CHANCERY COURT REPORTERS

Page 68

1  and, therefore, because he wasn't a director at the
2  time the company entered into this particular stock
3  purchase agreement -- it had a forum clause -- he
4  clearly wasn't closely related to that contract, and
5  he could not be bound by the forum selection clause.
6            THE COURT:   I buy that as far as it
7  goes, especially for personal rights that that
8  director might have. But, again, what I'm struggling
9  with is we are talking about the *res* is the seat of
10 BYJU's Alpha. BYJU's Alpha is the signatory, and
11 Mr. Pohl is the human actor who is bringing a
12 statutory claim to figure out -- an *in rem* claim to
13 see who should sit in the seat. But he's doing that
14 on behalf of BYJU's Alpha and is offering the *res*
15 before the Court, which is the director seat of BYJU's
16 Alpha.
17            Mr. Pohl -- I'm sure he is a very nice
18 guy -- he's not actually that relevant here. He's
19 sort of just a stand-in here.
20            ATTORNEY CZESCHIN:   Well --
21            THE COURT:   He's almost the agent for
22 the seat, in a weird way, when we're looking at this
23 225.
24            ATTORNEY CZESCHIN:   I'm not sure I see

CHANCERY COURT REPORTERS

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 183 of 410

Page 69

1  it that way. I think he is important. I think, you
2  know, he's the guy who the lender has decided would
3  become the fiduciary. And they did pick an
4  independent guy. He's not a patsy for them.
5       THE COURT:   I'm not saying that he is.
6  I'm just trying to figure out the relevance of
7  Mr. Pohl, the human living and breathing and walking
8  on this earth, to the 225, and the way that the forum
9  selection clause works, when what we're doing is an *in*
10 *rem* proceeding for a director seat of a signatory.
11      ATTORNEY CZESCHIN:   I don't think
12 there's any Delaware case that has ever held someone
13 to a forum selection clause when they were not at all
14 around at the time that contract was negotiated.
15      Now, I understand most of those don't
16 come up in the 225 context, and I'm not aware of one
17 in the 225 context. We can look quickly. But I think
18 it would be unprecedented to say that a guy that
19 wasn't even involved in any of this is somehow bound
20 by the credit agreement forum clause and can't
21 exercise his statutory right to file in Delaware
22 because he has a claim to the seat.
23      You would be going back years and
24 binding him to a contract that he had no knowledge of

Page 70

1  at the time. And I think that would just be very much
2  unprecedented.
3       THE COURT:   I think where we're maybe
4  finding some friction in our discussion is whether
5  this claim belongs to Mr. Pohl or whether this claim
6  belongs to BYJU's Alpha. And I understand he's the
7  petitioner, and I understand that in this context
8  BYJU's Alpha is sort of the nominal defendant in a
9  way.
10      ATTORNEY CZESCHIN:   Right.
11      THE COURT:   But if this *in rem*
12 proceeding is more affiliated with BYJU's Alpha than
13 it is with Mr. Pohl, as a human being, we don't look
14 at a signatory that's an entity and say, well, when
15 you signed this, Signatory, your directors were
16 different. And so now the directors who are causing
17 the signatory to take action, they weren't around at
18 the time this was signed. We still bind the entity,
19 regardless of who is exerting the rights of the
20 entity.
21      So I'm trying to sort of think through
22 that with regard to Mr. Pohl, who is asserting the *in*
23 *rem* proceeding for a director seat affiliated and only
24 relevant because it is a piece of BYJU's Alpha.

Page 71

1       ATTORNEY CZESCHIN:   Yes, I understand,
2  Your Honor. I think we just see it differently. I
3  think the other side is obviously arguing that he
4  isn't a director; that he's not in that capacity. And
5  the statute provides that any stockholder or any
6  person with a claim to the office can bring the
7  petition. And I view that as that's the right of that
8  individual to say, hey, I'm a director, and this is
9  what I want the Court to affirm.
10      So I think it is in his individual
11 capacity. I don't think it's something where he can
12 be bound to a contract from years before.
13      And also, just going back to what we
14 talked about previously, none of this matters, because
15 GLAS is not bound and any lender is not bound. And so
16 GLAS would be able to bring this action in this Court,
17 and they're the other plaintiff. So it doesn't
18 matter. It belongs in this Court. Their forum
19 selection provision just doesn't work. It doesn't say
20 what they say it says.
21      So then they also seem to be
22 suggesting that it's just wrongful, in a 225 action,
23 that Your Honor consider the underlying contract.
24 That's, of course, ridiculous. The *Hawk Investment*

Page 72

1  *Holdings* case is a very similar case to this one. A
2  creditor sought relief under Section 225, alleging
3  that there had been a default that triggered its right
4  to vote the company shares and replace the director.
5  And the Court considered the underlying contract and
6  found events of default. So you basically have a very
7  similar situation. And certainly, in lots of 225
8  actions, the Court examines some underlying document,
9  whether or not it's a stockholders agreement, whether
10 or not it's a purchase agreement. There's even been
11 one 225 case where they had to determine whether or
12 not a merger was valid in order to determine who the
13 board was. That's normal. That's what 225
14 proceedings are about.
15      So, again, just to wrap up, we think
16 that the contract is clear and unambiguous. We've got
17 sophisticated parties. They conceded the defaults,
18 and they conceded that we had the right to accelerate,
19 that GLAS had the right to accelerate.
20      Does Your Honor have any further
21 questions?
22      THE COURT:   No. Thank you.
23      Let's take a 15-minute recess.
24      (A recess was taken at 10:46 a.m.)

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 184 of 410

Page 73

1          (Resumed 11:03 a.m.)
2          THE COURT:    Thank you.  Please be
3 seated.
4          ATTORNEY KORPUS:    Good morning, Your
5 Honor.  Sheron Korpus, Kasowitz Benson Torres, for the
6 defendants.  Your Honor, I have just a small package
7 of some of the provisions from the agreement, but I
8 see that you've been taking notes on your binders, so
9 maybe you don't even need that.
10          THE COURT:    I've got more paper up
11 here.
12          ATTORNEY KORPUS:    I figured.  I
13 figured.  I don't even have a Sean here.  I'm a little
14 more old-fashioned.
15          Your Honor, we didn't need to be here
16 today.  This is a combination of a course of events
17 that has benefited no one and has put everyone's
18 investment at risk.  BYJU's has been a stellar
19 success.  It's the world's leading provider of online
20 education on both profit -- for-profit and nonprofit
21 basis.  It has grown fast and has raised capital to
22 achieve that growth.
23          What happened is that a group of
24 aggressive distressed debt investors who were not

Page 74

1 supposed to be in the deal in the first place have
2 created a series of what we believe are artificial
3 events of default based on what were, at most, minor
4 contractual breaches.  They thought they could use the
5 so-called default as leverage to get more and more
6 concessions from BYJU's.
7          When this whole process started,
8 before the notice of acceleration, notice of
9 enforcement was served, BYJU's has shown no financial
10 distress and made every single payment it was supposed
11 to make under this $1.2 billion agreement.
12          The group of lenders that calls
13 themselves the steering committee, it's dominated by a
14 few funds that were distressed debt funds, even though
15 the credit agreement provided that entities that are
16 primarily dealers in distressed debts are subject to
17 disqualification because they weren't supposed to be
18 in a deal like this.  And the steering committee
19 couldn't claim a payment default, because there was no
20 payment default.  So they latched onto a few alleged
21 breaches.  And you've heard about them today.  They
22 are the three breaches that Mr. Czeschin spoke about.
23 And as I will explain, none of them justifies, as a
24 matter of New York law, accelerating a $1.2 billion

Page 75

1 loan and activating a pledge to take over the
2 borrower.  I will go through them in detail.
3          Now, at first, the distressed debt
4 lender must have been pretty satisfied at its
5 hard-ball strategy, because BYJU's, fearing losing
6 investors and having to fight public litigation like
7 this, was scared off, and it was forced to enter into
8 these amendments and limited waivers that you've seen.
9          And what Mr. Czeschin didn't tell you
10 is that these amendments and waivers actually had fees
11 that netted the lenders almost $9 million in consent
12 fees and forbearance fees to which they weren't
13 originally contractually entitled.  And they also
14 received other contractual concessions worth tens of
15 millions of dollars.
16          But the problem is that this strategy
17 actually started to hurt the company and to backfire
18 on the lenders themselves.  It's no secret.  It's been
19 in the business news.  In recent months, BYJU's has
20 been under a lot of pressure, and in just about every
21 story, you will see the lenders in this litigation
22 mentioned.  And this pressure actually made it harder
23 for BYJU's to get alternative capital funding so it
24 can refinance and maybe pay off these lenders.

Page 76

1          Like I said, this litigation isn't in
2 anyone's interest.  Overall, what would be in
3 everybody's interest is an agreed resolution, where
4 BYJU's and the lenders can negotiate an amended
5 relationship and deal.  Indeed, they're still talking.
6 They're talking as we speak here in court today, and
7 they likely will continue to talk, even no matter what
8 happens today.
9          Because, as I will discuss in a
10 minute, and as Your Honor actually pointed out, the
11 borrower is not an operating company, and it doesn't
12 have many assets.  So this is really a bit of a
13 sideshow, and it's ended just exerting further
14 pressure in negotiation and causing BYJU's to
15 capitulate to the steering committee's extortionate
16 demands.
17          But in any event, the Court should not
18 grant the relief today, for two main reasons.  The
19 first reason is that this case should not be heard in
20 this Court.  It should be heard in New York, together
21 with the case that has already been brought there by
22 the parent guarantor and other BYJU's entities.
23          As I will explain shortly, there is an
24 exclusive jurisdiction clause that applies to this

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 185 of 410

Page 77

1 claim, and this case should not be heard here in
2 Delaware, with all due respect to the Court, just
3 under the words of the forum clause.
4          This Court doesn't need to decide this
5 matter here and now, because there is another venue,
6 one that the parties chose, that can deal with all of
7 the issues that has come up between the parties,
8 including ones that the Court has already decided are
9 not relevant to this proceeding.
10          And the second reason, Your Honor,
11 that the relief should not be granted is that even if
12 the Court decides it has jurisdiction over this case,
13 under New York law, the so-called defaults do not
14 support acceleration and the forfeiting of an entire
15 company.  So even if the Court determines that it
16 should hear this proceeding, it should find that the
17 acceleration is invalid, and therefore, the seizure of
18 BYJU's Alpha is invalid.
19          Let me start with the exclusive
20 jurisdiction clause.  You've already seen
21 Section 10.9(a) in the credit agreement, which is
22 JX 21.  The parties agreed that the credit agreement
23 would be governed by New York law, and they agreed --
24 and if I can take you to the provision, which starts

Page 78

1 on page 148 of JX 21, "Each of the parties hereto
2 hereby irrevocably and unconditionally submits, for
3 itself and its property, to the exclusive jurisdiction
4 of the ... New York [court] ...."
5          That's what they agreed.  In any --
6 and then you go on, "in any ... proceeding arising out
7 of or relating to this Agreement ...."  And I focus on
8 those words, and I'll come back to in a second.
9          And then, at the end of the clause,
10 you've got the carve-out that Mr. Czeschin was talking
11 about, which says, "Nothing in this Agreement or in
12 any other Loan Document shall affect any right that
13 [the] Agent or any Lender may otherwise" -- and I
14 stress the word "otherwise" -- "have to bring any
15 action or proceeding relating to this Agreement ...."
16 But not arising from this agreement.  That's covered
17 under the exclusive jurisdiction provision at the
18 beginning of this section.
19          Now, Delaware courts apply these
20 provisions strictly.  As the Delaware Supreme Court
21 said in *Ingres Corp. v. CA, Inc.*, that's in our brief,
22 "Forum selection [] clauses are 'presumptively valid'
23 and should be 'specifically' enforced unless the
24 resisting party '[] clearly show[s] that enforcement

Page 79

1 would be unreasonable and unjust, or that the clause
2 [is] invalid for such reasons as fraud [or]
3 overreaching.'"  And plaintiff is not trying to make
4 such a finding here.
5          What they are saying is they're
6 misreading the agreement.  They rely exclusively on
7 that last provision.
8          But that's not what the agreement
9 says.  We are not saying that the clause is
10 asymmetrical, like they argue in the brief, or that
11 there were asymmetrical clauses.  We're just looking
12 at the words of the agreement.
13          If you allow GLAS to bring this
14 action, you are reading out the clause that says that
15 each of the parties irrevocably and unconditionally
16 submits to the exclusive jurisdiction of the New York
17 courts.  And New York courts don't allow you to have
18 an interpretation that leaves contractual clauses
19 meaningless.  They read out the word "exclusive."
20          The only way to harmonize this --
21          THE COURT:   Well, the first sentence,
22 if we substitute in "GLAS" for "each of the parties."
23          ATTORNEY KORPUS:   Correct.
24          THE COURT:   "[GLAS] submits, for

Page 80

1 itself and its property, to the exclusive jurisdiction
2 of ... [SDNY] ...."
3          ATTORNEY KORPUS:   That's right.
4          THE COURT:   Why isn't it appropriate
5 to read that to mean that GLAS submits that it can be
6 sued in SDNY?
7          ATTORNEY KORPUS:   Because each of the
8 parties, including the lenders, including GLAS,
9 irrevocably and unconditionally submit to the
10 exclusive jurisdiction of SDNY.  It's "each of the
11 parties."  It's all of the parties in this case.
12          THE COURT:   But then if you read that
13 together with "Nothing in this Agreement" -- meaning
14 that sentence that we just discussed -- "shall affect
15 any right that" -- GLAS has to bring anything anywhere
16 else.
17          ATTORNEY KORPUS:   But let's focus on
18 the words, because words do matter.  They agreed to
19 exclusive jurisdiction for any dispute arising out of
20 or relating to the agreement.
21          But then what GLAS can do is otherwise
22 bring any action that's relating to this agreement.
23 So if it's just relating to the agreement -- let's say
24 they have to bring some kind of an enforcement

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 186 of 410

Page 81

1  proceeding against some asset.  They can bring it.
2            But if it's arising from the
3  agreement, if it's fundamental to the agreement, if
4  it's a question of determining the key question here,
5  which is whether or not there has been a default,
6  that's exclusively in New York, and they've agreed to
7  be exclusively in New York.
8            That's the only way you can harmonize
9  those two sentences.  Their reading of the agreement
10  reads out the "exclusive jurisdiction" in
11  paragraph -- the beginning of paragraph (c), where it
12  says "each of the parties."
13            The way to have an agreement that says
14  what they want it to say would say that GLAS and
15  lenders could sue wherever they want, and the borrower
16  or the borrow parties agree to exclusive jurisdiction.
17  That's not what this clause says.  This clause says
18  that all of the parties agreed to exclusive
19  jurisdiction.
20            And the limitation -- the exception
21  here is a lot more limited than they suggest.  It
22  gives them the ability to chase assets elsewhere if
23  they have to.
24            THE COURT:   And you're deriving that

Page 82

1  from the fact that the last sentence says "may
2  otherwise have" and is limited to relating to --
3            ATTORNEY KORPUS:   That is correct.
4            THE COURT:   -- whereas the other one
5  says "any action or proceeding arising out of or
6  relating to"?
7            ATTORNEY KORPUS:   That is correct.
8  And if you look at the pledge agreement that
9  Mr. Czeschin showed you in JX 18, it has exactly the
10  same language.  It had exclusive jurisdiction in
11  Singapore for any matter arising out of or relating to
12  that agreement.  And then the carve-out was just for
13  matters relating to.
14            THE COURT:   So running with your
15  interpretation, why isn't a 225 a right that GLAS
16  otherwise has relating to this agreement?
17            ATTORNEY KORPUS:   Because, Your Honor,
18  it is arising out of the agreement.  It couldn't be
19  more fundamentally arising out of the agreement.  It
20  is a question of finding whether or not there's been a
21  default.
22            We're not asking for you to --
23            THE COURT:   Don't you make the
24  argument that the agreement isn't properly considered

Page 83

1  in a 225?
2            ATTORNEY KORPUS:   Pardon me?
3            THE COURT:   Don't you make the
4  argument in a separate part of your presentation or in
5  your brief that the Court shouldn't consider the
6  agreement in a 225?
7            ATTORNEY KORPUS:   Should consider or
8  shouldn't?
9            THE COURT:   Should not.
10            ATTORNEY KORPUS:   No, I don't believe
11  I made that argument.  I believe, Your Honor, what
12  would be appropriate is for this matter to be stayed
13  so that a New York court can determine whether or not
14  there's been a default.  And then we can come back
15  here and decide who should be the director.
16            THE COURT:   Going back to the original
17  question that I asked.  A 225 is a statutory right.
18  The ability to bring a 225, I don't think, arises out
19  of the credit agreement.
20            So why isn't the 225 that depends on
21  the underlying operation of the credit agreement, why
22  doesn't that fall into the bucket of "otherwise and
23  relating to" in the last sentence?
24            ATTORNEY KORPUS:   Because, Your Honor,

Page 84

1  I submit the question of whether or not there's been a
2  default is arising out of the credit agreement, and
3  the parties agreed to exclusive jurisdiction there for
4  that matter.  And there's a reason here, because New
5  York law is important here, and the law of
6  unconscionability is important here.  And we're going
7  to talk about it in a minute.
8            And I'm not saying the Delaware court
9  can't decide New York law.  It does it all the time.
10            THE COURT:   So by your logic, you said
11  that collections would be a type of action would fall
12  into the "otherwise and relating to" bucket.  But that
13  would also require a default.
14            So how is that type of action
15  distinguishable from this 225?
16            ATTORNEY KORPUS:   No.  Collection
17  would require default.  It would require judgment in
18  New York.  And then they have to go and enforce that
19  judgment.  And I'm saying if they have to go and
20  enforce the judgment against some asset here or
21  whatever, everywhere, that's why the provision is in
22  there, to give them the right to enforce judgments.
23  But they have to get that judgment in New York.  A New
24  York court has to decide whether or not there's been a

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 187 of 410

Page 85

1  default.
2           Now, Your Honor, I just wanted to go
3  back to what I started saying about -- about a
4  possible stay of this provision -- of this proceeding
5  while the Court in New York decides if there's been a
6  default or not.
7           We actually have no objection, during
8  the pendency of that stay, for Mr. Pohl to remain and
9  the status quo order to continue until such time as
10 the New York court decides the matter. That's fine
11 with us. We just think that there are other matters
12 here. There's a lot of matters in New York. There's
13 claims by us against the lenders. There's other
14 claims by the lenders against us, and it just makes
15 sense for it all to be decided in New York, in
16 addition to --
17           THE COURT:  But you haven't moved to
18 dismiss under *McWane* and you haven't moved to dismiss
19 under 12(b)(1)?
20           ATTORNEY KORPUS:  We brought the
21 action in New York. We brought the action in New
22 York.
23           THE COURT:  I'm sorry. You haven't
24 moved to dismiss this action.

Page 86

1           ATTORNEY KORPUS:  Your Honor, I
2  believe when we first had the hearing on the status
3  quo order, Mr. Cicero asked -- told you that we intend
4  to make this argument.
5           THE COURT:  You're right.
6           ATTORNEY KORPUS:  And you said we
7  should address it today. And that's why we're here
8  today.
9           THE COURT:  Thank you. I have a very
10 short memory.
11           ATTORNEY KORPUS:  You have a lot of
12 cases, Your Honor. You've been busy. I've read some
13 of your decisions recently.
14           So this dispute belongs in New York.
15 That's what the parties agreed. And as Mr. Czeschin
16 said, sophisticated parties with sophisticated
17 advisors should be held to the terms of their
18 agreement. And that's what the agreement says.
19           Now, as a matter of judicial economy,
20 it also makes sense for this matter to be heard in New
21 York, where all claims, counterclaims, and third-party
22 claims relating to all matters arising this agreement
23 can be heard. This is not just a theoretical issue.
24 We filed the complaint in New York two months ago

Page 87

1  covering a broad variety of topics, and topics that
2  are not before the Court and the Court has already
3  held should not be before the Court.
4           Now, we can bring claims there against
5  the misconduct and breaches of the credit agreement,
6  improperly calling defaults, accelerating the loan,
7  and the hundreds of millions in damages that we have
8  suffered as a result of that conduct. We can bring
9  claims for breach of the implied covenant of good
10 faith and fair dealing based on the, as we see it,
11 bad-faith negotiations by the lenders. Those claims
12 are substantial.
13           But Your Honor's already held some of
14 that. So, for example, in the Court's letter of May
15 24, 2023, the Court declined to include plaintiffs'
16 proposed provision in the status quo order barring the
17 parent guarantor from exercising the disqualifying
18 power, and the Court stated, "Whether, as the
19 plaintiffs suggest, the steps taken to install the
20 alleged incumbent also revoke the Parent Guarantor's
21 authority under Section 1.12 is tangential to the core
22 control dispute and to Byju's Alpha's internal
23 affairs." It is tangential. It's not before this
24 Court. But it could and should be in New York.

Page 88

1           And then, in the Court's order of June
2  26 denying plaintiffs' motion to compel an answer to
3  Interrogatory No. 1 and to enforce the status quo
4  order, the Court stated, "Further investigation into
5  [] $500 million transfer that predated entry of the
6  status quo order is not properly within the scope of
7  this Section 225 action." That's right. But that
8  also can be litigated in New York.
9           Now, plaintiffs' main argument is that
10 it will take longer in New York. But -- and there's
11 not been a schedule, because even just this motion to
12 dismiss could take until 2024 to resolve, according to
13 plaintiffs.
14           Your Honor, in New York, we call that
15 chutzpah, because the complaint was filed June 6. And
16 if we follow the usual procedure and if they filed the
17 motion to dismiss, we could have had it heard. But it
18 was at their request that we deferred that. They
19 asked for an extension to July 14. Then they asked
20 for another extension to August 25 to file the motion
21 to dismiss or respond to the complaint.
22           And we only agreed to such an
23 extension on the understanding that they wouldn't use
24 that extension as an argument against New York being

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 188 of 410

Page 89

1 the correct forum. We have an email from Mr. Ashby
2 where he says, this email memorializes our agreement
3 that neither GLAS nor Pohl will use the fact of this
4 extension to argue for the appropriateness of the
5 Delaware forum or the inappropriateness of the New
6 York forum.
7            So we expressly wanted them not to be
8 able to make that argument, and yet they're still
9 making the argument of delay.
10           Then they're arguing that Section 225
11 is important because it gives you a summary remedy so
12 that the company's not immobilized. That's on page 55
13 of their brief. But as we all know, and as they
14 stipulate, this company has no active business
15 operations. And that's stipulated fact number 34. So
16 speed and paralysis isn't really the point here. It
17 doesn't really matter.
18           And in any event, as I told you, we
19 are fine with Mr. Pohl staying there until such time
20 as we have a resolution from New York, and then come
21 back before you.
22           And then they argue that Mr. Pohl is
23 an independent trying to bring this suit and isn't
24 bound by the credit agreement, and I know you had

Page 90

1 discourse with Mr. Czeschin about that. I'm happy to
2 address it, but I think you're already there, which is
3 exactly right.
4            Mr. Pohl is only here because he
5 claims to be a sole director and officer of BYJU's
6 Alpha. He says so in paragraph 1 of the verified
7 complaint. His sole basis for acting is based on the
8 validity of the enforcement action, and that's an
9 issue to be determined in New York. He is here as an
10 agent of a party to the credit agreement, a party
11 that's bound by the exclusive jurisdiction clause.
12           THE COURT:   Can you address the
13 argument that a 225 and the ability to bring a 225 is
14 bestowed on stockholders and directors, it's not
15 bestowed on the company.
16           ATTORNEY KORPUS:   Well, it's bestowed
17 on stockholders and directors, but he's only a
18 director of the company by virtue of him exercising
19 the pledge; otherwise, he's just a private citizen.
20 Either way, he's there through the mechanics of the
21 credit agreement and the forum selection clause, which
22 said all of the parties, each of the parties, agree to
23 the exclusive jurisdiction.
24           Also, he's not really a necessary

Page 91

1 party to this proceeding. They didn't really need to
2 add him. This could have been brought by GLAS alone.
3 And the fact that they added him, I suspect, is so
4 that they can make this argument. But he's really not
5 a necessary party here.
6            THE COURT:   How does -- maybe this
7 opens a whole can of worms. What is GLAS's ability to
8 bring a claim that is bestowed upon a stockholder or
9 director?
10           ATTORNEY KORPUS:   He's a shareholder.
11 Once they -- the lenders become shareholders once they
12 exercise the --
13           THE COURT:   That's right. I'm sorry.
14           ATTORNEY KORPUS:   Right.
15           So, Your Honor, in summary, we submit
16 that the Court should stay this action and that the
17 correct venue is New York. And I'll move to the
18 substance, unless you have any more questions on that
19 point.
20           THE COURT:   No. Thank you.
21           ATTORNEY KORPUS:   Thank you, Your
22 Honor.
23           So the next point is that even if the
24 Court decides to retain jurisdiction, it should find

Page 92

1 that the notice of acceleration and notice of default
2 were invalid. And the reason is that New York law
3 does not allow a lender to accelerate a debt or seize
4 assets from a pledge when the alleged defaults are
5 just not serious enough.
6            In the words of the New York appellate
7 division in the *Tunnell* case in our brief, "where the
8 breach asserted as a basis for acceleration is trivial
9 or inconsequential, the forfeiture may be viewed as an
10 unconscionable penalty ...." And equitable principles
11 don't allow acceleration.
12           The same point was reinforced in
13 *Hirsch v. Lindor* in our brief, where the Court of
14 Appeals, New York's highest court, said that the
15 courts "may [] intervene to prevent a forfeiture of a
16 substantial interest despite a technical breach or
17 omission ...."
18           Just as an example, as a side note,
19 New York has -- has an expedited procedure for summary
20 judgment in lieu of complaint when you sue on a loan.
21 And in that provision, 32.13, there are cases where
22 courts said -- Justice Sherwood said it in *Dragons 516*
23 *v. GDC 138 E 50* -- I'll just give you the cite because
24 it's not in our brief -- 2019 Westlaw 4089744 at page

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 189 of 410

Page 93

1   2. Justice Sherwood, in the commercial division in
2   New York, said, "Where a motion relates to failures
3   other than [] failure to make payment, the motion
4   should be denied."
5           So even though it has this expedited
6   summary judgment procedure for suing on a note, the
7   law is against allowing such a proceeding where there
8   is a nonpayment default, a nonmonetary default. And
9   here, that's what we have. We continued to make every
10  payment under the loan agreement at the time they took
11  this action.
12          But even outside a 32.13 context, New
13  York courts look to three factors to justify whether a
14  breach justifies acceleration: one, has the lender
15  suffered actual damages as a result of the default;
16  two, has the default impaired the lender's security;
17  and, three, does the default make the future payment
18  of principal and interest less likely? That's the *In*
19  *re Stanhope* case that's in our brief.
20          And when we look at the three events
21  of default, none of them make the grade, and they
22  don't justify acceleration. And I'm going to go
23  through them now.
24          But before I do, I want to make this

Page 94

1   point. No one is saying that if there is a breach,
2   they have no remedy. They have the same remedy that
3   any party to a contract has. If they can show there's
4   a breach and they suffered loss, they can sue for
5   damages. They can sue for damages for specific
6   performance. They can say we want the audited
7   statements, and we want them now. But that's not what
8   they've done.
9           They're trying to accelerate a
10  $1.2 billion debt and seize BYJU's Alpha, and that's
11  not allowed under New York law, because it's a
12  forfeiture, and New York law avoids forfeitures for
13  these type of breaches.
14          So first let's talk about the Whitehat
15  guarantee issue.
16          THE COURT:   Before we get into --
17          ATTORNEY KORPUS:   Yeah.
18          THE COURT:   -- whether these are
19  trivial defaults that would excuse acceleration or
20  prevent acceleration, I understood Mr. Czeschin to
21  make an argument coming and going on this point; one
22  being that the sophisticated nature of these parties
23  means that the doctrine doesn't apply in the first
24  place; and, second, that the acknowledgment of the

Page 95

1   default and the entitlement to the right of
2   acceleration in the subsequent amendments would cut
3   off operation of the doctrine.
4           ATTORNEY KORPUS:   Yeah.
5           THE COURT:   Could you address that.
6           ATTORNEY KORPUS:   Yes, Your Honor.
7   The argument applies to parties sophisticated or not.
8   And even the Court -- he read you from *Natixis* -- said
9   that there are cases where the courts would allow it,
10  and there was a case that involved sophisticated
11  parties, and I will talk about *Natixis* in a minute.
12          And as to the specified default and
13  all the amendments and all the language, I have a
14  section as I go through default; I can go there now if
15  you prefer. But just to summarize, all the parties
16  agreed to, all BYJU's agreed to, is to a definition of
17  those alleged default as "Specified Default." There
18  is no language anywhere, in any of those amendments,
19  saying that the company recognizes that these are
20  valid defaults; that the company recognizes that they
21  had the right to accelerate based on those defaults;
22  that the company recognizes that there is no
23  unconscionability, that they could take enforcement
24  action, all -- there's none of that.

Page 96

1           The one -- other than the definition
2   of "Specified Default," the one thing Mr. Czeschin
3   points to is that there's language in, I think, the
4   seventh amendment that they said that they're entitled
5   to tell GLAS to serve a notice of default. Sure, they
6   can serve a notice of default, because they don't want
7   to waive any of their rights either. It doesn't mean
8   that we agree anywhere that that notice of default is
9   valid, or that we waive any of our remedies under New
10  York law for unconscionability. All it said is that
11  they are entitled to serve a notice of default.
12          Because a forbearance in an amendment
13  has two sides. They didn't want to waive any of their
14  rights either. It's there to protect them. But it
15  doesn't mean that we are not going to be here one day
16  arguing about whether or not such -- such an
17  acceleration is proper.
18          THE COURT:   Well, it says that it
19  entitles the required lenders to deliver a notice of
20  acceleration.
21          ATTORNEY KORPUS:   That's right.
22          THE COURT:   Not default.
23          ATTORNEY KORPUS:   Okay. A notice of
24  acceleration. That's fine. They're entitled to serve

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 190 of 410

Page 97

1  the notice. But we don't waive any of defenses to
2  that notice.
3          THE COURT:   Go ahead.
4          ATTORNEY KORPUS:   May I go ahead?
5  Thank you.
6          So talking about Whitehat, first of
7  all. Now, the first supposed default was due to the
8  inability of one of BYJU's affiliates, a company
9  called Whitehat, which had negative net worth, to
10  serve as an additional guarantor under the credit
11  agreement.
12          And I want to emphasize the point that
13  Whitehat was to provide an additional guarantee. They
14  were alongside the many guarantees provided by the
15  borrower's other affiliates, including the parent,
16  Think and Learn, which has a multibillion-dollar
17  valuation. Every single one of those other guarantees
18  was provided.
19          As for Whitehat, the parties knew --
20  and it was reflected in the credit agreement -- that
21  in order to serve as an additional guarantor, it would
22  first need to get regulatory approval from the Reserve
23  Bank of India. And that's not a trivial thing to
24  achieve, and it can take time and multiple attempts.

Page 98

1          And as our expert said in his
2  declaration, when a guarantee is over a billion
3  dollars, you need RBI approval; and when it exceeds
4  400 percent of net worth, you need approval; and when
5  both tests are triggered, you need approval to both
6  aspects. And that's in JX 317 at pages 12 and 13.
7          And because it's a serious and
8  uncertain undertaking, there was no actual obligation
9  in the credit agreement on BYJU's Alpha or any of the
10  other BYJU's companies to obtain the guarantee.
11  Instead, Section 5.17(d) provides that the parent
12  guarantor, Think and Learn, will use reasonable
13  commercial efforts to procure the RBI approval on or
14  prior to April 1, 2022.
15          I frankly don't understand the
16  argument that Mr. Czeschin was trying to make under
17  the provision today when he tried to say that it was
18  kind of a -- a drop-dead date by April 1, 2022, when
19  he doesn't say what happens if they don't do it. I
20  think that clause -- which they never even addressed
21  in their brief, because I think they know it helps us,
22  and that's why we addressed it in our brief, and it's
23  on page 98, Your Honor, of JX 21.
24          THE COURT:   I have it.

Page 99

1          ATTORNEY KORPUS:   That clause clearly
2  says that the obligation is to use reasonable
3  commercial efforts. And then says that because it's
4  uncertain and because it's just reasonable commercial
5  efforts, if you don't manage to do it, it's not a
6  default.
7          THE COURT:   I spent some time with
8  Mr. Czeschin breaking down how that (i) works. Can
9  you explain to me your interpretation of how that
10  works.
11          ATTORNEY KORPUS:   My interpretation of
12  how that works is the failure to obtain the approval
13  prior to April 1, 2022, is not a default because it
14  ties to (d), which was to try and obtain -- you try to
15  use reasonable commercial efforts to procure the
16  approval on or prior to April 1, '22. We're going to
17  try our best.
18          THE COURT:   In my discussion, though,
19  with Mr. Czeschin, I think we got to a place where
20  they're not asserting that failure to procure RBI
21  approval was itself a default.
22          ATTORNEY KORPUS:   Yes. But I think
23  what they're saying -- so then we get to 5.9, and I
24  was going to go there next.

Page 100

1          THE COURT:   Okay.
2          ATTORNEY KORPUS:   So they're relying
3  on 5.9(c). But all 5.9(c) does, it's a mechanical
4  provision. It just says that when the approval is
5  taken, Whitehat shall accede.
6          Now, Whitehat India, in 5.9(c), is not
7  a party to this agreement. There's -- an obligation
8  on Whitehat India doesn't bind Think and Learn,
9  doesn't bind BYJU's Alpha. Nobody's obligated to --
10  to make sure that Whitehat India shall accede. The
11  only obligation on the borrower and on the loan
12  parties was to use reasonable commercial efforts.
13          Otherwise, Your Honor, the distinction
14  really makes no sense. Because, again, like they did
15  with the forum clause, you're reading out of the
16  agreement the "reasonable commercial efforts"
17  provision. What is the point? What is the point of
18  having a provision that says all we have to do is use
19  reasonable commercial efforts to obtain the approval,
20  when there is a provision saying that we are bound to
21  have this entity join whether or not we use reasonable
22  commercial efforts? It just makes no sense.
23          THE COURT:   And how do I reach the
24  argument that Whitehat India not acceding to the

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 191 of 410

Page 101

1  agreement isn't a default that lays at the feet of
2  BYJU's Alpha, given the subsequent amendments?
3           ATTORNEY KORPUS:   Sure.  When you look
4  at the subsequent amendments -- let's go first to the
5  first amendment, which Mr. Czeschin did not take you
6  to.
7           THE COURT:    And what's the JX number
8  of the first amendment?
9           ATTORNEY KORPUS:   Yeah.  I'm just
10  looking, I'm sorry.  105.
11           THE COURT:    Thank you.
12           ATTORNEY KORPUS:   So this is after the
13  April date, right, that is in the agreement.
14           And first of all, let's look at the
15  one, two, three, four, fifth "whereas" clause, where
16  it says, "despite significant efforts (including but
17  not limited to commercially reasonable efforts) on the
18  Parent Guarantor's part to obtain the RBI's approval
19  prior to April 1, 2022 to permit Whitehat India to
20  guarantee ..., no such approval has been forthcoming
21  to date." So they acknowledge right that there we
22  used commercially reasonable efforts.
23           Then you go to Section 2 on page 2.
24  And it says that "[a]s of the Effective Date,"

Page 102

1  everybody agrees that in "(a) Whitehat India shall not
2  be required to [] provide any guarantee ..." and that
3  any -- "all consequences under the Loan [Agreement] of
4  Whitehat India not providing a guarantee of [] Covered
5  Obligations ... are waived ...."  That's in (b).
6           So that's what happens first, in the
7  first amendment.  They agree that we used reasonable
8  commercial efforts, and they agree to waive any
9  default arising from that.
10           Then, later on, in Amendment 2, they
11  include the Whitehat back in the definition of
12  "Specified Defaults."  But as I said, that's just a
13  definition.  We never agreed that those specified
14  defaults are, in fact, defaults.  And we never agreed
15  that we didn't have defenses to those.  It was just a
16  forbearance.  It's just a definition.
17           THE COURT:    How does Amendment No. 2
18  interact with this first limited waiver?  Does it
19  supersede it?
20           ATTORNEY KORPUS:   Yes.  In time, you
21  mean?  Yes.
22           THE COURT:    In effect.
23           ATTORNEY KORPUS:   In effect?  I'm not
24  sure what the exact language is, but I assume it does.

Page 103

1  But I don't know that for a fact.
2           THE COURT:    And does this first
3  limited waiver have a termination date?
4           ATTORNEY KORPUS:   It does not have a
5  termination date.  It does say, though, in
6  Section 3(d) that "as of the Effective Date, no
7  Default or Event of Default has occurred and is
8  continuing." So they're agreeing as of April 5, 2022,
9  that there was no event of default.
10           THE COURT:    So on the first page, the
11  bottom of the page, that last "whereas" clause, it
12  says, "provided that the foregoing waiver shall be of
13  no effect on and following the later of October 8,
14  2022 ..." unless Whitehat guarantees or, rather, the
15  RBI approval is obtained.
16           ATTORNEY KORPUS:   I'm sorry, Your
17  Honor, where are you?
18           THE COURT:    I'm on the last "whereas"
19  clause, on page 1 of JX 105. and I'm focusing on the
20  definition of a "Waiver Termination Date."
21           ATTORNEY KORPUS:   Okay.  I see.
22           So it was an extension, is what you're
23  saying, it was an extension to October 8.  That's
24  fine.  But my point is as of that date, they

Page 104

1  recognized that we used reasonable commercial efforts.
2  As of that date, they agreed there was no default.
3           And I'm just saying that you cannot
4  read out the reasonable commercial efforts standard
5  and rely on 5.9(c).  Because otherwise you're reading
6  that whole clause out of the agreement, and New York
7  law does not allow you to do that.  5.9(c) is a
8  mechanical provision.  It just says get the approval,
9  use reasonable efforts.  You get the approval; then
10  Whitehat accedes.
11           This whole distinction between outcome
12  and efforts is -- is a fiction.  It doesn't --
13  agreements don't work that way.  Otherwise -- because
14  if they do, then you are reading out the obligation to
15  use reasonable commercial efforts.  And that's all
16  there was here.
17           And it's not the -- in any event, that
18  provision 5.9(c) was not an obligation of BYJU's Alpha
19  or any of the loan parties.  Their obligation was just
20  to use reasonable commercial efforts.
21           If I can move on?
22           THE COURT:    Yes.
23           ATTORNEY KORPUS:   And the second
24  reason why the reason the breach of the credit

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 192 of 410

Page 105

1  agreement related to Whitehat, even if it did require
2  us to obtain approval and for Whitehat to accede to
3  the agreement no matter what, is under the doctrine of
4  impossibility. Because under New York law,
5  nonperformance of a contractual obligation is excused
6  where such performance is rendered impossible by
7  intervening governmental activities, as long as they
8  are unforeseeable.
9          And as our expert explained, JX 317 at
10  20, in August 2022, the Reserve Bank of India passed
11  new regulations that made it impossible for Whitehat
12  to get approval for its additional guarantee. Because
13  under the new regulations, Whitehat, which everybody
14  knew didn't have assets to pass the net worth test,
15  would no longer be able to borrow net worth from the
16  parent guarantor. And their expert doesn't really
17  deny that it became impossible. He just says that
18  that change was foreseeable.
19          But that's just not the case. We
20  disagree. Our expert, at paragraph 17 of JX 317, sets
21  out that a discontinuation of net worth borrowing was
22  never explicitly stated prior to the new ODI rules
23  coming into effect, and it's borne out by reading the
24  draft regulations.

Page 106

1          The parties didn't know that it was
2  going to be excluded, that Whitehat would not be able
3  to borrow net worth. And there was never any
4  indication in the draft proposed regulations that it
5  would ever come to foresee it then. So it was not
6  foreseeable that RBI regulation would change and
7  prohibit the net worth borrowing and change before we
8  could obtain the approval for Whitehat guarantees.
9          They also argue that the impossibility
10  doctrine doesn't apply because the parties knew that
11  RBI may not grant approval, or grant it in time; and
12  therefore, it was up to the parties to allocate risk.
13  But we say that the parties did allocate the risk.
14  They allocated by saying we have to use commercially
15  reasonable efforts. And that's it. That's how the
16  risk was allocated in the agreement.
17          So, Your Honor, why am I spending time
18  on this, and why did I address it first? Because it
19  came first in time. And what it was, it was an
20  attempt by the lenders -- this gives you a kind of
21  flavor of how they were trying to play hardball.
22          We are paying all the interest. We're
23  doing everything we're supposed to do. And they came
24  and raised this and extorted the amendment that

Page 107

1  allowed them to get additional fees and started
2  talking about more amendments. And that's what they
3  were doing. It was really a gotcha that was not
4  supposed to be a gotcha under the agreement.
5          THE COURT:  This is just a very
6  fundamental question, just to be sure we're all on the
7  same page. Can Whitehat India accede to the agreement
8  without RBI approval?
9          ATTORNEY KORPUS:  No.
10          THE COURT:  Okay.
11          ATTORNEY KORPUS:  So defendants
12  respectfully submit that they have not breached the
13  agreement as to Whitehat. It's not even a close
14  question. The credit agreement did not require that
15  outcome.
16          Now, I want to just foreshadow a
17  little bit our good faith and clean hands doctrine,
18  because this is all a problem that's their own making.
19  We actually had a solution. We sent a detailed
20  proposal to GLAS, and it's in JX 166 and 167, and
21  specifically at 167, pages 7 to 9, where we said,
22  let's just move, all the assets out of Whitehat -- the
23  U.S. business, the Indian IP, the global IP -- into an
24  entity that's already a guarantor. That would solve

Page 108

1  everybody's problems.
2          And they said no. They rejected it
3  out of hand. And that's one of the claims we intend
4  to pursue in New York.
5          But even if we assume for the sake of
6  argument that the credit agreement required BYJU's to
7  have Whitehat accede to the agreement -- let's assume
8  5.9(c) governs, even though we don't think it does.
9  In that counterfactual world, would it justify
10  acceleration under New York law? Let's go back to the
11  test in *Stanhope*. Did a failure to get a guarantee
12  cause loss to the lenders? No. There's not a shred
13  of evidence on the record that it did.
14          Did it impair the security? No.
15  There was ample security from the other guarantors,
16  from Think and Learn and the other affiliated
17  companies. And they would have gotten all that same
18  security if they only agreed to our proposal in
19  October 2022.
20          Also, remember Whitehat had negative
21  net worth. A guarantee from an entity with negative
22  net worth is of no use.
23          So did it make payment less likely?
24  No. Because we kept paying. It was just hardball

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 193 of 410

Page 109

1    tactics by these lenders.
2            And that's what set everything else
3    off. That's kind of what put us on a collision course
4    with each other. That's why we're here today.
5            THE COURT:    Not the absence of audited
6    financials?
7            ATTORNEY KORPUS:    That comes later,
8    and I will get to that. But at that time, no. At
9    that time, at the time of the first amendment, second
10   amendment, they did not mention any concerns about
11   lack of audited financial statements.
12           The first time they raised it as an
13   issue was months later.
14           THE COURT:    Well, so I hear you
15   describing JX 105 as hardball tactics, but I look at
16   that as a waiver and a recognition, as you point out,
17   that recognizes that BYJU's used commercially
18   reasonable efforts. Maybe that's one way to read it.
19   And it, in fact, pushes out the time period to
20   accomplish this.
21           ATTORNEY KORPUS:    That's right.
22   Because they didn't really want to accelerate at that
23   time. They just wanted to use the threatening of the
24   acceleration to try and get us to a negotiation table,

Page 110

1    to negotiate amendments.
2            And I'll take you through some of that
3    history later. It was really a negotiation tactic.
4    It's to put leverage on.
5            So that's the first default, and I'm
6    ready to move on to the financial default, if Your
7    Honor is ready.
8            THE COURT:    Yes.
9            ATTORNEY KORPUS:    So there's two --
10   there's the audited reports and the unaudited. I'm
11   going to start, actually, with the unaudited ones,
12   with 5.1(b), because they come first in time.
13           And let me make it clear, because
14   Mr. Czeschin didn't. We provided financial
15   information, detailed financial information. They
16   have some issues about whether or not the information
17   was enough. But I'm going to take you through that.
18           The first one was the quarterly
19   financials for the quarter ending December 31, 2021,
20   that was due 75 days after the end of the quarter, so
21   due March 16, 2022. And BYJU's did provide that in
22   time. There's no dispute about that.
23           And let me take you to the report that
24   was provided. It's JX 59. Let me get there myself.

Page 111

1            It's 19 pages of financial
2    information.
3            THE COURT:    I have it.
4            ATTORNEY KORPUS:    Thank you.
5            Page 1 summarizes the various
6    members -- data for the various members of the BYJU's
7    family — revenue, cost, payroll, marketing expenses,
8    EBITDA, profit after tax, et cetera. Page 2 is the
9    balance sheet for Think and Learn. Page 3 is a P&L
10   statement. Page 4 is a cash flow statement. And then
11   you have many pages of detailed notes like, you would
12   see in any financial statements.
13           So we provided financial information.
14   They barely make any showing of how that's
15   insufficient. All they can do is say that instead of
16   providing it for just one quarter, this is
17   consolidated information for the previous three
18   quarters.
19           THE COURT:    And that it's not audited.
20           ATTORNEY KORPUS:    Well, this is the
21   obligation -- I'm talking about the obligation to
22   provide unaudited statements under 5.1(b). That's one
23   of the three breaches. I'll get to the audited ones.
24   But they're also relying on our failure to provide

Page 112

1    unaudited statements as one of the three.
2            They don't say how it actually harms
3    them that we gave them information consolidated for
4    three quarters, rather than one, or how it's material.
5            And the first supposed breach that
6    they're complaining about today, this was March 2022.
7    No one had any problem with this until months later.
8    The first mention we can find in the record of not
9    providing this information -- oh, sorry, they also
10   complained that we didn't provide comparative
11   financials to previous years. I don't know why
12   that -- why that would be -- what prejudice they would
13   suffer from that.
14           But in any event, the first time we
15   can find anything on the record of the lenders
16   complaining about that is five months later, August
17   29. So for five months, they had this financial
18   information. They didn't write immediately back and
19   say, hey, you didn't give us this, you didn't give us
20   that, it's a default. Nothing.
21           And then the next one is the financial
22   for Q1 of 2022, '23. Those you will find in JX 145.
23   They were also provided on time. They say that the
24   financials were due on December 13, but actually,

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 194 of 410

Page 113

1 that's not 75 days from the end of the quarter.
2 Sorry.  They were due on September 13, not on August
3 14, as the lenders say, if you do the math.
4           But in any event, if you look at 145,
5 again, we gave highly detailed statements — income
6 statement, cash statement, on page 1; balance sheet on
7 page 2; p&L on page 3; cash flow statement, and all
8 those notes.
9           And although we didn't provide it for
10 P&L, for the other BYJU's company, we even gave the
11 comparison to previous years that they're complaining
12 they didn't get.  And you'll find that in JX 150,
13 which has a P&L comparing Q1 '22, '23, to Q1 '21, '22.
14 JX 151 is a document showing year-on-year revenue
15 trends.  And JX 152, which is group company key
16 performance indicators.
17           So they got a lot of financial
18 information, and they haven't made any showing as to
19 why lack of comparatives for the Think and Learn
20 company is material, when they had all of this other
21 information, or why it allows acceleration for a
22 $1.2 billion debt.
23           Now I want to address in the *Natixis*
24 case that you had Mr. Czeschin talk about, and that

Page 115

1 information, but not enough financial information, or
2 you didn't add an entity with negative net worth as a
3 guarantor, when everybody knew that it was a problem
4 there them as a guarantor.
5           It's a very different case than
6 *Pegasus.*
7           So now we're going to go to the
8 audited reports.  Again, we submit that, one, if it is
9 a breach of the credit agreement, it doesn't reach the
10 level that allows them to accelerate a $1.2 billion
11 debt.  How do we know that?  Well, first of all, the
12 original credit agreement said that.  The original
13 credit agreement, Section 1.11, said that -- that any
14 breach arising "solely as a result of a failure [by]
15 any Loan Party to provide a notice, report, budget,
16 certificate ... or similar [financial] deliverable ...
17 [would] be deemed to be cured upon delivery of such
18 Reporting Deliverable to the Admin[] Agent,
19 notwithstanding that the time [] for delivery ... have
20 expired or passed."
21           Now, why is that important?  Because
22 it recognizes that at the time that the parties
23 entered into the agreement, they did not consider that
24 failure to provide a deliverable, like audited

Page 114

1 was also featured heavily in the brief, for the
2 proposition that a default is a default is a default.
3 It's not true that the *Natixis* Court refused to
4 entertain arguments or the Court declined to consider
5 triviality of a default.
6           In fact, Mr. Czeschin actually said
7 today that unconscionable conduct on the part of a
8 creditor to exploit a technical breach does give the
9 Court the ability to deny enforcement.  That's at page
10 8 of that decision.
11           But the Court noted that, unlike what
12 we allege here, the borrowers did not allege that the
13 lenders engaged in exploitive, overreaching,
14 unconscionable conduct.  We do allege that here.  And
15 let's look at the breaches in *Natixis*.  They were very
16 different.
17           Now *Natixis* was a mortgage foreclosure
18 action relating to a development in Times Square in
19 New York.  And the defaults in *Natixis* were failure to
20 satisfy key conditions for the loan, such as achieving
21 completion of the project on time, replenishing
22 reserve accounts, and securing a major retail tenant
23 to anchor the property.  These are major undertakings.
24 This is not you've provided us certain financial

Page 116

1 accounts, was so material that it allowed you to
2 accelerate.  There was a cure period.
3           Now, they relied on the amendment that
4 came later, when we were in negotiations, where we
5 said that, okay, now we can't cure anymore.  Amendment
6 7, I think it is.  But that's not the point.  The
7 point is, what did the parties agree to at the time of
8 the credit agreement?
9           The point isn't, can we cure today or
10 can we not cure today?  The point is, is it
11 unconscionable to accelerate a loan based on failure
12 to provide audited statements, where at the time they
13 entered into the agreement, the parties agreed that
14 failure to provide such notices on time, such
15 financial deliverables on time, is not a default.
16           THE COURT:   The provision provides the
17 ability to deliver and then have that delivery be
18 deemed to be cured, provided there has been no
19 acceleration.  So it doesn't speak to the materiality
20 of the default in view of acceleration.
21           ATTORNEY KORPUS:   The provision
22 recognizes that it wasn't so important to deliver it
23 on time.  And I understand that they claim they're
24 allowed to accelerate on it.  But we're saying it's

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 195 of 410

Page 117

1  unconscionable to accelerate on it when the audited
2  statements are around the corner.
3          Now, he talked about Deloitte. And I
4  have issues about referring to a letter from Deloitte
5  where it's clear hearsay; they're not here, they
6  weren't subpoenaed, they weren't deposed. He's
7  putting up a letter that was from public sources.
8          But what the company has said in its
9  releases, and what Mr. Ravindran testified to in his
10  deposition, is Deloitte was replaced with BDO. BOD is
11  another large firm. BDO promised the audited
12  financial results by the end of September. So in a
13  month, they're going to have those audited financial
14  results.
15          And the question is whether this
16  delay -- have they shown any damage as a result of the
17  delay? Have they shown any prejudice? Have they
18  shown any impairment? Without that, relying on that
19  delay to accelerate and forfeit the company is a
20  penalty that's not allowed under New York law. And
21  what's important --
22          THE COURT:   But my point -- and I
23  didn't really string words together in a cognizable
24  way, and I apologize.

Page 118

1          I understand your argument to be that
2  Section 1.11, and this ability to deem a cure upon
3  delivery at sort of any time in the future, indicates
4  that failure to deliver financial statements on the
5  contracted-for period can't support acceleration
6  because 1.11 shows that failure to provide them timely
7  wasn't material.
8          Is that your argument?
9          ATTORNEY KORPUS:   That's my argument.
10          THE COURT:   And so my question is how
11  1.11 can support that, when it still provides for the
12  right to accelerate.
13          ATTORNEY KORPUS:   What provides for
14  the right to accelerate? 1.11?
15          THE COURT:   Yes. It doesn't put off
16  the ability to accelerate to such time as it might be
17  deemed to be cured.
18          ATTORNEY KORPUS:   I don't believe that
19  1.11 gives you the right to accelerate.
20          THE COURT:   It doesn't. That is not
21  the source of the right.
22          ATTORNEY KORPUS:   Right.
23          THE COURT:   But it cuts off the right
24  to cause a cure upon late delivery upon acceleration.

Page 119

1  It says, "(provided there has been no acceleration of
2  the Term Loans ....)"
3          ATTORNEY KORPUS:   Right. But that --
4  but that assumes that there was a valid acceleration
5  in the first place, right? I don't think you can
6  say --
7          THE COURT:   I understand.
8          ATTORNEY KORPUS:   It's kind of
9  circular the way it's written, right? I don't think
10  you can say that failure to provide it does not --
11  failure to provide financial information is not a
12  default, unless there's an acceleration, but then
13  base the acceleration on the failure to provide the
14  financial statements. I think what that says is, if
15  there's an acceleration for something else, like for
16  nonpayment, for example, that's a different issue.
17          THE COURT:   But it doesn't say that.
18          ATTORNEY KORPUS:   It doesn't say that.
19  It may be a little unclear about it. But I don't
20  think -- it would be completely circular otherwise.
21  It would defeat the purpose of that provision. If you
22  could just accelerate based on failure to provide the
23  statement, then what's the point of the provision?
24          And it's not like they didn't receive

Page 120

1  financial statements. I showed you all the financial
2  statements they will receive, and they will receive
3  audited financial statements. But where is the loss?
4  How does this cost them?
5          And now I think we need to talk a
6  little bit about what were the lenders doing. Sorry.
7          Going back to *Stanhope*, there's been
8  no loss to them. And, in fact, there's no evidence
9  that the trading price went down in September 2022,
10  when the other financials weren't provided. And, in
11  fact, the lenders kept trading. And this is
12  important. If this was impairing their security, why
13  did they buy more?
14          So if you look, for example, at
15  Redwood, which is the largest holder here, they just
16  kept buying. Exhibit JX 157 shows that on
17  September 27, 2022, after the supposed first quarterly
18  report breach, and at almost exactly the same time of
19  the supposed audited statement breach, they had
20  $33 million.
21          Then, when you look at Exhibit JX 172,
22  it shows that interest increased to $165 million as of
23  November 21, 2022, two months later. And then, if you
24  look at the position as of March 1, 2023, that's in

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 196 of 410

Page 121

1 JX 219 and 220, Redwood increased its position to
2 $216 million.
3          So to hear complaining about not
4 receiving audited financial statements, they didn't
5 seem to care that much about it. They kept buying and
6 buying and buying. They increased by, I think,
7 seven-fold their holding in BYJU's over the time that
8 they're complaining about not getting these
9 statements. Because, Your Honor, it's all just about
10 leverage. And it doesn't justify acceleration.
11 There's been no effect on the security. And as I
12 mentioned before, BYJU's Alpha kept paying.
13          Now, I think I addressed the specified
14 default provision and why we don't believe it supports
15 what the lenders are doing here. It's just a
16 definition.
17          By the way, the reason why you've
18 heard so much from Mr. Czeschin about the amendments
19 and so little about the agreements -- he didn't take
20 you through the financials. He didn't really take you
21 through the defaults -- is because the testimony of
22 record is that GLAS never performed any analysis,
23 before serving the notice of acceleration and
24 enforcement, as to whether there was a default. They

Page 122

1 weren't able to point to any analysis done by anyone
2 else. That's in the Goldstein deposition, at 42:19 to
3 43:14 and 104:17 to 105:8. So they're relying almost
4 exclusively on these amendments, and they're trying to
5 say that we are estopped from arguing there was no
6 default.
7          But the defined term, as I said,
8 cannot make it an estoppel. And all the cases they're
9 relying on are all cases where there was an estoppel
10 certificate.
11          So I'll take you through them. In
12 *Hammelburger v. Foursome Inn Corp.*, the mortgagor
13 executed an estoppel certificate saying there were no
14 defenses or offsets to the mortgage. That's not the
15 case here. We never agreed there were no defenses.
16          In *Four Asteria*, it's the same. The
17 estoppel certificate was denying claims against the
18 lenders. Against the lenders, yeah.
19          And in *Joab Com. Laundries v. Reeder*,
20 the defendant entered into a stipulation promising to
21 allow a confession of judgment if he did not perform
22 certain repairs. There's nothing like this here. We
23 didn't concede anything. We just entered into an
24 amendment. Everybody was negotiating. Everybody

Page 123

1 keeps their powder dry. They want to call it the
2 specified default so they don't waive their right.
3 Fine. We don't agree, but we're going to try and
4 negotiate.
5          So, Your Honor, we don't believe that
6 any of these breaches justify acceleration of the
7 loan. And we don't believe that the amendments change
8 that at all. And we -- we believe that plaintiffs
9 have failed to show that there was a breach with
10 respect to Whitehat, given the fact there was no
11 actual obligation to achieve the Whitehat guarantee at
12 all, and that the possibility of doing so was
13 foreclosed by impossibility.
14          As to financial reports, they've not
15 shown how they've been negatively impacted, how the
16 security and chance of repayment has been impacted by
17 the fact that we didn't provide certain information,
18 like comparisons to previous years.
19          And as for the audited statements,
20 they haven't shown any impairment from that either,
21 even though we -- and, certainly, we hope to provide
22 those next month, when BDO completes its audit.
23          And BDO, by the way, was already in
24 the audit. It was auditing the subsidiaries. It's

Page 124

1 just now taking over the audit of the parent company.
2          And none of that is enough to
3 accelerate the $1.2 billion loan.
4          And the negative publicity and this
5 litigation and leaks to the press by the lenders,
6 that's all put us under immense pressure and damaged
7 access to capital, and there are serious claims that
8 we intend to pursue in New York.
9          Now, why are they playing such
10 reckless hardball? And that's kind of the sub-context
11 here. Because, as you know from the agreement, from
12 page 20 of the credit agreement, distressed debt
13 investors are not supposed to be in this deal, and yet
14 they're all over this deal. Redwood, which I
15 mentioned earlier, grew to be the biggest holder here,
16 with over $200 million. Their own LinkedIn profile
17 page says that they're an SEC-registered investment
18 advisor that focuses primarily on distressed and
19 stressed credit opportunities.
20          Redwood also stated in a recent SEC
21 filing that it focuses on distressed and stressed
22 investments, primarily in the fixed income markets.
23 It's no secret. It's right there in the filings.
24          HG Vora, another member of the

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS Doc 42-2 Filed 02/29/24 Page 197 of 410

Page 125

1  steering committee, has the second-largest holding, I
2  think. Maybe not, but it is a large holder, over
3  $100 million. It lists distressed investing as one of
4  its specialties on their LinkedIn page.
5          And another steering group member,
6  Silver Point, was recently described by Bloomberg as
7  "among the titans of distressed investing."
8          So that's what's going on here. They
9  were not supposed to even be in the deal, and they're
10 driving the bus, and they're driving it over a cliff.
11         THE COURT: So why didn't BYJU's Alpha
12 exercise its disqualification rights?
13         ATTORNEY KORPUS: Because we were
14 negotiating in good faith. We were trying not to
15 antagonize the lenders. We were trying to get to a
16 deal. We were negotiating in good faith. They
17 weren't.
18         But what we wouldn't do, they asked us
19 as a precondition to the negotiations to waive the
20 right forever. And we wouldn't do that. We said, as
21 part of an amendment, we'll waive it. But we're not
22 going to waive it on day one and lose all leverage.
23 But we won't exercise it for now because we really do
24 want to get to a deal with you. And now we're being

Page 126

1  penalized for doing so.
2          In any event, it doesn't really
3  matter, because even after we exercised it, they're
4  refusing to recognize the validity of it because
5  they're saying that, at this point, Mr. Pohl took
6  over, and the parent guarantor did not have the right
7  to serve the notice. And that's an issue we're going
8  to have to fight about in New York court.
9          THE COURT: Your brief states that
10 BYJU's was initially unaware that the lenders were
11 being controlled by distressed debt dealers. Can you
12 reconcile that with what you just explained as to how
13 public that information was?
14         ATTORNEY KORPUS: Yeah. I mean, they
15 didn't -- they executed the master consent. They
16 didn't go through the 180 lenders and research each
17 one of them online to see what business they were in,
18 right? They -- at the time, Redwood wasn't such a big
19 holder. And they don't know who is in the debt market
20 and who's doing what, and it wasn't really relevant to
21 them.
22         They must -- the agreement expressly
23 recognizes that notwithstanding the master consent,
24 you still have the right to come back in the future

Page 127

1  and disqualify the distressed lenders if you find out
2  that they were distressed lenders. It specifically
3  allows for that right, and that's exactly what's going
4  on here.
5          The other -- we have a point about --
6  sorry. I just wanted to address the nonpayment of
7  interest now, after all this damage has been done.
8          To be clear, we don't believe that's
9  a -- I don't believe their argument that it's a basis
10 for putting in Mr. Pohl, because it happened *ex post
11 facto*, right? You can't turn back the clock and rely
12 on something that happened later. But just to give
13 you the context, the brief doesn't really argue that
14 nonpayment gives them the right in this 225 action to
15 put Mr. Pohl in as a director. And their complaint
16 doesn't do it, and they didn't move to amend the
17 complaint. We certainly object to being able to rely
18 on actions that happened later.
19         But Mr. Czeschin did say that they
20 sent an invoice for the interest that wasn't paid, and
21 that's actually not true. Because when you look at
22 what they sent us, which is JX 287, what they sent us
23 is an invoice for the whole amount, for $1.25 billion,
24 in accelerated term loans, plus interest, plus

Page 128

1  $8 million of professional fees that we don't believe
2  they're entitled to, because the agreement says
3  they're only entitled to one advisor and they've got
4  an army of advisors. And they made it clear that if
5  we were to pay just the interest, they're going to
6  apply to the profits first.
7          So we never actually got a bill for
8  the interest. We would have paid the bill for the
9  interest, but that's not what they were trying to do.
10 They were not backing away from the acceleration. We
11 are ready to go back and pay the interest if the Court
12 finds that there was no default here.
13         Your Honor, just to address unclean
14 hands. Plaintiffs waited five months from the first
15 supposed breach on the quarterly unaudited financials
16 until they actually said anything about it, like I
17 said, at the end of August 2022. And then they waited
18 11 months to take action, by serving a notice of
19 acceleration.
20         And they say that no good deed goes
21 unpunished because they were negotiating a resolution
22 with us. But that really inverts the reality. They
23 weren't acting in good faith. They were using this
24 threat of acceleration to squeeze concessions with

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 198 of 410

Page 129

1    tens of millions of dollars and completely rewrite the
2    obligations.
3                And when you look at the negotiation
4    history, it actually tells you that.  So in October
5    2022, after these defaults, so-called defaults
6    happened, lenders made two "offers."  And I'm using
7    speech marks.  The first was to pay the entire term
8    loan at 105 percent, plus all kinds of costs.  So more
9    than they would get in an acceleration, acceleration
10   plus.
11               And the second was perhaps even more
12   Draconian.  It was immediate payment of two-thirds of
13   the loan, as well as an exit fee of the total loan for
14   each month it was still outstanding, and a consent fee
15   of 402 percent and penny warrants of 5 percent of the
16   parent's guarantor with antidilution provisions.
17   That's in the declaration of Mr. Ravindran.  And those
18   offers were not good-faith attempts, and they were
19   actually way beyond the pale.
20               And we continued to negotiate in good
21   faith, and you have some of that.  We responded, in
22   JX 202 and 203, with a term sheet which offered
23   concessions worth tens of millions of dollars,
24   including an interest rate increase of 300 basis

Page 130

1    points, 3 full percent, and further interest rate
2    increases.
3                That was summarily rejected by the
4    lenders, who countered, in JX 202 and 203, with an
5    immediate pay-down of $252 million at the penalty
6    premium for 105 percent, and a further 240 million to
7    be put in a blocked account.
8                So that's kind of how the negotiations
9    have gone here.  That just gives you the flavor.  I
10   recognize it may be not germane to the contractual
11   issues, but I think context is important here.
12               And then, in addition to that, there
13   are -- there's a bag of bad tricks.  They admit that
14   they contacted 300 financial institutions, telling
15   them of the remedies they exercised.  They threatened
16   to illegally disclose confidential information, in
17   violation of an NDA, until I had to send an email
18   telling them it would be a violation and they, backed
19   off.  That was in JX 273.
20               They had their Hong Kong advisor
21   contact potential investors telling them, don't invest
22   in this company.  All just to put leverage on us.  All
23   because they are -- they've been hijacked by the
24   steering committee of these distressed debt investors

Page 131

1    who are not supposed to be in the deal in the first
2    place.
3                Your Honor, I just briefly, before I
4    end, want to address the fees paid to Mr. Pohl, which
5    we have an issue with in our brief.
6                Mr. Pohl has agreed to pay himself
7    $75,000 a month for a minimum of three months under
8    some independent director agreement that he entered
9    into.  That dates back to March 3.  When he took over
10   BYJU's Alpha in May, he was back-paid $150,000 for
11   months he didn't actually serve as a director because
12   he didn't have control of anything.
13               We're not -- so he's already paid
14   himself, at the time of his deposition, $375,000 for
15   being a director of a company that doesn't have any
16   assets, doesn't have any operation, doesn't do
17   anything, not clear what he does.  Level of pay
18   doesn't make any sense.  And we believe it's a
19   violation of the status quo order.
20               Having said that, if the Court were to
21   keep him in place, we'd be willing for him to -- while
22   the case goes to New York, we'd be willing, you know,
23   to put up with it.  But otherwise, we really don't
24   believe that it's appropriate level of compensation.

Page 132

1                He says it is part of the ordinary
2    course of business provision of the SQO.  We don't
3    think there's anything ordinary about that
4    compensation.  Plaintiffs argue that they benchmarked
5    it against the market for independent directors.  I
6    don't think they benchmarked it against the market for
7    independent directors of an SPV, and if they did, then
8    I think we're in the wrong business.
9                So that's where we are on that issue,
10   Your Honor.  We believe this is a self-dealing
11   transaction and that those payments are contrary to
12   the SQO.
13               That's all I have, I believe, unless
14   you have any questions for me.
15               THE COURT:   No.  Thank you very much.
16               ATTORNEY KORPUS:   Thank you, Your
17   Honor.
18               ATTORNEY CZESCHIN:   Thank you, Your
19   Honor.
20               I want to start by getting back to you
21   on some of the questions that you asked.
22               You asked about whether or not any of
23   the amendments dealt with the disqualification issue.
24   It does come up in Amendment No. 7, one of the later

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript  - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 199 of 410

Page 133

1   amendments. And the parties agreed --
2                ATTORNEY KORPUS:   I'm sorry, Your
3   Honor.  I didn't realize there was going to be a
4   reply.  I thought Mr. Czeschin had already used all of
5   his time.
6                THE COURT:   I'll give you a couple
7   more minutes at the end as well.  Thank you.
8                ATTORNEY CZESCHIN:   The parent
9   guarantor did agree that they would not attempt to
10  disqualify a lender for a period of time during the
11  negotiations.  But that was one of the later
12  amendments.  In all of the earlier amendments, there
13  was no such agreement, and that was only for -- there
14  was a period of time during the forbearance period,
15  and a tail period afterwards, they agreed that they
16  would not exercise that disqualification right.  But
17  they never exercised that right during all of the
18  prior months in which they claim now they were being
19  oppressed and they had the ability to do so.
20               So I wanted to address Your Honor's
21  question on that.
22               Focusing now on the other side's
23  argument.  I think that their position, first on the
24  forum, is clearly incorrect.  As we said, we believe

Page 134

1   Pohl is here in a personal capacity.  This affects his
2   office.  This affects his ability to get the pay that
3   we just heard about.  This is personal to him.  We
4   think he is here in a personal capacity.
5                But beyond that, GLAS certainly has a
6   right.  They are the stockholder.  They own 100
7   percent of the stock now of BYJU's Alpha.  They have
8   the right.  And under the plain language of that forum
9   selection clause, it provides that GLAS is not bound.
10  GLAS can go wherever it wants.
11               And I think their argument that
12  they're trying to make is, well, the exception related
13  to GLAS says relating to the agreement, and it doesn't
14  say arising out of the agreement.  I believe there's
15  Delaware case law that says relating to the agreement
16  is broader language than arising out of.  It's
17  broader.  So the GLAS exception is broader, and you
18  have that same exception in every one of the
19  agreements.
20               So clearly the intent was, of the
21  parties, that GLAS could sue wherever GLAS wanted to.
22  It was only the borrowers that were bound to sue in
23  New York.
24               We talked a little bit about the New

Page 135

1   York action.  They didn't file a *McWane* there.  They
2   don't make a *McWane* argument because it's the
3   later-filed action.  It was filed months after this
4   case was filed.  And that case, you know, it will take
5   a very long time to get resolved in New York.  And the
6   whole purpose of Section 225 is to provide a prompt
7   means to resolve these types of disputes.
8                And they said, well, it's only an SPV,
9   a special purpose entity.  There's no assets; there's
10  nothing that can be done.  That is wrong.  It might be
11  a special purpose entity, but it's not the case that
12  this case getting resolved isn't important to the
13  parties and to the company.
14               This is a company that has an
15  accelerated $1.2 billion debt.  And, you know, I don't
16  want to get into the issue a lot about the
17  $500 million transfer that we talked about before, but
18  this company might have a right to go after that
19  $500 million that was transferred out.  And, you know,
20  those issues need to be resolved promptly.
21               This is important.  It's important to
22  GLAS.  It's important to the lenders that we figure
23  out who's in charge of this company so we can figure
24  out whether or not this company can chase that $500

Page 136

1   million; you know, whether it can do other things
2   related to the acceleration of the loan.
3                So it is very important.  It is
4   exactly what Section 225 provides for, as you can see
5   in the *Hawk Holding* case, which was very similar.
6                They then say, well, ah, you really
7   haven't suffered any harm.  You know, just a bunch of
8   financial statements.
9                Your Honor, these are lenders on a
10  $1.2 billion debt.  And they contracted to know
11  information about the financial stability of the
12  company that's supposed to repay them back, and that's
13  really their collateral.
14               And if you don't have any information
15  about what is going on at that company, especially not
16  audited information, then that is impairing your
17  collateral.  That is affecting you.  That is making
18  your investment not what you intended to be.  This
19  isn't what they bargained for, and they're losing
20  their rights to transparency.
21               There was a lot of the focus on the
22  contract, and said, well, "Specified Defaults" doesn't
23  mean it's really a default.  We don't think that's
24  credible.

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS    Doc 42-2    Filed 02/29/24    Page 200 of 410

Page 137

1    And then this idea that they said
2  well, you're entitled to send the notice of event of
3  default and acceleration, but that doesn't mean that
4  we don't have defenses. You know, I also don't think
5  that's credible, but it's also beside the point.
6    Because the trigger event in the
7  pledge agreement and the security agreement is the
8  sending of the notice. It's not whether or not the
9  notice is -- whether or not they have some defenses to
10 the notice, they have arguments against the notice.
11 The triggering event that allows GLAS to take over
12 control is the delivery of the notice. And if they
13 want to challenge it, I guess they can challenge it.
14 But that triggering event, when that notice was sent,
15 GLAS had the power to take over the company. And
16 that's what the contract says. And that's JX 19.
17    They also then looked at that first
18 waiver agreement, and Your Honor was correct. All
19 that first waiver agreement said was you guys didn't
20 get the Whitehat guarantee by April 1; we agree not to
21 enforce that obligation for another six months. So
22 this is not the lenders acting in a predatory manner.
23 They're saying, fine, take another six months.
24    Now, did they ask for some fee in

Page 138

1  connection with that? Yes. Because lenders do that.
2  You know, you didn't live up to your obligation, so
3  we're going to give you six months more. You know,
4  you're going to have to pay our legal fees in
5  connection with this, et cetera. That's just normal
6  course. That is not acting in bad faith.
7    There are several other points that I
8  wanted to highlight for Your Honor in their answer to
9  the complaint.
10    Well, first, before we get there,
11 they -- well, they say that -- you went through the
12 financial statements that we did get and the first set
13 of financials in March of 2022, and said, oh, look at
14 these financials; we gave you information.
15    It didn't have all of the information.
16 It was only nine months consolidated. They didn't
17 break out the last quarter so that we could see how
18 the business was -- was doing in the last quarter,
19 whether or not it was trending down or trending up.
20 It all gets blended together over a nine-month period.
21    They also didn't provide us the last
22 year comparable numbers so you can see how the
23 performance this year compares to last year; again, to
24 see, is the business trending up or is it trending

Page 139

1  down.
2    And there's no dispute about this.
3  They admit it in their answer, that they didn't
4  provide that. It's paragraph 54 of the answer.
5  "Defendants admit that ..., around March 16, [], Think
6  and Learn provided GLAS with financial statements for
7  the then-elapsed portion of [the] fiscal year" -- so
8  that's the nine months -- "[] that it did not provide
9  GLAS with financial information for [the] third fiscal
10 quarter and ... did not provide GLAS with [fiscal]
11 information for [the] previous fiscal year."
12    There's no dispute that the stuff that
13 they were giving us -- yes, they gave us numbers, but
14 those numbers were not in accordance with the
15 contract.
16    And then, also, when you get to
17 September, they failed to give us the audited numbers,
18 which is particularly significant, and as I think Your
19 Honor noted.
20    There was also the statement about,
21 well, the unconscionable conduct of the lenders in
22 this whole argument. We don't think that that is
23 correct at all. But they said, well, we're going to
24 do that in New York. We didn't -- we can't do that

Page 140

1  here. They can do it here, and, in fact, they have
2  done it here. If you look at the affirmative
3  defenses, in the answer to the complaint, they say
4  "Plaintiffs' acceleration and enforcement actions are
5  unconscionable and unwarranted because the purported
6  bases for acceleration are trivial [and]
7  inconsequential." That's the first affirmative
8  defense in their answer to the complaint.
9    But then they chose not to take any
10 discovery on it. They could have sent a subpoena to a
11 lender. They could have, you know, taken Redwood's
12 deposition. They didn't want the evidence in the
13 record.
14    The only person that brought forth
15 evidence would be our side, when we had the deposition
16 of Mr. Spencer, who was the Houlihan Lokey attorney or
17 financial advisor.
18    So they didn't make any effort to
19 support their affirmative defense. They just want to
20 really rely on lawyer argument and say, oh, it's so
21 horrible what the lenders are doing here.
22    And that just -- that's ridiculous.
23 This is not predatory behavior. This isn't a case
24 where they had a footfault, they missed a deadline,

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 201 of 410

Page 141

1  and then the next day the lender calls the loan. This
2  has been going on for over a year almost, now, and
3  there have been months and months of negotiations, and
4  there was forbearance after forbearance after
5  forbearance.
6            What would they have rather us done,
7  accelerate the loan six months ago instead of
8  negotiating? You know, we took the lesser course and
9  tried to negotiate a resolution. That is not
10  unconscionable conduct.
11            Also, you know, when you're a lender
12  and you're not getting the financial information that
13  you were promised, then you go to the other side and
14  you say, we're not getting the stuff that we were
15  promised. We want that, but now I'm also really
16  concerned about my debt. I want something else. You
17  know, not only do I want the information you didn't
18  give me, but because you didn't give it to me, now I'm
19  really concerned. I would like you to pay down some
20  of the debt. I would like to get, you know, my 1.2
21  billion go down to a billion. There's nothing wrong
22  with that. That's what lenders do. That's what
23  Mr. Spencer testified.
24            You know, they're in a bad position.

Page 142

1  They want to de-risk because they've got a company
2  that its internal controls are so bad they can't
3  produce compliant quarterly financials internally, and
4  they can't produce audited financials at all.
5            So --
6            THE COURT:   Why don't you make one
7  more brief point and then I'll ...
8            ATTORNEY CZESCHIN:   I've got it.
9  Thank you, Your Honor.
10            THE COURT:   Thank you.
11            ATTORNEY CZESCHIN:   The only point I'd
12  like to make is, you know, on Redwood, they were an
13  original lender. They consented to Redwood being in
14  the debt. I think that's clear from the record, the
15  master consent agreement.
16            I also want to note we do have a
17  hearsay objection to Mr. Riju Ravindran's declarations
18  being considered for the truth of the matter. They're
19  hearsay under 801, and there's no exception.
20            THE COURT:   Thank you very much.
21            ATTORNEY CZESCHIN:   Thank you.
22            ATTORNEY KORPUS:   I'll be very brief,
23  and then you can go celebrate your son's birthday,
24  Your Honor.

Page 143

1            THE COURT:   Oh, thank you. I don't
2  know how you-all knew about that. That's a little
3  creepy.
4            ATTORNEY KORPUS:   Your Honor, first of
5  all, on the jurisdiction clause, maybe there is case
6  law that says "relating" is broader than "arising."
7  But the difference here is that you have above arising
8  and relating, and then the draftsmen especially took
9  the arising out of the exceptions. So it says
10  relating only. So it's not for disputes arising out
11  of the contract. That's a distinction drawn within
12  the clause itself.
13            Mr. Czeschin said that it's going to
14  take forever in New York. If it is as simple and
15  straightforward as they say, it will be determined on
16  a motion to dismiss. If it's as simple -- they'll do
17  what we did here. The reason they agreed to this, and
18  the reason we agreed to this hearing on a paper
19  record, is because we don't believe that there is
20  really any need for any witnesses here. We believe we
21  can argue on this issue based on the record.
22            Yes, we didn't subpoena the lenders.
23  We're still talking to the lenders. We're still
24  negotiating. We're still hoping to do a deal. It's

Page 144

1  what we want to do. We didn't want to aggravate them
2  further by having to subpoena them. But we believe
3  you have everything you need to make a determination.
4            They got lots of financial
5  information. For the first time, I had Mr. Czeschin
6  recognize, saying exactly what I told you. They got
7  some information, they got three quarters, but on the
8  fourth quarter, they didn't get comparables. That's
9  not enough. That's not enough to accelerate a
10  $1.2 billion loan.
11            And he says that on the -- giving
12  notice, that the -- the act of just giving the notice
13  is enough to accelerate the loan. That's all they
14  have to do. That's absurd. If that was the case,
15  there wouldn't be any lawsuits. You could issue a
16  default notice even when there's no default at all and
17  accelerate the loan. That's not how it works. You
18  always have the right to come to court and say, hey,
19  that acceleration wasn't proper.
20            And we didn't say that we can't argue
21  unconscionability here as a defense of the 225. What
22  we said is, number one, we have claims for damages
23  arising from that, and those can be brought in New
24  York. And in any event, the entire dispute as to

GLAS Trust Company LLC, et al, v. Riju Ravindran, et al. - 8/4/23 Section 225 Trial Transcript - Del Chanc. C.A. No. 2023-0488-MTZ

Case 24-50013-BLS   Doc 42-2   Filed 02/29/24   Page 202 of 410

Page 145

1   whether or not there has been a default belongs in New
2   York, because it's so fundamental.  Not just to what
3   we're doing here.  They want to take this decision and
4   use it in other jurisdiction and say, a-ha, the Court
5   found that there was a default.  A New York court is
6   the right court to make that decision.  That's what
7   the parties agreed to.
8              And I believe that's all I have, Your
9   Honor.
10             THE COURT:   Thank you very much.
11             ATTORNEY KORPUS:   Thank you.
12             THE COURT:   I wanted to know if
13  you-all planned on exchanging one more round of
14  briefing.  Obviously, you joined issue today, but I
15  only have one round; basically, your simultaneous
16  openings.
17             ATTORNEY CZESCHIN:   The pretrial
18  order -- or not the pretrial order, the scheduling
19  order, I believe says that there won't be post-trial
20  briefing.  We haven't talked about it.
21             If Your Honor thinks post-trial
22  briefing would be helpful, I'm happy to talk with them
23  about it.  But if Your Honor thinks that the record as
24  it is is sufficient, we're happy to stand on it as

Page 146

1   well.
2              ATTORNEY KORPUS:   We'd be happy to do
3   it if Your Honor wants it.
4              THE COURT:   All right.  I'll let you
5   know.  I just wanted to check in on your expectations.
6              Thank you all very much.  Travel safe.
7   I appreciate the accommodation on the time.  I
8   remembered why you knew that, and thank you very much.
9              Take care.
10             (Court adjourned at 12:30 p.m.)
11
12                      - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 147

1                    CERTIFICATE
2              We, JULIANNE LABADIA and DEBRA A.
3   DONNELLY, Official Reporters for the Court of Chancery
4   of the State of Delaware, do hereby certify that the
5   foregoing pages numbered 3 through 146 contain a true
6   and correct transcription of the proceedings as
7   stenographically reported by us at the hearing in the
8   above cause before the Vice Chancellor of the State of
9   Delaware, on the date therein indicated.
10             IN WITNESS WHEREOF we have hereunto
11  set our hands at Wilmington, this 4th day of August,
12  2023.
13
14  /s/ Julianne LaBadia      /s/ Debra A. Donnelly
    ------------------------  ------------------------
15  Official Court Reporter   Official Court Reporter
16
17
18
19
20
21
22
23
24

**ATTORNEY CICERO:**
**[2]** 3/4 3/12
**ATTORNEY**
**CZESCHIN: [57]** 3/19
4/2 4/6 4/10 7/11 7/23
15/2 15/9 23/7 23/14
24/11 25/13 25/24 28/7
28/20 28/23 39/20
39/24 40/8 41/21 42/6
42/11 43/1 43/3 43/14
44/18 45/8 45/11 46/6
46/10 46/20 46/23
47/23 49/5 49/9 50/7
53/15 57/15 64/21 65/3
65/9 65/21 66/20 66/23
67/7 67/19 68/20 68/24
69/11 70/10 71/1
132/18 133/8 142/8
142/11 142/21 145/17
**ATTORNEY KORPUS:**
**[65]** 53/6 73/4 73/12
79/23 80/3 80/7 80/17
82/3 82/7 82/17 83/2
83/7 83/10 83/24 84/16
85/20 86/1 86/6 86/11
90/16 91/10 91/14
91/21 94/17 95/4 95/6
96/21 96/23 97/4 99/1
99/11 99/22 100/2
101/3 101/9 101/12
102/20 102/23 103/4
103/16 103/21 104/23
107/9 107/11 109/7
109/21 110/9 111/4
111/20 116/21 118/9
118/13 118/18 118/22
119/3 119/8 119/18
125/13 126/14 132/16
133/2 142/22 143/4
145/11 146/2
**ATTORNEY NEAL: [1]**
3/13
**THE COURT: [121]**
2/19 3/11 3/18 4/1 4/5
4/8 7/5 7/22 14/21 15/3
23/2 23/11 24/8 25/2
25/23 28/4 28/18 28/22
39/18 39/21 40/5 41/15
41/24 42/7 42/18 43/2
43/10 44/10 45/4 45/10
45/18 46/9 46/14 46/22
47/22 49/1 49/6 49/23
53/14 57/13 64/15
64/22 65/4 65/16 66/15
66/21 67/4 67/14 68/6
68/21 69/5 70/3 70/11
72/22 73/2 73/10 79/21
79/24 80/4 80/12 81/24
82/4 82/14 82/23 83/3
83/9 83/16 84/10 85/17
85/23 86/5 86/9 90/12
91/6 91/13 91/20 94/16
94/18 95/5 96/18 96/22
97/3 98/24 99/7 99/18
100/1 100/23 101/7
101/11 102/17 102/22
103/2 103/10 103/18

104/22 107/5 107/10
109/3 109/14 110/8
111/3 111/19 116/16
117/22 118/10 118/15
118/20 118/23 119/7
119/17 125/11 126/9
132/15 133/6 142/6
142/10 142/20 143/1
145/10 145/12 146/4
**VARIOUS COUNSEL:**
**[1]** 3/2

**$**
**$1.2 [11]** 6/15 28/2
74/11 74/24 94/10
113/22 115/10 124/3
135/15 136/10 144/10
**$1.2 billion [11]** 6/15
28/2 74/11 74/24 94/10
113/22 115/10 124/3
135/15 136/10 144/10
**$1.25 [1]** 127/23
**$1.25 billion [1]** 127/23
**$100 [1]** 125/3
**$100 million [1]** 125/3
**$150,000 [1]** 131/10
**$165 [1]** 120/22
**$165 million [1]** 120/22
**$200 [1]** 124/16
**$200 million [1]** 124/16
**$216 [1]** 121/2
**$216 million [1]** 121/2
**$22 [1]** 6/10
**$22 billion [1]** 6/10
**$252 [1]** 130/5
**$252 million [1]** 130/5
**$300 [1]** 41/1
**$300 million [1]** 41/1
**$33 [1]** 120/20
**$33 million [1]** 120/20
**$375,000 [1]** 131/14
**$38 [1]** 32/12
**$38 million [1]** 32/12
**$500 [4]** 88/5 135/17
135/19 135/24
**$500 million [3]** 88/5
135/17 135/19
**$75,000 [1]** 131/7
**$8 [1]** 128/1
**$8 million [1]** 128/1
**$9 [1]** 75/11

**'**
**'21 [1]** 113/13
**'22 [3]** 99/16 113/13
113/13
**'23 [2]** 112/22 113/13
**'Event [1]** 13/24
**'h [1]** 52/7
**'important [1]** 52/5
**'in [1]** 51/17
**'must [1]** 52/5
**'presumptively [1]**
78/22
**'provisions [1]** 52/3
**'specifically' [1]** 78/23

**-**
**-and [2]** 2/6 2/10

**....' [1]** 51/21

**/**
**/s [2]** 147/14 147/14

**0**
**0526 [1]** 1/23

**1**
**1.11 [6]** 115/13 118/2
118/6 118/11 118/14
118/19
**1.12 [1]** 87/21
**1.2 [1]** 141/20
**10 [1]** 18/20
**10.2 [1]** 20/12
**10.9 [2]** 62/9 77/21
**100 [1]** 134/6
**100 percent [2]** 4/17
29/22
**104:17 [1]** 122/3
**105 [5]** 101/10 103/19
109/15 129/8 130/6
**105:8 [1]** 122/3
**10:46 [1]** 72/24
**11 [3]** 35/15 35/16
128/18
**111 [9]** 33/20 33/21
34/18 35/14 36/22 37/2
37/3 37/14 48/1
**11400 [1]** 1/22
**117 [1]** 48/1
**11:03 [1]** 73/1
**12 [3]** 9/10 85/19 98/6
**125 [1]** 21/8
**127 [1]** 21/8
**129 [2]** 13/18 21/8
**12:30 [1]** 146/10
**12th [1]** 8/24
**13 [3]** 98/6 112/24
113/2
**138 [1]** 92/23
**14 [2]** 88/19 113/3
**144 [1]** 21/8
**145 [2]** 112/22 113/4
**146 [1]** 147/5
**147 [1]** 21/8
**148 [1]** 78/1
**15-minute [1]** 72/23
**150 [1]** 113/12
**151 [1]** 113/14
**152 [1]** 113/15
**155 [1]** 22/20
**157 [1]** 120/16
**16 [2]** 110/21 139/5
**166 [1]** 107/20
**167 [2]** 107/20 107/21
**168 [3]** 9/1 9/7 47/6
**17 [1]** 105/20
**170 [1]** 22/13
**172 [1]** 120/21
**175 [1]** 16/21
**18 [3]** 63/2 63/5 82/9
**180 [2]** 10/4 126/16
**187 [2]** 18/22 35/5
**19 [4]** 20/22 63/2 111/1
137/16
**19801 [1]** 1/23

**1st [3]** 18/7 18/8 37/24
**2**
**20 [2]** 105/10 124/12
**2019 [1]** 92/24
**202 [2]** 129/22 130/4
**2020 [1]** 53/21
**2021 [6]** 13/17 44/4
54/8 60/6 60/7 110/19
**2022 [8]** 8/24 9/10
10/5 10/15 11/9 12/12
12/17 16/8 16/22 17/4
17/9 19/13 37/24 38/4
38/22 38/23 39/4 43/6
43/7 43/8 43/16 46/16
54/2 54/11 98/14 98/18
99/13 101/19 103/8
103/14 105/10 108/19
110/21 112/6 112/22
120/9 120/17 120/23
128/17 129/5 138/13
**2023 [4]** 1/13 87/15
120/24 147/12
**2023-0488-MTZ [1]** 1/5
**2024 [1]** 88/12
**2025 [1]** 53/22
**203 [2]** 129/22 130/4
**21 [7]** 13/14 13/18 62/9
77/22 78/1 98/23
120/23
**219 [1]** 121/1
**220 [1]** 121/1
**225 [30]** 1/18 4/14 5/11
31/3 61/2 61/3 68/23
69/8 69/16 69/17 71/22
72/2 72/7 72/11 72/13
82/15 83/1 83/6 83/17
83/18 83/20 84/15 88/7
89/10 90/13 90/13
127/14 135/6 136/4
144/21
**225s [1]** 66/17
**22nd [1]** 59/12
**23 [1]** 63/6
**24 [4]** 13/17 17/4 60/6
87/15
**240 [1]** 130/6
**24th [3]** 16/7 16/22
44/3
**25 [3]** 17/8 19/13 88/20
**255-0526 [1]** 1/23
**25th [1]** 19/10
**26 [1]** 88/2
**27 [2]** 10/15 120/17
**273 [1]** 130/19
**27th [1]** 10/5
**287 [1]** 127/22
**29 [1]** 112/17

**3**
**30 [1]** 63/6
**300 [2]** 129/24 130/14
**302 [1]** 1/23
**30th [1]** 11/9
**31 [8]** 92/4 11/9 53/22
54/2 54/8 54/8 54/11
110/19
**311 [1]** 53/5
**317 [3]** 98/6 105/9

**105/20
32.13 [2]** 92/21 93/12
**34 [1]** 89/15
**37 [1]** 6/17
**3rd [3]** 27/21 31/23
37/6

**4**
**400 [1]** 98/4
**402 [1]** 129/15
**4089744 [1]** 92/24
**42:19 [1]** 122/2
**43:14 [1]** 122/3
**45 [2]** 13/7 16/6
**45-day [2]** 16/7 34/5
**4th [1]** 147/11

**5**
**5.1 [6]** 9/21 10/22
43/15 45/9 110/12
111/22
**5.14 [1]** 44/15
**5.17 [15]** 37/20 39/1
39/22 41/7 41/16 42/21
43/9 43/23 44/19 46/12
46/24 47/13 47/21 51/1
98/11
**5.9 [25]** 12/7 12/10
38/20 39/22 40/1 41/12
41/20 42/9 42/15 43/15
43/15 44/9 45/10 45/11
45/12 46/12 46/13
99/23 100/3 100/3
100/6 104/5 104/7
104/18 108/8
**50 [1]** 92/23
**50 percent [2]** 27/16
27/19
**500 [2]** 1/12 1/22
**51 [1]** 21/15
**516 [1]** 92/22
**54 [1]** 139/4
**55 [1]** 89/12
**59 [1]** 110/24

**6**
**6th [1]** 18/10

**7**
**7.1 [1]** 30/6
**75 [3]** 11/10 110/20
113/1

**8**
**8.1 [5]** 13/2 13/11 15/5
15/5 34/6
**801 [1]** 142/19
**8th [2]** 12/17 12/21
44/7

**9**
**98 [1]** 98/23
**9:15 [1]** 1/13

**A**
**a.m [3]** 1/13 72/24 73/1
**ab [1]** 49/24
**ab initio [1]** 49/24
**abandon [1]** 33/5

# A

**ability [12]** 28/5 54/16 81/22 83/18 90/13 90/17 114/9 116/17 118/2 118/16 133/19 134/22

**able [18]** 15/16 28/9 32/9 32/13 34/12 43/20 54/13 54/15 55/18 56/4 56/5 65/19 71/16 89/8 105/15 106/2 122/1 127/17

**above [4]** 30/2 63/10 143/7 147/8

**absence [2]** 46/15 109/5

**absent [2]** 51/2 51/3

**absurd [1]** 144/14

**accede [14]** 12/5 37/11 40/2 46/2 47/4 47/11 56/14 59/14 59/23 100/5 100/10 105/2 107/7 108/7

**accedes [1]** 104/10

**acceding [4]** 44/11 45/24 46/18 100/24

**accelerate [27]** 16/18 17/14 29/17 49/17 50/24 72/18 72/19 92/3 94/9 95/21 109/22 115/10 116/2 116/11 116/24 117/1 117/19 118/12 118/14 118/16 118/19 119/22 124/3 141/7 144/9 144/13 144/17

**accelerated [4]** 37/4 37/5 127/24 135/15

**accelerating [2]** 74/24 87/6

**acceleration [60]** 15/17 16/16 17/11 18/14 19/15 20/19 27/23 31/10 33/24 37/6 37/13 43/2 43/4 48/5 48/10 48/15 48/23 49/4 50/2 50/6 51/18 74/8 77/14 77/17 92/1 92/8 92/14 93/14 93/22 94/19 94/20 95/2 96/17 96/20 96/24 108/10 109/24 113/21 116/19 116/20 118/5 118/24 119/1 119/4 119/12 119/13 119/15 121/10 121/23 123/6 128/10 128/19 128/24 129/9 129/9 136/2 137/3 140/4 140/6 144/19

**access [2]** 32/5 124/7

**accommodation [1]** 146/7

**accomplish [2]** 30/5 109/20

**accordance [3]** 20/11 54/19 139/14

**according [1]** 88/12

**accounts [4]** 32/6 32/6 114/22 116/1

**achieve [3]** 73/22 97/22 123/11

**achieving [1]** 114/20

**acknowledge [2]** 16/14 101/21

**acknowledged [2]** 17/1 19/24

**acknowledgement [1]** 50/12

**acknowledges [3]** 16/12 18/13 58/15

**acknowledgment [3]** 50/10 50/11 94/24

**act [2]** 57/17 144/12

**acting [10]** 28/14 58/2 59/6 65/18 66/21 67/17 90/7 128/23 137/22 138/6

**action [31]** 4/14 25/12 32/1 54/4 61/2 62/18 62/22 64/14 65/5 70/17 71/16 71/22 78/15 79/14 80/22 82/5 84/11 84/14 85/21 85/21 85/24 88/7 90/8 91/16 93/11 95/24 114/18 127/14 128/18 135/1 135/3

**actions [12]** 4/16 4/20 4/21 5/2 5/16 20/4 30/4 31/3 32/21 72/8 127/18 140/4

**activating [1]** 75/1

**active [1]** 89/14

**activities [1]** 105/7

**actor [1]** 68/11

**actual [8]** 9/8 16/20 18/21 18/23 61/8 93/15 98/8 123/11

**add [2]** 91/2 115/2

**added [4]** 14/2 14/4 91/3

**addition [2]** 85/16 130/12

**additional [12]** 12/10 12/11 37/23 39/13 40/3 42/17 59/14 97/10 97/13 97/21 105/12 107/1

**address [12]** 8/5 53/11 86/7 90/2 90/12 95/5 106/18 113/23 127/6 128/13 131/4 133/20

**addressed [4]** 25/22 98/20 98/22 121/13

**adds [2]** 8/24 9/1

**adequate [1]** 56/13

**adjourned [1]** 146/10

**Admin [1]** 115/18

**Administrative [6]** 1/2 9/21 10/21 17/9 19/13 62/17

**admit [8]** 8/12 8/13 11/19 17/12 52/22 130/13 139/3 139/5

**admitted [2]** 49/19 50/14

**admitting [1]** 19/18

**adopted [1]** 59/12

**advisor [5]** 26/9 124/18 124/23 136/20 140/17

**advisors [5]** 5/19 18/2 18/2 86/17 128/4

**affairs [1]** 87/23

**affect [4]** 29/11 62/14 78/12 80/14

**affecting [1]** 136/17

**affects [2]** 134/1 134/2

**affidavits [1]** 70/12

**affiliated [3]** 70/12 70/23 108/16

**affiliates [2]** 97/8 97/15

**affirm [1]** 71/9

**affirmative [3]** 140/2 140/7 140/19

**aforesaid [1]** 54/21

**afterwards [1]** 133/15

**against [13]** 62/19 81/1 84/20 85/13 85/14 87/4 88/24 93/7 122/17 122/18 132/5 132/6 137/10

**agent [18]** 1/2 1/3 9/21 10/21 15/15 17/19 19/14 36/4 62/15 62/15 62/16 62/17 63/11 63/14 68/21 78/13 90/10 115/18

**aggravate [1]** 144/1

**aggressive [1]** 73/24

**ago [4]** 53/17 54/14 86/24 141/7

**agreed [42]** 12/16 17/1 20/1 20/14 23/4 24/2 24/18 38/17 41/4 44/4 44/19 45/14 45/17 47/14 48/8 48/9 48/13 66/11 76/3 77/22 77/23 78/5 80/18 81/6 81/18 84/3 86/15 88/22 95/16 95/16 102/13 102/14 104/2 108/18 116/13 122/15 131/6 133/1 133/15 143/17 143/18 145/7

**agreeing [1]** 103/8

**agreement' [1]** 52/6

**agreements [9]** 23/5 33/3 51/18 52/13 62/23 63/18 104/13 121/19 134/19

**agrees [3]** 16/12 18/13 102/1

**ah [1]** 136/6

**ahead [6]** 27/21 30/11 30/14 31/24 97/3 97/4

**all [90]** 1/15 17/20 19/19 23/3 25/5 26/2 29/21 30/4 30/5 30/7 35/7 36/2 36/3 36/7 37/11 46/22 47/24 48/11 55/6 55/8 57/8 57/9 61/2 63/3 63/17 65/20 65/24 67/1 69/13 77/2 77/6 80/11 81/18 84/9 85/15 86/21 86/22 89/13 90/22 95/13 95/13 95/15 95/16

**95/24 96/10 97/7 100/3 100/19 101/14 102/5**

**104/15 106/22 107/6 107/18 107/22 108/17 111/15 113/7 113/20 115/11 120/1 121/9 122/8 122/9 123/8 123/12 124/6 124/14 125/22 127/7 129/8 130/22 130/22 132/13 133/4 133/12 133/17 137/18 138/15 138/20 139/23 142/4 143/2 143/5 144/13 144/16 145/8 145/13 146/4 146/6**

**all-caps [2]** 36/2 36/3

**allege [3]** 114/12 114/12 114/14

**alleged [4]** 74/20 87/20 92/4 95/17

**allegedly [1]** 61/22

**alleging [1]** 72/2

**allocate [2]** 106/12 106/13

**allocated [2]** 106/14 106/16

**allow [7]** 79/13 79/17 92/3 92/11 95/9 104/7 122/21

**allowed [6]** 63/14 94/11 107/1 116/1 116/24 117/20

**allowing [1]** 93/7

**allows [5]** 63/19 113/21 115/10 127/3 137/11

**almost [5]** 68/21 75/11 120/18 122/3 141/2

**alone [1]** 91/2

**alongside [1]** 97/14

**ALPHA [36]** 1/6 4/17 5/5 6/3 17/21 22/16 22/18 23/7 29/23 30/1 32/8 36/6 40/17 65/19 66/19 66/22 67/5 68/10 68/10 68/14 68/16 70/6 70/8 70/12 72/24 77/18 90/6 94/10 98/9 100/9 101/2 104/18 121/12 125/11 131/10 134/7

**Alpha's [2]** 67/16 87/22

**alternative [1]** 75/23

**although [1]** 113/9

**always [1]** 144/18

**am [1]** 106/17

**amend [1]** 127/16

**amended [6]** 9/5 13/20 13/20 15/7 49/19 76/4

**amending [4]** 9/13 13/10 13/10 15/5

**amendment [58]** 8/22 8/23 9/9 10/6 12/15 13/21 14/2 14/23 16/4 16/5 16/5 16/6 16/10 16/11 16/21 17/3 17/5 18/10 18/11 18/12 18/17 18/24 19/3 19/4 20/8 21/3 21/4 34/13**

**34/14 34/17 34/18 34/23 34/24 35/4 35/7 35/11 36/11 36/23 37/14 44/6 47/5 50/4 59/4 96/4 96/12 101/5 101/8 102/7 102/10 102/17 106/24 106/9 109/10 116/3 116/5 122/24 125/21 132/24**

**amendments [35]** 8/4 8/10 8/11 8/17 9/12 26/3 26/11 28/18 28/21 29/3 33/6 47/1 47/2 47/16 50/21 57/9 58/21 59/21 60/4 75/8 75/10 95/2 95/13 95/18 101/2 101/4 107/2 110/1 121/18 122/4 123/7 132/23 133/1 133/12 133/12**

**amends [1]** 13/2

**among [2]** 33/3 125/7

**amount [2]** 42/13 127/23

**ample [1]** 108/15

**analysis [2]** 121/22 122/1

**anchor [1]** 114/23

**another [17]** 6/5 10/18 12/4 18/10 18/19 44/7 46/24 51/1 52/24 64/3 77/5 88/20 117/11 124/24 125/5 137/21 137/23

**answer [8]** 11/18 25/19 88/2 138/8 139/3 139/4 140/3 140/8

**antagonize [1]** 125/15

**antidilution [1]** 129/16

**anymore [1]** 116/5

**anyone [1]** 122/1

**anyone's [1]** 76/2

**anywhere [4]** 64/7 80/15 95/18 96/8

**apologize [1]** 117/24

**apparently [1]** 22/21

**appeals [2]** 51/11 92/14

**APPEARANCES [1]** 1/24

**appears [1]** 35/3

**appellate [1]** 92/6

**applicable [3]** 5/23 46/6 54/20

**application [1]** 52/9

**applies [3]** 59/18 76/24 95/7

**apply [10]** 6/24 7/17 33/16 37/4 37/15 60/2 78/19 94/23 106/10 128/6

**applying [1]** 49/12

**appoint [3]** 4/19 4/24 5/10

**appointed [3]** 32/23 53/19 65/11

**appointing [1]** 30/10

**appoints [3]** 30/3 30/22 30/24

**A**

appreciate [1] 146/7
appropriate [3] 80/4
83/12 131/24
appropriateness [1]
89/4
approval [44] 38/4
38/5 39/4 40/7 40/10
41/9 42/1 42/22 43/17
43/19 43/20 44/12
44/17 45/7 45/13 45/22
45/23 46/3 46/4 46/7
46/16 46/19 60/17
60/19 97/22 98/3 98/4
98/5 98/13 99/12 99/16
99/21 100/4 100/19
101/18 101/20 103/15
104/8 104/9 105/2
105/12 106/8 106/11
107/8
approve [1] 38/7
April [51] 12/12 12/20
37/24 38/4 38/22 38/23
39/4 39/10 39/12 39/12
39/14 39/14 39/16 40/3
40/5 40/9 40/11 41/5
41/10 41/11 41/12 42/1
42/17 43/6 43/7 43/8
43/16 43/21 43/22 44/1
44/5 44/12 44/23 45/1
45/2 45/7 45/12 45/19
45/22 46/4 46/16 47/4
53/21 98/14 98/18
99/13 99/16 101/13
101/19 103/8 137/20
April 1 [42] 12/12
12/20 38/4 38/22 38/23
39/4 39/10 39/12 39/12
39/14 39/14 39/16 40/3
40/5 40/9 40/11 41/5
41/10 41/11 41/12 42/1
42/17 43/6 43/7 43/8
43/16 43/21 43/22 44/1
44/5 44/12 44/23 45/1
45/2 45/7 45/12 45/19
45/22 46/4 46/16 47/4
53/21
April 1st [1] 37/24
area [1] 48/16
argue [9] 52/19 79/10
89/4 89/22 106/9
127/13 132/4 143/21
144/20
arguing [5] 42/14 71/3
89/10 96/16 122/5
argument [44] 4/3
14/16 14/21 33/2 33/11
33/12 37/2 37/17 47/1
56/19 56/23 57/6 59/16
59/18 60/12 60/24 61/7
62/1 62/6 63/22 82/24
83/4 83/11 86/4 88/9
88/24 89/8 89/9 90/13
91/4 94/21 95/7 98/16
100/24 108/6 118/1
118/8 118/9 127/9
133/23 134/11 135/2
139/22 140/20

arguments [8] 5/12
29/13 35/18 33/19 48/1
48/2 114/4 137/10
arise [1] 67/5
arises [1] 83/18
arising [18] 78/6 78/16
80/19 81/2 82/5 82/11
82/18 82/19 84/2 102/9
115/14 134/14 134/16
143/6 143/7 143/9
143/10 144/23
army [1] 128/4
around [7] 7/6 49/8
67/2 69/14 70/17 117/2
139/5
Arsht [2] 2/5 3/15
article [3] 13/19 13/20
13/21
artificial [1] 74/2
ASHBY [3] 2/6 3/16
89/1
aside [1] 60/3
ask [3] 21/12 33/6
137/24
asked [12] 21/3 21/3
22/3 22/7 66/8 83/17
86/3 88/19 88/19
125/18 132/21 132/22
asking [1] 82/22
aspect [1] 7/5
aspects [2] 7/10 98/6
asserted [1] 92/8
asserting [2] 70/22
99/20
asset [2] 81/1 84/20
assets [7] 76/12 81/22
92/4 105/14 107/22
131/16 135/9
assume [4] 4/16 5/6
102/24 108/5 108/7
assumed [2] 60/18
60/20
assumes [1] 119/4
Asteria [1] 122/16
astral [1] 64/16
asymmetrical [2]
79/10 79/11
attempt [2] 106/20
133/9
attempts [2] 97/24
129/18
attorney [4] 30/4 30/19
65/23 140/16
attorney-in-fact [2]
30/4 30/19
audit [10] 53/1 54/6
54/9 54/13 54/15 54/19
56/2 123/22 123/24
124/1
audited [34] 9/22 10/2
10/10 10/14 10/17 11/3
27/1 37/8 52/21 52/22
55/1 55/2 55/15 55/19
55/23 94/6 109/5
109/11 110/10 111/19
111/23 115/8 115/24
116/12 117/1 117/11
117/13 120/3 120/19
121/4 123/19 136/16

139/17 142/4
auditing [2] 94/20
123/24
auditor [4] 53/18 53/23
55/1 55/19
auditors [2] 53/19
54/22
Audits [1] 55/15
August [9] 1/13 59/12
60/7 88/20 105/10
112/16 113/2 128/17
147/11
August 22nd [1] 59/12
authority [4] 25/18
49/6 57/13 87/21
authorized [1] 29/21
avoidance [1] 39/3
avoids [1] 94/12
aware [3] 4/7 4/13
69/16
away [5] 21/9 28/21
29/1 55/20 128/10

**B**

back-paid [1] 131/10
backed [1] 130/18
backfire [1] 75/17
background [2] 33/1
56/17
backing [1] 128/10
bad [6] 50/11 87/11
130/13 138/6 141/24
142/2
bad-faith [1] 87/11
bag [1] 130/13
balance [3] 28/1 111/9
113/6
ball [1] 75/5
bank [4] 32/5 38/6
97/23 105/10
banker [1] 65/23
Bar [2] 2/7 2/12
barely [1] 111/14
bargained [1] 136/19
barring [1] 87/16
base [1] 119/13
based [8] 42/14 74/3
87/10 90/7 95/21
116/11 119/22 143/21
bases [1] 140/6
basic [1] 41/16
basically [4] 13/7 61/1
72/6 145/15
basis [9] 11/1 56/13
58/6 59/9 73/21 90/7
92/8 127/9 129/24
BDO [4] 117/10 117/11
123/22 123/23
became [3] 27/7 28/2
105/17
become [6] 8/14 14/11
16/1 40/2 69/3 91/11
becomes [2] 23/22
29/20
becoming [1] 61/18
bedrock [2] 5/22 33/5
began [1] 14/22
beginning [4] 31/2
60/23 78/18 81/11

behalf [8] 2/6 3/21 4/0
17/18 97/1 105/11 27/9
68/14
behavior [1] 140/23
belongs [5] 70/5 70/6
71/18 86/14 145/1
benchmarked [2]
132/4 132/6
benefited [1] 73/17
Benson [3] 2/12 3/10
73/5
beside [1] 137/5
best [2] 6/10 99/17
bestowed [4] 90/14
90/15 90/16 91/8
between [8] 15/10
24/15 31/22 38/16
45/20 48/20 77/7
104/11
beyond [3] 57/3 129/19
134/5
big [2] 6/15 126/18
biggest [1] 124/15
bill [2] 128/7 128/8
billion [16] 6/10 6/15
28/2 74/11 74/24 94/10
98/2 113/22 115/10
124/3 127/23 135/15
136/10 141/21 141/21
144/10
bind [5] 62/22 67/8
70/18 100/8 100/9
binders [1] 73/8
binding [1] 69/24
birthday [1] 142/23
bit [5] 64/16 76/12
107/17 120/6 134/24
black [1] 45/20
blank [1] 30/13
blended [1] 138/20
blocked [1] 130/7
Bloomberg [1] 125/6
blow [2] 19/22 36/1
board [2] 23/16 55/8
55/10 72/13
BOD [1] 117/10
books [2] 54/10 55/16
borne [1] 105/23
borrow [4] 60/10 81/16
105/15 106/3
borrower [11] 22/16
23/10 32/8 40/17 42/17
48/12 58/15 75/2 76/11
81/15 100/11
borrower's [1] 97/15
borrowers [2] 114/12
134/22
borrowing [2] 105/21
106/7
both [6] 12/18 24/20
59/10 73/20 98/5 98/5
bottom [9] 9/11 13/1
19/2 35/18 36/2 36/3
62/12 103/11
bound [11] 64/12 68/5
69/19 71/12 71/15
71/15 89/24 90/11
100/20 134/9 134/22
box [2] 36/15 45/20

breach [52] 14/12
15/12 38/15 38/23 39/5
39/11 39/15 39/17
41/10 41/17 42/2 42/15
43/8 43/13 43/22 44/1
44/9 44/13 44/17 44/24
45/3 45/7 46/2 46/3
46/4 46/7 46/7 46/11
46/14 46/17 49/14
49/16 50/14 50/15
51/12 52/1 52/20 87/9
92/8 92/16 93/14 94/1
94/4 104/24 112/5
114/8 115/9 115/14
120/18 120/19 123/9
128/15
breached [1] 137/12
breaches [10] 9/16
50/24 74/4 74/21 74/22
87/5 94/13 111/23
114/15 123/6
break [1] 138/17
breaking [1] 99/8
breathing [1] 69/7
brief [23] 7/12 8/6 39/2
49/10 51/8 57/16 58/8
78/21 79/10 83/5 89/13
92/7 92/13 92/24 93/19
98/21 98/22 114/1
126/9 127/13 131/5
142/7 142/22
briefing [4] 25/5
145/14 145/20 145/22
briefly [1] 131/3
briefs [1] 56/17
bring [22] 12/24 13/13
13/14 36/14 53/5 57/6
62/18 65/19 71/6 71/16
78/14 79/13 80/15
80/22 80/24 81/1 83/18
87/4 87/8 89/23 90/13
91/8
bringing [5] 65/5 65/6
65/10 65/11 68/11
broad [1] 87/1
broader [5] 39/22
134/16 134/17 134/17
143/6
BROCK [2] 2/2 3/20
brother [1] 31/12
brought [8] 4/14 67/17
76/21 85/20 85/21 91/2
112/10 144/23
Brown [2] 2/9 3/5
bsent [1] 51/22
bucket [2] 83/22 84/12
budget [1] 115/15
bullet [2] 50/20 50/21
bunch [2] 40/19 136/7
burden [1] 56/21
bus [1] 125/10
business [13] 23/13
40/6 40/10 43/17 45/13
75/19 89/14 107/23
126/17 132/2 132/8
138/18 138/24
busy [1] 86/12
but [151]
buy [3] 6/11 68/6

## B

**buy...** [1] 120/13
**buying** [4] 120/16
121/5 121/6 121/6
**Byju** [2] 31/11 55/11
**BYJU'S** [74] 1/6 4/17
5/5 5/24 6/3 6/7 7/24
10/2 16/11 17/20 22/16
22/18 23/7 24/20 27/6
27/22 28/5 29/22 29/24
30/1 30/12 30/15 30/19
31/13 32/8 36/6 40/17
53/2 61/9 61/14 65/19
66/18 66/22 67/5 67/16
68/10 68/10 68/14
68/15 70/6 70/8 70/12
70/24 73/18 74/6 74/9
75/5 75/19 75/23 76/4
76/14 76/22 77/18
87/22 90/5 94/10 95/16
97/8 98/9 98/10 100/9
101/2 104/18 108/6
109/17 110/21 111/6
113/10 121/7 121/12
125/11 126/10 131/10
134/7

## C

**CA** [1] 78/21
**call** [4] 17/14 61/10
88/14 123/1
**called** [8] 13/21 18/11
18/24 61/15 74/5 77/13
97/9 129/5
**calling** [1] 87/6
**calls** [2] 74/12 141/1
**can't** [19] 23/19 43/23
48/4 48/18 56/3 57/11
57/12 59/8 59/16 66/14
69/20 84/9 116/5 118/5
127/11 139/24 142/2
142/4 144/20
**capacity** [10] 1/2 62/16
64/19 65/6 65/11 65/15
71/4 71/11 134/1 134/4
**capital** [3] 73/21 75/23
124/7
**capitulate** [1] 76/15
**caps** [2] 36/2 36/3
**care** [2] 121/5 146/9
**carve** [2] 78/10 82/12
**carve-out** [2] 78/10
82/12
**case** [45] 5/22 6/11
7/12 7/24 8/20 11/18
24/1 24/13 24/16 24/23
24/24 30/17 31/7 33/15
51/11 51/14 56/20
67/21 67/23 69/12 72/1
72/1 72/11 76/19 76/21
77/1 77/12 80/11 92/7
93/19 95/10 105/19
113/24 115/5 122/15
131/22 134/15 135/4
135/4 135/11 135/12
136/5 140/23 143/5
144/14
**cases** [20] 5/11 48/11

48/15 48/19 49/17
49/18 50/8 50/9 50/10
51/6 51/8 51/18 57/16
57/24 58/14 86/12
92/21 95/9 122/8 122/9
**cash** [6] 26/18 26/19
26/21 111/10 113/6
113/7
**cause** [6] 39/5 41/17
42/2 108/12 118/24
147/8
**causes** [1] 29/17
**causing** [1] 58/3 70/16
76/14
**ceased** [1] 27/13
**celebrate** [1] 142/23
**Center** [2] 1/11 1/22
**CEO** [1] 31/13
**certain** [6] 4/21 21/17
50/23 114/24 122/22
123/17
**certainly** [7] 24/11
49/20 60/13 71/12
123/21 127/17 134/5
**certificate** [6] 30/12
115/16 122/10 122/13
122/17 146/14
**certificates** [3] 21/17
21/19 21/22
**certify** [1] 147/4
**cetera** [2] 111/8 138/5
**chain** [1] 25/9
**challenge** [4] 5/12 31/5
137/13 137/13
**Chambers** [1] 1/11
**chance** [1] 123/16
**Chancellor** [2] 1/15
147/8
**CHANCERY** [4] 1/1
1/11 1/21 147/3
**change** [7] 52/12 60/4
60/11 105/18 106/6
106/7 123/7
**charge** [1] 135/23
**chase** [2] 81/22 135/24
**check** [2] 28/24 146/5
**Chipman** [2] 2/9 3/5
**chose** [2] 77/6 140/9
**chutzpah** [1] 88/15
**CICERO** [5] 2/9 2/9 3/5
3/5 86/3
**circular** [2] 119/9
119/20
**circumscribed** [1]
51/20
**cite** [9] 7/12 7/18 22/10
39/8 48/12 49/10 56/20
67/21 92/23
**cited** [2] 51/15 57/16
**cites** [1] 57/18
**citizen** [1] 90/19
**claim** [14] 57/17 66/18
66/24 68/12 68/12
69/22 70/5 70/5 71/6
74/19 77/1 91/8 116/23
133/18
**claiming** [2] 57/5 57/8
**claims** [12] 85/13
85/14 86/21 86/22 87/4

87/9 87/11 90/5 108/3
92/17 124/7 144/22
**clause** [31] 19/2 62/8
62/9 64/13 67/8 68/3
68/5 69/9 69/13 69/20
76/24 77/3 77/20 78/9
79/1 79/9 79/14 81/17
81/17 90/11 90/21
98/20 99/1 100/15
101/15 103/11 103/19
104/6 134/9 143/5
143/12
**clauses** [4] 50/23
78/22 79/11 79/18
**clean** [1] 107/17
**clear** [20] 11/23 24/5
27/3 38/21 46/11 46/13
60/15 62/21 64/2 64/5
64/5 64/6 67/9 72/16
110/13 117/5 127/8
128/4 131/17 142/14
**clearly** [11] 14/18
33/16 36/13 55/3 62/1
62/4 68/4 78/24 99/1
133/24 134/20
**client** [1] 64/10
**cliff** [1] 125/10
**clock** [1] 127/11
**close** [2] 36/15 107/13
**closely** [2] 64/11 64/19
68/4
**co** [2] 3/9 3/15
**co-counsel** [2] 3/9
3/15
**cognizable** [1] 117/23
**Cole** [2] 2/9 3/5
**collateral** [7] 1/3 30/8
62/16 63/11 63/14
136/13 136/17
**colleague** [2] 3/16 3/22
**Collection** [1] 84/16
**collections** [1] 84/11
**collision** [1] 109/3
**colloquially** [1] 64/24
**colorable** [2] 66/18
66/24
**Com** [1] 122/19
**combination** [1] 73/16
**comes** [4] 32/4 32/18
61/12 109/7
**comfort** [1] 55/24
**coming** [6] 7/1 7/6
58/17 61/14 94/21
105/23
**commence** [2] 54/13
54/15
**commencing** [1] 53/21
**commercial** [21] 38/3
38/13 41/8 43/11 44/14
44/16 52/10 93/1 98/13
99/3 99/4 99/15 100/12
100/16 100/19 100/22
102/8 104/1 104/4
104/15 104/20
**commercially** [8]
38/14 38/20 44/21
44/23 101/17 101/22
106/14 109/17
**committee** [4] 74/13

87/9 87/11 90/5 108/3
committees [1] 76/15
**communication** [1]
54/6
**companies** [2] 98/10
108/17
**company** [44] 1/2 2/8
4/20 5/7 6/9 18/3 26/17
27/7 31/13 40/18 40/24
53/10 54/2 54/23 55/17
68/2 72/4 75/17 76/11
77/15 89/14 90/15
90/18 95/19 95/20
95/22 97/8 113/10
113/15 113/20 117/8
117/19 124/1 130/22
131/15 135/13 135/14
135/18 135/23 135/24
136/12 136/15 137/15
142/1
**company's** [1] 89/12
**comparable** [1] 138/22
**comparables** [1] 144/8
**comparative** [1]
112/10
**comparatives** [1]
113/19
**compares** [1] 138/23
**comparing** [1] 113/13
**comparison** [1] 113/11
**comparisons** [1]
123/18
**compel** [1] 88/2
**compensation** [2]
131/24 132/4
**complained** [1] 112/10
**complaining** [6] 54/3
112/6 112/16 113/11
121/3 121/8
**complaint** [10] 86/24
88/15 88/21 90/7 92/20
127/15 127/17 138/9
140/3 140/8
**complete** [4] 10/23
11/3 51/10 54/19
**completely** [3] 23/21
119/20 129/1
**completes** [2] 30/12
123/22
**completion** [1] 114/21
**compliance** [4] 21/17
21/18 21/22 52/4
**compliant** [3] 11/14
27/2 142/3
**concede** [1] 122/23
**conceded** [5] 8/1 8/2
17/22 72/17 72/18
**concern** [2] 22/7 27/9
**concerned** [5] 26/14
26/16 27/6 141/16
141/19
**concerning** [1] 40/14
**concerns** [5] 18/5 26/6
26/12 37/21 109/10
**concessions** [5] 8/19
74/6 75/14 128/24
129/23
**conclusion** [1] 49/7
**concurrent** [1] 63/15

74/12 125/1 130/24
**condition** [1] 27/7
**conditions** [1] 114/20
**conduct** [8] 48/8 48/13
51/24 87/8 114/7
114/14 139/21 141/10
**confession** [1] 122/21
**confidential** [1] 130/16
**confirm** [2] 4/15 29/1
**confirmed** [1] 65/13
**confirming** [1] 32/20
**conglomerate** [2] 6/1
24/19
**connected** [1] 55/13
**connection** [2] 138/1
138/5
**consent** [14] 4/23
30/21 30/23 32/20
32/22 61/14 61/16
61/16 61/17 75/11
126/15 126/23 129/14
142/15
**consented** [2] 61/9
142/13
**consequences** [1]
102/3
**consider** [5] 71/23
83/5 83/7 114/4 115/23
**consideration** [1] 59/2
**considered** [3] 72/5
82/24 142/18
**consolidated** [3]
111/17 112/3 138/16
**constitutes** [1] 48/8
**contact** [1] 130/21
**contacted** [2] 66/8
130/14
**contain** [2] 24/8 147/5
**context** [8] 7/14 69/16
69/17 70/7 93/12
124/10 127/13 130/11
**continue** [2] 76/7 85/9
**continued** [2] 93/9
129/20
**continuing** [1] 103/8
**contract** [37] 6/24 9/17
11/14 14/8 14/12 14/19
15/10 15/22 33/19 34/6
37/17 37/20 38/18
39/13 45/6 48/1 56/21
57/7 57/17 58/5 58/10
60/16 60/20 67/10
67/10 68/4 69/14 69/24
71/12 71/23 72/5 72/16
94/3 136/22 137/16
139/15 143/11
**contracted** [3] 49/8
118/5 136/10
**contracted-for** [1]
118/5
**contractual** [12] 5/6
5/8 8/17 15/18 19/20
27/20 48/2 74/4 75/14
79/18 105/5 130/10
**contractually** [1] 75/13
**contrary** [1] 132/11
**control** [6] 4/16 4/18
5/7 87/22 131/12
137/12
**controlled** [1] 126/11

# C

controls [1] 142/2
copies [1] 4/11
copy [1] 4/8
core [1] 87/21
corner [1] 117/2
Corp [2] 78/21 122/12
Corporation [1] 4/15
correct [11] 21/23
46/21 64/21 79/23 82/3
82/7 89/1 91/17 137/18
139/23 147/6
cost [2] 111/7 120/4
costs [1] 129/8
coterminous [1] 41/19
counterclaims [1]
86/21
countered [1] 130/4
counterfactual [1]
108/9
couple [2] 29/6 133/6
course [6] 71/24 73/16
109/3 132/2 138/6
141/8
Court's [2] 87/14 88/1
courtroom [1] 3/22
courts [12] 7/19 62/20
63/7 63/13 64/2 78/19
79/17 79/17 92/15
92/22 93/13 95/9
covenant [2] 44/14
87/9
covenants [2] 51/3
55/22
covered [2] 78/16
102/4
covering [1] 87/1
created [1] 74/2
credibility [1] 55/12
credible [2] 136/24
137/5
credit [65] 5/5 6/12 7/3
8/5 8/11 9/1 9/2 9/13
9/13 9/22 10/1 11/1
12/7 12/9 13/2 13/11
13/12 13/16 18/4 20/12
21/10 21/16 27/15 28/8
33/8 33/20 34/3 36/8
37/21 50/22 54/16
55/22 56/1 59/5 60/5
62/24 64/10 64/12
65/24 67/1 67/2 67/5
69/20 74/15 77/21
77/22 83/19 83/21 84/2
87/5 89/24 90/10 90/21
97/10 97/20 98/9
104/24 107/14 108/6
115/9 115/12 115/13
116/8 124/12 124/19
creditor [3] 51/24 72/2
114/8
creepy [1] 143/3
crystal [4] 64/2 64/5
64/5 64/6
crystal-clear [1] 64/5
crystalline [1] 64/1
cure [37] 9/5 9/5 13/4
13/7 13/8 14/13 14/13

15/6 15/7 15/14 15/21
16/11 16/12 17/12
17/12 18/6 19/4 19/7
19/8 20/1 20/14 20/16
34/5 34/7 34/8 34/12
34/20 36/10 36/12 37/7
116/2 116/5 116/9
116/10 118/2 118/24
cured [21] 8/14 14/10
16/13 17/6 18/16 18/16
19/9 20/9 20/9 34/1
34/9 34/15 34/16 35/11
35/20 35/21 36/19
37/12 115/17 116/18
118/17
cut [1] 95/2
cuts [1] 118/23
CZESCHIN [22] 2/2
3/20 74/22 75/9 78/10
82/9 86/15 90/1 94/20
96/2 98/16 99/8 99/19
101/5 110/14 113/24
114/6 121/18 127/19
133/4 143/13 144/5
Czeschin's [1] 53/8

# D

damage [2] 117/16
127/7
damaged [1] 124/6
damages [5] 87/7
93/15 94/5 94/5 144/22
data [1] 111/6
date [32] 12/14 12/17
17/4 18/17 20/6 20/10
32/17 33/23 34/8 34/17
35/12 36/20 40/4 40/6
40/12 41/6 44/4 45/17
45/19 60/19 62/24
98/18 101/13 101/21
101/24 103/3 103/5
103/6 103/20 103/24
104/2 147/9
dated [3] 9/9 13/17
19/1
dates [1] 131/9
DAVID [2] 2/11 3/9
day [13] 16/7 16/9 34/5
41/3 44/2 55/4 55/5
55/5 55/13 96/15
125/22 141/1 147/11
days [11] 10/4 11/10
13/7 16/6 32/11 40/6
40/10 43/17 45/13
110/20 113/1
de [2] 52/8 142/1
de minimis [1] 52/8
de-risk [1] 142/1
dead [2] 46/15 98/18
deadline [4] 44/12
45/14 46/13 140/24
deal [12] 33/18 74/1
74/18 76/5 77/6 124/13
124/14 125/9 125/16
125/24 131/1 143/24
dealers [2] 74/16
126/11
dealing [2] 52/15 87/10
132/10

deals [3] 14/8 14/20
15/22
dealt [2] 132/23
DEBRA [2] 147/2
147/14
debt [25] 48/5 49/4
49/17 51/1 51/19 61/10
61/12 61/13 61/14
73/24 74/14 75/3 92/3
94/10 113/22 115/11
124/12 126/11 126/19
130/24 135/15 136/10
141/16 141/20 142/14
debts [1] 74/16
December [5] 11/9
18/7 18/8 110/19
112/24
December 1st [1] 18/7
December 31 [1] 11/9
decide [6] 7/24 18/9
77/4 83/15 84/9 84/24
decided [3] 69/2 77/8
85/15
decides [5] 5/21 77/12
85/5 85/10 91/24
decision [5] 24/10
25/12 114/10 145/3
145/6
decision-makers [2]
24/10 25/12
decisions [4] 22/17
22/18 23/13 86/13
declaration [2] 98/2
129/17
declarations [5] 23/24
24/2 24/4 24/7 142/17
declined [1] 87/15
114/4
declining [1] 26/22
deed [2] 12/6 128/20
deem [1] 118/2
deemed [9] 18/16 20/9
34/1 34/9 34/16 35/20
115/17 116/18 118/17
default [120] 5/4 5/15
8/1 8/13 8/13 8/15 9/20
10/7 10/8 12/2 12/3
13/22 13/23 14/8 14/12
14/15 14/20 15/6 15/11
15/13 15/13 15/15
15/16 15/23 16/1 16/16
16/17 17/10 17/14
17/22 18/14 20/18
27/23 29/15 29/16
29/20 31/10 32/20
33/21 34/11 46/17
47/16 48/9 48/10 48/14
50/5 50/10 50/13 50/21
51/19 52/9 52/11 52/13
52/13 58/15 58/17 59/9
72/3 72/6 74/3 74/5
74/19 74/20 81/5 82/21
83/14 84/2 84/13 84/17
85/1 85/6 92/1 93/8
93/8 93/15 93/16 93/17
93/21 95/1 95/12 95/14
95/17 95/17 96/2 96/5
96/6 96/8 96/11 96/22
96/7 99/6 99/13 99/21

101/1 102/9 103/7
103/96039 104/2
110/5 110/6 112/20
114/2 114/2 114/2
114/5 116/15 116/20
119/12 121/14 121/24
122/6 123/2 128/12
136/23 137/3 144/16
144/16 145/1 145/5
Default' [1] 14/1
default.' [1] 52/14
defaulted [1] 52/12
defaults [61] 8/15 9/3
9/4 9/14 9/15 9/18 13/5
13/6 13/9 14/5 14/7
14/10 14/11 14/18
14/24 15/1 15/11 15/19
15/21 16/8 16/13 17/2
17/6 18/4 18/15 19/3
19/9 19/15 20/8 20/16
34/15 35/10 35/20
36/10 36/18 37/11 47/3
47/8 47/10 48/4 48/23
49/3 49/20 50/1 56/11
59/22 72/17 77/13 87/6
92/4 94/19 95/20 95/21
102/12 102/14 102/14
114/19 121/21 129/5
129/5 136/22
defeat [1] 119/21
defendant [3] 17/16
70/8 122/20
defendants [14] 1/7
2/13 3/6 5/12 5/14 8/3
8/12 33/4 52/12 56/16
59/8 73/6 107/11 139/5
defense [3] 140/8
140/19 144/21
defenses [7] 97/1
102/15 122/14 122/15
137/4 137/9 140/3
deferred [1] 88/18
define [2] 15/20 47/2
defined [4] 14/23 27/14
62/15 122/7
definition [9] 8/24 9/2
95/16 96/1 102/11
102/13 102/16 103/20
121/16
DELAWARE [20] 1/1
1/12 1/23 4/15 5/23
61/2 63/23 63/23 64/2
65/2 69/12 69/21 77/2
78/19 78/20 84/8 89/5
134/15 147/4 147/9
delay [4] 89/9 117/16
117/17 117/19
delayed [5] 30/17
31/21 53/4 54/3 55/3
deliver [8] 9/20 10/21
17/9 19/14 96/19
116/17 116/22 118/4
deliverable [3] 115/16
115/18 115/24
deliverables [1] 116/15
delivered [4] 29/16
29/20 38/22 38/22
delivers [1] 30/15
delivery [9] 27/24 34/1

34/4 115/17 115/19
116/17 118/3 118/24
137/12
Deloitte [8] 53/2 53/17
55/6 55/9 56/2 117/3
117/4 117/10
demands [1] 76/16
denied [2] 51/20 93/4
deny [3] 11/22 105/17
114/9
denying [1] 88/2
122/17
department [1] 22/6
depends [1] 83/20
deposed [1] 117/6
deposition [13] 21/2
21/7 21/15 22/20 26/8
52/22 56/6 57/4 117/10
122/2 131/14 140/12
140/15
depositions [2] 24/3
25/14
deriving [1] 81/24
described [1] 125/6
describing [1] 109/15
design [1] 54/18
designated [1] 32/4
despite [2] 92/16
101/16
detail [3] 8/21 57/3
75/2
detailed [4] 107/19
110/15 111/11 113/5
determination [1]
144/3
determine [4] 31/17
72/11 72/12 83/13
determined [2] 90/9
143/15
determines [1] 77/15
determining [1] 81/4
development [1]
114/18
did [40] 5/16 10/10
12/19 21/20 22/10
28/11 28/18 28/22
44/16 52/22 57/8 66/12
66/13 69/3 100/14
101/5 105/1 106/13
106/18 107/14 108/11
108/13 108/14 108/23
109/10 110/21 114/12
115/23 116/7 120/13
122/21 126/6 127/19
132/7 133/9 137/24
138/12 139/8 139/10
143/17
didn't [72] 10/15 11/15
11/20 11/23 12/20
17/12 24/4 25/19 25/20
27/1 28/17 29/4 29/9
31/17 33/7 34/11 38/19
43/12 43/18 46/19 51/1
53/12 57/2 60/19 61/22
61/23 73/15 75/9 91/1
96/13 102/15 105/14
106/1 109/22 110/14
112/10 112/18 112/19
112/19 113/9 113/12

**D**

**didn't... [31]** 115/2
117/23 119/24 121/4
121/19 121/20 122/23
123/17 125/11 126/15
126/16 127/16 131/11
131/12 133/3 135/1
137/19 138/2 138/15
138/16 138/21 139/3
139/24 140/12 140/18
141/17 141/18 143/22
144/1 144/8 144/20
**difference [2]** 38/16
143/7
**different [11]** 15/4
21/11 27/18 45/5 48/19
48/24 64/8 70/16
114/16 115/5 119/16
**differently [1]** 71/2
**direct [2]** 27/19 30/1
**director [37]** 4/19 4/19
22/16 23/16 25/15
30/23 32/4 64/20 65/1
65/8 65/12 65/18 65/19
66/4 66/7 66/19 66/22
67/5 67/18 67/23 67/24
68/1 68/8 68/15 69/10
70/23 71/4 71/8 72/4
83/15 90/5 90/18 91/9
127/15 131/8 131/11
131/15
**director's [1]** 65/1
**directors [7]** 55/7
70/15 70/16 90/14
90/17 132/5 132/7
**disagree [1]** 105/20
**disallowed [1]** 23/21
**disallowing [1]** 25/8
**disavowed [1]** 21/5
**disclose [1]** 130/16
**discontinuation [1]**
105/21
**discourse [1]** 90/1
**discovers [1]** 32/6
**discovery [1]** 140/10
**discuss [1]** 76/9
**discussed [1]** 80/14
**discussing [1]** 27/12
**discussion [2]** 70/4
99/18
**discussions [2]** 31/22
31/23
**dismiss [7]** 85/18
85/18 85/24 88/12
88/17 88/21 143/16
**dispute [12]** 10/11
10/13 10/19 11/17
63/13 80/19 86/14
87/22 110/22 139/2
139/12 144/24
**disputed [1]** 12/23
**disputes [2]** 135/7
143/10
**disqualification [9]**
28/8 29/3 29/7 29/10
61/23 74/17 125/12
132/23 133/16
**disqualified [1]** 28/11

**disqualify [6]** 28/6
28/18 28/16 28/19
127/1 133/10
**disqualifying [1]** 87/17
**distinction [3]** 100/13
104/11 143/11
**distinguishable [1]**
84/15
**distinguishes [1]**
15/10
**distress [2]** 61/10
74/10
**distressed [13]** 73/24
74/14 74/16 75/3
124/12 124/18 124/21
125/3 125/7 126/11
127/1 127/2 130/24
**division [2]** 92/7 93/1
**doctrine [10]** 7/9 48/3
52/8 59/18 60/2 94/23
95/3 105/3 106/10
107/17
**doctrines [1]** 7/15
**documents [14]** 11/13
21/5 22/22 23/18 24/16
24/23 25/11 25/17
25/20 29/24 30/3 30/13
31/6 63/17
**does [30]** 7/5 13/3
22/22 24/8 30/11 37/14
43/12 46/1 52/11 62/10
62/22 72/20 84/9 91/6
92/3 93/17 100/3
102/17 102/18 102/24
103/2 103/4 103/5
104/7 108/8 114/8
119/10 120/4 131/17
132/24
**doesn't [50]** 16/1 22/23
33/16 37/4 39/11 41/10
41/14 43/7 45/1 45/2
47/1 47/13 47/20 57/21
60/2 60/21 64/8 71/17
71/19 71/19 76/11 77/4
83/22 89/17 94/23 96/7
96/15 98/19 100/8
100/9 104/12 105/16
106/10 115/9 116/19
118/15 118/20 119/17
119/18 121/10 126/2
127/13 127/16 131/15
131/16 131/16 131/18
134/13 136/22 137/3
**doing [13]** 65/18 68/13
69/9 106/23 107/3
120/6 121/15 123/12
126/1 126/20 138/18
140/21 145/3
**dollar [1]** 97/16
**dollars [5]** 32/7 75/15
98/3 129/1 129/23
**dominated [1]** 74/13
**don't [82]** 7/12 7/13 8/5
8/14 9/15 10/17 10/19
12/22 14/13 15/11 21/6
23/18 28/23 29/11 32/5
33/11 39/14 39/23 41/9
43/22 45/2 49/18 50/13
50/18 50/24 53/7 56/18

**earth [1]** 69/8
**EBITDA [1]** 71/18
**economic [5]** 33/12
56/16 56/19 56/21 58/3
**economy [1]** 86/19
**education [2]** 6/8
73/20
**effect [7]** 37/12 54/23
102/22 102/23 103/13
105/23 121/11
**effective [5]** 4/21 36/19
66/13 101/24 103/6
**effectively [3]** 9/4 49/8
59/13
**effects [1]** 29/17
**effort [1]** 140/18
**efforts [31]** 38/3 38/13
38/15 38/16 38/20 41/8
43/11 44/14 44/16
44/21 44/24 98/13 99/3
99/5 99/15 100/12
100/16 100/19 100/22
101/16 101/17 101/22
102/8 104/1 104/4
104/9 104/12 104/15
104/20 106/15 109/18
**eight [4]** 8/10 27/12
28/12 57/9
**either [8]** 11/18 39/22
41/19 52/1 90/20 96/7
96/14 123/20
**elapsed [1]** 139/7
**element [1]** 51/22
**ELIZABETH [2]** 2/5
3/17
**else [7]** 42/10 42/12
80/16 109/2 119/15
122/2 141/16
**elsewhere [1]** 81/22
**email [3]** 89/1 89/2
130/17
**emphasize [1]** 97/12
**end [14]** 10/4 11/11
11/11 15/7 20/20 32/10
56/7 78/9 110/20 113/1
117/12 128/17 131/4
133/7
**ended [6]** 9/24 11/9
54/2 54/7 54/11 76/13
**ending [1]** 110/19
**enforce [6]** 12/16
84/18 84/20 84/22 88/3
137/21
**enforced [1]** 33/4
78/23
**enforced' [1]** 52/5
**enforcement [11]**
51/20 52/2 63/7 74/9
78/24 80/24 90/8 95/23
114/9 121/24 140/4
**engage [1]** 50/1
**engaged [1]** 114/13
**engaging [1]** 18/2
**enough [7]** 92/5
110/17 115/1 124/2
144/9 144/9 144/13
**enter [1]** 16/9 18/10
75/7
**entered [13]** 8/4 8/10

**earth [1]** 69/8 — continued cross references

8/23 10/6 48/22 58/21
60/6 68/2 115/23
116/13 122/20 122/23
131/8
**entertain [1]** 114/4
**entire [6]** 17/24 28/12
51/19 77/14 129/7
144/24
**entities [3]** 21/12 74/15
76/22
**entitle [3]** 8/16 8/17
48/23
**entitled [20]** 5/5 5/16
11/24 16/15 16/18 17/8
17/8 17/13 18/13 19/18
20/18 48/14 55/23
75/13 96/4 96/11 96/24
128/2 128/3 137/2
**entitlement [1]** 95/1
**entitlements [3]** 19/11 19/12
96/19
**entity [18]** 6/2 17/19
23/5 24/20 32/8 38/6
38/7 40/2 67/18 70/14
70/18 70/20 100/21
107/24 108/21 115/2
135/9 135/11
**entry [1]** 88/5
**enumerated [1]** 42/3
**equitable [4]** 33/9 48/3
51/21 92/10
**equity [3]** 36/10 48/6
75/22
**especially [4]** 25/4
68/7 136/15 143/8
**ESQ [8]** 2/2 2/2 2/4 2/6
2/9 2/10 2/11 2/11
**essentially [3]** 13/3
23/5 24/19
**estopped [2]** 58/16
122/5
**estoppel [5]** 7/9 122/8
122/12 122/13 122/17
**et [2]** 111/8 138/5
**even [41]** 8/5 10/16
22/15 28/12 37/13
44/24 49/13 49/13 50/1
51/4 52/3 54/15 56/18
56/22 60/3 64/22 65/13
69/19 72/10 73/9 73/13
74/14 76/7 77/11 77/15
88/11 91/23 93/5 93/12
95/8 98/20 105/1
107/13 108/5 108/8
113/10 123/21 125/9
126/3 129/11 144/16
**evening [1]** 4/12
**event [21]** 14/14 15/13
15/15 16/17 29/18 32/3
52/24 59/24 76/17
89/18 103/7 103/9
104/17 112/14 113/4
126/2 137/2 137/6
137/11 137/14 144/24
**events [19]** 5/4 5/15
8/1 8/12 8/13 8/15
13/21 13/23 13/24 14/8
14/11 14/20 15/23
17/22 59/19 72/6 73/16

**Case 24-5... Doc 42... Page ... of 410**

56/22 56/23 57/1 57/1
56/23 69/1 69/15
70/13 71/11 73/9 73/13
79/17 82/23 83/3 83/10
83/18 92/11 93/22 96/9
97/1 98/15 98/19 99/5
103/1 104/13 108/8
112/2 112/11 118/18
119/5 119/9 119/19
121/14 123/2 123/3
123/5 123/7 126/19
128/7 128/19 128/1
130/21 131/23 132/2
132/6 135/2 135/15
136/14 136/23 137/4
137/4 139/22 142/6
143/1 143/19
**done [6]** 94/8 122/1
127/7 135/10 140/2
141/6
**DONNELLY [2]** 147/3
147/14
**double [1]** 28/24
**double-check [1]**
28/24
**doubt [1]** 39/3
**down [19]** 12/2 12/24
13/13 14/3 19/1 20/6
22/24 35/18 50/4 53/20
53/24 63/9 99/8 120/9
130/5 138/19 139/1
141/19 141/21
**Draconian [1]** 129/12
**draft [1]** 105/24 106/4
**drafted [1]** 24/6
**draftsmen [1]** 143/8
**Dragons [1]** 92/22
**drawn [1]** 143/11
**driving [2]** 125/10
125/10
**drop [1]** 98/18
**drop-dead [1]** 98/18
**dry [1]** 123/1
**due [10]** 11/10 28/2
32/10 32/13 77/2 97/7
110/20 110/21 112/24
113/2
**duress [19]** 29/12
33/11 33/12 56/17
56/19 56/22 57/3 57/5
57/6 57/10 57/10 57/17
57/21 57/24 58/3 58/6
58/8 58/11 59/6
**during [6]** 6/12 11/4
26/4 28/11 29/8 31/16
85/7 133/10 133/14
133/17

**E**

**each [13]** 13/24 30/11
32/6 78/1 79/15 79/22
80/7 80/10 81/12 90/22
109/4 126/16 129/14
**earlier [14]** 20/17 34/14
40/9 40/9 41/1 43/16
43/18 43/21 45/12 47/2
58/13 60/7 124/15
133/12
**early [1]** 32/12

**E**

events... [2] 74/3 93/20
eventually [1] 27/11
everybody [5] 102/1
105/13 115/3 122/24
122/24
everybody's [2] 76/3
108/1
everyone [1] 23/4
everyone's [1] 73/17
everything [5] 11/21
11/24 106/23 109/2
144/3
everywhere [1] 84/21
evidence [6] 53/9 61/8
108/13 120/8 140/12
140/15
ex [1] 127/10
exact [1] 102/24
exactly [12] 7/14 15/9
16/6 46/20 58/18 61/4
82/9 90/3 120/18 127/3
136/4 144/6
examines [1] 72/8
example [5] 34/5 87/14
92/18 119/16 120/14
exceeds [1] 98/3
exception [8] 43/9 43/5
63/19 81/20 134/12
134/17 134/18 142/19
exceptions [1] 143/9
exchanging [1] 145/13
excluded [1] 106/2
exclusive [20] 62/10
63/8 63/24 64/3 76/24
77/19 78/3 78/17 79/16
79/19 80/1 80/10 80/19
81/10 81/16 81/18
82/10 84/3 90/11 90/23
exclusively [4] 79/6
81/6 81/7 122/4
excuse [2] 59/8 94/19
excused [1] 105/5
executed [2] 122/13
126/15
executes [1] 32/20
executing [2] 4/22 31/6
exercise [16] 5/6 8/3
8/17 27/19 29/4 29/9
31/8 58/5 58/9 58/10
61/22 69/21 91/12
125/12 125/23 133/16
exercised [4] 5/8 126/3
130/15 133/17
exercising [3] 66/3
87/17 90/18
exerting [2] 70/19
76/13
Exhibit [2] 120/16
120/21
Exhibit JX 157 [1]
120/16
Exhibit JX 172 [1]
120/21
exhibits [2] 24/9 24/12
exist [2] 33/7 36/8
existing [1] 4/23
exit [1] 129/13

expectations [1] 146/5
expedited [2] 92/19
93/5
expenses [1] 111/7
expert [4] 98/1 105/9
105/16 105/20
experts [1] 59/11
expire [1] 17/3
expired [8] 10/5 15/14
16/7 16/13 17/4 19/8
20/2 115/20
expires [2] 16/2 18/8
explain [1] 28/5 39/21
74/23 76/23 99/9
explained [3] 26/12
105/9 126/12
explicitly [1] 105/22
exploit [2] 51/24 114/8
exploitive [2] 51/23
114/13
explored [1] 25/11
expressly [6] 15/22
30/7 48/7 48/9 89/7
126/22
extended [4] 13/4 13/8
18/6 26/2
extends [1] 9/5
extension [8] 59/1
88/19 88/20 88/23
88/24 89/4 103/22
103/23
extensions [3] 57/22
58/1 58/22
extent [4] 23/23 25/10
63/14 64/7
extorted [1] 106/24
extortionate [1] 76/15
extra [1] 48/2
extra-contractual [1]
48/2

**F**

face [1] 60/2
facility [2] 6/21 7/16
fact [27] 7/6 7/15 10/18
14/6 30/4 30/19 45/6
50/10 52/12 55/3 62/23
63/5 65/7 67/10 82/1
89/3 89/15 91/3 102/14
103/1 109/19 114/6
120/8 120/11 123/10
123/17 140/1
facto [1] 127/11
factors [1] 93/13
facts [4] 7/24 10/13
12/19 61/8
factual [2] 32/24 57/20
fail [1] 39/10
failed [7] 11/3 12/5
12/12 31/24 37/10
123/9 139/17
failing [2] 49/14 52/21
fails [2] 37/3 48/16
failure [33] 9/20 10/21
33/22 39/3 41/24 42/22
43/24 44/8 44/16 46/8
47/3 47/10 47/14 51/9
51/12 56/14 59/23 93/3
99/12 99/20 108/11

11/24 114/19 115/14
115/24 116/11 116/14
118/4 118/6 119/10
119/11 119/13 119/22
failures [1] 93/2
fair [1] 87/10
faith [9] 87/10 87/11
107/17 125/14 125/16
128/23 129/18 129/21
138/6
fall [2] 83/22 84/11
family [1] 111/7
far [1] 68/6
fashioned [1] 73/14
fast [7] 40/4 40/12 41/6
45/14 45/17 45/19
73/21
fearing [1] 75/5
featured [1] 114/1
February [1] 18/20
February 10 [1] 18/20
fee [3] 129/13 129/14
137/24
fees [7] 75/10 75/12
75/12 107/1 128/1
131/4 138/4
feet [1] 101/1
felt [1] 64/15
few [5] 41/1 56/11 60/7
74/14 74/20
fiction [1] 104/12
fiduciary [1] 69/3
fifth [1] 101/15
fight [2] 75/6 126/8
figure [2] 25/3 25/6
42/19 65/4 68/12 69/6
135/22 135/23
figured [2] 73/12 73/13
file [6] 31/18 31/24
61/1 69/21 88/20 135/1
filed [10] 29/5 29/6
57/11 61/24 86/24
88/15 88/16 135/3
135/3 135/4
filing [3] 31/21 32/3
124/21
filings [1] 124/23
fills [2] 30/14 30/14
finally [4] 22/14 33/13
58/4 64/9
finance [2] 22/6 22/12
financial [58] 6/18 10/3
21/19 21/21 22/22 22/3
22/8 22/11 26/9 26/15
27/4 27/7 34/4 37/8
49/15 51/2 51/10 51/13
52/21 52/23 53/3 53/22
54/1 54/9 74/9 109/11
110/6 110/14 110/15
111/1 111/12 111/13
112/17 112/21 113/17
114/24 115/1 115/16
116/15 117/12 117/13
118/4 119/11 119/14
120/1 120/1 120/3
121/4 123/14 130/14
136/8 136/11 138/12
139/6 139/9 140/17
141/12 144/4

financials [29] 9/22
10/14 10/17 10/17 11/10
10/23 11/2 11/3 11/10
11/13 26/21 26/24 27/1
27/2 55/1 55/2 55/15
55/23 56/13 109/6
110/19 112/11 112/24
120/10 121/20 128/15
138/13 138/14 142/3
142/4
financing [1] 59/3
find [8] 57/18 77/16
91/24 112/8 112/15
112/22 113/12 127/1
finding [3] 70/4 79/4
82/20
finds [2] 51/12 128/12
fine [8] 85/10 89/19
96/24 103/24 123/3
137/23
Finger [2] 2/3 3/20
finish [1] 116/21
firm [6] 24/14 25/1 53/2
55/24 56/2 117/11
fiscal [7] 9/23 10/4
11/8 139/7 139/9
139/10 139/11
five [8] 40/6 40/9 43/17
45/12 53/21 112/16
112/17 128/14
five-year [1] 53/21
fixed [1] 124/22
flavor [2] 106/21 130/9
flip [1] 11/5
flow [5] 26/18 26/19
26/21 111/10 113/7
80/17 136/21
focus [8] 5/14 5/18
9/10 38/10 61/17 78/7
focuses [1] 124/18
124/21
focusing [2] 103/19
133/22
fold [1] 121/7
follow [2] 45/18 88/16
following [6] 13/24
20/5 20/10 35/12 36/19
103/13
footfault [1] 140/24
foothold [1] 7/7
footnotes [1] 8/6
forbear [2] 16/19 18/18
forbearance [12] 18/7
18/8 18/24 36/19 58/24
75/12 96/12 102/16
133/14 141/4 141/4
141/5
forbearances [3] 57/22
58/2 58/23
forced [1] 75/7
foreclosed [1] 22/13
foreclosure [1] 114/17
foregoing [2] 103/12
147/5
foresee [1] 106/5
foreseeable [6] 60/4
60/5 67/12 67/13
105/18 106/6
foreshadow [1] 107/16

forever [2] 125/20
143/14
forfeit [1] 117/19
forfeiting [1] 77/14
forfeiture [3] 92/9
92/15 94/12
forfeitures [1] 94/12
forget [1] 35/4
forgotten [1] 50/16
form [1] 30/13
formed [1] 23/9
former [1] 65/23
forth [2] 24/15 140/14
forthcoming [1]
101/20
forum [24] 62/7 62/8
62/9 62/10 63/22 63/24
64/12 66/14 67/8 68/3
68/5 69/8 69/13 69/20
71/18 77/3 78/22 89/1
89/5 89/6 90/21 100/15
133/24 134/8
forum also [1] 63/22
forward [1] 47/21
found [4] 66/5 67/23
72/6 145/5
founder [2] 25/16
31/12
four [7] 21/10 21/11
34/23 35/3 36/23
101/15 122/16
Foursome [1] 122/12
fourth [2] 36/18 144/8
frankly [3] 48/15 56/23
98/15
fraud [2] 51/23 79/2
friction [1] 70/4
Friday [1] 1/13
front [2] 35/5 40/15
full [2] 10/22 130/1
fundamental [3] 81/3
107/6 145/2
fundamentally [1]
82/19
funding [1] 75/23
funds [3] 28/15 74/14
74/14
further [8] 18/15 54/4
72/20 76/13 88/4 130/1
130/6 144/2
future [4] 36/8 93/17
118/3 126/24

**G**

gains [1] 32/5
game [1] 50/13
gave [8] 58/22 59/2
59/3 112/3 113/5
113/10 138/14 139/13
GDC [1] 92/23
General [1] 4/15
germane [1] 130/10
gets [2] 14/2 29/16
29/20 138/20
getting [8] 26/15 26/20
27/2 27/5 121/8 132/20
135/12 141/12 141/14
given [5] 13/6 53/10
55/13 101/2 123/10

**G**

**gives [6]** 81/22 89/11
106/20 118/19 127/14
130/9
**giving [4]** 13/8 139/13
144/11 144/12
**glanced [1]** 21/13
**GLAS [65]** 1/2 2/8 4/16
5/6 5/7 5/16 8/17 15/15
16/15 17/13 18/18
19/18 20/17 21/18
27/19 27/22 28/10
29/20 30/3 30/7 30/11
30/16 30/19 31/5 32/19
58/8 62/16 62/22 63/3
63/11 63/19 63/19 64/6
66/2 66/13 71/15 71/16
72/19 79/13 79/22
79/24 80/5 80/8 80/15
80/21 81/14 82/15 89/3
91/2 96/5 107/20
121/22 134/5 134/9
134/10 134/13 134/17
134/21 134/21 135/22
137/11 137/15 139/6
139/9 139/10
**GLAS's [2]** 8/2 91/7
**global [1]** 107/23
**goes [10]** 16/14 25/9
30/11 30/14 32/18 34/8
37/18 68/7 128/20
131/22
**Goldstein [1]** 122/2
**gone [4]** 34/20 130/9
**good [16]** 2/19 3/2 3/4
3/13 3/18 3/19 4/1 73/4
87/9 107/17 125/14
125/16 128/20 128/23
129/18 129/20
**good-faith [1]** 129/18
**got [14]** 40/19 52/16
72/16 73/10 78/10
99/19 113/17 128/3
128/7 142/1 142/8
144/4 144/6 144/7
**gotcha [2]** 107/3 107/4
**gotten [2]** 54/12
108/17
**governed [2]** 9/4 77/23
**governmental [2]** 38/6
105/7
**governs [1]** 108/8
**grab [1]** 7/21
**grace [1]** 32/11
**grade [1]** 93/21
**grant [3]** 76/18 106/11
106/11
**granted [1]** 77/11
**grew [1]** 124/15
**GRIGSBY [2]** 2/11 3/10
**group [4]** 73/23 74/12
113/15 125/5
**grown [1]** 73/21
**growth [1]** 73/22
**guarantee [44]** 12/6
12/20 12/21 12/22
37/22 38/1 38/8 38/21
39/5 39/10 39/13 40/2

40/15 40/23 41/2 41/5
41/17 42/3 42/8 42/13
42/14 42/17 44/3 44/8
44/9 45/3 46/8 47/12
47/15 51/4 56/15 59/23
94/15 97/13 98/2 98/10
101/20 102/2 102/4
105/12 108/11 108/21
123/11 137/20
**guarantees [7]** 40/16
40/18 40/20 97/14
97/17 103/14 106/8
**guarantor [24]** 9/24
11/9 12/7 12/12 20/5
36/4 37/23 38/2 40/3
43/11 47/12 59/14
76/22 87/17 97/10
97/21 98/12 105/16
107/24 115/3 115/4
126/6 129/16 134/5
**Guarantor's [2]** 87/20
101/18
**guarantors [2]** 32/16
108/15
**guess [3]** 53/1 66/18
137/13
**guy [4]** 68/18 69/2 69/4
69/18
**guys [2]** 32/16 137/19

**H**

**ha [1]** 145/4
**habit [1]** 22/22
**Hammelburger [1]**
122/12
**hand [1]** 108/3
**handle [1]** 23/13
**hands [8]** 33/14 33/16
60/24 61/1 62/1 107/17
128/14 147/11
**happened [14]** 4/22
10/9 15/20 33/1 43/4
46/18 52/24 55/13 60/1
73/23 127/10 127/12
127/18 129/6
**happening [2]** 29/9
61/22
**happens [6]** 41/11
41/11 56/8 76/8 98/19
102/6
**happy [5]** 31/15 90/1
145/22 145/24 146/2
**hard [8]** 40/4 40/12
41/6 45/14 45/17 45/19
52/20 75/5
**hard-ball [1]** 75/5
**hardball [4]** 106/21
108/24 109/15 124/10
**harder [1]** 75/22
**harm [1]** 136/7
**harmonize [2]** 79/20
81/8
**harms [1]** 112/2
**harsh,' [1]** 52/5
**hasn't [1]** 37/6
**hat [1]** 15/1
**haven't [14]** 10/15 37/7
37/9 37/10 54/12 54/15
56/4 85/17 85/18 85/23

113/18 123/20 136/7
145/20
**having [4]** 3/6 45/7
75/6 100/18 131/20
144/2
**Hawk [2]** 71/24 136/5
**he's [36]** 25/8 25/16
64/10 64/11 64/12
64/19 64/22 64/23 65/5
65/6 65/7 65/10 65/11
65/11 65/12 65/16
65/17 65/22 65/22
66/21 68/13 68/18
68/18 68/21 69/2 69/4
70/6 71/4 90/17 90/19
90/20 90/24 91/4 91/10
117/6 131/13
**head [1]** 7/13
**hear [5]** 23/23 66/10
77/16 109/14 121/3
**heard [10]** 52/7 74/21
76/19 76/20 77/1 86/20
86/23 88/17 121/18
134/3
**hearing [3]** 86/2
143/18 147/7
**hearsay [4]** 24/1 117/5
142/17 142/19
**heavily [4]** 33/13 33/15
34/10 114/1
**held [7]** 5/20 49/21
62/3 69/12 86/17 87/3
87/13
**helpful [1]** 39/8 145/22
**helping [1]** 3/23
**helps [1]** 98/21
**HENRY [1]** 2/2 3/22
67/21
**here's [1]** 9/8
**hereby [5]** 16/24 19/24
36/6 78/2 147/4
**hereto [2]** 17/1 78/1
**hereunto [1]** 147/10
**hey [5]** 32/15 58/23
71/8 112/19 144/18
**HG [1]** 124/24
**high [1]** 56/21
**highest [1]** 92/14
**highlight [1]** 138/8
**highlights [2]** 6/23
7/15
**highly [2]** 48/20 113/5
**hijacked [1]** 130/23
**him [18]** 17/18 21/3
21/3 21/12 22/3 22/7
22/17 66/8 66/13 66/14
67/11 69/24 90/18 91/2
91/3 131/21 131/21
134/3
**himself [4]** 4/24 30/24
131/6 131/14
**Hirsch [1]** 92/13
**his [21]** 21/2 23/24
52/22 55/11 56/6 57/4
64/19 65/5 65/10 65/14
67/4 67/15 69/21 71/10
90/7 98/1 117/9 131/14
133/5 134/1 134/2
**history [2]** 110/3 129/4

**hold [1]** 52/16
**holder [1]** 17/23
**holder [4]** 120/15
124/15 125/2 126/19
**holders [1]** 27/18
**holding [4]** 27/15
121/7 125/1 136/5
**Holdings [1]** 72/1
**holds [1]** 50/19
**HON [1]** 1/15
**Hong [1]** 130/20
**Honor's [4]** 4/3 25/22
87/13 133/20
**hope [1]** 123/21
**hoping [1]** 143/24
**horrible [1]** 140/21
**horse [1]** 46/15
**Houlihan [2]** 26/10
140/16
**human [1]** 67/17 68/11
69/7 70/13
**hundreds [1]** 87/7
**hurt [1]** 75/17

**I**

**I'd [2]** 28/23 142/11
**I'll [10]** 78/8 91/17
92/23 110/2 111/23
122/11 133/6 142/7
142/22 146/4
**I'm [44]** 7/21 19/11
22/5 25/6 28/24 41/21
42/18 44/13 46/4 49/10
53/6 65/4 67/14 68/8
68/17 68/24 69/5 69/6
69/16 70/21 71/8 73/13
84/8 84/19 85/23 90/1
91/13 93/22 101/9
101/10 102/23 103/16
103/18 103/19 104/3
110/5 110/10 110/17
111/21 129/6 133/2
141/15 141/18 145/22
**I've [25]** 25/7 33/11
73/10 86/12 142/8
**idea [2]** 50/1 137/1
**identified [1]** 60/22
**identify [1]** 28/10
**ignore [1]** 8/3 33/6
**ii [3]** 17/6 20/3 35/9
**illegally [1]** 130/16
**imagine [1]** 52/20
**immediate [1]** 54/23
129/12 130/5
**immediately [2]** 28/2
112/18
**immense [1]** 124/6
**immobilized [1]** 89/12
**impact [1]** 54/18
**impacted [2]** 123/15
123/16
**impair [1]** 108/14
**impaired [1]** 93/16
**impairing [2]** 120/12
136/16
**impairment [2]** 117/18
123/20
**implied [1]** 87/9

**important [28]** 6/23
7/17 8/23 13/9 34/21
34/22 35/15 36/21
40/18 41/2 52/23 55/15
56/12 56/15 69/1 84/5
84/6 89/11 115/21
116/22 117/21 120/12
130/11 135/12 135/21
135/21 135/22 136/3
**impossibility [9]** 33/13
59/9 59/17 59/18 60/2
60/12 105/4 106/9
123/13
**impossible [4]** 59/13
105/6 105/11 105/17
**improperly [1]** 87/6
**in [406]**
**inability [1]** 97/8
**inapplicable [1]** 33/10
**inappropriateness [1]**
89/5
**INC [3]** 1/6 1/6 78/21
**include [5]** 11/15 34/23
35/15 87/15 102/11
**includes [1]** 17/20
**including [8]** 51/12
59/22 77/8 80/8 80/8
97/15 101/16 129/24
**income [2]** 113/5
124/22
**inconsequential [1]**
92/9 140/7
**incorrect [1]** 133/24
**increase [1]** 129/24
**increased [3]** 120/22
121/1 121/6
**increases [1]** 130/2
**incredibly [1]** 56/20
**incumbent [2]** 65/7
87/20
**indeed [3]** 48/13 48/14
76/5
**independent [6]** 64/13
69/4 89/23 131/8 132/5
132/7
**India [23]** 12/4 37/22
37/23 38/6 38/7 44/11
45/24 46/1 46/17 47/11
59/9 59/11 59/14 97/23
100/6 100/8 100/10
100/24 101/19 102/1
102/4 105/10 107/7
**Indian [6]** 6/13 38/7
107/23
**indicated [1]** 147/9
**indicates [1]** 118/3
**indication [1]** 106/4
**indicative [1]** 33/14
**indicators [1]** 113/16
**indirect [2]** 6/4 23/8
**individual [4]** 65/6
65/10 71/8 71/10
**information [41]** 9/23
11/15 21/21 21/23 27/6
33/23 34/2 34/5 34/9
34/12 37/9 49/15 54/12
110/15 110/15 110/16
111/2 111/13 111/17
112/3 112/9 112/18

## I

information... [19] 113/18 113/21 115/11 115/1 119/11 123/17 126/13 130/16 136/11 136/14 136/16 138/14 138/15 139/9 139/11 141/12 141/17 144/5 144/7
Ingres [1] 78/21
initially [2] 26/19 126/10
initio [1] 49/24
Inn [1] 122/12
install [1] 87/19
instances [1] 49/16
instances,' [1] 51/22
instead [4] 5/14 98/11 111/15 141/7
institutions [2] 6/18 130/14
insubstantial [1] 52/8
insufficient [1] 111/15
intend [4] 53/11 86/3 108/3 124/8
intended [2] 14/9 136/18
intent [1] 134/20
intentionally [1] 47/18
interact [1] 102/18
interest [18] 32/9 32/12 32/18 76/2 76/3 92/16 93/18 106/22 120/22 127/7 127/20 127/24 128/5 128/8 128/9 128/11 129/24 130/1
intermediate [1] 46/2
internal [2] 87/22 142/2
internally [1] 142/3
interpretation [4] 79/18 82/15 99/9 99/11
Interrogatory [1] 88/3
interrupt [1] 53/7
intervene [2] 48/6 92/15
intervening [3] 59/19 59/24 105/7
introducing [1] 53/9
introductions [1] 3/8
invalid [5] 58/18 77/17 77/18 79/2 92/2
inverts [1] 128/22
invest [1] 130/21
invested [1] 6/18
investigation [1] 88/4
investing [2] 125/3 125/7
investment [5] 65/23 71/24 73/18 124/17 136/18
investments [1] 124/22
investors [10] 6/20 6/20 7/1 7/6 52/23 73/24 75/6 124/13 130/21 130/24

invoice [3] 127/20 127/23 83/21
involved [4] 26/11 65/24 69/19 95/10
IP [2] 107/23 107/23
irrevocable [1] 30/18
irrevocably [5] 30/3 36/6 78/2 79/15 80/9
is [397]
isn't [16] 44/1 48/5 58/6 71/4 76/1 80/4 82/15 82/24 83/20 89/16 89/23 101/1 116/9 135/12 136/19 140/23
issue [18] 31/7 43/19 48/8 48/13 59/10 86/23 90/9 94/15 109/13 119/16 126/7 131/5 132/9 132/23 135/16 143/21 144/15 145/14
issued [1] 55/6
issues [7] 5/3 26/17 77/7 110/16 117/4 130/11 135/20
itself [12] 7/3 21/10 36/4 37/3 44/17 46/3 50/22 55/19 78/3 80/1 99/21 143/12

## J

January [2] 18/10 19/1
January 6 [1] 19/1
January 6th [1] 18/10
Joab [1] 122/19
Joe [1] 3/5
join [1] 100/21
joined [1] 145/14
JOSEPH [1] 2/9
judgment [7] 84/17 84/19 84/20 84/23 92/20 93/6 122/21
judgments [1] 84/22
judicial [1] 86/19
JULIANNE [2] 147/2 147/14
July [1] 88/19
jump [2] 13/18 46/5
June [7] 11/9 32/12 53/1 53/16 53/17 88/1 88/15
June 30th [1] 11/9
jurisdiction [23] 62/20 63/8 63/13 64/3 76/24 77/12 77/20 78/3 78/17 79/16 80/1 80/10 80/19 81/10 81/16 81/19 82/10 84/3 90/11 90/23 91/24 143/5 145/4
jurisdictions [1] 63/16
Justice [4] 1/11 1/22 92/22 93/1
justifies [2] 74/23 93/14
justify [5] 93/13 93/22 108/9 121/10 123/16
JX [40] 9/1 9/7 13/14 13/18 13/19 16/21 18/23 35/4 45/16 47/6

47/19 53/5 62/9 63/2 63/3 75/7 77/22 78/21 82/9 98/6 98/23 101/7 103/19 105/9 105/20 107/20 109/15 110/24 112/22 113/12 113/14 113/15 120/16 120/21 121/1 127/22 129/22 130/4 130/19 137/16
JX 105 [2] 103/19 109/15
JX 145 [1] 112/22
JX 150 [1] 113/12
JX 151 [1] 113/14
JX 152 [1] 113/15
JX 166 [1] 107/20
JX 18 [1] 82/9
JX 19 [1] 137/16
JX 202 [2] 129/22 130/4
JX 21 [3] 77/22 78/1 98/23
JX 219 [1] 121/1
JX 273 [1] 130/19
JX 287 [1] 127/22
JX 317 [3] 98/6 105/9 105/20
JX 59 [1] 110/24
JX number [1] 101/7

## K

Kasowitz [3] 2/12 3/10 73/5
keep [2] 11/5 131/21
keeps [1] 123/1
kept [5] 108/24 120/11 120/16 121/5 121/12
key [9] 5/3 5/18 7/23 33/2 62/2 63/18 81/4 113/15 114/20
kick [1] 48/18
kind [11] 19/6 32/24 42/7 45/20 80/24 98/18 106/20 109/3 119/8 124/10 130/8
kinds [1] 129/8
King [2] 1/12 1/22
knew [6] 97/19 105/14 106/10 115/3 143/2 146/8
knowable [1] 60/13
knowledge [1] 69/24
known [1] 60/14
Kong [1] 130/20
KORPUS [4] 2/10 3/9 53/7 73/5

## L

LABADIA [2] 147/2 147/14
lack [5] 26/15 46/3 46/7 109/11 113/19
lacks [2] 55/12 63/22
landlord [2] 48/16 48/17
landlord-tenant [1] 48/16
language [28] 9/8 13/3 14/1 14/4 14/19 16/20

19/17 21/13 33/8 36/2 36/3 38/15 41/1 42/4 43/6 49/22 51/2 51/4 60/9 62/10 62/21 64/1 82/10 95/13 95/18 96/3 102/24 134/8 134/16
large [4] 61/8 56/2 117/11 125/2
largest [3] 6/8 120/15 125/1
last [14] 4/12 23/2 53/1 56/10 62/6 79/7 82/1 83/23 103/11 103/18 138/17 138/18 138/21 138/23
latched [1] 74/20
late [3] 20/14 20/14 118/24
later [20] 10/17 44/6 49/19 58/16 58/17 66/1 102/10 103/13 109/7 109/13 110/3 112/7 112/16 116/4 120/23 127/12 127/18 132/24 133/11 135/3
later-filed [1] 135/3
latest [1] 40/11
Laundries [1] 122/19
LAUREN [2] 2/4 3/14
law [40] 4/15 5/23 7/8 24/14 25/1 33/10 36/9 49/4 49/7 49/23 51/9 51/17 52/1 56/20 57/7 58/4 58/9 59/11 60/11 63/14 63/23 63/23 67/9 74/24 77/13 77/23 84/5 84/5 84/9 92/2 93/7 94/11 94/12 96/10 104/7 105/4 108/10 117/20 134/15 143/6
lawsuit [3] 31/18 31/22 61/5
lawsuits [1] 144/15
lawyer [1] 61/7 140/20
lawyers [1] 6/10
lays [1] 101/1
Layton [2] 2/3 3/20
leading [1] 73/19
leaks [1] 124/5
Learn [31] 6/2 12/5 12/11 17/19 22/2 22/4 22/19 23/3 23/9 23/16 23/17 24/9 24/12 24/17 24/21 25/9 25/11 25/16 25/17 25/18 30/2 32/15 41/1 53/19 97/16 98/12 100/8 108/16 111/9 113/19 139/6
Learn's [1] 55/7
least [2] 28/16 49/16
leaves [2] 55/10 79/18
legal [8] 5/18 33/2 56/18 59/17 60/12 61/4 62/3 138/4
legitimate [3] 26/5 27/9 27/9
lender [20] 28/10 58/1 58/2 61/6 61/12 61/15 61/17 61/18 62/17 69/2

71/15 74/4 78/13 92/3 93/14 133/10 140/11 141/1 141/11 142/13
lender's [2] 29/11 93/16
lenders [83] 12/14 12/15 15/16 16/19 17/7 18/2 18/5 18/13 18/18 19/10 19/12 20/11 21/18 26/5 26/10 26/13 26/14 27/4 27/4 27/10 27/14 27/15 28/6 28/13 28/16 28/17 31/15 35/22 36/20 40/15 40/22 41/4 44/2 44/19 52/24 55/23 57/21 58/22 61/10 61/11 61/13 66/2 74/12 75/11 75/18 75/21 75/24 76/4 80/8 81/15 85/13 85/14 87/11 91/11 96/19 106/20 108/12 109/1 112/15 113/3 114/13 120/6 120/11 121/15 122/18 122/18 124/5 125/15 126/10 126/16 127/1 127/12 129/6 130/4 135/22 136/9 137/22 138/1 139/21 140/21 141/22 143/22 143/23
Leonard [2] 1/11 1/22
less [3] 32/7 93/18 108/23
lesser [1] 141/8
let [6] 42/19 77/19 110/13 110/23 110/24 146/4
let's [21] 13/11 16/5 18/21 35/16 35/24 36/1 38/10 44/15 49/1 50/3 63/5 72/23 80/17 80/23 94/14 101/4 101/14 107/22 108/7 108/10 114/15
letter [6] 32/14 52/17 53/16 87/14 117/4 117/7
level [3] 115/10 131/17 131/24
leverage [5] 74/5 110/4 121/10 125/22 130/22
lieu [1] 92/20
likely [6] 60/14 76/7 93/18 108/23
limitation [1] 81/20
limitation -- the [1] 81/20
limited [7] 53/20 75/8 81/21 82/2 101/17 102/18 103/3
Lindor [1] 92/13
line [1] 49/23
LinkedIn [2] 124/16 125/4
Linklaters [3] 2/7 3/16 25/1
listed [1] 9/20
lists [1] 125/3

## L

**literally [1]** 23/18
**litigated [1]** 88/8
**litigation [9]** 29/5 29/6
57/11 59/7 61/24 75/6
75/21 76/1 124/5
**little [9]** 18/19 64/16
73/13 107/17 119/19
120/6 121/19 134/24
143/2
**live [1]** 138/2
**living [1]** 69/7
**LLC [2]** 1/2 2/8
**LLP [4]** 2/5 2/7 2/9
2/12
**loan [51]** 6/16 6/16
6/19 6/23 7/1 7/16
12/12 16/18 17/6 17/10
17/14 17/20 19/14 23/6
23/10 23/13 27/17
29/17 31/10 32/10 34/1
36/5 36/9 37/5 37/13
38/8 47/4 62/14 62/19
75/1 78/12 87/6 92/20
93/10 100/11 102/3
104/19 114/20 115/15
116/11 123/7 124/3
129/8 129/13 129/13
136/2 141/1 141/7
144/10 144/13 144/17
**loans [10]** 27/16 28/1
37/4 39/7 41/19 42/5
42/24 61/10 119/2
127/24
**logic [1]** 84/10
**Lokey [2]** 26/10 140/16
**long [6]** 20/15 38/14
53/4 54/2 105/7 135/5
**longer [6]** 20/16 26/24
27/5 34/20 88/10
105/15
**looked [6]** 14/2 19/3
34/14 35/9 47/1 137/17
**looking [4]** 15/4 68/22
79/11 101/10
**lose [1]** 125/22
**losing [2]** 75/5 136/19
**loss [4]** 94/4 108/12
120/3 120/8
**lost [3]** 19/10 36/12
37/18
**lot [14]** 23/17 24/15
24/23 25/5 27/17 31/3
40/16 75/20 81/21
85/12 86/11 113/17
135/16 136/21
**lots [2]** 72/7 144/4

## M

**magnitude [1]** 38/8
**main [2]** 76/18 88/9
**maintenance [6]** 38/2
39/5 41/17 42/3 42/8
42/14
**major [2]** 114/22
114/23
**majority [1]** 51/22
**make [34]** 5/12 21/2

31/18 35/6 41/13 48/16
50/18 74/11 79/3 82/23
83/3 86/4 89/8 91/4
93/3 93/9 93/17 93/21
93/24 94/21 98/16
100/10 108/23 110/13
111/14 122/8 131/18
134/12 135/2 140/18
142/6 142/12 144/3
145/6
**makers [2]** 24/10 25/12
**makes [5]** 27/3 85/14
86/20 100/14 100/22
**making [5]** 23/12 33/19
89/9 107/18 136/17
**manage [1]** 99/5
**mandatory [4]** 39/6
41/18 42/5 42/23
**manner [3]** 20/23 58/2
137/22
**March [14]** 9/24 27/21
37/6 53/22 54/2 54/8
54/8 54/11 110/21
112/6 120/24 131/9
138/13 139/5
**March 31 [6]** 9/24
53/22 54/2 54/8 54/8
54/11
**March 3rd [2]** 27/21
37/6
**market [3]** 126/19
132/5 132/6
**marketing [1]** 111/7
**markets [1]** 124/22
**marks [1]** 129/7
**master [5]** 61/16 61/16
126/15 126/23 142/15
**material [12]** 50/15
51/10 51/13 52/19
52/20 55/3 55/21 56/11
112/4 113/20 116/1
118/7
**materiality [1]** 50/14
116/19
**math [1]** 113/3
**matter [20]** 13/5 21/2
55/15 58/9 60/21 71/18
74/24 76/7 77/5 80/8
82/11 83/12 84/4 85/10
86/19 86/20 89/17
105/3 126/3 142/18
**matters [5]** 71/14
82/13 85/11 85/12
86/22
**matured [1]** 8/15
**matures [2]** 14/14
15/13
**MAX [2]** 2/11 3/9
**may [17]** 31/23 32/10
36/8 51/19 62/17 63/14
67/10 78/13 82/1 87/14
92/9 92/15 97/4 106/11
119/19 130/10 131/10
**May 3rd [1]** 31/23
**maybe [9]** 26/18 55/5
70/3 73/9 75/24 91/6
109/18 125/2 143/5
**McWane [3]** 85/18
135/1 135/2

**mean [16]** 21/7 24/1
43/7 43/10 43/24 43/24
43/18 45/2 65/22 67/20
80/5 96/7 96/15 102/21
126/14 136/23 137/3
**meaning [2]** 25/10
80/13
**meaningless [1]** 79/19
**means [10]** 6/17 20/13
23/19 27/15 34/10
40/10 42/8 64/8 94/23
135/7
**measure [1]** 64/4
**measuring [1]** 52/9
**mechanical [6]** 5/9
5/13 31/1 31/4 100/3
104/8
**mechanics [1]** 90/20
**mechanism [1]** 61/4
**meet [2]** 56/22 56/24
**member [2]** 124/24
125/5
**members [2]** 111/6
111/6
**memorializes [1]** 89/2
**memory [1]** 86/10
**mention [1]** 29/2
109/10 112/8
**mentioned [7]** 8/7
11/20 15/24 47/17
75/22 121/12 124/15
**mere [1]** 45/6
**merger [1]** 72/12
**merit [1]** 63/22
**merits [1]** 29/12
**middle [1]** 19/7 35/19
53/23
**might [7]** 23/23 58/5
60/17 68/8 118/16
135/10 135/18
**million [16]** 32/7 32/12
41/1 75/11 88/5 120/20
120/22 121/2 124/16
125/3 128/1 130/5
130/6 135/17 135/19
136/1
**millions [4]** 75/15 87/7
129/1 129/23
**minimis [1]** 52/8
**minimum [2]** 42/12
131/7
**minor [2]** 49/13 74/3
**minute [4]** 72/23 76/10
84/7 95/11
**minutes [1]** 133/7
**misconduct [1]** 87/5
**misconstrue [1]** 33/7
**misreading [1]** 79/6
**miss [1]** 34/7
**missed [2]** 12/17
140/24
**modifications [1]** 54/7
**moment [1]** 49/2
**money [2]** 6/10 32/15
**month [8]** 18/19 53/17
54/14 117/13 123/22
129/14 131/7 138/20
**months [32]** 10/16
27/12 28/12 29/6 41/1

45/7 54/16 54/24 56/5
59/2 66/7 75/19 86/23
109/13 112/7 112/16
112/17 120/23 128/14
128/18 131/7 131/11
133/18 135/3 137/21
137/23 138/3 138/16
139/8 141/3 141/3
141/7
**MORGAN [1]** 1/15
**morning [8]** 3/1 3/2 3/4
3/13 3/18 3/19 4/1 73/4
**Morris [2]** 2/5 3/14
**mortgage [2]** 114/17
122/14
**mortgagor [1]** 122/12
**most [4]** 48/15 61/18
69/15 74/3
**motion [7]** 88/2 88/11
88/17 88/20 93/2 93/3
143/16
**move [7]** 28/4 42/20
91/17 104/21 107/22
110/6 127/16
**moved [7]** 85/17 85/18
85/24
**moving [2]** 15/1 29/14
**Mr [7]** 32/22 52/22
55/10 57/2 58/6 65/5
129/17
**Mr. [74]** 4/18 4/19 4/22
4/24 20/22 21/1 21/9
21/16 21/23 22/14
22/21 23/15 24/5 25/7
25/14 25/15 26/9 26/23
30/21 30/22 30/22
30/24 31/11 31/11
31/19 32/3 32/23 53/8
53/9 55/11 64/10 64/17
66/6 68/11 68/17 69/7
70/5 70/13 70/22 74/22
75/9 78/10 82/9 85/8
86/3 86/15 88/1 89/19
89/22 90/1 90/4 94/20
96/2 98/16 99/8 99/19
101/5 110/14 113/24
114/6 117/9 121/18
125/5 127/10 127/15
127/19 131/14 131/6
133/4 140/16 141/23
142/17 143/13 144/5
**Mr. Ashby [1]** 89/1
**Mr. Byju [2]** 31/11
55/11
**Mr. Cicero [1]** 86/3
**Mr. Czeschin [20]**
74/22 75/9 78/10 82/9
86/15 90/1 94/20 96/2
98/16 99/8 99/19 101/5
110/14 113/24 114/6
121/18 127/19 133/4
143/13 144/5
**Mr. Czeschin's [1]**
53/8
**Mr. Pohl [26]** 4/19 4/22
30/22 30/22 31/19 32/3
32/23 53/9 64/10 64/17
66/6 68/11 68/17 69/7
70/5 70/13 70/22 85/8

447/54/16 54/24 56/5
59/2 66/7 75/19 86/23
109/13 112/7 112/16
112/17 120/23 128/14
128/18 131/7 131/11
133/18 135/3 137/21
137/23 138/3 138/16
139/8 141/3 141/3
141/7

**89/19 89/22 90/4 126/5**
127/10 127/15 131/4
131/6
**Mr. Ravindran [13]**
4/18 4/24 21/9 21/16
22/14 22/21 24/5 25/7
25/14 25/15 30/21
30/24 117/9
**Mr. Riju [6]** 20/22 21/1
21/23 23/15 31/11
142/17
**Mr. Spencer [3]** 26/23
140/16 141/23
**Mr. Stephen [1]** 26/9
**Ms. [1]** 67/21
**Ms. Henry [1]** 67/21
**MTZ [1]** 1/5
**much [10]** 24/18 34/20
70/1 121/5 121/18
132/15 142/20 145/10
146/6 146/8
**Mullin [1]** 1/5
**MULLIN,ESQ [1]** 2/5
**multibillion [1]** 97/16
**multibillion-dollar [1]**
97/16
**multiple [1]** 97/24
**must [4]** 40/2 57/17
75/4 126/22
**must -- the [1]** 126/22
**my [19]** 3/9 3/15 3/16
3/22 7/13 7/21 19/10
25/19 42/21 53/12
64/10 99/11 99/18
103/24 117/22 118/9
118/10 141/16 141/20
**myself [1]** 110/24

## N

**name [1]** 30/9
**Natixis [8]** 51/14 95/8
95/11 113/23 114/3
114/15 114/17 114/19
**nature [6]** 6/22 52/11
94/22
**NDA [1]** 130/17
**NEAL [2]** 2/4 3/14
**nearly [1]** 28/1
**necessary [2]** 30/4
90/24 91/5
**need [14]** 50/13 66/4
73/9 73/15 77/4 91/1
97/22 98/3 98/4 98/5
120/5 135/20 143/20
144/3
**negative [5]** 97/9
108/20 108/21 115/2
124/4
**negatively [1]** 123/15
**negotiate [10]** 8/9 18/1
18/3 31/15 59/4 76/4
110/1 123/4 129/20
141/9
**negotiated [7]** 26/4
40/4 40/13 41/4 47/18
52/6 69/14
**negotiating [8]** 24/24
31/16 122/24 125/14
125/16 128/21 141/8

# N

negotiating... [1] 143/24

negotiation [7] 6/12 28/12 66/9 76/14 109/24 110/3 129/3

negotiations [13] 26/1 26/11 27/13 31/14 31/19 40/14 45/15 87/11 116/4 125/19 130/8 133/11 141/3

neither [1] 89/3

net [11] 60/10 97/9 98/4 105/14 105/15 105/21 106/3 106/7 108/21 108/22 115/2

netted [1] 75/11

never [17] 28/11 32/17 37/12 57/8 57/10 58/21 58/23 59/5 98/20 102/13 102/14 105/22 106/3 121/22 122/15 128/7 133/17

new [92] 2/7 2/12 5/22 6/20 6/24 7/6 7/7 7/19 8/24 9/2 14/1 14/3 32/20 33/10 48/3 49/3 49/7 51/9 51/11 51/17 56/20 57/7 57/15 58/4 59/12 59/20 60/8 60/8 62/11 67/22 74/24 76/20 77/13 77/23 78/4 79/16 79/17 81/6 81/7 83/13 84/4 84/9 84/18 84/23 84/23 85/5 85/10 85/12 85/15 85/21 85/21 86/14 86/20 86/24 87/24 88/8 88/10 88/14 88/24 89/5 89/20 90/9 91/17 92/2 92/6 92/14 92/19 93/2 93/12 94/11 94/12 96/9 104/6 105/4 105/11 105/13 105/22 108/4 108/10 114/19 117/20 124/8 126/8 131/22 134/23 134/24 135/5 139/24 143/14 144/23 145/1 145/5

news [1] 75/19

nice [1] 68/17

Nichols [2] 2/5 3/14

NICOLE [2] 2/2 3/22

nine [3] 138/16 138/20 139/8

nine-month [1] 138/20

No. [31] 9/9 12/15 16/4 16/5 16/5 16/6 16/10 16/11 16/22 17/3 17/5 18/11 18/24 19/4 19/5 20/8 34/14 34/14 34/18 34/23 35/1 35/4 35/8 35/11 36/11 37/14 44/6 45/16 47/6 102/17 132/24

No. 1 [2] 12/15 44/6

No. 2 [10] 9/9 16/4 16/6 17/3 19/4 20/8 35/11

36/11 47/6 102/17

No. 3 [7] 16/5 16/5 16/6 16/10 16/11 16/22 17/5 19/5

No. 7 [11] 18/11 18/24 34/14 34/14 34/18 34/23 35/1 35/4 35/8 37/14 132/24

No. 8 [1] 45/16

Nobody's [1] 100/9

nominal [1] 70/8

none [15] 12/23 18/15 20/7 28/20 34/15 35/10 35/17 35/19 36/18 48/11 71/14 74/23 93/21 95/24 124/2

nonetheless [1] 16/19

Nonmaterial [1] 9/16

nonmonetary [2] 51/12 93/8

nonpayment [4] 93/8 119/16 127/6 127/14

nonperformance [1] 105/5

nonprofit [1] 73/20

nor [1] 89/3

normal [2] 72/13 138/5

North [2] 1/12 1/22

note [4] 21/2 92/18 93/6 142/16

noted [3] 6/13 114/11 139/19

notes [4] 52/7 73/8 111/11 113/8

nothing [9] 46/12 62/13 67/3 78/11 80/13 112/20 122/22 135/10 141/21

notice [46] 13/6 15/16 16/16 17/10 17/14 18/14 19/14 19/19 19/19 20/18 27/22 27/23 28/9 29/7 29/15 29/15 29/20 31/9 32/19 37/5 74/8 74/8 92/1 92/1 96/5 96/6 96/8 96/11 96/19 96/23 97/1 97/2 115/15 121/23 126/7 128/18 137/2 137/8 137/9 137/10 137/10 137/12 137/14 144/12 144/12 144/16

notices [1] 116/14

notwithstanding [4] 20/4 63/10 115/19 126/23

November [10] 13/17 16/7 16/22 17/4 17/8 19/10 19/13 44/3 60/6 120/23

November 24 [3] 13/17 17/4 60/6

November 24th [3] 16/7 16/22 44/3

November 25 [2] 17/8 19/13

November 25th [1] 19/10

number [9] 29/16 31/3

35/5 49/10 49/17 63/15 89/15 107/7 144/22

number 2 [1] 31/3

numbered [1] 147/5

numbers [5] 56/3 138/22 139/13 139/14 139/17

# O

object [2] 24/1 127/17

objecting [1] 24/7

objection [2] 85/7 142/17

objections [1] 53/8

obligated [2] 11/2 100/9

obligation [19] 10/2 12/16 39/12 42/16 45/21 57/6 98/8 99/2 100/7 100/11 104/14 104/18 104/19 105/5 111/21 111/21 123/11 137/21 138/2

obligations [3] 59/20 102/5 129/2

obligor [1] 51/19

obtain [10] 39/3 42/1 42/22 98/10 99/12 99/14 100/19 101/18 105/2 106/8

obtained [1] 103/15

obviously [4] 56/14 64/17 71/3 145/14

occur [1] 14/1

occurred [5] 8/2 10/7 13/6 32/3 103/7

occurring [1] 33/22

October [9] 8/24 9/10 12/17 12/21 44/7 103/13 103/23 108/19 129/4

October 12 [1] 9/10

October 12th [1] 12/17

October 8th [3] 12/17 12/21 44/7

odd [1] 66/16

ODI [1] 105/22

off [10] 7/13 46/15 56/3 75/7 75/24 95/3 109/3 118/15 118/23 130/19

offered [1] 129/22

offering [1] 68/14

offers [2] 129/6 129/18

office [4] 66/13 66/24 71/6 134/2

officer [9] 22/1 22/2 22/4 22/8 22/11 22/15 30/24 65/12 90/5

officers [1] 4/23

Official [3] 147/3 147/15 147/15

offsets [1] 122/14

oh [5] 28/13 112/9 138/13 140/20 143/1

old [2] 6/20 73/14

old-fashioned [1] 73/14

olding [1] 52/7

omission [1] 60/11

92/17

omitted [1] 60/9

on [230]

once [6] 15/14 15/14 32/3 37/4 91/11 91/11

ones [3] 77/8 110/11 111/23

online [3] 60/8 73/19 126/17

onshore [1] 12/6

onto [1] 74/20

openings [1] 145/16

opens [1] 91/7

operating [2] 40/23 76/11

operation [3] 83/21 95/3 131/16

operations [1] 89/15

opportunities [1] 124/19

opportunity [2] 59/2 59/4

opposed [1] 50/3

oppressed [1] 133/19

oppressing [1] 28/14

oppression [1] 29/8

oppressive [1] 61/21

order [17] 10/13 10/19 12/19 24/3 32/5 72/12 85/9 86/3 87/16 88/1 88/4 88/6 97/21 131/19 145/18 145/18 145/19

ordinary [2] 132/1 132/3

original [13] 9/6 33/8 37/21 50/19 50/22 51/5 60/5 61/13 61/15 83/16 115/12 115/12 142/13

originally [4] 6/17 44/2 44/3 75/13

others [1] 21/14

otherwise [15] 20/4 62/17 78/13 78/14 80/21 82/2 82/16 83/22 84/12 90/19 100/13 104/5 104/13 119/20 131/23

ought [1] 33/4

outcome [3] 38/17 104/11 107/15

outside [4] 53/1 55/7 55/19 93/12

outsider [2] 55/16 65/22

outstanding [2] 27/16 129/14

over [30] 6/21 8/4 8/8 11/5 12/15 18/19 27/12 30/20 50/12 50/13 53/10 53/17 54/24 56/4 57/23 75/1 77/12 98/22 121/7 124/1 124/14 124/16 125/2 125/10 126/6 131/9 137/11 137/15 138/20 141/2

Overall [1] 76/2

overdue [1] 54/16

overreaching [1] 51/23 114/13

overreaching.' [1] 79/3

own [4] 30/8 107/18 124/16 134/6

owned [4] 6/4 6/5 23/8 24/21

# P

p.m [1] 146/10

PA [1] 2/3

package [1] 73/6

pages [6] 21/7 98/6 107/21 111/1 111/11 147/5

paid [5] 127/20 128/8 131/4 131/10 131/13

pale [1] 129/19

paper [4] 25/4 53/11 73/10 143/18

paper' [1] 52/10

paragraph [16] 14/3 19/22 35/18 35/19 36/2 36/17 51/1 54/1 62/13 63/6 63/9 81/11 81/11 90/6 105/20 139/4

paragraph -- the [1] 81/11

paragraphs [1] 89/16

paralysis [1] 89/16

Pardon [1] 83/2

parent [21] 6/2 9/23 11/8 17/19 20/5 22/19 30/1 36/4 38/2 43/10 60/10 76/22 87/17 87/20 97/15 98/11 101/18 105/16 124/1 126/6 133/8

parent's [1] 129/16

parenthetical [1] 20/7

part [8] 22/5 47/2 51/24 83/4 101/18 114/7 125/21 132/1

participation [1] 61/9

particular [2] 49/14 68/2

particularly [4] 5/23 26/18 51/15 139/18

parties [78] 5/19 5/24 8/9 9/3 14/9 14/18 16/9 17/1 17/6 17/10 17/20 17/24 18/9 19/14 20/1 20/13 24/2 24/15 24/18 26/3 27/11 31/14 31/23 33/4 36/5 40/4 40/13 40/15 41/3 44/19 45/14 45/17 48/20 49/12 49/21 50/2 52/16 60/16 62/17 77/6 77/7 77/22 78/1 79/15 79/22 80/8 80/11 80/11 81/12 81/16 81/18 84/3 86/15 86/16 90/22 90/22 94/22 95/7 95/11 95/15 97/19 100/12 104/19 106/1 106/10 106/12 106/13 115/22 116/7 116/13 133/1 134/21 135/13 145/7

parties' [1] 52/3

**P**

**Partners [1]** 67/23
**party [15]** 48/7 58/5
62/19 64/10 64/18 65/8
78/24 86/21 90/10
90/10 91/1 91/5 94/3
100/7 115/15
**pass [1]** 105/14
**passed [2]** 105/10
115/20
**past [2]** 8/4 8/8
**PATRICK [2]** 2/6 3/16
**patsy [1]** 69/4
**pause [1]** 20/24
**pay [15]** 32/9 32/13
32/16 32/16 75/24
128/5 128/11 129/7
130/5 131/6 131/17
134/2 136/12 138/4
141/19
**pay-down [1]** 130/5
**payable [1]** 28/2
**paying [3]** 106/22
108/24 121/12
**payment [12]** 32/9
32/13 32/18 48/17
74/10 74/19 74/20 93/3
93/10 93/17 108/23
129/12
**payments [1]** 132/11
**payroll [1]** 111/7
**Pegasus [2]** 67/22
115/6
**penalized [1]** 126/1
**penalty [3]** 92/10
117/20 130/5
**pendency [1]** 85/8
**penny [1]** 129/15
**people [1]** 24/6
**percent [11]** 4/17
27/16 27/19 29/22 98/4
129/8 129/15 129/15
130/1 130/6 134/7
**perform [2]** 54/19
122/21
**performance [6]** 26/17
52/10 94/6 105/6
113/16 138/23
**performed [1]** 121/22
**perhaps [5]** 23/14
46/18 64/18 66/16
129/11
**period [40]** 9/5 9/5
10/5 13/4 13/8 14/13
14/14 15/6 15/8 15/14
15/21 16/2 16/7 16/12
17/2 17/13 17/24 18/6
18/8 19/4 19/8 19/8
20/2 26/2 26/5 29/8
31/17 32/11 34/6 34/7
44/22 53/21 109/19
116/2 118/5 133/10
133/14 133/14 135/15
138/20
**periods [1]** 11/12
**permission [1]** 4/3
**permit [1]** 101/19
**permits [1]** 60/9

**person [3]** 20/5 71/6
140/14
**personal [5]** 65/14
68/7 134/1 134/3 134/4
**personam [1]** 64/23
**petition [1]** 71/7
**petitioner [1]** 70/7
**pick [1]** 69/3
**picked [1]** 63/7
**piece [1]** 70/24
**place [7]** 59/20 74/1
94/24 99/19 119/5
131/2 131/21
**plain [1]** 134/8
**plainly [5]** 55/14 61/3
62/8
**plaintiff [5]** 2/3 2/8
3/21 71/17 79/3
**plaintiffs [10]** 1/4 4/4
4/14 31/17 31/24 87/19
88/13 123/8 128/14
132/4
**plaintiffs' [4]** 87/15
88/2 88/9 140/4
**plan [1]** 54/18
**plane [1]** 64/16
**planned [1]** 145/13
**play [6]** 1/6 6/5 17/21
36/6 40/21 106/21
**playing [1]** 124/9
**Please [1]** 73/2
**pledge [9]** 29/19 30/5
30/6 63/1 75/1 82/8
90/19 92/4 137/7
**pledged [3]** 29/21
29/22 30/8
**plus [4]** 127/24 127/24
129/18 129/10
**POHL [34]** 1/3 2/3 3/21
4/19 4/22 5/10 30/22
30/22 31/19 32/3 32/23
53/9 64/10 64/17 65/5
65/17 66/6 68/11 68/17
69/7 70/5 70/13 70/22
85/8 89/3 89/19 89/22
90/4 126/5 127/10
127/15 131/4 131/6
134/1
**point [46]** 5/9 5/13
5/14 5/17 23/2 28/6
31/2 33/2 34/21 34/22
36/17 39/19 47/18
47/21 50/20 50/21
51/15 52/18 56/17 57/4
57/23 64/9 89/16 91/19
91/23 92/12 94/1 94/21
97/12 100/17 100/17
103/24 109/16 116/6
116/7 116/9 116/10
117/22 119/23 122/1
125/6 126/5 127/5
137/5 142/7 142/11
**pointed [1]** 76/10
**points [3]** 96/3 130/1
138/7
**poor [1]** 46/15
**portion [2]** 30/8 139/7
**position [7]** 45/4 49/2
50/18 120/24 121/1

**possibility [1]** 123/12
**possible [2]** 44/20 85/4
**post [4]** 32/3 127/10
145/19 145/21
**post-filing [1]** 32/3
**post-trial [2]** 145/19
145/21
**posted [1]** 60/8
**potential [2]** 26/17
130/21
**powder [1]** 123/14
**power [9]** 28/15 28/19
28/21 29/1 30/7 30/15
30/20 87/18 137/15
**PowerPoint [7]** 16/3
17/24 23/1 25/21 36/24
47/24 63/21
**precondition [1]**
125/19
**predated [1]** 88/5
**predatory [2]** 137/22
140/23
**prefer [1]** 95/15
**prejudice [3]** 38/1
112/12 117/17
**premium [1]** 130/6
**prepared [1]** 21/6
**prepayment [4]** 39/6
41/18 42/5 42/23
**prerequisite [1]** 45/24
**present [1]** 4/3
**presentation [4]** 3/24
53/8 53/12 83/4
**press [1]** 124/5
**pressure [4]** 75/20
75/22 76/14 124/6
**pretend [4]** 33/7 44/15
49/1 50/3
**pretrial [6]** 10/12 10/18
12/19 24/3 145/17
145/18
**pretty [5]** 24/5 24/18
28/24 67/9 75/4
**prevent [3]** 62/22
92/15 94/20
**prevented [1]** 63/12
**previous [5]** 111/17
112/11 113/11 123/18
139/11
**previously [1]** 71/14
**price [1]** 120/9
**primarily [3]** 74/16
124/18 124/22
**primary [1]** 13/17
**principal [2]** 27/24
93/18
**principle [7]** 5/18 5/21
5/22 33/5 49/13 49/21
62/3
**principles [2]** 51/21
92/10
**prior [15]** 20/23 21/4
38/4 39/4 39/10 39/16
42/1 43/6 54/8 98/14
99/13 99/16 101/19
105/22 133/18
**private [2]** 53/20 90/19
**probably [2]** 22/7

**problem [5]** 75/10
75/16 107/18 112/7
115/3
**problems [2]** 59/15
108/1
**procedure [3]** 88/16
92/19 93/6
**proceeding [16]** 62/18
62/23 65/14 67/17
69/10 70/12 70/23 77/9
77/16 78/6 78/15 81/1
82/5 85/4 91/1 93/7
**proceedings [4]** 63/12
63/15 72/14 147/6
**process [1]** 74/7
**procure [5]** 38/3 44/17
98/13 99/15 99/20
**produce [2]** 142/3
142/4
**productive [2]** 27/13
31/19
**professional [2]** 27/4
128/1
**profile [1]** 124/16
**profit [3]** 73/20 73/20
111/8
**profits [1]** 128/6
**prohibit [1]** 106/7
**project [1]** 114/21
**promised [3]** 117/11
141/13 141/15
**promising [1]** 122/20
**prompt [1]** 135/6
**promptly [3]** 57/6
57/18 135/20
**proper [3]** 62/7 96/17
144/19
**properly [5]** 5/8 82/24
88/6
**properties [1]** 62/20
**property [4]** 65/2 78/3
80/1 114/23
**proposal [2]** 107/20
108/18
**proposed [3]** 60/8
87/16 106/4
**proposition [1]** 114/2
**protect [1]** 96/14
**proves [1]** 14/9
**provide [41]** 10/2
10/10 10/14 11/2 11/3
11/20 11/21 21/21
26/24 33/22 34/9 37/10
40/16 49/15 50/24 51/9
51/13 52/21 97/13
102/2 110/21 111/22
111/24 112/10 113/9
115/15 115/24 116/12
116/14 118/6 119/10
119/11 119/13 119/22
123/17 123/21 135/6
138/21 139/4 139/8
139/10
**provided [23]** 4/11
10/16 11/14 21/17
21/20 30/13 33/24 37/8
37/9 57/21 74/15 97/14
97/18 103/12 110/14

**110/24 111/13 112/23
114/24 116/18 119/1
120/10 139/6
**provider [1]** 73/19
**provides [11]** 13/4
15/6 48/10 61/4 71/5
98/11 116/16 118/11
118/13 134/9 136/4
**providing [6]** 34/11
51/18 58/1 102/4
111/16 112/9
**provision [30]** 28/9
34/3 34/19 35/2 37/17
37/19 38/24 63/24 64/5
71/19 77/24 78/17 79/7
84/21 85/4 87/16 92/21
98/17 100/4 100/17
100/18 100/20 104/8
104/18 116/16 116/21
119/21 119/23 121/14
132/2
**provisions [4]** 63/3
73/7 78/20 129/16
**proxy [1]** 30/19
**Pte [2]** 29/24 30/2
**public [4]** 53/16 75/6
117/7 126/13
**publicity [1]** 124/4
**pull [3]** 9/7 34/24 63/5
**purchase [3]** 67/24
68/3 72/10
**purchased [1]** 40/24
**purport [1]** 29/7
**purported [1]** 140/5
**purportedly [1]** 53/10
**purpose [5]** 23/9
119/21 135/6 135/9
135/11
**purposes [1]** 30/5
**pursuant [2]** 4/14 12/7
**pursue [3]** 64/14 108/4
124/8
**push [3]** 18/19 44/4
44/7
**pushes [1]** 130/7
**put [19]** 14/6 14/18
35/23 36/13 36/23
50/19 59/20 66/4 66/7
66/13 73/17 109/3
110/4 118/15 124/6
127/15 130/7 130/22
131/23
**putting [3]** 60/3 117/7
127/10

**Q**

**Q1 [3]** 112/22 113/13
113/13
**quarter [11]** 11/11
11/19 11/22 110/19
110/20 111/16 113/1
138/17 138/18 139/10
144/8
**quarterly [8]** 11/1
11/10 27/2 37/9 110/18
120/17 128/15 142/3
**quarters [5]** 11/4 11/8
111/18 112/4 144/7
**questions [7]** 25/19

## Q

**questions... [6]** 41/14
47/21 72/21 91/18
132/14 132/21
**quickly [2]** 56/12 69/17
**Quigley [1]** 3/23
**quite [2]** 44/13 46/5
**quo [7]** 32/5 85/9 86/3
87/16 88/3 88/6 131/19
**quote [1]** 39/2
**quotes [1]** 27/3

## R

**rabbit [1]** 14/24
**raise [3]** 33/10 33/12
59/3
**raised [4]** 57/10 73/21
106/24 109/12
**ran [1]** 32/11
**rank [1]** 117/5
**rare [1]** 51/17
**rate [2]** 129/24 130/1
**rather [3]** 103/14 112/4
141/6
**Raveendran [2]** 31/12
55/11
**RAVINDRAN [27]** 1/6
4/18 4/24 5/9 17/18
20/23 21/1 21/9 21/16
21/24 22/14 22/21
23/15 24/5 25/7 25/14
25/15 30/21 30/24
31/11 32/22 52/22
55/10 57/2 58/6 117/9
129/17
**Ravindran's [1]** 142/17
**RBI [32]** 38/3 38/5 39/4
40/6 40/10 42/1 42/22
43/17 43/19 43/20
44/12 44/17 45/7 45/13
45/23 46/3 46/3 46/7
46/15 46/19 59/12
59/20 60/7 60/17 60/19
98/3 98/13 99/20
103/15 106/6 106/11
107/8
**RBI's [1]** 101/18
**RCEs [1]** 45/21
**re [1]** 93/19
**reach [2]** 100/23 115/9
**read [11]** 22/23 39/15
44/14 51/16 79/19 80/5
80/12 86/12 95/8 104/4
109/18
**readiness [1]** 54/9
**reading [7]** 43/5 79/14
81/9 100/15 104/5
104/14 105/23
**reads [1]** 81/10
**ready [3]** 110/6 110/7
128/11
**real [1]** 14/17
**reality [1]** 128/22
**realize [1]** 133/3
**reason [12]** 46/24
47/12 60/21 76/19
77/10 84/4 92/2 104/24
104/24 121/17 143/17
143/18
**reasonable [28]** 38/3
38/13 38/15 38/20 41/8
43/11 44/14 44/16
44/21 44/24 98/12 99/2
99/4 99/15 100/12
100/16 100/19 100/21
101/17 101/22 102/7
104/1 104/4 104/9
104/15 104/20 106/15
109/18
**reasons [2]** 76/18 79/2
**receive [3]** 119/24
120/2 120/2
**received [3]** 40/7 54/5
75/14
**receiving [1]** 121/4
**recent [2]** 75/19 124/20
**recently [3]** 6/9 86/13
125/6
**recess [2]** 72/23 72/24
**reckless [1]** 124/10
**recognition [1]** 109/16
**recognize [4]** 16/16
126/4 130/10 144/6
**recognized [6]** 7/20
30/18 49/20 55/24
60/16 104/1
**recognizes [8]** 59/22
95/19 95/20 95/22
109/17 115/22 116/22
126/23
**reconcile [1]** 126/12
**record [15]** 24/8 24/24
25/4 26/8 47/17 57/20
108/13 112/8 112/15
121/22 140/13 142/14
143/19 143/21 145/23
**records [2]** 54/10
55/17
**Redwood [8]** 61/17
120/15 121/1 124/14
124/20 126/18 142/12
142/13
**Redwood's [1]** 140/11
**Reeder [1]** 122/19
**refer [2]** 45/15 47/19
35/10
**reference [2]** 14/7
35/10
**references [1]** 11/8
**referred [6]** 6/6 17/3
20/8 24/20 35/11 36/11
**referring [8]** 10/8 10/24
39/16 50/20 50/22 51/7
58/7 117/4
**refers [8]** 10/1 12/3
12/9 19/2 19/4 38/5
41/7 62/15
**refinance [1]** 75/24
**reflected [1]** 97/20
**refuse [1]** 52/2
**refused [1]** 114/3
**refusing [1]** 126/4
**regard [1]** 70/22
**regardless [1]** 70/19
**regards [3]** 14/4 20/24
58/13
**registered [1]** 124/17
**regulation [1]** 106/6
**regulations [7]** 59/13
60/8 80/9 105/11 (29/24
105/13 105/24 106/4
**regulatory [1]** 97/22
**reinforced [1]** 92/12
**rejected [2]** 108/2
130/3
**related [12]** 4/21 62/23
63/17 64/11 64/19 67/1
67/9 67/11 68/4 105/1
134/12 136/2
**relates [1]** 93/2
**relating [21]** 62/18
63/12 78/7 78/15 80/20
80/22 80/23 82/2 82/6
82/11 82/13 82/16
83/23 84/12 86/22
114/18 134/13 134/15
143/6 143/8 143/10
**relationship [1]** 76/5
**relatively [1]** 49/13
**releases [1]** 117/9
**relevance [1]** 69/6
**relevant [5]** 23/22
68/18 70/24 77/9
126/20
**reliance [1]** 47/13
**relied [2]** 21/14 24/3
116/3
**relief [2]** 72/2 76/18
77/11
**relies [2]** 36/23 39/1
**rely [16]** 23/24 33/9
33/13 33/20 34/10
37/19 37/24 38/9 38/10
43/23 48/3 79/6 104/5
127/11 127/17 140/20
**relying [8]** 22/12 33/15
55/17 100/2 111/24
117/18 122/13 122/9
**rem [7]** 64/23 65/14
67/17 68/12 69/10
70/11 70/23
**remain [1]** 85/8
**remedied [10]** 18/16
18/17 20/9 20/9 34/16
34/16 35/12 35/20
35/21 36/19
**remedies [10]** 8/3 8/18
15/18 19/20 27/20 31/9
58/9 66/3 96/9 130/15
**remedy [3]** 89/11 94/2
94/2
**remember [2]** 27/17
108/20
**remembered [1]** 146/8
**reminded [1]** 67/22
**remove [4]** 4/18 4/23
5/9 66/3
**removed [2]** 31/11
32/22
**removes [1]** 30/21
30/23
**rendered [1]** 105/6
**repairs [1]** 122/22
**repayment [1]** 123/16
**repeated [1]** 57/21
**repeatedly [1]** 8/1
**replace [1]** 72/4
**replaced [1]** 117/10
**replenishing [1]** 114/21
**reply [1]** 133/4
**report [4]** 54/6 110/23
115/15 120/18
**reported [1]** 147/7
**Reporter [2]** 147/15
147/15
**REPORTERS [2]** 1/21
147/3
**reporting [5]** 26/15
51/3 51/10 51/13
115/18
**reports [3]** 110/10
115/8 123/14
**represented [4]** 6/11
24/13 24/22 48/21
**repudiate [2]** 57/7
57/17
**reputable [1]** 56/2
**reputation [1]** 66/5
**request [3]** 17/9 19/13
88/18
**requests [1]** 31/13
**require [9]** 39/6 41/18
42/5 42/23 84/13 84/17
84/17 105/1 107/14
**required [12]** 9/21
10/14 10/22 17/7 19/12
20/11 27/14 33/23
36/20 96/19 102/2
108/6
**requirement [8]** 37/22
38/2 39/6 41/18 42/4
42/9 42/13 42/15
**requires [1]** 45/5
**requiring [1]** 52/4
**res [2]** 68/9 68/14
**research [1]** 126/16
**reserve [4]** 38/6 97/22
105/10 114/22
**resignation [2]** 54/22
55/6
**resigned [6]** 53/2 53/3
55/2 55/7 55/9 55/9
**resigns [1]** 53/18
**resisting [1]** 78/24
**resolution [8]** 8/9 18/1
26/4 54/6 76/3 89/20
128/21 141/9
**resolve [3]** 8/20 88/12
135/7
**resolved [3]** 135/5
135/12 135/20
**resolves [2]** 18/4 18/5
**respect [6]** 5/13 19/15
22/18 54/7 77/2 123/10
**respectfully [1]** 107/12
**respects [1]** 36/7
**respond [1]** 88/21
**responded [1]** 129/21
**responsibility [2]** 25/8
25/9
**result [6]** 32/8 54/17
87/8 93/15 115/14
117/16
**results [2]** 117/12
117/14

**Resumed [1]** 73/1
**retail [1]** 114/22
**retain [1]** 91/24
**revenue [2]** 111/7
113/14
**revised [1]** 18/3
**revoke [1]** 52/4
**rewrite [1]** 129/1
**Richards [1]** 2/3 3/20
**ridiculous [2]** 71/24
140/22
**rights [17]** 5/8 7/2
29/11 53/12 58/6 58/11
61/23 67/4 67/11 67/15
67/16 68/7 70/19 96/7
96/14 125/12 136/20
**RIJU [11]** 1/6 17/17
20/22 20/22 21/1 21/1
21/23 23/15 31/11
55/10 142/17
**Riju's [2]** 17/17 31/12
**risk [12]** 58/5 58/8 58/9
60/17 60/18 60/20
60/22 73/18 106/12
106/13 106/16 142/1
**road [1]** 50/4
**role [2]** 5/1 23/3
**round [2]** 25/5 145/13
145/15
**rule [1]** 60/4
**rules [1]** 105/22
**run [1]** 11/12
**running [1]** 82/14

## S

**safe [1]** 146/6
**said [57]** 11/21 21/6
21/13 22/5 22/10 22/12
22/17 22/17 23/18
25/19 25/24 26/23 30/2
32/15 50/4 56/6 58/7
59/5 60/23 61/20 66/6
76/1 78/21 84/10 86/6
86/16 90/22 92/14
92/22 92/22 93/2 95/8
96/4 96/10 98/1 102/12
107/21 108/2 114/6
115/12 115/13 116/5
117/8 122/7 125/20
128/16 128/17 131/20
133/24 135/8 136/22
137/1 137/19 138/13
139/23 143/13 144/22
**sake [1]** 108/5
**same [19]** 20/23 32/21
35/6 36/17 54/3 55/4
55/5 55/9 55/13 62/24
63/18 82/10 92/12 94/2
107/7 108/17 120/18
122/16 134/18
**sampling [1]** 51/7
**satisfied [1]** 75/4
**satisfy [1]** 114/20
**saw [4]** 18/5 19/18
20/17 60/16
**saying [25]** 28/13
32/22 43/24 56/9 58/17
64/7 65/16 69/5 79/5
79/9 84/8 84/19 85/3

**saying... [12]** 94/1 95/19 99/23 100/20 103/23 104/3 106/14 116/24 122/13 126/5 137/23 144/6

**says [80]** 7/13 9/12 9/14 13/5 16/14 16/24 17/7 19/7 19/24 20/3 20/7 20/17 22/2 30/7 33/21 34/4 34/7 34/15 34/19 35/17 36/4 38/1 39/2 39/9 40/1 40/5 41/16 42/4 43/6 43/15 50/11 51/9 51/17 56/1 58/4 58/14 59/11 62/10 62/13 63/9 64/6 71/20 78/11 79/9 79/14 81/12 81/13 81/17 81/17 82/1 82/5 86/18 89/2 90/6 96/18 99/2 99/3 100/4 100/18 101/16 101/24 103/12 104/8 105/17 119/1 119/14 124/17 128/2 132/1 134/13 134/15 137/16 143/6 143/9 144/11 145/19

**scared [1]** 75/7

**schedule [1]** 88/11

**scheduling [1]** 145/18

**scope [1]** 88/6

**scroll [1]** 13/1

**SDNY [3]** 80/2 80/6 80/10

**Sean [11]** 3/23 9/7 11/6 13/13 18/22 34/24 36/14 37/1 47/6 53/5 73/13

**seat [10]** 65/1 65/1 66/4 68/9 68/13 68/15 68/22 69/10 69/22 70/23

**seated [1]** 73/3

**SEC [2]** 124/17 124/20

**SEC-registered [1]** 124/17

**second [20]** 5/7 5/13 11/22 12/1 13/15 14/22 35/23 38/10 38/24 42/21 50/21 51/14 53/24 77/10 78/8 94/24 104/23 109/9 125/1 129/11

**second-largest [1]** 125/1

**secret [2]** 75/18 124/23

**section [57]** 1/18 4/14 9/10 9/12 9/21 10/22 12/7 13/1 13/2 13/2 13/10 13/12 14/7 14/19 14/22 15/22 16/23 20/12 30/6 31/3 33/20 33/21 34/6 34/18 35/14 35/16 36/1 36/22 37/2 37/3 37/14 37/20 38/20 38/24 41/7 43/9 46/12 46/24 47/13 56/18 61/2

61/3 62/9 72/2 77/21 78/13 87/21 88/7 89/10 95/14 98/11 101/23 103/6 115/13 118/2 135/6 136/4

**Section 1.11 [2]** 115/13 118/2

**Section 1.12 [1]** 87/21

**Section 10.9 [1]** 77/21

**Section 2 [1]** 101/23

**Section 225 [4]** 88/7 89/10 135/6 136/4

**Section 3 [1]** 103/6

**Section 5.17 [1]** 98/11

**securing [1]** 114/22

**security [11]** 29/19 63/1 63/6 93/16 108/14 108/15 108/18 120/12 121/11 123/16 137/7

**seeing [1]** 46/5

**seeking [1]** 65/12

**seem [2]** 71/21 121/5

**seemed [1]** 23/4

**seems [1]** 45/19

**seen [3]** 33/11 75/8 77/20

**seize [2]** 92/3 94/10

**seizure [1]** 77/17

**selection [9]** 62/8 64/13 68/5 69/9 69/13 71/19 78/22 90/21 134/9

**self [1]** 132/10

**self-dealing [1]** 132/10

**send [9]** 15/16 16/15 18/14 19/18 20/18 28/9 29/7 130/17 137/2

**sending [1]** 137/8

**sends [1]** 27/22

**sense [6]** 31/18 85/15 86/20 100/14 100/22 131/18

**sent [10]** 31/9 32/14 32/19 37/6 107/19 127/20 127/22 127/22 137/14 140/10

**sentence [10]** 37/24 38/9 38/10 38/11 38/24 54/5 79/21 80/14 82/1 83/23

**sentences [1]** 81/9

**separate [1]** 83/4

**September [8]** 10/5 10/15 56/7 113/2 117/12 120/9 120/17 139/17

**September 27 [2]** 10/15 120/17

**September 27th [1]** 10/5

**series [2]** 8/10 74/2

**serious [3]** 92/5 98/7 124/7

**serve [8]** 96/5 96/6 96/11 96/24 97/10 97/21 126/7 131/11

**served [1]** 74/9

**serving [2]** 121/23 128/18

**set [3]** 109/2 138/12 147/11

**sets [1]** 105/20

**seven [2]** 57/8 121/7

**seven-fold [1]** 121/7

**seventh [1]** 96/4

**several [5]** 4/11 31/16 51/8 59/15 138/7

**shall [16]** 14/1 33/23 34/1 39/4 41/16 42/1 42/4 42/22 62/14 63/11 78/12 80/14 100/5 100/10 102/1 103/12

**shareholder [1]** 91/10

**shareholders [1]** 91/10

**shares [5]** 29/21 29/22 30/16 30/20 72/4

**sheet [3]** 111/9 113/6 129/22

**shell [1]** 40/17

**SHERON [4]** 2/10 3/9 53/7 73/5

**Sherwood [2]** 92/22 93/1

**short [1]** 86/10

**shortly [1]** 76/23

**should [25]** 5/18 5/20 48/6 49/21 58/16 62/3 68/13 76/17 76/19 76/20 77/1 77/11 77/16 77/16 78/23 83/7 83/9 83/15 86/7 86/17 87/3 87/24 91/16 91/24 93/4

**shouldn't [4]** 49/12 49/24 83/5 83/8

**show [8]** 24/12 35/2 40/14 45/6 61/8 78/24 94/3 123/9

**showed [2]** 82/9 120/1

**showing [3]** 111/14 113/14 113/18

**shown [6]** 74/9 117/16 117/17 117/18 123/15 123/20

**shows [6]** 45/16 47/18 55/14 116/8 120/16 120/22

**shred [1]** 108/12

**side [23]** 4/11 6/1 9/17 14/17 18/12 20/15 23/23 24/13 25/1 25/15 26/16 31/5 33/18 36/22 39/1 59/11 60/18 62/7 66/11 71/3 92/18 140/15 141/13

**side's [1]** 133/22

**sides [3]** 24/21 59/10 96/13

**sideshow [1]** 76/13

**sign [7]** 12/11 22/10 27/19 30/20 37/23 50/9 50/12

**signatory [5]** 68/10 69/10 70/14 70/15 70/17

**signature [2]** 17/17 21/1

**signed [32]** 11/13 17/15 17/17 17/18

20/21 20/23 21/4 21/10 21/10 21/11 21/24 22/1 23/5 23/17 24/1 24/5 25/7 26/3 26/12 30/18 50/11 57/9 59/21 61/15 62/24 63/18 64/17 64/18 66/1 67/2 70/15 70/18

**significance [1]** 25/10

**significant [6]** 29/12 32/2 38/16 54/18 101/16 139/18

**signing [1]** 22/22

**signs [5]** 24/6 25/17 30/23 38/8 56/2

**Silver [1]** 125/6

**similar [6]** 19/17 63/3 72/1 72/7 115/16 136/5

**simple [2]** 143/14 143/16

**simply [2]** 17/22 48/5

**simultaneous [1]** 145/15

**Singapore [2]** 63/8 82/11

**single [2]** 74/10 97/17

**sit [1]** 68/13

**sits [1]** 64/24

**situation [7]** 48/12 48/20 48/24 49/19 57/23 58/20 72/7

**six [5]** 44/7 137/21 137/23 138/3 141/7

**skip [3]** 20/6 20/6 53/20

**skipped [1]** 12/15

**slide [9]** 5/4 6/13 7/4 27/3 28/3 29/14 30/10 33/17 55/4

**slides [1]** 4/9

**slightly [2]** 15/4 45/5

**small [1]** 73/6

**so-called [3]** 74/5 77/13 129/5

**sole [9]** 4/18 4/19 22/15 23/9 30/22 32/4 64/20 90/5 90/7

**solely [2]** 55/17 115/14

**solution [1]** 107/19

**solve [1]** 107/24

**somebody [5]** 48/16 58/10 66/4

**somehow [2]** 58/18 69/19

**someone [5]** 50/9 66/5 66/23 67/8 69/12

**something [16]** 7/19 15/11 42/9 42/11 45/5 48/14 49/16 60/1 60/13 61/15 64/8 66/10 71/11 119/15 127/12 141/16

**son's [1]** 142/23

**SONDRA [2]** 2/11 3/9

**soon [1]** 44/20

**sophisticated [22]** 5/19 5/19 5/24 24/14 33/3 48/7 48/20 48/21 49/11 49/21 50/2 52/16 62/3 62/5 62/5 65/23

72/17 86/16 86/16 94/22 95/7 95/10

**sort [10]** 23/12 45/23 49/24 50/3 64/24 66/16 68/19 70/8 70/21 118/3

**sought [1]** 72/2

**source [1]** 118/21

**sources [1]** 117/7

**speak [5]** 28/19 28/22 67/4 76/6 116/19

**special [2]** 135/9 135/11

**specialties [1]** 125/4

**specific [4]** 33/18 34/19 42/16 94/5

**specifically [4]** 34/19 35/21 107/21 127/2

**specified [46]** 9/2 9/4 9/14 9/15 9/16 10/8 12/1 12/3 13/4 13/5 13/8 14/5 14/7 14/24 15/19 16/8 16/13 17/2 17/5 17/10 18/15 19/3 19/9 19/15 20/7 34/15 35/10 35/20 36/10 36/18 47/3 47/8 47/10 47/15 48/9 50/20 59/22 60/19 95/12 95/17 96/2 102/12 102/13 121/13 123/2 136/22

**speech [1]** 129/7

**speed [1]** 89/16

**Spencer [4]** 26/9 26/23 140/16 141/23

**spending [1]** 106/17

**spent [1]** 99/7

**spoke [1]** 74/22

**spot [1]** 19/10

**SPV [2]** 132/7 135/8

**SQO [2]** 132/2 132/12

**Square [1]** 114/18

**squeeze [1]** 128/24

**squishier [1]** 7/9

**squishy [1]** 7/15

**stability [1]** 136/11

**stand [3]** 37/7 68/19 145/24

**stand-in [1]** 68/19

**standard [1]** 104/4

**standards [2]** 54/20 67/13

**Stanhope [3]** 93/19 108/11 120/7

**start [5]** 31/14 31/16 77/19 110/11 132/20

**started [5]** 50/3 74/7 75/17 85/3 107/1

**Starting [1]** 33/19

**starts [3]** 13/23 49/24 77/24

**STATE [3]** 1/1 147/4 147/8

**stated [4]** 87/18 88/4 105/22 124/20

**statement [8]** 111/10 111/10 113/6 113/6 113/7 119/23 120/19 139/20

**statements [27]** 10/3

**statements... [26]**
21/20 37/8 52/21 52/23
53/3 54/1 54/10 94/7
109/11 111/12 111/22
112/1 113/5 116/12
117/2 118/4 119/14
120/1 120/2 120/3
121/4 121/9 123/19
136/8 138/12 139/6
**states [1]** 126/9
**status [8]** 32/5 54/9
85/9 86/2 87/16 88/3
88/6 131/19
**statute [1]** 71/5
**statutory [9]** 53/19
54/22 64/13 66/12
66/15 66/17 68/12
69/21 83/17
**stay [3]** 85/4 85/8
91/16
**stayed [1]** 83/12
**staying [1]** 89/19
**steering [6]** 74/13
74/18 76/15 125/1
125/5 130/24
**stellar [2]** 66/5 73/18
**stenographically [1]**
147/7
**step [1]** 46/2
**Stephen [1]** 26/9
**steps [4]** 5/13 31/1
31/4 87/19
**stick [1]** 15/21
**still [16]** 10/17 12/22
18/9 34/8 37/12 42/15
65/14 70/18 76/5 89/8
118/11 126/24 129/14
143/23 143/23 143/24
**stipulate [1]** 89/14
**stipulated [4]** 10/13
10/18 12/19 89/15
**stipulation [2]** 10/12
122/20
**stock [7]** 4/17 29/22
30/12 30/14 67/24 68/2
134/7
**stockholder [4]** 30/20
71/5 91/8 134/6
**stockholders [3]** 72/9
90/14 90/17
**stop [1]** 42/19
**story [2]** 61/7 75/21
**straightforward [1]**
143/15
**Strategic [1]** 67/22
**strategy [2]** 75/5 75/16
**Street [2]** 1/12 1/22
**stress [2]** 34/22 78/14
**stressed [2]** 124/19
124/21
**strict [1]** 52/4
**strictly [1]** 78/20
**string [1]** 117/23
**struggling [1]** 68/8
**stuck [1]** 67/14
**stuff [2]** 139/12 141/14
**sub [1]** 124/10

**sub-context [1]** 124/10
**subject [1]** 74/16
**submit [5]** 80/9 84/1
91/15 107/12 115/8
**submits [4]** 78/2 79/16
79/24 80/5
**subpart [1]** 12/2
**subpoena [3]** 140/10
143/22 144/2
**subpoenaed [1]** 117/6
**subsequent [4]** 50/15
95/2 101/2 101/4
**subsidiaries [6]** 6/3
24/22 40/16 40/19
40/20 123/24
**subsidiary [6]** 6/4 6/6
12/4 12/10 23/8 60/10
**substance [1]** 91/18
**substantial [2]** 87/12
92/16
**substitute [1]** 79/22
**success [1]** 73/19
**such [24]** 4/22 15/7
19/7 19/8 34/21 34/22
79/2 79/4 85/9 88/22
89/19 93/7 96/16 96/16
101/20 105/6 114/20
115/17 116/14 116/14
118/16 124/9 126/18
133/13
**sue [8]** 63/3 63/19
81/15 92/20 94/4 94/5
134/21 134/22
**sued [1]** 80/6
**suffer [1]** 112/13
**suffered [4]** 87/8 93/15
94/4 136/7
**sufficient [1]** 145/24
**suggest [2]** 81/21
87/19
**suggesting [1]** 71/22
**suing [1]** 93/6
**suit [2]** 65/20 89/23
**Suite [1]** 1/22
**summarily [1]** 130/3
**summarize [1]** 95/15
**summarizes [1]** 111/5
**summary [4]** 89/11
91/15 92/19 93/6
**supersede [1]** 102/19
**supplemental [1]**
32/19
**support [8]** 48/4 49/4
50/6 57/21 77/14 118/5
118/11 140/19
**supports [2]** 60/12
121/14
**suppose [1]** 25/2
**supposed [19]** 11/16
12/11 15/12 21/19
21/22 74/1 74/10 74/17
97/7 106/23 107/4
112/5 120/17 120/19
124/13 125/9 128/15
131/1 136/12
**Supreme [1]** 78/20
**sure [14]** 7/22 28/7
28/24 35/6 39/20 41/13
51/17 68/17 68/24 96/5

**termination [3]** 103/3
107/6
**terms [5]** 5/20 18/3
37/3 52/10 86/17
**test [2]** 105/14 108/11
**testified [5]** 22/15 26/7
31/20 117/9 141/23
**testify [1]** 57/3
**testimony [2]** 24/9
121/21
**tests [1]** 98/5
**thank [31]** 3/6 3/12
3/18 4/1 4/5 25/23 46/9
46/22 47/22 53/14
72/22 73/2 86/9 91/20
91/21 97/5 101/11
111/4 132/15 132/16
132/18 133/7 142/9
142/10 142/20 142/21
143/1 145/10 145/11
146/6 146/8
**their [60]** 5/20 7/2 10/4
10/10 11/18 24/14
29/10 29/12 33/15
33/19 36/12 37/2 37/16
39/2 46/24 47/3 47/13
47/14 47/24 48/15
49/22 50/18 53/23 55/1
56/17 58/8 58/10 60/10
60/12 61/22 62/4 66/3
71/18 81/9 86/17 88/18
89/13 96/7 96/13 98/21
104/19 105/16 107/18
120/12 121/7 123/1
123/2 124/16 125/4
127/9 127/15 130/20
133/23 134/11 136/13
136/20 138/8 139/3
140/8 140/19
**themselves [2]** 74/13
75/18
**then-elapsed [1]** 139/7
**theoretical [1]** 86/23
**theory [1]** 39/22
**thereafter [1]** 43/8
**therefore [11]** 16/9
16/15 17/7 17/13 19/9
32/19 43/20 59/16 68/1
77/17 106/12
**therein [1]** 147/9
**they -- the [1]** 91/11
**they'll [1]** 143/16
**they're [47]** 8/6 8/7
10/7 28/13 43/19 52/18
56/5 57/8 61/21 64/7
71/17 76/5 76/6 79/5
89/8 89/10 94/9 96/4
96/24 99/20 99/23
100/2 103/8 111/24
112/6 113/11 116/23
117/5 117/13 121/8
122/3 122/4 122/8
124/14 124/17 125/9
125/10 126/3 126/5
128/2 128/3 128/5
134/12 136/19 137/23
141/24 142/18
**they've [9]** 37/12 47/14
81/6 94/8 123/14

**123/15 128/3 130/22**
142/1
**thing [5]** 7/1 54/3
66/16 96/2 97/23
**things [15]** 12/18 12/23
14/17 15/20 24/6 25/8
30/12 42/2 48/22 48/23
52/19 55/12 56/9 56/11
136/1
**thinking [1]** 66/2
**thinks [3]** 65/7 145/21
145/23
**third [3]** 12/3 86/21
139/9
**third-party [1]** 86/21
**thirds [1]** 129/12
**this [254]**
**though [24]** 22/15 23/4
28/12 65/13 74/14 93/5
99/18 103/5 108/8
123/21
**thought [2]** 74/4 133/4
**threat [1]** 128/24
**threatened [1]** 130/15
**threatening [1]** 109/23
**three [14]** 22/7 49/16
55/8 74/22 93/13 93/17
93/20 101/15 111/17
111/23 112/1 112/4
131/7 144/7
**through [14]** 56/12
70/21 75/2 90/20 93/23
95/14 110/2 110/17
121/20 121/21 122/11
126/16 138/11 147/5
**throughout [1]** 17/24
**tie [1]** 66/14
**ties [1]** 99/14
**timely [1]** 51/10 56/13
118/6
**times [6]** 21/11 22/7
34/23 35/3 36/23
34/18
**TIMOTHY [4]** 1/3 2/3
3/21 65/17
**titans [1]** 125/7
**today [23]** 3/7 3/15
3/22 10/16 12/22 14/17
28/13 37/7 57/2 73/16
74/21 76/6 76/8 76/18
86/7 86/8 98/17 109/4
112/6 114/7 116/9
116/10 145/14
**together [7]** 6/6 39/23
40/1 76/20 80/13
117/23 138/20
**told [6]** 26/20 58/21
58/23 86/3 89/18 144/6
**too [6]** 20/14 20/14
20/15 20/21 34/20
50/11
**took [13]** 21/2 26/8
26/24 28/21 32/21
53/10 58/24 59/1 93/10
126/5 131/9 141/8
143/8
**top [4]** 7/13 11/7 16/23
35/17
**topics [2]** 87/1 87/1

**T**

Torres [3]  2/12 3/10 73/5
total [2]  42/13 129/13
trades [1]  6/19
trading [2]  120/9 120/11
transaction [3]  6/14 6/15 132/11
transcript [1]  1/18 22/13 22/20
transcription [1]  147/6
transfer [4]  30/7 30/17 88/5 135/17
transferred [1]  135/19
transfers [1]  30/15
transparency [1] 136/20
Travel [1]  146/6
treatment [1]  61/21
trending [3]  138/19 138/19 138/24 138/24
trends [1]  113/15
trial [4]  1/18 53/11 145/19 145/21
trials [1]  25/4
tricks [1]  130/13
tried [3]  21/12 98/17 141/9
trigger [2]  29/18 137/6
triggered [2]  72/3 98/5
triggering [2]  137/11 137/14
triggers [2]  15/17 19/19
trivial [7]  48/4 49/3 50/1 92/8 94/19 97/23 140/6
triviality [1]  114/5
true [5]  21/23 67/7 114/3 127/17 147/5
trumping [1]  36/22
trumps [3]  34/18 35/14 46/13
TRUST [2]  1/2 2/8
truth [1]  142/18
try [13]  8/3 28/16 41/8 44/21 56/22 59/3 59/4 61/22 99/14 99/14 99/17 109/24 123/3
trying [23]  8/9 9/17 18/1 18/3 25/3 25/6 26/4 41/22 42/19 52/18 65/4 69/6 70/21 79/3 89/23 94/9 98/16 106/21 122/4 125/14 125/15 128/9 134/12
Tunnell [3]  2/5 3/15 92/7
turns [1]  5/2
two-thirds [1]  129/12
type [4]  61/4 84/11 84/14 94/13
types [1]  135/7

**U**

U.S [1]  107/23
unambiguous [2]  33/3

---

72/16
unaudited [7]  10/23 11/2 110/10 110/11 111/22 112/1 128/15
unaware [1]  126/10
uncertain [2]  98/8 99/4
unclean [5]  33/14 33/16 60/24 61/1 62/1 128/13
unclear [1]  119/19
unconditionally [4]  36/7 78/2 79/15 80/9
unconscionability [5]  7/8 84/6 95/23 96/10 144/21
unconscionable [9]  51/23 92/10 114/7 114/14 116/11 117/1 139/21 140/5 141/10
under [53]  5/5 9/21 10/22 14/22 21/16 23/10 28/7 29/18 31/6 32/4 36/8 39/12 44/9 44/12 46/11 49/3 50/19 51/9 52/12 54/16 57/7 57/9 57/24 59/6 61/2 63/23 72/2 74/11 75/20 77/3 77/13 78/17 85/18 85/19 86/22 87/21 93/10 94/11 96/9 97/10 98/16 102/3 105/3 105/4 105/13 107/4 108/10 111/22 117/20 124/6 131/7 134/8 142/19
underlying [6]  6/14 54/10 71/23 72/5 72/8 83/21
understand [14]  7/2 15/3 22/22 25/20 49/2 67/20 69/15 70/6 70/7 71/1 98/15 116/23 118/1 119/7
understanding [5]  21/5 23/20 28/5 44/13 88/23
understood [2]  14/21 94/20
undertaking [1]  98/8
undertakings [1]  114/23
unforeseeable [1]  105/8
unforeseen [1]  59/19
unjust [1]  79/1
unless [6]  36/20 78/23 91/18 103/14 119/12 132/13
unlike [3]  5/11 31/3 114/11
unpack [1]  42/7
unprecedented [2]  69/18 70/2
unpunished [1]  128/21
unreasonable [1]  79/1
unsupported [1]  61/8
unwarranted [1]  140/5
updated [1]  26/21
use [29]  4/17 9/15 9/16

---

9/18 38/2 38/12 39/24 38/19 41/8 44/14 44/16 44/20 45/21 74/4 88/23 89/3 98/12 99/2 99/15 100/12 100/18 100/21 104/9 104/15 104/20 106/14 108/22 109/23 145/4
used [9]  8/16 21/14 38/14 43/11 101/22 102/7 104/1 109/17 133/4
using [3]  44/23 128/23 129/6
usual [1]  88/16
utilization [1]  51/20

**V**

valid [7]  4/20 58/24 66/14 72/12 95/20 96/9 119/4
valid' [1]  78/22
validity [1]  5/2 90/8 126/4
valuable [1]  59/1
valuation [1]  97/17
valued [1]  6/9
variety [1]  87/1
various [1]  111/5 111/6
vast [1]  51/21
venue [2]  77/5 91/17
verified [1]  90/6
verify [1]  21/22
Vice [2]  1/15 147/8
view [5]  5/9 54/21 71/7 116/20
viewed [1]  92/9
VIII [1]  13/21
violation [1]  130/17 130/18 131/19
virtue [1]  90/18
Vora [1]  124/24
vote [2]  29/21 72/4
vulture [2]  28/15 61/6

**W**

wait [1]  57/12
waited [2]  128/14 128/17
waiting [1]  54/24
waive [10]  53/12 96/7 96/9 96/13 97/1 102/8 123/2 125/19 125/21 125/22
waived [5]  35/21 36/20 56/23 58/16 102/5
waiver [8]  20/11 102/18 103/3 103/12 103/20 109/16 137/18 137/19
waivers [2]  75/8 75/10
waives [1]  36/7
walked [2]  21/9 55/20
walking [1]  69/7
wanted [18]  38/8 40/15 40/22 41/3 44/2 44/3 44/8 44/20 51/16 85/2 89/7 109/23 127/6 133/20 134/21 138/8

---

15/10 146/5
wants [4]  63/4 65/20 134/10 146/3
warrant [1]  52/1
warrants [2]  129/15 129/16
water [2]  7/21 50/19
way [19]  14/11 15/10 39/15 55/5 68/22 69/1 69/8 70/9 79/20 81/8 81/13 90/20 104/13 109/18 117/24 119/9 121/17 123/23 129/19
we'd [3]  131/21 131/22 146/2
we'll [1]  125/21
we've [2]  54/24 72/16
weak [1]  125/21
weeks [1]  31/16
weird [1]  68/22
Welcome [1]  3/11
went [4]  27/5 31/5 120/9 138/11
weren't [16]  14/10 14/17 22/17 26/20 27/2 27/5 44/23 70/17 74/17 75/12 117/6 117/6 120/10 122/1 125/17 128/23
Westlaw [1]  92/24
what's [7]  41/12 57/13 101/7 117/21 119/23 125/8 127/3
whatever [1]  84/21
when [63]  7/16 7/18 13/5 13/6 14/22 15/4 15/11 21/12 25/3 26/2 26/11 27/24 29/8 29/16 29/19 33/16 41/16 52/15 57/18 58/7 58/21 59/21 61/12 61/13 61/20 64/17 64/18 66/2 67/2 67/16 68/22 69/9 69/13 70/14 74/7 86/2 92/4 92/20 93/20 98/2 98/3 98/4 98/17 98/18 100/4 100/20 101/3 113/20 115/3 116/4 117/1 118/11 120/10 120/21 123/22 127/21 129/3 131/9 137/14 139/16 140/15 141/11 144/16
whenever [1]  38/7
whereas [5]  19/2 82/4 101/15 103/11 110/3
WHEREOF [1]  147/10
wherever [5]  63/4 63/19 81/15 134/10 134/21
whether [30]  5/7 5/15 29/2 67/13 67/15 70/4 70/5 72/9 72/9 72/11 81/5 82/20 83/13 84/1 84/24 87/18 93/13 94/18 96/16 100/21 110/16 117/15 121/24 132/22 135/24 136/1 137/8 137/9 138/19 145/1

---

while [4]  8/8 38/19 85/5 131/21
White [5]  6/11 24/13 24/16 24/23 24/24
Whitehat [53]  12/4 12/20 12/21 12/22 37/10 37/22 37/23 40/1 40/23 40/23 41/2 44/11 45/24 46/1 46/17 47/3 47/10 47/15 51/3 56/14 59/9 59/14 59/23 94/14 97/6 97/9 97/13 97/19 100/5 100/6 100/8 100/10 100/24 101/19 102/1 102/4 102/11 103/14 103/14 100/5 105/2 105/11 105/13 106/2 106/8 107/7 107/13 107/22 108/7 108/20 123/10 123/11 137/20
who's [2]  126/20 135/23
whole [9]  31/13 61/6 74/7 91/7 104/6 104/11 127/23 135/6 139/22
wholly [4]  6/4 6/5 23/8 23/11
wife [1]  55/11
Williams [2]  1/11 1/22
willing [3]  66/9 131/21 131/22
Wilmington [3]  1/12 1/23 147/11
within [7]  0/3 14/14 17/13 40/6 43/17 88/6 143/11
without [7]  16/13 17/5 19/8 37/14 38/1 107/8 117/18
witness [2]  57/1 147/10
witnesses [1]  143/20
won't [2]  125/23 145/19
word [3]  8/16 78/14 79/19
words [8]  7/17 77/3 78/8 79/12 80/18 80/18 92/6 117/23
work [7]  39/23 39/24 43/12 47/1 47/13 71/19 104/13
works [6]  14/12 69/9 99/8 99/10 99/12 144/17
world [2]  43/10 108/9
world's [2]  6/8 73/19
worms [1]  91/7
worried [2]  26/18 26/20
worth [13]  60/10 75/14 97/9 98/4 105/14 105/15 105/21 106/3 106/7 108/21 108/22 115/2 129/23
wouldn't [5]  65/19 88/23 125/18 125/20 144/15

**W**

**wrap [1]** 72/15
**write [1]** 112/18
**writing [1]** 58/15
**written [8]** 4/23 6/24
7/17 30/21 30/23 32/20
32/21 119/9
**wrong [7]** 14/18 61/3
62/1 62/8 132/8 135/10
141/21
**wrongful [1]** 71/22
**wrote [1]** 32/17

**Y**

**year-on-year [1]**
113/14
**years [6]** 66/1 69/23
71/12 112/11 113/11
123/18
**Yep [1]** 43/1
**yet [3]** 54/12 89/8
124/13
**York [76]** 2/7 2/12 5/22
7/8 7/19 33/10 48/4
49/4 49/7 51/9 51/11
51/17 56/20 57/7 57/15
58/4 62/11 67/22 74/24
76/20 77/13 77/23 78/4
79/16 79/17 81/6 81/7
83/13 84/5 84/9 84/18
84/23 84/24 85/5 85/10
85/12 85/15 85/21
85/22 86/14 86/21
86/24 87/24 88/8 88/10
88/14 88/24 89/6 89/20
90/9 91/17 92/2 92/6
92/19 93/2 93/13 94/11
94/12 96/10 104/6
105/4 108/4 108/10
114/19 117/20 124/8
126/8 131/22 134/23
135/1 135/5 139/24
143/14 144/24 145/2
145/5
**York's [1]** 92/14
**you'll [1]** 113/12
**you-all [3]** 25/5 143/2
145/13

**Z**

**ZURN [1]** 1/15

# EXHIBIT 28

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GLAS TRUST COMPANY LLC, in its          :
capacity as Administrative Agent and    :
Collateral Agent, and TIMOTHY R.        :
POHL,                                    :
                                         :
                Plaintiffs,              :
                                         :
        v                                : C. A. No.
                                         : 2023-0488-MTZ
RIJU RAVINDRAN, BYJU'S ALPHA, INC.,      :
and TANGIBLE PLAY, INC.,                 :
                                         :
                Defendants.              :


                      _ _ _


                    Chancery Court Chambers
                    Leonard L. Williams Justice Center
                    500 North King Street
                    Wilmington, Delaware
                    Thursday, May 18, 2023
                    3:15 p.m.

                      _ _ _

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

                      _ _ _


 TELEPHONIC ORAL ARGUMENT and RULINGS OF THE COURT ON
   PLAINTIFFS' MOTION FOR EXPEDITION AND MOTION FOR
                  STATUS QUO ORDER


--------------------------------------------------------
                CHANCERY COURT REPORTERS
            Leonard L. Williams Justice Center
            500 North King Street - Suite 11400
                Wilmington, Delaware 19801
                    (302) 255-0523

2

1  APPEARANCES:

2        BROCK E. CZESCHIN, ESQ.
         SUSAN HANNIGAN COHEN, ESQ.
3        NICOLE M. HENRY, ESQ.
         CAROLINE M. McDONOUGH, ESQ.
4        Richards, Layton & Finger, PA
            for Plaintiff Timothy R. Pohl
5

6        LAUREN K. NEAL, ESQ.
         ELIZABETH A. MULLIN, ESQ.
7        Morris, Nichols, Arsht & Tunnell LLP
                   -and-
8        PATRICK C. ASHBY, ESQ.
         of the New York Bar
9        Linklaters LLP
            for Plaintiff GLAS Trust Company LLC, in its
10          capacity as Administrative Agent and Collateral
            Agent
11

12       JOSEPH B. CICERO, ESQ.
         Chipman Brown Cicero & Cole LLP
13               -and-
         SHERON KORPUS, ESQ.
14       DAVID M. MAX, ESQ.
         of the New York Bar
15       Kasowitz Benson Torres LLP
            for Defendants
16

17

18

19

20                           - - -

21

22

23

24

3

1          THE COURT:  Good afternoon.  This is

2  Morgan Zurn.  May I have appearances, please,

3  beginning with counsel for Mr. Pohl.

4          ATTORNEY CZESCHIN:  Good afternoon,

5  Your Honor.  This is Brock Czeschin from Richards,

6  Layton & Finger on behalf of plaintiff Timothy Pohl.

7  With me in my office is Susan Hannigan Cohen, and on

8  the line with us from my office are Nicole Henry and

9  Caroline McDonough.

10          THE COURT:  Thank you.

11          Counsel for GLAS Trust Company?

12          ATTORNEY NEAL:  Good afternoon, Your

13  Honor.  Lauren Neal of Morris Nichols Arsht & Tunnell

14  on behalf of plaintiff GLAS Trust Company LLC.  On the

15  line is my colleague Elizabeth Mullin, and also on the

16  line is Patrick Ashby from Linklaters, Irena

17  Goldstein, senior legal counsel at GLAS, and Katie

18  Fischer, who is a vice president at GLAS.

19          THE COURT:  Thank you.

20          Counsel for the defendants?

21          ATTORNEY CICERO:  Good afternoon, Your

22  Honor.  Joe Cicero, Chipman Brown Cicero & Cole.  Also

23  on the line with me are my co-counsel, Sheron Korpus

24  and David Max from the Kasowitz Benson Torres firm.

4

1                THE COURT:  Thank you.

2                ATTORNEY CICERO:  And also, I will

3   note I believe I have some client representatives

4   listening.  They are going to be on mute.

5                THE COURT:  Thank you.  That was my

6   first request.  I hear a lot of folks joining our

7   call.  Please mute your lines if you're not speaking.

8                The second is that I understand

9   someone violated our court policy and the trust that

10  we put in you-all when we make these accessible to the

11  public and was recording this proceeding.  That is

12  strictly prohibited, and if I hear about it, you will

13  not be able to participate in these proceedings any

14  further.

15               Third, Mr. Czeschin, your audio

16  quality was not great.  I don't know if there's

17  anything you can do to improve that.  But we'll go

18  from there, and you may proceed.

19               ATTORNEY CZESCHIN:  Thank you, Your

20  Honor.

21               I believe there's some interference on

22  the line, or I'm not sure if it's people clicking in

23  or off of the call.  But hopefully you can hear me

24  better now?

5

1          THE COURT:  It is better.  Thank you.

2          ATTORNEY CZESCHIN:  Okay.

3          So with Your Honor's permission, I'll

4    be speaking on behalf of both of the plaintiffs today

5    and addressing the motions for entry of a status quo

6    order and for expedition in this action that's brought

7    pursuant to Section 225 of the Delaware General

8    Corporation Law.

9          And I would like to start, briefly,

10   with just a description of the underlying facts.

11   Plaintiff GLAS Trust Company is the administrative and

12   collateral agent for a group of lenders that provided

13   a $1.2 billion term loan to Byju's Alpha.  And Byju's

14   Alpha is a special-purpose entity that was set up to

15   be the borrower for that loan.  Byju's Alpha was a

16   wholly owned subsidiary of Byju's Pte., which is part

17   of a family of Byju's companies that operate a very

18   large online education business.

19          And the loan terms are set forth in a

20   number of detailed agreements, including a credit

21   agreement, a security agreement, and a pledge

22   agreement.  And pursuant to those agreements, a number

23   of the Byju's entities agreed to be guarantors for the

24   loan and/or they pledged various assets --

6

1          UNKNOWN SPEAKER:  I'm so sorry to

2   interrupt.  I believe the hearing is underway, so I'm

3   going to hop off.

4          THE COURT:  I'm sorry.  Everyone

5   except for Mr. Czeschin needs to mute their lines.

6          Mr. Czeschin, you may proceed.

7          ATTORNEY CZESCHIN:  Sure.

8          So, again, pursuant to the agreements,

9   there are a lot of Byju's entities, related entities,

10  that agreed to be guarantors for the loan and/or they

11  pledged assets as collateral for the loan.  And that

12  would include one of the other defendants here,

13  Tangible Play, Inc.

14          And those loan documents were signed

15  in November of 2021.  And unfortunately, relatively

16  quickly thereafter, Byju's Alpha and its related

17  entities fell out of compliance with the loan terms.

18  And I don't think it's necessary to go too deep into

19  the detail on this call into the defaults, but they

20  fall into three general buckets.

21          The first bucket was the failure to

22  provide audited financial statements.  The second

23  failure was not providing timely or complete unaudited

24  financial statements.  And then, third, there was a

1    failure by one of the Byju's companies, known as

2    Whitehat, to join as a guarantor to the credit

3    agreement by the date it was required to do so.

4            And these defaults by Byju's, they

5    started in February of 2022 and they continued to pile

6    up as time went on, so that by the summer of 2022, you

7    have counsel for the lenders sending correspondence

8    demanding that the defaults be addressed.  And this

9    led to, you know, months of correspondence and

10   negotiations between the parties, including the

11   execution of several amendments to the credit

12   agreement and a forbearance agreement.

13           And in those agreements, Byju's

14   expressly acknowledges and agrees to the existence of

15   the defaults, and they are defined as the "Specified

16   Defaults" in the papers.  And they further agree that

17   those specified defaults provided the lenders with the

18   right to accelerate the loan once the forbearance

19   period expired.  And we quote those documents at the

20   outset of our reply brief that was submitted, Your

21   Honor, and we submit that the language could not be

22   more clear.

23           Nonetheless, despite the best efforts

24   from the lenders and from GLAS, the negotiations

8

1  during the forbearance period were not successful.

2  Either Byju's would not engage, or they continued to

3  drag their feet and they continued to fail to perform

4  the obligations under the credit agreement.

5              So February 10, 2023, comes, and that

6  is when the forbearance period expires.  And it

7  expired without any resolution.

8              But, again, the lenders did not

9  immediately accelerate the loan and exercise their

10  remedies on that date.  They tried to continue to

11  engage with Byju's for several more weeks.  But given

12  the continued foot-dragging on that side and growing

13  concern about the security of the loan, on March 3,

14  2023, the lenders determined that they had no choice

15  but to instruct GLAS, as the administrative and

16  collateral agent, to provide notice of default and

17  acceleration of the loan and to exercise the remedies

18  under the pledge and security agreements.

19              In particular, GLAS exercised its

20  contractual right to transfer 100 percent of Byju's

21  Alpha's stock to itself, and following the

22  belt-and-suspenders rights in the loan documents, also

23  executed an irrevocable proxy memorializing its power

24  as the attorney-in-fact of Byju Alpha's direct parent.

1          And these actions gave GLAS the

2   authority to vote or otherwise control 100 percent of

3   Byju's Alpha's stock.  And GLAS used that authority to

4   execute a stockholder written consent that, among

5   other things, removed all of Byju's Alpha's existing

6   directors -- and we understand that there was only one

7   director, and that is Mr. Riju Ravindran, one of the

8   defendants here -- and appointed in his place, as the

9   new sole director, Mr. Timothy Pohl.

10          And that written consent was properly

11  drafted and delivered to the company, and there's no

12  dispute that's been raised by the defendants with

13  respect to the written consent.

14          Also on March 3, Mr. Pohl exercised

15  his power as the sole director by executing a written

16  consent in that capacity removing any existing

17  officers of the company and appointing himself CEO and

18  secretary of the company with sole authority and

19  control over the company's accounts.  Mr. Pohl and

20  GLAS also sent notices out to over 300 financial

21  institutions notifying them of Pohl's exclusive

22  authority over Byju's Alpha's accounts and seeking to

23  locate those accounts so that he could take control.

24          Now, Byju and Riju Ravindran, who are

1  sort of the two top folks at the defendants, refused

2  to accept this exercise of remedies, but they did come

3  back to the negotiating table, and the parties again

4  engaged and, you know, sought to reach a resolution of

5  their disputes.  And the lenders were willing and

6  happy to do that, and certainly did not want to rush

7  into litigation if it wasn't necessary.

8            However, unfortunately, the parties

9  weren't able to reach an agreement, and there was

10 increasing concern about the underlying security and

11 collateral for the loan, especially given the

12 announcement that Mr. Ravindran was being investigated

13 by the Indian government.

14           So as a result of that, on May 3, the

15 plaintiffs filed this litigation, along with our

16 motion to expedite and a motion for a status quo

17 order.  And I'd like to turn to the motion for status

18 quo order first.

19           It has been the historic practice of

20 this Court to enter status quo orders in Section 225

21 proceedings where, as here, there's a dispute as to

22 who the proper board is of the company.  And the

23 purpose is, really, to protect the company and its

24 assets until the Court can determine who is the proper

1 | board.

2 | Now, the elements for the entry of a

3 | status quo order are a threat of irreparable harm,

4 | balance of the hardships, and a likelihood of success

5 | on the merits.  The threat of irreparable harm is

6 | generally satisfied simply because you may have

7 | someone exercising control of the company that doesn't

8 | have authority to do so.  And that's why status quo

9 | orders are typical in this setting.

10 | But here, we have that form of

11 | irreparable harm plus a whole lot more.  And, you

12 | know, I want to focus on that additional irreparable

13 | harm we have in this case which, really, starts after

14 | we filed the complaint.  Mr. Byju Ravindran told the

15 | lenders and their advisors that over $500 million that

16 | they had been led to believe was in Byju's Alpha was

17 | no longer in that entity and the lenders would never

18 | find it.

19 | To say that this was shocking and

20 | extremely concerning would be an understatement.  This

21 | is really extraordinary conduct and is why we pushed

22 | to have this hearing promptly.

23 | And significantly, in the declaration

24 | that was filed by Mr. Ravindran along with the

1   defendants' opposition papers, Mr. Ravindran admits

2   that on some undisclosed date, presumably in 2023, the

3   cash was moved out of Byju's Alpha to some unnamed

4   other entity that we don't know, allegedly an entity

5   that's related to Byju's and located in the U.S.

6             And remarkably, Mr. Ravindran provides

7   no explanation for why this money was moved.  He just

8   says, well, there's no prohibition in the loan

9   agreement on transfers.

10             But there is something called

11   fraudulent transfer, when you move funds to keep them

12   from the reach of creditors.  And here, Mr. Ravindran

13   moved half a billion dollars out of a distressed

14   entity, after it had defaulted on its credit

15   agreement, after the company had entered into a

16   forbearance agreement to keep the lenders from

17   exercising the remedies, and possibly after that

18   forbearance agreement had expired.  We don't know the

19   date that the money was moved.  And you also have,

20   again, his brother, Mr. Byju Ravindran, saying to the

21   lenders, "You're never going to find it."

22             So we felt that it was critical to get

23   a status quo order to lock this company down and to

24   get the current director, Mr. Pohl, in place and

1  access to the books and records, to understand what

2  happened and what assets are left, if any.

3              And it really is necessary to preserve

4  the current value of Byju's Alpha to understand what

5  happened, because no one has told us where the

6  $500 million was moved to, but it was apparently a

7  related entity.  Well, which one?  Is it an entity

8  that Mr. Ravindran controls, such that, as a party to

9  this litigation, he can be ordered not to make any

10  further transfers?

11              We have something that on its face

12  looks, you know, highly suspect.  And one of the

13  current assets of the company may be the right to get

14  that money back at some point.  And at the very least,

15  the plaintiffs -- and, frankly, the Court -- should be

16  told where the money went so we can determine whether

17  or not it could be locked down and frozen until this

18  case can be resolved.

19              So this is a case in which we have a

20  very real and somewhat -- or I'd say quite unusual

21  situation, where there is a true risk of irreparable

22  harm.

23              Now, the defendants, they don't

24  dispute that there should be a status quo here, a

1   status quo order entered here.  But they do dispute

2   what is the status quo.  According to the defendants,

3   Mr. Ravindran remains the current director of the

4   company.  And that's simply incorrect.

5             There's no dispute that GLAS exercised

6   remedies, including delivering a written consent

7   removing Mr. Ravindran and appointing Mr. Pohl.  That

8   is the current state of affairs.  That Mr. Ravindran

9   has refused to accept his removal doesn't change the

10  facts.

11            And where the plaintiff has taken

12  facially valid action to replace a preexisting manager

13  or director, this means that that new manager will

14  generally be recognized as the incumbent and the

15  proper side to manage the entity under a status quo

16  order.  And in our brief, Your Honor, we cited three

17  recent opinions for this point.  That would be the

18  *Klein* case, the *Saadia Square*, and the *Haart* cases,

19  all that were cited in our reply brief.

20            And they make clear that the Court

21  must accept the allegations of the complaint as true

22  in determining who is the incumbent, and that to put

23  the removed director -- here, Mr. Ravindran -- back in

24  office would be, effectively, improper mandatory

1   injunctive relief at the outset of the case.

2                   Now, despite those authorities, the

3   defendants argue, well, this case should be different

4   because Mr. Pohl was never actually given access to

5   the company's accounts.  And we don't think that can

6   possibly be a justification, because otherwise, the

7   removed director could essentially always retain

8   office simply by refusing to comply.

9                   We also have an entity here that does

10  not have active operations and employees.  So some of

11  the concerns that, in different cases, have come up

12  about continuity of operations on the ground, that

13  just doesn't apply here.  This is a special-purpose

14  entity with no operations and no employees.

15                  And the fact is that Mr. Pohl has done

16  everything he could to assert his authority over the

17  entity, including sending out notices to 300 financial

18  institutions in March and again in May, trying to

19  locate and lock down the assets of the company.

20                  So there's really nothing here that

21  justifies departing from the normal rule that Mr. Pohl

22  should be recognized as the incumbent.  And I really

23  would point to the *Saadia Square* case as similar,

24  where, there, Saadia Square submitted a written

1  consent purporting to remove the manager and

2  appointing itself as the new manager.  And then there

3  was a motion for a status quo order in that matter,

4  and Your Honor found that Saadia should be put in

5  place as the incumbent status quo manager and found

6  that because Saadia had not been given any access to

7  the books and records or accounts of the company, the

8  order says that no later than the next business day,

9  the other side shall furnish and make available to

10 Saadia any and all books and records necessary for the

11 operation of the company.

12             And that's effectively the same

13 situation that we have here and the same relief that

14 we are seeking here.

15             Now, there are also a couple of other

16 differences between the two status quo orders that the

17 parties have proposed.  One is that defendants are not

18 only asking for Mr. Ravindran to be put back into

19 office, but their form of status quo order really

20 doesn't prohibit him from doing anything.  It just

21 says that he must provide plaintiffs with seven days'

22 notice before taking any actions outside the ordinary

23 course.  We think that that's an improper approach for

24 a status quo order in these situations.

1          They also seek to exclude, even from

2    the notice requirement, Mr. Ravindran purporting to

3    disqualify certain lenders under the credit agreement.

4    Now, this is a right that we don't think Mr. Ravindran

5    has, because he's been removed and for other reasons.

6    But it's a term of the credit agreement that would

7    allow the company to disqualify lenders and have them

8    be forced to sell or assign their interest at a

9    discount.

10          And we think it's really a remarkable

11    request that they want to be able to do this while

12    under a status quo order.  The entire purpose of a

13    status quo order is to lock down the parties and the

14    company in the positions where they are when the

15    litigation is filed.

16          And here, the key stakeholders for

17    what, you know, appears to be an insolvent entity are

18    the lenders.  And the notion that the defendants can

19    change the lenders during the pendency of a status quo

20    order, we think, is plainly incorrect.

21          So those are the primary differences

22    between the two orders that the parties have

23    submitted, and that's why we think there is a very

24    real risk of irreparable harm in this case.  And I

1  think I can just briefly touch on the balance of the

2  hardships and likelihood of success on the merits.

3  On balance of hardships, given that

4  both sides concede that a -- or both sides have agreed

5  that a status quo order should be entered, the balance

6  of the hardships is really, you know, would one side

7  suffer an undue hardship if the other side's order was

8  entered.  And I think that really comes down to, well,

9  who is the best person here to preserve the assets of

10  the company while this matter gets decided.

11  On the one hand you have Mr. Pohl, who

12  is an independent expert in dealing with distressed

13  entities.  He's had a successful career in the

14  restructuring group at Lazard and, before that, as a

15  partner at Skadden Arps.  And then, on the other hand,

16  you have Mr. Ravindran, who has admitted to

17  transferring half a billion dollars out of the

18  company, for no discernible reason, while it was in

19  default under its credit agreement.  So we think the

20  choice there is clear.

21  And on the likelihood of success on

22  the merits, this is the least weighty of the elements

23  at this preliminary stage, but plaintiffs have already

24  made a very strong showing.  You need look no further

19

1  than the forbearance agreement.  In that agreement,

2  the defendants acknowledge and agree to the specified

3  defaults.  And they further acknowledge and agree that

4  the specified defaults entitle -- that is the word

5  that is used -- "entitle the lenders to accelerate the

6  loan and exercise remedies."

7            And the notion in the opposition brief

8  that those agreements were signed under economic

9  duress is, we think, fairly absurd, given the size of

10 the company that we're talking about here and given

11 the sophistication and, really, the teams of lawyers

12 that have been working on this for a very long time.

13           Now, the defendants also make a forum

14 argument which we believe lacks merit.  The forum

15 selection clause doesn't say what they say it says.

16 Rather, it expressly recognizes that GLAS, as the

17 agent for the lenders, can sue in any jurisdiction.

18 It's only the defendants that are required to file in

19 New York.

20           Also, the forum provision doesn't

21 apply to Mr. Pohl, who is not a signatory to the

22 credit agreement.  And he has an express statutory

23 right, under Section 225, to pursue this case.

24           And also, this is a Section 225 case,

1   in which the Court has express authority to resolve

2   corporate control disputes.  And those disputes often

3   involve issues of foreign law that this Court

4   routinely decides.  So we don't think there is any

5   basis for their argument on the forum selection

6   clause.

7               And that's really, you know, all I had

8   with respect to the motion for status quo order.  If

9   Your Honor has any questions on that one, before I

10  move to the next motion, I'd be happy to address them.

11              THE COURT:  No.  Thank you.

12              ATTORNEY CZESCHIN:  So the second

13  motion is the motion to expedite.  Again, this is not

14  opposed by the defendants, but they are asking for a

15  trial in September, and they do that so to allow for

16  motion to dismiss briefing on their forum argument.

17              We think that's improper.  We don't

18  think that motion practice in an expedited 225 case is

19  appropriate.  Rather, they can make their argument in

20  their trial brief.

21              Accordingly, we don't think we need

22  until September, and we would ask for the earliest

23  available date, before the end of July, preferably,

24  because we view this as a very simple case that can be

1  resolved based on largely undisputed facts and the

2  parties' written agreements.

3            Unless Your Honor has any questions, I

4  have nothing further.

5            THE COURT:  I do.  Do you foresee

6  presenting the issues on a dispositive motion or with

7  a full-blown trial?

8            ATTORNEY CZESCHIN:  Your Honor, I

9  think we were anticipating that we would need to go to

10 trial.  But I guess we haven't ruled out the

11 possibility of a motion for summary judgment.

12           THE COURT:  Thank you.

13           Mr. Cicero.

14           ATTORNEY CICERO:  Thank you, Your

15 Honor.  I appreciate your time today, and I just want

16 to give some brief overview.  And it's going to be

17 brief, and then I will hit the three issues.

18           Byju's Alpha's and Tangible Play, as

19 you heard, are part of a group of related entities

20 which together constitute the world's largest

21 education technology business.  When I refer to

22 "Byju's," I'll do my best, I'm referring to the

23 collective business entities.  Otherwise, I will refer

24 to "Byju's Alpha" or the "company."

1          Byju's technology and products benefit

2     in excess of 150 million children globally.  As

3     reflected on their website, and I think we put a

4     footnote in our brief, you'll see that Byju owns

5     numerous education businesses and products.

6          For example, just to put it in

7     context, Your Honor, one such business is called Epic.

8     It's used by 10 million U.S. students on a monthly

9     basis.  That's the current active user amount.

10          In addition to its for-profit

11    business, Byju's also provides about 150 million

12    children globally with free access to the platform.

13    That's about 4 times larger than Kahn Academy, which

14    those of us on the phone may be more familiar with.

15    This makes Byju's likely the owner of the largest

16    not-for-profit education platform in the world.

17          That group of companies has been

18    valued recently at over $22 billion.  And the company,

19    as Mr. Czeschin said, is a borrower under a credit

20    agreement in connection with a $1.2 billion term loan.

21          The company's ultimate parent, Think &

22    Learn, is a private limited company organized under

23    Indian law.  Think & Learn is also the parent

24    guarantor under the credit agreement.

1           It's clear from the terms of the

2    credit agreement that the parties always intended that

3    the consortium of lenders would not be comprised of

4    entities that primarily deal in distressed debt.  This

5    is a hot-button issue, I think, in this matter,

6    whether it's here or whether it's in New York.

7           At the heart of lenders' concerns, and

8    likely the reason for this action, is that the credit

9    agreement expressly provides that the company can

10   designate any entity whose "primary activity is the

11   trading or acquisition of distressed debt," and they

12   could designate such entity as a disqualified lender.

13   If the lender is designated as such, among other

14   things -- without getting too much into the

15   technicalities, Your Honor -- the designated lender

16   could not trade its debt freely.

17          It turns out that the lender group, we

18   believe, now includes opportunistic traders that trade

19   in distressed debt, which was not, you know, accounted

20   for in the agreement, or at least there was a

21   mechanism to deal with it.  Those lenders are seeking

22   to avoid being contractually disqualified and thus

23   have attempted to rely upon purported nonmonetary

24   defaults of the credit agreement to extract a windfall

1  with the threat of seizing the company and, in the

2  process, eliminating the possibility of

3  disqualification.

4              We believe that the purported defaults

5  that opposing counsel mentioned -- I think we

6  mentioned three types, and I'm not going to get into,

7  I think, the details on that, Your Honor.  It's in the

8  papers on both sides.  But they're characterized as

9  nonmonetary defaults.  They do not give rise to a

10  level to allow the remedies sought under New York law.

11  They are disproportionate and unconscionable under the

12  case law there.  To allow an acceleration and

13  immediately due payment of $1.2 billion based on these

14  types of defaults is, like I said, disproportionate

15  under New York law.

16              So the whole basis of this action is

17  like a bunch of dominoes, Your Honor.  Those dominoes

18  add up to this case.  And without those, you couldn't

19  have a Section 225 case.

20              Simply stated, I think the lenders are

21  not truly interested in running the company, like a

22  typical 225 case, or making the company successful;

23  but rather, they want unrestricted trading of the debt

24  and the ability to make a hefty premium.  This doesn't

1    line up with the purpose of Section 225 that opposing

2    counsel even mentioned, which is to make sure that the

3    company is preserved.

4                    It runs counter to the purpose of a

5    status quo order — to protect the company and its

6    business.  The company has made all payments, that's

7    critical, on time and in full to the lenders under the

8    credit agreement.

9                    The timing of the lender action also

10   highlights these true motives that I just mentioned.

11   To facilitate the negotiations between lenders and the

12   company, they executed an NDA in late February of this

13   year.  Basically, the terms of the negotiations, the

14   timing, the fact that they were occurring, and many

15   other details were barred from being in the public.

16   Yet approximately one week after that NDA was signed,

17   plaintiff, GLAS, the lenders' appointed administrative

18   agent, sent a default and demanded immediate and full

19   payment from the company and its guarantors.

20                    GLAS claimed that it had authority to

21   issue the written consents and, as you heard, replaced

22   the directors and officers with their appointee,

23   Mr. Pohl.  We certainly don't dispute the fact that

24   those written consents were provided.  We dispute the

1   underlying merit of those.  And I understand Your

2   Honor's decision in *Saadia*, which I'll get to in a

3   moment, and I think this is distinguishable.

4                   Plaintiffs then waited two months to

5   commence this action, while they continued

6   negotiations with Byju's.  As set forth in our papers,

7   lenders have engaged in a campaign to harm the

8   business.  Again, they're not interested in running

9   this company.

10                   These are not the actions of a lender

11  looking to remedy purported events of default to get

12  paid, particularly when they are being paid.  They

13  certainly are not actions of corporate constituents

14  looking out for the best interests of the company.

15                   Three issues -- one, the composition

16  of the status quo order, the status quo restrictions,

17  and the scheduling -- are really what's in play today.

18                   With respect to the status quo board,

19  Mr. Pohl never was "installed," from a factual point

20  of view, as a director or officer.  And he did not

21  gain any access to the company's accounts system or

22  other property.

23                   I think it's important that this is

24  highlighted or amplified by plaintiffs' own proposed

1   status quo order, at paragraph 4, which seeks a

2   mandatory injunction that defendants immediately

3   provide access to and exclusive control over all the

4   accounts, servers, system, documents, and information

5   of the company.

6               If Mr. Pohl had been installed, he

7   would have access to that.  And I understand that he

8   didn't really have control over that, but I think

9   that's a factor in deciding who's the status quo

10  board.  It happens quite often.  As we sit here today,

11  as a factual matter, the status quo is Mr. Ravindran.

12  He's a director and officer of the company.  He has

13  access to and control over the very items plaintiffs

14  are asking this Court to transfer to Mr. Pohl via the

15  proposed status quo order.

16              I think this is consistent with Your

17  Honor's decisions in *Saadia* and *Haart* and also

18  consistent with Vice Chancellor Fioravanti's fairly

19  recent decision in *Packsize*.  And I'll explain.

20              While plaintiffs argue that *Saadia* and

21  *Haart* support their position, if you look closely at

22  the facts -- which Your Honor definitely knows more

23  than we do -- when you look back at the complaint in

24  *Saadia*, which it was an action under Section 18-110 of

1    the LLC Act and concerned an operating agreement that

2    was silent about the removal of the managing member,

3    while it's true that the individual deemed to be the

4    incumbent provided written consents and Your Honor

5    found that person to be on the board, critically, that

6    member actually not only executed written consents,

7    but acted as the managing member and conducted

8    business at the company.

9                    In the complaint, there's an

10   allegation that the new managing member negotiated and

11   closed on a sale of real property for $157 million.

12   It notified the tenant of the sale and instructed the

13   tenant to remit lease payments to the new owner.  That

14   is doing much more than simply providing consents.

15   That is actually acting on behalf of the company.

16                    Similarly, in *Haart*, after executing

17   written consents, the director doing so terminated the

18   prior director and officer's access to her company

19   emails and company credit card.  Again, that's more

20   than just providing written consent.

21                    And I think *Packsize* supports this,

22   and I don't think it's inconsistent with Your Honor's

23   rulings.  I think it's consistent.  Vice Chancellor

24   Fioravanti said this issue of determining a status quo

1    board is really fact intensive.  And then he goes on

2    to say that he distinguishes between certain scenarios

3    and then gives these examples that if there's an

4    installment of new management -- for example, changing

5    the lock to the corporate offices and taking control

6    of the facilities and infrastructure -- then that's

7    the status quo, and he would provide status quo on the

8    ground at the time.  And we think that is consistent

9    with what we're asking for here.

10                    Also, the *Salamone* case was cited in

11   the other set of briefs.  That was actually a case

12   that I handled many years ago.  And in that situation,

13   that's another one where written consents were dropped

14   and the board that was purportedly removed remained on

15   the status quo board.  That case took probably nine

16   months to come to fruition, and ultimately, one of the

17   claims was dismissed for violating Delaware corporate

18   law.

19                    I'd like to move on to the status quo

20   provisions.  We think there's only really two major

21   disputes on that.  One, at the outset, I want to say

22   our notice provision about providing seven days'

23   notice -- I mean, that's fairly standard.  I think

24   it's been in almost every status quo order that I've

1   ever been involved with.  I don't think we necessarily

2   would have a problem removing a notice provision.

3   It's really about what the restrictions are, and I

4   think the restrictions comport with a typical status

5   quo order.

6                   There are two issues.  One goes back

7   to paragraph 4, which we just spoke about.  This is

8   mandatory injunctive relief requiring defendants to

9   hand over property and control to Mr. Pohl.  That is

10  mooted, obviously, if Mr. Ravindran is left as the

11  status quo.

12                  The only other one, which we believe

13  is the main issue in this case, in this dispute, at

14  least the biggest one before Your Honor, is paragraph

15  5(j).  The remainder of paragraph 5 is fine.

16  Paragraph 5 subsection (j) is a novel request of this

17  Court.  It asks that this Court restrict the company

18  and its affiliates, not parties to this case,

19  including Think & Learn, from designating any lender

20  as a disqualified lender under the terms of the credit

21  agreement.

22                  Plaintiffs are asking this Court, on

23  an interim basis, to enjoin a contractual right of

24  parties and nonparties.  Plaintiffs have failed to

31

1  demonstrate that the company and its affiliates are no

2  longer afforded that right and have not shown any

3  irreparable harm on that point.

4          And I think opposing counsel have

5  noted that the only entity that could, I guess, invoke

6  that right, for lack of a better term, is the company.

7  And I don't believe that's true.

8          Section 1.12 of the credit agreement

9  provides that the parent guarantor, which is Think &

10 Learn, can send a notice under this agreement,

11 including, we submit, a notice to disqualify the

12 lender.  And it's actually irrevocable under that

13 section.  I can read a little bit from it.

14          It says, "Each Loan Party by its

15 execution of this Agreement irrevocably authorizes the

16 Parent Guarantor" to do a number of things, and

17 authorizes the parent guarantor to give all notices

18 and instructions to execute on its behalf and to make

19 such agreements, "and in each case, each Loan Party

20 shall be bound as [if] that Loan Party itself had

21 given [] notice and instructions[.]"

22          So if Your Honor were to, on an

23 interim basis, restrict the invocation of a

24 contractual right of a nonparty, I just don't think

32

1  that's something the Court can do, particularly at

2  this stage.

3            Secondly, even if the company were the

4  only party that can invoke that notice, we don't think

5  it's appropriate under status quo protection.  This is

6  not a protection of the company at all.  It's a

7  protection of the lender.  I have never seen this

8  before.

9            And I think that would be off track,

10 to take away -- to actually take away a contractual

11 right of the company during the status quo period and

12 provide relief to a lender who doesn't have standing

13 and is using Mr. Pohl as its agent to seek -- and GLAS

14 to seek such relief.

15            Importantly, Byju's believes it's

16 approximately two weeks away from a large equity

17 infusion, as we put down in our papers, that would

18 enable a material pay-down of the term loan.  We

19 believe all of this, including getting rid of this DQ

20 provision, is just leverage by the lenders because

21 they need a negotiating tactic for purposes of a new

22 negotiation of the credit agreement.

23            Any disruption of this new equity

24 infusion would not actually help the company, it would

33

1   harm it.  And Section 225 was designed to stabilize
2   and add the company.
3                    I want to quickly address -- well,
4   I'll address as quickly as Your Honor wants me to, I
5   can hone into it a little bit more.  In the reply
6   brief, plaintiffs make some statements that the
7   company is near insolvency.  You heard that today.
8   Those allegations are completely absent from
9   plaintiffs' 54-page complaint, which I also think is
10  fairly novel for a 225 case, laying forth all the
11  background on this unique case.
12                   This is not a fraudulent transfer
13  action, nor could it be.  The payments are being made
14  on the loan, and there is no insolvency.  And there
15  certainly are no fiduciaries owed to the lenders.  The
16  facts will ultimately show that the company is
17  solvent.
18                   As discussed in our papers, Byju's
19  recently raised $250 million.  In addition, we can
20  show that, in the last 12 months, it raised 1 billion
21  in equity.  One half of that was in the last six
22  months, and 750 million of it is unsecured.  And there
23  are other assets owned by Byju's Alpha.  I believe it
24  holds the license to use intellectual property in

1 | India, which is very valuable.

2 | Plaintiffs raised this issue of the

3 | $500 million transfer as a reason to rule against

4 | defendants, and obviously this is -- you know, when

5 | first hearing about it, it raises antenna.  I

6 | understand that, Your Honor.

7 | But Byju's was not restricted from

8 | making any transfers, contractually or otherwise, as

9 | noted.  It wasn't a fraudulent transfer.  And if it

10 | were, the lenders have recourse.  A Section 225 case

11 | is not the avenue to adjudicate a fraudulent transfer

12 | claim.  We believe that's skirting a fulsome plenary

13 | case that is meant to be brought in New York here.

14 | Plaintiffs knew from the start that

15 | there was no restriction, and that's why they had to

16 | rely upon this fraudulent transfer theory.  But as

17 | discussed, Byju's is solvent.  Byju's moved the funds,

18 | and Byju's moved the funds to an entity that it

19 | controls in the United States.  The money is in the

20 | United States.  I don't know exactly when it was done.

21 | To be candid, these were based on fear

22 | of lenders acting expeditiously with these

23 | unconscionable tactics to assets without a proper

24 | determination and due process under the credit

1   agreement.  Byju's felt the need to protect the cash.

2   Nothing less.  There's nothing impermissible about it.

3   As sophisticated lenders, they could have insisted on

4   a restrictive provision.  They did not.

5                   I want to touch briefly on -- because

6   it sort of goes hand in hand with scheduling, Your

7   Honor -- on the jurisdictional forum piece.

8                   We -- there's clearly a disconnect

9   between the two sides as to how we read this forum

10  selection provision.  I read this, even with the extra

11  language at the end, as requiring exclusive

12  jurisdiction for all parties to bring disputes under

13  the credit agreement and related documents.  There is

14  sort of what I'll call at least unusual to me, Your

15  Honor, maybe it's not to New York lawyers, an unusual

16  provision at the end that the other side seizes on.

17                  But read in whole with this agreement

18  and in that particular paragraph, I believe that means

19  that the parties are not restricted to only going to

20  New York to enforce a judgment or other remedy once

21  they already have a judgment in New York on an

22  underlying default or otherwise.  And that's how we

23  read it.  Obviously, we didn't -- none of us fully

24  briefed that issue for Your Honor.  I think it's an

1   important issue.  We would like a modest amount of
2   time to do that.
3                   It's not common, but it's not unheard
4   of, Your Honor.  I think in the *Stream TV* case, Vice
5   Chancellor Laster allowed something like that to
6   occur.  It was a different issue, but he allowed a
7   motion to dismiss to happen pretty promptly.  And that
8   happened late last year, I believe.
9                   And that case, by the way, is on
10  five-month track in a 225 case also involving creditor
11  issues.  So we think our ask of an additional month is
12  fair and, with a status quo order in place, would not
13  be harmful to anyone.
14                  We want to deal with this
15  expeditiously; we just need an extra month -- or not
16  need, Your Honor, but we think that's the right move,
17  to have more time so that we can brief this issue for
18  you.
19                  I also want to say, and I'm happy to
20  get into the jurisdictional issue more, but we'd like
21  to have that in briefing before Your Honor.
22                  There's also just simply a practical
23  and personal note.  I -- and Your Honor may not care
24  about it, I understand, but I have a family vacation

1  planned the last week of July spilling into August

2  that was delayed for two years based upon the

3  pandemic.  I understand that's not an issue.  There's

4  important issues before the Court.  I wanted to note

5  it, and that's one of the other reasons.  It's not as

6  if my client is begging me to make sure this thing

7  gets delayed.  That is not what's happening.

8              Your Honor, unless you have any other

9  questions, we believe that our status quo order is the

10  appropriate one, and we believe that this case could

11  be fairly presented to the Court by the beginning of

12  September with some modest time available for a motion

13  to dismiss.

14              THE COURT:  Thank you.  No questions.

15              Mr. Czeschin.

16              ATTORNEY CZESCHIN:  Thank you, Your

17  Honor.  Very briefly.  You know, we obviously disagree

18  with the characterization of the lenders as being some

19  sort of distressed debt vultures and the

20  characterization of, really, the background here.

21              But on the key issues for today of the

22  status quo order, first of all, it is very normal to

23  have status quo orders apply to the affiliates of the

24  parties.  But even beyond that, the provision that

1   Mr. Cicero referred to about the parent guarantor

2   acting to give notices, that provision says they can

3   act on behalf of the entity, which is Byju's Alpha.

4   It's still Byju's Alpha that is doing the thing,

5   they've just said someone can send the notice on their

6   behalf.  So we don't think that -- we don't think that

7   gets them out of, you know, the situation where it's

8   really Byju's Alpha that is doing this

9   disqualification.

10                  And we also don't think it's unusual

11  to have affiliates bound by a status quo order.  I

12  think that happens all the time.  And beyond that,

13  going back to what I said before, which is this -- the

14  whole point of a status quo order is to lock people

15  down in their current positions.

16                  If they would have taken this action,

17  you know, in the many months since the parties have

18  been talking -- the parties have been talking since

19  the summer of 2022 -- then obviously, it wouldn't be

20  subject to a status quo order.  But we are where we

21  are as of today, and we ought to lock everything down,

22  meaning the parties' positions and, again, the assets

23  of the company.

24                  And there was a lot said about, well,

1    Pohl doesn't even want to run this company.  We're

2    talking about Byju's Alpha.  We're not talking about

3    the entire Byju's family of companies.  We're talking

4    about Byju's Alpha, which was effectively a holding

5    company that was to give comfort to the lenders.

6                    And, you know, it's important to have

7    Mr. Pohl be the director of that company during the

8    status quo period so that he can locate and lock down

9    assets.  That's what we're asking to do.  There's no

10   other running of the company that's going to happen.

11   And that's what he has tried to do, is lock down

12   assets.

13                    And again referring back to the *Saadia*

14   *Square* case, I think that case is exactly on point.

15   And just like the proposed status quo order in this

16   case, in that case there was a paragraph that said

17   *Saadia* will be immediately given access to the books

18   and records and the accounts of the company because he

19   had been excluded from that by the other side.  And

20   that's the exact same thing that we are seeking here.

21                    And just finally, on the $500 million

22   point, that's a huge issue.  I think what we heard

23   from the other side does not give us any comfort that

24   there won't be further transfers of assets if

1    Mr. Ravindran is in control, given this history of,

2    frankly, what looks like an improper transfer.  I

3    don't see anyone on our side, how there could be any

4    trust and confidence that Mr. Ravindran would not take

5    action again that we believe would be clearly

6    inappropriate.

7                    And then, finally, the forum piece,

8    that's something we're happy to brief, but we think it

9    should be briefed in connection with an expedited

10   trial.

11                   THE COURT:  Thank you.  Can you

12   address why your status quo order precludes Mr. Pohl,

13   in 5(j), from designating anyone as a disqualified

14   lender?  Presumably he's a fiduciary for the company.

15                   ATTORNEY CZESCHIN:  I'm sorry.  So it

16   would prohibit Mr. Pohl from designating anyone as a

17   disqualified lender, you're right.  That point -- you

18   know, we don't think Mr. Pohl would do that, but we

19   thought it was appropriate, given that this is an

20   entity -- and again, when I'm talking about

21   insolvency, I'm talking only about Byju's Alpha --

22   this is an entity that seems to potentially be

23   insolvent.  And therefore, the creditors are the

24   residual beneficiaries; and that, you know, who those

41

1   creditors are should be locked down.  And that applies

2   whether or not Mr. Pohl is in office or Mr. Ravindran

3   is in office, in our view.

4                    ATTORNEY CICERO:  Your Honor, this is

5   Joe Cicero.  May I briefly address that one question

6   that you asked Mr. Czeschin?

7                    THE COURT:  In a moment.  I'll give

8   you the opportunity.  I'm considering what

9   Mr. Czeschin said.

10                   ATTORNEY CICERO:  Thanks.

11                   THE COURT:  I suppose I don't quite

12  understand, unless we know that we're in the zone of

13  insolvency, why the stratification of lenders is

14  something, through a contractual arm's length

15  arrangement, that should be, as you put it, "locked

16  down" under a 225 status quo order.  Until we get to a

17  place where there's fiduciary duties owed to those

18  creditors, I don't think of that as something sort of

19  internal to the company that we typically, as you say,

20  lock down in connection with determining who's at the

21  helm of the company.

22                   ATTORNEY CZESCHIN:  Yeah.  I think,

23  given the fact that we don't know a lot about the

24  insolvency or the solvency of this entity -- we

42

1  thought that there certainly is the prospect that this

2  is an insolvent entity and that the lenders are the

3  residual beneficiaries, so it makes sense to lock them

4  down.

5             Again, I suspect that if Mr. Pohl is

6  the director, that he would not be doing that.  And

7  what we believe, the -- the idea for a holding company

8  would be just to hold the assets, find the assets, and

9  make sure everything is locked down until this case

10  gets decided.  So we were willing to live with that

11  restriction for, you know, Mr. Pohl or Mr. Ravindran,

12  whoever is the status quo director.

13             I understand Your Honor's concern that

14  it's a little unusual to address a lender issue in a

15  status quo order, but given sort of the unique facts

16  here and the fact that this company, you know,

17  arguably is in insolvency, that it is appropriate.

18             THE COURT:  Given, as you said, that

19  we don't know yet whether the company is actually in

20  the zone of insolvency; and given, if I were to enter

21  your status quo order, obviously Mr. Pohl is your

22  preferred fiduciary for Byju's Alpha, how would you

23  respond if we tweaked 5(j) to say that if Mr. Pohl

24  thought that a lender needed to be designated as a

1  disqualified lender, that he would give five days'

2  notice to the parties, instead of just precluding him

3  from doing so?  And then we might be able to address

4  that issue with more information and a little bit more

5  clarity.

6              ATTORNEY CZESCHIN:  We wouldn't have

7  any objection to that at all, Your Honor.

8              THE COURT:  Okay.  Thank you.

9              Mr. Cicero.

10              ATTORNEY CICERO:  Thank you, Your

11  Honor.  I appreciate you indulging me.

12              On that last point, of course they

13  don't have an issue with that, because Mr. Pohl is the

14  appointee of the lenders and he would never, ever

15  disqualify them.  So it doesn't really matter, you

16  know, if that provision is there or not.  If Mr. Pohl

17  is in power, then he's not going to disqualify a

18  lender, whether or not it's beneficial to the company,

19  not to the lenders.

20              And I agree with Your Honor about --

21  or at least what I believe Your Honor is saying about

22  insolvency.  I actually think it's much worse than

23  that.  Under the *Gheewala* decision, I don't think it's

24  the zone of insolvency.  You have to be insolvent in

1   fact.  So there's been no showing of that, and this

2   would be way outside the norm and we think it's

3   inappropriate.

4              Again, we think Mr. Pohl obviously

5   isn't going to disqualify a lender in any event, and

6   this is all about leverage.  And the status quo order

7   should not be protecting the lenders.  It should be

8   protecting the company.  And, you know, basically

9   that's a contractual right, as I noted, and I think

10  that would be unusual.

11             One last thing.  I think it's unfair

12  to say that, under our status quo order, there would

13  be transfers.  Our status quo order, unless I'm

14  missing something, Your Honor, completely excludes

15  transfers of any kind, which is the norm under a

16  status quo order.  It just has the notice provision,

17  which is pretty common.

18             And, again, I think we'd be okay

19  taking that out.  We don't -- so everyone's protected,

20  whether or not -- well, they're protected whether our

21  guy's in or not.  So we just think this DQ provision

22  should not be in any order, and we think Mr. Ravindran

23  is the proper status quo director.

24             I appreciate your indulgence again.

1 | Thank you.

2 |                 THE COURT:  Thank you.

3 |                 Thank you all very much for all the

4 | hard work that went into the briefing and the

5 | presentation.

6 |                 There's a lot of folks on the line.  I

7 | got a lot of paper, and the parties have explained a

8 | lot of background and made a lot of argument.

9 |                 If everyone could mute your lines,

10 | please, so there's no interruption.

11 |                 Despite the interest, paper, and work

12 | that's gone into these motions, this is, at the end of

13 | the day, a motion to expedite and a motion for a

14 | status quo order filed with a 225.  To my mind, those

15 | forms of relief are granted as a matter of course in a

16 | 225.  Further, the law and my position on keeping the

17 | incumbent, even a disputed incumbent, in the board

18 | seats under the status quo order is clear.

19 |                 I'll start with the status quo order.

20 | The terms mostly, with one exception, look pretty

21 | routine.  Under the principles that I enumerated in

22 | *Haart* and *Saadia* that the parties are both familiar

23 | with, Mr. Pohl is the incumbent and his service as

24 | Byju's Alpha's fiduciary is the status quo.  Changing

1  that would be a mandatory injunction that I'm not

2  permitted to do on this record and at this stage.

3            The defendants' argument that Mr. Pohl

4  hasn't been installed or hasn't acted as a director or

5  officer, and that Mr. Ravindran still has unique

6  access to the company's books and records, just

7  reflects why we're all on the phone today — that the

8  efficacy of the documents installing Pohl as a

9  director and officer are disputed.  Under the

10 principles and the law that I've explained in *Haart*

11 and *Saadia*, Mr. Pohl is the incumbent and he'll remain

12 in his position pending the adjudication of this

13 dispute.

14            I think the other terms in the status

15 quo order are fairly routine and they're appropriate.

16            As to 5(j), I am hesitant to alter

17 contractual rights, especially given that this is such

18 a hot-button issue between the parties, yet I don't

19 actually have a lot of insight into that issue from

20 the parties.

21            I think that there's good reason to

22 require five days' notice if Mr. Pohl were to

23 designate a disqualified lender, based solely on the

24 fact that this is such a hot-button issue between the

1    parties.  So I would ask that that change be made in a

2    proposed order.  I'll let the parties work out the

3    language.

4              Despite agreeing that a status quo

5    order is necessary, the defendants do make some

6    arguments against the elements of entering that relief

7    and, in particular, the reasonable likelihood of

8    success.  To me, these concerns actually come home to

9    roost in considering whether the case schedule should

10   build in time for the defendants to assert those

11   issues on a motion to dismiss.

12             Those issues include whether a forum

13   selection clause in the underlying loan agreements can

14   divest this Court of its *in rem* statutory jurisdiction

15   and whether it's fairly read to bind GLAS; and the

16   application of what I think is fairly nuanced New York

17   law governing acceleration of forfeiture.

18             I don't think that there's much to be

19   gained from carving those off and taking them up

20   independently in the schedule.  I think this

21   company -- which is, after all, my paramount concern

22   in a 225 -- is best served by getting this matter

23   tried as quickly as possible, and those issues can be,

24   of course, fully briefed and presented to the Court in

48

1   connection with trial.

2                   The irreparable harm and balance of

3   the equities components of entering a status quo order

4   are pretty routine in a 225.  We've got a Delaware

5   entity in flux.

6                   As to the balance of the equities, I

7   think the parties have taken kind of an odd tack of

8   trying to convince me of who is a better fiduciary for

9   the company.  I don't think the question at this

10  moment is one of comparing the morals and

11  qualifications of the erstwhile leaders.  To me, I'm

12  supposed to be thinking about keeping the company on

13  an even keel, with as few transitions as possible and

14  without the ability to make significant changes to the

15  company until we resolve who is properly in the board

16  seats.

17                  So the status quo order will be

18  entered with the modification that I've requested as

19  to Section 5(j).

20                  Expedition.  As I hinted, the most

21  equitable schedule will be to take this matter to

22  trial within 90 days and the defendants' arguments on

23  the merits can be presented at that time.

24                  Mr. Cicero, I apologize for that.  I

1  actually do care very much about your vacation.

2  Summer is a tough time to be a Chancery attorney when

3  these types of things pop up.  But I can't,

4  unfortunately, in this instance push back the

5  resolution of a 225 to accommodate that vacation.  I

6  am hopeful you'll be able to work something out with

7  your colleagues and your co-counsel and your client.

8              That said, my July is pretty full with

9  other Chancery lawyers having terrible summers.  I can

10 offer you August 2nd or 3rd or 4th, is the closest

11 that I've got.  Hopefully, Mr. Cicero, that works out.

12 And if it doesn't, hopefully you can find a way to

13 still enjoy your vacation and make sure your clients'

14 needs are met.

15             Any questions?  Anything unclear,

16 starting with Mr. Cicero?

17             ATTORNEY CICERO:  The only question --

18 and thank you.  I appreciate the comments, Your Honor.

19 I think those are the last few days of my vacation.

20 I'll try to figure it out and we'll make it work.

21             The only question I have is with

22 respect to your modification of 5(j) with the notice.

23             Are you still requiring -- so I think,

24 broadly, it states that no affiliates, no -- I just

1   don't -- is there an ability to have a carve-out

2   where -- the way I look at it is the parent guarantor

3   has a right, under the section that I noted -- I think

4   Mr. Czeschin disputed that, but I think there's a way

5   to deal with that.  If we were to -- if the parent

6   guarantor were to disqualify a lender, there are

7   remedies for that that could be fought about in the

8   normal course.

9                Are you suggesting -- are you ruling,

10  pardon me, that the language should stay that it binds

11  affiliates and parents?

12               THE COURT:  What I am intending is

13  that if Mr. Pohl, for Byju's Alpha, intends to

14  designate a disqualified lender, that he must give the

15  parties to this action five days' notice before it

16  becomes effective, so that if there's a dispute about

17  his authority to do so, you can come to the Court and

18  we can get it sorted out.

19               ATTORNEY CICERO:  Okay.  But would it

20  also -- and I just want to make sure I get this right.

21  I've gotten off the phone before and we've had to put

22  together a status quo order and I've missed things.

23               So it would preclude Think & Learn,

24  for example, from making its own independent notice of

1  disqualified lender?  Is that what you're envisioning?

2  I think -- that was my concern.

3              THE COURT:  And I'll hear from

4  Mr. Czeschin on this.  I don't read 5(j) to say that.

5  I read it to identify Think & Learn as a signatory to

6  certain credit and guarantee agreements, and I don't

7  think that I have jurisdiction, in a 225, to tell

8  Think & Learn to do or not do anything.

9              ATTORNEY CICERO:  Okay.  I --

10             THE COURT:  Maybe I'm misunderstanding

11  what Mr. Czeschin was intending.

12             ATTORNEY CZESCHIN:  Well, if I may,

13  Your Honor.

14             THE COURT:  Yes.

15             ATTORNEY CZESCHIN:  I think there are

16  two points.  I think that, at least in my experience,

17  it has been common to have status quo orders apply to

18  affiliates.  And so, you know, frankly, we think this

19  should apply to affiliates.

20             But even putting that issue aside on

21  this disqualification point, the way it works under

22  the agreement, my understanding is Think & Learn would

23  be purporting to submit something on behalf of Byju's

24  Alpha, and it shouldn't be able to do that at this

1  point because, you know, it's no longer under Think &

2  Learn's control.  It's under Mr. Pohl's control.  So

3  they should not be able to submit any form of notice

4  on behalf of Byju's Alpha or in the shoes of Byju's

5  Alpha.

6              THE COURT:  Mr. Cicero.

7              ATTORNEY CICERO:  We read it

8  differently, Your Honor.  And I didn't -- and part of

9  this just needs to be -- we think needs to be heard in

10 New York.

11             But we read that differently.  We

12 believe that the parent guarantor, who has guaranteed

13 a lot of money here that has been borrowed, can

14 provide -- it is irrevocably authorized to give these

15 notices.

16             And I just wanted to make it clear,

17 because I don't want to be in a situation where, if

18 parent guarantor determines -- and I'm not saying they

19 will -- determines that there needs to be a

20 disqualification of a lender and sends it out in its

21 own regard, that there's going to be a contempt motion

22 coming my way.  So I just want to be crystal clear

23 about it.

24             THE COURT:  I understand.  One of my

53

1   goals when I enter these is, certainly, for the

2   parties to know exactly what they can and cannot do in

3   view of potential contempt.  And I don't think that

4   this issue has been fairly presented for me to go out

5   on that limb and make a determination as I sit here.

6              What I would ask you to do is confer.

7   Maybe the stars will align and you'll come up with

8   some language that works for everybody.  I know

9   there's good counsel on this call that can maybe make

10  that happen.

11             If you can't, please just send me a

12  letter brief and your proposed status quo order so

13  that I can make sure that I understand all the nuances

14  of this issue.  It's obviously very important to you

15  all.

16             ATTORNEY CICERO:  Thank you.

17             ATTORNEY CZESCHIN:  Thank you, Your

18  Honor.

19             THE COURT:  Thank you.

20             Any other questions?

21             ATTORNEY CZESCHIN:  I have no

22  questions, Your Honor.

23             THE COURT:  All right.  Thank you very

24  much.  I will ask Ms. Simeone to reach out to schedule

54

1   trial, and I will be looking for hopefully just one

2   proposed order, but if not, two.

3                   Thank you.

4           (Proceedings concluded at 4:21 p.m.)

5

6                   – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

55

1                          CERTIFICATE

2

3                I, JULIANNE LaBADIA, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, and Delaware Notary Public, do

7    hereby certify the foregoing pages numbered 3 through

8    54, contain a true and correct transcription of the

9    proceedings as stenographically reported by me at the

10   hearing before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated.

12               IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 22nd day of May, 2023.

14

15

16

17               /s/ Julianne LaBadia
                 ---------------------------
18                  Julianne LaBadia
                 Official Court Reporter
19             Registered Diplomate Reporter
                Certified Realtime Reporter
20                Delaware Notary Public

21

22

23

24

CHANCERY COURT REPORTERS

# EXHIBIT 29

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 24-10140 (JTD)
 4   BYJU'S ALPHA, INC.,           .
                                   .
 5                                 .  Courtroom No. 5
                                   .  824 North King Street
 6                                 .  Wilmington, Delaware 19801
                 Debtor.          .
 7                                 .  Monday, February 5, 2024
     . . . . . . . . . . . . . . .  3:00 p.m.
 8

 9                    TRANSCRIPT OF FIRST DAY HEARING
                  BEFORE THE HONORABLE JOHN T. DORSEY
                     UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:          Robert S. Brady, Esquire
                              Kenneth J. Enos, Esquire
13                            YOUNG CONAWAY STARGATT & TAYLOR LLP
                              Rodney Square
14                            1000 North King Street
                              Wilmington, Delaware 19801
15
                              Benjamin Finestone, Esquire
16                            QUINN EMANUEL URQUHART
                                & SULLIVAN LLP
17                            51 Madison Avenue
                              22nd Floor
18                            New York, New York 10010

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Sharon A. Page, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the U.S. Trustee:      Linda Casey, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
3                            844 King Street, Suite 2207
                             Lockbox 35
4                            Wilmington, Delaware 19801

5  For GLAS Trust
6  Company LLC:               Brian Schartz, Esquire
                             KIRKLAND & ELLIS LLP
7                            609 Main Street
                             Houston, Texas 77002
8

9  For Tangible Play,
   Inc.:                      William E. Chipman, Jr., Esquire
10                           CHIPMAN BROWN CICERO & COLE, LLP
                             1313 North Market Street
11                           Suite 5400
                             Wilmington, Delaware 19801
12
                             -and-
13
                             Sheron Korpus, Esquire
14                           KASOWITZ BENSON TORRES LLP
                             1633 Broadway
15                           New York, New York 10019

16
   For Camshaft:              Pieter Van Tol, Esquire
17                           HOGAN LOVELLS US LLP
                             390 Madison Avenue
18                           New York, New York 10017

19

20

21

22

23

24

25

1                               INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 4:  Debtor's Motion for Entry of Interim         38
4           and Final Orders (I) Authorizing
            Continued Maintenance and Use of
5           Prepetition Bank Accounts, (II)
            Authorizing Continued Use of Existing
6           Checks and Business Forms, (III)
            Temporarily Waiving the Requirements
7           of Section 345(b) of the Bankruptcy
            Code, and (IV) Granting Related Relief
8           [Docket No. 4]

9           Court's Ruling:                              39

10 Agenda
   Item 5:  Debtor's Motion for Entry of Interim         39
11          and Final Orders (I) Authorizing the
            Use of Cash Collateral, (II) Authorizing
12          the Debtor to Obtain Post-Petition
            Financing, (III) Granting Senior
13          Post-Petition Security Interests, and
            According Superpriority Administrative
14          Expense Status Pursuant to Sections 364(c)
            and 364(d) of the Bankruptcy Code, (IV)
15          Granting Adequate Protection, (V)
            Modifying the Automatic Stay, and (VI)
16          Granting Related Relief [Docket No. 5]

17          Court's Ruling:                              47

18

19 DECLARATIONS:                                         PAGE

20 1) Timothy R. Pohl                                    35

21

22 Transcriptionists' Certificate                        54

23

24

25

 1        (Proceedings commence at 3:01 p.m.)

 2            THE COURT:  Good afternoon.  This is Judge Dorsey.

 3  We are on the record in BYJU's Alpha, Inc., Case No. 24-

 4  10140, first day hearing.

 5            I will go ahead and turn it over to debtor's

 6  counsel.

 7            MR. BRADY:  Good afternoon, Judge Dorsey.  Robert

 8  Brady of Young Conaway, proposed counsel for the debtor.

 9            Can you hear me okay?

10            THE COURT:  I can.  Thank you.

11            MR. BRADY:  First, we would like to thank the

12  Court, as always, for scheduling us today on our request for

13  initial relief.  On the Zoom with me I am joined by my

14  partner, Ken Enos, and then Susheel Kirpalani, Ben Finestone,

15  and Daniel Holzman from Quinn Emanuel.  Also on the Zoom is

16  the debtor's sole director and officer, Timothy Pohl.  He was

17  the declarant for the first day declaration.

18            Your Honor, we have been working with Ms. Casey

19  from the Office of the United States Trustee and we, as

20  always, thank her for her work with us on the forms of order

21  to the two first day motions.  We are pleased to report that

22  we have resolved all of her issues and those resolutions are

23  reflected in the revised forms of order that were filed this

24  morning.

25            So, with that, Your Honor, if acceptable to the

1  Court, I will turn the virtual lectern over to Mr. Finestone

2  who will make the debtor's presentation to the Court,

3  explaining how the debtor got here and what we hope to

4  accomplish.  I think after that we will hear from counsel for

5  the agent for the lenders and then I expect others will want

6  to address the Court and then after that Mr. Enos will

7  present the two first day motions that are on the agenda.

8           THE COURT:  Thank you.  Mr. Finestone.

9           MR. FINESTONE:  Thank you, Your Honor.  Its Ben

10  Finestone from Quinn Emanuel, proposed counsel to the debtor

11  and debtor-in-possession.

12           Your Honor, can I ask that permission be granted

13  to my colleague, Ms. Botvinnik, Christine Botvinnik, so that

14  she can share a relatively brief presentation that we have

15  prepared for the Court.

16           THE COURT:  Can you raise your hand?  It is easier

17  to find you on the screen so we can give you permission.

18  There she is, she turned her camera on.

19           MR. FINESTONE:  The virtual hand raise, Your

20  Honor.

21           THE COURT:  There we go.

22           UNIDENTIFIED SPEAKER:  Your Honor, I believe it

23  states that the host disabled screen share.

24           THE COURT:  Yeah, that is what we are trying to

25  figure out here.  You should have it now.

1          MR. FINESTONE:   Thank you, Christine.

2          So, Your Honor, this is a -- there's 22 pages to

3   this PowerPoint, but when you take out the table of contents

4   and other dividers like that it's just a 15-page

5   presentation.

6          Christine, if its -- can you go to page -- can you

7   flip the slide to page 2?  Thank you.

8          Your Honor, really what I want to do here is just

9   go through the prepetition background.  Its not a protracted

10  prepetition background, but it is ostensibly complex. I think

11  it will help orient the Court.  We will then stop as of the

12  petition date, take a free snapshot of what the debtor is --

13  of what its capital structure looks like on the petition

14  date, what assets it has or doesn't has as of the petition

15  date and then what I would like to do is just describe for

16  you, Your Honor, what this debtor-in-possession views as its

17  outlook for this Chapter 11 case.

18         Christine, can you flip to the next page, please.

19  And then the next page.  Thank you.

20         So, Your Honor, BYJU's Alpha, which I will refer

21  to as the debtor today so as to not confuse it with all of

22  the other BYJU's entities, it's a Delaware corporation. It is

23  a single purpose financing vehicle and it was established by

24  its ultimate former parent company, Think & Learn.  Think &

25  Learn is a global EdTech company that was founded back in

1  2011, Your Honor, by an individual named Byju Ravindran.

2           Our debtor, BYJU's Alpha, was established much

3  later. It was established in 2021 for one purpose. It was

4  established for this Think & Learn conglomerate to access the

5  US capital markets; specifically, as I said, through a

6  Delaware corporation.

7           Initially, Your Honor, our debtor had one director

8  and one officer and his name was Riju Ravindran.  That is the

9  brother of the founder of the overall enterprise, Your Honor.

10  As I said, this debtor was established to access the Western

11  capital markets and that is exactly what it did.

12           On November 24th, 2021, after being established,

13  say two months earlier, Your Honor, it borrowed $1.2 billion

14  by issuing some syndicated term loans under a credit

15  agreement and in that credit agreement, and that is GLAS that

16  Your Honor has probably seen in other Chapter 11 cases,

17  serves as administrative agent for what the debtor believes

18  to be more then 100 different lenders holding those term

19  loans, Your Honor.

20           Within months of the issuance of those term loans,

21  Your Honor, there were defaults.  And ultimately, I am going

22  to jump ahead, but just to sort of give Your Honor some sense

23  of who controls this debtor right now ultimately those

24  defaults, after a protracted period of workout negotiations,

25  resulted in these lenders enforcing rights and remedies and

1  replacing BYJU's brother, Riju, with Mr. Tim Pohl.  And as we

2  stand here today, Your Honor, and since March 3rd, 2023 this

3  debtor still only has one employee, still only has one

4  officer, and still only has one director, but its Tim Pohl

5  since March 3rd, 2023, Your Honor.

6             Christine, can you turn the page.

7             (Indiscernible) parties that we are aware of now,

8  Your Honor. I addressed the debtor, BYJU's Alpha; that is the

9  Delaware corporation that issued the $1.2 billion in term

10 loans.  I addressed Mr. Pohl, he is our sole director and

11 officer.  He has been there since March of 2023.  I addressed

12 GLAS, they are the administrative agent for all the lenders.

13 They are represented by Kirkland & Ellis, Pachulski Stang,

14 and the Reed Smith Law Firm, Your Honor.

15            Think & Learn that is the overall enterprise,

16 former affiliates of the debtor, Your Honor.  Maybe today I

17 will refer to them as the BYJU's enterprise, but I am going

18 to try really hard to refer to them as Think & Learn just to

19 keep that label distinct from the debtors, Your Honor, so as

20 not to confuse things.  In various prepetition litigation,

21 Your Honor, they have been represented by Kasowitz Benson.

22            Next are the two brothers that I called out

23 before.  Byju is the individual who founded this entire

24 enterprise back in 2011 and here is his brother again, who

25 Mr. Pohl replaced back in March 2023.

1         Camshaft Capital Fund, Your Honor, I am going to

2    hold the Court in a little bit of suspense for that fund.  I

3    can tell you this, that nobody thought that Camshaft Capital

4    Fund should be a key party in interest in this bankruptcy

5    case when these term loans were issued back in 2021, Your

6    Honor, but they are now the party in interest in this

7    bankruptcy case.  They are a named defendant in the adversary

8    proceeding we commenced contemporaneously with the filing of

9    the voluntary petitions.

10        Christine, can you flip the page please.

11        So, Your Honor, this page is called "Events of

12   Default."  Your Honor may be thinking, Mr. Finestone, why are

13   you talking about events of default under a credit agreement,

14   didn't the debtor just file a voluntary petition on Friday

15   and doesn't bankruptcy, as a legal matter, accelerate all of

16   debt irrespective of whether or not there have been prior

17   events of default or not. Its not usually something I, as a

18   bankruptcy Judge, have to really get into and that is a good

19   question in most cases, Your Honor.

20        The reason why we are going to briefly address the

21   events of default here, and as early as slide six in this

22   presentation, Your Honor, there are parties out there,

23   there's already been an objection filed on Your Honor's

24   docket, that is going to seek to undo the corporate

25   governance of this debtor-in-possession.  And to be clear,

1  they want to undo the corporate governance not to step in and

2  seek to avoid and recover fraudulent transfers; they want to

3  undo the corporate governance because they no longer control

4  this debtor and they don't want the fraudulent transfer claim

5  to be pursued.

6           The way, Your Honor, that their challenging Mr.

7  Pohl's role as corporate governor and the way that they have

8  already threatened to challenge the pendency of this Chapter

9  11 case is to attack the events of default.  Your Honor, I am

10  not going to take the Court's time and go into the merits or

11  the specifics of the events of default unless the Court has

12  questions, but I want to point out three objective facts

13  about them, Your Honor, which really, I think, lead to the

14  inescapable conclusion that these defaults are as solid as

15  they can get.

16           Your Honor, point number one, and these the bottom

17  three bullet points on this slide, the BYJU enterprise,

18  including this debtor under prior management, acknowledged

19  and agreed to these defaults over and over again.  It called

20  these defaults specified defaults.  They acknowledged and

21  agreed that they exist and they acknowledged and agreed that

22  the lenders were entitled to enforce rights and remedies.

23  So, that is objective fact number one which is that the

24  borrower parties, as parties often do in forbearance and

25  amendment negotiations, acknowledge the events of default.

1    If that weren't enough, Your Honor, I am going to

2   fast-forward a little bit and I will fill in the interim, but

3   if that weren't enough Vice Chancellor Zurn, at the Delaware

4   Court of Chancery, held a trial in August of 2023 and Her

5   Honor issued a ruling in November of 2023 that had, at least,

6   two holdings in it, Your Honor:

7    One, Mr. Pohl was validly appointed as replacement

8   sole director and officer. Two, at least one of these four

9   specified defaults, the failure of the borrower entities to

10   produce a guarantee it promised it would produce, was a

11   legitimate and valid event of default.

12    To be clear, Vice Chancellor Zurn didn't reach the

13   other three defaults just because it was unnecessary.  So, we

14   got the borrower's agreement, we have got Vice Chancellor

15   Zurn's ruling, which is unstayed, Your Honor, they didn't

16   seek to stay it.  I only say that, Your Honor, so that Your

17   Honor is comfortable that it is the law of the land, when Mr.

18   Pohl filed these voluntary petitions on Friday, that pursuant

19   to Vice Chancellor Zurn's ruling that he is validly in place

20   as the legitimate independent corporate governor of this

21   debtor-in-possession.  There is nothing that can be

22   questioned about the corporate authority that was exercised

23   in filing these petitions, Your Honor.

24    Now I promised the Court a third objective fact

25   and its not on this slide, but I do want to emphasize it.

1  Your Honor, for the last 10 to 12 months, prior to the filing

2  of this petition, this debtor hasn't made any interest

3  payments.  So, even if all of these specified defaults that

4  have been agreed to and that Vice Chancellor Zurn found at

5  least one of which was legitimate, even if they didn't exist

6  or even if hypothetically Vice Chancellor Zurn made a bad

7  legal error, something that we can't wrap our heads around,

8  there's been a series of payment defaults because no interest

9  payments were made.

10          I want to make one editorial comment about that.

11  The reason interest payments weren't made, it's not because

12  Mr. Pohl was installed and Mr. Pohl was installed and said

13  I've got money and I don't want to make these interest

14  payments because I want to end up before Judge Dorsey 10

15  to 12 months from now; no, Mr. Pohl didn't have the money,

16  Your Honor, because all of the loan proceeds that everybody

17  expected to be there when Mr. Pohl was appointed have been

18  fraudulently transferred away.  They didn't have the cash.

19          So, Mr. Pohl wasn't able to make interest payments

20  and more importantly, Your Honor, the people that are going

21  to challenge this bankruptcy case they are the ones that they

22  have been saying in the public that are actually in

23  possession and control of this cash and they had the ability

24  to make the interest payments if they wanted to make them.

25  If they really believed in the merits of their appeal they

1 | could have continued to service the debt because
2 | hypothetically if they get a reversal they don't want this
3 | company to be in a payment default, but they didn't make
4 | those payments, Your Honor, and that is really the third
5 | objective fact without getting into any of the events of
6 | default.  That is why the corporate authority is firm and why
7 | the appeal that they want to press, notwithstanding the
8 | automatic stay, is really moot as a practical matter because
9 | if the specified defaults were mistaken the payment defaults
10 | cannot be cured.

11 |        Christine, can you please flip to the next page.

12 |        So, Your Honor, I reference the fact that before
13 | Mr. Pohl was appointed the lenders, we understand, were
14 | involved in protracted workout negotiations.  Those failed.
15 | Mr. Pohl was appointed March 2023.  Prior to the time that
16 | Mr. Pohl was appointed the lenders were receiving piecemeal
17 | financial reporting that indicated a significant amount of
18 | money on the balance sheet.

19 |        And when I say balance sheet the reporting didn't
20 | just suggest or report that this significant amount of money
21 | was on a consolidated balance sheet, no. These borrowers were
22 | representing that it was cash held and owned by this debtor,
23 | BYJU's Alpha, in cash and bank which, obviously, to anyone
24 | who is skilled at reading financial statements, understands
25 | to mean BYJU's Alpha had a significant amount of money.

1          Your Honor, I have that number in blank brackets

2  because those reporting -- those reports were given to the

3  lenders and even to Mr. Pohl on March 15th after he was

4  appointed pursuant to confidentiality agreements, but I am

5  comfortable just saying to Your Honor that it was a

6  significant amount of cash and when we subsequently talked

7  about what this debtor-in-possession has already comfortably

8  alleged to be a fraudulent transfer, its about the same

9  number, Your Honor.

10          So, Mr. Pohl gets appointed, he is immediately

11  looking for the cash that he is even being told is there.  He

12  can't find it.  What are the first things that Mr. Pohl does

13  in furtherance of his fiduciary duty is he sends letters out

14  to all of the financial institutions in the country.  GLAS,

15  for its part, is doing the same thing.  They are the

16  derivative pecuniary stakeholders after all.  None of those

17  financial institutions come back to us and say that money you

18  are looking for we have it in an account in your name.

19  Debtor's former management, who was threatening to challenge

20  this bankruptcy, they are refusing to recognize the exercise

21  of remedies in Mr. Pohl's status as corporate governor, Your

22  Honor.

23          So, Mr. Pohl does something that Delaware makes

24  available for situations just like this.  He commences a

25  Section 225 action under general Delaware corporate law and

1   that is the action that was pending before Judge Morgan Zurn

2   that I referenced earlier.  He commenced that action on

3   May 3rd, Your Honor, and as I said, to jump to the punchline

4   which I have already unveiled, on November 2nd, 2023, after a

5   trial in August, Judge Zurn ruled in Mr. Pohl's favor.

6           Christine, can you flip to the next page.

7           March 3rd -- May 3rd, sorry, Your Honor, was when

8   the 225 action was commenced.  May 8th, five days later,

9   perhaps in response to the commencement of the 225 action,

10  Mr. Byju Ravindran, the overall founder of the overall

11  enterprise, was on the phone with a representative for the

12  lenders and he said the money is some place that the lenders

13  will never find it.

14          Now, its an alarming statement in and of itself,

15  but if I just stop there and I don't underscore the fact that

16  its alarming in and of itself, its completely inconsistent

17  with the financial reporting that said this amount of money

18  was in cash and bank attributable to the debtor's soon to be

19  debtor-in-possession.

20          Christine, can you flip the page.

21          A couple of weeks later Judge Zurn enters Her

22  Honor's first order. Its an interim order, Your Honor,

23  because the trial doesn't take place until August.  Judge

24  Zurn looks at the papers, sort of almost like a TRO or a

25  preliminary injunction type procedure, and says I am going to

1  enter this interim order.  And until we get to trial

2  everybody needs to treat Mr. Pohl as having -- everybody has

3  to afford Mr. Pohl access to and exclusive control over the

4  accounts…etc., of this debtor, Your Honor.  He needs to be

5  able to have access to everything that is necessary for him

6  to perform his role as a sole director and officer of the

7  company.  If we have our trial in August and we find out that

8  Mr. Pohl was invalidly appointed we can undo that, but for

9  now he has got to have access.

10       So, Mr. Pohl, with the benefit of that interim

11  order, we again approached Mr. Ravindran, who was the former

12  director and officer, and we say, please, give us information

13  on the bank accounts. He provides us three bank account

14  numbers, Your Honor.  We look at them, we find about half a

15  million dollars.  That is nothing in relation to the half a

16  billion dollars that we expected to be there.  And those were

17  the only three bank accounts that were provided to us.

18       Mr. Pohl, diligent corporate governor, continues

19  to do his own investigation, with the help of counsel, to

20  uncover an investment account which was not one of the

21  accounts that Mr. Ravindran provided to us.  Once we found

22  the existence of this investment account we could start to

23  trace through the cash transfers that this debtor had engaged

24  in and we found something very alarming, Your Honor; a series

25  of transfers, which I will show in the next slide, its not

1  that many, that quickly add up to $533 million to a hedge

2  fund called Camshaft Capital Management.

3           Christine, can you flip.

4           This is a boring slide, Your Honor, but this is

5  the series of transfers. I point it out to Your Honor just to

6  show we are really talking about three lumpsum transfers in

7  April and July of 2022.  This was after, Your Honor, that the

8  factual underpinnings of, at least, two of those events of

9  default had occurred.

10          Christine, can you flip to the next page.

11          So, Your Honor, I am not going to attack Camshaft.

12  I will save that for the litigation.  Let me just say, Your

13  Honor, that Camshaft is not Vanguard, Camshaft is not

14  BlackRock, they are not Fidelity Investments.  Camshaft, we

15  find out, is a Miami based hedge fund run by William Morgan

16  who is a gentleman in his young 20's without any reported

17  formal training.

18          In the initial report to the SEC the headquarters,

19  the location of business of Camshaft, is identified at a

20  place where there has been an IHOP for as long as we can see.

21  And just to clarify -- it was funny, Your Honor, I had an

22  associate drafting this presentation for me and I kept seeing

23  IHOP and the I was lowercase, iHOP, and the hop was capital.

24  This is not to be confused with iPad or iPhone.  This is, in

25  fact, an International House of Pancakes, Your Honor.

1           Christine, can you flip to the next page.

2           Your Honor, Camshaft, this is the entity that the

3   debtor transferred more then half a billion dollars too.  We

4   did more research upon them.  We find out that their overall

5   assets under management is being reported as $595 million.

6   So, it doesn't take anyone to be much of a mathematician to

7   know that $533 million is a significant, significant

8   percentage of the overall assets under management. That

9   caused the lenders and Mr. Pohl more concern that this money

10  is not in a comfortable place.

11          We also studied that Camshaft's strategies, Your

12  Honor, are high risk trading strategies: leveraging, short

13  selling, liquid securities, derivatives. I will put it this

14  way, when Mr. Brady started and he thanked the U.S. Trustee

15  for his comments, and I will also just second that, thank you

16  to the U.S. Trustee for working with us in preparing for this

17  bankruptcy filing, Camshaft is, sort of, the opposite of a

18  Section 345 qualified place for the debtor's cash to be.

19  This is not a comfortable place for $533 million to be, but

20  it gets worse, Your Honor.

21          Christine, can you flip to the next page.

22          The reason it gets worse, Your Honor, is that when

23  we first found out that the money was transferred to Camshaft

24  at least as was being argued to us by the BYJU's management,

25  former management, there was a matching asset.  At least they

1  could say, well, we took the company's $533 million, but you

2  have got a limited partnership in this Camshaft and maybe

3  Camshaft is going to do amazing things with your money.  That

4  wasn't good enough for our lenders.  They commenced the state

5  law fraudulent transfer action in Florida State Court, Your

6  Honor.  They sought to avoid those transfers under Florida's

7  enactment of the Uniform Fraudulent Transfer Act.

8           In the course of that litigation, Your Honor,

9  Camshaft responds and says lenders this action is invalid

10 because it's not your money, its BYJU's Alpha money.  So, you

11 need to bring in BYJU's Alpha as a necessary party to this

12 litigation.  Okay.  Well that is slightly comforting that, at

13 least, Camshaft is acknowledging that its our money, the

14 debtor's money, Your Honor.

15          Then there is a turnaround, there is a violent

16 turnaround and all of a sudden on December 4th, after

17 Camshaft telling that Florida State Court that it was the

18 debtor's money, Camshaft responded to our request for books

19 and records and says, no, you are not going to get any books

20 and records because you have no limited partnership interest

21 and then they commenced the litigation on the same date

22 making a declaratory judgment that the debtor has no interest

23 in Camshaft.

24          So, just to stop right there, I said it gets

25 worse.  It's one thing to take our cash and invest it in a

1  place that, in our mind, no reasonable businessman would

2  invest in, but it's another thing to do that and then

3  transfer for no consideration the limited partnership

4  interest in Camshaft.  The debtor is left with nothing, Your

5  Honor, and we have been told the opposite of what has been

6  true.

7           Christine, can you flip the page please.

8           This is just, Your Honor, the different

9  allegations that Camshaft made in the Florida -- in the two

10  pieces of Florida litigation, one saying its BYJU's Alpha's

11  money, our debtor's money, and then, two, saying, no, the

12  debtor doesn't even have a limited partnership interest in

13  Camshaft.  You don't even have a right to books and records.

14           Christine, can you flip to the next page.  Okay.

15  Stop there.

16           It's the cleavage date, it's the petition date.

17  Your Honor, we filed this bankruptcy case because those funds

18  have to be avoided and recovered for the benefit of RSP,

19  derivatively for the benefit of our creditors.

20           Can we go to the next page, Christine.

21           I referenced, Your Honor, a series of a

22  prepetition litigation and I just want to call them all out

23  for purposes of orientation.  First action is the fraudulent

24  transfer action that I referenced.  GLAS commenced it on

25  behalf of the lenders under state law fraudulent transfer,

1  Camshaft and affiliates on the defendants.  This one, of

2  course, is stayed upon our filing of the bankruptcy petition

3  because it is now our charge to pursue the avoidance and

4  recovery of fraudulent transfers under Chapter V.  That

5  action was stayed pursuant to 362, Your Honor.

6        Second action is Camshaft v. BYJU's.  That is that

7  action that really shook everybody when Camshaft filed

8  another action in Florida State Court saying you, debtor,

9  don't even have a limited partnership interest in Camshaft.

10 That action is also stayed, Your Honor, because it is an

11 action against the debtor under 362.  It also probably, as an

12 alternative, should be stayed because its seeking a ruling as

13 to what is property of this debtor's estate and in our view

14 that falls within Your Honor's exclusive jurisdiction.

15       The third action, Your Honor, is the appeal of the

16 Delaware Chancery Court Section 225 action.  That is pending

17 before the Delaware Supreme Court.  That is stayed pursuant

18 to the automatic stay because its an action against the

19 debtor-in-possession, Your Honor.  And we view it as not only

20 meritless, but practically moot for the reason I said

21 earlier, Your Honor, because there has been a series of

22 payment defaults following the specified defaults which are

23 the subject of this appeal.

24       The last action -- I know I am dropping a lot on

25 Your Honor, I just want to be complete. The last action is an

1  action that the non-debtor BYJU's commenced against GLAS and

2  some other lenders during the pendency of the Delaware

3  Chancery Court action and they commenced this action in New

4  York State Court really seeking a collateral ruling, Your

5  Honor.  The Delaware Chancery Court was pending, they

6  commenced this action in New York State Court seeking a

7  ruling that the events of default were illegitimate and

8  invalid.

9       The action hasn't really proceeded far, it's not

10  against the debtor.  So, it is not of the view that Section

11  362 automatically stays this action, but it may threaten our

12  attempts to prosecute a plan, Your Honor, because it also

13  seeks to challenge the legitimacy and disqualify as many of

14  our lenders who we would need to negotiate with.  That is

15  just a placeholder.

16       Christine, can you flip the page.

17       So, Your Honor, its actually a pretty simple

18  capital structure.  The term loan that I referenced is about

19  $1.2 billion.  I am rounding up.  There was a quarter --

20  there was about $267 million of accrued interest as of the

21  petition date. It also includes a premium, Your Honor.  And

22  there was also a bridge loan that these lenders provided to

23  us prior to the bankruptcy case so that we could prepare for

24  the bankruptcy case and so that we could be prepared to fund

25  this bankruptcy case.  It was the product of the negotiations

1  that we had with DIP financing.

2        Not the full $5 million has been funded, but those

3  are the same lenders, Your Honor, that were holders of the

4  term loans. I said before, Your Honor, we believe that there

5  is more then 100 distinct lenders of record in this facility.

6  We have also said, Your Honor, and we are not trying to hide

7  this fact, we don't know whether we have other creditors

8  other then these 100 term lenders.  Certainly possible.

9        Mr. Pohl has been frustrated in his attempts to

10 learn everything he can and to access all of the books and

11 records of this debtor.  There may be other creditors.  It's

12 another benefit of this bankruptcy case that the creditors

13 will be on notice and they can come into this collective

14 action and assert claims that they exist, Your Honor.

15       Christine, can you flip to the next page.

16       Mr. Pohl is the sole director, officer, and

17 employee.  I referenced the bridge account and I also

18 referenced, Your Honor, Mr. Enos or Mr. Brady will prosecute

19 this, we have a cash collateral motion on file.  The motion,

20 itself, is also a motion for DIP financing, but we are not

21 seeking approval to enter into or draw any DIP financing on

22 an interim or on an emergency basis.  We will only be asking

23 Your Honor to schedule a final hearing for that.

24       Christine, can you flip.  One more time.

25       Last slide, Your Honor.  So, Chapter 11, Your

1  Honor, it's got a lot of benefits for us.  We spent a long

2  time discussing this, Mr. Pohl with counsel.  We spent a long

3  time discussing this with our lenders as well, Your Honor.

4          First and foremost, the pursuit of the fraudulent

5  transfer action.  We're an SVB. Those $533 million of loan

6  proceeds should not have been transferred out after these

7  events of default existed and it certainly should not have

8  been transferred out for no consideration and it certainly

9  should not have been transferred out to a hedge fund that

10  resides in IHOP, Your Honor.  That is business number one and

11  that is why we made sure to commence that action

12  contemporaneously with this petition.

13          We believe Rule 2004 will be helpful to us, Your

14  Honor.  Based upon all the inconsistent things that have been

15  said to us about where that cash is we have been told

16  Camshaft has it. We have been told we are the beneficiary of

17  it.  We have been told other affiliates have it.  We even

18  said it exists.  We have told its in some offshore

19  subsidiary.  We don't know where it is.  We believe, and I

20  think all of us would bet a lot of our personal funds, there

21  are subsequent transferees of this cash.  That is one benefit

22  of Rule 2004.

23          More importantly, we have got co-obligors.  We

24  have got former brothers and former sisters who also chose or

25  who don't have the ability to have made a payment on any of

1  the debt that we are on the hook for and we need to figure

2  this all out.  So, that is, sort of, Chapter 11 initiative

3  number two, Your Honor.

4         Three and four I will just merge together as we

5  uncover facts, based upon what we think to be rather alarming

6  backdrop, we may have other actions to bring, Your Honor.

7         Finally, prosecution and confirmation of a

8  Chapter 11 plan.  We want to get proceeds back.  We want to

9  distribute them to creditors.  Chapter 11, as Your Honor

10  knows, can be a good vehicle for that.  That is our view,

11  Your Honor.

12         I will stop there, of course, to answer any

13  questions the Court has.  But in terms of the agenda, Your

14  Honor, we have got a very modest cash collateral motion to

15  prosecute. I think we are seeking $75,000 of authority to get

16  us to the final hearing.  Then we have got a similarly modest

17  cash management motion to prosecute in which we are really

18  seeking the authority to open up new accounts for two

19  reasons.  That bridge loan I referenced the funds are still

20  in an account.

21         At GLAS we would like to bring them into a new

22  account where Mr. Pohl can have complete control over them,

23  but also, Your Honor, there's three other accounts that have

24  something nominal in there like $20,000.  And we have great

25  concerns that the debtor's former management, the BYJU's

1  enterprise, still has ways to access and actually make

2  withdrawals from those accounts.  So, we have moved the cash

3  into a place that is safe.  I think we have satisfied the

4  U.S. Trustees concerns in that regard.

5          From that respect, Your Honor, it's a relatively

6  modest agenda.  The Chapter 11 case at a higher level, as you

7  can tell, and thank you for letting me give this

8  presentation, it raises a lot of serious issues, and we, on

9  behalf of our lenders, want to work with haste to seek to

10 undo some of the damage that has been done to this debtor,

11 Your Honor.

12          THE COURT:  Okay.  Thank you.

13          Only one question at this point.  I was looking at

14 the docket before we started today.  I saw that there was a

15 notice filed that an adversary proceeding was filed under

16 seal, but I didn't see the sealed adversary proceeding.

17          Has it actually been filed yet?

18          MR. FINESTONE:  Well, let me answer in substance

19 and then if Your Honor has a question, then I'll come back to

20 technicalities.  But I know that in the first instance, we

21 filed a completely redacted or sealed complaint.  We,

22 subsequently, Your Honor, filed a redacted complaint, which

23 has a very, very small amount of redactions, so I believe

24 they've both been filed.  I think they're on the adversary

25 proceeding docket, not on the main Chapter 11 docket.  Maybe

1  that complains -- maybe that answers Your Honor's question.

2          Mr. Enos, anything you can help the Court with on

3  that?

4          MR. ENOS:  Good afternoon, Your Honor.  Ken Enos,

5  Young Conaway Stargatt & Taylor, on behalf of the debtor.

6          I can confirm that the adversary proceeding, in

7  fact, has been commenced and a summons was issued on Friday.

8  In addition, there was a copy -- I don't know if the Court

9  had a chance to see it -- there was a copy of the adversary

10  complaint in the materials that were sent over to chambers as

11  a related pleading for today's hearing.

12          THE COURT:  All right.  Thank you.

13          MR. FINESTONE:  Okay.  Thank you, Your Honor.

14          Christine, you can take down the presentation.

15          THE COURT:  All right.  I know there was an

16  objection filed, but it was really an objection to the relief

17  being requested.

18          Is there anyone else who wants to be heard, other

19  than the objectors, because I'll deal with that when we get

20  to the objection?

21          MR. SCHARTZ:  Hi, Your Honor.  It's Brian Schartz

22  from Kirkland & Ellis on behalf of GLAS, the agent.

23          Can you hear me okay?

24          THE COURT:  You're a little -- maybe I can turn

25  the volume up a little on my end.

1           Can we turn it up a little?  I'm having a hard --

2           MR. SCHARTZ:  I'll speak up, too.

3           How about that?

4           THE COURT:  That's better.

5           MR. SCHARTZ:  Okay.  All right.

6           Very quickly, as Mr. Finestone said, we represent

7  GLAS, as the agent on the syndicated loan that's, by far, the

8  debtor's largest creditor -- maybe it's the only creditor; we

9  don't know -- with over $1.4 billion outstanding.  The agent

10 also owns the equity interests of the debtor.  It's a

11 situation you admittedly don't see every day, but I think

12 it's a reflection of how dire this situation really is.

13          Your Honor, we just rise to say a couple things.

14 Number one, this case is vitally important to the agent and

15 the lenders.  They've been living with a loan that has been

16 in default for more than 14 months.  As you've heard,

17 numerous defaults, including failure to pay significant

18 interest and Aramor payments (phonetic) over the last 10

19 months, and the agent is broadly seeking, tasked with

20 ensuring that the lenders' rights are protected in the

21 circumstance of the defaulted loan.

22          And this case is very important from the

23 perspective of that goal, but also it's part and parcel of a

24 worldwide enforcement strategy that we would like you to be

25 aware of, the whole goal, which is to maximize the value of

1  the debtor -- the lenders' recovery.

2          I want to emphasize, Judge, that, you know, we

3  never want to find ourselves in a litigation or enforcement

4  posture.  The agent, the Ad Hoc Group of Lenders have worked

5  for 17 months trying to find a way out of the situation.

6  They've negotiated extensively with the controlling insider,

7  Mr. Byju Ravindran and his various agents and advisors to

8  find a solution.  And we did that even after we exercised

9  remedies.  We did it during the course of the Delaware 225

10 litigation.  We tried to do it even after we won the 225

11 litigation in front of Vice Chancellor Zurn.

12         I will add, Judge, one of the most important

13 findings we think, in addition to what Mr. Finestone talked

14 about in terms of the Delaware Chancery Court is that Vice

15 Chancellor Zurn found that, quote:

16         "That the repeated forbearance reveals the lenders

17 were patient with the loan partners."

18         We've tried to find peace.  We've tried to have a

19 real negotiation, Your Honor.  That's what Kirkland & Ellis

20 is all about, frankly.  But the funny thing about

21 negotiation, Judge, is that it requires counterparties who

22 are willing to engage in good faith to secure a real

23 resolution.

24         And the sad thing about this case, Your Honor, is

25 that the agent and lenders now understand that we don't

1   really have that counterparty.  We've dealt with months of a

2   steady stream of false promises, false starts, missed

3   deadlines, misleading press releases, stale or incomplete

4   information, outright lies, and frivolous litigation threats.

5   After all of that, we now understand that we have the choice

6   to fight for our recovery and that's what we're going to do.

7           Our primary goal here, Judge, first and foremost,

8   we have to find out where the $533 million in cash has gone.

9   Where is it?  How much has been spent?  And by whom?  Mr.

10  Byju Ravindran, himself, as you heard, previously said that

11  it was someplace the lenders will never find it.

12          Well, Judge, we are here to prove him wrong.  We

13  intend to help Mr. Pohl and the debtor's counsel find that

14  money and, frankly, we won't stop until we get as much of it

15  back as possible to the debtor, where it rightfully belongs.

16  We feel that Mr. Ravindran believes the rules do not apply to

17  him.  We're here to show him that they do.

18          And this case isn't about just recovering the $533

19  million; it's about a whole host of other claims that Mr.

20  Pohl identified and talked about in his first place -- in his

21  first day declaration, excuse me.  As he's mentioned, we now

22  believe that there are colorable claims against the debtors'

23  former management and other decision-makers.  Mr. Pohl

24  identified in his first day declaration hundreds of millions

25  of dollars of transfers to other parties, other than

1  Camshaft, for which there's been no explanation.  We,

2  frankly, are thrilled that Mr. Riju Ravindran, Byju's

3  brother, has appeared in this court through counsel, because

4  we firmly believe he has a lot of explaining to do for his

5  own actions while he was in control of the debtor.

6          To bring all of this together, Judge, the various

7  claims and related issues regarding the now-defaulted loan,

8  should not be pursued in piecemeal in a mishmash of different

9  forums.  We have a tool to consider them in Chapter 11 and we

10  should use it.  This is not a waste of judicial resources,

11  gamesmanship or anything like that.  It is exactly what the

12  bankruptcy process is designed to handle.

13          Even more, Judge, while the objecting parties, if

14  you saw their objection, might have believed and then

15  (indiscernible) here, after I'm done talking, there is an

16  emergency here.  The agent and the lenders firmly believe

17  that time is of the essence in the face of the likely

18  dissipation of significant and liquid estate assets.  This is

19  not a fraudulent conveyance of the type that you see in large

20  corporate matters; this is cash.  Cash gets spent.  We really

21  need to find where it is and what is happening to it.

22          From a broad picture, Judge, I want to talk for

23  just a second about steps that we've taken as the lenders --

24  as GLAS with the support of the lenders worldwide.  When we

25  wake up every morning, we check the news about this company,

1  the former brothers and sisters that Mr. Finestone

2  represented and mentioned.  It is very clear that the value

3  of the lenders' collateral against the other entities, who

4  are former affiliates of the debtor, they've cratered.  That

5  value has cratered.

6          And the information that comes out on nearly a

7  daily basis is alarming.  Several operational creditors have

8  filed involuntary bankruptcy petitions against the parent

9  company in India.  It's (indiscernible) that real certainty

10  exists as to whether it has an ability to continue as a

11  going-concern.  Just two weeks ago, the parent company

12  announced an equity rights issued at a $250 million

13  evaluation.  That is less than 2 percent of its peak

14  valuation of $22 billion from 2022.  The CFO has resigned.

15  The GC has resigned.  All known independent board members

16  have resigned.  It's purported that thousands of employees

17  are laid off.

18          These are critical issues to the agent and lender,

19  Judge, because the term loan is guaranteed by those entities

20  and their value is continuing to diminish, hopefully, not

21  vanishing completely.  Faced with this reality, in addition

22  to this Chapter 11 case, the agent, with significant lender

23  support -- we're talking to roughly 90 percent of the lenders

24  on a weekly basis, if not a daily basis sometimes -- the

25  agent has taken, or is expected to take various steps beyond

1  this case, but we've all pulled together.

2           In Singapore, we exercised the contractual remedy

3  in the loan documents that allow GLAS to appoint receivers

4  over the assets of the debtor's former immediate parent and

5  one of its loan guarantors, Byju's Pte. and Great Learning,

6  respectively.  Again, the lenders are working with the

7  receivers and existing managers to sell that business, the

8  proceeds of which we hope will be used to pay down the loan

9  or at least part of it.

10          In India, we, ourselves, GLAS, with the support of

11 significant lenders, are launching a voluntary bankruptcy

12 petition against Byju's parent about two weeks ago.  We are

13 looking to recover whatever value remains before it, too,

14 vanishes.

15          In the United States, as Mr. Finestone referenced,

16 there are guarantees from three former affiliates of the

17 debtor and we're closely vetting next steps there, too,

18 Judge.

19          In the media, Byju's has characterized the agreed

20 and the lenders as overly aggressive.  "Vulture funds" seems

21 to be their favorite catchphrase, in addition to what you've

22 already heard about Mr. Pohl not properly being in charge.

23 With respect, that's all noise.  We're not vulture lenders;

24 in fact, a significant proportion of these lenders were

25 lenders on day one.  By our math, it's just over 60-something

1 percent were lenders on day one, so they're not vulture

2 funds.  They are par -- many of them are par lenders, looking

3 to get a recovery.

4          And the first and most important question at the

5 outset is:  Where is the $533 million?  Any party that is

6 unwilling to answer that simple question truthfully and

7 immediately, we would submit, already has told you everything

8 you need to know about their motives.  And, Judge, we would

9 urge you to help us do everything we can to find this money

10 and bring it back into the estate as we move this bankruptcy

11 case and the process that Mr. Finestone laid out.  Thank you.

12          THE COURT:  Thank you.

13          All right.  Why don't we go to the motions and

14 I'll hear the objection in connection with the motion that

15 gets filed or gets presented.

16          MR. CHIPMAN:  Your Honor, this is William Chipman

17 on behalf of Riju Ravindran and Tangible Play, Inc. and, Your

18 Honor, my co-counsel wants to address some of the issues that

19 were raised by debtor's counsel and Glas' counsel in the

20 presentation.

21          Would now be a good time for that, Your Honor?

22          THE COURT:  I'll give them that opportunity in

23 connection with their objection to the motions.

24          MR. CHIPMAN:  Thank you, Your Honor.

25          MR. FINESTONE:  Your Honor, Ben Finestone, Quinn

1  Emanuel, proposed counsel to the debtor.

2          Mr. Enos is going to handle presenting the motion,

3  but what I'd like to do, Your Honor, before turning it over

4  to Mr. Enos is to move --

5          Mr. Enos, are we first -- is the agenda, first,

6  going to be cash collateral or cash management?

7          Forgive me, Your Honor.

8          MR. ENOS:  It will be cash management.

9          MR. FINESTONE:  Okay.  Your Honor, if it's okay

10 with the Court, I would like to move paragraphs 90 to 101 of

11 Mr. Pohl's first day declaration into evidence.

12         THE COURT:  Why don't we just move the whole thing

13 in?

14         MR. FINESTONE:  Yep.  It's easier.  I was going to

15 come back on the second motion.

16         Your Honor, we'd move for the submission of

17 Mr. Pohl's declaration into evidence, Your Honor.

18         THE COURT:  All right.  Is there any objection?

19     (No verbal response)

20         THE COURT:  The declaration is admitted, without

21 objection.

22     (Pohl Declaration received in evidence)

23         MR. FINESTONE:  Thank you.

24         Mr. Enos will present the motion, Your Honor.

25         THE COURT:  Thank you.

1          Mr. Enos, you're going to have to either speak up

2   or do something with your Mr. Finestone, because you're very

3   difficult to hear.

4          MR. ENOS:  Okay.  Your Honor, I will do my best.

5          Can you hear me okay?

6          THE COURT:  I can hear you, but it's very, very

7   soft.  Can you turn up the microphone on your computer,

8   perhaps.  Maybe you need to increase the volume on the

9   microphone.

10          MR. ENOS:  Is that any better?

11          THE COURT:  Not really.

12      (Laughter)

13          MR. ENOS:  I do not know how I can make this thing

14   better.  I will, if the Court will indulge me, I will walk

15   down to Mr. Brady's office in 30 seconds and handle these

16   from there if that's okay with the Court?

17          THE COURT:  No, that's fine.  I can hear you okay.

18   I'm just going to have to strain a little bit.

19          Go ahead.

20          MR. ENOS:  My apologies, Your Honor.  There was a

21   technology upgrade this morning that apparently I did not

22   upgrade it correctly, I suppose.

23          In any event, Your Honor, before I get started, I

24   noted that Ms. Casey had her hand up for a while.  It's now

25   down.  I don't know if she needed to address the Court or

1  not.  So, before I start, I just wanted to begin with her.

2            THE COURT:  Ms. Casey?

3            MS. CASEY:  Good afternoon, Your Honor.  Linda

4  Casey on behalf of the United States Trustee.

5            I had raised my hand when you had asked if anybody

6  else had anything else to say in general, as opposed to

7  objecting.  The United States Trustee has worked out all of

8  our issues on the first day pleadings.  We do note that the

9  debtor's declaration indicates that they do not have access

10 presently to the books and records and, accordingly, they

11 don't know who their creditors are.

12           While we are not objecting to the entry of the

13 first day orders, we do note that the debtors will have the

14 burden of demonstrating that the appropriate parties have

15 received actual notice for the relief sought and for the

16 final day, in particular, but without waiving any rights

17 whether a challenge period should commence prior to creditors

18 receiving notice of the bankruptcy or notice of the orders.

19           But as for today's purposes, we do not have any

20 objection.

21           THE COURT:  Okay.  Thank you, Ms. Casey.

22           MS. CASEY:  Thank you.

23           MR. ENOS:  Thank you, Your Honor.

24           As Mr. Finestone mentioned, we have a very short

25 slate of requests for the Court today and that is obviously

1  largely because it's a nonoperating company.  We do not need

2  much relief.  We need the ability to pay bills and pay fees

3  and expenses that arise in the ordinary course.

4          Accordingly, Your Honor, we are seeking approval

5  to use our existing bank accounts and open new bank accounts,

6  as well as limited cash collateral relief so that we can pay

7  whatever expenses may arise.

8          I'll echo the various statements that were made by

9  Ms. Casey.  We filed these pleadings on Friday.  She promptly

10 provided us comments and we were able to work those comments

11 out over the weekend and those solutions were reflected in

12 the proposed forms of order that were filed this morning.

13         Hopefully, Your Honor, those made their way to

14 your desk, Your Honor, and you had an opportunity to review

15 them?

16         THE COURT:  I have, thank you.

17         MR. ENOS:  Great.

18         So we're starting, first, Your Honor, with cash

19 management.  I guess we're calling this "cash management" but

20 I think it's more just a bank account motion.  The debtor has

21 three bank accounts.  I believe it was already represented

22 there's somewhere around $20,000 in those bank accounts.  We

23 wish to be able to continue to have access with those

24 accounts in the interim period.

25         As Mr. Finestone mentioned, we're in the process

1   of obtaining new bank accounts with a different bank to hold

2   the proceeds of the bridge loan, as well as the proceeds of

3   the DIP financing, if it is approved.  And importantly, the

4   relief authorized by the interim cash management order both,

5   gives us the ability to use those bank accounts, but also

6   sets up, as is traditional, a process for opening new bank

7   accounts.

8            So, Your Honor, I don't have much further on that.

9   Unless the Court or anyone else has any questions, we would

10  request that you enter the interim order approving the

11  continued use of debtor's bank accounts.

12           THE COURT:  Okay.  I have no questions.

13           Does anyone else wish to be heard?

14      (No verbal response)

15           THE COURT:  I'm satisfied the requested relief is

16  appropriate and I'll enter the order.

17           MR. ENOS:  Thank you very much, Your Honor.

18           Turning to the DIP and cash collateral motion.  At

19  the outset, I would note that through the motion, the debtor

20  is seeking approval of a $260 million DIP facility -- twenty

21  million of that is new money -- along with the use of cash

22  collateral, in accordance with the budget.

23           Importantly, we are now only seeking -- today, we

24  are only seeking entry of the interim cash collateral order

25  and limiting the use of cash collateral to $75,000.  This was

1  an issue first raised by Ms. Casey and her point was that

2  it's a nonoperating company.  Do you really need unlimited

3  use of cash collateral?  And we agree with her, Your Honor,

4  so we conferred internally, came up with $75,000.  We believe

5  that's an appropriate and necessary number for us to continue

6  to prosecute these cases and (indiscernible) to any expenses

7  that may arise before we come back before the Court.

8         And, Your Honor, before I shift to, you know, the

9  order and changes made to the order, I do not plan to address

10  anything regarding the DIP financing, except to mention that

11  as we note in the motion, no later than 14 days before the

12  final hearing, we will be filing, at the very least, the DIP

13  credit agreement, a proposed final form of order, a

14  supplement to the motion, which we'll fill in certain of the

15  information gaps that were included in the DIP motion that

16  was filed.  We'll also be submitting a declaration of Mr.

17  Pohl.

18         So, Your Honor, turning to the order, I think

19  after having made Ms. Casey's comments, it is one of the more

20  routine and mundane cash collateral orders that will come

21  before the Court.  It already had the standard carve-out

22  provision.  We have since added a challenge period provision,

23  as well as making a number of paragraphs in the interim order

24  subject to that challenge period.  In addition, Your Honor,

25  we have struck the indemnification language.

1        So, Your Honor, at this time, I would cede the

2   podium to the objectors and anyone else that wishes to be

3   heard, and I'd certainly be willing to answer any questions

4   that Your Honor may have.

5        THE COURT:  Okay.  Let me go ahead and hear from

6   the objectors.

7        MR. CHIPMAN:  Good afternoon, Your Honor.  William

8   Chipman on behalf of Riju Ravindran and Tangible Play, Inc.

9   I think we're the objectors.

10       Your Honor, we filed a preliminary objection to

11  the cash collateral and DIP motion this morning.  I hope Your

12  Honor has had a chance to review that objection?

13       THE COURT:  I did, thank you.

14       MR. CHIPMAN:  Thank you, Your Honor.

15       Your Honor, before I get into our objection, I

16  think a lot of it has been addressed with comments from the

17  U.S. Trustee limiting the amount of cash collateral to

18  $75,000.  That's a welcomed development for us.

19       But before I turn to the remaining part of our

20  objection, my co-counsel Mr. Sheron Korpus from Kasowitz

21  would like to address Your Honor regarding some of the

22  statements that were made in the debtor's opening

23  presentation.

24       If I may cede the podium to my co-counsel, I'd

25  appreciate that, Your Honor.  You've already admitted him *pro*

1  *hac vice*.  I appreciate, Your Honor, doing that.

2            THE COURT:  Okay.  Mr. Korpus, go ahead.

3            MR. KORPUS:  Thank you, Your Honor.  Nice to meet

4  you and to appear before you.

5            Can you hear me okay?

6            THE COURT:  You're a little soft.  If you could

7  speak up a little bit, that would be helpful.

8            MR. KORPUS:  Yes, Your Honor.  I'll try my best.

9  Let me just check my volume on my computer.  It's a hundred.

10            Okay.  Your Honor, I won't take too much of your

11  time, because there isn't a motion by us before you at this

12  time to address this, but there is a second side to this

13  story.  And the second side to this story is that that at the

14  time that BYJU's Alpha took out the loan and at the time that

15  a notice of default was served by the lenders, there was no

16  payment involved.  Every interest coupon was met and paid for

17  in full.

18            The defaults of the lenders' rate were all

19  technical on the nature of reporting and (indiscernible)

20  really focused on this guaranty to be given by subsidiary

21  that all parties knew was going to be difficult to get due to

22  the change of law in India and the ability of that subsidiary

23  to provide that guaranty, and that's why the loan agreement

24  provided that all we had to do was reasonable efforts to try

25  and obtain the guaranty, which, to this day, the lenders have

1   not disputed that, indeed, the BYJU's entities did exercise

2   reasonable efforts to do so.  So, all of these defaults put a

3   lot of pressure on the company and, ultimately, there was a

4   notice of default, notice of acceleration, and a seizure of

5   BYJU's Alpha, all based on these non-monetary alleged

6   defaults.

7           Alpha is not, as you heard, it has never been an

8   operating company.  Its sole goal was to receive the $1.25

9   billion and that money was to be used for the entire of

10  Byju's global network of companies.  So it was always known

11  that the funds would be sent from BYJU's Alpha elsewhere to

12  the group.  That's why there is no covenant that the lenders

13  can rely on preventing the transfer of funds to anyone.

14          After the default was served, the lenders started

15  this 225 action for control and Mr. Finestone showed you the

16  chart of actions.  And what's unique about this case, Your

17  Honor, it's essentially trying to stay two actions that the

18  lenders themselves started.  They started the 225 action and

19  through this bankruptcy, they're trying to moot our appellate

20  rights.

21          They filed this, not after the judgment was

22  rendered, but two months later after they saw our opening

23  brief, because we believe we have strong appellate arguments

24  and I'll get to that in a second.  Everything that they

25  showed you about the specified defaults and the agreement and

1  the arguments made are all part of the record for the 225.

2  They're all going to be part of the record before the

3  Delaware Supreme Court.  We have the right to pursue our

4  appellate rights.  If we lose, then I guess we're back here

5  and they can do what they want to do, but we do have these

6  appellate rights to exercise.

7         And then the second action that they're trying to

8  stay is another action that they, themselves, have brought.

9  The lenders brought the action for fraudulent transfer in

10  Florida.  They don't like the way it's been going and that's

11  why on the eve of the motion to dismiss, they filed this

12  petition to moot that action.

13         So there's a lot of gamesmanship going on here.

14  They could pursue this action as creditors.  And there's no

15  good reason why they filed this bankruptcy today, other than

16  to moot the actions that they, themselves, took before we had

17  a chance to present our side.

18         So, we intend, Your Honor, to bring a motion to

19  either dismiss the petition or for relief from the automatic

20  stay to pursue our appeal in Delaware.

21         You've heard that there's now been a payment

22  default.  Well, that payment default came because they

23  accelerated and they can't have it both ways.  And they never

24  presented the borrower with an invoice asking for payment of

25  interest; in fact, they said if we made an interest payment,

1  that would apply to the numerous fees of all the lawyers that

2  you see before you on this Zoom that have been involved on

3  the daily basis talking to their clients and talking to the

4  company and all the rest and, Your Honor, we believe that we

5  should, at some point, address this before the Delaware

6  Supreme Court and that's where this case belongs.

7         And I believe I don't have anything else and the

8  rest is for Mr. Chipman to address in his objections, unless

9  you have any questions for me?

10        THE COURT:  No questions, thank you.

11        Mr. Chipman?

12        MR. CHIPMAN:  Thank you, Your Honor.

13        So given that the debtors filed a revised form of

14  order limiting the use of cash collateral to $75,000, I think

15  that moots most of our objection, Your Honor.  Our objection

16  was, basically, that the only amount that should be

17  authorized to be used under the interim cash collateral order

18  should be limited to what the debtors actually need to spend.

19  So I think the $75,000 cap addresses that.

20        We also asked for specific -- the terms of the DIP

21  loan, which I believe Mr. Enos said he would file 14 days

22  prior to the hearing.  Your Honor, normally, we would see

23  those filed with the petition and, usually, we would have a

24  little bit longer period of time to review those and file an

25  objection, so we think 14 days is a little short.  We don't

1  know what the terms of the DIP are.  We just know that it's a

2  $260 million roll-up with a $20 million -- or $240 million

3  roll-up on a $20 million new term loan.  We don't know any of

4  the other terms and releases, so forth, and so on.  We also

5  think, Your Honor, we should have time to fully brief a

6  motion to dismiss and enter that at the same time.

7       So, Your Honor, if it pleases the Court, we think

8  that we should have 21 days' notice of the terms of the DIP.

9  And if Your Honor is going to schedule a final DIP hearing, I

10 think we should have time to fully brief the motion to

11 dismiss and have it heard at the same time.

12      THE COURT:  Well, I'll direct the parties to meet

13 and confer and talk about that issue and then come back to me

14 and contact chambers for the proposed hearing.

15      MR. CHIPMAN:  That works, Your Honor.  We

16 appreciate your time.

17      I don't think I have anything else because of the

18 comments that were accepted of Ms. Casey that limited the

19 amount of the cash collateral to $75,000.  It took away a lot

20 of our -- it mooted a lot of our argument, Your Honor.

21      THE COURT:  Okay.  So I can, for purposes of what

22 I'm going to put on the docket, are you withdrawing your

23 objection?

24      MR. CHIPMAN:  Your Honor, we're withdrawing our

25 objection with regard to limiting the amount of cash

1  collateral to be authorized to be used during the interim

2  period, because that's already been addressed by the U.S.

3  Trustee.

4         With regard to the rest of the objection, Your

5  Honor, again, we would like a full version of the DIP motion,

6  the DIP credit agreement, the final DIP order, and sufficient

7  time for us to address it in the context, as we talked about,

8  of a motion to dismiss.  So that part of our objection, I'm

9  not withdrawing, Your Honor, but --

10        THE COURT:  Well, that's not before me today, so

11  there's no objection to the DIP at this point.

12        MR. CHIPMAN:  So, Your Honor, that's correct.

13  Your Honor, we did reserve our rights on that.

14        So, with regard to the use of the cash collateral,

15  we'll withdraw our objection with regard to that, Your Honor.

16        THE COURT:  Okay.  Thank you.

17        Anything else that we need?  Anyone else wish to

18  be heard before I rule?

19      (No verbal response)

20        THE COURT:  Okay.  I'm satisfied the requested

21  relief is appropriate and I will enter the order as

22  submitted, the revised order as submitted by the debtors.

23        I don't know what else we need to talk about at

24  this point, other than maybe some preliminary observations by

25  me at this point.  And at this point, I've got a valid Court

1　of Chancery order appointing another party as the controlling

2　shareholder of the debtors or whatever -- I don't know if

3　it's shareholder or -- controls the debtors and Mr. Pohl is

4　the sole officer and director of that company.  That order

5　has not been stayed pending appeal, so the order is that

6　order, and I'm going to proceed on that basis, just so

7　everybody is aware of that.

8　　　　　　One other observation -- one other request, that

9　the parties start talking to each other.  There really is no

10　reason the debtors, at this point, shouldn't know where that

11　money is and I don't understand why that hasn't been

12　disclosed.  So I'm going to request that the parties talk to

13　each other and see if you can come to an understanding about

14　that and figure out what's going on here, because we're going

15　to waste a lot of time and energy on discovery and motions

16　and whatnot, that could be avoided if the parties would just

17　talk to one another.

18　　　　　　Mr. Korpus?

19　　　　　　MR. KORPUS:  Yes, Your Honor.  I'm set.

20　　　　　　THE COURT:  Okay.  All right.

21　　　　　　Anything else for today?

22　　　　　　MR. FINESTONE:  One final thing, Your Honor.  For

23　the record, Ben Finestone, Quinn Emanuel, proposed counsel to

24　the debtors-in-possession.

25　　　　　　And I think it's related to the theme of Your

1  Honor's last comments for which we thank the Court.  I didn't

2  have the adversary proceeding number before, Your Honor, but

3  it's Adversary Proceeding 24-00513.

4        We filed, as I mentioned, I think twice, we filed

5  that complaint on Friday, February 2nd, and we emailed

6  counsel to Camshaft, because they're, at least, the initial

7  transferee.  We asked them to accept service:  no response.

8  We asked them to accept service today:  no response.

9        I am not, Your Honor, about to ask the Court to do

10 something about that.  We can serve the complaint.  We can

11 handle that if counsel is going to continue to ignore us.

12        What I am asking for is very modest.  We asked

13 them to accept service twice.  Both those times, we also

14 asked them to meet and confer so that we can satisfy Your

15 Honor's requirement that before we file a motion to expedite

16 discovery in that adversary proceeding -- because to us, cash

17 is a melting ice cube -- they're not meeting and conferring

18 with us.  So my modest request from Your Honor is can we have

19 authority to file a motion to expedite discovery, Your Honor?

20 Your Honor will schedule it when it works for the Court.

21        But we can't sit here comfortably getting ignored

22 on the meet-and-confer requirement, and, Your Honor, of

23 course, I know you directed your comments to Mr. Korpus, but

24 we, and Mr. Pohl, of course, are going to be available to

25 talk.  All we want to do is find the money.  But we just want

1  simple authority from Your Honor that emailing these, because

2  counsel is ignoring us to satisfy our meet-and-confer

3  requirement, before we file our motion to expedite discovery,

4  the merits of which Your Honor will evaluate when you get the

5  motion.

6          THE COURT:  Is there anyone on the call from

7  Camshaft, by chance?

8          Yes, there is, Mr. Van Tol.

9          MR. VAN TOL:  Hi, Your Honor.  It's Pieter Van Tol

10 from Hogan Lovells for Camshaft.

11         The adversary complaint was just filed, Your

12 Honor.  It was just served.  So now that it's served, we

13 will, of course, engage with counsel, as is appropriate.  If

14 they have a motion to make, we will, of course, address it.

15         THE COURT:  Okay.  Mr. Finestone, has it been

16 served by serving on counsel and requesting them to accept

17 service or was it served on the registered agent or how was

18 the service completed?

19         MR. FINESTONE:  Your Honor, I actually don't know

20 whether we -- yeah, we asked counsel to accept.  They haven't

21 accepted.  Maybe Mr. Van Tol just accepted.

22         I did not rise prepared to tell Your Honor that we

23 satisfied a (indiscernible) for service in view of their lack

24 of agreement.  All I rose for was to see if I can file this

25 motion to expedite discovery, Your Honor.

1        So, Mr. Van Tol, we'll meet and confer with you

2   immediately both, on service and the meet-and-confer

3   requirement.

4        MR. VAN TOL:  Thank you, Your Honor.

5        THE COURT:  All right.  Mr. Van Tol, are you

6   accepting service on behalf of your clients?

7        MR. VAN TOL:  I believe it's already been served,

8   Your Honor, through some corporate meeting, so I don't know

9   if that's necessary, but I will double-check that.

10       THE COURT:  Okay.  Then I would direct the parties

11  to meet and confer and talk about the discovery issues in

12  advance of the final hearing.

13       MR. VAN TOL:  Thank you, Your Honor.

14       THE COURT:  Okay.  All right.

15       Anything else for today?

16       MR. ENOS:  Yes, Your Honor, just one

17  administrative item.  We need to schedule a final

18  hearing/second day hearing.

19       THE COURT:  I'm going to ask you to contact

20  chambers to do that so that I don't mess up the calendar.

21       MR. ENOS:  Absolutely, Your Honor.

22       THE COURT:  It's been known to happen.

23       (Laughter)

24       THE COURT:  All right.  Anything else for today?

25       (No verbal response)

1          THE COURT:  Okay.  Thank you all very much.  I

2   appreciate it.  I will see everybody when we get around to

3   the second day hearing.

4          MR. ENOS:  Thank you, Judge.

5          THE COURT:  Okay.  Thank you.

6          We're adjourned.

7          COUNSEL:  Thank you, Your Honor.

8      (Proceedings concluded at 4:06 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of our

5      knowledge and ability.

6

7      /s/ William J. Garling                    February 6, 2024

8      William J. Garling, CET-543

9      Certified Court Transcriptionist

10     For Reliable

11

12     /s/ Mary Zajaczkowski                     February 6, 2024

13     Mary Zajaczkowski, CET-531

14     Certified Court Transcriptionist

15     For Reliable

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 30

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 24-10140 (JTD)
 4   BYJU'S ALPHA, INC.,           .
                                   .
 5            Debtor.             .
     . . . . . . . . . . . . . .   .
 6                                 .
     BYJU'S ALPHA, INC.,           .
 7                                 .
             Plaintiff,            .  Adv. Pro. No. 24-50013 (JTD)
 8                                 .
        v.                         .
 9                                 .
     CAMSHAFT CAPITAL FUND, LP     .
10   CAMSHAFT CAPITAL ADVISORS,    .  Courtroom No. 5
     LLC, AND CAMSHAFT CAPITAL     .  824 North King Street
11   MANAGEMENT, LLC,              .  Wilmington, Delaware 19801
                                   .  Friday February 16, 2024
12          Defendant.             .  2:09 p.m.
     . . . . . . . . . . . . . .   .
13
                          TRANSCRIPT OF HEARING
14             BEFORE THE HONORABLE JOHN T. DORSEY
                  UNITED STATES BANKRUPTCY JUDGE
15
     APPEARANCES:
16

17   For the Debtor:         Kenneth Enos, Esquire
                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                             1000 North King Street
18                           Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Audio Operator:         Sharon A. Page, ECRO

21   Transcription Company:  Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtor:              Benjamin Finestone, Esquire
                            QUINN EMANUEL URQUHART
                               & SULLIVAN LLP
                            51 Madison Avenue
                            22nd Floor
                            New York, New York 10010

For GLAS Trust
Company LLC:                Brian Schartz, Esquire
                            KIRKLAND & ELLIS LLP
                            609 Main Street
                            Houston, Texas 77002

For Camshaft:               Pieter Van Tol, Esquire
                            HOGAN LOVELLS US LLP
                            390 Madison Avenue
                            New York, New York 10017

For Tangible Play,
Inc.:                       Joseph Cicero, Esquire
                            CHIPMAN BROWN CICERO & COLE, LLP
                            1313 North Market Street
                            Suite 5400
                            Wilmington, Delaware 19801

3

1                                INDEX

2    MOTIONS:                                            PAGE

3    Agenda
     Item 1:  Emergency Motion of Debtor for Limited        4
4             Expedited Discovery or, Alternatively,
              for an Order Pursuant to Bankruptcy Rule
5             2004 Authorizing Examination
              [D.I. 58/A.D.I 7, 2/9/24]
6
              Court's Ruling:                               34
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          (Proceedings commenced at 2:09 p.m.)

3          (Call to Order of the Court)

4          THE COURT:  Please be seated.  Mr. Enos, no need

to reintroduce Mr. Finestone. We can just jump right to Mr.

5   Finestone.

6          MR. ENOS:  Thank you, Your Honor.  With the

7   Court's permission I will cede the podium to Mr. Finestone.

8          MR. FINESTONE:  Good afternoon, Your Honor.  Ben

9   Finestone from Quinn Emanuel, proposed counsel to the

10  debtors-in-possession.

11         Your Honor, we are here today with respect to the

12  debtor's motion to expedite discovery that was filed at ECF

13  No. 7 on the adversary proceeding docket.  We also filed

14  that, Your Honor, in the main bankruptcy case in an attempt

15  to preempt any additional procedural oppositions that may

16  come our way.

17         Your Honor, I guess what I would like to do is

18  just start off by clarifying that in our view we are asking

19  for very modest relief.  What we have asked for the Court to

20  grant us authority to do is to issue six document requests to

21  the Camshaft defendants, eight interrogatories to the

22  Camshaft defendants, and across all 14 of those discovery

23  requests, Your Honor, it's safe to say they concern one

24  thing; they concern the transfer of $533 million of the

25  debtor's funds.  We have also asked Your Honor to issue six

1  very, very similar interrogatories to the debtor's former

2  officer and director, Mr. Ravindran, who we know because he

3  was the only employee of the debtor who was responsible for

4  the transfer.

5        Your Honor, I guess what I would like to present

6  today is four potential grounds for cause that can form the

7  basis for Your Honor to grant us the relief that we have

8  asked the Court to grant.

9        First, I will just sort of refer by incorporation,

10 Your Honor, the first day hearing that took place on February

11 5th we submitted for admission, and it was admitted, Mr.

12 Pohl's declaration.  Mr. Pohl's declaration goes through in

13 great detail everything that we have been able to learn about

14 this transfer and I won't take the Court through it again,

15 the Court was gracious with the Court's time on the first day

16 hearing, but I will just, at the highest of levels, summarize

17 it.

18        Mr. Pohl came into power in March 2023.  It took

19 him a while, but he discovered that this half a billion

20 dollars was gone. It took him a while, but he discovered that

21 the half a billion dollars was transferred to a hedge fund

22 called Camshaft Fund.  And then in subsequent litigation in

23 State Court we found out not only that the money was gone

24 from the debtor, but any putative argument for a replacement

25 asset, such as an interest in this Camshaft Fund, we were

1  being told the debtor doesn't even have that.  So, the $533

2  million was gone and there was nothing put back on the

3  balance sheet.  So, that is grounds one which is the

4  description around this, what we have alleged with great

5  confidence, Your Honor, to be an actual intent fraudulent

6  transfer.

7          Grounds number two, Your Honor -- as Your Honor

8  knows, pursuant to the scheduling order that the Court

9  entered this week, we have two objections filed to this

10  motion for expedited discovery: one by the Camshaft

11  defendants and one by Mr. Ravindran.  Together it is more

12  then 20 pages.  One thing that isn't referenced or isn't

13  included at all in any of those 20 pages, and I will go

14  further, Your Honor, they also filed a motion to dismiss our

15  voluntary petition last night or the night before is another

16  25 pages.

17          In those 45 pages there is no argument,

18  allegation, there is no even suggestion that this transfer

19  was done without an actual intent to hinder, delay, defraud

20  our lenders and maybe that would be tough for them to do

21  because, as Your Honor may remember from the first day

22  declaration, our former director and officer stated that the

23  money was somewhere where our lenders would never find it.

24          I don't care about the lenders, Your Honor.  I

25  care about my estate and I care about the debtor.  That is

1    now -- the money is somewhere where he doesn't think I am

2    ever now going to find it on behalf of the estate.

3          So, no substantive response and not just on actual

4    intent, Your Honor, no response or suggestion of reasonably

5    equivalent value.  Forget reasonably equivalent value, forget

6    fair consideration, they don't even say, well, you got a

7    peppercorn of consideration in exchange.  So, lots of

8    opportunities to say this wasn't a fraudulent transfer and

9    instead this whole bankruptcy case was a bad faith filing.

10          Ground three, Your Honor, and we made this point

11    in the reply that we filed yesterday, but I would just like

12    to put a little nuance on it.  We said, Your Honor, that in

13    these opposition papers they advanced reasons why we

14    shouldn't get the expedited discovery, but they didn't answer

15    the question of where the funds are.  They certainly could

16    have, Your Honor.  There could have been a hypothetical

17    opposition that was filed that said: YOur Honor, this isn't a

18    fraudulent transfer as alleged, we have defenses to the

19    fraudulent transfer, or there was good cause for why Mr.

20    Ravindran, the prior officer and director, transferred the

21    money, we are going to assert those defenses.  They certainly

22    know that this Court is going to give them an opportunity to

23    present their defenses.

24          They could have said that and at the same time

25    said, but the cash that we transferred is in Florida, its in

1  a Camshaft Fund, or it's in an account in Delaware, or its

2  somewhere safe.  They dodged that question entirely.  My

3  point is they certainly could have said this is where the

4  cash is while retaining all of the defenses on the merits.

5  The location of the cash should have been a non-controversial

6  point. It's an addition reason for concern for the debtor.

7        Just to drill down on it a little bit, I guess

8  with more precision, there are two defendants over there --

9  two objectors, Your Honor.  I guess we are not surprised that

10 Mr. Ravindran didn't want to tell us where the cash is.  He

11 is, after all, the person who transferred the cash away and

12 we suspect that the money is in the power of the Ravindran

13 enterprise.  So, him hiding it maybe we weren't surprised.

14       The Camshaft Funds, which were the funds that

15 received this cash, at least, as an initial matter, they

16 should really have no dog in this fight, Your Honor.  They

17 shouldn't care who has the claim against Camshaft for that

18 cash. I would have expected them to respond and say, yes, we

19 do have the cash, we will hold it pending Judge Dorsey's

20 ruling, or, yes, we do have the cash -- or we don't have the

21 cash anymore because someone took it away from us.  Either

22 way we are just a conduit or we have no dog in this fight.

23       Instead, what we see is them responding also and

24 they didn't shed so much as a clue.  So, our inference from

25 that, which at least from the debtor's perspective we believe

1  to be inescapable, Your Honor, is these are two parties

2  working on concert with each other.  From our perspective

3  they're hiding the debtor's cash and that is grounds three

4  for expedited discovery, Your Honor.  We said in our papers

5  it's a non-controversial point, but I will just say it one

6  more time: concealment of transferred funds is one of the

7  more compelling badges of fraud when it comes to actual

8  fraudulent transfers, Your Honor.

9          Fourth potential basis, and I am not going to

10  spend any time on it because I don't think I need to, we

11  reference it in our papers, but fourth potential grounds,

12  Your Honor, for the motion I will just say that their refusal

13  to meet and confer, after the Court suggested a meet and

14  confer, its -- obviously, the Court knows whether that was an

15  instruction, a direction, or an order, but it was at a

16  minimum a suggestion. Their refusal to meet and confer and

17  the refusal to shed any light on the location of the cash, I

18  think, independent of everything else stands and compromises

19  grounds to grant our motion for expedited discovery.

20          Your Honor, I will just -- I think I would like to

21  just request the opportunity to respond to some arguments

22  after their made.  They filed a motion to dismiss the Chapter

23  11 case.  The mere filing of a dispositive motion really,

24  most Courts have decided, should have no impact on whether

25  discovery should be stayed, whether discovery should be

1 expedited.  The mere filing of a motion is just that, it's
2 the mere filing of a motion.

3         I will just say that like if the Court is going to
4 break from that tradition it shouldn't be this motion that
5 would cause the Court to break from that tradition.  This
6 motion, Your Honor, questioning whether this filing is value
7 maximizing we have a tough time accepting that motion as
8 having any merit whatsoever.  We have no assets, Your Honor,
9 no material assets relative to our $1.4 billion.  The reason
10 we have no assets is because of our former director and
11 officer; the same party who has filed the motion to dismiss
12 the bankruptcy case.

13         We filed this case in the first instance to avail
14 ourself of Chapter 5 cause of action. It is our job, as
15 fiduciaries for the estate, to recover this money for the
16 estate.  We are not recovering it for the benefit of any
17 subset of lenders.  We are not recovering it for GLAS.  We
18 are not recovering it for the 100 lenders that we have.  We
19 are not recovering it for potentially unknown, unsecured
20 creditors that we just don't know about because we haven't
21 had a full review of our books and records.

22         We are seeking to recover that money, Your Honor,
23 for the benefit of this Chapter 11 estate and Your Honor
24 knows we are not going to be able to do anything with that
25 cash without Court approval. It is going to be distributed in

1  a fair and equitable way under Title VI.  So, two-party

2  dispute we have got 100 lenders that we know about.  A two-

3  party dispute we have got initial transferee and likely its

4  been represented to us there will have to be subsequent

5  transferees.  I don't see any two-party dispute here. I see

6  plain and obvious financial distress.

7          One last point, I see value maximization, Your

8  Honor. I know I'm really getting into the merits of the

9  motion that is not being presented today, so I am going to

10  cut it off after this.  In their papers they continue to

11  point to all of these motions to dismiss that they had

12  pending in the Florida State Court when the lenders were

13  pursuing avoidance of the same fraudulent transfer.  They are

14  saying those motions were so -- those motions to dismiss had

15  so much merit that we decided to file this Chapter 11 case

16  out of fear of those motions to dismiss arguments that they

17  think are dispositive.

18          Your Honor, I haven't been in the trenches on the

19  arguments that they have made in Florida because that is

20  GLAS's cause of action. It is not the estate's cause of

21  action.  But I have reviewed their papers and I have noticed

22  that basically all of them fall away.  They said the debtor

23  wasn't a party.  Well, the debtor is the plaintiff now.  They

24  said GLAS wasn't an actual creditor.  It's actually the 100

25

1  lenders.  Well, that doesn't matter anymore, Your Honor,

2  because I have standing under Chapter 5.

3       Technical argument after technical argument, none

4  of them are going to apply to this debtor-in-possession

5  pursuing the causes of action.  To bring that all together

6  for that reason alone the stronger that they think their

7  arguments were in Florida the more value maximizing this

8  Chapter 11 case will be under the auspices of this Court, the

9  U.S. Bankruptcy Court for the District of Delaware.

10       Your Honor, we ask that the order be entered so we

11  can find the location of the cash.  We really are not trying

12  to get a leg-up on federal rules of civil procedure and we

13  made sure to keep the scope to just a location of the cash.

14  We are concerned about dissipation.  We are concerned about

15  subsequent transfers and the deleterious effects it could

16  have on our estate.

17       Thank you for the opportunity to be heard, Your

18  Honor.

19       THE COURT:  Thank you.

20       MR. SCHARTZ:  Good afternoon, Your Honor.  Brian

21  Schartz with Kirkland & Ellis. I represent GLAS, the agent,

22  on the defaulted loan.

23       The agent acts on behalf of more then 100 lenders.

24  The agent takes its role very seriously.  And we are going to

25  do everything in our power to help the debtor find the $533

1  million.   Mr. Finestone is right, the debtors' perspective is

2  different then GLAS's, but we are aligned on this.   We have

3  spent more than nine months trying to find that money.   We

4  have no answer for it today.   We have learned a couple

5  things:

6          Number one, we have learned just how far that

7  folks who are represented in this room will go to conceal

8  that answer.   When Mr. Byju Ravindran told us in May of last

9  year they put the money "some place the lenders would never

10 find it" it was a clear statement of intent to conceal that

11 and they have acted accordingly.   So, no one has disputed

12 that.   It's a very interesting point that Mr. Finestone just

13 made, but we have been aware of it for a long time.

14         Second thing we have learned is that Byju

15 Ravindran, his brother Riju Ravindran, and the rest of the

16 Think & Learn corporate enterprise to which BYJU's Alpha used

17 to be a part of they have, essentially, abandoned all of

18 their obligations under the credit agreement.   So, I want to

19 unpack that for a moment because it's a complicated point

20 that comes up in all of the papers.   You are going to hear

21 more about it, but I do think there is an important takeaway

22 for today's purposes.

23         When we litigated the Delaware 225 action in

24 Delaware it was on the basis of four acknowledged events of

25 default.   The debtors, Think & Learn, had signed papers

1  saying we acknowledge these events of default.  Vice

2  Chancellor Zurn found that there was, at least, one that Mr.

3  Pohl had been appointed correctly because of that and that is

4  what would be up for appeal was it not stayed.  Again, they

5  didn't seek a stay when they lost.

6          Since then, Judge, the events of default have only

7  piled up.  So, when I was here at the first day hearing

8  virtually, I said there were 11 events of default.  By our

9  count it is pretty hard to keep count.  We think there are,

10  at least, 16 events of default outstanding with probably more

11  coming on the horizon, Judge.  And they are not immaterial.

12  When you add the whole thing up, I am not going to go through

13  every single one because it would be pretty boring and dry,

14  but they go to the heart of the lenders original decision to

15  loan money to the company.

16          Lenders don't make a loan for more then a billion

17  dollars without having protections and a credit agreement.

18  They go to payments of interest which hasn't been made in

19  quite some time, payments to amortization, same thing.

20  Quarterly calls with the management team.  Its been a long

21  time since we have had them.  Ability to inspect books and

22  records.  Ability to see financial records.  None of that has

23  happened, Judge.  And, of course, no lender would make a loan

24  unless they had that.

25

1          Think & Learn says that the lenders want to have

2    their cake and eat it too or have it both ways.  Everyone

3    followed that argument.  All the lenders and the agent want

4    is to get the benefit of the contract that was entered into

5    and to have them comply with the law.  I am focusing on this

6    because when you think about it we think it tells you

7    something very important.  What it means is that Think &

8    Learn and the Ravindran's, both brothers, they are far more

9    interested in hiding the $533 million then they are with

10   complying with the credit agreement.

11         They would rather hide the money then comply with

12   the agreement.  That is a very important proposition because

13   what it means, Judge, is pursuing the Delaware appeal,

14   pursuing modification, automatic stays, let that go forward;

15   its all a ruse, its all a red herring because if they were to

16   win the Delaware appeal, which they won't, but if they were

17   they are, by our account, at least a dozen other defaults

18   waiting for them on the other side.  The lenders are just

19   going to do the same thing they already did.

20         It's such an important point because why would

21   Think & Learn and the Ravindran's engage in such a

22   (indiscernible) strategy; well, Judge, its just time.  The

23   more time they can buy the more they can continue to hide the

24   money and keep up the charade, the longer they have the

25   debtor's money and the more they can use it; however, it is

1  that they're using it.  Hopefully it is not as improper as we

2  fear.

3          By the way, it's also the same reason that the

4  Ravindran's and Think & Learn wanted to dismiss the case

5  because if they are successful, it isn't like they are going

6  to sue themselves and bring $533 million back into BYJU's

7  Alpha.  There is going to be another default, but even if

8  they could they aren't going to do it because they are not

9  going to do anything to maximize the value of this debtor.

10          To the contrary, they want to do what every bad

11  actor insider who is worried about a claim by creditors of

12  one of the boxes for which they had a fiduciary duty, they

13  are going to do what every bad actor wants to do, they are

14  going to try and bury it.  That is why we have things in

15  bankruptcy like the ability for creditors to obtain standing

16  to bring a case.  And this is a Delaware Corp., not a

17  Delaware LLC, so we don't have that technical issue here.

18          Judge, we really want the ruse to stop today.  We

19  agree with Mr. Finestone that the relief is very narrowly

20  tailored.  We think that it's appropriate and we would ask

21  you to approve it.  Counsel for the parties are in this room,

22  they can answer these questions today.  Its been more ten

23  nine months. It's a critically important question to my

24  client and the lenders which it represents.  We stand in

25  support of the motion without qualification.

1          Thank you.

2          THE COURT:  Thank you.  Any one else in support of

3   the motion?

4      (No verbal response)

5          THE COURT:  Okay.

6          MR. VAN TOL:  Good afternoon, Your Honor.  Pieter

7   Van Tol for the adversary proceeding defendants, Camshaft.

8          I would like to go back to the standard because I

9   think this is a rare instance where the parties agree. It is

10  the good cause standard that seems to be the favored one

11  among the District Courts and Bankruptcy Courts, but if you

12  look at what that says it imports a reasonableness inquiry.

13  In turn, that means that the Court should look at whether or

14  not there are merits to the claim.

15         Expedited discovery is an extraordinary remedy.

16  We cited the <u>Techtronic</u> case and it cautioned that it should

17  be used very carefully after a look at the merits.  What is

18  interesting about Mr. Finestone's presentation, Your Honor,

19  he focused on what he called technical arguments.  What he

20  didn't happen upon was the substantive argument that was made

21  in the motion to dismiss in the Florida Court in which

22  Camshaft the credit agreement does not restrict the use of

23  the loan proceeds.

24         That, Your Honor, goes right to the merits of the

25  case. That goes right to whether or not there was a

1  fraudulent transfer simply because a hedge fund was sent

2  money.  That issue, Your Honor, was going to be decided by

3  the Florida Court and it was on the cusp of deciding that and

4  it had already denied expedited discovery and on the eve of

5  such a hearing GLAS pulled the plug.  What we haven't heard

6  from any party here today is why would they do that?

7         They had the ability, as of November 2023, to come

8  to bankruptcy court if that is where they really wanted to

9  be.  Instead, what they did is they went to a Florida Court,

10 asserted Florida claims just like they do here, didn't get

11 the result that they wanted, so they came to Your Honor.

12         THE COURT:  The action in Florida was filed before

13 the decision was made in the Chancery Court case, was it not?

14         MR. VAN TOL:  Yes, Your Honor.

15         THE COURT:  So, it was a different party, it was

16 GLAS?

17         MR. VAN TOL:  It was, Your Honor, but then they

18 had the ability as of November 2023 if they wanted to stop

19 what was going on in Florida, they could have stopped it a

20 lot earlier then they did rather than on the eve of what they

21 thought was going to be an adverse result.  So, they come to

22 Your Honor and then in their papers what they --

23         THE COURT:  I don't know if I have any evidence

24 that they thought it was going to be an adverse result.

25

1          MR. VAN TOL:  Well, Your Honor, I think the

2  chronology suggests it is.  It makes no sense for them to go

3  right up to the eve of a hearing and then pull the plug.

4  What they say in their papers is that Your Honor is a better

5  Judge, to use that word advisedly, of what Florida law is

6  then the Florida Judge.  Of course, we have full confidence

7  in whatever Your Honor decides, but its both inaccurate and

8  not really --

9          THE COURT:  Well, I am not deciding Florida law.

10  These are fraudulent transfers under the bankruptcy code.

11          MR. VAN TOL:  They are, Your Honor.  They also

12  import Florida law.  That is right in the complaint.  They

13  are making the same claim based on Florida law that they made

14  in the case before the Florida Judge.

15          THE COURT:  I do that every day in every state.

16          MR. VAN TOL:  agreed, Your Honor.  My only point

17  is there has been no showing why the Florida Court couldn't

18  do that.  So, the only conclusion one can draw is that --

19          THE COURT:  Well, the Florida Court can't apply

20  the bankruptcy code.

21          MR. VAN TOL:  I'm sorry, I didn't hear you, Your

22  Honor.

23          THE COURT:  Florida Court can't employ the

24  bankruptcy code.

25          MR. VAN TOL:  I understand, Your Honor.

1          THE COURT:  So, they got two causes of action.

2 One under the bankruptcy code and one under the Florida code.

3          MR. VAN TOL:  Yes, Your Honor.  Obviously, and you

4 know this more then I do, there is a dovetail and overlap on

5 the elements of actual and constructive fraudulent transfer.

6 We would make the same arguments on the merits here that we

7 were making in the Florida case.

8          So, what we are asking for, Your Honor, is not

9 anything extraordinary.  We are ready to file a motion to

10 dismiss.  It will be similar to the one that has been filed.

11 We will also add our other claims.  All we are asking is that

12 Your Honor take a look at the merits before you decide

13 whether or not there should be expedited discovery rather

14 than the other way around.  It will be a much more informed

15 decision that Your Honor makes once you see what the law is

16 as opposed to counsel's arguments about what they think the

17 law is.

18          So, for that reason, Your Honor, we would submit

19 that good cause has not been shown and all we are asking,

20 Your Honor, is a time, not a lot of time, to simply get our

21 motion to dismiss on record, have it decided and then the

22 Court can see where things lie on discovery.

23          THE COURT:  All right. Thank you.

24          MR. VAN TOL:  Thank you, Your Honor.

25          MR. CICERO:  Good afternoon, Your Honor, Joe

1  Cicero from Chipman Brown.  Thank you for hearing me today,

2  may it please the Court.

3          I won't belabor what's in our papers, I will just

4  highlight that we're here to object on Mr. Ravindran's behalf

5  on the discovery that's proposed to be propounded against him

6  in this adversary proceeding, we think for a couple reasons.

7  One, we filed a motion to dismiss, which will be heard in 25

8  days before Your Honor.  We believe that under that time

9  frame there's no reason to have discovery before Your Honor

10 hears that, it's a pretty short time frame, and I won't

11 belabor the reasons for that.

12          The other one is -- it's sort of an awkward

13 procedural scenario that we're in for Mr. Ravindran.  The

14 proposed requests were awkward and unorthodox, they appear to

15 be under Rule 33, they also -- and it's and/or Rule 2004, and

16 it's in the adversary caption.  So Mr. Ravindran is not a

17 party, we've appeared here to object, just like anyone would

18 object to quash a subpoena who's a nonparty, but we don't see

19 how a Rule 2004 examination can be awarded based upon what we

20 put in our papers, which is there's a pending proceeding in

21 the adversary proceeding that we're here today on and that

22 would be skirting that.

23          And in the adversary proceeding itself, Mr.

24 Ravindran is not a party and certainly, if they wanted to

25 serve subpoenas, they could do that, but what they can't do

1 under the Rules of Federal Procedure as adopted by the

2 Bankruptcy Rules is serve interrogatories on a nonparty, and

3 that's what they've done.  You've heard it today, they asked

4 for a handful of interrogatories.  If you look at the

5 proposed discovery requests, they are interrogatories, and

6 they don't reference Rule 45.  Rule 45 does not give one the

7 ability to propound interrogatories, nor, do I submit, Rule

8 2004 allows that.  Rule 2004 allows for documents and for an

9 examination, which I believe is sort of similar to a

10 deposition.

11        So, for that reason, you know, we think it should

12 be stayed because of the motion to dismiss, but we also think

13 that it's procedurally improper and, as set forth in the

14 papers, Rule 2004 doesn't work.

15        I want to give a little bit of some background

16 points.  I don't want to go back and forth on the merits; I

17 think this is the wrong place for that.  It's a motion to

18 accelerate discovery, it's not any other hearing.  So the

19 fact, if we remain silent on a particular fact, we're not

20 conceding that, as Your Honor knows.  And so the aspersions

21 that we remain silent leads one to believe that we agree with

22 it is certainly not the case.

23        The debtor, as you know, was never an operating

24 company.  I think it was solely to serve as a borrower under

25 the credit agreement.  GLAS and Mr. Pohl's complaint in the

1  Court of Chancery action specifically states that.  They

2  state, "BYJU's Alpha's is a special financing vehicle that

3  has no active business operations."  The only creditors are

4  the lenders that are within the purview of the GLAS agency

5  relationship.

6          THE COURT:  We don't know that because they

7  haven't been given the business records.

8          MR. CICERO:  They've been given the business

9  records.  In the 225 action, we gave the business records.

10 They're just sparse because it was a special purpose

11 financing vehicle.  They have lenders and that's it, and the

12 lenders are all one party.

13         THE COURT:  They're still creditors.

14         MR. CICERO:  Pardon me?

15         THE COURT:  Lenders are still creditors.

16         MR. CICERO:  Sure, they're creditors, but they

17 can't act alone under their current arrangement.  There's a

18 steering committee that controls the lenders and they can act

19 as one voice, and GLAS is the agent for them.

20         So, really, you're talking about a conglomerate

21 being -- it's one party, it's 100 lenders within the auspices

22 of GLAS.  And then Mr. Pohl, who was appointed by GLAS, and

23 Mr. Pohl, at his deposition in the Court of Chancery action,

24 admitted that he takes instruction from GLAS.  I took his

25 deposition.

1          These are the things that you would learn when we

2     have this motion to dismiss hearing and I'm just highlighting

3     some counterpoints to the narrative.  This was really a

4     nonpayment default and, under New York law, we believe it

5     would have been characterized as technical defaults that

6     would not accelerate a loan like this, and they avoided New

7     York like the plague.  They came to Delaware in one of the

8     most unorthodox 225 actions I've ever seen, I don't think

9     it's ever been done.  They came as lenders to enforce their

10    rights as lenders under a corporate governance procedure that

11    allows one to take control of the board, which they did, and

12    the Court said that they were able to do that, but it was

13    very unorthodox.  What they were really focused on during

14    that proceeding was finding out where the money is, and the

15    Court said that's not relevant.

16         As you noted, even before the decision, they filed

17    in Florida.  They had learned somehow that Camshaft had the

18    money.  I'm not involved in the Florida action, I don't know

19    what's happening there, but they certainly knew in September

20    before the ruling came down, so they had plenty of time.  And

21    what they learned, at least according to their complaint, is

22    that that money was transferred in 2002, so well before the

23    actions happened --

24         THE COURT:  2002?

25         MR. CICERO:  '22, sorry.

1          THE COURT:  Twenty two years ago?

2      (Laughter)

3          MR. CICERO:  I misspoke.  2022, not '23, and, you

4   know, I'm going back to college on that one.

5          So it was purportedly transferred well before even

6   the remedial measures taken that caused the Chancery action,

7   Your Honor.  They waited at every instance; they waited two

8   months to file the Chancery action, they waited two months to

9   file this action from the ruling from Vice Chancellor Zurn.

10  So they're not really acting with alacrity and what they're

11  asking for is expedited discovery.  And, as I said, in 25

12  days you will hear the motion to dismiss, you will decide

13  that as you may, but it certainly doesn't make sense to

14  accelerate discovery.

15          I will submit that what they really want is the

16  answer.  They care less about this bankruptcy than they do

17  about that answer.  So that's why they're doing this.  They

18  know that, if the motion to dismiss comes and goes, you might

19  rule in our favor; you might not, but if you do, they don't

20  get the answer to that question and that's why they're here

21  on this expedited motion.

22          As I said, I can't speak for Camshaft, but with

23  respect to Mr. Ravindran, I don't think there's a mechanism

24  -- you can't use -- I don't think you can use 2004 and there

25  would need to be nonparty discovery.  We did not appear as a

1  party.  There was a strange -- bear with me one second --

2  there was a strange notation in the reply that seemed to

3  concede that Rule 2004 doesn't apply.  It was at page 16, it

4  said "solely in the alternative," the Rule 2004 request was

5  solely an alternative to its request that expedited discovery

6  be granted in the adversary proceeding.  Now that Ravindran

7  has appeared in the adversary proceeding and advanced no

8  procedural objection to the requested discovery proceeding in

9  the adversary proceeding, the debtors' request under Rule

10 2004 is moot.  And then they put a footnote that notes that

11 we've waived our objections to the non-Rule 2004 discovery,

12 and they quote from the notice of this hearing saying that,

13 if you don't object, you've waived all rights to the relief

14 sought.

15         Your Honor, as you know, the relief sought is to

16 expedite the discovery, it's not for you to compel answers to

17 discovery.  So we certainly had not waived our procedural

18 objections.  We are objecting to the expedition of this case

19 -- or this discovery and to stay discovery, we weren't

20 talking about the procedural aspects.  I raised them today to

21 put it on the record.  If Your Honor does rule to expedite,

22 which we believe you shouldn't, we can lodge our objections

23 and we can proceed in the normal course.

24         THE COURT:  Let me ask you a question.

25         MR. CICERO:  You may.

1          THE COURT:  Did the company in the Court of

2   Chancery action admit that they were for nonpayment defaults?

3          MR. CICERO:  No, that's a big point of contention.

4   What they're taking is a defined term, and I believe it was

5   stipulate -- no, I forget what it was -- it was like --

6          UNIDENTIFIED SPEAKER:  Specified default.

7          MR. CICERO:  -- specified default -- thank you

8   very much -- in the forbearance agreements when they were

9   working through extensions and amendments to the credit

10  agreement, they used the phrase specified default.  It was

11  just a defined term to use within that document.  Nothing, we

12  would submit, in that document -- we've argued this before

13  with the Court of Chancery and we've also argued it on appeal

14  to the Supreme Court in our opening brief -- nothing in there

15  actually says we agree and concede and acknowledge that this

16  is a default.  That's our position; that was our position

17  with the Court of Chancery and in the Supreme Court.

18          THE COURT:  All right.  So my other question is, I

19  don't understand why your clients and the Camshaft parties,

20  if everything was on the up-and-up, if there's no fraudulent

21  conveyances here, why not just tell them where the money is?

22          MR. CICERO:  I understand that, Your Honor.  This

23  is a weird situation in the sense that the tactics that have

24  been employed by GLAS have been very Draconian.  The lenders

25  have already shown that they are determined to be as

1  aggressive as possible and will stop at nothing.  When is the

2  -- I would just put it this way, when is the last time you've

3  seen an acceleration while the borrower is paying all

4  amounts, and when did you see a 225 action that was brought

5  when there was no lawsuit on a default.

6          They've never even -- I think Judge Rievel (ph)

7  said it right, if you read his transcript when he vacated the

8  motion to expedite, he was perplexed as to why GLAS never

9  sued on the note.  They've never once filed a lawsuit to

10  collect on the note to claim that there was a default.  What

11  they did, they did an end-run with Section 225, which is

12  unorthodox, as I said.

13          So this is all unprecedented.  They've used the

14  press and they've cut off the oxygen of the company and, as

15  noted at the first day hearing, the value has plummeted.

16  That's because of the action of the lenders, Your Honor, and

17  that's why my clients are concerned about them learning about

18  where the valuable assets are that are allowed to be moved to

19  other BYJU's entities where they because they know that

20  they've employed these ultra-aggressive tactics that we

21  believe are unlawful, and we have a multiple series of

22  lawsuits and appeals that have now been stayed where we're

23  trying to vindicate their rights.  That's the answer, Your

24  Honor.

25          THE COURT:  Well, it's all before me now.  So

1  you're not really answering for -- to my satisfaction why you

2  can't just tell them where the money is because, if you do, I

3  mean, they can't take any action without coming to me first,

4  and this all goes away.

5          MR. CICERO:  I understand the question.  First and

6  foremost, I don't --

7          THE COURT:  It leads me to believe that there's

8  something wrong going on here.  If your client is not even

9  willing to say where the money is, that's a problem, I have a

10 problem with that.

11         MR. CICERO:  I understand your position, Your

12 Honor, but I certainly can't tell them where the money is

13 because I don't personally know where the money is.

14         THE COURT:  Well, your client does.

15         MR. CICERO:  Well, they noted that counsel today

16 could tell you --

17         THE COURT:  Camshaft certainly does, they know

18 where they transferred it to.

19         MR. CICERO:  Camshaft may know more than my

20 client.  I don't know what they know, standing here today,

21 and it certainly isn't fair to say in papers that counsel

22 could stand in this courtroom and tell you where the money

23 is, and that's what they've done multiple times.

24         THE COURT:  Well, I mean, you can ask your client,

25 you've chosen --

1          MR. CICERO:  And I didn't say I -- and --

2          THE COURT:  -- you've chosen not to ask your

3   client.

4          MR. CICERO:  -- and I can't say -- well, you

5   should assume that I've asked my client and had conversations

6   with my client about this matter, but I'm not allowed to

7   reveal what those contents of those discussions were at this

8   time.  But I gave you my position; I don't have any better

9   answer for Your Honor.

10          THE COURT:  All right.

11          MR. CICERO:  Thank you.

12          THE COURT:  Okay, anyone else on this side?

13          All right, back over here.

14          MR. FINESTONE:  Just briefly, Your Honor.  Ben

15   Finestone, proposed counsel for the debtor-in-possession.

16          Your Honor was exactly right, the cause of action

17   that we're asserting is pursuant to Section 548 of the

18   Bankruptcy Code.  We also have a Section 544 code, which is

19   technically a federal count as well.  So Your Honor was

20   right, we have both of those.  The lenders, they didn't have

21   either of those.  They didn't have Section 548, they didn't

22   have Section 550, and, more importantly, when they were

23   pursuing that cause of action it was for their own benefit

24   and nobody else's benefits.  As I said before, Your Honor,

25   we're pursuing the action for the entire estate.

1            The first thing that counsel said when they took

2    the podium, Your Honor, they said we -- that I omitted one of

3    the arguments made in their motion to dismiss in the Florida

4    court, and the argument that I omitted was that they were

5    also asking that Florida court to rule that there were no

6    defaults under the credit agreement, which I guess would cut

7    down the standing of the plaintiff GLAS.  I didn't intend to

8    omit that and actually I did reference it in the papers that

9    I filed.  But to the extent I did omit it today it was for a

10   good reason, because my estate doesn't care about whether

11   there were defaults when the assets were transferred.  Maybe

12   it's a data point, Your Honor, but -- and, actually, it's a

13   data point that's been ruled in our favor by Vice Chancellor

14   Zurn.

15           But even putting all of that aside, under 548, the

16   issues are was I insolvent and did I get anything back -- I

17   was and I didn't -- or was it done with actual intent.

18   Counsel said that I stood up here and I was silent about --

19   or that Your Honor shouldn't take inferences about their

20   silence, silence on the merits, and I think that's a fair

21   thing to say, Your Honor, except for the fact that we're not

22   just dealing with silence, we're dealing with a statement, an

23   admissible statement, an exception to hearsay by Riju

24   Ravindran himself who said he put the money someplace where

25   the lenders will never find it, that sounds pretty close to

1   what 548 actual intent, fraudulent transfer, is looking for.

2           So we're not just talking about their silence,

3   we're talking about what they did say and what would be

4   admissible, and what also has been admitted in the Tim Pohl

5   declaration, Your Honor.  The hundred lenders, each one of

6   them has 1109(b) standing in this bankruptcy case and each

7   one of them will have the ability to vote on a plan under

8   Section 1126.  So they stand -- the statement that they are

9   bound to speak through some steering committee, one, I don't

10  think Counsel has any insight, I don't have any insight into

11  what internal regulations or rules that those lenders have

12  made for themselves, but the Bankruptcy Code doesn't limit

13  them that way.

14          I disagree with Counsel.  I won't get into a tit-

15  for-tat on it, Your Honor, but we disagree completely that we

16  have all the books and records; it's not our position, it's

17  not what we understand to be the case, Your Honor.  So there

18  certainly could be other creditors and we'll see as the

19  proofs of claim come into this case, another benefit of the

20  Chapter 11 case.

21          Your Honor, finally, again, I said I don't care

22  about the defaults, and I mentioned it to Your Honor at the

23  first day, there have been a year of payment defaults since

24  the three defaults that Vice Chancellor Zurn didn't have to

25  rule on and since the one default that Vice Chancellor Zurn

1  did endorse, there's been a year of payment defaults.  So, to

2  the extent that matters -- I said it doesn't matter much to

3  me as debtor-in-possession because my filing in your Court

4  accelerated all the loans, but to the extent that matters,

5  there's defaults in this case.

6          And finally, Your Honor, this is exactly why I

7  made that Rule 2004 argument, Your Honor, because I didn't

8  want to be dealt with this shell game, I guess is the way to

9  put it.  He filed his objection in the adversary proceeding,

10 I didn't see any objection to him saying that he would be

11 subject to discovery in the adversary proceeding, but I knew

12 that if he was going to make that argument, then I would ask

13 Your Honor to give me the release -- this is the relief for

14 Mr. Ravindran and under Rule 2004, we cited a case that says

15 the pending proceeding rule is discretionary, Your Honor.  I

16 acknowledge that it's a rule that most Bankruptcy Courts look

17 to in the first instance, but in a case like this where

18 they're refusing to identify the location of the cash, where

19 they've appeared in the adversary proceeding, where they're

20 clearly acting in concert with the defendant to the adversary

21 proceeding, I don't think they should be able to argue the

22 pending proceeding rule.

23          So it's Rule 2004 or it's Federal Rules of Civil

24 Procedure, we'd just like to serve the six interrogatories on

25 Mr. Ravindran and as well as Camshaft because -- speculation,

1  and then I'll sit down -- the idea that Mr. Ravindran doesn't

2  know where the cash is, I think that's frivolous and we all

3  know that's not true.  The idea -- Camshaft may not know,

4  Camshaft was the IHOP hedge fund, they were probably used --

5  the money was probably put in them and taken out of them.

6  They're probably not paying for counsel; if they're paying

7  for counsel, it's with the estate's money, Your Honor.  So

8  it's Mr. Ravindran that knows the answer.

9          And so, with that, Your Honor, I ask for the

10 relief.

11         THE COURT:  Well, Mr. Cicero made the point, and I

12 think it's a good one, that Mr. Ravindran is not a party to

13 the adversary proceeding.  So, if you're going to take

14 discovery of him, it has to be by subpoena, you can't do it

15 by Rule 33.

16         MR. FINESTONE:  Acknowledged, Your Honor.  Our

17 response to that for Mr. Ravindran is what I said before,

18 which is why we've asked, alternatively, for the authority to

19 issue that subpoena pursuant to Rule 2004.

20         THE COURT:  Okay.  All right.

21         Well, this is obviously a highly unusual

22 situation.  I do have serious concerns about the location of

23 the funds and why it hasn't been disclosed, and it leads me

24 to have serious concerns that there's something happening

25 that shouldn't be happening.  The debtors are now before me,

1  I have a Court of Chancery ruling that says that Mr. Pohl

2  controls the debtors, and he is the one who's prosecuting

3  this case.  The fact that parties may seek to dismiss the

4  bankruptcy case or seek to dismiss the adversary proceeding,

5  or both, is not dispositive of whether or not I can allow

6  discovery to go forward and, given the concerns that I have,

7  I'm going to allow that discovery to go forward, as requested

8  by the debtors, on an expedited basis.

9         If there's nothing wrong here, that's going to

10 help resolve the issues.  If there is something wrong, then

11 we're going to see where we're going and we'll have an idea

12 of what this case is all about.  So there's no reason not to

13 produce it.

14        The other factor that gives me pause is the fact

15 that the debtor -- well, before they were the debtor, before

16 Mr. Pohl took over -- apparently transferred $533 million to

17 a hedge fund operating out of an IHOP in Georgia, and then

18 that money all of a sudden disappears and nobody wants to

19 tell me where it is.  I've got a problem with that.

20        So that's why I'm going to expedite the discovery

21 in this case.  I'll deal with the motions to dismiss in due

22 course as they come up.

23        The other issue is the -- and I'm going to raise

24 now so the parties can talk about it -- is the appeal.  The

25 Rooker-Feldman doctrine would preclude me from doing anything

1  with regard to that Court of Chancery order; I can't reverse

2  it, I can't change it, I can't uphold it, that's not -- you

3  know, Rooker-Feldman would prevent me from doing that.  So my

4  inclination would be -- and I want the parties to talk about

5  this -- is to lift the stay to allow that appeal to go

6  forward, so that issue can be resolved because it has to be

7  resolved.  And if the answer is, well, that's all well and

8  good, but there's still a number of other defaults, well,

9  we'll deal with that when we get there, but we're not there

10  yet.

11         So I want the parties to meet and confer on the

12  discovery issues, I'm going to order it this time.  The last

13  time I didn't order it, I made a suggestion.  I'm going to

14  order the parties to meet and confer about the discovery, and

15  I'm going to order the parties to meet and confer about

16  lifting the stay to allow the Supreme Court, the Delaware

17  Supreme Court appeal to go forward.

18         Any questions?  Did I miss anything or are there

19  any questions?

20         MR. FINESTONE:  Thank you, Your Honor.  I don't --

21  I'm not able to suggest that Your Honor -- I'm not sure that

22  Your Honor missed anything, but I will at least just call

23  out, we had a proposed order attached to the motion and we'd

24  ask the Court to enter that order.

25         THE COURT:  I think we've got to get a date in

1  there.  There were missing dates on it, I think.  So you're

2  going to have put dates in and then -- get a date from

3  chambers and then -- I think there was a 14-day --

4          MR. FINESTONE:  Status conference.

5          THE COURT:  -- I don't know if we'll be able to

6  make --

7          MR. FINESTONE:  Yeah.

8          THE COURT:  -- it might be 13, it might be 15.

9  We'll have to figure out dates, so you'll have to contact

10  chambers for that.

11          For Mr. Ravindran, you're going to have to proceed

12  by subpoena rather than the interrogatories.  And, as Mr.

13  Cicero pointed out, Rule 45 only governs production of

14  documents, not -- but Rule 2004 does allow for an

15  examination, but I didn't see where you asked for an

16  examination of Mr. Ravindran.

17          MR. FINESTONE:  No, Your Honor, we limited it to

18  interrogatories.  So let us revise the proposed order, we'll

19  speak to chambers about a date.  We'll met and confer with

20  them on the Ravindran issue, but otherwise, I guess, we're

21  authorized to issue a subpoena to Mr. Ravindran.

22          THE COURT:  Yes, you're authorized to issue the

23  subpoena.

24          MR. FINESTONE:  Yeah.

25          THE COURT:  I'll give Mr. Cicero, though, the

1  opportunity to raise an objection to it, if he chooses to do

2  so.

3          MR. FINESTONE:  Okay.

4          THE COURT:  But as you would under Rule 45,

5  governed by Rule 45, but we'll deal with it on an expedited

6  basis as well.

7          MR. FINESTONE:  Thank you, Your Honor.  And then

8  we acknowledge and accept the direction to meet and confer on

9  the stay relief.  Another just call-out, on the motion to

10  dismiss the Chapter 11 case that they filed, the second half

11  of that brief is a request to lift the stay.  And we will

12  meet and confer with them on that and we will take Your

13  Honor's comments in consideration.  And it may be that when

14  we respond to the papers that -- I guess all I'm saying is,

15  it's already been submitted to the Court, the request to lift

16  the stay, and we'll met and confer with them.

17          THE COURT:  Yeah, I think they're request was in

18  the alternative.  So, if you agree to allow the stay to be

19  lifted, that might resolve the motion completely, I don't

20  know, but we'll see.

21          MR. FINESTONE:  Thank you, Your Honor.

22          THE COURT:  Mr. Van Tol?

23          MR. VAN TOL:  Thank you, Your Honor, just one

24  thing briefly.  On the expedited discovery, I believe the

25  proposed order was five calendar days.  If we could ask for

1  five business days, just because of the coming holiday, which

2  I think would be next Friday.

3          MR. FINESTONE:  Well, it's -- this is your Court,

4  Your Honor, but our response to that is, I want Mr.

5  Ravindran's counsel to stand up here and say the money is not

6  going anywhere in the extra two days.  We made a decision to

7  ask for five calendar days, we thought it would have been too

8  aggressive to ask for more, Your Honor, but the money could

9  be moving today, Your Honor.  So, if they can give us some

10 comfort, then we -- and he's looking for a stipulation, then

11 we can wheel-and-deal; if not, we'll stick with our request

12 to the Court.

13         THE COURT:  Five calendar days would put us on the

14 23rd -- no, one, two three -- it would put us next Wednesday,

15 the 21st.  I mean, money moves quickly, they can move it, you

16 know, right after this hearing they could move it.  So I'm

17 going to give you five business days to -- so change the

18 order for that date.  So it will be next Friday, the 23rd.

19         MR. FINESTONE:  Thank you, Your Honor.

20         MR. CICERO:  Just one clarification, Your Honor --

21 thank you and I think I understand the ruling on the subpoena

22 part, but I'm not sure if I understood whether there's a Rule

23 2004 request granting or not.

24         THE COURT:  Yes, I'm granting --

25         MR. CICERO:  Okay.

1                 THE COURT:  -- your 2004 request to issue the

2      subpoena, but you'll still have the opportunity to object to

3      the subpoena, but I want that done on an expedited basis.  I

4      don't want you to wait a month --

5                 MR. CICERO:  Understood.

6                 THE COURT:  -- to file an objection.  I expect an

7      objection within a day or two after the subpoena is issued,

8      if you have an objection.

9                 MR. CICERO:  Thank you.

10                 THE COURT:  And we'll deal with it on an expedited

11     basis after that.

12                 MR. CICERO:  I appreciate that.  Thank you.

13                 THE COURT:  All right, anything else?

14          (No verbal response)

15                 THE COURT:  Okay.  Thank you all very much.  We

16     are adjourned.

17                 COUNSEL:  Thank you, Your Honor.

18          (Proceedings concluded at 2:57 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                  February 16, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                   February 16, 2024

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 31

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CASE NO.: 2023-022640-CA-01 (43)**

GLAS TRUST COMPANY LLC, in its capacity as
Administrative Agent and Collateral Agent,

   Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT
CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL
MANAGEMENT, LLC, and JOHN DOE,

   Defendants.

_____/

## JOINT INITIAL CASE MANAGEMENT CONFERENCE REPORT

In conformity with Florida Rule of Civil Procedure 1.201(b) and this Court's Order dated
September 11, 2023 setting an Initial Case Management Conference, Plaintiff GLAS Trust
Company, LLC ("GLAS") and Defendants Camshaft Capital Fund, LP, Camshaft Capital
Advisors, LLC, and Camshaft Capital Management, LLC (collectively, "Camshaft," and, together
with GLAS, the "Parties") submit this Joint Initial Case Management Conference Report, and state
as follows.

**A. Brief factual statement of the action, which includes the claims and defenses.**

<u>Plaintiff's Position</u>

This action arises from GLAS's efforts to expeditiously recover over half a billion dollars
in fraudulently-transferred funds from their recipients, the three Camshaft Defendants and the yet-
to-be-identified John Doe Defendant(s).   As set forth in GLAS's Complaint, shortly after
defaulting on over $1 billion in loans (which remains due and outstanding today), the borrower
BYJU's Alpha ("Borrower") made five transfers totaling $533 million—over 80% of its assets—

1

to Camshaft.  Camshaft is a high-risk and unknown hedge fund founded in 2020 by William C. Morton, a 23-year old with no formal training in investing and money management, and which originally ran its business out of an IHOP in Little Havana.  There was no legitimate reason for Borrower's transfers.  They were made with the intent to frustrate and defraud the Lenders. Borrower was insolvent at the time of the transfers, or rendered insolvent as a result of the transfers; and it did not receive any value, and certainly not reasonably equivalent value, in exchange for the $533 million.  The purpose of the transfers was for Borrower to hide the money from its creditors, *not* to generate an investment return, as the Camshaft Defendants claim in their position statement below.

Additionally, it is unclear whether the $533 million remains at Camshaft today.  That information has been concealed from GLAS, and is one of the subjects of GLAS's outstanding discovery requests to the Camshaft Defendants.  Assuming the money has moved, which discovery will reveal, the John Doe Defendant(s), the purported new beneficial owner(s) of those funds (or the limited partnership interest in Camshaft Capital Fund, a hedge fund, acquired on account of those funds), should be identified and formally added as defendant(s) to this action.

As it stands, through its current Complaint, GLAS brings this action: (i) to avoid and enjoin the actually and constructively fraudulent transfers of $533 million to Camshaft Capital Fund (**Counts I-II**); (ii) to avoid and enjoin any and all above-market management and incentive fees paid by or on account of BYJU's Alpha to the Fund's investment manager and general partner, Defendants Camshaft Capital Advisors and Camshaft Capital Management, respectively (**Count III**); and (iii) upon receipt of discovery, if appropriate, to avoid and enjoin the actually and constructively fraudulent transfers to the John Doe Defendant(s).

Finally, with respect to Defendants' Position below, as set forth in *Plaintiff's Combined*

*Opposition to the Camshaft Defendants' Motion to Dismiss and Motion to Transfer* [D.I. 49], GLAS has unequivocally stated claims for actual and constructive fraudulent transfer. Cognizant that GLAS's claims will proceed on the merits, Camshaft relies upon numerous scattershot procedural defenses to stall this litigation from moving forward. Those arguments are fundamentally flawed. They misunderstand Florida fraudulent transfer law, ignore binding Florida precedent, and should be flatly denied, all as set forth in GLAS's Opposition.

<u>Defendants' Position</u>

GLAS's Complaint purports to ask the Court to seize $533 million in assets owned by BYJU'S Alpha, Inc. ("BYJU's")—a non-party to this litigation—invested into Camshaft Capital Fund, LP, based on statutory fraudulent transfer claims that require Plaintiff to prove, among other things, that BYJU's is "liable" to GLAS. § 726.102 (4), (7), Fla. Stat. But GLAS has failed to name BYJU's as a defendant in this lawsuit. As its counsel admitted at the October 3, 2023 hearing, ***GLAS has not even sued BYJU's*** in any court for breach or default of the Credit Agreement, nor has it sued BYJU's itself for fraudulent transfer, "[b]ecause it has not decided to exercise that remedy yet." (*See* Oct. 3 Oral Arg. Tr. at 29:17-18.)

Florida law does not empower a Court to seize assets owned and invested by a non-Party, on behalf of other anonymous lenders, based on alleged breaches of the Credit Agreement which GLAS has not provided to the Court (and which Defendants are not parties to). Instead, this lawsuit is merely a vehicle for evading courts, like Delaware, that have already considered discovery requests similar to the requests GLAS is making here and rejected them, as well as attempting to improperly obtain the discovery sought in this case for the improper purpose of pressuring non-party BYJU's in business negotiations. That is not a proper use of the Florida courts, and this Court should dismiss Plaintiff's Complaint for its numerous pleading deficiencies,

and stay discovery until the Court rules on the Motion to Dismiss.

First, Plaintiff lacks standing to assert its claims because it does not stand in the position of a creditor. It does not have a "claim" within the meaning of Florida's fraudulent transfer statutes, and it is not pursuing such a claim against BYJU's in any litigation. Moreover, Plaintiff pleads that the Credit Agreement between BYJU's and various creditors is the basis for this action, yet the Credit Agreement is repugnant to the Complaint and the relief sought. Plaintiff's failure to attach the Credit Agreement is itself an additional cause for dismissal.

Second, Plaintiff has failed to join an indispensable party to this litigation—BYJU's—which, unlike Defendants, is the alleged debtor and party to the Credit Agreement.

Third, this case is governed by mandatory New York forum selection and choice of law provisions, and thus this lawsuit has been filed in an improper forum.

Fourth, notwithstanding these threshold deficiencies, each of Plaintiff's claims against Camshaft for fraudulent transfer fail as a matter of law on multiple bases. Moreover, pursuant to the terms of the Credit Agreement entered into by BYJU's and its lenders, BYJU's is explicitly permitted to use the loaned monies to make investments.

For these reasons, and others, the Court should dismiss Plaintiff's Complaint with prejudice.

**B. Brief statement on the theory of damages by any party seeking affirmative relief.**

<u>Plaintiff's Position</u>

As set forth in the Complaint, in Counts I-IV, GLAS asserts four causes of action for: (1) avoidance and injunction of actual fraudulent transfer against Camshaft Capital Fund and John Doe under §726.105(1), Fla. Stat. (**Count I**); (2) avoidance and injunction of constructive fraudulent transfer against Camshaft Capital Fund under §§726.105(1)(b) and 726.106(1), Fla. Stat. (**Count II**); (3) avoidance of constructively fraudulent transfer against Camshaft Capital

4

Advisors and Camshaft Capital Management under §§726.105(1)(b) and 726.106(1), Fla. Stat. (**Count III**); and (4) avoidance of constructively fraudulent transfer against John Doe under §§726.105(1)(b) and 726.106(1), Fla. Stat. (**Count IV**).   In Counts I-IV, GLAS also requests declarations that the transfers were fraudulent under the Florida Uniform Fraudulent Transfer Act.

<u>Defendants' Position</u>

Defendants are not seeking affirmative relief at this time, but reserve the right to seek relief for this improper use of process and other claims.

**C.  Likelihood of settlement.**

The Parties believe it is difficult to assess the likelihood of settlement at such an early stage of the litigation, and that settlement discussions at this time are premature.   The Parties agree that all settlement discussions will be made in good faith, and the Parties will inform the Court if any settlement is reached.

**D.  Likelihood of appearance in the action of additional parties and identification of any nonparties to whom any of the parties will seek to allocate fault.**

<u>Plaintiff's Position</u>

GLAS anticipates that discovery in this matter may lead to the identification of the John Doe Defendant(s) and potentially other entities who should be brought into this litigation as defendants.   Accordingly, GLAS may seek to amend its Complaint to add those additional parties, including other parties involved in any transfers related to some or all of the $533 million or any asset on account of the $533 million.

<u>Defendants' Position</u>

Defendants have moved to dismiss Plaintiff's Complaint for, among other reasons, failure to attach the underlying agreement which is the basis of Plaintiff's case, the Complaint is repugnant to the underlying agreement; lack of standing, improper venue, failure to join an indispensable

5

party, failure to adequately plead its claims, and failure to properly sue the underlying borrower BYJU's in any court for breach or default of the Credit Agreement at issue, or as a fraudulent transferor.  In short, GLAS is seeking to have a trial within a trial by attempting to prove that BYJU's is a fraudulent transferor, and seizing BYJU's funds without BYJU's even being present to defend itself.

**E.  Proposed limits on the time: (i) to join other parties and to amend the pleadings, (ii) to file and hear motions, (iii) to identify any nonparties whose identity is known, or otherwise describe as specifically as practicable any nonparties whose identity is not known; (iv) to disclose expert witnesses; and (v) to complete discovery.**

Plaintiff's Position

GLAS's position on these dates, in addition to subsequent dates, is set forth in the proposed Scheduling Order attached hereto as Appendix A.

GLAS's proposed Scheduling Order is built on three principal pillars: (i) a November 14, 2023 deadline by which Camshaft must respond to the outstanding discovery and complete its document productions in response to GLAS's outstanding targeted requests,[1] (ii) a December 22,

---

[1]  GLAS served targeted interrogatories and document requests on Camshaft concurrently with service of its Complaint.  Camshaft Capital Fund ("Camshaft Fund") was served on September 11, 2023 [D.I. 28], Camshaft Capital Advisors ("Camshaft Advisors") was served on September 20, 2023 [D.I. 32], and Camshaft Capital Management ("Camshaft Management") was served on September 22, 2023 [D.I. 38].  In particular, GLAS served Legalinc, Camshaft Fund's then-publicly-designated registered agent with the Delaware Secretary of State; and any mistake by Camshaft Fund in designating Legalinc is not a legally valid excuse to avoid service (*i.e.*, Camshaft Fund must be held accountable for the consequences of its own mistake).  Mot. to Compel [D.I. 30] at 9-11.  Accordingly, Camshaft has had GLAS's discovery requests for >1.5 months, and the discovery response deadlines are October 26, 2023 (Camshaft Fund), November 6, 2023 (Camshaft Advisors), and November 8, 2023 (Camshaft Management).

But Camshaft blatantly refuses to comply with those deadlines.  On October 17 and 20, 2023 calls to discuss this Report, Camshaft's counsel: (i) said Camshaft Fund disputed service on September 11th, (ii) after first refusing to take a definitive position on whether they would be moving to stay, acknowledged that there was a "99.9%" chance that the Camshaft Defendants in fact would move to stay discovery on or before November 6, 2023, and *not* respond to discovery while the motion was pending (*even though* there is no "bridge order" excusing Camshaft's discovery responses while its motion is pending), and (iii) in response to GLAS's request, refused to discuss Camshaft's search parameters to identify responsive documents at this time.

2023 deadline (approximately one month after the receipt of documents from Camshaft) for GLAS to amend its initial Complaint to add new claims and parties, including identifying the John Doe Defendant(s), based on its receipt of the aforementioned discovery, and (iii) trial in approximately one year from the date of amendment (here, beginning on or around mid-to-late-January 2025, which is 16 months post-commencement of this case and consistent with Administrative Order No. 21-09's guidance that complex civil cases be tried "*no later than* 24 months after designated as complex"). *The first two pillars are very important to GLAS:* As GLAS will be prepared to explain to the Court, obtaining targeted discovery from Camshaft on the outstanding discovery requests is a **key gating item** to this case moving forward on the merits, including GLAS amending its Complaint and identifying the John Doe Defendant(s). Without that discovery, it will be challenging for this case to proceed on the merits. Therefore, any case schedule should ensure that Camshaft expeditiously produces discovery in response to the discovery requests that were served in mid-September 2023, over six weeks ago.

In contrast, Camshaft's proposed Scheduling Order (attached hereto as Appendix B) builds to a trial in September 2025, months after GLAS's proposed trial in January 2025. At this time, GLAS believes that Camshaft's proposal is unnecessarily long—Administrative Order No. 21-09 assumes that complex civil cases "typically involve more than 20 witnesses," which GLAS, at this time, does not expect to be the case here—and expects the Parties can move discovery forward

---

This Court should not countenance such tactics. Camshaft should have filed its motion to stay weeks ago, having told this Court that it was going to move to stay at the October 3rd discovery hearing and again in its October 10th motion to dismiss. Mot. to Dismiss [D.I. 47] at 2. Had Camshaft timely filed a motion to stay, that motion could already have been resolved, *before* Camshaft's discovery responses came due. The only explanation for why Camshaft sat its motion is it wanted to buy itself more time, in the event the Court ultimately denied their motion, as it should. As Camshaft's counsel has said, "[o]bviously, I think it's important to follow the rules." 10/3/2023 Hr'g Tr. at 13:23-24. The Court should require Camshaft to follow the rules.

expeditiously, especially with Camshaft's upfront production of discovery in response to outstanding requests.  Nonetheless, if the Court were to consider Camshaft's proposal, GLAS believes that five primary modifications should be made to its proposed schedule:

- A November 14, 2023 deadline should be added for Camshaft to respond to outstanding discovery and complete its document productions.  Only then can deadlines for joining additional parties and amending the Complaint be set.

- A September 27, 2024 deadline should be added for the Parties to exchange preliminary lists of "will call" or "may call" witnesses (other than any experts) in order to ensure that the Parties will have had the opportunity to depose all prospective trial witnesses.

- The structure of expert disclosures should be changed.  The Court should implement a standard, two-part expert-disclosure schedule: the Parties mutually disclose any opening experts on the same date (January 20, 2025) and then the Parties mutually disclose any rebuttal experts on the same date (March 17, 2025).  In contrast, Camshaft has devised an expert schedule that unfairly gives it preferential treatment over GLAS.  Under Camshaft's schedule, GLAS is required to disclose its experts first.  Then, Camshaft receives *two* opportunities to designate responsive/rebuttal experts, as compared to just one opportunity for GLAS. Camshaft also receives more than double the time that GLAS gets to designate responsive/rebuttal experts.  That atypical schedule is simply unequal and unfair.

- The Parties have proposed different pretrial deliverables and should be required to meet and confer about what should be filed with the Court in advance of trial.

- GLAS is willing to consider a compromise position of a trial in spring 2025.

Alternatively, rather than resolve the Parties' competing Scheduling Orders at this time, GLAS requests that this Court set two interim deadlines—for Camshaft to complete its discovery responses, including document productions, in response to the outstanding discovery and then for GLAS to amend its Complaint and add claims/join parties—and defer consideration of a full scheduling order until GLAS files its Amended Complaint.  That will enable the current Parties to refine their views on an appropriate schedule, and further will allow any newly-added parties under any Amended Complaint to participate in scheduling discussions.

<u>Defendants' Position</u>

Defendants' position on these dates, in addition to subsequent dates, is set forth in the proposed Scheduling Order attached hereto as Appendix B.

Defendants' proposed trial date in September 2025 is based on the Eleventh Judicial Circuit's Administrative Order No. 21-09, available at <u>10122459346-ADMINISTRATIVE ORDER NO. 21-09.pdf (flcourts.org)</u>, which provides for trial within 24 months following a civil case's designation as complex.

In contrast, Plaintiff proposes that the Court not even enter a trial order at this time, and instead set a discovery deadline applying to Defendants of November 14, 2023 (or one week following the Case Scheduling Conference). This is unreasonable for three reasons. First, as Defendants have stated in their Motion to Dismiss and in the prior Court hearing, Defendants will move for a stay of discovery pending the case-dispositive issues raised in the Motion, which will be pending at the time of the Case Scheduling Conference. Second, Plaintiff's proposal misstates the applicable response date for Defendants to object or respond to the requests based on the applicable service date.[2]  And third, Plaintiff's position further illustrates that the thrust of this action is not a set a trial, or sue BYJU's for breach of contract to obtain a judgment establishing Plaintiff's entitlement to the funds, but instead to obtain discovery that Plaintiff otherwise would not be entitled to in the prior pending litigations, in other fora, between Plaintiff and BYJU's—the actual party in interest and beneficial owner of the more than $500M in investments that Plaintiff seeks to seize in this litigation.

Plaintiff's effort to short-circuit suing BYJU's to establish entitlement to the funds presents numerous legal issues that will require gatekeeping by the Court at the pleading stage, and failing that, at summary judgment, especially to establish whether Plaintiff has standing, and whether or

---

[2] Plaintiff relies on an ineffective service date of Sept. 11, 2023 (as raised in Defendants' Motion to Vacate Ex Parte Order and not the corrected service of process on CT Corporation on September 20, 2023. That latter date yields a response date under the Florida Rules of Civil Procedure of November 6, 2023, but as stated above, Defendants intend to move for a Stay of Discovery which will be pending prior to that date.

when Plaintiff must add additional indispensable parties such as BYJU's.  Given the complexity

of those issues, the half-billion-dollar amount in controversy, and the pendency of this litigation

in the Complex Division, Defendants request that the Court set a trial date in line with the two-

year guidelines set forth in the Administrative Order No. 21-09.

**F.  Names of the attorneys responsible for handling the action.**

The attorneys responsible for handling this action on behalf of GLAS are Marcos D.

Jiménez, Esq., Andrew Zaron, Esq., and Diego Pérez Ara, Esq. of León Cosgrove Jiménez, LLP;

and Richard U.S. Howell, P.C. and Ravi Subramanian Shankar, Esq. of Kirkland & Ellis LLP.

The attorneys responsible for handling this action on behalf of Defendants are David

Massey, Esq. and Marty Steinberg, Esq. of Hogan Lovells US LLP.

**G.  Necessity of a protective order to facilitate discovery.**

The Parties expect that a protective order will be necessary to facilitate discovery.  The

Parties have started preparing a proposed protective order that will be submitted to the Court for

consideration.

**H.  Proposals for the formulation and simplification of issues, including the elimination of frivolous claims or defenses, and the number and timing of motions for summary judgment or partial summary judgment.**

The Parties agree to confer with each other to explore potential simplification and

streamlining of the issues, including the elimination of frivolous claims or defenses.  Defendants

have filed a Motion to Dismiss, which remains pending and to which GLAS has responded.  The

Parties do not know at this time if any motions for summary judgment or partial summary judgment

will, or should, be filed in this case.  As for timing, the Parties anticipate that after all fact and

expert discovery has been conducted and before the final pre-trial conference, all motions for

summary judgment will have been filed and heard by the Court, subject to the Court's schedule.

**I.** **Possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents, electronically stored information, and the need for advance rulings from the court on admissibility of evidence.**

The Parties agree to work with one another regarding authenticity of documents and in formulating proper protocols and search terms related to electronically stored information. The Parties do not expect a voluntary exchange of documents. At this time, the Parties do not expect any need for advance court rulings on the admissibility of evidence, but will advise the Court if that changes.

**J.** **Possibility of obtaining agreements among the parties regarding the extent to which such electronically stored information should be preserved, the form in which such information should be produced, and whether discovery of such information should be conducted in phases or limited to particular individuals, time periods, or sources.**

As stated previously, the Parties agree to work with one another regarding authenticity of documents and in formulating proper protocols and search terms related to electronically stored information. The Parties believe it is appropriate to use an e-discovery platform, and the exchange of load files such that relevant metadata is preserved, when possible, and production, review, and document control is made simpler. The Parties agree to work with one another regarding the appropriate scope, custodians, and sources of data.

**K.** **Suggestions on the advisability and timing of referring matters to a magistrate, master, other neutral, or mediation.**

At this time, the Parties do not believe that there is a need for a referral to a magistrate or master, but reserve the right to request a referral during the course of the litigation.

The Parties do not currently intend to participate in any mediation conference.

**L.** **Preliminary estimate of the time required for trial.**

The Parties cannot determine at this time the number of days that will be required for trial.

**M. Requested date or dates for conference before trial, a final pretrial conference, and trial.**

The Parties refer to their respective proposed Scheduling Orders, attached hereto as Appendix A (Plaintiff) and Appendix B (Defendants).

**N. Defendants' position on these dates is set forth in the proposed Scheduling Order appended hereto. Description of pertinent documents and a list of fact witnesses the parties believe to be relevant.**

Plaintiff's Position

As stated previously, the instant dispute relates to fraudulent money transfers involving Camshaft. The relevant documentation would include, but is not limited to, the following categories:

- communications between Defendants, on one hand, and Borrower, its former corporate parents and affiliates (as defined in GLAS's discovery requests and who collectively do business under the trade name "BYJU's"), or their representatives, on the other hand;

- documentation concerning any money transfer between or among Borrower or BYJU's, on the one hand, and Defendants, one the other hand;

- account records (*e.g.*, capital account statements, custodial statements, financial statements, and statements of management fees, transaction fees, placement fees, and expenses) associated with Borrower, BYJU's, or any money transfer;

- records of confirmations, transfers, assignments, re-titlings, subscriptions, contributions, withdrawals, redemptions and other transactions associated with any of Borrower, BYJU's, or any money transfer;

- documents and communications concerning the relationship between Defendants or William C. Morton, on the one hand, and Borrower, BYJU's, or their representatives, on the other hand;

- agreements entered into between Defendants, on the one hand, and Borrower, BYJU's, or their representatives, on the other hand;

- term sheets, presentations, letters, legal documents, and offering materials exchanged between Defendants or their representatives, on the one hand, and Borrower, BYJU's, or their representatives, on the other hand;

- documents and communications concerning any direct or indirect investments, dispositions, or transfers made by Defendants or any of their representatives or affiliates to BYJU's or its representatives or its affiliates; and

- documents demonstrating the organizational, ownership, and control structure of Defendants, as well as documents memorializing the terms of the limited partnership interests held in Camshaft Capital Fund, LP and/or its general partner and investment manager.

The relevant factual witnesses would include, but are not limited to, the following persons: (i) Camshaft Capital Fund, LP's corporate representative; (ii) Camshaft Capital Advisors, LLC's corporate representative; (iii) Camshaft Capital Management, LLC's corporate representative; (iv) William C. Morton (Camshaft's founder and "[k]ey [p]erson"); (v) various other current/former employees of Defendants; (vi) various current/former employees and representatives of BYJU's; (vii) certain representatives of GLAS; (viii) various authenticating witnesses; and (ix) any others identified in discovery.

With respect to Defendants' Position, GLAS states that Camshaft has included numerous topics for discovery that are not relevant to the elements of a fraudulent transfer claim under the Florida Uniform Fraudulent Transfer Act, and which continue to reflect Camshaft's failure to grasp the statute. GLAS will be prepared to object to any irrelevant and tangential discovery at the appropriate time.

<u>Defendants' Position</u>

As stated previously, Defendants' position is that this is a specious lawsuit, and Plaintiff's Complaint should be dismissed with prejudice for the reasons stated in Defendants' Motion to Dismiss. If the case does proceed, then relevant discovery on merits issues would include, without limitation:

- Documents regarding the underlying transactions that are the basis for the claims, and any other documents establishing the basis for Plaintiff to enforce the claims in its Complaint;
- Records regarding the identities of "creditors" the Plaintiff represents and Plaintiff's communications with the "anonymous lenders" it claims to represent;
- All communications concerning BJYU's in connection with the Credit Agreement and the filing of this lawsuit;
- All communications concerning Defendants and the filing of this lawsuit;
- Plaintiff's communications and documents concerning (1) the creditors including but not limited to the "anonymous lenders" in relation to (a) the BJYU parties; (b) the Credit Agreement and underlying transaction documents and (c) the filing of this lawsuit;

- Plaintiff's communications and documents related to negotiations that resulted in the Credit Agreement;

- All documents that comprise the transactional documents related to the Credit Agreement;

- All Documents establishing the basis for Plaintiff's claim that BYJU's investment with Camshaft was disallowed under the Credit Agreement;

- Documents relating to any purported creditor represented by Plaintiff and whether they are dealers in distressed debt in a manner contrary to the Credit Agreement;

- Documents relating to whether the purported creditors represented by Plaintiff hold short bond or other financial positions involving BYJU's or any of its affiliates;

- Documents establishing that Plaintiff has not sued BYJU's for breach or default of the Credit Agreement or for fraudulent transfer, and why Plaintiff "has not decided to exercise that remedy yet";

- All documents related to any attempt to (1) obtain the collateral that supports the Credit agreement; and/or (2) enforcing any guaranty associated with the Credit agreement; and

- Documents relating to Plaintiff's due diligence employed prior to bringing this action and whether it meets the elements for malicious prosecution or abuse of process.

- The relevant factual witnesses would include, but are not limited to, the following persons:

    (i) corporate representative of GLAS; (ii) corporate representatives of any creditor, including but not limited to the "anonymous lenders," (iii) authenticating witnesses; and (iv) any others identified in discovery.

**O. Number of experts and fields of expertise.**

The Parties cannot determine at this time the number of experts that will be involved.

**P. Any other information that might be helpful to the court in setting further conferences and trial date.**

None at this time.

Dated: October 24, 2023

Respectfully submitted,

***For Plaintiff:***

Marcos D. Jiménez
Florida Bar No.: 441503
Andrew Zaron
Florida Bar No.: 965790
Diego Pérez Ara
Florida Bar No.: 1023765
Email: mjimenez@leoncosgrove.com
Email: azaron@leoncosgrove.com
Email: dperez@leoncosgrove.com
Email: eperez@leoncosgrove.com
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Facsimile: 305.437.8158

OF COUNSEL:

Richard U.S. Howell, P.C. (*pro hac vice*
application forthcoming)
Ravi Subramanian Shankar (admitted *pro
hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: 312.862.2000
Email: rhowell@kirkland.com
Email: ravi.shankar@kirkland.com

***For Defendants:***

David Massey
Florida Bar No. 86129
Marty Steinberg
Florida Bar No. 187293
Email: david.massey@hoganlovells.com
Email: marty.steinberg@hoganlovells.com
**HOGAN LOVELLS US LLP**
600 Brickell Avenue
Suite 2700
Miami, Florida 33131
Telephone: (305) 459-6500
Facsimile: (305) 459-6550

## **CERTIFICATE OF CONFERRAL**

I hereby certify that I have personally conferred in good faith with Defendants and have incorporated their positions herein.

*Andrew D. Zaron*
Andrew D. Zaron

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2023, a true and correct copy of the foregoing was served via the Florida Courts E-Filing Portal to all counsel of record.

*Andrew D. Zaron*
Andrew D. Zaron

# APPENDIX A

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CASE NO.: 2023-022640-CA-01 (43)**

GLAS TRUST COMPANY LLC, in its capacity as
Administrative Agent and Collateral Agent,

      Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT
CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL
MANAGEMENT, LLC, and JOHN DOE,

      Defendants.

_____/

**[PLAINTIFF'S PROPOSED] SCHEDULING ORDER SETTING
TRIAL DATE AND PRETRIAL SCHEDULE**

      THIS CAUSE is set for trial during the Court's trial calendar beginning in **<u>January 2025</u>**.

The Final Pretrial Conference will be held at [time, day, in **December 2024**].  The Calendar Call

will be held at [time, day, in **January, 2025**].  The Parties shall adhere to the following schedule

subject to further order of the Court, though the Parties may move the deadlines set in Sections 1-

8 hereof by mutual agreement:

      1.    Camshaft Defendants to complete discovery responses, including document

productions, in response to the interrogatories and document requests served concurrently with the

Complaint by **November 14, 2023**.[3]

      2.    Plaintiff to file any Amended Complaint, adding additional claims and/or joining

additional parties, following the completion of aforementioned discovery responses, by **December

_____

      [3]   This deadline assumes that the Camshaft Defendants do not withhold documents
responsive to Plaintiff GLAS Trust Company LLC's document requests based on one or more
objections.  If the Camshaft Defendants do withhold documents, then that will extend all
subsequent dates in this proposed Scheduling Order.

**22, 2023**.

3.    Parties to mutually exchange expert witness designations by **June 17, 2024**.

4.    Parties to mutually exchange preliminary lists of "may call" or "will call" witnesses (other than rebuttal experts) by **July 19, 2024**.

5.    Parties to mutually exchange rebuttal expert witness designations (for the avoidance of doubt, such experts will be limited to providing only opinions rebutting an opinion elicited by another party's expert) by **August 9, 2024**.

6.    Fact discovery shall be completed by **August 23, 2024**.

7.    Expert discovery shall be completed by **September 20, 2024**.

8.    Dispositive motions, including those regarding summary judgment and *Daubert*, must be filed by **October 15, 2024**.

9.    Mediation shall be set by **October 31, 2024**.

10.    All pretrial motions and memoranda of law, including motions *in limine*, must be filed by **November 15, 2024**.

11.    Final pretrial conference report with pretrial stipulation, proposed joint verdict form, proposed findings of fact and conclusions of law and final exhibit and witness lists shall be filed **December 6, 2024**.

12.    Mediation shall be completed by **December 13, 2024**.

**APPENDIX B**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2023-022640-CA-01 (43)

GLAS TRUST COMPANY LLC, in its capacity as
Administrative Agent and Collateral Agent,

      Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT
CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL
MANAGEMENT, LLC, and JOHN DOE,

      Defendants.

_____/

### [DEFENDANTS' PROPOSED] SCHEDULING ORDER SETTING TRIAL DATE AND PRETRIAL SCHEDULE

THIS CAUSE is set for trial during the Court's trial calendar beginning in **September 2025**. The Calendar Call will be held at [time, day, in **August 2025**]. A Status Conference will be held at [time, day, in **July 2025**]. The parties shall adhere to the following schedule:

1.     Joinder of any additional parties by **December 29, 2023**

2.     Filing of motions to amend the complaint by **January 31, 2024**

3.     Fact discovery shall be completed by **November 29, 2024**

4.     Selection of Mediator due by **November 29, 2024**

5.     Plaintiff(s) shall disclose experts, expert witness reports and information identified in Florida Rule of Civil Procedure 1.280(b)(5) by **January 5, 2025**

6.     Defendant(s) shall disclose experts, expert witness reports and information identified in Florida Rule of Civil Procedure 1.280(b)(5) by **February 24, 2025**

7.     Exchange of rebuttal expert witness reports and information identified in Florida Rule of Civil Procedure 1.280(b)(5) due by **March 17, 2025**

8.      Expert discovery shall be completed by **April 15, 2025**

9.      Dispositive motions, including those regarding summary judgment and *Daubert*, must be filed by **May 15, 2025**

10.    Mediation shall be completed by **May 1, 2025**

11.    All pretrial motions and memoranda of law must be filed by **May 15, 2025**

12.    Motions in limine must be filed by **June 2, 2025**

13.    Joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law must be filed by **August 5, 2025**

# EXHIBIT 32

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL MANAGEMENT, LLC, and CAMSHAFT CAPITAL ADVISORS, LLC,

     *Plaintiffs,*

v.

BYJU's Alpha, Inc.,

     *Defendant.*

**COMPLEX BUSINESS LITIGATION DIVISION**

CASE NO.  2023-027523-CA-01

## CORRECTED COMPLAINT[1]

Plaintiffs Camshaft Capital Fund, LP ("Camshaft Capital Fund"), Camshaft Capital Management, LLC ("Camshaft Capital Management"), and Camshaft Capital Advisors, LLC ("Camshaft Capital Advisors" and, together with Camshaft Capital Fund and Camshaft Capital Management, collectively "Camshaft") bring the following action (the "Complaint") against Defendant BYJU's Alpha, Inc. ("BYJU's" or "Defendant") and allege as follows:

## INTRODUCTION

1.      This is an action for declaratory relief arising out of (i) the status of BYJU's as a former limited partner of Camshaft Capital Fund as of the first quarter of 2023, at which time BYJU's transferred all of its investment interest as a limited partner in Camshaft Capital Fund to a third party; (ii) the appointment of Mr. Timothy R. Pohl ("Mr. Pohl") as the sole director and officer of BYJU's; and (iii) Mr. Pohl's November 20, 2023, demand that Camshaft provide certain very broad categories of books and records of Camshaft, despite the fact that BYJU's is no longer

---

[1]      Camshaft submits this Corrected Complaint to revise a scrivener's error regarding the state of incorporation for Defendant and three typographical errors in paragraphs 3, 10, and 66.  The remainder of the Corrected Complaint remains unchanged from the initial Complaint filed on December 4, 2023 (Dkt. No. 2).

a limited partner of Camshaft Capital Fund.

2. Camshaft is in doubt as to the existence or non-existence of its rights under contract, as well as Camshaft's absence of any statutory obligations with respect to BYJU's demand for books and records under Delaware law.

3. More specifically, Camshaft is in doubt as to the absence of any statutory obligations it may have to disclose books and records information to BYJU's, a former limited partner of Camshaft Capital Fund, because BYJU's has transferred all of its investment interest to another entity, resulting in BYJU's having a zero-balance capital account in Camshaft Capital Fund, thereby terminating its relationship with Camshaft. *See Greenhouse v. Polychain Fund I LP*, No. CV 2018-0214-JRS, 2019 WL 2290245, at \*4-5 (Del. Ch. May 29, 2019) (holding that the plaintiff had no standing to seek books and records under 6 Del. C. § 17-305 because the plaintiff was no longer a limited partner and the statute "affords . . . no right to former limited partners to inspect a partnership's books and records.").

4. Likewise, Camshaft is in doubt as to any contractual (or statutory) rights it may have to refuse to disclose books and records to BYJU's as a former limited partner of Camshaft Capital Fund.

5. Camshaft is entitled to have such doubt removed.

6. BYJU's takes the position that it is entitled to control and access of the Camshaft books and records that it seeks.

7. BYJU's has stated in writing that if it does not receive such books and records, despite being a former limited partner, it will "seek appropriate relief to the fullest extent permitted under law" against Camshaft. Demand Letter from Timothy R. Pohl to Camshaft dated November 20, 2023, at 3 (hereinafter the "Demand Letter") (attached as Exhibit "A").

8.      BYJU's position is clear: despite the lack of any statutory or contractual rights as a former limited partner, it intends to file a lawsuit in a misguided attempt to vindicate purported rights that do not exist.

9.      This is not a new dispute. Mr. Pohl is the hand-selected agent of GLAS, which previously brought a suit to achieve a similar goal: to obtain third-party Camshaft records without a proper basis.  Camshaft has resisted these improper methods to attempt to obtain records of a third party when BYJU's has not been held to have made a fraudulent transfer under the terms of the Credit Agreement.  As the Court will recall, GLAS, sought similar relief that Mr. Pohl is now seeking.  GLAS and Mr. Pohl's objectives have not changed but merely are now wrapped in a different tactic.  Attempting to access this information through BYJU's, a former limited partner of Camshaft Capital Fund, that has no right to Camshaft's records.

## THE PARTIES

10.      Plaintiff Camshaft Capital Fund is a Pooled Investment Vehicle operating as a hedge fund.  Camshaft Capital Fund is a limited partnership organized and existing under the laws of the State of Delaware (File No. 3441752) with its principal place of business at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

11.      Plaintiff Camshaft Capital Management is the General Partner for Camshaft Capital Fund.  Camshaft Capital Management is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

12.      Plaintiff Camshaft Capital Advisors is an investment management firm that services institutional clients.  Camshaft Capital Advisors is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 16850

Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

13.     Defendant BYJU's is a special-purpose financing vehicle in the business of designing and developing education software solutions.  BYJU's is a corporation organized and existing under the laws of the State of Delaware.

14.     BYJU's is a former limited partner of Camshaft Capital Fund.

15.     BYJU's was never a limited partner or member of Camshaft Capital Management or Camshaft Capital Advisors.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under Florida Statute Section 86.011, as this Court has jurisdiction to enter declaratory judgments.

17.     This is an action in which the amount in controversy exceeds seven hundred and fifty thousand dollars ($750,000.00), exclusive of interest and costs to which Camshaft would be entitled, and is otherwise within the subject matter jurisdiction of this Court.

18.     This Court has personal jurisdiction over BYJU's because BYJU's negotiated and entered into a partnership relationship in Florida and with Florida-based entities.

19.     Venue is proper in Miami-Dade County, Florida, because, among other things, Section 11.03 of the Second Amended and Restated Limited Partnership Agreement (Revised) of Camshaft Capital Fund, LP (hereinafter the "LPA") that is implicated in this lawsuit provides: "Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the ***State of Florida*** . . . ." (emphasis added).

## FACTUAL ALLEGATIONS

**I.**     ***BYJU's Former Partnership Relationship with Camshaft Capital Fund***

20.     In April and July 2022, BYJU's made certain investments in Camshaft Capital Fund totaling $533 million (the "Investment").

21.     As a result, BYJU's became a limited partner in Camshaft Capital Fund.

22.     While BYJU's was a limited partner of Camshaft Capital Fund, BYJU's rights and obligations as to the Investment were governed by the LPA, as well as the Delaware Statutes, including the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101 *et seq.*

23.     Further, the LPA is governed by Delaware law, but the jurisdictional provision of the LPA provides that actions pertaining to enforcement of any provisions or rights under the agreement must be brought in the courts of the State of Florida.

24.     BYJU's is no longer a partner of Camshaft Capital Fund and, therefore, BYJU's has no rights to inspect Camshaft's books and record.

**II.**     ***BYJU's Transfers All of Its Interest in Camshaft Capital Fund to a Third Party***

25.     In the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's, BYJU's transferred one hundred percent of its interest in Camshaft to a third party pursuant to the terms of the LPA.

26.     As of the date of the transfer, BYJU's has a zero-balance capital account, thus terminating its Investment and making it a ***former*** limited partner of Camshaft Capital Fund.

**III.**     ***BYJU's Demand For Camshaft's Books and Records
           and Camshaft's Refusal to Comply with the Request***

27.     On November 20, 2023, approximately three quarters ***after*** the transfer of all of BYJU's interest in Camshaft Capital Fund to a third party, Mr. Pohl, representing himself as the sole director, chief executive officer, and secretary of BYJU's, sent a Demand Letter to Camshaft

asserting *fifteen* very broad document requests and demanding that a wide array of Camshaft's books and records be provided to BYJU's within five (5) business days. Ex. A at 1–3. These requests are similar to those submitted to this Court by GLAS.

28.    Mr. Pohl, as representative of BYJU's, states in the Demand Letter that BYJU's is entitled to access and control of Camshaft's books and records regarding the Investment under "contractual and legal rights, including Section 17-305 of the Delaware [L]imited [P]artnership [A]ct." Ex. A at 1. That is Mr. Pohl's sole statutory basis for demanding books and records from Camshaft.

29.    Subsequently, on December 4, 2023, Camshaft, through undersigned counsel, sent a response letter to BYJU's counsel and Mr. Pohl (the "Response Letter") (attached here to as Exhibit "B"), notifying BYJU's that as a former limited partner of Camshaft Capital Fund, it has no contractual or statutory right to access Camshaft's books and records.

30.    BYJU's Demand Letter is clear that in the event Camshaft "does not respond or provide the requested information," BYJU's will "seek appropriate relief to the fullest extent permitted under the law," Ex. A at 3, which undoubtedly threatens the filing of a lawsuit.

## IV.    *An Actual Controversy Exists Between Camshaft and BYJU's*

31.    As such, there exists an actual controversy between the parties as to whether BYJU's, as a former limited partner of Camshaft Capital Fund, has the right to access books and records. And likewise, whether Camshaft has an obligation to disclose those books and records to a *former* limited partner in Camshaft Capital Fund demanding they be turned over.

32.    Although a present controversy is not required under Florida law, the issuance of a judgment by this Court would resolve the existing controversy between the parties relating to the dispute described above (and as further described below) and resolve Camshaft's doubt as to

whether it has any obligation to respond to BYJU's demand as a consequence of BYJU's status as a former limited partner of Camshaft Capital Fund.  That is, this action will declare the rights and obligations of Camshaft under the LPA and the relevant Delaware law.

33.    This Complaint clearly satisfies the elements of the Declaratory Judgment Act, which are:

 a. A bona fide, actual, present practical need for the declaration;

 b. That the declaration should deal with a present, ascertained, or ascertainable state of facts **OR** a present controversy as to a state of facts;

 c. That some immunity, power, privilege, or right of the complaining party is dependent upon the facts or the law applicable to the facts;

 d. That there is some person or persons who have, or reasonably may have an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law; and

 e. That the antagonistic and adverse interests are all before the court by proper process or class representation and that the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

*May v. Holley*, 59 So.2d 636, 639 (Fla.1952).

34.    Accordingly, declaratory relief is warranted because a justiciable controversy exists as to whether Camshaft has the right to refuse to disclose its books and records to a former limited partner, which has no statutory or contractual rights to inspect such records.

## COUNT I
**(Declaratory Judgment That Camshaft Owes No Duty or Obligation to Disclose Books and Records to BYJU's Pursuant to 6 Del. C. § 17-305)**

35.     The allegations in paragraphs 1 through 34 above are incorporated by reference as though fully set forth herein.

36.     This is an action against BYJU's for a declaratory judgment under the Florida Declaratory Judgment Act, § 86.011 *et seq.*, Florida Statutes.

37.     As of the first quarter of 2023, BYJU's was no longer a partner of Camshaft Capital Fund because BYJU's had transferred all of its interest in Camshaft Capital Fund, including but not limited to the entirety of its interest in the Investment to a third party, resulting in BYJU's having a zero-balance capital account.

38.     On November 20, 2023, BYJU's representative, Mr. Pohl, sent a Demand Letter to Camshaft asserting that, among other things, pursuant to "Section 17-305 of the Delaware [L]imited [P]artnership [A]ct" BYJU's is entitled to access and control over certain Camshaft books and records pertaining to the Investment.  Ex. A at 1.

39.     Section 17-305(a) of the Delaware Revised Uniform Limited Partnership Act provides that:

> (a) Each ***limited partner***, in person or by attorney or other agent, has the right, subject to such reasonable standards (including standards governing what information (including books, records and other documents) is to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners, to obtain from the general partners from time to time upon reasonable demand for any purpose ***reasonably related to the limited partner's interest as a limited partner***:
>
> (1) True and full information regarding the status of the business and financial condition of the limited partnership;
>
> (2) Promptly after becoming available, a copy of the limited partnership's federal, state and local income tax returns for each year;
>
> (3) A current list of the name and last known business, residence or mailing address of each partner;

(4) A copy of any written partnership agreement and certificate of limited partnership and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the partnership agreement and any certificate and all amendments thereto have been executed;

(5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each partner and which each partner has agreed to contribute in the future, and the date on which each became a partner; and

(6) Other information regarding the affairs of the limited partnership as is just and reasonable.

6 Del. C. § 17-305(a)(1)-(6) (emphasis added).

40.     BYJU's is not a limited partner of any Camshaft entity and, thus, this statute does not apply to it, and it has no statutory right to request books and records under Section 17-305 of the Delaware Revised Uniform Limited Partnership Act. *Greenhouse v. Polychain Fund I LP*, No. CV 2018-0214-JRS, 2019 WL 2290245, at *4-5 (Del. Ch. May 29, 2019) (holding that the plaintiff had no standing to seek books and records under 6 Del. C. § 17-305 because the plaintiff was no longer a limited partner and the statute "affords . . . no right to former limited partners to inspect a partnership's books and records.").

41.     On December 4, 2023, Camshaft responded to BYJU's Demand Letter and notified BYJU's that it had no statutory standing to request books and records, and rejected BYJU's request for the disclosure of the requested books and records. *See generally* Ex. B.

42.     There is a bona fide, actual, present practical need for the declaration because BYJU's has demanded Camshaft provide numerous very broad categories of books and records pertaining to the Investment, despite the fact that BYJU's is a former limited partner of Camshaft Capital Fund with a zero-balance capital account.

43.     BYJU's was never a limited partner of any other Camshaft entity.

44.     As a result of the Demand Letter and its threat of legal action, Camshaft is in doubt as to what its rights and obligations are to BYJU's under the Delaware Revised Uniform Limited

Partnership Act, particularly Section 17-305, and, as such, whether Camshaft properly rejected BYJU's demand for books and records as a former limited partner.

45.     Camshaft's declaratory judgment action relates to a present, ascertained, or ascertainable state of facts or controversy because BYJU's has expressly stated in writing that in the event of non-compliance with providing the requested information, it will "seek appropriate relief to the fullest extent permitted under law" against Camshaft, which is which is a clear threat to file a lawsuit.  Ex. A at 3.

46.     Camshaft, as the complaining party, must be assured of its right to refuse to disclose confidential and trade secret books and records to BYJU's, a former limited partner of Camshaft Capital Fund.

47.     BYJU's reasonably has an actual, present, adverse, and antagonistic interest in Camshaft's requested declaratory relief.

48.     All the antagonistic and adverse interests are all before the Court because this is a question of the rights or obligations of BYJU's and Camshaft pursuant to BYJU's demand for Camshaft's books and records.

49.     The relief sought by Camshaft is not an attempt to obtain advisory legal advice from this Court, or the answer to questions propounded from curiosity.

**WHEREFORE**,  Camshaft respectfully requests that this Court enter judgment against BYJU's declaring that Camshaft has no statutory obligation, including under Section 17-305 of the Delaware Revised Uniform Limited Partnership Act, to disclose any of its books and records to BYJU's.

## COUNT II
### (Declaratory Judgment That Camshaft Owes No Duty to Disclose Books and Records to BYJU's Pursuant to the LPA)

50.    The allegations in paragraphs 1 through 34 above are incorporated by reference as though fully set forth herein.

51.    This is an action against BYJU's for a declaratory judgment under the Florida Declaratory Judgment Act, § 86.011 *et seq.*, Florida Statutes.

52.    As of the first quarter of 2023, BYJU's was no longer a partner of Camshaft Capital Fund because BYJU's had transferred all of its interest in Camshaft Capital Fund, including but not limited to its interest in the Investment to a third party, resulting in BYJU's having a zero-balance capital account.

53.    On November 20, 2023, BYJU's representative, Mr. Pohl, sent a Demand Letter asserting that, among other things, pursuant to "contractual . . . rights" BYJU's entitled to access to very broad categories of Camshaft's books and records.  Ex. A at 1.

54.    During the time BYJU's was a limited partner of Camshaft Capital Fund, its rights were governed by the LPA.

55.    Section 7.02 of the LPA provides:

7.02    Books and Records.  The General Partner [Camshaft Capital Management] shall keep or cause to be kept, at the Partnership's [Camshaft Capital Fund's] expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts, Net Profits and Net Losses of the Partnership [Camshaft Capital Fund], the respective Capital Accounts of the Partners and such other matters required by the Act.  Such books of account shall be the property of the Partnership [Camshaft Capital Fund], shall be kept in accordance with sound accounting principles and procedures consistently applied, and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives upon notice to the General Partner [Camshaft Capital Management].  The books of account shall be maintained at the principal office of the General Partner [Camshaft Capital Management] or at the office of the Partnership's [Camshaft Capital Fund's] accounting or administrative firm, as determined by the General Partner [Camshaft Capital Management] in its sole

discretion. Notwithstanding the foregoing, however, the General Partner [Camshaft Capital Management] is not obligated to show any Partners records detailing the actual Securities trades placed by the Partnership [Camshaft Capital Fund]. Information regarding the Partnership's [Camshaft Capital Fund's] trading and specific investments is proprietary.

56.     The LPA is the only contractual basis by which BYJU's claims any right to demand Camshaft's books and records.

57.     BYJU's is a former limited partner of Camshaft Capital Fund and, thus, has no contractual right under the LPA to inspect Camshaft's books and records.

58.     BYJU's was not a limited partner of any other Camshaft entity.

59.     On December 4, 2023, Camshaft responded to BYJU's Demand Letter and notified BYJU's that it had no contractual right to demand books and records because BYJU's is not a limited partner of Camshaft Capital Fund. *See generally* Ex. B.

60.     There is a bona fide, actual, present practical need for the declaration because BYJU's has demanded Camshaft to provide very broad categories of books and records, but BYJU's is no longer a partner of Camshaft Capital Fund by virtue of BYJU's transfer of all its interest in Camshaft Capital Fund to a third party.

61.     As a result of the Demand Letter and its threat of legal action, Camshaft is in doubt as to its contractual rights under the LPA and, as such, whether Camshaft must comply with BYJU's demand for the production of documents when BYJU's is a former limited partner of Camshaft Capital Fund and has no right to inspect any of Camshaft's books and records.

62.     Camshaft's declaratory judgment action relates to a present, ascertained, or ascertainable state of facts or controversy because BYJU's has expressly stated in writing that in the event of non-compliance with providing the requested information, it will "seek appropriate

relief to the fullest extent permitted under law" against Camshaft, which is a clear threat to file a lawsuit.  Ex. A at 3.

63.     Camshaft, as the complaining party, must be assured of its right to refuse to disclose confidential and trade secret books and records to BYJU's, a former limited partner of Camshaft Capital Fund.

64.     BYJU's reasonably has an actual, present, adverse, and antagonistic interest in Camshaft's requested declaratory relief.

65.     All the antagonistic and adverse interests are all before the Court because this is a question of the rights or obligations of BYJU's and Camshaft pursuant to BYJU's demand for Camshaft's books and records.

66.     The relief sought by Camshaft does not seek advisory legal advice from this Court, or the answer to questions propounded from curiosity.

**WHEREFORE**, Camshaft respectfully requests that this Court enter judgment against BYJU's declaring that Camshaft has no contractual obligation under the LPA to disclose any of its books and records to BYJU's.

## PRAYER FOR RELIEF

**WHEREFORE**, Camshaft respectfully requests that this Court enter judgment against BYJU's:

a.     Declaring that Camshaft has no statutory obligation to disclose any of its books and records to BYJU's.

b.     Declaring that Camshaft has no contractual obligation under the LPA to disclose any of its books and records to BYJU's.

c.     Granting Camshaft any further relief the Court deems just and appropriate.

Dated: December 15, 2023.

Respectfully submitted,

**HOGAN LOVELLS US LLP**
600 Brickell Avenue
Suite 2700
Miami, Florida 33131
Tel: 305-459-6500
Fax: 305-459-6550

By:/s/ *David B. Massey*
David B. Massey
Florida Bar No. 86129
Marty Steinberg
Florida Bar No. 187293
david.massey@hoganlovells.com
marty.steinberg@hoganlovells.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of December, 2023, a true and correct copy of the foregoing document was electronically filed, which will serve a Notice of Filing on all counsel of record, via the Court's e-service system.

By:/s/ *David Massey*__
David B. Massey

14