**EXHIBIT F**

**March 14, 2024 Transcript**

\\4163-8548-8207 v1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .  Chapter 11
                                  .  Case No. 24-10140 (JTD)
BYJU'S ALPHA, INC.,               .
                                  .
            Debtor.               .
. . . . . . . . . . . . . . . . . .
                                  .
BYJU'S ALPHA, INC.,               .
                                  .
          Plaintiff,              .  Adv. Pro. No. 24-50013 (JTD)
                                  .
     v.                           .
                                  .
CAMSHAFT CAPITAL FUND, LP         .
CAMSHAFT CAPITAL ADVISORS,        .  Courtroom No. 5
LLC, AND CAMSHAFT CAPITAL         .  824 North King Street
MANAGEMENT, LLC,                  .  Wilmington, Delaware 19801
                                  .
          Defendant.              .  Thursday, March 14, 2024
. . . . . . . . . . . . . . . . .    10:00 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:           Kenneth Enos, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

(APPEARANCES CONTINUED)

Audio Operator:           Sharon A. Page, ECRO

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Debtor:              Benjamin Finestone, Esquire
                             QUINN EMANUEL URQUHART
                               & SULLIVAN LLP
                             51 Madison Avenue
                             22nd Floor
                             New York, New York 10010

For Camshaft:                Pieter Van Tol, Esquire
                             HOGAN LOVELLS US LLP
                             390 Madison Avenue
                             New York, New York 10017

For Riju Ravindran:          Joseph Cicero, Esquire
                             CHIPMAN BROWN CICERO & COLE, LLP
                             1313 North Market Street
                             Suite 5400
                             Wilmington, Delaware 19801

                             Sheron Korpus, Esquire
                             KASOWITZ BENSON TORRES LLP
                             1633 Broadway
                             New York, New York 10019

For GLAS Trust
Company:                     Ravi Shanker, Esquire
                             KIRKLAND & ELLIS LLP
                             300 North LaSalle
                             Chicago, Illinois 60654

                             Brian Schartz, Esquire
                             KIRKLAND & ELLIS LLP
                             601 Lexington Avenue
                             New York, New York 10022

INDEX

MOTIONS:                                                        PAGE

Agenda
Item 2: Debtor's Motion for Temporary                          7
        Restraining Order [D.I. 31, 2/28/24
        (sealed)/ D.I. 41, 2/29/24 (redacted)]

        Court's Ruling:                                        171


WITNESSES CALLED
BY THE PLAINTIFF:                                               PAGE

    RIJU RAVINDRAN
    Direct examination by Mr. Cicero                           13
    Cross-examination by Mr. Finestone                         29
    Cross-examination by Mr. Shankar                           73
    Redirect examination by Mr. Cicero                         82

(Proceedings commenced at 10:00 a.m.)

THE COURT: Good morning, everyone. Please be seated.

MR. ENOS: Good morning, Your Honor, Ken Enos, Young Conaway Stargatt & Taylor, on behalf of the debtor. Your Honor, I believe there are two items scheduled to go forward today. The Court's order to show cause as well as the debtor's motion for a preliminary injunction.

Your Honor, I believe at the last hearing, the Court indicated it was fairly agnostic in terms of the order that we take these in. I would say --

THE COURT: I changed my mind.

MR. ENOS: Oh, then, I will follow the lead of the Court and not say another word. Thank you.

THE COURT: We're going to go with the order to show cause first. So let me ask. Is Mr. Morton in the courtroom?

MR. VAN TOL: Good morning, Your Honor, Peter Van Tol for Camshaft. Mr. Morton is not in the courtroom.

THE COURT: Okay. I was informed yesterday by Camshaft counsel that Mr. Morton allegedly was hospitalized somewhere overseas and that he asked for permission to appear by Zoom. I indicated, in response to that, that before I allowed him to do that, he needed to provide certain information, including, one, proof that he was hospitalized,

two, where he's located, three, whether he's going to provide the information that was ordered, and four, his current home address, phone number, and other identifying information.

In response, Camshaft's counsel advised me that Mr. Morton was allegedly now released from the hospital, but they provided no proof. Mr. Morton provided no proof that he was actually hospitalized at all. And frankly, given his absolute contempt for this Court, I don't believe him.

Two, I was advised that Mr. Morton would not comply with my previous order to provide information, leaving me no choice but to hold him and the Camshaft defendants, since he's the only one who can respond on behalf of Camshaft, in contempt of court. I am going to issue an order to that effect.

The order will provide monetary sanctions against both Camshaft defendants and Mr. Morton in the amount of $10,000 per day, given the fact that he apparently is aware of the location of a half a billion dollars or more than a half a billion dollars that was removed from the debtor's accounts prior to their filing for bankruptcy. He certainly has the financial ability to pay those fines, including Camshaft.

As far as I know, Mr. Morton still has access to those funds. I have no proof otherwise. I'm also going to issue a bench warrant for Mr. Morton's arrest for civil

contempt. And in doing so, I'm going to take a break.

I have the US Marshals here in the courtroom. We're going to take a recess while I discuss with the US Marshals the form of order that I'm going to be issuing and providing them with a copy so that they can take whatever actions they are allowed to take to seek Mr. Morton's arrest and confinement until he is willing to comply with my order.

So with that, I'm going to take a recess. I'll ask the US Marshals to come back into chambers. I'm going to ask debtor's counsel to come back, as well. Is anyone here representing Mr. Morton?

MR. VAN TOL: No, Your Honor, just me, on behalf of Camshaft.

THE COURT: Okay. So we're going to be discussing Mr. Morton's confinement, so just debtor's counsel because the marshals are interested in whatever information you might have to be able to locate Mr. Morton. And we'll take a recess. We'll go into the conference room over here in the hall. We'll take a recess. And when we're finished, we'll come back on the record. Okay. We're recessed for a moment.

MR. FINESTONE: Your Honor, one question.

THE COURT: Yes.

MR. FINESTONE: Can debtor's counsel bring also in the debtors sole director and officer, Mr. Pohl, into chambers?

THE COURT: Yes.

MR. FINESTONE: Thank you, Your Honor.

(Off the record at 10:05 a.m.)

(On the record at 10:38 a.m.)

THE CLERK: All right. Thank you. You may be seated.

THE COURT: All right. So for the record, I did have a chambers conference with the US Marshals, debtor's counsel, the U.S. Trustee's counsel, and we talked about Mr. Morton and whatever information the debtors had about Mr. Morton and how to locate him.

And we will now turn to the second part of the hearing, which is the motion for injunctive relief. Mr. Van Tol?

MR. VAN TOL: Your Honor, before we go on, may I just make two points for the record?

THE COURT: Yes.

MR. VAN TOL: The first is, Your Honor stated earlier that the Court believes Mr. Morton has access to the funds. I would simply point the Court to our sworn interrogatory response where Mr. Morton says he does not have the funds.

THE COURT: I understand that. I didn't say that he does have access. I said I suspect that he does. I suspect that he does because he's showing absolute contempt

for the Court, which leads me to believe he has zero credibility.

MR. VAN TOL: Understood, Your Honor. I'm simply making this point for the record, and I appreciate it.

THE COURT: Understood.

MR. VAN TOL: And the second point, again, just for the record, is we obviously object to Mr. Morton not being heard today. We understand Your Honor's ruling. I'm simply noting that for the record.

THE COURT: All right. Again, he was ordered to appear in person, and did not do so, and did not provide an adequate excuse for why he could not be here.

MR. VAN TOL: Thank you, Honor.

THE COURT: Okay. All right. Let's go to the preliminary injunction. And I've read the papers, so I don't need opening statements. We can just jump into the evidence, and then we'll go into closings after that.

MR. FINESTONE: Okay, great, Your Honor.

THE COURT: Unless you want to just do a two-minute opening, just to set the stage is fine, but I don't need a lot of opening.

MR. FINESTONE: Ben Finestone, Quinn Emanuel, on behalf of the proposed and now counsel to the debtor in possession, Your Honor. Why don't I just talk about the evidentiary agreements that we had reached with the other

side? We have been able to reach agreements on evidence, and they're pretty simple.

In terms of all of the exhibits that the parties have sent to chambers electronically and have here in the courtroom, the debtor and Mr. Ravindran and Camshaft have agreed that they may all be admitted and considered today, but solely for purposes of the preliminary injunction hearing today, so parties can reserve their rights as to admissibility beyond today, Your Honor.

THE COURT: Is that all the parties?

MR. FINESTONE: Yes, Your Honor. And GLAS as well as -- all four parties are party to this agreement, Your Honor.

THE COURT: Okay, so I have, just for the record, I want to make sure we have what we're talking about here. I have debtor's TRO Exhibits 1 through 52; is that correct?

MR. FINESTONE: Yes, Your Honor.

THE COURT: Then I have Ravindran's Exhibits 1 through 10.

MALE VOICE: That's correct, Your Honor.

THE COURT: Do I have any from Camshaft?

MR. FINESTONE: Nothing from Camshaft and nothing from GLAS, Your Honor.

THE COURT: Okay, so those are the only two, just the debtor's and Ravindran's?

MR. FINESTONE: Yeah.

THE COURT: Okay. And there's an agreement, all admissible without objection?

MR. FINESTONE: Yes, Your Honor.

THE COURT: Okay. They're all admitted without objection.

MR. FINESTONE: And I'll just clarify or note, Your Honor, that included in the Debtor's Exhibits 1 through 52 is a declaration of Mr. Pohl. It is the same first-day declaration that was admitted for purposes of that contested matter. And also included in Mr. Ravindran's exhibits from 1 to 10 is the same declaration that was filed on the Court's docket in advance of when this hearing was initially scheduled for the TRO, Your Honor.

Both parties have no objection to that testimony coming in as their direct. Again, Your Honor, solely for purposes of the PI hearing.

THE COURT: Okay. Are there any objection?

MALE VOICE: No, it's correct, Your Honor.

THE COURT: Okay. They're admitted without objection.

MR. FINESTONE: So Your Honor, the witnesses that the debtors had put on their list for today was Mr. Pohl. His testimony is now in via the declaration. And we would call Mr. Ravindran to the stand. For purposes of efficiency

and economy, if Mr. Ravindran intends on putting any supplemental direct, that should probably go first. I don't know what their intention is here.

THE COURT: Well, let me ask first, is there any cross examination of Mr. Pohl?

MALE VOICE: There is no cross examination.

THE COURT: Okay. So Mr. Pohl is done. So then, Mr. Ravindran, do you intend to put on --

MR. CICERO: We will do a short direct of Mr. Ravindran, who I believe is on Zoom.

THE COURT: All right. Are you calling him as your witness?

MR. FINESTONE: I am calling him as an adverse witness, but I have no objection to their direct going first, if that's okay with the Court.

THE COURT: All right. We'll do that. Why is Mr. Ravindran not in the courtroom?

MR. CICERO: He's abroad. I think we talked about this at the last hearing, Your Honor, that you allowed that he could attend via Zoom.

THE COURT: Well, attend and testifying are two different things.

MR. CICERO: I guess we misunderstood that, Your Honor.

MALE VOICE: I understood your order. And I guess

maybe we're wrong. You asked that he'd be available as a witness by Zoom is what we understood it. If we misunderstood, I apologize. But I think all the parties were under that impression.

THE COURT: All right. Well, ordinarily, I do not allow witnesses to testify by Zoom. You have to be in the courtroom unless you have met the requirements of Rule 43. Do you have a reason why Mr. Ravindran cannot be here in the courtroom?

MR. CICERO: We did not discuss that with Mr. Ravindran. We understand that he is abroad in Dubai, where he lives. But under that rule, I don't have any other reasons.

THE COURT: All right. Is he precluded from traveling to the United States?

MR. CICERO: I don't know the answer to that, Your Honor, because it wasn't a discussion we had because we misunderstood.

THE COURT: All right. Well, let's bring him up on Zoom, and we'll start with that. I want to set a record for why he is not available to be here in person.

MR. CICERO: Okay. Can you hear me, Mr. Ravindran? And turn on your camera.

THE COURT: Mr. Ravindran, are you on? All right.

MR. CICERO: Can you hear us, Mr. Ravindran.

THE WITNESS:  Yes.

THE COURT:  Mr. Ravindran, please raise your right hand.  State your full name for the record, please.  State your full name for the record, please.  Can you hear me, Mr. Ravindran?

THE WITNESS:  Yes, sir.

THE COURT:  State your full name for the record, please.

THE WITNESS:  Yeah.  My name is Riju Ravindran.

THE COURT:  Can you spell your last name for the record?

THE WITNESS:  Yes, sir.  It's R-A-V-I-N-D-R-A-N, Ravindran.

THE COURT:  Do you affirm the testimony you're about to give as the truth, the whole truth, and nothing but the truth to the best of your knowledge and ability?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay, thank you.  You may lower your hand.

MR. CICERO:  Did I understand correctly you want me to ask about his availability?

THE COURT:  Yes.

MR. CICERO:  Okay.

DIRECT EXAMINATION

BY MR. CICERO:

Q.   Mr. Ravindran, where are you currently located?

A.   Sir, I'm currently located in Dubai.

Q.   And is there a reason, if any, that you cannot travel outside of Dubai to the United States for today's hearing?

A.   Yes, sir, I do live with my parents.  I've been taking care of them, and I think both they are in their 70s and dad is going under cancer treatment, also, so I've been the one who has been taking care of him.  That's the one primary reason.  And as far as I know, I think it's not request, also.  I was not aware also, but I've been with my dad and I think recently mom is also having dementia so she just keeps asking (inaudible).  I don't know.  Yeah.

MR. CICERO:  Your Honor, do you want me to proceed with more questions about his availability?

THE COURT:  Mr. Ravindran, where in Dubai exactly are you located?

THE WITNESS:  Sir, I live in Dubai.  It's called a place, Emirates Hills.

THE COURT:  Where are you right now for the testimony?

THE WITNESS:  I'm in my home office, sir.  It's evening, it's 6:30 over here.  So I'm in my home office.

THE COURT:  Is there anyone in there with you?

THE WITNESS:  No, sir.  Nobody is there with me.

THE COURT: Do you have any documents in front of you?

THE WITNESS: No, sir. Only my laptop, which I'm talking to, sir.

THE COURT: Okay. I'm going to direct you to only use your laptop for purposes of this testimony and not to receive any messages, not look at any emails, not send any emails, not look at anything other than the Zoom screen. Is that understood?

THE WITNESS: Yes, sir.

THE COURT: All right. You may proceed.

MR. CICERO: Thank you, Your Honor.

BY MR. CICERO:

Q. Good evening for you, Mr. Ravindran. As you know, this is a bankruptcy proceeding concerning BYJU's Alpha. What is BYJU's Alpha?

A. BYJU's Alpha is an subsidiary of Think and Learn Private Limited.

Q. What is Think and Learn Private Limited.

A. Think and Learn Private Limited, it's a company from India. It's a private limited company and primarily into education and technology.

Q. And I believe you said that BYJU's Alpha is a subsidiary of Think and Learn. Is Think and Learn the sole stockholder of BYJU's Alpha or is there some other structure?

A. Think and Learn -- sorry -- BJYU's Alpha is since the accident BYJU's PTE, which is a Singapore entity. And BYJU's PTE is directly 100 percent owned by Think and Learn Private Limited. That is an Indian company.

Q. Okay, so BJYU's PTE is the sole stock or was at least before the chancery ruling that is being appealed was the sole stockholder of BYJU's Alpha. And then the stockholder of BYJU's PTE is Think and Learn. Did I get that right?

A. Yes, sir.

Q. Okay. What, if any, role do you have at BJYU's Alpha?

A. Sorry, sir. Can you repeat once more?

Q. Do you have any function or role at BJYU's Alpha?

A. Yes, I was a director over there.

Q. You say was? I'm sorry I spoke over you.

A. Yeah. So sorry. I was a director and was removed with an appeal, I think, in 2023.

Q. So you were a director until the court ruling in Delaware?

A. Yes, sir. Exactly. That's what I was -- yeah.

Q. With respect to the parent, Think and Learn, do you have any role with Think and Learn?

A. Yes, Think and Learn, also, I'm a director, nominee director of this also.

Q. Sir, what was the word you used? A what director?

A. It's a nominee director.

Q. What does that mean?

A. It's like nominated by the parent company.

Q. How many board members are there at Think and Learn?

A. Currently three board members, sir.

Q. Who are the other board members?

A. Yeah, one is Byju Ravindran. Second one Divya Gogalnath. Third person is myself, Riju Ravindran.

Q. What was the function and purpose of BYJU's Alpha, if you know?

A. BYJU's Alpha was set up in, I think, in 2021. It was primarily used for -- it's like an SPV. It's like special purpose vehicle for raising funds and using it for abroad expansion.

Q. I don't know if I heard correctly. You said raising funds and what was the last part, expansion?

A. Abroad, international expansion, sir.

Q. Okay. Did BYJU's Alpha ultimately raise funds for international expansion?

A. Yes, sir. We did raise fund from term loan, Term Loan B. That was around 1.2 billion, sir.

Q. Term Loan B, 1.2 billion. Is that what you said?

A. Yes, sir.

Q. Okay. Why did BYJU's Alpha borrow $1.2 billion?

A. As I mentioned, this was for international expansion to go into different markets, sir.

Q. Was there international expansion performed by BJYU's Alpha?

A. Yes, sir.

Q. Did you make decisions regarding the use of funds for that international expansion?

A. No, not by me.

Q. Who made the decisions?

A. Usually, the decision will come from the parent company, that is, Think and Learn Private Limited.

Q. Was there one person or multiple persons at Think and Learn that would provide that guidance to you at BJYU's Alpha?

A. Yes, sir. Being the parent company and this was a non-operating company, so most of the time, management or the Treasury or the subsequent leaders in certain functions will be making decisions.

Q. How would those decisions be communicated to you from the folks at the Think and Learn, the parent company?

A. Yeah, usually I think we all work out of either from the -- because primarily, I was in India before now. Recently, I shifted to Dubai. So whenever the meeting is there or in the person, we'll be discussing and letting me

know that these are the things to be done, or either by phone call or any of the meetings.

Q. Other than your position on the board of directors at Think and Learn, do you hold any other positions or do you have any other roles at Think and Learn?

A. No, sir. I'm only the director, nominee, yeah.

Q. You understand that you've been named as a defendant in a bankruptcy proceeding, correct?

A. Yes, sir.

Q. Okay. And there are other -- are you aware that there are other defendants, as well?

A. Yes, sir.

Q. There's one group of defendants I'll refer to as Camshaft. Does that name mean anything to you?

A. I heard that one, sir. I heard on defendant list, yeah.

Q. Do you know what Camshaft is?

A. No. Primarily, I think they're a fund manager. That's what my knowledge, sir.

Q. Was Camshaft or the Camshaft entities, did they do business with BJYU's Alpha?

A. Yes.

Q. In what way?

A. I think BYJU's Alpha, if I'm correct, and if Alpha is invested fund through Camshaft, yeah, I think, yeah.

Q. Okay. BJYU's Alpha's invested funds in Camshaft. What was your role, if any, in that decision?

A. No, as I was mentioning that I'll be getting instructions from the parent company. And since I was the sole director over there, I'll be signing those documents. So documents are signed by me, sir.

Q. So you signed documents for the purpose of those investments; is that right?

A. Yes, sir.

Q. Why did you sign those documents?

A. No, they said -- because, as told, I'm not actively involved or participating over there. It's based on the instructions from the parent company, Treasury. If the fund under management, it's from the Treasury, we'll be doing that, sir.

Q. Did you --

A. That's what I've been doing.

Q. My apologies. Did you select Camshaft as the fund manager or the place where the funds were invested?

A. No. No, sir.

Q. Do you know how Camshaft was selected?

A. No, I have no idea, sir.

Q. How many investments did BJYU's Alpha make in the Camshaft funds?

A. If I'm correct, I think it's two investments, sir,

because all this deposition I recently had, so that's why. Otherwise, I don't remember many of these instances. Most of this recollection is from I had two days before, a long deposition, so from that one, yeah, I think it's two, if I'm correct.

Q. So just for the record, for the Court's edification, you were deposed two days ago; is that right?

A. Yes, sir. I think the full day, I think for nine hours, starting evening, 3 o'clock to 12:00 in the midnight. That was approximately seven hours of deposition, sir.

Q. And that was Dubai time that you're referring to, right?

A. Exactly, sir.

Q. Okay. So I think you noted that your memory was refreshed about two investments. Do you know when did those investments take place?

A. I think, sir, that was in 2022, around March, April or -- and June and July, I believe, yeah.

Q. Okay. There's also a defendant named in this action called Inspilearn. Are you familiar with that entity?

MR. FINESTONE: Objection. Leading.

MR. CICERO: Okay, I think it's --

THE COURT: It's just background. Overruled.

MR. CICERO: Thank you.

BY MR. CICERO:

Q.   Are you familiar with an entity named Inspilearn?

A.   Yes, sir.

Q.   What do you know about Inspilearn?  What is Inspilearn?

A.   Yeah.  Similarly, Inspilearn also was a subsidiary of parent company, Think and Learn Private Limited.  Even I was a manager over there, sole manager over there.

Q.   Who are the members -- or it's an LLC.  Who are the members of Inspilearn?

A.   No, I think I'm the only member of this.

Q.   You're referring to manager, right?  Is that what you're referring to?

A.   Yes.  Sorry.

Q.   Let me call stock --

A.   Was that -- yeah.

Q.   Would it be fair if I said stockholder?  Who's the stockholder of Inspilearn?

THE COURT:  There's no stockholders of LLCs.

MR. CICERO:  The equity owners.  I think he's getting confused with the term, but who is the equity?

THE COURT:  Well, he was the managing member of it.  He should know how it works.

MR. CICERO:  I just think he's having a hard time understanding me.

BY MR. CICERO:

Q. Do you know what a member of an LLC is?

A. Yes, sir. I understood. I misunderstood that one. It was Think and Learn Private Limited. Sorry. Yeah.

Q. Okay. Are you still the manager of Inspilearn?

A. No, sir. I resigned from there.

Q. When did you resign?

A. In February, February 14, exactly, because that's also a reason and I think it was a Valentine's day. That was demanded by the opposition counsel last day.

Q. Why did you resign from Inspilearn?

A. No. I've been -- as I think, I've been a director and board member for a lot of the companies. I think around 15 to 20 companies. And I've been getting down from and basically, like, resigning from many companies because it's like, as a default procedure. And a few more I'll be getting down because as you will be knowing that (inaudible), I won't be actively participating. There is no point in just being a namesake director over there. So it's been about planned, which has been happening.

Q. There are allegations in this proceeding that over $500 million was moved from BYJU's Alpha's Camshaft account to an Inspilearn account. Are you familiar with those allegations?

A. Yes, sir. That fund movement was from Alpha to Inspilearn, sir.

Q.   Okay.  When did that transfer from BYJU's Alpha to Inspilearn first occur, if you know?

MR. FINESTONE:  Objection.  Seeks a legal conclusion, Your Honor.

MR. CICERO:  I'm asking a factual question, Your Honor.

THE COURT:  Repeat the question.

MR. CICERO:  When were the funds first transferred from BYJU's Alpha to Inspilearn?

THE COURT:  He can answer the question.

MR. FINESTONE:  Objection.  Lack of foundation.  Funds.

THE COURT:  Which -- well --

MR. CICERO:  The 500 -- over $500 million, approximately, that I just mentioned in that question.

BY MR. CICERO:

Q.   Do you understand the question?

THE COURT:  Why don't you restate it?

MR. CICERO:  I'll restate it.

BY MR. CICERO:

Q.   The approximately $500 million that you said you were familiar with, when were those funds moved from BYJU's? Alpha to Inspilearn?

A.   Yes, sir.  It was in approximately February, March in 2023.

Q. Who made that decision?

A. It is a decision from the parent company, Think and Learn, sir.

Q. Did you ask the parent company why money was being moved from BYJU's Alpha to Inspilearn?

A. No, sir. I think one more point which I want to make over here. Actually, all this one moment, whatever because every time I will get an instruction, I'll be getting signed and moving on. Sir, that's what I have been doing. And if primarily, see, everything was within the company only. It was from Alpha to Inspilearn, Inspilearn to Inspilearn. So everything is -- as far as my limited knowledge, I wasn't knowing that it is within the company, sir.

Q. When that decision was made, how many directors of Think and Learn were there? I think you testified how many there are today. Is that different?

A. Yeah. You are talking about in 2023, sir?

Q. Correct.

A. Yeah. I think if it is 2023, March, we had six directors, sir. Three directors were there.

Q. Do you know whether Inspilearn still has those funds?

A. No. Don't know exactly. No, Inspilearn? No. No. I think from a recent press release after I got

resigned, I learned that it's not with Inspilearn. It's my limited knowledge.

Q. Is that -- for the record, is that the press release that was attached to your declaration that you submitted?

A. Yes, exactly. That's what I was mentioning.

Q. When you read that press release, did you ask anybody at Think and Learn whether that was true and if so, where the money was?

A. Yes, sir, I did ask because I know that this is the person and this is it. So I thought the best person to check with Mr. Byju. I asked him about this fund and this one. Then he told the Treasury, who is managing, Praveen Prakash. You should check with him. So that's what I did, also. I did check with Praveen. So I couldn't get a proper answer from him.

THE COURT: I'm sorry. Who did you speak to?

THE WITNESS: Sir, I spoke to Mr. Prakash. He was the Treasury manager. He's a founding member, sir.

THE COURT: Can you spell his last name for me, please?

THE WITNESS: Sure. It's like his name is Praveen and last name is Prakash, P-R-A-K-A-S-H, Praveen Prakash.

THE COURT: Thank you. And he's the Treasury what? For Think and Learn?

THE WITNESS: Yes. The parent company Think and Learn Private Limited, sir. He is a founding member.

THE COURT: Founding member. And what's his -- and you said he had some position there.

THE WITNESS: Yeah. Treasury head, sir.

THE COURT: Okay. Thank you.

BY MR. CICERO:

Q. I should ask, did you ask Mr. Prakash the questions of whether this is true and whether the money was moved and where?

A. As I told already, it's like I asked him, so I think he was reluctant. He was refusing to give me an answer. I don't know because I can't force him. And I can't go beyond that one, sir.

Q. I take from that you didn't get an answer. Is that a fair statement?

A. Yes, that's what I was mentioning, sir.

Q. Do you know where the funds are currently deposited?

A. No, sir. I don't have an idea.

MR. CICERO: I have no further questions. I yield to opposing counsel.

THE COURT: Okay.

MR. CICERO: And I wanted to note for the record, just at the last hearing, just to talk about his

availability, which I think we dealt with. But at page 35 of the transcript, Your Honor said you're going to order Mr. Ravindran to appear and testify before the hearing on the 14th. And we asked would it be okay by Zoom. And you said, yes, that's fine. I just wanted to note that, Your Honor.

THE COURT: All right, thank you.

MR. CICERO: Thank you. And if I have redirect, I'll let you know.

MR. FINESTONE: Your Honor, may I first approach with a copy of the deposition transcript?

THE COURT: Do I not have that in electronic format?

MR. FINESTONE: We could send it to Your Honor.

THE COURT: If you got it, I'll just take it that way.

MR. FINESTONE: And one more administrative request, Your Honor. Given the virtual attendance of the witness, may I ask for my associate to have the ability to show exhibits and the deposition transcript if necessary?

THE COURT: Yes. Who's going to be doing that?

MR. FINESTONE: Jordan Nakdimon.

THE COURT: Okay.

MR. FINESTONE: N-A-K-D-I-M-O-N.

THE COURT: Is he doing this through the Zoom?

MR. FINESTONE: Yes, Your Honor.

THE COURT: Can you raise your hand so we can find you and give you rights? There we go. Meant to virtually, but that's fine.

MR. FINESTONE: May I proceed, Your Honor?

THE COURT: Ready to go? Yeah. You're ready to go.

MR. FINESTONE: Okay. Thank you.

CROSS-EXAMINATION

BY MR. FINESTONE:

Q. Good afternoon, Mr. Ravindran.

A. Hi. Good afternoon, sir.

Q. You can hear me okay?

A. Yes, sir, I can hear.

Q. Mr. Ravindran, you are a director of many of the companies in the BYJU's enterprise, correct?

A. Yes, sir.

Q. You're a director in most of the companies in the BYJU's enterprise; isn't that true?

A. Yeah. As you mentioned, many of the companies, sir.

Q. And you're a director of the parent company, T&L, correct?

A. Yes, sir.

Q. Along with your brother and your sister-in-law, correct?

A.    Yes, sir.  They are my brother and sister.

Q.    That parent company, T&L, is sometimes referred to as BYJU's, correct?

A.    Yes, sir.

Q.    That's one and the same.  T&L and BYJU's are the same company, correct, sir?

A.    Yes.

Q.    You testified a little bit, Mr. Ravindran, about when you were the director of BYJU's Alpha.  Do you remember your testimony, sir?

A.    Yes, sir.

Q.    It was just you, nobody else, as the sole director and officer of BYJU's Alpha, correct?

A.    Yes, sir.

Q.    The responsibility over BYJU's Alpha lied with you and you alone, correct?

A.    Responsibility.  Can you repeat the question once?

Q.    The responsibility over by BYJU's Alpha lied with you and you alone, sir; is that correct?

A.    No, I think with me and the parent company.  It's always been like that, sir.

Q.    Okay.

MR. FINESTONE:  Jordan, can I ask you to please bring up page 21 of the deposition transcript?

BY MR. FINESTONE:

Q. Mr. Ravindran, you and I met two days ago when I took your deposition, correct?

A. Exactly, sir.

Q. And I asked you questions and you gave me answers, correct?

A. Yes.

Q. And you answered those questions as truthfully as you knew how to answer them, correct?

A. Yes, sir.

Q. Okay, can I ask you to please take a look at page 21? It's on the right, Mr. Ravindran, line 6 to 10. A little bit below that, line 11 through 15. And I'm going to read it out loud, Mr. Ravindran. And so the responsibility for BYJU's Alpha was your responsibility, correct? Your lawyer put an objection to from, and you answered yes. Do you see that on the transcript, sir?

A. Yes, sir. Yes, sir.

Q. Did I ask you that question and did you give me that answer?

A. Yes.

MR. FINESTONE: Okay, Jordan, you can take the transcript down.

BY MR. FINESTONE:

Q. Mr. Ravindran, when you made decisions in your role as sole director and officer of BYJU's Alpha, it was not

by yourself, was it?

A. Yes.

Q. You made those decisions with Think and Learn, the parent entity; isn't that true, sir?

A. Yeah. Think and Learn means basically from Think and Learn directions will be there. So it's a Think and Learn decisions. That's what I was trying to (inaudible), yeah.

Q. My question is a little bit different than that, Mr. Ravindran. Isn't it true, sir, that when you made decisions for BYJU's Alpha, you worked with Think and Learn to make those decisions, sir?

A. No. I can't term it as I worked with the Think and Learn because I was referring always as I got instructions, and I was getting executed, sir. So it's not like that. I worked with the Think and Learn, and I got instruction and working, sir. That's what I believe. That there is a small difference.

Q. Okay, Mr. Ravindran. Isn't it true that, in fact, you didn't even one time make a decision for yourself over BYJU's Alpha? It was always with the parent company, correct?

A. Yes, sir.

Q. And Inspilearn is another company that you were the sole governor of; isn't that true, sir?

A.   Yes.

Q.   Same thing here.  Any decisions that were made while you were the sole governor of Inspilearn, they were made by the parent, correct?

A.   Yes, sir.

Q.   You resigned just about one month ago from that role, sole governor of Inspilearn, true?

A.   Sir.

Q.   And other than what you testified about today here in court, you're not able to tell me any specific reason for that resignation; isn't that right?

A.   Yeah.  I think as I mentioned, as I submitted also in resignation, also, I mentioned with a personal reason also, sir.

Q.   Inspilearn is the only entity that you resigned from in February of 2024, Mr. Ravindran, correct?

A.   No, there are a few other companies, also.

Q.   Okay.

MR. FINESTONE:  Jordan, can you bring up the transcript and bring it to page 36, please?  Thank you, Jordan.  Line 21 to 25.

BY MR. FINESTONE:

Q.   Mr. Ravindran, did I ask you, did you resign from any of those companies in February of 2024?  And did you give me the answer?  Don't remember the date exactly.  I think

that was in January, I believe.

A.   Yeah.

Q.   In your deposition, did you testify that you resigned from any companies in February other than Inspilearn?

MR. FINESTONE:  You could take it down, Jordan.

THE WITNESS:  Can you repeat the question once more, sir?

MR. FINESTONE:  I'll withdraw the question.

BY MR. FINESTONE:

Q.   On Valentine's Day, that was the day that you chose to resign from Inspilearn, correct, sir?

A.   Yes, sir.

Q.   And you sent a letter to Think and Learn regarding your resignation, did you not?

A.   Yes.

Q.   You sent a letter to the Think and Learn board, correct?

A.   Yes.

Q.   You are one of the members of the Think and Learn board, are you not?

A.   Yes.  I'm a nominee director over there, sir. Yes, I'm a board member.

Q.   You didn't discuss your resignation with anyone. You just sent that letter, correct?

A.   Yes.

Q.   You didn't discuss it with your brother or your sister-in-law before sending that letter.  You just sent the letter, correct?

A.   Yes, sir.

Q.   And neither of the board members called you when you determined to resign, when they received that letter; isn't that true, Mr. Ravindran?

A.   Correct, sir.

Q.   They didn't call you and ask why you were resigning, did they?

A.   No.  I think I didn't find anything over there because it's kind of a non-operating entity, I think, yeah, as far as I remember.  No, there was no call and asking, I believe.  Yeah.

Q.   And Mr. Ravindran, after you sent that letter, you received the corporate resolution back from the Think and Learn board that very same day, didn't you?

A.   Yes, sir.

Q.   And that resolution from the Think and Learn board said that it accepted your resignation, didn't it?

A.   Yes, sir.

Q.   But you still had no discussion with the other board members, did you?

A.   Yeah.  As far as five, no.  That's correct.

Q. You don't know when they drafted that resolution, do you?

A. No, I don't know.

Q. And even though you're one of the directors of Think and Learn, you didn't participate in the drafting of that resolution, did you?

A. Yeah. No, I was not a part of that one.

Q. It all just happened in one day. You sent the letter, and you got a corporate resolution back, correct?

A. Yeah, I believe. Yeah.

Q. And on this day that you resigned from Inspilearn, February 14, Inspilearn had an asset that was worth at least $533 million.

A. Yes, sir.

Q. The money was at Inspilearn. You were sure of that, weren't you, sir?

A. Yes. Money was at Inspilearn, yes.

Q. But when you resigned, you didn't talk to anyone about the money, did you?

A. No. No.

Q. You did assume, though, sir, did you not, that the board of Think and Learn, they knew where the money was, correct?

A. I don't know about that one.

MR. FINESTONE: Jordan, can we bring up page 79 of

the transcript, please? Can you highlight lines 18 to 23?

BY MR. FINESTONE:

Q. Mr. Ravindran, did I ask you at your deposition, did the board of Think and Learn understand where the money was? Did your counsel object to the form of the question? And did you respond? I don't know. I assumed they will also know, right, Inspilearn. Yes, the same, yep. Did I ask you that question and did you give me that answer?

A. Yeah.

Q. And you were a member.

MR. FINESTONE: You could take it down now, Jordan. Thank you.

BY MR. FINESTONE:

Q. And you were a member of the board on February 14, a member of the T&L board, correct, sir?

A. Yes, sir.

Q. And today you still sit on that board with your brother and sister-in-law, correct, sir?

A. Yes, Byju and Divya.

Q. There is a replacement manager at Inspilearn as we sit here today; isn't that true, sir?

A. Yes.

Q. You didn't appoint him before you resigned, but you have some understanding that he was appointed after you resigned, correct?

A.   Yes.

Q.   And maybe you've spoken with him in the last 30 days or maybe you haven't.  You don't really remember, do you?

A.   Yeah, I think, yeah.  Correct, what you told is correct.

Q.   You have no clear memory about whether or not he's called you and asked about the history of Inspilearn, do you, sir?

A.   No, I don't think I had a discussion with this. That follows my understanding.  I'm not able to recollect because -- no, as far as I remember, no.

Q.   And Mr. Ravindra, when you found out that there was a replacement manager of Inspilearn, you never picked up the phone, and gave him a call, and said, look out for the $533 million I left there, did you?

A.   No, sir.  I think it's ultimately with the Think and Learn itself, right?  So I didn't find anything strange over there, sir.

Q.   You do believe, Mr. Ravindran, though, that Think and Learn they still have the cash today, do you not?

A.   Yes.

Q.   And you understand what the US Bankruptcy Court is, Mr. Ravindran?

A.   Yes, sir.

Q. If the US Bankruptcy Court directed you, Mr. Ravindran, as a director of Think and Learn, to direct the man in Treasury to move the money, you would do that, wouldn't you, sir?

A. No. Can you repeat the question once more, please?

Q. Yeah. If the US Bankruptcy Court, Mr. Ravindran, directed you to direct the man in Treasury to move the money, you would do that, would you not, sir?

A. Yes, within my capacity, sir. I will do that one for sure.

Q. Yeah. And if the US Bankruptcy Court, Mr. Ravindran, directed you to work with your brother and your sister-in-law, the other two directors of T&L, to move the money, you would do that too, wouldn't you, sir?

A. As I stated before, also, it's, like, within my capacity because I'm a single member, board member, over there with being one member, whatever in my capacity I'll be able to do, sir.

Q. You would follow the order of the Court, would you not, sir?

A. Yes, sir. That's why I precisely told once more. I am one of the board member. If I am able to do, 100 percent I'll do that.

Q. You cannot describe the books and records of

BYJU's Alpha, can you, sir?

A. Can you repeat the question?

Q. I'm changing subjects a little bit now, Mr. Ravindran. I apologize. BYJU's Alpha, that was the entity that you were the sole director and officer of, correct?

A. Yes, sir.

Q. And even though you were the sole director and officer, you can't describe to me the books and records at all, can you?

MR. CICERO: Objection. Vague and ambiguous.

THE COURT: Overruled. You can answer as best you can.

THE WITNESS: Yes, sir.

BY MR. FINESTONE:

Q. Yes. You cannot describe them, correct, sir?

A. Yes, I'm not a director anymore of Alpha over there.

Q. My question is a little bit different, Mr. Ravindran. Based upon your prior experience as director of BYJU's and Alpha, are you able to describe to me in any respect what the books and records of BYJU's Alpha looked like?

A. No. And even I didn't understand the meaning of describe, so I don't know that one.

Q. Let me ask you something different, Mr. Ravindran.

                                                                    41

You would agree with me, would you not, sir, that the
information about the assets and liabilities of all of the
BYJU subsidiaries, that's kept at the Think and Learn level,
correct?

        A.   Yes.

        Q.   And you're a director of Think and Learn, sir, are
you not?

             MR. CICERO:  Your Honor, I think he --

             THE COURT:  Yeah, we had crossover.  Can you
repeat your answer, Mr. Ravindran?

             THE WITNESS:  Yeah.  Yes, sir.

             THE COURT:  You were answering the last question
and you were spoken over, so I need you to repeat your last
answer.

             THE WITNESS:  No.  Can I have the question because
I got confused?  Can I have the last question once again,
please, sir?

BY MR. FINESTONE:

        Q.   Mr. Ravindran, it's true, is it not, that
information about the assets and the liabilities of all of
the BYJU subsidiaries, that's kept at the Think and Learn
level, correct?

        A.   Yes, sir, probably.  Most probably, yes.

        Q.   And that's the entity that you're still a director
of, correct?

A. Yes, sir.

Q. Okay. Thank you, Mr. Ravindran. I want to go back in time a little bit. You testified earlier today a little bit about those transfers of cash from BYJU's Alpha to Camshaft. Do you remember that testimony, sir?

A. Yes, sir.

Q. In April of 2022, BYJU's Alpha transferred $318 million to Camshaft hedge fund, correct?

A. I think date will be correct only. Yeah, I think that one only, yeah.

Q. It was Think and Learn that decided to make that transfer; is that right?

A. Yes. Think and Learn, yep.

Q. And in April of 2022, you sat on the board of Think and Learn, did you not, sir?

A. Yes.

Q. And in your role as BYJU's sole director and officer, you accepted the decision that the Think and Learn board made, did you not?

A. No. Can you repeat the question, sir? I'm just getting confused over that.

Q. As sole director and officer of BYJU's Alpha, you consented to the transfer of BYJU's Alpha's cash to the Camshaft hedge fund, correct?

A. For this I signed, if that's what you are looking

into. Yes, I am the person who signed.

Q. You signed the documents for BYJU's Alpha to make the investment into Camshaft, did you not?

A. Yes. From the instructions from the parent company, sir.

Q. Yeah. And even though you were on the board of Think and Learn, you have no idea why Think and Learn made that direction to you to invest the money in Camshaft, correct?

A. Correct.

Q. You just didn't think too much about that one, did you?

A. No. I think, as I was telling always, it's like fund is always been with Think and Learn is my belief and still today. So it's always like within the parent, whether Alpha, Inspilearn, Inspilearn, everything is always thinking. That's my limited knowledge. I didn't think beyond that, correct.

Q. Okay. I'm looking for a yes or no. You didn't think very much about the decision to invest the money into Camshaft, correct?

A. Yeah.

MR. CICERO: Your Honor, asked and answered.

THE WITNESS: It's always from instruction with the instruction, yeah.

BY MR. FINESTONE:

Q. And you didn't even ask Think and Learn one question before you signed the documents, did you?

A. No.

Q. Camshaft, they have nothing to do with education, do they?

A. I didn't look into them. I don't know the answer to that.

Q. You don't know that they have anything to do with education, do you, sir?

A. Correct, sir.

Q. You've never heard of them in April of 2022, had you?

A. No. You're asking you heard about Camshaft in 2023?

Q. No. Mr. Ravindran, did you -- do you need me to speak louder or speak slower?

A. No, because it's laptop, and this. Yeah, slower will be better because with foreign language, I'll have a slight difficulty. That's why I'm trying as much as coming closer and trying to pick up.

Q. I understand, but how is the volume? Should I speak louder or quieter or it's just fine.

A. It's good, sir. It's good.

Q. Okay, thank you. Mr. Ravindran, in April of 2022,

when you signed the documents, you had never heard of Camshaft hedge fund, correct?

A. Correct.

Q. And BYJU's Alpha, they had never done business with Camshaft before, as far as you knew, right, sir?

A. Yes, sir.

Q. In fact, you don't know of any entity in the entire BYJU's enterprise that had ever done any business with Camshaft, correct?

A. I don't know exactly, but, yeah, I think it's correct.

Q. You never met anyone named William Cameron Morton, did you?

A. No.

Q. You didn't ask the other board -- you didn't ask your brother if he had ever met Mr. Morton, did you, sir?

A. No.

Q. You didn't ask your sister-in-law whether she had ever met Mr. Morton, did you, sir?

A. No.

Q. You didn't even know -- as the sole director of BYJU's Alpha, you didn't even know what human being brought Mr. Morton to the BYJU's enterprise, did you?

A. No, sir.

Q. And today, you still don't know anything about

Camshaft, do you?

A. Yeah. Correct.

Q. You just got the instruction from the parent, and you followed that instruction, correct?

A. Yes, sir.

Q. And you were sitting on the parent's board when you got that instruction, correct?

A. Yes.

Q. It's possible you read the offering materials -- I'll withdraw the question.

Do you remember your deposition, Mr. Ravindran, when I showed you some materials that described the Camshaft investment, and we talked about them being called the offering materials?

A. I think, if you're referring to the signed document, maybe, I think it's a subscription document, if I may.

Q. Yeah, it's possible you read the materials from Camshaft, but you wouldn't have understood anything; isn't that true?

A. Correct.

Q. You didn't have the knowledge, or skill, or the type of experience to review that kind of investment, isn't that true, sir?

A. Yes. It's always acted on behalf of -- always

legal advisors because I think this is beyond this -- yeah, you're correct.

Q. You did --

A. It's always legal advisors. Yeah.

Q. I'm sorry, Mr. Ravindran. You did sign a subscription agreement that says you did have the experience and knowledge to understand the documents; isn't that true?

MR. CICERO: Objection, Your Honor.

THE WITNESS: Yes.

THE COURT: Hold on.

MR. CICERO: We don't have the document in front of us, but if I recall, that's a legal conclusion based upon the language of the document.

THE COURT: I don't think it calls for a legal conclusion. And he's already answered the question. He said yes.

BY MR. FINESTONE:

Q. Mr. Ravindran, when you made the decision to sign the documents, there was nobody else other than you that was looking out for BYJU's Alpha, was there?

A. Yes, sir.

Q. Mr. Ravindran, you do agree with me that BYJU's Alpha's business partners, as a general matter, they should have a strong business reputation and they should adhere to high ethical standards. Do you agree with that?

A. Yes.

Q. And do you also agree, Mr. Ravindran, that BYJU's Alpha, when you were the governor of BYJU's Alpha, it shouldn't, as a general matter, do business with somebody guilty of moral turpitude; do you agree with that statement also, Mr. Ravindran?

A. Correct.

Q. You had no idea, did you, that Mr. Morton was charged with knowingly or purposefully causing reasonable apprehension of bodily injury to family members? That's not something you knew about, is it?

MR. CICERO: Object to the form, Your Honor. Lack of foundation.

THE COURT: Well, he's asking him if he knows. He either does or he doesn't. You can answer the question, Mr. Ravindran.

THE WITNESS: Thank you. No, I have no idea. I think these are the things which I already told in the deposition, also, so I think it's the same thing, yeah.

BY MR. FINESTONE:

Q. And you didn't know because you did no investigation whatsoever into whether or not Mr. Morton had a prior criminal record, correct, sir?

A. Yeah. As I mentioned already, it's like I didn't do an investigation. It's always from direction from the

Think and Learn. So I'm not looking into that entity at all, so that's why. Yeah.

Q. And Mr. Ravindran, a few months later, in July of 2022, BYJU's Alpha invested another $215 million; isn't that right?

A. Yes, sir. This is also memory refresh (inaudible).

Q. And you signed the documents once again, correct?

A. Correct.

Q. You were just taking a direction from the parent, though, correct?

A. Yes, sir.

Q. And at that time that that direction was given to you, Mr. Ravindran, the board of Think and Learn was you, your brother, and your sister-in-law, correct?

A. No, that is always with the Treasury, sir.

Q. I'm sorry, I couldn't hear.

A. It's not the board, it's the Treasury.

Q. My question is a little bit different, sir. I'm not asking about Treasury or the board. The question's only about the board. At the time that this $215 million was invested in Camshaft in July of 2022, the board was made up of you, your brother, and your sister-in-law; is that true, sir?

A. No. In 2022, as told before, also, it was six

members.

Q. Did the board include you, your brother, and your sister-in-law, sir?

A. Yeah. I think -- I think I'll prefer -- I don't know whether it's the right thing. Prefer calling as other Byju or Divya. It's rather brother -- I think it's a company after all, right? So that's how we see it over here.

Q. Was that a yes or a no? Were those three individuals that I identified on the board of directors of Think and Learn, sir?

A. Yes, sir.

Q. And the other three directors that you just mentioned, they're no longer on the board, correct?

A. Correct.

Q. Those other three directors have resigned from their position; isn't that true?

A. Yes, they resigned in 2023. They were present the time when (inaudible) 2022, yeah. They were on the board.

Q. Yeah. And one was Chan Zuckerberg, correct?

A. Yes, sir.

Q. That's the wife of the Facebook founder, sir?

A. No.

Q. You don't know why these directors resigned, do you? You can't tell us any reason why they resigned?

A. No. Over there, slightly, I'm correcting. Over

there, I think Chan Zuckerberg. It's an initiative, and the person who was on the board was Vivian, if I'm correct, sir. I think that's a big thing, which I should correct over there. Yeah.

Q. Okay. Slightly different question, sir. You don't know why they resigned: is that right?

A. No, I don't know exactly what is the reason.

Q. Mr. Ravindran, if we fast forward in time a little bit to March 2023, the Camshaft investment was moved away from BYJU's Alpha, is that right, sir?

A. Yes, 2023. Yes, sir, you're right.

Q. And it was moved away from BYJU's Alpha to another entity called Inspilearn, is that right?

A. Yes, Alpha to Inspilearn. Both are BYJU subsidiaries.

Q. Both are BYJU subsidiaries and both of those subsidiaries are governed by you individually, correct, sir?

A. Yes. One, I am a member, and the second, I was sole director, sir.

Q. You're the sole director and officer of BYJU's Alpha, correct?

A. Yes, sir.

Q. And you're the manager, the sole manager of Inspilearn, correct?

A. Sir, yes.

Q. And you signed documents approving of that transfer, did you not?

A. Yes.

Q. The direction came from Think and Learn, but you signed the documents, correct?

A. Correct, sir.

Q. And you were sitting on the board of Think and Learn when that direction came in for you to sign those documents, correct, sir.

A. Yes. I was a nominee director. As I was mentioning, I was never involved. Today also, on that day, also, I was never actively involved in any of this decision. So if you see the search or anything, you won't see anywhere in any of the discussion participation. You can check with anybody, the board. I never been a part of any active discussion. I was always silent and a nominee member.

MR. FINESTONE: Your Honor, I just moved to strike as not responsive to the question.

THE COURT: Sustained. It's stricken. Answer the question. Mr. Ravindran.

THE WITNESS: Yes, sir.

BY MR. FINESTONE:

Q. Mr. Ravindran, it was the same Camshaft investment that was moved from BYJU's Alpha to Inspilearn, correct? There was no change to the Camshaft investment, was there?

A. I think you are right. I'm not 100 percent sure, but I think it's correct.

Q. The only thing that changed was who owned the Camshaft investment. Is that right?

A. Yes. I think, yes.

Q. You don't really know why that transfer took place. Back -- withdrawn.

Mr. Ravindran, back in March of 2023, you don't know why you were signing those documents, did you?

A. No. As I acted on that one, it's from Alpha to Inspilearn. Yeah, that's my understanding.

Q. My question is about why. You didn't know why you were doing what you were doing, correct?

A. No. Can you ask me one more? I'm just confused over there.

Q. Mr. Ravindran, in March of 2023, you didn't know the reason why you were signing documents to move assets from BYJU's Alpha to Inspilearn.

A. Correct? Yeah. (Inaudible).

Q. And sitting here today -- I'm sorry, sir. Sitting here today, March 2024, you still can't tell me any reason for why the Camshaft investment was moved from BYJU's Alpha to Inspilearn. Isn't that true, sir?

A. Correct, sir.

Q. You can't think of one idea, can you?

A. No, I don't have an idea, sir.

Q. So after this transaction happened, Mr. Ravindran, you were still the sole director and officer of BYJU's Alpha? Or you were no longer the sole director and officer of BYJU's Alpha?

A. No, sir. Can you just slow down a little bit? Because I'm not able to catch the pace and answer that. That's why I'm just fumbling a little bit.

Q. Okay. I'll slow down, sir. I'm sorry.

A. Yeah.

Q. Mr. Ravindran, after the transaction, BYJU's Alpha no longer had any interest in the Camshaft hedge fund, correct?

A. No, not sure about that one, sir. I think you are referring to 2023 or '24. Can you just tell me exact?

Q. Sure. I'm talking about 2023 when BYJU's Alpha transferred the Camshaft interest over to Inspilearn. And you signed the documents. Do you remember that transfer?

A. If I'm correct, that is from Alpha to Inspilearn, yeah, correct.

Q. BYJU's Alpha to Inspilearn, correct?

A. Correct, sir.

Q. After that transfer happened, Mr. Ravindran, BYJU's Alpha, they didn't have anything left, correct?

A. Yes.

Q. Inspilearn didn't pay by BYJU's Alpha anything for the Camshaft investment. Is that true?

A. Not sure. No idea about such.

Q. You don't know of anything that Inspilearn might have paid BYJU's Alpha, do you?

A. Correct.

Q. And you were the manager of Inspilearn, correct?

A. Yes.

Q. And as the manager of Inspilearn, it's not only they didn't pay anything. You didn't even promise to pay anything, did you?

A. Correct.

A. What you told is correct. I don't know about that one. Whether I -- sorry, can you repeat the question? I'm getting confused. When you -- can you ask me once more, please?

Q. Isn't it true, sir, that Inspilearn, they didn't promise or agree to pay BYJU's Alpha any amount of money for the Camshaft investment?

A. As far as I know. I don't know that whether it's promised. I don't remember signing anything on behalf of Inspilearn or this one from the parent. Something promised? I'm not sure about that, sir.

Q. As far as you know, sir, Inspilearn, they just got the Camshaft interest for free, correct?

A.   I don't know about that, sir.

Q.   Can you tell me anything, Mr. --

A.   Can I just elaborate once more over here?  I think most of this one I'm not involved in.  Since I was over there.  I was just signing.  So I don't know whether anything is done on this one.  Clearly, that's my understanding till today also, sir.

Q.   If you don't know, there's nothing you can do about that.  But I'm going to ask you the question one more time, sir.  Are you able to tell the Court $1 of value that Inspilearn promised it would pay BYJU's Alpha for the Camshaft investment?

MR. CICERO:  Objection; asked and answered.

THE COURT:  Overruled.

THE WITNESS:  My answer is I don't know that, sir.

MR. FINESTONE:  Jordan, can I ask you to bring up what is Exhibit 46, please?

BY MR. FINESTONE:

Q.   Can you see this on your screen, Mr. Ravindran?

A.   Yes, sir, I can see.

Q.   And do you recognize this document?

A.   No, I don't recognize exactly.  If you can tell me what that, I think, day before yesterday you showed me some of the documents.  Is that one of them?  I'm not sure.

Q.   Yeah.  I can't tell you.  But I will ask Jordan to

flip to page 43. And maybe that'll help you remember what this document is. Okay, that's good. Thank you, Jordan. Mr. Ravindran, would you please look at your screen and see if this page refreshes your memory at all?

A. Yes, I think -- I believe you showed me this two days before. And these are my signatures. I think I confirmed that one. Yeah.

Q. Is this the document, Mr. Ravindran, that you signed to document the transfer of the Camshaft interest from BYJU's Alpha to Inspilearn?

A. I think this will be, but I don't know the content. If this is the same one. Mostly this one, yes.

Q. Do you see that line beneath --

A. It's (inaudible).

Q. Do you see that line, sir, beneath amount of subscription. Where it says 100 percent of BYJU's Alpha's Inc.'s LP interest in Camshaft?

A. 100 percent of BYJU's Alpha LP interest in Camshaft. Yes, I read that one.

Q. And that is consistent with the transaction that you and I have been talking about today?

A. I think so, sir.

Q. Do you see the date at the bottom, sir? Can you read the date of this document?

A. I can read. I saw the date, sir.

Q. Could you read it into the record, please?

A. That's 3/31/2023.

Q. Yeah. And that's the date that you signed this piece of paper, isn't it, sir?

A. I'm not sure, sir. I don't remember exactly. I think this is the same thing also you asked me over there. I told I don't remember. This is the same date which I signed. I'm not sure about that, sir.

Q. Mr. Ravindran, isn't it true that Mr. Pohl was appointed sole director and officer of BYJU's Alpha on March 3rd, 2023?

A. Don't know. I think the records will be there. I don't know the exact date.

Q. Okay. You don't know. Thank you.

MR. FINESTONE: Jordan, we can take this down, please. Okay, Mr. Ravindran, we're going to move on from the March 2023 transfer.

BY MR. FINESTONE:

Q. I want to fast forward to February 2024. Is that okay, sir?

A. Yes, sir.

Q. Now, in February of 2024, on the first day of February in 2024, you moved the money out of Camshaft. Isn't that true?

A. Yes, I signed the paper, sir. I remember.

Q. Yeah. And you don't know when you signed that paper whether you had heard about the bankruptcy filing of BYJU's Alpha. Or you hadn't heard about the bankruptcy filing of BYJU's Alpha, correct?

A. No, can you repeat the question exactly once more, sir?

Q. When you signed those documents on February 1st to move the money out of Camshaft, you can't remember whether you had heard about the BYJU's Alpha bankruptcy filing. Or you had not heard about the BYJU's Alpha bankruptcy filing. Isn't that true?

A. Yes. Correct. I don't remember that one.

Q. And the reason that you moved this money out of Camshaft, it's not because you heard something bad about Camshaft or you changed your mind about Camshaft, correct?

A. Yes. As I told, I don't know or I don't remember. What you're telling me is correct.

Q. You signed the documents, but once again, you just took direction from the parent company. Is that true, Mr. Ravindra?

A. Yes.

Q. And on February 1st, 2024. You sat on the board of the parent company. Isn't that true, sir? Did you answer that, sir? If you did, I missed it.

A. Yes, I told, yes, sir.

Q.   I'm sorry.

A.   Yeah.

Q.   You didn't ask any questions when the parent company asked you to sign these documents on February 1st, correct.

A.   Can you repeat that?  It was --

Q.   You didn't ask any questions of the parent company when you were directed to sign these documents on February 1st, 2024, did you?

A.   No.

Q.   You had no idea why you were moving the money out of Camshaft into a non-US trust.  Isn't that true?

A.   Correct.

Q.   You had no understanding as to why you were doing what you were doing, correct?

A.   Yeah.  As previously told as (inaudible) the instruction came from there.  So I followed that one.

Q.   And I'm sorry to be repetitive, but when the instruction came, you were sitting on the parent's board, correct?

A.   Correct.

Q.   And there's no one else other than you, sir, that would have had any knowledge about this on behalf of Inspilearn.  Because you were the sole member of Inspilearn, correct?  Withdrawn.  Withdrawn.

You were the sole manager of Inspilearn on February 1st, 2024, correct?

A. Yes.

Q. There's nobody else at Inspilearn that might know why you were doing what you were doing, correct?

A. At Inspilearn? Yes.

Q. And you're the one that you signed these documents physically in person, right?

A. Yes.

Q. You didn't sign it through a computer? You did some sort of physical signing of these documents, right?

A. Yes, sir. As far as I remember, it's physical.

Q. And it's only about a month ago, right? This is February 2024; am I right?

A. Yes.

Q. You can't remember where you were when you signed those documents, can you?

A. I think mostly will be in Dubai. Otherwise, I'll be in India. I also travel India --

Q. Mr. Ravindran, you don't -- you can't remember if you were in Dubai or India. Can you?

A. No, I don't remember exactly is what my recollection, sir --

Q. Where do you --

A. -- because -- can I complete that one, please?

Q. Yes, of course. I'm sorry, Mr. Ravindran.

A. Yeah. Because usually for work, most of the work is back in Bangalore. And my --being this one now nominee at this one I'll be signing. So different places I would have signed. So as far as I remember, mostly it should be in Dubai or otherwise back in Bangalore or in Mumbai.

Q. You can't remember, Mr. Ravindran, the name of the trust that you were transferring these assets to, can you?

A. Yes. Don't remember. As I mentioned already, it is within the company itself with what I always believe. Then that's why I don't remember this one.

Q. You may never have known the name of the trust. Is that what you're saying, sir?

A. Correct.

Q. You can't remember who was in the room with you when you signed these documents, can you?

A. Mostly, I think nobody was there.

Q. Can you remember or can you not remember whether there were people in the room with you?

A. Don't remember exactly. It's like this only. It's an office room. So mostly I will be alone over there. That's why I remember.

Q. You are not sure, Mr. Ravindran, whether there were people in the room with you or not. Is that true?

A. Mostly I will be alone. I'm not able to give 100

percent guarantee that somebody else was there. I think mostly it's me. That's why I'm taking -- giving that answer, sir.

Q. Okay. Thank you, sir. You didn't sign on behalf of the -- I withdraw the question. Mr. Ravindran, you signed these documents on behalf of Inspilearn, correct?

A. Yes.

Q. You didn't sign these documents on behalf of the non-US trust, did you?

A. Correct.

Q. But you don't remember who did sign the documents for the non-US trust, do you?

A. Correct.

Q. And today, you're not even curious why you did what you did, are you?

A. You're telling curious about what?

Q. I'll withdraw the question.

Mr. Ravindran, you don't know whether it was securities or cash that you were signing to move away from Inspilearn into a non-US trust, do you?

A. Don't know about that, sir.

Q. And when you resigned on Valentine's Day, two weeks later, the assets were still in that trust, right?

A. Yes.

Q. You don't know what those assets were, but they

were in the trust. Is that right?

A. Yes. That's my understanding, sir.

Q. Mr. Ravindran, I'm moving a little bit away from the assets for a moment. And I wanted to ask you some questions about the BYJU's enterprise. Deloitte was the BYJU's auditor for five to six years. Is that right, sir?

A. Yes.

Q. And they resigned from their job in 2023, correct?

A. Correct.

Q. Separate question. The Ministry of Corporate Affairs, that's an organization that regulates corporations in India. Is that right, sir?

A. Correct.

Q. And they have commenced an inquiry. I'm sorry, Mr. Ravindran. They have commenced an inquiry into the affairs of BYJU's. Isn't that true?

MR. CICERO: Objection. Irrelevant to this proceeding.

THE COURT: Overruled.

THE WITNESS: Can you repeat the question, please, once more?

BY MR. FINESTONE:

Q. Isn't it true, Mr. Ravindran, that the Ministry of Corporate Affairs has commenced an inquiry into the business affairs of BYJU's?

A. Yes. It's a routine inquiry.

Q. Well, Mr. Ravindran, this is the only time that the Ministry of Corporate Affairs has ever sought to inquire into the affairs of BYJU's. Isn't that right?

A. I think I might need to have somebody -- as far as I remember, it is only one. Or maybe previously also. I'm not sure. I'm not exactly. Yeah.

Q. Jordan, can we bring up the deposition transcript at page 280? The question that I asked you was actually on 207, Mr. Ravindran. Jordan, can you help me out? And then -- thank you. Mr. Ravindran, did I ask you at your deposition how many times has the MCA made this inquiry into T&L since its inception? And did you answer, if I'm able to recollect, it's only once. That's what I remember. Yeah.

A. Yeah. My answer is the same. Yeah.

Q. Okay. Thank you, sir. You can take it down, Jordan. Thank you. That investigation remains pending today, correct, Mr. Ravindran?

A. That inquiry is going on. Yeah, that's fine. Inquiry means over here. I'll just elaborate on that point. Because since you brought it up.

Q. No, Mr. Ravindran, your lawyer can ask you questions. That's not a question that I'm concerned about right now. You'll get a chance to elaborate if your lawyer wants to ask you the question.

A.   No, this --

THE COURT:  Mr. Ravindran, Mr. Ravindran, just answer the questions that you're asked.  Your counsel will have a chance to redirect if they think you need to explain something.

THE WITNESS:  Sorry, Judge.  I won't do that.  Yeah.  Thank you.

BY MR. FINESTONE:

Q.   Mr. Ravindran, changing subject a little bit.  Four of the prior investors in the BYJU's enterprise, they filed a complaint concerning BYJU's attempt to raise $200 million in capital.  Isn't that true, sir?  I'm just asking for a yes or no.

A.   Sir, over here, I won't be able to tell yes or no now because the question is not correct.

Q.   Yes or no, sir?  Have prior shareholders in the BYJU's company filed a complaint against BYJU's regarding the company's attempt to raise capital?

A.   There is some lawsuit.

Q.   And isn't it true, Mr. Ravindran, that at your deposition you refused to answer my questions about the lawsuit?

A.   May I answer without yes or no here.

Q.   My question is looking for a yes or no.  Did you refuse to answer my questions, yes or no?

A. I mentioned no comment because the question I felt it's not the correct one. So I don't know how to tell yes or no when the question is wrong.

Q. Okay, well, you could just tell me no, Mr. Ravindran. Let me ask it slightly more specific. Isn't it true, Mr. Ravindran, that MIH Ed Tech Peak 15, Sofina SA, and General Atlantic Singapore, they filed an action against BYJU's with respect to the efforts to raise capital? Is that true or not, sir?

A. That's not true.

Q. Okay. Can you tell me about the action that these investors --

A. This is because I don't have the clear details -- (inaudible) -- I don't have the clear details about the lawsuit, sir. That's why I'm telling this is not true.

MR. CICERO: I object again to relevance, Your Honor.

THE COURT: Overruled.

BY MR. FINESTONE:

Q. Mr. Ravindran, was an oppression and mismanagement suit filed before the National Company Law Tribunal commenced with respect to BYJU's, sir.

A. This also I won't be able to give an yes or no answer because the question is wrong.

Q. At your --

A. May I -- this one -- this is because only one is what asked over here. So it's a lawsuit is over there. That's why I'm completely agreeing there is a lawsuit which is going on. It is only because there is a rights issue which is we had issued the rights issue. So only because of that one, they are not agreeing for that one. So they gone to NCLT. That's my understanding, sir.

Q. Mr. Ravindran, at your deposition, you wouldn't answer me when I asked you whether BYJU's was in a precarious financial position. Isn't that true, sir?

A. Sorry. Can you rephrase it?

Q. I'll withdraw the question. Standing here today, Mr. Ravindran, the BYJU's enterprise, they are in a precarious financial position, are they not?

A. No.

Q. At your deposition, Mr. Ravindran, did you refuse to comment on whether or not BYJU's was in a precarious financial position, sir?

A. Yes. Because I was not able to give a yes or no answer to that one that day, sir. Because it's in front of the judge. So I can give an answer.

Q. Because it's in front of the judge. That's why you didn't answer me, correct?

A. No, you're mistaking me. Over there, the question which you asked. I felt it is not the right question which

you asked. So I was not able to give a yes or no answer. But my limited knowledge of it, I put no comment. So you took it as no comment is like I'm refusing to answer. I'm really sorry. That was not my meaning over there.

Q. Mr. Ravindran, you told us that you would inquire -- your deposition was two days ago, was it not, sir?

A. Yes, sir.

Q. And didn't you tell us that in between your deposition and this court hearing that we're at today that you would further inquire as to where the money was? Did you make that promise, sir?

A. Correct, sir.

Q. And you would make that inquiry pursuant to your powers as a director of Think and Learn, correct?

A. Yes, as an individual, I told, sir.

Q. And you still don't know where the -- you still can't tell us where the money is. Is that right, Mr. Ravindran?

A. Yes, sir. I still don't know where the money is.

MR. FINESTONE: Your Honor, nothing other than subject to redirect.

THE COURT: Well, let me -- just to follow up on that. Did you ask, Mr. Ravindran, where the money is?

THE WITNESS: Yes, sir. After that yesterday, the deposition, I felt that because there was a context that I

went asked Praveen and Praveen refused to answer. So my counsel from -- opposition counsel asked me can you go and check with BYJU? So I felt there is a day gap. And I went asked him BYJU again.

So asking, do you know where the money exactly is? Then I asked -- then he told that you should go back and check with Praveen. So that's a final answer which I got, sir. So there is one development which happened. So he refused to give. I couldn't force him and get it done, sir, because --

THE COURT: So just so I'm clear who, you asked your brother, Byju, if he knew where the money was. And he said go ask -- I'm sorry, I forgot his name.

THE WITNESS: Praveen, again, sir. Because this I did only because the opposition counsel asked me that question. So I felt that is relevant. I should check from my side once more. That's why I did in good faith, sir.

THE COURT: So as of today, two of the three members of the board of Think and Learn don't know where the money is located. Is that what you're telling me?

THE WITNESS: As far as me, I don't know, sir. I don't know about the other members, sir.

THE COURT: Well, your brother told you to go ask the Treasury Department. So did he not know or is he just telling you he wasn't going to tell you?

THE WITNESS: I don't know about him, sir, but Treasury is what he asked me to. I checked with the Treasury only, sir. Because Treasury is the one who has been acted and instructed me, sir.

THE COURT: Okay. All right.

MR. FINESTONE: One more question, Your Honor.

THE COURT: Go ahead.

BY MR. FINESTONE:

Q. Mr. Ravindran, you agree with me, it is the board of directors of Think and Learn that manage the company Think and Learn, correct, sir.

A. Not always. There is a hierarchy like board plus management and advisors. Because that's how it's been working.

MR. FINESTONE: Jordan, can I ask you to bring up Exhibit 44, please? Okay, thank you, Jordan. Can I ask you to turn, Jordan, to -- these don't have page numbers. So if you can find me a page that has Chapter 3 and Chapter 4 on it. Going to guess it's about page 6 after the table of contents. Excellent job, Jordan.

BY MR. FINESTONE:

Q. Mr. Ravindran, can I ask you to read paragraph 8 beneath Chapter 4 and just tell me when you're done reading it, sir.

A. Is it by any chance, will it be able to magnify

slightly more? Yeah, perfect. That should be fine. Thank you. Yes, sir. I have gone through this.

Q. Mr. Ravindran, does this refresh your memory as to your understanding that it is the board of Think and Learn that has the powers to take all acts and take all actions that Think and Learn may wish to do?

A. Yeah, I think -- I don't remember whether you showed me that and recollected this one. I think this is the same thing, yeah.

MR. FINESTONE: Okay. Thank you. Nothing further, Your Honor.

MR. CICERO: No redirect, Your Honor.

THE COURT: I do have one final question, Mr. Ravindran. You mentioned earlier in your testimony that Inspilearn has a new managing member. Who is that managing member?

THE WITNESS: Yes, sir, I did. His name is Sharath Kumar. I don't know there is any middle name. As far as I remember, it's Sharath Kumar.

THE COURT: Okay, thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: We have further cross examination. So you're not done yet.

CROSS-EXAMINATION

BY MR. SHANKAR:

Q. Mr. Ravindran, Ravi Shankar from Kirkland & Ellis on behalf of GLAS Trust Company. It is nice to see you again.

A. Hi. Good afternoon.

Q. Can you hear and see me okay?

A. Yes.

Q. You have been a director of Think and Learn since 2011, correct?

A. Yes, sir.

Q. As a director of Think and Learn, Think and Learn complies with its obligations to maintain books of account and other relevant books and papers and financial statements, correct?

A. Yes, sir.

Q. Think and Learn maintains financial and accounting records with respect to its subsidiaries, correct?

A. Correct.

Q. Information, for example, about the $533 million from BYJU's Alpha, that information should be maintained in the books of account and papers of Think and Learn, correct?

A. Yes, it should be.

Q. Because there is going to be a record showing where the money is today and which entity holds it, right?

A. Yes, it should, sir. Can I elaborate on that one? Because --

Q. No, thank you, Mr. Ravindran.

A. Yeah. Okay, fine.

Q. Whenever the 533 million originally from BYJU's Alpha moves within Think and Learn and its subsidiaries, there are accounting records tracking that movement, correct?

A. Think it should be that one.

Q. You were deposed two days ago on Tuesday, right?

A. Yes.

Q. Before your deposition, you asked Byju Ravindran about the current location of the $533 million correct?

A. Yeah, correct.

Q. And when you originally asked Byju Ravindran about the location of the 533 million, you did that because you understood that would be one of the questions asked at your deposition, correct?

A. Yes.

Q. And you were told to check with Praveen Prakash, correct?

A. Yes.

Q. And Praveen Prakash told you he is not providing that information to you? Correct?

MR. CICERO: Objection, asked and answered for a while by Mr. Finestone.

THE COURT: We have some follow up questions?

MR. SHANKAR: I do, Your Honor. I am

transitioning to Mr. Ravindran's authority, statutory authority under the Indian Companies Law Act to obtain this information from Mr. Prakash.

THE COURT:  Okay.  Go ahead.

MR. SHANKAR:  And I am just table setting here for a moment.

THE COURT:  All right, that's fine.  Go ahead.

BY MR. SHANKAR:

Q.  Mr. Ravindran, Mr. Prakash told you he is not providing that information to you, correct?

A.  Yeah.  He refused to give an answer.

Q.  And then you did not tell Byju Ravindran that Praveen Prakash declined to provide you with the information about the location of the 533 million, correct?

A.  That day, on deposition day?  No.  And after that, I did check.  That's yesterday.  I did check.  That's what I just mentioned to the other lawyer.

MR. SHANKAR:  Okay.  Nick Benyo.  If we could pull up Exhibit 49.  Your Honor, Mr. Benyo is our trial tech.

THE COURT:  Okay, well, I can give him -- or you can just use theirs so I don't have to switch who has co-hosting rights.  I'm sorry, which exhibit was this?

MR. SHANKAR:  Exhibit 49, Your Honor.

THE COURT:  Okay.

BY MR. SHANKAR:

Q. Mr. Ravindran, you see on the screen in front of you Chapter 9 of the Indian Companies Act called Accounts of Company. You see that?

A. Yes, I saw.

Q. And this is one of the documents you and I went through at your deposition. You recall that?

A. Yes. You did take me through this one, I believe.

Q. If we could blow up Section 3, if possible. You see where it says, "The books of account and other books and papers maintained by the company within India shall be open for inspection at the registered office of the company or at such other place in India by any director during business hours." And then the sentence continues. You see that?

A. Yes.

Q. You understand that this Section 3 concerns the inspection rights by any director, correct?

A. Correct.

Q. You are a director of Think and Learn, correct?

A. Yes.

Q. For Think and Learn, the registered office is in Bangalore, correct?

A. Correct.

Q. You've been to the Bangalore offices a number of times, correct?

A. Yes.

Q.    If we could blow up Section 4.  You see where it says, "Where an inspection is made under subsection 3, the officers and other employees of the company shall give to the person making such inspection all assistance in connection with the inspection which the company may reasonably be expected to give."  You see that?

A.    I saw that.  I'm trying to understand.  Give me a second.  Yes.  I continue.

Q.    And you see that Section 4, it's referencing subsection 3, which we just went through.

A.    Yes, sir.

Q.    And you see subsection 4 references employees of the company?

A.    Any other employee.  Yes.

Q.    And that employees must provide reasonable cooperation with a director making an inspection request. You see that in subsection 4?

A.    Yes.

Q.    In his role in the Treasury Department, Praveen Prakash is an employee of Think and Learn, correct?

A.    Praveen Prakash is, correct.

Q.    You never told Praveen Prakash that under the Indian Companies Act you have a right to information about the books and records of Think and Learn, correct?

MR. CICERO:  Objection; calls for a legal

conclusion.

THE COURT: Just ask him if he asked him.

MR. CICERO: He used the word "right".

THE WITNESS: No.

BY MR. SHANKAR:

Q. No, you never made that ask of Praveen Prakash, correct?

A. Yes. I never asked. Never asked.

Q. You never conveyed to Praveen Prakash that under the Indian Companies Act he has an obligation to provide you with reasonable information regarding your request, correct?

A. Frankly speaking, I don't look -- I don't speak company load to him at all. It's like anything. These are points which you are making. I saw first two days before. So no, I didn't.

Q. You understand, Mr. Ravindran, that I represent GLAS Trust Company. You understand that?

A. Yes. You mentioned, correct.

Q. And you understand that GLAS is the agent of the Term Loan B Lenders. Are you aware of that?

A. Yes, I know that, sir.

Q. You understand that the lenders of BYJU's Alpha are keenly interested in understanding the location of the $533 million?

A. Yes, sir.

Q. And when Mr. Finestone referenced at your deposition you saying that you would make an ask before today about the current location of the $533 million, that was a colloquy between you and me at the deposition, correct?

A. Sorry. Can you repeat the question once more?

Q. Sure. I am the person who asked you to follow up after Tuesday on the location of the $533 million, correct?

A. Yes. I think you are. I think you are the person. Yeah.

Q. And you said you would try to ask, exercising your powers as a director of Think and Learn, correct?

A. Yes.

Q. Mr. Ravindran, where is the $533 million?

MR. CICERO: Asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't know about that one.

BY MR. SHANKAR:

Q. 500-plus million dollars. That's a significant sum of money in your mind?

A. Yes, sir.

Q. $500 million. That's a significant sum of money for Think and Learn?

A. Yes, sir.

Q. You came to today's hearing knowing that the debtor and its creditors wanted to know where the money is,

correct?

A. Yes, sir.

Q. You are aware that the lenders have been seeking the location of the money for months. Are you aware of that?

A. Not sure about that one. Yes, I know that been seeking the location, yes.

Q. And you and I -- you and I specifically discussed figuring out where the money is on Tuesday, correct?

A. Can you repeat the question once more?

Q. On Tuesday, you and I specifically discussed figuring out where the money is. And we can take down the exhibit.

A. Yeah. You had asked me. Yeah.

Q. You are a director of Think and Learn, correct?

A. Yes.

Q. You are a shareholder of Think and Learn?

A. Yes.

Q. You are the brother of the founder?

A. Yes. Yeah.

Q. Are you unable to tell me where the $533 million is, Mr. Ravindran?

MR. CICERO: Objection; asked and answered.

BY MR. SHANKAR:

Q. Or do you simply not want to?

A. Sorry. To your question, correct? I'm not able

to, and I don't know that one. I think one question which you asked, I clearly told. That's why with a good intention, good faith, I went back and checked also. And your point of trying to tell that.

You can ask Praveen and -- because currently in February, this is February which has happened right now. It's in March. The financial audit year ends and the auditor financial sheet only will have the current location. That is in FY '24 once they complete. That is by October only, auditor sheet will come. Then only anybody will know. Work friendly (phonetic) at this time, is there? That's a procedure I think in India. I think you will be knowing that one.

Q. It is your belief that no one at Think and Learn right now knows where the $533 million is.

A. I was talking about myself, sir.

Q. So I'll ask it one more time, Mr. Ravindran. Are you unable to say where the money is or do you not want to?

A. I am not unable to. Yes, sir. That's what I'm saying. I'm not able to.

MR. SHANKAR: No further questions, Your Honor.

THE COURT: Thank you.

MR. CICERO: I have brief redirect. May I ask that that last exhibit be put back up and -- 49. Jordan, can you please put 49 back up? Thank you. And you could take

the pop out off and then just maybe enlarge it for Mr. Ravindran. Thank you. I'm focusing solely on Section 3.

REDIRECT EXAMINATION

BY MR. CICERO:

Q. Mr. Ravindran, you walked through a portion of Section 3 of this exhibit a moment ago with GLAS's counsel. I want to focus in on the last paragraph where it says, provided that the inspection in respect of. Do you see that paragraph.

A. I have not gone through. I can read that one. Yeah.

Q. Can you please read that and tell me when you're finished reading it?

A. Yes, sir. Yes, sir, I have gone through that.

Q. Do you have an understanding of what that means?

A. I understood that one, yeah.

Q. What does it mean?

A. So it's -- I won't be able to find out for sure.

Q. Why wouldn't you be able to find out for sure?

A. Because I am only one of the directors. With my limited capacity, I won't be able to do. That is clearly because previously he was not referring to this point. Now I am clear that otherwise I think I would have. But still, as I told, it was an auditor '24, it's clear over here. Yeah.

Q. You would have to make a request to the full board

to authorize this inspection.  Is that right?

A.  Sorry, can you repeat once more?

Q.  In order to inspect the books and -- the books of account under this section, because it's a subsidiary, you would have to make a request for the full board to make a resolution.

A.  Yes, correct.

MR. FINESTONE:  Your Honor, I would object to these questions as leading.

MR. CICERO:  That's my last question.

THE COURT:  Okay.  Overruled.

MR. CICERO:  Thank you.  Nothing further.

THE COURT:  I have a question.  Leave that up, please.  Mr. Ravindran, did you ask your brother and sister in law to give you a resolution so that you could inspect the records?

THE WITNESS:  No, sir.

THE COURT:  And your brother and sister in law are the only other two directors of Think and Learn, correct?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  Correct, sir.

THE COURT:  That's all I have.  Thank you, Mr. Ravindran.  You can take the exhibit down, please.

MR. FINESTONE:  Just take it down, Jordan.

THE COURT: Mr. Ravindran, your testimony is over. I'm going to ask you to stay on the Zoom call, though, please, for the rest remainder of the hearing.

THE WITNESS: Thank you, Your Honor. I'll be going.

THE COURT: You can turn off your camera.

THE WITNESS: Thank you.

THE COURT: All right, we're at 12:15. How long do we think closings are? We have any other witnesses I should ask first?

MR. FINESTONE: With the exhibits and evidence, Your Honor, the debtor rests.

THE COURT: Okay. Anything from --

MR. CICERO: We rest, Your Honor.

THE COURT: Okay, so we're done with the evidence. Let's take our lunch break, then we'll come back at 1 o'clock and we'll pick up with closing arguments at that time, and we'll go from there. So we're recessed till 1 o'clock.

(Off the record at 12:17 p.m.)

(On the record at 1:03 p.m.)

THE BAILIFF: All rise. Thank you. Please be seated.

THE COURT: All right. Start with closing arguments.

MR. FINESTONE: Good afternoon. Your Honor, Ben

Finestone from Quinn Emanuel, on behalf of the debtor in possession. First, what I wanted to do, Your Honor, was thank Your Honor, with respect to last week. The adversarial process is a funny thing. It's often such a big part of the judicial system in the United States, and it's no doubt one of the best, at least in my humble opinion, ways to find truth.

But sometimes the adversaries, together, no pun intended, in concert, miss the biggest issue. And so when the Court came out last time and asked the parties about the authority that the Court has or doesn't have to enter the kind of relief that we requested, I just wanted to, on behalf of the debtor, thank the Court for giving the parties the ability to go back and brief it in a supplementary filing.

And what we were able to do, Your Honor, I think, is sort of return to the Court with what I would describe as nothing less than a Mount Rushmore of judicial bankruptcy brains. And what I mean by that is, having been afforded the extra time from the Court, we are confident that we've got a list of Justice Scalia, Judge Ambro, Judge Sontchi, Judge Gross, Judge Walsh, all interpreting Grupo, not just in a way that doesn't preclude this court from granting the relief that the debtors have requested, but in fact, looking at Grupo and saying there's actually an affirmative blessing of that relief within Grupo.

And of course, I can't take all the credit for putting that -- to synthesizing that. It really was, at least I thought in the first instance, it was Judge Ambro that synthesized it so effectively in the Owens Corning decision, Your Honor. But then as we studied the record, a lot of that thinking goes back to Judge Walsh's decision prior to Judge Ambro adopting it and allowing the thought evolution to continue.

But just to sort of state what we put in the brief, what Judge Ambro included in the Owens Corning decision is that, pretty remarkable, not only did he conclude that Grupo Mexicano had to do with the limitations of the equitable authority of a District Court, not Your Honor's Bankruptcy Court, but also, as I said, he went further in analyzing Justice Scalia's work and concluded that had the Grupo Mexicano case been before Your Honor's court, Your Honor would have been authorized to do what the District Court was not authorized to do by Justice Scalia.

So Grupo Mexicano sort of turned from a putative block to the debtors relief to actually a thrust behind the relief that we're requesting. And although Grupo Mexicano, Your Honor, did concern there were unsecured creditors who didn't have a judgment against their borrower, against their debtor, the Grupo Mexicano, and there was no fraudulent transfer, it actually is a fraudulent transfer case because

they were seeking injunctive relief to prevent a prospective fraudulent transfer away from them.

And here, although there have been, as the debtor has alleged, no less than four fraudulent transfers, the reason why we're here with our hair on fire -- and thank you to the Court for putting up with us during the pendency of the entire Chapter 11 case -- the reason why we've had our hair on fire, the entire pendency of the Chapter 11 case, is because of our concern that there will be yet another fraudulent transfer.

There were two when we filed this case' we were scared. Our fears were realized. There have now been a third and a fourth. And now standing here today, the freeze, the injunctive relief that we're looking for, is to prevent a prospective fraudulent transfer.

So it really does, in many ways, line up with Grupo. And there isn't much, Your Honor, there isn't a whole lot to add to Ambro's analysis of Grupo Mexicano, because it's so analytically sound, it's very impressive, and it's obviously favorable to the debtor in possession here. But just two observations.

One, Ambro, although while he concluded that a Bankruptcy Court would have been authorized to do what the District Court couldn't do in Grupo Mexicano on those very same facts to stop a future fraudulent transfer, the case

really was, as Your Honor knows, what Owens Corning was about was, of course, substantive consolidation.

And one observation that Ambro made, he said, irrespective of all of this, he was talking about a court with greater powers than his, Ambro was, he was talking about the Supreme Court. And he said in Samsell, which is a pre, earlier Supreme Court case, the Supreme Court had already blessed substantive consolidations.

And what Ambro said was what the court -- he's referring to the Supreme Court -- what the court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option.

And so Ambro was sort of saying, the Supreme Court is saying sub-con exists. And that's true, binding me as a judge on the Third Circuit until Congress or the Supreme Court changes that.

The reason I bring it up, because today is not about substantive consolidation, although I will note some of the evidence suggests that substantive consolidation with certain non-debtors may be appropriate. Today is not really about substantive consolidation. It's not a count in our complaint.

But the same concept does apply in the following sense, Your Honor. The Third Circuit, with Judge Ambro has opined that Grupo Mexicano does not limit the Bankruptcy

Court's authority to enjoin against future fraudulent transfers.

The Third Circuit has gone further and said, actually, Grupo Mexicano supports and endorses an injunctive relief in that context. And until the Third Circuit changes its mind, or until Congress changes Judge Ambro's analysis, it is the law of the land here. And I think that offers the Court a whole lot of comfort if it is so moved by the case that the debtor put in to grant us the relief that we have requested.

THE COURT: Let me interrupt for a second.

MR. FINESTONE: Yes, Your Honor.

THE COURT: Judge Ambro's ruling in Grupo Mexico, the issue about application in the context of a fraudulent conveyance action was in a footnote. It was not the subject matter of the case, it's dicta. And Judge Ambro did not address the Supreme Court's decision in Granfinanciera, which held that in the context of determining whether a party has a right to a jury trial under the Seventh Amendment, the Court has to look to whether or not the relief being sought is equitable or legal.

And in Granfinanciera, which was a bankruptcy case, actually a fraudulent transfer case, the Court said that's a legal claim, and they're entitled to a jury trial. So how do I square that?

MR. FINESTONE: Well, Your Honor, two-part answer. The first part is that if we don't have a Grupo Mexicano issue today, Your Honor, or if you agree with us that Grupo Mexicano is not an issue for a debtor, but actually a force behind the debtor, then we aren't concerned with whether the claim is legal or equitable, because Grupo Mexicano is not an enemy to injunctive relief.

But if we do assume that Grupo Mexicano, if we assume for the sake of the analysis, Your Honor, that Grupo Mexicano does not, in and of itself, bless what the debtor has asked the Court to grant today, Your Honor, it is still true under Grupo Mexicano that if Congress has acted to give Your Honor the power to grant us injunctive relief, then there is no issue with whether the underlying claim is legal or equitable if Congress has acted.

And that's sort of in our brief, we had the four buckets, Your Honor, and what I want to do is just move to the second bucket, which is --

THE COURT: Well, but didn't the Supreme Court say that the Congress can't just change something from a legal claim to an equitable claim that existed in 1789? It has to be a new cause of action, a new basis for relief.

MR. FINESTONE: I think, Your Honor, but please, of course, push back. I think what the Supreme Court was saying is that judges can't exercise equitable relief unless

their ability to exercise that equitable relief existed back when it existed.

But if Congress, through all of the means and ways that Congress acts, decides it would be fair to pass the following statute and vest Judge Dorsey with the ability to grant relief, I don't think any of those cases limit the ability of Congress to, through the Bankruptcy Code or otherwise, give you the ability to do so. We're no longer searching for a source of equitable authority. We're just looking for statutory authority.

THE COURT: But in Granfinanciera, didn't the Court say that the fact that Congress created the Bankruptcy Code and gave the authority to Article 1 judges, bankruptcy judges, does not change the nature of the type of claim and a fraudulent conveyance claim they said was a legal claim?

MR. FINESTONE: I agree with that, Your Honor. I misunderstood the Court's question. I do not believe, or at least I don't believe Congress ever has purported to pass legislation that says this kind of claim is legal or equitable. I think that probably is left to the courts.

And so one argument that we didn't make in our papers to Your Honor, this is sort of a bucket four argument within our four categories. But one argument that we didn't make to Your Honor is we didn't disagree or attempt to disagree with Granfinanciera, that a fraudulent transfer

claim is a legal claim in nature. We didn't take issue with Granfinanciera because it's either the case that Grupo doesn't limit a Bankruptcy Court's equitable authority, or we've got some equitable claims, which I will get to, Your Honor.

But I don't think either of those issues touches whether or not Congress could have vested this court with the ability to grant injunctive relief over any kind of claims, even if they are legal. I don't know that there's anything that bars Congress from doing so, from giving the Court the ability to do so.

In fact, look at avoidance powers, Your Honor, that's an equitable power that this court obviously certainly has, and it's vested by Congress, and we're not searching for whether or not there's equitable authority for the Court to do it.

THE COURT: Other than Grupo Mexicano, which says that a legal claim does not give authority to provide for an injunction in a non-equity type case, in a legal case.

MR. FINESTONE: In an Article 3 district court, but not in a bankruptcy case and not under fraudulent transfer law at least was the debtors and Judge Ambro's analysis of Justice Scalia's opinion.

THE COURT: Okay. All right, go ahead.

MR. FINESTONE: So, Your Honor, statutory

authority for the ability for this court to grant the relief that we have asked Your Honor, we've got two. We featured one in the papers primarily, and that's Section 105(a).

And I have to be candid with the Court. I don't think many bankruptcy practitioners, as a general matter, they don't generally want to lead with 105(a). We know that the Supreme Court has been whittling down what courts are able to do pursuant to 105(a) over the years, continuing to stress to all of us that 105(a) can really only be used in furtherance of other sections of the code and only when it's not in contravention of other sections of the code.

But we really do believe, Your Honor, and we believe that the evidence showed that an application of 105(a) here today would be inherently in square in furtherance of Sections 544, Sections 548, and perhaps most squarely, 550, which provides the debtor putatively with the ability to recover the property transferred.

If the Court doesn't exercise its ability, its authority under 105(a) to enter an injunction, Your Honor, it's going to do great violence to the debtor's ability to do what 550 allows the debtor to seek to do. It's going to do great violence to take out the practical consequence of the debtor trying to do what it wants to do under 544 and 548. So we really do think 105(a) is -- the application that we're asking the Court to exercise is in furtherance of the code.

There's another one, Your Honor. 105(a) is also going to be in furtherance of something else. And it came out today, really for the first time, Your Honor, we learned it in discovery.

When we received the interrogatory responses from the other side, it told us about a March 1st, 2023, transfer. This is the gratuitous transfer, the horizontal transfer from BYJU's Alpha to Inspilearn, the two entities that Mr. Ravindran was the governor of. And we didn't know when that transfer took place when this case filed. We found out it was March 1. To us, that was a stunning date because it was two days before Mr. Pohl took power over by BYJU's Alpha as the sole director and officer. So that was a little suspicious to us, Your Honor.

But we also -- it made a little sense to us, and it was completely consistent with our fraudulent transfer theory, because in the middle of February 2023, that's exactly when the forbearances stopped.

And so for a debtor run by Mr. Ravindran to realize these lenders are not forbearing anymore, for him to move assets to another entity that he controlled, it didn't surprise us because we had already alleged and we knew that we believed there were actual intent, fraudulent transfers.

So we kind of accepted in our minds, Your Honor, this March 1st, 2023, date, they got it just under the -- no,

just before Mr. Pohl came into power. And what we saw in the subscription agreement that Mr. Ravindran signed to move that 100 percent interest is it was actually dated -- we learned this in the limited discovery we got -- March 30th, 2023.

And so that actually is now beginning to look like us, Your Honor, as an ultra vires transfer of the debtor's interest in property. And as Your Honor knows, under Delaware law, ultra vires means void, not voidable. I've gone pretty far away, afield from my authority argument, my 105 argument. But this is now 105 in furtherance of 362. The automatic stay. This is now 105 in furtherance of -- probably I should have cited, first, 541, property of the estate.

It appears to us, Your Honor, that this interest, that we may not be in an avoiding context, but this may be about turnover of property of the estate and 105 to preserve our ability to seek turnover under 542. To preserve 541 property is another perfect example of how 105 should operate. I promise --

THE COURT: Just to make sure so I have the record correctly, I had in my notes that Exhibit 46 shows the transfer occurred on March 21st, not March 3rd.

MR. FINESTONE: Your Honor, I think what maybe Your Honor was seeing was at the top of the page there was the date. The dates are not the way we do it in the US, but

I think it said 29/03/24. And then at the bottom of the page where Mr. Ravindran signed, it said March 31st, 2023, in the way that it says that.

THE COURT: Just take a look real quick. This was Exhibit 46, right?

MR. FINESTONE: Yeah. And I have a Bates stamp, if Your Honor -- I remember it's page 43 of that exhibit. And it is 46, Your Honor.

THE COURT: Okay, I was looking at the -- I'm sorry, I was looking at the subscription agreement signature line.

MR. FINESTONE: This is, in fact, the subscription agreement. Oh, you're looking at a date elsewhere on the subscription agreement, Your Honor?

THE COURT: Yeah, signed by Camshaft Capital on 3/31/23.

MR. FINESTONE: And Mr. Ravindran signs above.

THE COURT: Right. So is this the transfer from the debtors to Inspilearn?

MR. FINESTONE: Yes, Your Honor, that's what Mr. Ravindran testified about today. And if you look at the amount of subscription, it references 100 percent of BYJU Alpha's LP's interest. That's my debtor, Your Honor, BYJU Alpha.

THE COURT: So the signature is 3/23. But I see

where you're referring to.  The date above is March 23rd.

MR. FINESTONE:  I think, Your Honor, the 23rd is the year.

THE COURT:  Or March 29th, '23.  Excuse me.

MR. FINESTONE:  Yeah.  I think this is all within three days.  29, 30, 31.

THE COURT:  And when did Mr. Pohl become -- was he ordered by the Court of Chancery to be -- take over the company?

MR. FINESTONE:  March 3rd.

THE COURT:  March 3rd.

MR. FINESTONE:  Yes.

THE COURT:  Okay.

MR. FINESTONE:  Yeah.  That's when the remedies was exercised.  If Your Honor is asking when did Vice Chancellor Zurn rule that that was effective, that's obviously a different date, but the ruling is retroactive.

MALE VOICE:  November 2nd.

MR. FINESTONE:  Vice Chancellor Zurn ruled on November 2, 2023, that Mr. Pohl's appointment on March 3rd, 2023, was valid.

THE COURT:  So he had already been appointed prior --

MR. FINESTONE:  Prior to the dates on this piece of paper.

THE COURT: Prior to the dates. Right. Okay. All right.

MR. FINESTONE: Your Honor, in addition to 105, there's 544(a). And Section 544(a) is sometimes referred to as the strong armed powers of the debtor in possession or of the trustee. Under 544(b), as Your Honor knows, the trustee can seek to avoid any transfer that any one of its unsecured creditors that existed on the petition date could do under state law. That's used frequently, 544(b).

And 544(b) is only about avoiding. It gives the trustee certain avoidance powers if it can find a golden creditor who could do it his or herself. 544(a) is a little bit different. It doesn't just talk about the ability to avoid. It says, I, Your Honor, the trustee, I not only can avoid what any of these three -- it then lists three hypothetical creditors.

It says, I have the rights, all of the rights and powers that any of those three hypothetical creditors had. And they're hypothetical. They don't even have to exist. This is just vested in me, Your Honor.

And one of those powers that those hypothetical creditors would have, Your Honor, is the ability to seek equitable remedies under the Uniform Fraudulent Transfer Act as enacted by the Delaware legislature. And Your Honor and I had some discussion about those provisions under the section

Remedies of Creditors and whether it's under Florida's Uniform Voidable Transaction Act or whether it's under Delaware's Uniform Fraudulent Transfer Act, it doesn't matter.

I, as the debtor, Your Honor, under 544(a) have the rights and powers that these creditors would have, and one of them is to seek provisional relief and perhaps even more specifically, to seek an injunction against further transfers of the asset transferred, Your Honor.

So 105(a) and 544(a) are two statutory bases that we believe, Your Honor, give the Court authority, even if Grupo Mexicano and Owens Corning do not, Your Honor.

Assuming, Your Honor, that everything I've said thus far at the podium is without any merit whatsoever and that I'm wrong about all of that, what we also put forward in our briefing, Your Honor, is that we went back to Judge Goldblatt's decision in EHT, Your Honor, and his was --

THE COURT: Judge Sontchi did EHT.

MR. FINESTONE: Its Team Systems. Thank you, Your Honor. As I said, assuming everything I said was wrong.

In Judge Goldblatt's decision in Team Systems, of course, Your Honor, he says -- Judge Goldblatt had an issue with entering injunctive relief for the fraudulent transfer claim and the way that Judge Goldblatt resolved it was finding and equitable claim, Your Honor. We have got, at

least, two in this adversary proceeding without, Your Honor, even reaching the potential turnover claim of estate property.

The first claim, Your Honor, is our claim for an accounting. And you may have heard, Your Honor, Mr. Ravindran today say he doesn't know of any BYJU Alpha books and records, and that all the books and records were kept by the parent. And you certainly heard, Your Honor, the debtor throughout this case complaining to Your Honor, and complaining in papers, and complaining in Court that we don't have any books and records. And in Paragraph 39, we included in our briefing all the places in the complaint where we made those complaints, Your Honor.

Just to tie it to Judge Goldblatt's decision these are about the facts of the case before His Honor, not before Your Honor, but it says: "And here, because of the incomplete business records and uncertainty about what became of the transferred funds, there appears to be good reason why the plaintiff would invoke this equitable remedy."

I am no longer quoting Judge Goldblatt, Your Honor, incomplete business records and uncertainty about what became of the transferred funds its almost as if Judge Goldblatt has been watching the case that is proceeding before Your Honor. And Your Honor --

THE COURT: Well, one difference with Team Systems was they had actually alleged an account for accounting.

MR. FINESTONE: If I could, I would take agree with the concept of what Your Honor is saying, but I would take -- I would just suggest that if Your Honor is going to use the verb "allege" then we are on the exact four legs of the stool of that complaint because the allegations are in our complaint; the factual allegations.

Your Honor is right that there is not a count that says please provide us an accounting. What I would say about that, Your Honor: I would refer Your Honor to Paragraph 39 of our supplemental briefing. There are two -- 38, Your Honor. 39 was where we listed our factual allegations.

In 38 we have two Third Circuit cases that say -- that basically say for a remedy like accounting if the factual allegations are -- if its in there, its in there. If the factual allegations are in there then the Court can read into the complaint the remedy or the cause of action that the debtor is asking the Court to read into.

The two Third Circuit cases, Your Honor, are Bechtel and MassMutual. If that weren't enough, Your Honor, at Paragraph 41 of our -- this is our supplemental brief, not the complaint -- we cited a case form a familiar Vice Chancellor, its Vice Chancellor Zurn who, of course, plays another big role in, at least, the prepetition period leading

up to this Chapter 11 case. Vice Chancellor Zurn in a case called In Re DeGroot, I hope that I'm pronouncing it right, says -- she goes so far as to say that an accounting is merely a remedy. It isn't even a standalone cause of action. Its inherent to breach of fiduciary duty claims.

Of course, Your Honor, we do have a breach of fiduciary duty claim in our complaint. That is count number four, Your Honor. And while I am on the subject of breach of fiduciary duty, Your Honor, I will just segway because I'm sort of off accounting which is very, very important and really has been a theme of our case. So, in substance we are with Judge Goldblatt and Team Systems, Your Honor, even if in form we are missing the words.

Breach of fiduciary duty. I didn't have it on the tip of my tongue, Your Honor, to respond when the Court asked these very good questions at the last hearing. Count four is, of course, our breach of fiduciary duty claim against our former sole director and officer who testified today, Mr. Ravindran.

Former Chief Judge Robinson from the District Court for the District of Delaware has an opinion called Hechinger. Hechinger was actually affirmed by Judge Ambro. I am not going to oversell the Judge Ambro affirmance didn't touch the issues I am about to address, so I am focused on Judge Robinson from the District Court.

What Judge Robinson does in Hechinger is first she says, which I think is incontrovertible, breach of fiduciary duty claims are and always have been equitable claims. That is not enough, Your Honor. Its got to be an equitable claim and an equitable remedy. Your Honor pushed back on me last week and said, well, Granfinanciera, sort of, says that if its cash its cash and that's not an equitable remedy, Mr. Finestone. I am paraphrasing what the Court said.

What Judge Robinson's analysis in Hechinger does is she says it is true that generally when you assert a breach of fiduciary duty claim, which is equitable in nature, if you are looking for monetary damages the relief you are looking for is legal. There are certain exceptions to that rule, Your Honor, and one of the exceptions applies for Judge Robinson in Hechinger and one of the exceptions applies here. If the "monetary damages," another label, Your Honor, that you're looking for is really about disgorgement you really are trying to return something that an unfaithful fiduciary transferred away from the estate. That is an equitable remedy even if it is cash.

Judge Robinson cited a Supreme Court case called Terry and fortunately for the debtor Terry post-dates Granfinanciera and Terry cites to a Supreme Court case called Tohl (phonetic). So, that still exists notwithstanding Granfinanciera that if the breach of fiduciary duty claim you

are seeking, which is an equitable claim, is seeking disgorgement of a certain set of funds that you got equitable claim and you got equitable remedy.

So, we believe, Your Honor, whether it's under breach of fiduciary duty or whether its under accounting we are lining up with Judge Goldblatt if we need to line up with Judge Goldblatt in Team Systems. I don't use a lot of fancy Latin expressions, I usually don't know what they mean, so I hope I'm using this right, but the sine qua non of this Chapter 11 case, as Your Honor knows best, has been about where are the debtor's funds.

We have seen these funds go from BYJU's Alpha to Camshaft, we have seen them then transfer horizontally -- the LP interest transferred and so the funds are still sitting there at Camshaft. We have seen them put purportedly, I agree with Your Honor nothing has been proven, in an offshore trust and now we don't know where they are. But we are looking for those funds.

This is about disgorgement of a breach of the duty of loyalty. And I will say, Your Honor, there was a little bit of testimony today. I have touched on this a little bit earlier, we are not just trying to shoehorn into Team Systems here, it's actually like substantively important that we get these funds because the walls are crumpling around the BYJU's enterprise. Deloitte has resigned, the three directors

resigned last year, there is an action pending seeking to reject the current board.

The rights offering that they were seeking to, or maybe still are seeking to, effectuate they are trying to raise $200 million. The minority shareholders are objecting to that because it threatens to dilute their existing equity interest down to just about zero. What that means if you are bringing in new money and the new money is taking all the equity it means that company is bordering or is insolvent. That is their complaint. We don't know if its true, but that is exactly what these sophisticated investors are saying. You cannot raise this money and give all the equity to these new investors.

That is a long way of saying, Your Honor, we are facing an insolvent party that is holding our funds and we think if we don't get our funds, we don't know what we are going to get. So, we are focusing on it more from an irreparable harm perspective, but it does line up just precisely, in our view, or at least substantially similar to Judge Robinson's comments citing Terry, the Supreme Court case that post-dates Granfinanciera, Your Honor.

I would like to touch on futility, Your Honor, and that is the argument that so what if there has been a fraudulent transfer, so what if there has been a breach of fiduciary duty, so what if Mr. Ravindran has given testimony

that, in our respectful view, confirms all of that. The only person that is before Your Honor's Court is Mr. Ravindran and he can't do anything about it, Your Honor.

The first thing that I would say on futility is that this is not a -- its, of course, not an affirmative burden of ours under the Third Circuit standard for obtaining injunctive relief. It's some form of defense that they have advanced. They have not at all proven that something is futile. In fact, what we heard from Mr. Ravindran is he's a director on most of the companies, he said, of the entire enterprise. He said that he didn't even know exactly which ones he's a director of or not. He didn't know who signed for Inspilearn Trust.

So, I say all of that to tell Your Honor he very well could be the director of whichever subsidiary owns these funds. Even if that is not the case, one thing that we do know is that the parent controls all. I think that was inescapable inference or straight up testimony today. And this board of directors, Your Honor, is in charge of everything and while Mr. Ravindran attempted to point away to the board of directors as if the parent was someone not before the Court, he is a director of Think and Learn, the ultimate parent. He is a director BYJU's, one and the same, Your Honor, along with his brother and sister-in-law.

What we heard him say is that he will, of course, take the Court's direction and try to get this money back if he is ordered to do so. That is not futile. We heard him say further he will, of course, go to the other two directors and ask them to make the instruction with him, again, if Your Honor issues the order.

In terms of whether it would be appropriate for Your Honor to enter an order that reaches Mr. Ravindran, but also reaches Byju Ravindran, and also reaches Byju's wife is entirely consistent with Rule 65, Your Honor. Its got an active concert standard. And what we heard today, I think, Your Honor, with respect to each of the four transfers is that Mr. Ravindran, the witness here today, worked in active concern with the board of directors of the parent. He is one-third of the board of directors of the parent, but he worked in active concert with the board.

It was the same two-step every time. It was all I do -- I've got the authority, all I do is sign after I get a direction from the parent board. So, the parent board gives him a direction. If that was the end of the dance, Your Honor, these transfers don't happen because Riju has to sign. If Riju doesn't get that direction he doesn't sign because he doesn't know what he is doing, with all due respect. He said that he has no idea what he was doing when he was doing it.

So, these were parties acting in active concert. This was the parent board acting in active concert with Mr. Riju Ravindran. And I will just say it one more time so its not lost, one-third of the parent board is, in fact, Mr. Riju Ravindran. So, this is a case, Your Honor, that we believe screams out for a fair and uncontroversial and unremarkable application of Rule 65, Your Honor, again, if Your Honor is inclined to enter the relief we are asking the Court to enter.

In terms of, Your Honor, the two primary prongs which are likelihood of success and irreparable harm, Your Honor, of course, listened closely to the testimony and so I am not going to go through the four transfer and summarize the testimony in any painstaking detail. What I would like to do though is just call out some of the things that are in the record, but weren't in the live testimony today so hopefully that will just supplement the evidentiary experience today, Your Honor.

Your Honor heard about the April 2022 and July 2022 transfers to Camshaft. Those transfers, we heard from the witness, that there was no reason offered to the Court as to why that transfer made any sense. He didn't know Camshaft, nobody knew Camshaft, they never invested in hedge funds before. There was no countervailing purpose even offered, but one thing I didn't get into with the witness,

Your Honor, was the timing of those transfers April and July of 2022.

Those were effectuated, Your Honor, it was April 1st, 2022. If you look at the credit agreement, which is in evidence, Your Honor, April 1st, 2022 was the first date in the original credit agreement by which the borrower, BYJU's Alpha, the entity in whose shoes I stand now, had to deliver a white hat guarantee which is just a guarantee from another entity. It didn't deliver that by April 1st.

The insiders were the ones best positioned to know are we ever going -- they were never able to deliver it and that is the default that ultimately Vice Chancellor Zurn determined to be a -- without prejudice to any of the other defaults to be an actual default. This transfer happens after April 1st when lending a powerful inference that these insiders move money once they realized that at a minimum it was going to be unlikely that they would ever be able to deliver the white hat guarantee. So, I just wanted to talk about that timing because the next transfer has powerful timing inferences as well, Your Honor.

Transfer number two we now fast-forward to what we thought, what the debtor-in-possession thought, was March 1st, 2023. Today, based on discovery, it seems more then likely that this transfer may have happened after Mr. Pohl

was appointed on March 3rd, but let's leave it at March 1st for now or let's just talk about it as March 2023.

Your Honor heard the testimony about this was a gratuitous transfer, Inspilearn didn't pay one cent for it. Its not that Inspilearn promised it would pay a lot of money and then breached; no, Inspilearn got it for free from the beginning. But I wanted to comment on the timing, Your Honor, because it is February 10th, 2023, and this is referenced in the first day declaration at Paragraph 46. Its also referenced in the, I believe its Exhibit 8, which is one of the amendments to the credit agreement.  It is February 10th, 2023 when the forbearance period that the lenders were negotiating finally lapsed.

This was before my time, Your Honor, but the lenders gave workout negotiations along a good shot and February 10th, 2023 was when those lenders did not extend forbearance anymore.  So, now you have got a borrower, BYJU's Alpha, sitting on a super valuable Camshaft limited partnership interest, basically the $533 million, it now sees, oh, my borrowers are no longer talking to me, they're fed up, they have had it up to here. I, the borrower, am now at risk of enforcement rights and remedies. I have to move this away.  And they did move it away, as we heard from the testimony today.  They moved it to Inspilearn.

Inspilearn was a restricted subsidiary, but not a guarantor. They didn't tell anybody about it, Your Honor. So, once again, a date that screams out fraudulent transfer in addition to the absence of any legitimate business reason even offered. Usually in litigation you've got a plaintiff and you've got a defendant. The plaintiff is saying this was done to defraud me, the defendant is usually saying, no, it wasn't done for X, it was done for Y. We have got an insider here, Your Honor, who can't even come up with a reason why the transfer was done; not one possible reason. Not even the places that fraudsters usually go to, like it was done for some tax reason or something; nothing, complete blank slate.

This was an actual fraudulent transfer. Forbearance was up, Your Honor. It was moved away from the lenders. It was also a breach of fiduciary duty because this debtor received not a drop of cent in exchange. It was a breach of duty of loyalty because he was in charge of both entities.

Transfer three, Your Honor, this was the petition date transfer. Again, no countervailing suggestion for why it was done. It was moved -- you heard the witness say, from his perspective, it was a non-movement because it was Inspilearn to Inspilearn, but it wasn't a move -- but it was from Inspilearn to a non-US trust. That is, in fact, what the discovery responses and what his declaration says. He

has no idea -- he offered no reason why to move anything to a non-US trust. There is, of course, a super powerful, inescapable inference, that you are moving something to a non-US trust because you have US lenders and a US debtor-in-possession who has alleged those transfers to be a fraudulent transfer.

We are talking the petition date in this case. GLAS had already, back in November, commenced the state law fraudulent transfer action and this debtor had filed for Title XI relief and filed on that same date the fraudulent transfer claim. So, I don't know that any conclusion could be reached about the movement to the non-US trust other then a fraudulent transfer. Whether stay relief or not, that is going to be an issue for discovery, Your Honor, but certainly subsequent fraudulent transfer.

Then transfer four, Your Honor, we didn't think it could get worse, but it did. On March 5th Mr. Ravindran submitted a declaration and that declaration is now in evidence for this preliminary injunction hearing. That declaration says he resigned on February 14th, very suspicious valentine's day resignation, Your Honor. The only reason he could give to me at the deposition and today was that -- I will paraphrase it as it was a pattern and practice, I am on so many boards that I just began stepping down from them. That is all I can say about that.

He did it on February 14th knowing the bankruptcy case was filed. There was nothing about February 14th that called out for that day to be the day. This is him resigning from his post as manager of Inspilearn. He didn't resign from any other companies in February. Today maybe he told me he might have, but in his deposition, he said he didn't.

Your Honor, I have to say its really incredible and I don't like saying this, but its incredible to me that he woke up on February 14th, typed a letter to send to his brother and sister-in-law saying I am resigning from my post at Inspilearn, I am not going to call you up and talk about it beforehand, I never mentioned it to you all beforehand, but I am going to send you this letter, I guess, through email and not only that but on the very same day, it had to be within hours, he got a corporate document back, a resolution from Think and Learn, the board of Think and Learn on which he sits, that says we accept your resolution.

That is like two people coming to -- this is going to be a poor analogy, Your Honor, it's like two people coming to a wedding and having some finely intricate dance that you needed some teacher to teach you, and you need to go to dance class for months, and they came out there and they did their dance, and it was perfect, and everybody is cheering, and everybody asked did you take any lessons, when did you learn to do that dance, the name that I can't come up with, and

they say, no, this is the first time we did it, it was just a dance we did. We didn't speak to each other at all about it. In fact, we just met on the dance floor and did this dance.

It's a suspicious resignation, Your Honor, to say the least. And, of course, the reason why the debtor believes that he resigned --

THE COURT: If you're on Zoom mute your line or I am going to remove you from the call.

MR. FINESTONE: And, of course, Your Honor, the reason we submit that that resignation occurred was you can find it in the rest of the declaration. The convenient resignation allows Mr. Ravindran to then say, in the next paragraph, therefore, I left the money there. By the way he resigned from his post without a concern about the money at all. He just left the money sitting in the Inspilearn trust. Never called anyone to say, please, take care of this money. I am just leaving the house. Then he leaves and now he is able to say, therefore, I don't know what's happened after the fact.

I did stumble upon a press release -- I did stumble upon a press release that suggests to me that there was a fourth transfer, but since I have resigned, I don't know anything about that fourth transfer. He hasn't resigned from the parent board. He hasn't resigned from the parent board, and we heard testimony today that this money is still

at BYJU's the enterprise. So, he has been willfully blind about the location of the cash, Your Honor.

In terms of irreparable harm, and then I am going to sit down, Your Honor, subject to any questions the Court may have, I touched upon irreparable harm before when I was talking about the fact that we are seeking recission, disgorgement, restitution of the funds and why it was important to us because it is our sense that the situation at BYJU's is not a good one. There is some form of federal investigation pending, there are lawsuits pending. Every day in the news we see that there are stays of extraordinary meanings of shareholders who are seeking to reject the board.

Your Honor noted at some hearing, and I hope I get this right because I'm speaking to the man whose quote it was, but it was something along the lines, Your Honor, of money moves quickly. That exactly has been the debtor's concern. We don't know whether its money or security, but it moves quickly. It has moved quickly in front of the debtor's face, Your Honor. The dissipation of money has always been -- there is plenty of case law saying dissipation of money, especially if you have an insolvent entity, can give rise to irreparable harm.

The post-petition fraudulent transfers that we have seen here, Your Honor, are evidence of a pattern and practice of that money going further and further away from

the debtor and I don't know if there is a better example or illustration of the irreparable harm that we are at risk of suffering.

The last thing I will say in the opposition papers that they filed, Your Honor, before the last hearing they had an argument that said they were now arguing prong three of the preliminary injunction standard, harm to the potentially enjoined party. They said depriving the enterprise, this is the BYJU's enterprise, Your Honor, of access to its operating capital would be a major blow to the business, a business that employs tens of thousands of employees.

This is, of course, trying to appeal to the Bankruptcy Court's sympathy for operating businesses, but what it does to us is it cements our conclusion, at least, that we are faced with the risk of irreparable harm because we have now been threatened in a Court filing that they are going to take this cash and start using it to operate some business that we have no idea what it is supposed to do.

It really is completely inconsistent with that they have done. If they have sought to use this money for operations, Your Honor, they never would have put it in Camshaft, a hedge fund that I was careful to say this at the beginning of this case, but I will say it now, is nothing but a sham. So, now to tell us that they are going to use this cash to operate their struggling business overseas is

basically telling us that -- is basically rubbing the risk of irreparable harm in our face, Your Honor.

So, we believe that in terms of likelihood of success and irreparable harm we have met our burden, Your Honor, respectfully. We have done our best to meet our burden. Those are the most two important prongs. In terms of harm to them I don't think there is any harm to them because this is cash that they put away in safe places, purportedly safe places like Camshaft, like an offshore trust. There is no harm to that money being turned over to the Bankruptcy Court registry. They are just hiding it. They are not using it.

In terms of public policy, Your Honor, the public policy is -- I will come full circle, Your Honor. The public policy that Justice Scalia was talking about in Grupo Mexicano when he spoke about bankruptcy and fraudulent conveyance law is designed to prevent the kind of conduct that the plaintiffs were concerned about in Grupo Mexicano. And he used -- Justice Scalia used the word "prevent." He did not use the word "deter" or "allow redress for." He said prevent and I think that lines up perfectly, Your Honor, with the relief that we have requested of the Court.

Thank you for allowing us to come into Court on an emergent basis several times in this case. We respectfully request that the Court enter an order directing Riju and the

two directors who in active concert with Mr. Ravindran to turn the money over to the Bankruptcy Court's registry.

Last comment, in their papers they have taken a lot of swings at our request that it go to the Bankruptcy Court registry. As I said last time, we thought that was a conservative place to put it, Your Honor. We didn't ask for it to be returned to BYJU's Alpha, which is where it was before at the last peaceable moment before the breach of fiduciary duty. We asked for it to be put in the registry. They are not using it for their operations. It's a place that we feel very comfortable, of course, with cash being.

Once Your Honor decides the merits of the fraudulent transfer lawsuit or the breach of fiduciary duty lawsuit, if we are wrong about everything we said, if we can't cash the check that we have written then its going back to them. Thank you very much, Your Honor.

THE COURT: Thank you.

Does GLAS wish to be heard?

MR. SCHARTZ: Good afternoon, Your Honor. Brian Schartz from Kirkland & Ellis on behalf of GLAS, the agent for the term loan.

I am going to keep my comments quick and to the point. I do have a short handout. Mr. Finestone covered the first half of it already, so I am not going to go through that, but I would like to hand it up to your Court. I will

pass it out. It's the same one that we emailed your Chambers earlier today.

THE COURT: Okay.

MR. SCHARTZ: May I approach?

THE COURT: Yes. Thank you.

MR. SCHARTZ: As I said, the first, call it, five pages of the presentation really just cover the transfers that Mr. Finestone just went through. So, I am not going to belabor it, Your Honor. I am going to leave it with you because it may or may not be helpful to kind of see how everything works in terms of timing because there are a lot of dates and it is quite complicated.

I want to focus in on really just a couple arguments that are made in BYJU's paper by counsel. So, if we could give my team, its Nick Belnoy (phonetic), I believe, who is my tech person, just giving him access to the --

THE COURT: Raise his virtual hand on the Zoom call and we will give it to him. You're good to go.

MR. SCHARTZ: Okay. If we could, Nick, go to page 6, but I am going to keep it moving along here.

There is, in BYJU's papers, an argument regarding the credit agreement and it goes something like the fact that debtor -- Judge, we complied with the credit agreement, we're moving these funds; therefore, it can't be a fraudulent conveyance. I want to unpack that just a little bit. As we

talked through it, as a team, I figured a picture would help unpack this.

What you really have here is a circle on the left side, a simple Venn diagram, compliance with the credit agreement, a right circle fraudulent conveyance, in the middle they can overlap. The point here, Judge, is that the fact that you comply with the credit agreement or not comply with the credit agreement is irrelevant to fraudulent conveyance. It's a very logical clear point and, in fact, we have a case that we cite in our papers, also from Judge Sontchi, its In Re EVCI that we cite here on this slide where he found in the context of someone raising a point that payments made under a contract prepetition, you know, couldn't be clawed back. He said transfer may be fraudulent even if its made in accordance with the terms of the contract between the parties. That is exactly what we have here, Judge.

In fact, we go a step further when we look at the credit agreement because Section 5.7 of the credit agreement, this is the provision just before 5.8 that Riju cites in his papers, provides very clear that the parent guarantor, which is Think and Learn, their restricted subsidiaries, which included BYJU's Alpha, includes BYJU's Alpha still, to comply with all laws, rules, and regulations.

Why am I saying all of this? It just makes sense, Judge. The fact that the money was transferred, even if it complied with the credit agreement, it does not cleanse a fraudulent conveyance. You cannot contract that away. Its very clear from the Sontchi decision, in fact its very clear from the credit agreement itself, that is why Section 5.7 is in this credit agreement and, frankly, every other credit agreement of any significant loan of this size.

Perhaps an obvious point, but its been raised and I wanted to talk about it. I also want to talk a little bit, if you go to slide seven, about whether or not the credit agreement was complied with if Your Honor wants to go a little bit deeper. We don't think that all of the provisions of the credit have been followed. You know, let's just look at each transfer that Mr. Finestone went through. I did not cover the fourth transfer because its not covered in the complaint. Its focused on one, two, and three.

For each of them non-compliance of Section 5.7 if Your Honor finds that this was a fraudulent conveyance it was, by default, a breach of Section 5.7 and, therefore, is not in compliance. In addition, there is an investment provision, but the investment provision it prohibits investments in any person with a whole bunch of exceptions. We have no evidence from Mr. Ravindran that any of those exceptions would apply.

What you would normally see is an investment policy, a board meeting in proving the investment policy, you would see resolution deciding to move the money to a fund or a series of fund, there is maybe a money management policy, we have none of that. In fact, what you heard today, Judge, is the total opposite. He doesn't really know why the money was moved to Camshaft. He just did it because Think and Learn said so. So, the idea that a wire, two wires, of $533 million to Camshaft is somehow complying with the credit agreement when there is nothing in the record that supports that is, frankly, asinine.

So, we don't think it's been complied with for the first transfer. We certainly don't think its complied with for the second transfer because there was no consideration given back to BYJU's Alpha. It was literally just a giveaway. You heard that today when Mr. Ravindran testified. The same thing goes for the third transfer, Judge.

So, just to bring it home the credit agreement if it is complied with does not fund a transfer. You have a case from Judge Sontchi. In fact, the credit agreement itself says that. And we have no evidence in the record that shows that any of the detailed provisions of the credit agreement, in fact, were complied with when BYJU's Alpha, under Mr. Ravindran's direction, moved the money to Camshaft then moved the LP interest to Inspilearn and then subsequently moved the

cash or whatever the asset was, we don't know if its cash, from Inspilearn to this offshore trust; none of that complies with the credit agreement. There is no evidence before the Court that it did, in fact, comply with the credit agreement.

Any questions, Your Honor?

THE COURT: Not at this time.

MR. SCHARTZ: Okay. Let's go to the next slide, please. A little bit about default to go back to the very beginning. You hear a lot about the four defaults, the white hat guarantee. That is all important. Its how we establish Mr. Pohl's role in the bankruptcy, prior to the bankruptcy. Since the four original defaults that were litigated at the time that the Delaware 225 action was present there have bene a whole bunch more and here is a list.

They are actually quite hard to keep track of, but when you go through these its, essentially, and I have said this before at the podium, and I am going to say it again, its BYJU's enterprise that has walked away from its obligations under the credit agreement. And each one of these is important. Taking them as a whole they are extremely important. They include failure to deliver financial audited and unaudited, missed interest payments, (indiscernible) payments, no quarterly management calls, there has been an involuntary petition filed in India, inspection rights, information demands made on the credit

agreement have been ignored.  Again, failure to deliver unaudited financials, missed interest payments, and the list goes on and on and on.

Judge, we are going to have more.  The whole point is that this is a credit agreement that is so very clearly in default.  Any argument that its not in default really doesn't make much sense.

Let's go to the next point.  Notwithstanding the fact that the credit agreement very clearly is in default, the affirmative covenant survive until the loan obligations have been paid in full in cash.  So, all of the requirements of the debtor, all the requirements of the now unaffiliated, but previously affiliated entities in the BYJU's capital structure that are obligated on the debt, they continue to have requirements to comply with under the credit agreement; notwithstanding the fact that its in default.  Does that make sense?  That's really how every credit agreement works.

Go to the next slide.  And they also survive acceleration.  That is what we have in Section 10.5.  So, that is where we sit from a GLAS perspective vis-à-vis the credit agreement.  We think it's very important that the credit agreement not be taken somehow to cleanse these very significant transfers that were made and which are the subject of the amended complaint.

THE COURT: What does the credit agreement say about what happens when the debtor is in default in terms of the debtor's ability to then transfer funds or use the funds for operations?

MR. SCHARTZ: Yeah, its interesting. Arguably, if the debtor was in default we would charge default interest, we would have a negotiation around forbearance, which we did, and it didn't happen, and then you would exercise remedies. That lead to the acceleration. If we were just in default without acceleration, arguably the debtor would still be able to move cash around and comply with those provisions. We would take the position the whole thing is accelerated. Everything is due and owing right now.

Moving the money around actually is not permitted. Why? Because we actually are required to be paid down right now. That is what the credit agreement says. That cash is supposed to be used by the rest of BYJU's enterprise to pay down the agent who then distributes the funds to the lenders because the maturity date has, essentially, has occurred.

THE COURT: When did the acceleration occur? What was the date?

MR. SCHARTZ: The acceleration date officially occurred on March 3rd, I believe, when remedies were exercised. Sorry, March 3rd, 2023. Its on slide three of our timeline that I didn't walk through, but it's there.

THE COURT: Okay. Thank you.

MR. SCHARTZ: Okay. I want to talk very briefly. I'm going to try not to belabor anything that Mr. Finestone touched on. Talk really briefly --

If you could go to the next slide, Nick.

-- on fiduciary duties.

So, this is slightly technical. Mr. Ravindran has talked about in his papers, and actually in his testimony today, that BYJU's Alpha is a special purpose vehicle and BYJU's Alpha is a Delaware corporation. It's not a Delaware LLC.

And in the papers, Mr. Ravindran talks about Section 102(b)(7) of the Delaware General Corporation Law, which allows corporations to eliminate the personal liability of the director to the corporation or stockholder for monetary damages for breach of fiduciary duty as a director or the officer.

What they don't focus on is the language we put in bold on that top box on this slide. Because what it also goes on to say, what the statute goes on to say is that any such provision, limitation provision, "shall not eliminate the liability of actions or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."

And we would submit, Judge, the reason BYJU's

Alpha was the borrower on this loan was specifically so GLAS and the lenders for which it serves, would be able to access Delaware corporate law because it's exactly this type of provision, this language in bold, that is designed to protect the creditors. I'm not going to go through the list of everything you've heard today, but a few things jumped out and I think each one of these things I point to shows very clearly that Mr. Ravindran did not act in good faith in his time as a director of the debtor.

He, quote, accepted the decision that Think & Learn made as the sole director of the debtor. He did that when he moved the money and made the first two transfers in April and July of '22. He said, somewhat stunningly, that he had no idea why the money would be moved. We have an idea, in fact, we know, because his brother said he was going to put the money someplace where the lenders would undercover find it.

Mr. Ravindran did not question why Think & Learn, the parent, would move from the money from the debtor, of which he was the sole director, to Camshaft. He said he blindly signed the documents, as the director of BYJU's Alpha, to move the money. He testified that he would not have understood anything. You know, he said he had read the subscription agreement, or seen it, but he didn't say he understood it; in fact, he said he did not understand it, and

that he didn't have knowledge or the skill to really understand anything. The list goes on and on and on.

And that type of conduct, Judge, for a director of a Delaware corporation, that is not what the lenders loaned into. And BYJU's Alpha, being a Delaware corporation, having the protection of the Delaware DGCL is exactly why the structure was set up the way it was.

The same thing goes for the duty of loyalty. That's not waivable, you know, there is no waiver, so I don't have to talk about a carve-out. But what you heard today goes specifically to, as Mr. Finestone pointed out, a duty of loyalty breach. By just taking direction from Think & Learn, Riju Ravindran did no work as a director. He's on the board of Think & Learn.

And I'll focus in on the second transfer, although, I think they're each very problematic, but the second transfer, in particular, when the LP interests of BYJU's Alpha was transferred by Riju Ravindran in his capacity as sole director of the debtor to Inspilearn, of which he was also the sole manager, without any consideration, transferred it from one entity to which he owed a fiduciary duty to the company to an LLC for no consideration, it is a *per se* breach of fiduciary duty of loyalty. I mean, that is -- I can't even come up with a more textbook example of breach of duty of loyalty.

Forget about the duty of care for just a second. It's still a breach of the duty of care, but it is a breach of the duty of loyalty and he testified to that today. He said that transfer was made for no consideration. It was taken away from BYJU's Alpha and it was given to Inspilearn for no consideration. That is a *per se* breach of fiduciary duty of loyalty -- per sea breach of the duty of loyalty, excuse me.

That is it, Judge. I just wanted to cover those couple of points. If you have any questions, I'll cede the podium.

THE COURT: No, nothing further. Thank you.

MR. SCHARTZ: Thank you.

MR. KORPUS: Good afternoon, Your Honor. Sheron Korpus of Kasowitz, Benson, Torres for Mr. Ravindran.

Your Honor, the motion that's before the Court is both improper and futile. It's improper because this is not the type of relief that this Court should give, as Your Honor already indicated, and Your Honor actually included everybody in this room to it at the last hearing, the Supreme Court precedent in Grupo Mexicano and in Granfinanciera, and besides which, the entire discussion in those cases relate to whether the Court can order a typical freezing order.

I haven't heard anybody on the other side even talk about the big elephant in the room, but what they're

asking you to do is completely unprecedented. This isn't a freezing order. This is a mandatory injunction requiring somebody who apparently doesn't even have the power to do it, doesn't have control over the funds, and we'll get to that, physically get control of certain funds and transfer them to the Court. It's unheard of. I've never seen it. I don't know if the Court has ever seen it. And they don't even address it.

And it's futile because our client, Mr. Ravindran, literally cannot do what the debtor wants him to do, and because the Court doesn't have jurisdiction over these other parties and that, alone, should result in the Court denying the relief. And in addition, as we argued in our brief, they don't meet the criteria for a preliminary injunction, and I will get to that. So those are the three points I want to make, mainly since they're (indiscernible) with whether the relief is proper.

The Court was right to focus last Wednesday on whether it has the right to grant the relief in light of Grupo Mexicano and other case law, but let's just take a step back and understand what those rules are about and why they exist. The roots of Grupo Mexicano go back a long way. They go back to 1945, the Supreme Court in the De Beers case, which made it clear that an interim injunction has to match the final relief that you seek. The preliminary injunction

is always appropriate to grant intermediate relief of the same character as to which may be granted finally. And that's the logic behind Grupo Mexicano and a vast amount of other case law. If you're seeking monetary relief, what you're after is monetary damages and you cannot get preliminary injunctive relief. Your relief is money, which is what you get after you get a judgment.

They try to obscure that fact, but there's a lot of Bankruptcy Court decisions finding that those courts don't have the power to enter a preliminary judgment where it's a legal claim and when there's no lien or other equitable interest in the property, like the In re Teams case last year by Judge Goldblatt, or the Trustees of Conneaut Lake Park case from the Western District of Pennsylvania, in our brief, or the Goldsmith case in our brief. They rely heavily on this EHT decision, which is really an outlier, as we explain in our brief.

He takes a footnote from Owens Corning way past its proper application. And Mr. Finestone, today, doubled down on it. I mean, all due respect to Judge Ambro, all due respect to Judge Scalia, and to all -- and to the Mount Rushmore that the debtor built today, that footnote was *dicta*. The case before the Court was about the remedy of substantive consolidation and whether it's available.

It wasn't about preliminary injunction and but

whether -- and it didn't exclude the Bankruptcy Court in the Third Circuit from applying Grupo Mexicano. That's not what the case was about, and as I just mentioned, plenty of cases hold the other way.

So, really, it comes down to EHT. In EHT, the Court found that even if Grupo Mexicano applied, it would have grounds for the relief because of the equitable relief being sought in that case.

The Bankruptcy Court for the District of New Mexico put it well in their Las Uvas Valley Dairies case. In our brief, we said:

"Bankruptcy Rule 7065 allows bankruptcy courts to enter injunctions, but clearly does not give bankruptcy courts any powers denied to district courts under Grupo Mexicano."

And that's the end of the story.

Now in the supplemental brief, the debtor and GLAS now try to rely on Section 105 as an alternative to 7065. But we've seen in the, In re Morristown case that I cited to you last week, where the Third Circuit said that Section 105 doesn't give bankruptcy courts powers to (indiscernible) new remedies. And I know you didn't agree with us previously on whether or not Morristown precludes a mandatory injunction -- I'm not quoting it for that proposition -- but --

And I'm getting used to my new prescription. I can't see -- I can see it with, but I can't see you with -- I'm having a little trouble with my glasses.

-- what <u>Morristown</u> does hold is that Section 105 cannot be used to grant injunctions to create new rights that don't exist under the Code. And I'm quoting from the Third Circuit here at 885 F.2d 100:

"Section 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the Code."

And then I'm reading some cites. The Court goes on:

"Nor does Section 105 give the Court power to create substantive rights that would otherwise be unavailable under the Code."

And they did not point to any provision of the Code that allows them to take property away from other parties, and they didn't do it in their brief, and Mr. Finestone is trying to amend his complaint today at the podium, which is clearly improper, by addressing what he had to say in their reply brief filed on March 6th. They actually noted that 105 doesn't get them there. They argued on pages 2 and 3 that they don't need 105. They also have 7065. But now they come in and say, Well, maybe 7065 doesn't work, so maybe we need to go back to 105.

He referred to the *ultra vires* provision 541. Well, for the transfer on March 21, even if the transfer did take place after the self-executing consent by the creditors, at that point, there was no decision of the Chancery Court. They hadn't even commenced the Chancery Court proceeding. All it was, was a self-executing consent filed by lenders, purporting to take control of the company, which, as you know, we are contesting -- it's on appeal -- and you signed an order allowing us to lift the stay and continue prosecuting that appeal.

And as for Section 544(a), that's not pled anywhere in the complaint and it doesn't work anyway. It doesn't give you injunctive relief under 544(a).

The law is simply that they cannot get injunction for a legal claim, and for that reason, they've now changed tack. Now they're trying to argue, No, no, no, we have equitable claims. The big tale is they weren't pled at all in the amended complaint. The word "accounting" is not mentioned in the amended complaint. It never says that they were seeking equitable remedies.

It says the opposite. Counts 1, 2, and 3 all seek the recovery of money under fraudulent transfer theories. Count 4 seeks compensatory damages. Count 5 for breach of the automatic stay, actual and punitive damages. They mention "constructive trust" in a footnote when talking about

the automatic stay; that's the only place where it comes up. Their only claim is for damages.

And then in the initial briefing they filed, seeking it hereof, again, they didn't mention the word "equity" or "equitable" in 40 pages. It didn't mention an accounting. It mentioned the "constructive trust," once again, dealing with the automatic stay claim, and the same in their reply they filed before the hearing.

It's really straightforward: they want monetary recovery and they want a TRO PI to ensure they can get their money, and with all due respect, Your Honor, this Court can't do that.

And yet after the hearing when you raised this issue, all of a sudden they say, Well, you know, if you look at my complaint this way, if you look at it that way, if you look between the lines, I supplemented from the podium, we didn't ask for an accounting, but we really want an accounting all along. That just doesn't work.

The Court, the Supreme Court in Granfinanciera was very clear about this. If you sue for fraudulent transfer to get transferred money back, not real estate, not chattel: cash. You have a legal claim. It doesn't matter what you call it. The Court said, and I quote:

"Any distinction that might exist between damages and monetary relief under a different label is purely

semantic." That's 492 U.S. 49, note 7.

You can call it a trust. You can call it an accounting. But at the end of the day, it's just money. They want to get the money back and they can't actually get an injunction for that.

Granfinanciera -- pardon me -- there argues that if you can't get it on a federal claim, you can get it under Florida law or maybe Delaware law. It cites to the Chihuly case, but that case is about garnishing the proceeds of a sale of real property. It's not about just the money.

And as we said in our brief, under Florida law, fraudulent conveyances are voidable -- not void -- which means that they cannot have an equitable interest in the money, and the same is under Delaware law. And more importantly, Florida or Delaware State law can't allow this Court to enter an injunction that a mountain of case law, including two Supreme Court cases, says it has no power to grant.

They argued at the last hearing, but I didn't hear it today, that they pled the constructive trust. I think the Court debunked it at the last hearing, because it was rejected. That exact attempt was rejected by the Court in Team Systems. You can't just say, We want the constructive trust, as kind of an intermediate step to getting the money back. It doesn't magically make money for damages equitable,

a claim for money equitable. That's exactly the semantic change of label that Granfinanciera rejected.

And the same logic is true of Mr. Finestone's claim last week's hearing when you raised the issue that what they want is a specific fund, rather than fungible money. That argument proves too much. If that were the case, then every fraudulent transfer would be entitled to a preliminary injunction.

There's always a body of money that you're going after. It's just more semantics, and the cases they cite really don't support that proposition. Sereboff v Mid Atlantic Med. Servs., Inc. in their brief is an ERISA case, which, under statute, provides for specific equitable remedies. Chauffeurs, Teamsters, and Helpers (phonetic) in their brief was about backpay under Title 7 of the Civil Rights Act, which has long been recognized as an equitable (indiscernible) claim.

Finally, they said they want an accounting, even though they never pled it in the amended complaint, and even if they had, it would make no difference. Because, again, in the words of Granfinanciera, it's semantics. What they want is the money. It's not an accounting; it's the money.

Today I heard someone say -- I can't remember which counsel -- said it's disgorgement. It's not disgorgement.

Mr. Ravindran doesn't have the money. They want damages for breach of fiduciary duty. That's why Mr. Finestone asked at the deposition of Mr. Ravindran whether he has any D&O coverage, because they're really looking for money.

So, we submit, Your Honor, that the Court does not have authority to enter a preliminary injunction here. And I just want to emphasize one point that we can't get lost, and I said it before, all of these cases we've talked about, all of the cases Mr. Finestone talks about are about a standard freezing order. And what you're trying to do here is something very, very different. They're seeking to order a party, before any judgment has been issued, to hand over more than half a billion dollars; in other words, to actually pay the judgment, what a judgment would be, if there was a judgment. It's unheard of and it's not *status quo* at all. It's changing the *status quo*.

The Third Circuit in <u>Trinity Industries v Chicago Bridge Iron Company</u> in our brief set out that a may or may not preliminary injunction is particularly heavy and only to be employed in the most unusual cases. And they just don't make the case here.

Why did the lenders never sue for judgment under the credit agreement? The supposed breaches and events of default they're complaining about happened, at this point,

two years ago and they still haven't done it. To this day, they have not brought an action for judgment. They could have sued in New York, which is the venue (indiscernible) under the credit agreement. They could have used the expedited provision under 3213 to get summary judgment to move complaint if they meet the standards. I'm not considering they would -- we would obviously object -- but they could have tried. And they could have had a judgment by now and then they could come to the Court with a judgment and ask for whatever remedy flows there that. They never did.

Instead, they sued in Delaware Chancery, they sued in Florida, they came into this court, but they never asked for a judgment. Why? If it's such an open-and-shut case as they've been telling you, why didn't they ever sue for breach?

It's because, Your Honor, under New York law, there are defenses to the breaches they assert. There are defenses to the breaches that they are relying on to have Mr. Pohl take over the company. The company was not able to provide the guaranty because of a change of law in India. That's the issue that we're going to be pursuing with the Supreme Court, thanks to Your Honor's orders lifting the stay. But they know that in New York, courts recognize that if it's a non-material breach, you can't exercise Draconian remedies.

And they've been Draconian, right?  I mean, they issued -- they signed a self-executing consent, took over the company, they filed the company now into bankruptcy, now they're coming here for this unprecedented relief.  That's exactly what New York courts protect against and that's why they haven't brought the action in New York to this day.

Now, they're trying to pretend that they do have a judgment.  Footnote 10 of their brief is really somewhat outrageous.  It suggests that they do have a judgment.  They have a judgment from the Delaware Court of Chancery.

But that's not a judgment.  There's no money damages in that judgment.  There's not -- it's just an order that Mr. Pohl is the right director of Alpha, until such time as that judgment is reversed.

What they're trying to do, Your Honor, is skip over judgment.  Skip over the post-judgment attachment and go straight to some kind of a mandatory order forcing payment in the court and it is absolutely extraordinary and unprecedented.

Let me move on to futility, Your Honor.  Riju Ravindran submitted a declaration in which he said that he resigned as director of Inspilearn, LLC, the company that made a transfer on February 1.  And he resigned on February 14th.  That was before this motion was ever filed. He does not have access to the money.  It's not his money.

You asked for him to show up and testify today, and he did. You ordered his deposition, and he did for nine grueling hours, past midnight. He was very honest in exactly what he did, and what he did was fulfill his role as a director of the company, a shelf company, a special purpose company, which is part of a larger group. It's no secret; they knew that.

THE COURT: Did he comply with his obligations as a director of the company?

MR. KORPUS: He did. Because at the time --

THE COURT: The testimony I heard, he did not.

MR. KORPUS: Well, Your Honor --

THE COURT: And I will say this on the record, I have -- I can't imagine any trier of fact who would have listened to Mr. Ravindran and conclude that he either wasn't being untruthful or that he's the most incompetent officer or director of a company in Delaware's history.

MR. KORPUS: Your Honor, we have to remember what the company is. The company was a fully owned subsidiary by the parent.

THE COURT: It's a Delaware, United States corporation. He was the director, the sole director, and he completely blew off his obligations to make sure that what he was doing was in the best interests of the company that he was a director of.

MR. KORPUS: Which, he's the sole shareholder of the company. Those are the people that he owed duties to and he acted at the direction and in the interests of the group. That was the way that it was set up from the beginning.

The lenders knew this. They knew they were lending money to Alpha. They knew that Alpha is solely owned by PNM and they knew -- and I'll get to that -- that the credit agreement expressly provides that the proceeds of the loan agreement are to go to everybody, are to go outside to all of the operations in the group. That's the setup of this deal.

THE COURT: In the unless they're in default.

MR. KORPUS: That's not true.

Counsel was not able to point to any provisions saying that once they were in default, they can't do it; in fact, they said the opposite. They said even when they were in default they could still use the money for operations. He said maybe not when accelerated, but I didn't cite anything to you, and there is nothing, because the acceleration is being contested. We've contested the acceleration from day one, because it's based on this guaranty that the company was not able to provide. So it comes a full circle back to whether or not there was a default or there wasn't and that's the question.

But Mr. Ravindran, I submit, Your Honor, testified

candidly and honestly that he did what is expected of him by the only shareholder of the company.

THE COURT: And he's an officer -- excuse me -- a director of that shareholder --

MR. KORPUS: He's a -- but --

THE COURT: -- and yet he did nothing to find out why they were doing this, who Camshaft was, was Camshaft an appropriate place to send this money. He did nothing.

MR. KORPUS: Because, Your Honor, the interests are aligned at that time. This was before Mr. Pohl took over, right. He was there and he was acting in the interests of Alpha, which are the same as the interests of PNM.

THE COURT: All right. Go ahead.

MR. KORPUS: Thank you.

So, Your Honor, he does not have access to the money. It's not his money. And you can order him to pay $500 million into court, but he simply could not do it, as he testified.

And, Your Honor, I heard, I think, Mr. Finestone say, Well, what's the harm? Why don't you just order him and we'll see what happens.

I'm very conscience, Your Honor, of what happened here earlier this morning, and so should the Court be, of putting somebody in a position where he physically cannot do something that's ordered by the Court, and I think the Court

should be concerned about that, as well. Certainly, we have cited authority to you that you cannot sign orders that would be futile.

THE COURT: Well, I could still enter a freeze order.

MR. KORPUS: Yes, Your Honor.

If all other requirements are met, if you are convinced that you have the authority under Grupo Mexicano and Granfinanciera, if you feel that they've met the requirements, yes, but that would at least resolve that issue.

But that's why, Your Honor, courts shy away from mandatory injunctions, so as not to put people in a position like the debtors are trying to put Mr. Ravindran in. And he explained why he resigned. I understand that they find it incredible and I heard about the (indiscernible) and all that, but Mr. Ravindran testified that he had personal reasons, in addition to everything else. He's looking after his two ailing parents. He's the only one looking after them and he's trying to get himself off other boards.

He also resigned from another board, Akash, which is an operating company, recently. So this is what he's been doing. And I think that, if anything, the experience two days ago and today, would further cement why he's trying to get himself removed from these kinds of situations.

THE COURT: Well, the timing was very convenient, that he resigned immediately before the funds are transferred out of Inspilearn.

MR. KORPUS: Yeah, as I said, Your Honor, at the time, there was no request for a TRO. There was no motion that was on file.

THE COURT: No, I think it's convenient for him to be able to say, I know nothing. I see nothing. I don't know where the money is, because I was no longer there. And, frankly, I don't buy that. He's a director of the parent company.

Under Indian law, it would show to me that he has the ability to obtain that information that we've been asking for -- that I've been asking for. I don't think he's in compliance with his obligations under the discovery. He had an obligation to provide the information. He could find it if he wanted to; he just doesn't want to.

MR. KORPUS: Your Honor, I think in the redirect, we pointed you to the *proviso* in the Indian law, which says that there has to be a Board resolution.

THE COURT: And he said he didn't even ask for it --

MR. KORPUS: Well, he's not a lawyer --

THE COURT: -- which means he's not complying with his discovery obligations.

I'm very upset about the fact that we're obfuscating where this money is and they are trying every trick in the book to be able to say, We don't know.  This guy doesn't know.  That guy doesn't know.  We don't know where it is.  We can't tell you.

And I'm tired of it.  I want to know where this money is and I'm going to order him to find out where the money is.

MR. KORPUS:  And I'm sure that he's, as he said on direct and on cross, that he will try.

THE COURT:  No -- no, "try"; "do," as Yoda would say.

(Laughter)

MR. KORPUS:  Hear you, I do, Your Honor.

But he can only do what he can do.

THE COURT:  Well, I think he can comply with my order, because if he doesn't, he's going to end up with Mr. Morton.

MR. KORPUS:  Your Honor, the other part of the order that we have a problem with is that just before the hearing, the debtors modified it to make it binding on other people and entities not before the Court, which is audacious. They want the Court to sign an order that would be binding on people that aren't before it, who are not U.S. citizens, who are not in the United States, without going through

enforcement in wherever they are, without going through steps under the Hague, and I don't think Your Honor can do that.

THE COURT: Well, there's precedent, though, that Rule 65, when I issue an injunction, if somebody is aware of that injunction and they act in concert with somebody else to avoid that injunction, then I, one, obtain jurisdiction over them, and, number two, I can pursue them, as well.

MR. KORPUS: I understand that, Your Honor, but I don't think you can make it -- you can enter the order that they drafted, which specifically makes it binding on people not before you and in foreign jurisdictions.

And I think, Your Honor, the only exception to that under the Dentsview (phonetic) case, is if those people are, quote, virtually, a representative of Ravindran or Inspilearn, and they're not. If they were virtual representatives, then Mr. Byju Raveendran would have told Mr. Riju Ravindran when he asked where the money was and he didn't.

THE COURT: Well, you can't have it both ways. If you're an officer and director of the parent company -- you're telling me (indiscernible) the parent company, so he was -- Mr. Ravindran was acting for the benefit of the parent company, instead of the creditors.

You can't have it both ways. If he's an officer and director -- if these are officers and directors of the

parent company, then they have an obligation to comply with the order, and if they don't comply with an order, I gain jurisdiction over them and I can proceed accordingly.

MR. KORPUS: I understand your views, Your Honor. I mean, I'm just telling you what we believe the case law is, and I believe that would be a very far-reaching --

THE COURT: I mean, I don't think I need to name them --

MR. KORPUS: Right.

THE COURT: -- in any order, but if they -- they're going to be noticed -- they're going to get notice of it because Mr. Ravindran is going to tell them. I'm going to order him to advise the parent company and the officers and directors of the parent company of the order, if I enter one, and so they'll be aware of it.

MR. KORPUS: I understand, Your Honor.

THE COURT: And if they violate that order, we'll see where it goes.

MR. KORPUS: Understood, Your Honor.

And finally, Your Honor, my final point about the criteria for a PI. I have a feeling I know what you're going to say on the likelihood of success on the merits, but if you could just indulge me. On the actual fraudulent conveyance claim, their claim boils down to a single statement made by Byju Raveendran, who isn't before the Court.

And that statement is completely out of context. Yes, he didn't want to tell, at the time, the lenders, where they kept the money, because the lenders were acting in a hyperaggressive manner. I have never seen before, lenders using a non-monetary default to not only call a default and accelerate, but also to take over the borrower entity and then file it into bankruptcy, all at the time Byju was making every payment due under the agreement and the lenders were just trying to push for more and more concessions in these negotiations. So, at the heat of the moment, Mr. Raveendran, Mr. Byju Raveendran made that statement.

That does not give you a fraudulent conveyance claim. And there was no contractual obligation to tell them where the money was. There was no covenant limiting where they could put the loan proceeds. There was no escrow account. That was the deal. They knew what they were doing. They have some of the most sophisticated funds in the world represented by very capable counsel like Kirkland & Ellis and Shearman & Sterling, and they knew exactly what the deal was.

BYJU's Alpha was an entity that existed just to get the loan proceeds. There was never any contractual obligation or expectation that the money would stay there. It is absurd to suggest that there's a fraudulent transfer just because the debtor has less money than the $1.2 billion that it's owed. By that logic, if after day one after the

loan is made, you take some of those proceeds and you move it across the group, as the credit agreement expressly recognizes, at that point, the entity is insolvent and it's a fraudulent transfer or a constructive fraudulent transfer. It just doesn't make any sense.

There's no missing money. The money, under 5.8, was always supposed to be used for the general purposes of the group and not just for Alpha. And 5.8 also recognizes the funds could be used for investments and there's no limitation on the investment not being in Camshaft or anywhere else. They were allowed to put it in investments and that's what they did.

The lenders didn't bargain for any kind of veto over the investments that the group is putting the money in while it chooses to use it for general operating purposes. They don't like that the funds were in Camshaft, I understand that, but they didn't contract for a veto right.

And as for the consideration for the transfers between BYJU's and Inspilearn -- between BYJU's Alpha and Inspilearn, all Mr. Ravindran said is that he's not aware of what consideration there was. He's not the accountant. He's not in treasury. We don't know sitting here today, but I would expect that there would be some kind of a journal entry that records an intercompany transfer. One would expect it, I just don't know. I can't tell you that there is one. But

Mr. Ravindran was not aware of one. That's all the testimony is, not that there was no consideration.

THE COURT: So, it's the Sergeant Schultz defense, "I see nothing, I know nothing," even though I'm the only managing member of the company?

MR. KORPUS: The only managing member of a solely owned subsidiary, that is correct, at the time.

THE COURT: And he doesn't know where the money is?

MR. KORPUS: He doesn't know where the money is today, no. He's not longer a part of Inspilearn. He's no longer a part of BYJU's Alpha. I mean, Your Honor, he testified. His testimony is what it is.

THE COURT: It certainly is.

MR. KORPUS: And as for the fiduciary duty claim, the certificate of incorporation contained an exculpatory provision, as you know, for any duty of care. And we submit that his duty of loyalty was a duty of loyalty to the parent, to the shareholders, and to the company at a time when it was fully owned by PNM. I think we've spoken about that.

He does not owe any fiduciary duties to the creditors. He did not owe any fiduciary duties to the creditors at the time that the transfer was made out of Alpha.

And the breach of the automatic stay, I don't

think they are really pursuing that, but if they are, I mean, the funds didn't belong to the debtor on February 1. They were in Inspilearn, so it couldn't be a breach of the automatic stay.

And, second, a transfer, which the debtor, I think, acknowledges was scheduled long before February 1, took place at 11:50 a.m. Indian time, so that's before the Chapter 11 case was filed.

MR. FINESTONE: Just for the record, Your Honor, the record is pretty broad and this is merely a preliminary injunction hearing, but that statement is not in the record, the time of the petition date transfer. That fact is not in the record.

MR. KORPUS: I believe it is somewhere in the record.

THE COURT: Can you point me to --

MR. KORPUS: I will get you a --

THE COURT: It wasn't in the testimony.

MR. FINESTONE: It's not admissible evidence. It may be a lawyer's statement or brief.

THE COURT: If it's in one of the documents that's submitted, otherwise, there was no testimony about it.

MR. KORPUS: I'll see if I can get you a cite from one of the documents it was submitted, Your Honor.

And, Your Honor, with respect, we submit that the

debtor cannot point to irreparable harm for several reasons. First of all, they worry about fear of dissipation and they claim to have been worried about it since last May, but they never asked for a remedy before then.

All these months, you know, they went down to Florida, they sued Camshaft. The money was at Camshaft, at the time, I guess. They never asked for a TRO there. They never asked for an injunction there. They could have done something about it then. They chose not to. Why? They got a pretty hostile reception in Florida, so they changed course and decided, we're going to withdraw that case, we're going to file the bankruptcy, we're going to come to this court, we'll get a better reception.

That's their own making. They can't now come and say, Oh, we're going to irreparably harmed if you, Your Honor, don't do something about this.

And there's also, of course, the authority that parties seeking money damages can never have irreparable harm, because it is just money at the end of the day.

And for all those reasons, Your Honor, we request that you deny the motion. I'm happy to answer any further questions that you have.

THE COURT: No more questions, thank you.

Mr. Van Tol wishes to make an argument.

MR. VAN TOL: Thank you, Your Honor. It's a long

day, so I'll make two quick points.

The first is on the relief point, and this goes back to De Beers. The De Beers case says you cannot seek relief that is not supported by the allegations in the complaint.

There's relief sought here to enjoin Mr. Morton and Camshaft, or I should say, "Camshaft," from transferring or doing anything with the funds. But the allegations in the complaint are plain; they say Mr. Morton no longer has the funds, Camshaft doesn't have the funds, and they're express about that. There's no claim in the complaint to or about Mr. Morton or Camshaft about the funds. So they're asking for relief that's not in the complaint. That's point one.

Point two, Your Honor, goes to the merits.

THE COURT: The same kind of issue we had with the BYJU's officers or the directors of the parent company; maybe I don't name him in the order, but if he knows about it and he doesn't comply with it, he's on the hook.

MR. VAN TOL: Your Honor hit on my point.

My point is, solely, they shouldn't be named. I fully understand the "in concert" point.

Going to the liability, since the Pohl declaration is in evidence, I wanted to point Your Honor to paragraph 57 of the declaration. I have an extra copy handy if you would like one.

155

THE COURT: Well, just go ahead and read whatever you want to read.

MR. VAN TOL: If I may approach, Your Honor?

THE COURT: Yeah.

MR. FINESTONE: It's Exhibit 3, Your Honor, if you want it electronically.

THE COURT: Okay.

MR. VAN TOL: Thank you, Mr. Finestone.

What I want to draw your attention to, Your Honor, is paragraph 56, page 19, where Mr. Pohl is talking about events that happened in March of 2023 and he talking about settlement discussions. And at the top of page 19 he says, quote:

"I was informed that, as part of these discussions -- those discussions, in an effort to assuage the lenders' concerns about the whereabouts of the other $500 million of debtor funds, on March 27, 2023, the loan parties' outside counsel confirmed to the lenders' outside counsel that he watched his client access certain cash balances in the United States and saw the account balance, which reflected an amount of cash consistent with the loan parties' assertions that the funds had not been dissipated."

He goes on to say that is the same amount of money that was transferred to Camshaft. So in May -- I'm sorry -- in March of 2023, Your Honor, Mr. Pohl and the lenders were

satisfied that that initial transfer -- they didn't know it was to Camshaft, but they saw that it was in the United States in an account -- they were satisfied that that was enough to assuage their concerns.

They can't come into court now, Your Honor, and say that that transfer was a fraudulent transfer. They didn't think it was fraudulent in March of 2023. It isn't.

The only reason they're here today, Your Honor, is that they were about to face an adverse judgment from a Florida Court on that very point and they came to this Court.

With that, Your Honor, I would urge you to at least amend the injunction to remove Mr. Morton and Camshaft or, better yet, deny it.

THE COURT: All right. Thank you.

MR. FINESTONE: Brief reply, Your Honor?

THE COURT: Yes.

MR. FINESTONE: Thank you.

Ben Finestone, Quinn Emanuel, on behalf of the debtor, Your Honor. Thank you for the opportunity to reply to these arguments.

Your Honor, I want to start, perhaps ironically with something I don't care about. I don't care about the lender's conduct prior to the filing of the case, I don't care about whether or not it breached the contract for the reasons that Judge Walrath articulated because what -- the

claims that I put at issue and have attempted to prove a likelihood of success are statutory claims and, as Judge Walrath noted, it's neither here nor there whether that contract was breached, it's whether or not I prove up under 548, under 544, as the case may be, Your Honor. But I do want to note just one thing.

Mr. Korpus, counsel to Mr. Ravindran, said why didn't these lenders seek a judgment against the borrower. And I was perplexed by this argument because, as we've heard today, Your Honor, and as is in evidence, in March of 2023, March 3rd of 2023, they enforced rights and remedies against the borrower. They not only installed Mr. Pohl, who they were confident was going to do the right thing, but they effectively equitized, they became the owner of BYJU's Alpha. So to point to the time passed after that and say why didn't the lenders seek a judgment, they didn't have to seek a judgment against a company that they owned. I have to say, from a business perspective, it's -- I don't even know how to respond to that, it meant nothing.

The reason I bring it up -- and I also note that at the same time that he's saying why didn't lenders seek a judgment against the company that they owned, he's also saying they were acting hyper-aggressively. So I don't know which it is, passive lenders or hyper-aggressive lenders. It really doesn't matter. The only reason I wasted the Court's

time with that point is I like the reference to judgment.

And why did I like the reference to judgment, Your Honor, because I wanted to come back to Grupo Mexicano, which is a decision that I know the Court has read. And the Court, the capital C Court, Justice Scalia, spends a lot of time talking about how the movants and/or plaintiffs in that -- the creditors in that case did not have a judgment, they were merely unsecured creditors without any property interests. And that's a big part of the case and I think it's a big foundation for the reasoning in Grupo Mexicano, but, Your Honor, here, everybody has a judgment and that's because I, as the debtor-in-possession, have the rights under 544(a) of a judgment lien creditor. I am the manifestation of judgment creditors and I'm the one that's pursuing the fraudulent transfer, Your Honor, and that -- I'm completely different in that respect. I represent creditors with judgments and I'm the one that's pursuing the fraudulent transfer claim.

And I say that all just to come back to Judge Ambro and my favorite footnote, Your Honor. Judge Ambro pointed out and observed the big differences between what Grupo Mexicano was talking about and what cases that pend before Your Honor are talking about, and that's one of the differences, the entire estate is a judgment lien creditor, and I just want to read what Judge Ambro said: "One way" -- because Judge Ambro really went far and said, "One way to

conceptualize this idea is to recognize that, had the company in Grupo Mexicano been in bankruptcy, the Bankruptcy Court would have had the authority to implement the remedy the District Court lacked authority to order under general equitable power outside the bankruptcy context."

I do agree with Your Honor that it is likely and perhaps -- it is likely or certainly reasonable to conclude that Justice Ambro's footnote in Owens Corning was something more akin to dicta than it was a necessary part of the Court's holding, I agree with the Court, but I also will refer the Court to something I probably don't need to refer to the Court to, but Footnote 4 of our supplemental brief, Your Honor, talks about the fact that the practical reality, notwithstanding that the comment may be dicta, notwithstanding that the comment may be in a footnote, this is persuasive authority, Your Honor, from a judge who sits on the Third Circuit, and I'll just read from the District of Delaware, a quote about this kind of content, and it says, "Dictum from higher courts is entitled to deference by" -- respectfully, Your Honor -- "inferior courts and should not be disregarded except for good cause."

The Third Circuit has also said, even though dicta, because it is not the sort of passing reference or overly generalized statement that causes courts to assign little, if the Court were to accept it, contentions that the

relevant passage in <u>Combustion Engineering</u> -- this Court finds no reason to reject its precepts.

It's basically saying, which is all we've ever tried to say to this Court, which is that Ambro analysis, which Judge Sontchi followed and which Judge Gross followed, and which Judge Walsh predated, is sound analysis and I think is -- really helped me understand what Justice Scalia was doing in <u>Grupo Mexicano</u>, which of course had nothing to do with bankruptcy, Your Honor.

Rule 65, I was going to -- Your Honor saved me the energy, thank you to the Court, I was going to stand up and make the unremarkable point that Federal Rule 65 does in fact and of course applies to parties who are not "before the Court." I will remind the parties in the courtroom that Mr. Ravindran not only would be bound if your Court's order said to let the other directors know, he testified that he would let the other directors know if Your Honor were to enter the court order.

What I'm going to ask the Court to do, more than what the Court is suggesting, maybe the Court is leaning towards doing -- excuse me for any presumption, Your Honor -- I do think that Mr. Byju Ravindran and the sister-in-law, Ms. Divya should be expressly called out in the order. And the reason I think that those two individuals should be called out in the proposed order, Your Honor, is because we've

already had evidence that they've worked in active concert; that is a legal conclusion that could be made. Fraudulent transfer number one, it was the board that made the decision and it was Mr. Ravindran, Witness Ravindran, who stepped out of the way. I won't repeat myself, it's the same thing with fraudulent transfer two and it's the same thing with fraudulent transfer three. Fraudulent transfer four we don't know about because the head was in the sand, Your Honor.

So we do think there is an evidentiary basis today to conclude that the other two directors of Think and Learn are in fact people who acted in active concert with Mr. Ravindran.

Now, I'm not saying and I'm not asking the Court to go beyond the -- what Rule 65 prescribes, I'm just saying they have acted in active concert with Mr. Ravindran, and they continue to do so because they're sitting on the board of the company that Mr. Ravindran testified has the cash, Your Honor.

In terms of merits -- and then I'm going to sit down and answer -- after asking the Court whether I can answer any questions -- I do have one more thing after quickly touching upon the merits.

Of course Your Honor was right, the notion that it's not a breach of duty, of loyalty, or care, as Counsel to GLAS said, to transfer assets away for no value is stunning.

I believe the argument that they're making is premised on the notion that the only fiduciary duty that people could possibly have is to the shareholders where an entity is solvent, but the evidence today shows 1.4 billion of liabilities and no remaining assets in the debtor after the transfer. The debtor transferred all of its assets away, left the balance sheet zero. No evidence of even a note, a promise, a charitable maybe I'll pay you back, nothing to replace the left side of the balance sheet, the right side of the balance sheet, of course, unchanged, unchanged, subject to 1.4 billion of liability. That means the transferor is insolvent, and of course there are duties to the company. Delaware law came out that way for a long, long time, since Gheewalla at the latest, Your Honor.

The fraudulent transfer, the same thing, I just kept hearing it's okay with the contract, it's okay with the contract. I'm not going to wade into whether it was okay with the contract, but it's not okay to be insolvent, transfer assets away for nothing. There are many fraudulent transfer cases before Your Honor in which there is going to be a factual trial about how much was the replacement asset worth, did you get reasonably equivalent value. We don't have to have that trial here because we got zero back. This fraudulent transfer is an actual fraudulent transfer; it probably meets the standard of waste, Your Honor. It's

basically taking an asset and putting a match to it.

So that's my last comment with one exception. I just wanted to come back, I believe quite strongly that Grupo Mexicano, as interpreted by Judge Ambro in Owens Corning, gives Your Honor the authority to grant us the relief, but I just wanted to say, if Your Honor is unconvinced, the Hechinger decision by Judge Robinson, 327 B.R. 537, clearly, with Supreme Court authority, says merely the fact that we are after what we -- what might be cash does not mean it's not an equitable remedy. Judge Robinson says, "The remedy sought by plaintiff is also equitable. Plaintiff has alleged that the director/defendants in approving the LBO of Hechinger ensured the removal of at least $127 million of value from Hechinger by cashing out themselves," and the entire case was about recovering that dividend from the LBO. Judge Robinson cites the Terry case that I said, and said, damages are considered to be equitable relief if they are equitable in nature -- that is, they would restore the status quo and return a sum rightfully belonging to another.

I did agree with Mr. Korpus, we do not think that Mr. Ravindran has $533 million in his pocket, in his personal assets. We do not have any realistic sense that we're going to recover compensatory damages from Mr. Ravindran, and that's why it's so important that he be ordered as a director of Think and Learn to direct whichever of his corporate

instrumentalities has the funds to return the funds to the debtor. The theme of this case and throughout our complaint is restitutionary in nature, Your Honor, our complaint is replete with those allegations.

So, thank you very much for the time today, Your Honor. I'll sit down, unless there's any questions before I do.

THE COURT: Just can you address Mr. Van Tol's argument about paragraph 56 of Mr. Pohl's declaration?

(Pause)

MR. FINESTONE: Oh, Your Honor, this was -- this was -- the lenders were involved in negotiations with the debtor -- not with the debtor, actually, this is the lenders involved in negotiations with the debtors' former affiliates, with the BYJU's enterprise, and the lenders were basically saying -- these lenders are on the cusp of taking the action they ultimately took in Florida for the fraudulent transfer case, Your Honor. Somebody showed the lenders a screen that said the cash is here. So what that -- I'm glad Your Honor brought this up -- so what that meant to them, Your Honor, is that we could continue to talk to you, at least the cash is there. It doesn't mean at all that the lender said, okay, the cash is there, let me waive the prior defaults and let's go back to a normal debtor/creditor relationship. All this was was -- all this was was saying the money is still here,

you don't have to take enforcement actions immediately.

Now, ultimately, they did file the fraudulent transfer lawsuit in the fourth quarter of 2023, but showing that the cash still existed, it hadn't been dissipated, I think -- am I responding to the right point, Your Honor?

THE COURT:  Yes.

MR. FINESTONE:  Yes, yes.  It's nothing more than something that BYJU's did to tell the lenders don't take immediate steps right now.

The other thing, Your Honor's comment made me -- I did think of something.  The comment by the brother of the witness today who said the cash is somewhere where the lenders are never going to find it, and I think that comment was made shortly after they did enforce rights and remedies of May of 2023, that is admissible evidence, it's in the first day declaration, it's been put in.  That is a statement -- and that would be admissible at trial, that's a statement of a party opponent, and I do think that's a clear concession that this money was moved to frustrate creditors' attempts post-default, post-rights and remedies, to access their collateral.

THE COURT:  Okay.  Thank you.

Does GLAS counsel wish to -- rebuttal?

MR. SCHARTZ:  For the record, Brian Schartz, Kirkland & Ellis, on behalf of GLAS.

I want to address the last point very quickly, the question you just asked Mr. Finestone about. What we on the GLAS side refer to as the cash verification process, if Your Honor has my presentation, slide 3, you'll see exactly the timeline that Mr. Finestone was just talking about. And this slide and the next slide, those red boxes, those are red because at the bottom of the timeline, those are things we didn't know, Judge.

So what happened was a default happened. Forbearance expires on February 10th, '23, that's the second-to-last box on the right, remedies exercised. At the time, we, GLAS and the lenders, did not know the cash was moved to Camshaft. So there was a cash verification process after remedies were exercised on March 3rd. Why? Because the lenders were always going to try and negotiate in good faith to find a resolution. And BYJU's, through its representative, said, hey, we're going to kind of show you that there's cash still at Alpha around the time. What we didn't know and what that page does not say is important, we didn't know it was at Camshaft at the time, right?

And so we now believe -- and I'm not going to testify from the podium -- we now believe that whatever we were shown, as described in Mr. Pohl's declaration, that wasn't us saying this is okay, that was us being lied to by whoever set up the cash verification process at BYJU's.

So that's just to answer your question, that's not technically in the record, but it's how we view what happened. And it set the stage -- just to tie the whole point together, it set the stage, which is on the next slide, of all the intense negotiations, and this is in the record because it's discussed in Mr. Pohl's declaration. You see at the top intense negotiations and you see at the bottom, again, the red boxes, the movements of value that were surreptitiously happening while those discussions were going on.

So I just want to take and tie it, at no point did the lenders get access to knowledge and then not take action somehow blessing facts, you know, frankly, once the -- once it was revealed that the money was at Camshaft, it created a very busy few days for us while we figured out what we were going to do because no one, including the funds, that our lenders knew who Camshaft was and, frankly, it was terrifying.

So that is the answer to that question. I do want to answer one -- I just want to address one other point. Mr. Korpus mentioned, Mr. Finestone answered some of it, you know, why not sue in New York, why not do a TRO in Florida. The reality is, Judge, at some point the lenders were always hoping that there would be a negotiation to resolve all of this stuff. So, yes, the lenders were characterized as

Draconian, maybe it's not consistent, we moved too fast, we moved too slow, but as you see on these slides, intense negotiations across the top, they've always been trying -- they've always been trying to have discussions.

At some point over the course of the last few months, total breakdown, total breakdown. No responses to very basic questions like where is the money. Hey, how is the sale process for another subsidiary against which we have claims and liens, how's that going? No one will tell us. It's a stone wall. And when you hit a stone wall and you represent the agent and you are the agent, that's when you have to jump into action.

So, if you look at it in hindsight and you say to yourself, well, why didn't you do a TRO in Florida or why didn't you sue for a judgment in New York, we did exercise remedies on BYJU's Alpha, we did institute the Delaware 225 action, we were protecting our loan interests as well as we could, but there was always some hope that there would be negotiation at some point. That negotiation is dead, it's just died.

So I don't want it to look like -- you know, everyone is looking at the timeline with perfect hindsight. We're here not because the lenders took a crazy position; we're here because BYJU's disappeared on us. There is no bid/ask, there is no open discussion, there is no disclosure

about literally the million questions that the lenders ask us every day, do you know this, do you know that, do you know this. We know nothing. We don't know where the money is, we don't know how the business is performing. We have rumors out of India that, you know, people are being laid off left and right, that they don't have the money to the clean toilets in headquarters. It's pretty dire and, when it's that dire, you have to move to protect your collateral.

So I want you to have that perspective. I've said that before, but it's extremely important. We're only here today because you have a debtor that has just run amuck. There are no adults, there are no non-insider adults running this organization. It's Byju Ravindran, his brother Riju, who apparently does whatever he says, Byju's wife. They're doing whatever they want, and they're going to do whatever they want to torture value.

What you would normally see, Judge, is the company would just file for bankruptcy on their own basis. They would have had a voluntary filing, they would have negotiated use of cash collateral on the DIP, and we would have sorted it out. Instead, they just said, oh, I can't believe you called a default, and ignored everything. Stopped paying interest, stopped paying amortization, stopped providing interest -- stopped providing information. They've just -- they've gone into a hole. And it's really sad because I

think we're standing in the spot where a huge amount of value has been destroyed across the structure, and we're going to have to continue to do things about it unless someone wants to actually stand up and have a real negotiation with us, which, you know, we'll always engage, we will, but there's no one doing that right now.

Thank you, Judge.

THE COURT:  All right, thank you.

MR. KORPUS:  If I may respond to that last point, Your Honor?  I just -- I know you've been very patient, I just don't want you to take my silence to agreement with anything that was just said about the timeline, negotiations, good faith, or anything like that, because we have an active case by the parent against the lenders and against GLAS in New York State that has not been stayed asserting that all of the damage and all the value that's been destroyed is due to the actions of the lenders and everything that they've done, and going to the press and everything else.

I'm not going to belabor the point, but I just don't want anyone to say like Mr. Korpus sat there after that presentation and didn't say anything.

THE COURT:  Thank you.

All right, let's take a recess until 4 o'clock. We'll come back and I'll give you my ruling.

(Recess taken at 3:05 p.m.)

(Proceedings resumed at 4:00 p.m.)

THE COURT: Thank you. Please be seated.

You're going to have to bear with me a little bit here because I'm working off of different notes that I've taken in connection with my review of the pleadings and during the hearing. So I might need to gather my thoughts a little bit here.

To break the suspension, though, I am going to issue an injunction, a freeze injunction preventing the transfer of the funds or the use of the funds, wherever they might be located, we don't know, from being moved again or used by whoever is holding them for anything other than paying the potential claim of the plaintiffs in connection with the adversary proceeding.

So, to begin, as I raised at the TRO hearing, I had concerns about whether or not I had the authority to enter any kind of an injunction, whether mandatory or a freeze injunction. I call it a status quo injunction. And based on my initial review of Judge Goldblatt's decision in In re Team Systems International, LLC, 2023 WL 1428572, a bankruptcy case from the District of Delaware, January 31, 2023 -- excuse me, 2024 -- the question was raised as to whether when you have a legal claim -- and a fraudulent transfer claim is a legal claim, as I'll get to in a moment -- can the Court issue a prejudgment attachment of funds that

were the subject of that fraudulent conveyance.

And the Supreme Court in Grupo Mexicano determined that -- and this is from a 1999 decision, this is 119 S.Ct. 1961, 1999 decision -- that the Court may not freeze defendant's assets prior to obtaining a judgment when the plaintiff's assets only -- when the plaintiff only asserts a legal claim, it has to be an equitable claim. That left open the question of whether or not the plaintiffs in this case have alleged a claim for equitable relief.

The fraudulent conveyance action itself, as the Supreme Court decided in In re Granfinanciera, 109 S.Ct. 2782, a 1989 decision, concluded that a -- in that case it was -- the question was whether or not the defendant was entitled to a jury trial under the Seventh Amendment to the U.S. Constitution. The Court in that case rejected the suggestion that a suit to recover cash that had been fraudulently conveyed -- and this was a bankruptcy case and the issue was a fraudulent conveyance transaction -- can be described as equitable by seeking the imposition of a constructive trust, which is an equitable remedy on the transfer of the cash, and the Court concluded that it did not, it still was a legal claims and the defendant was entitled to a jury trial.

So, if you combine Grupo Mexicano and Granfinanciera, you'd come to the conclusion that when you

have a fraudulent transfer claim standing alone without any equitable claims along with it, there is no right to a prejudgment attachment of assets. The Supreme Court in Granfinanciera, however, left open the idea that state courts -- or states, excuse me, have adopted the Uniform Fraudulent Transfer Act, which includes in some states the right to a prejudgment attachment in the context of a fraudulent transfer claim. Excuse me, that was Grupo Mexicano, not Granfinanciera. And the Court said in that case that states that have adopted the Uniform Fraudulent Transfer Act allowing non-judgment creditor to -- a right to bring a fraudulent conveyance claim and, applying Rule 18(b), may have the right to assert a claim for prejudgment attachment, and the Court said we're not expressing an opinion on that because this isn't a fraudulent transfer case.

If you look at Rule 18(b), it talks about joinder of claims: A party may state a claim for money and a claim to set aside a conveyance that is fraudulent without first obtaining a judgment for the money.

So, in this case, the only evidence I have at this point is that Delaware law or Florida law might apply to the fraudulent conveyance in these cases. Both Delaware law and Florida law allow for a prejudgment attachment for a fraudulent conveyance. The case law isn't clear as to whether that applies in a context where a party is seeking to

recover cash, but I have no reason to say -- but given that the provisions in the UFTA are very broad, it doesn't eliminate the possibility of an attachment for money, if that's the claim. I find that under the Florida and Delaware UFTA the plaintiffs here would have a right to seek a judgment -- or seek a return of fraudulent funds without first obtaining a judgment for the money.

On the issue of a mandatory injunction, I think I've already ruled on that. I don't think the plaintiffs have met the requirements yet for a mandatory injunction, but, as I said, I'll be issuing a freeze injunction.

The other possibility -- not possibility, the other way the plaintiff can assert an equitable claim is where they raise a claim for breach of fiduciary duty. The parties disagree on whether or not a breach of fiduciary duty constitutes an equitable claim, subject to the right to seek prejudgment attachment. There's a split of authority within the District Court of Delaware, Palmer v. Roali, 217 WL 4319320, District of Delaware, September 28th, 2017, found that claims for breach of fiduciary duty were legal and that the party was entitled to a jury trial. I'll note that that case was -- that was a case cited by the defendant.

I'll note that there was another case out of the Northern District of Illinois that disagreed with that conclusion, that's Orwell Harvest, Ltd. v. Widerhorn, 662

F.Supp. 3d 801, (N.D.Ill. 2022).   In that case, the Court actually referred to Granfinanciera and concluded that a breach of fiduciary duty claim are historically equitable even where the relief sought is disgorgement and damages.

And I have the other opinion in the District of Delaware by Judge Robinson in 2005, In re Hechinger, which -- and that's 327 B.R. 537 (Dist. Del. 2005), affirmed 278 F.App'x 125 (3d Cir. 2008).  "Actions" -- in which Judge Robinson found, "Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions in equity.  Damages are considered to be equitable if they are restitutionary in nature," and the damages here are restitutionary in nature.

The allegation is that Mr. Ravindran, at the behest of the parent company, transferred funds from BYJU's Alpha, first to Camshaft -- still under the control of BYJU's Alpha, but to Camshaft -- and then subsequently transferred them again from BYJU's Alpha to Inspilearn.  And I find that those allegations are equitable in nature and, therefore, I would have the authority to enter an injunction on that basis.

Jumping ahead a little bit.  On the issue of breach of fiduciary duty, the debtors raised an argument that, well, Mr. Ravindran was acting on behalf of the parent company at the time he made the transfers and, therefore, the

transfers are not a breach of fiduciary duty because he had an obligation to act on behalf of the parent company. And, generally, in a parent and wholly-owned subsidiary context, directors of a subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders. That's Trenwick America Litigation Trust v. Ernst & Young, LLP, 906 A.2d 168 at 200 (Del. Ch. 2006).

That rule does not apply, however, when the subsidiary is insolvent or when the transaction at issue would render the subsidiary unable to meet its legal obligations. And that's the Gheewalla decision by the Delaware Supreme Court, 930 A.2d 92, (Del. 2007); and also In re Teleglobe, 943 F.3d 345 at 367 (3d Cir. 2007). Instead, in that context, directors of a wholly-owned subsidiary owe a duty to the subsidiary, not -- excuse me -- directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take actions benefitting the parent corporation that they know will render the subsidiary unable to meet its legal obligations, Trenwick -- that's the Trenwick decision, 906 A.2d at 203, footnote 96.

And the evidence that was presented today clearly indicates that when the funds were transferred, at least from BYJU's Alpha to Inspilearn, BYJU's Alpha was left with no money, unable to meet its obligations. And it had loans that

were provided to it and then it had -- and Mr. Ravindran had an obligation to make sure that he did not leave the debtors with an inability to comply with his legal obligations, which he did, and he acted without knowing what he was doing and why he was doing it. Frankly, I'm flummoxed by his testimony that he was on the board of the parent company, one of three members of the parent company at one point -- now, four to six, but at the relevant time it was three -- and yet he didn't know what was happening. He said he was directed to do it by the parent company. Well, he was a member of the board of the parent company, so he had an obligation to act on behalf of the creditors of BYJU's Alpha.

On the issue of whether or not the debtors have asserted a claim for accounting, there is some -- there's nothing in the complaint that says Account 6, whatever it might be, for accounting. But I agree with the plaintiffs that the Third Circuit has held that as long as the issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy. That's Bechtel v. Robinson, 886 F.2d 664 at 679, note 11 (3d Cir. 1989), holding that equitable estoppel was a remedy available to the appellant/plaintiff even though it was not explicitly pled because plaintiff has discussed at length the facts that give rise to equitable estoppel. And here I find that in the complaint the debtors raised all kinds of allegations about

the fact that they don't know where the money is, they still don't know where the money is. Mr. Ravindran refuses to tell him where it is. He claims he doesn't know where it is even though he's a director of the parent company, and nobody else will tell us where it is.

Mr. Morten, who apparently knows where it is, is refusing to say where it is. And I've said from the beginning of this case that's a huge red flag. The fact that the parent company is attempting to hide where the assets are is huge, it shows that they are engaged in what appears to be a potential fraud, and we need to get to the bottom of it.

So, for those reasons, I conclude that there is grounds for me to be able to enter an injunction and I will do so. I believe -- and I'm getting into the standard for granting an injunction. You need to determine, one, whether there is a likelihood of success. I think Mr. Ravindran's testimony today clearly shows the likelihood of success on the merits on the breach of fiduciary duty and the fraudulent conveyance claims. He clearly did not understand what was happening and did it anyway. He feigns ignorance, even though he was a member of the board of the parent company and the sole member of BYJU's Alpha, and therefore he had a duty to act on behalf of the creditors before he transferred all of the funds held by BYJU's Alpha to a third party.

So I find that there is a likelihood of success on

the merits. There is certainly harm, potential harm, irreparable harm to the plaintiffs here because, as far as I can tell, the only funds available to pay this are the funds that were taken from BYJU's Alpha. And, as I've said over and over, the parent company is hiding those assets and not disclosing where they are, and that tells me that they do not have the funds available to repay other than the funds that they took. So I find that there is actual harm, irreparable harm to the lenders if we cannot locate and have those assets available to pay any judgment that will occur at the time we get to a trial on the merits.

Just bear with me because I'm kind of jumping around here a little bit. Going back to the question of whether or not the complaint alleged facts sufficient to show that there was an accounting requested, I think the evidence today also showed that there is a reason for an accounting in this case. And I'll note that under Rule 15 there is a right to an appeal after trial -- or during trial if issues are raised that were not raised in the pleadings. While this was not a trial on the merits, it was an evidentiary hearing in the context of a preliminary injunction hearing, and evidence was admitted that indicates to me that the complaint could be amended, should be amended, to allege a claim for accounting.

On the issue of harm to -- going back to the standard for imposing an injunction -- harm to the defendants

in this case, I had zero evidence of any harm to the defendants. The defendants put on no evidence to indicate to me that they would be harmed if the funds were frozen and, therefore, I find that there is no basis for finding any harm to them.

And whether it's in the public interest, I think it actually -- it definitely is. We have a bankruptcy case here where a party that apparently removed money from the debtor and is hiding it and not telling me where it is, that clearly is something that is in the public interest.

And, therefore, I think that plaintiffs have met all four factors for imposing an injunction in this case.

So that leaves us where who is the injunction going to be issued against. Certainly against the defendants, all of defendants in the case. And I do believe that the testimony of Mr. Ravindran today showed that his brother, Byju Ravindran, and his sister-in-law -- and I apologize, I can't recall her name -- that the three of them were definitely involved in this whole process. They were acting in concert to remove the money from BYJU's Alpha to initially transfer it to Camshaft, and then ultimately to Inspilearn, and then ultimately to some other party we don't know. Mr. Ravindran testified that he was acting at the direction of the board of the parent, and that's the board of the parent, those three people. Therefore, I'm going to

include Mr. Byju Ravindran and the sister-in-law in the injunction order.

I'm going to ask the parties to meet and confer, and come up with a form of order and submit it under certification of counsel. And I would ask counsel for Mr. Ravindran -- well, here's two more orders. One, Mr. Ravindran is ordered to find out where the funds are. I do not believe him when he says he cannot get the information, I think he can, he's a director of the parent company. If he has to ask the other directors for permission to find out where that information is, then he needs to do so because I don't believe he's complied with his discovery obligations in that regard. He certainly has access to the books and records of the company as a director and he should be able to find out where they are, where the funds are.

I said two orders, but now I can't remember what the other one was. I don't think there was another one, though, maybe just the one.

Any questions?

MR. FINESTONE: Not from the debtor, Your Honor. Thanks for the time.

THE COURT: Okay. Mr. Korpus?

MR. KORPUS: No questions, Your Honor.

COUNSEL: Nothing, Your Honor.

THE COURT: No questions, okay. All right.

So I'll look for the form of order that gets submitted and we'll get that entered as quickly as possible.

MR. FINESTONE: One question, Your Honor.

THE COURT: Yes.

MR. FINESTONE: Could we ask for a bench ruling that the terms of the proposed -- the terms of the order as described by the Judge will apply until we get that order uploaded?

THE COURT: Yes, I will so order the record to that effect.

All right, anything else?

(No verbal response)

THE COURT: Thank you all very much. We are adjourned.

(Proceedings concluded at 4:22 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    March 15, 2024
William J. Garling, CET-543
Certified Court Transcriptionist
For Reliable

/s/ Tracey J. Williams                    March 15, 2024
Tracey J. Williams, CET-914
Certified Court Transcriptionist
For Reliable