### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC., | ) | Case No. 24-10140 (JTD) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| BYJU's ALPHA, INC.., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 24-50013 (JTD) |
| | ) | |
| CAMSHAFT CAPITAL FUND, LP, | ) | |
| CAMSHAFT CAPITAL ADVISORS, LLC, | ) | |
| CAMSHAFT CAPITAL MANAGEMENT, LLC, | ) | |
| INSPILEARN LLC, AND RIJU RAVINDRAN, | ) | |
| | ) | |
| Defendants. | ) | **Re:  Adv. D.I. 31, 56, 80 & 84** |

## <u>MEMORANDUM OPINION</u>

Plaintiff, BYJU's Alpha (the "**Debtor**") brought this adversary proceeding against defendants Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, Camshaft Capital Management (collectively, "**Camshaft**"), Inspilearn LLC, and Riju Ravindran (together with Camshaft, the "**Defendants**"), asserting claims for fraudulent transfer, breach of fiduciary duty, and violation of the automatic stay.[1]  After being stonewalled when trying to locate the $533 million at issue in this proceeding, the Debtor filed the instant motion seeking a temporary restraining order requiring the Defendants to deposit the funds in this court's registry (the "**Motion**").[2]  The parties argued the Motion at a hearing on March 14, 2024, during which I also heard argument on my previously issued order to show cause regarding why Camshaft and its

---

[1]  Amended Compl., Adv. D.I. 40.
[2]  Motion for Temporary Restraining Order, Adv. D.I. 31.

principal William Cameron Morton ("**Morton**") should not be held in civil contempt ("**Show Cause Order**").[3]  I ruled on both the Motion and the Show Cause Order from the bench.  Upon the Defendants' appeal, I have elected to write this supplementary opinion pursuant to Local Rule 8003-2 in further support of my March 14 ruling, in which I held Camshaft and Mr. Morton in civil contempt and granted a preliminary injunction maintaining the status quo.  The basis for each of these rulings is set forth below.

**JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1409(a).

**BACKGROUND**

Debtor is a special purpose financing vehicle and formerly an indirect subsidiary of Think and Learn Private, Ltd. ("**T&L**"), an Indian corporation focused on providing accessible education technology.  T&L is a family-run business; its three-member board consists of founder Byju Ravindran, his younger brother Riju Ravindran, and Byju's wife, Divya Gokulnath.  During all times relevant to this dispute, Riju served as the sole director of the Debtor.

In November 2021, the Debtor, along with other BYJU's entities, took out a $1.2 billion term loan from lenders, which it defaulted on in less than four months.[4]  In April 2022, shortly after this initial default, Riju Ravindran authorized the first of six transfers to Camshaft, totaling over $533 million in exchange for an ownership interest in Camshaft.[5]  "[T]hese funds appeared

---

[3] Show Cause Order, Adv. D.I. 56.
[4] Declaration of Timothy Pohl, Adv. D.I. 32-3, at 13.  See also Final Order and Judgment, *Glas Trust Co. LLC v. Ravindran*, C.A. No. 2023-0488 (Del Ch. 2023).
[5] Declaration of Timothy Pohl, Adv. D.I. 32-3, at 4.

to make up more than 90% of Camshaft's regulatory assets under management."[6]  The Debtor's

bank accounts show no sign of having received any return from this purported investment in

Camshaft.[7]

   The Debtor continued defaulting on its loan covenants after the Camshaft transfers.  By

October 2023, there were at least four defaults on the covenants under the credit agreement

between the Debtor, its affiliates, and the lenders.[8]  Each of the defaults enabled the lenders to

exercise remedies, which they did on March 3, 2023.[9]  The lenders' agent GLAS Trust Company

LLC ("**GLAS**") then accelerated the loans and replaced Riju Ravindran with Timothy Pohl to

serve as the Debtor's sole director and officer.[10]  Subsequent litigation in the Delaware Court of

Chancery affirmed Pohl's appointment.[11]  The Debtor filed for chapter 11 protection in February

2024 and filed this adversary proceeding in an attempt to recover the $533 million transferred to

Camshaft.  The Debtor alleges, *inter alia*, that the transfers qualify as actual and constructive

fraudulent transfers under both 11 U.S.C. §§ 544, 548, and applicable state law, and that the

transactions constitute a breach of Riju Ravindran's fiduciary duty to the Debtor.[12]

   The location and control of the $533 million transferred to Camshaft (the "**Transferred**

**Funds**") is at the heart of this adversary proceeding.  Remarkably, the Debtor has been unable to

glean any meaningful information as to present whereabouts of the Transferred Funds, despite

diligent efforts to do so.  The sparse information that has surfaced is particularly concerning.

The Debtor's witness, its managing director Timothy Pohl, testified that in response to the

---

[6] *Id.*
[7] *Id.* at 23.
[8] *Id.* at 12-14.
[9] *Id.* at 3
[10] *Id.*
[11] Final Order and Judgment, *Glas Trust Co. LLC v. Ravindran*, C.A. No. 2023-0488 (Del Ch. 2023).
[12] Amended Compl., Adv. D.I. 40, at  43-53.

lenders' decision to exercise remedies, Byju Ravindran explicitly told the lenders' advisors that "the money is someplace the Lenders will never find it."[13] There is no dispute that the funds were transferred from the Debtor to Camshaft, but certain facts bring Camshaft's legitimacy into serious question. The address for its principal place of business, supplied by Camshaft to the SEC, is actually the address of an IHOP in Miami.[14] Camshaft eventually provided an additional address, which points to a sparsely furnished room that shows no sign of regular activity.[15] The Debtor alleges that Camshaft has no working telephone and publicly misrepresents its management team to include individuals who are unaware that they are being held out in such capacity.[16] The evidence suggests that Mr. Morton is actually Camshaft's sole employee.

Even more concerning, any attempts to engage with Camshaft and its director, Mr. Morton, have failed. On February 16, I issued an order granting the Debtor's motion for expedited discovery, which required Camshaft to respond to the Debtor's interrogatories.[17] Camshaft issued a response, but with an "attorneys' eyes only" designation.[18] The perceived deficiency in the Camshaft's response caused the Debtor to call for an emergency status conference on February 27, which prompted Camshaft to agree to remove the "attorneys' eyes only" designations from its responses.[19] After Camshaft's agreement, the parties tried to cancel the status conference less than an hour before its start time, to which I refused. Though the parties indicated at the status conference that they would continue discussions, within days Camshaft filed a motion for protective order ("**Motion for Protective Order**"),[20] seeking a

---

[13] Declaration of Timothy Pohl, Adv. D.I. 32-3, at 4; Adv. D.I. 40, at 5.
[14] *Id.* at 4.
[15] Opening Brief in Support of TRO, Adv. D.I. 32, Exhibits 17-19.
[16] *Id.* at 10-11, 13-17.
[17] Order Granting Debtor's Emergency Motion for Limited Discovery, Adv. D.I. 22, at 2.
[18] February 27 Hearing Transcript, Adv. D.I. 37, at 4-5.
[19] *Id.* at 9.
[20] Motion for Protective Order, Adv. D.I. 28.

ruling that it was not required to respond to the outstanding discovery on relevance grounds. At a hearing on March 1, I denied the Motion for Protective Order and ordered Camshaft to provide the requested information by the end of the day or return to the courtroom on March 4 for a status conference to discuss why I should not issue an order to show cause as to why Camshaft should not be held in contempt (the "**March 1 Order**").[21]  At the conclusion of the March 1 hearing I instructed Camshaft's counsel to inform Mr. Morton, as Camshaft's principal, that in the event a status conference to discuss the possibility of a contempt order was necessary, Mr. Morton's presence in the courtroom was expressly requested:

> COURT:  I would request that [Mr. Morton] be in the courtroom.  I think it will be very important for him to be here.  I think he needs to hear it from me directly.[22]

> COUNSEL:  Understood, Your Honor.  Thank you.[23]

Camshaft refused to comply with the March 1 Order, and, on March 4, a status conference was held.[24]  At the status conference, Camshaft's counsel explained, "As to the question of the documents, as officers of the Court, we advised Mr. Morton that he should produce the documents, he should produce the information, he declined.  That is where we are today."[25]  Camshaft's counsel continued, "[M]y client is not here today.  I understood Your Honor's [request] that he appear.  He is overseas and was not able to make it.  He was actually on his way by the time Your Honor's order came out."[26]

---

[21] March 1 Transcript, Adv. D.I. 100-4, at 17.
[22] March 1 Hearing Transcript, Adv. D.I. 100-4, at 26.
[23] *Id.*
[24] March 4 Hearing Transcript, Adv. D.I. 100-5, at 4.
[25] *Id.*
[26] *Id.* at 3.

Having failed to comply with the March 1 Order, I issued the Show Cause Order,[27] to be

heard on March 14, 2024, in conjunction with the Debtor's Motion for injunctive relief.  When

instructing the parties on the show-cause hearing, I stated:

> I want to make it absolutely clear to Mr. Morton that one of the possible remedies[]
> I am going to impose for the contempt is civil confinement if he doesn't comply
> with the order[, a]nd I want to give him every opportunity to be heard on that before
> I impose that penalty.[28]

The Show Cause Order specified:

> IT IS HEREBY ORDERED THAT:
>
> Mr. Morton shall appear in person on March 14, 2024, at 10:00 a.m. in . . . the
> United States Bankruptcy Court . . . and SHOW CAUSE why he and Camshaft
> should not be held in contempt of Court for their failure to comply with this Court's
> order.  The Court shall consider all possible sanctions against Camshaft and Mr.
> Morton, including placing Mr. Morton in civil confinement until he purges himself
> of such contempt.[29]

At 3:54 pm on the eve of the show cause hearing, my chambers received an email from

Camshaft's counsel indicating that Mr. Morton "cannot attend in person" because he had

"recently been hospitalized and thus remains overseas," but that he wished to appear in court via

Zoom.  Consistent with my chambers' procedures of only allowing witnesses to testify remotely

upon a showing of good cause,[30] my Courtroom Deputy responded to the email and informed

Camshaft's counsel that in order to evaluate Mr. Morton's request I would need (1) some proof

that he had actually been hospitalized, (2) clarification as to whether he intended to have his own

---

[27] Show Cause Order, Adv. D.I. 56.
[28] March 4 Hearing Transcript, Adv. D.I. 100-5, at 13.
[29] Show Cause Order, Adv. D.I. 56.
[30] *See* Chambers Procedures for Judge John T. Dorsey (revised Jan. 11, 2024),
https://www.deb.uscourts.gov/sites/default/files/judge%20John%20T.%20Dorsey/CHAMBERS%2
0PROCEDURES%20FOR%20JUDGE%20DORSEY_0.pdf ("The remote attendance of live witnesses is
permitted only upon a showing of good cause and in compelling circumstances.  See Fed. R. Civ. P.
43(a)."); FED. R. CIV. P. 43(a) ("For good cause in compelling circumstances and with appropriate
safeguards, the court may permit testimony in open court by contemporaneous transmission from a
different location.").

counsel appear at the show cause hearing, and (3) clarification as to whether he intended to comply with the order to produce the requested discovery.  A mere thirty minutes before the start of the show-cause hearing, I heard back from Camshaft's counsel, informing me (1) that Mr. Morton had been discharged without providing any proof of his hospitalization, (2) that Mr. Morton's separate counsel would not appear at the show-cause hearing, and (3) that Mr. Morton did not intend to comply.  Mr. Morton did not appear at the show-cause hearing.  "Camshaft's counsel advised me that Mr. Morton was allegedly now released from the hospital, but . . . provided no proof." [31]

At the March 14 hearing, upon learning that Mr. Morton had failed to comply with the Show Cause Order, I issued a bench ruling holding both Camshaft and Mr. Morton in contempt. I then took a recess for the purpose of finalizing and issuing both the Contempt Order and accompanying bench warrant.[32]

Following the issuance of the contempt documents, I reconvened the hearing and heard argument and evidence on the Debtor's Motion for injunctive relief.  At the conclusion of the hearing, I granted the Motion and issued "a freeze injunction preventing the transfer of the funds or the use of the funds, wherever they might be located, . . . includ[ing] Mr. Byju Ravindran and [Divya Gokulnath]."[33]

## DISCUSSION

### I.    CIVIL CONTEMPT

Section 105 of the Bankruptcy Code allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11

---

[31] March 14 Hearing Transcript, Adv. D.I. 100-6, at 5.
[32] Civil Contempt Bench Warrant Notice, Adv. D.I. 81.
[33] March 14 Hearing Transcript, Adv. D.I. 100-6, at 171, 180-81.

U.S.C. § 105(a). "Section 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the Code." *In re Morristown & Erie R. Co*, 885 F.2d 98, 100 (3d Cir. 1989). This equitable authority created by Section 105 gives a bankruptcy court the power to hold parties in civil contempt. *See, e.g., In re Vaso Active Pharms, Inc.*, 514 B.R. 416, 421-22 (Bankr. D. Del. 2014); *In re Baker*, 390 B.R. 524, 531 (Bankr. D. Del. 2008); *In re Anderson*, 348 B.R. 652, 661 (Bankr. D. Del. 2006).

"A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." *In re Vaso Active Pharms.,* 514 B.R. at 422. The "clear and convincing" standard requires that any ambiguity be resolved in favor of the party charged with contempt. *U.S. on Behalf of I.R.S. v. Norton*, 717 F.2d 767, 774 (3d Cir. 1983). A court also must give fair warning that certain acts are forbidden before holding a party in civil contempt. *Id.*

There is no doubt that these standards have been met in this case. At the March 1 hearing, I instructed counsel for Mr. Morton:

> You are going to produce the information that has been requested and you will do so by the end of the day today. If not then on Monday at 10 a.m. I will have a hearing on a motion for why I shouldn't issue an order to show cause and why I am not going to hold your client in contempt for refusing to produce the information.[34]

I also requested that Mr. Morton appear in my courtroom if he failed to comply with this order to produce information.[35] Mr. Morton had knowledge of this order.

---

[34] March 1 Hearing Transcript, Adv. D.I. 100-4, at 17. I ultimately changed the Monday hearing from a show-cause hearing to a status conference for the parties to explain whether Mr. Morton had complied with my order.

[35] *Id.* at 25.

At the status conference on March 4, his counsel informed me that he "advised Mr. Morton that he should produce the documents . . . he declined."[36]  Consequently, I issued a second order to Camshaft and Mr. Morton, demanding that he appear before me to show cause for his refusal to comply with my March 1 Order.  He once again failed to comply.  Having heard no reason that might justify the refusal of Camshaft and Mr. Morton to follow this Court's orders, they were held in contempt.  Given that my warnings regarding the possibility of sanctions did not prompt any action by Camshaft or Mr. Morton, I concluded that monetary sanctions might elicit some response but were, standing alone, unlikely to be sufficient to compel full compliance.[37]  Accordingly, the contempt order both (1) required "Camshaft and Mr. Morton . . . [to] remit to the Clerk of Court in the sum of $10,000 for each day that they remain in contempt," and (2) called for Mr. Morton's civil confinement.[38]

---

[36] March 4 Hearing Transcript, Adv. D.I. 100-5, at 4.

[37] Considering Camshaft's and Mr. Morton's steadfast insistence that they need not follow this Court's orders, as well as the time sensitive nature of this matter, I concluded that it would be both futile and a waste of resources to issue an order for monetary sanctions alone before ordering Mr. Morton's confinement.  In light of Mr. Morton's conduct to date and the time constraints imposed by this dispute, I believe that both monetary sanctions and civil confinement are the least coercive sanctions available. This is particularly so given Mr. Morton's refusal to appear at the show-cause hearing, his failure to provide any proof of his hospitalization, and his outright refusal to provide the information he was ordered to produce.  *See Pasternack v. Klein*, CV 14-2275, 2017 WL 1508970, at *2-3 (E.D. Pa. Apr. 27, 2017) (requiring district courts to use the least coercive sanctions "reasonably calculated to win compliance with its orders").  *See also RLI Ins. v. Nexus Servs.*, No. 5:18-cv-00066, 2023 U.S. Dist. LEXIS 96817, *16-17 (D.W. Va.  June 2, 2023)) ("'A court may impose sanctions for civil contempt to coerce obedience to a court order or to compensate the complainant for losses sustained' . . . Civil contempt sanctions may be 'imposed in an ordinary civil proceeding upon notice and an opportunity to be heard'") (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1987); *Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994)) (internal citations omitted).

[38] Order on Finding of Contempt, Adv. D.I. 80.  Upon further review, it does appear that the Contempt Order includes language that does not clearly convey my intent that Mr. Morton have the ability to release himself from confinement upon taking the necessary action.  The provision that reads "these monetary sanctions shall begin on this day and shall accrue each day thereafter until: (i) *the Debtor confirms receipt of the information Camshaft was ordered to produce*" should instead read "These monetary sanctions shall begin on this day and shall accrue each day thereafter until: (i) *Camshaft produces the information it was ordered to produce at the hearing on March 1, 2024.*"

## II.    **PRELIMINARY INJUNCTION**

### a.    Whether prejudgment injunctive relief is consistent with *Grupo Mexicano* and *Granfinanciera*

The first issue in determining whether to order prejudgment injunctive relief is whether doing so would be consistent with the Supreme Court's holdings in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

In *Grupo Mexicano*, the Court examined whether a district court had the authority to issue a temporary restraining order preventing the petitioners from transferring their right to receive payment prior to the adjudication of the petitioner's pending contract claim. *Grupo Mexicano*, 527 U.S. at 312, 318. The Court decided the issue in accordance with traditional principles of equity, noting that "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Id.* at 318 (quoting A. DOBIE, HANDBOOK OF FEDERAL JURISDICTION AND PROCEDURE 660 (1928)). The Court determined that the relief granted by the U.S. district court in this case was legal, not equitable, and held that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of [the] contract claim for money damages." *Id.* at 333. The Court's ruling in *Grupo Mexicano* ultimately stands for the proposition that a court may not issue an equitable remedy, such as an asset freezing injunction, where the plaintiff's claims are purely legal in nature. *Id.*

In *Granfinanciera*, the Court examined "whether a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer." *Granfinanciera*, 492 U.S. at 36. The

Seventh Amendment grants the right to a jury trial in "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized . . . ." *Id.* at 41 (quoting *Parsons v. Bedford*, 3 Pet. 433, 447 (1830)).  Therefore, the question in *Granfinanciera* was whether a claim for the avoidance of a monetary fraudulent transfer is legal or equitable in nature.  The Court held that the nature of a fraudulent transfer action ultimately depends on the relief sought by the plaintiff.  In a fraudulent conveyance action, where the remedy sought is purely monetary, the action is legal in nature; where the plaintiff seeks the return of specific assets, the action is equitable.  *Id.* at 46-47 ("We therefore conclude that respondent would have had to bring his action to recover an alleged fraudulent conveyance of a determinate sum of money at law in 18th-century England, and that a court of equity would not have adjudicated it.").  *See also In re Team Sys. Int'l, LLC*, Adv. No. 23-50004, 2023 WL 1428572, at *8 (Bankr. D. Del. Jan. 31, 2023) (under *Granfinanciera*, "[t]he claim is equitable to the extent it seeks the return of a specific asset, but legal to the extent it seeks money damages for the value of the asset transferred").

Taken together the Court's rulings in *Grupo Mexicano* and *Granfinanciera* raises a potential threshold issue in deciding the Debtor's Motion for injunctive relief.  Here, the Debtor only seeks monetary damages from the Defendants' alleged fraudulent transfers, which makes the Debtor's claim a legal—not equitable—claim under *Granfinanciera*.[39]  *Granfinanciera*, 492 U.S. at 46-47; *In re Team Sys. Int'l, LLC*, 2023 WL 1428572, at *8.  *Grupo Mexicano* imposes limitations on a district court's authority to order prejudgment equitable relief when the plaintiff's claim is legal.  *Grupo Mexicano*, 527 U.S. at 333.  In anticipation of the March 14

---

[39] Amended Complaint, Adv. D.I. 40, at 45-49.

hearing, I asked the parties to brief the issue of whether *Grupo Mexicano* prohibits a prejudgment attachment of the missing assets in this instance.

According to the Debtor, *Grupo Mexicano* does not bar injunctive relief in this case because *Grupo Mexicano* only touches on "the extent of general, unarticulated equity authority in the federal courts,"[40] and because Section 105 of the Bankruptcy Code provides the statutory authority for bankruptcy courts to issue the relief requested by the Debtor. The Debtor further argues that the Delaware Uniform Fraudulent Transfer Act ("**DUFTA**") provides an independent basis for the relief sought because federal courts generally have the authority to issue injunctions under state law.[41] Furthermore, the Debtor asserts that its amended complaint raises equitable claims because (1) breach of fiduciary duty is inherently equitable in nature, and (2) its complaint implicitly requests the equitable remedy of accounting.

In response, Defendants argue that the requested relief is barred by *Grupo Mexicano*.[42] The Defendants disagree with the Debtor's contention that it has alleged equitable claims, contending that "a preliminary injunction is appropriate where the plaintiff is seeking a permanent injunction or other equitable remedy, but not where the plaintiff seeks money damages."[43]

Taken together, *Grupo Mexicano* and *Granfinanciera* stand for the proposition that there is no right to prejudgment attachment of assets in a fraudulent transfer claim that only seeks monetary damages.[44] However, the Court in *Grupo Mexicano* left open the idea that state law

---

[40] Adv. D.I. 72, at 7 (quoting *In re Owens Corning*, 419 F.3d 195, 208 n.14 (3d Cir. 2005)).

[41] *Id.* at 13-14.

[42] Adv. D.I. 74, at 3.

[43] *Id.* at 4.

[44] The Debtor points to several cases to advance the argument that *Grupo Mexicano*'s holding does not limit a bankruptcy court's authority to issue injunctions. *See Owens Corning*, 419 F.3d at 208, n.14; *In re Focus Media Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004); *In re Stone & Webster, Inc.*, 286 B.R. 532 (Bankr. D. Del. 2002); *EHT US1, Inc.*, 2021 WL 3828556, at *1 n.11 (Bankr. D. Del. Aug. 27, 2021);

may independently provide for prejudgment attachment. *Grupo Mexicano*, 527 U.S. at 330-331.

Federal Rule of Civil Procedure 64 provides that "every remedy is available that, under the law

of the state where the court is located, provides for seizing a person or property to secure

satisfaction of the potential judgment." FED. R. CIV. PRO. 64(a). Recognizing the potential

tension posed by the Court's ruling and Rule 64, Justice Scalia wrote:

> There are other factors which likewise give us pause: The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes the use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? . . . We do not decide which side has the better of these arguments. We set them forth only to demonstrate that resolving them in this forum is incompatible with the democratic and self-deprecating judgment we have long since made: that the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence.

*Grupo Mexicano*, 527 U.S. at 330-331. The Court in *Grupo Mexicano* also addressed the tension

between Federal Rule 18(b) and conflicting state laws. Rule 18(b) permits a party to join

contingent claims, specifying that "a plaintiff may state a claim for money and a claim to set

aside a conveyance that is fraudulent as to that plaintiff, without first obtaining judgment for the

money." FED. R. CIV. PRO. 18(b). In a footnote, the *Grupo Mexicano* Court wrote:

> Several States have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfers Act), which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim. Insofar as Rule 18(b) applies to such an action, the state statute eliminating the need for a judgment may have altered the common-law rule that a general contract creditor has no interest in his debtor's property. Because this case does not involve a claim of fraudulent conveyance, we express no issue on this point.

---

Adv. D.I. 72, at 7. Because I have decided this issue on other grounds, I do not address this argument in this opinion.

*Grupo* Mexicano, 527 U.S. at 324 n.7.  Through its discussion on Federal Rules 18(b) and 64, the *Grupo Mexicano* Court made clear that it intended to leave open the possibility that state law can provide for prejudgment attachment remedies in fraudulent conveyance cases.

The State of Delaware allows the type of prejudgment asset attachment sought by the Debtor.  Under DUFTA, the creditor in a fraudulent transfer action may obtain "[a]n attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law," which includes "[a]n injunction against further disposition by the debtor or a transferee . . . of the asset transferred or of other property," as well as "[a]ny other relief the circumstances may require."  DEL. CODE ANN. tit. 6, § 1307(a)(2)-(3).  This DUFTA provision grants courts the broad authority to issue prejudgment injunctions that fit the exigencies of the particular case.  Nothing in this statute eliminates the possibility of a prejudgment attachment where only monetary remedies are sought by the plaintiff.  I find that under DUFTA, the Debtor here has a right to seek attachment against the fraudulently transferred funds without first obtaining a judgment for the money.

Additionally, in *In re Teams Systems*, Judge Goldblatt recognized that even where the plaintiff in a fraudulent conveyance action solely seeks monetary damages on the fraudulent conveyance count, equitable remedies may still be appropriate if the plaintiff alleged additional claims "sounding in equity."  2023 WL 1428572 at *9 n.54 ("So long as one of the plaintiffs' viable claims sounds in equity, the case would fit within *Grupo Mexicano*'s equitable exception even if that equitable claim is joined with a legal claim.").  Here, I agree with the Debtor that it has nevertheless raised equitable claims through (1) its claim of breach of fiduciary duty against Riju Ravindran and (2) its claim for accounting.

Courts frequently recognize that breach of fiduciary duty is an equitable claim. *See, e.g.*, *Local No. 391 v. Terry*, 494 U.S. 558, 567 (1990) (breach of fiduciary duty claims "were within the exclusive jurisdiction of courts of equity"); *In re Hutchinson*, 5 F.3d 750, 757 (4th Cir. 1993); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537 (D. Del. 2005), *aff'd*, 278 Fed. App'x. 145 (3d Cir. 2008) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'—carrying with them no right to a trial by jury.") (quoting *In re Evangelist*, 760 F.2d 27, 29, 31 (1st Cir. 1985) (Breyer, J.)). *But see Palmer v. Reali*, No. 15-994, 2017 WL 4319320, at *4 (D. Del. Sept. 28, 2017) (adjudicating breach of fiduciary duty as a legal claim because the remedies sought by the claimant were legal in nature).  The conclusion that breach of fiduciary duty is inherently an equitable claim also comports with *Granfinanciera*'s guidelines for differentiating legal and equitable claims—in *Orwell Harvest, Ltd. v. Widerhorn* for example, the court applied the *Granfinanciera* framework and concluded that breach of fiduciary duty is a historically equitable claim, even where the relief sought is disgorgement and damages.  662 F. Supp. 3d 801, 803 (N.D. Ill. 2002).

Next, although the Debtor does not specifically use the word, "accounting" in its complaint, I am satisfied that it has pled a request for accounting such that the equitable remedy sought by the Debtor is appropriate here. *See Duncan v. Vantage Corp.*, 2019 WL 1349497, at *11 (D. Del. Mar. 26, 2019) (accounting is an equitable claim); *In re Teams Sys.*, 2023 WL 1428572, at *8 ("*Granfinanciera* explained that this accounting [for the disposition of cash] is an equitable remedy.").  Under the Third Circuit's precedent, "as long as the issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy." *Bechtel v. Robinson*, 886 F.2d 644, 678 n.9 (3d Cir. 1989); *Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir. 1970) (a court may grant "any relief appropriate under the circumstances . . . even though the

complaint did not request injunctive relief, if a cause of action for injunctive relief were in fact inherent in the complaint") (internal citations omitted).  *See also* FED. R. CIV. PRO. 54(c) ("[A] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").  Accounting is recognized as an equitable remedy that applies "[w]here a dispute exists as to the location or existence of particular funds," *Matter of Estate of DeGroat*, 2020 WL 2078992, at *24 (Del. Ch. Apr. 30, 2020), and the Debtor's complaint sufficiently alleges a dispute over the location of the Debtor's missing funds to imply accounting as an equitable remedy.  Despite their best efforts to do so, the Debtor has been unable to locate the missing funds.  Riju Ravindran refuses to tell the Debtor where the money is and claims that he does not know where it is, despite being a Director of the parent company that authorized the transfer.  More importantly, Mr. Morton, who apparently knows where the money is, refuses to say where it is or otherwise cooperate with this Court's orders in any meaningful way, further demonstrating that an accounting is an appropriate remedy here.

Federal Rule 15 also lends support to my conclusion that the Debtor has adequately pled for an accounting.  Rule 15 allows a court to permit pleadings to be amended when "evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings . . . ." FED. R. CIV. PRO. 15(b).  The current proceeding is not a trial, but it is a contested evidentiary hearing, and the parties introduced evidence indicating that the complaint could—and should—be amended to explicitly allege a claim for accounting.

Insofar as the inclusion of equitable claims allows a court to issue equitable relief, I am satisfied that the Debtor's claims for breach of fiduciary duty and accounting allow for equitable relief to issue here, in addition to the independent authority to order a prejudgment attachment provided by DUFTA.

16

### b. Whether injunctive relief is warranted in this case

To warrant a preliminary injunction, the movant must show:

(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974) (alterations in original). "Only the first two factors are necessary. 'If these gateway factors are met, a court then considers the remaining two factors and determines its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *In re Teams Sys.*, 2023 WL 1428572, at *10 (quoting *Reilly*, 858 F.3d at 179).

The Debtor's request to require the Defendants to deposit the lost funds in this court's registry is a request for mandatory injunctive relief. "An injunction is 'mandatory' if it would 'alter the status quo by commanding some positive act.'" *Doe v. Del. State Univ. Bd. of Trs.*, No. 20-1559, 2021 WL 2036670, at *2 (D. Del. May 21, 2021) (quoting *Pub. Interest Legal Foundation v. Boockvar*, 2020 WL 6144618, at *2 (M.D. Pa. Oct. 20, 2020)). "[A] mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts." *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citing *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)). Compared to a prohibitory ("status-quo") injunction, a party seeking a mandatory injunction "bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal citations omitted). *See also Hart Intercivic, Inc. v. Diebold, Inc.*, 2009 WL 3245466, at *3 (D. Del. Sept. 30, 2009) ("Where a plaintiff seeks a mandatory preliminary injunction, rather

17

than a prohibitory preliminary injunction, the burden of showing an entitlement of relief is greater.") (citing *Sanofi-Aventis U.S. LLC v. Novo Nordisk, Inc.*, No. 06-1369, 2006 U.S. Dist. LEXIS 69150, at *20 (D.N.J. June 22, 2006)).  I do not believe this is the type of extraordinary case to warrant a mandatory injunction.  However, I do believe a prohibitory injunction designed to freeze the assets is appropriate in this circumstance.

The Debtor has shown that it has a reasonable probability of success on its fraudulent transfer claims.  To prove actual fraudulent transfer, the plaintiff must show that the disputed transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A).  The parties do not dispute that Debtor transferred the disputed funds to Camshaft immediately after incurring substantial debt.  After the transfer, Debtor's founder Byju Ravindran is quoted as saying: "the money is someplace the Lenders will never find it."[45]  It is difficult to imagine a single combination of words to demonstrate actual fraudulent intent more clearly.  Riju Ravindran's testimony on March 14 strengthens the Debtor's argument that the funds were transferred with actual fraudulent intent.  In his testimony, Ravindran consistently feigned ignorance as to the reasons behind the Camshaft transfer, despite acknowledging that he served on the board of directors that authorized the transaction from the Debtor to Camshaft.[46]  Alarmingly, Ravindran testified to being the sole director of the Debtor at the time of the transfer, but that he had no idea why his company had decided to make $533 million in "investments" to Camshaft.[47]  The Defendants have not presented a single piece of evidence to suggest that the Camshaft transfers were made for any reason other than defrauding

---

[45] Adv. D.I. 32-3, at 4.
[46] March 14 Hearing Transcript, Adv. D.I. 100-6, at 42-43.
[47] *Id.*

the Debtor's creditors.  I find that the Debtor is reasonably likely to succeed on its claim for

actual fraudulent transfer.[48]

In its defense, Camshaft argues that (1) the Credit Agreement permitted the Debtor's

transfers to Camshaft, (2) that Camshaft was a mere conduit in the transactions, and that (3) the

Debtor nevertheless received reasonably equivalent value for the $533 million transferred to

Camshaft.[49]  I disagree with Camshaft that the terms of the Credit Agreement somehow justify

the Debtor's transfers to Camshaft in this instance.  Camshaft points to Section 5.8 of the Credit

Agreement, which allows the Debtor to make investments "notwithstanding anything contrary

under [the] Agreement."[50]  However, as GLAS argued at the March 14 hearing, the immediately

preceding section in the Credit Agreement requires the Debtor to comply with all laws of

relevant governmental authorities.[51]  I agree with GLAS to the extent that a simple provision

authorizing an entity to make "investments" cannot cure an otherwise fraudulent transfer under

Section 548.

Camshaft's mere conduit argument is also unfounded.  Camshaft repeatedly objected to

providing any information about subsequent transfers of the disputed funds to third parties.[52]

Camshaft's very refusal to provide this information indicates that it has information about

subsequent transfers of the disputed funds.  Camshaft cannot possibly be a mere conduit if it

knows where the subsequent transfers occurred and where the money went because the very fact

---

[48] Even if the Debtor does not prevail on its actual fraudulent transfer claims, it is reasonably likely to succeed on its constructive fraudulent transfer claims.  A transfer is constructively fraudulent if the debtor (1) receives less than reasonably equivalent value for the transaction and (2) was insolvent on the date of the transfer.  11 U.S.C. § 548(a)(1)(B).  There is no dispute that the Debtor was insolvent when it transferred its funds to Camshaft, and there has been no evidence presented to suggest that an ownership interest in Camshaft was worth anything remotely close to $533 million.
[49] *See* Adv. D.I. 35.
[50] *Id.* at 3.
[51] *Id.* at 3.
[52] March 14 Transcript, Adv. D.I. 100-6, at 44-46.

that it exercised "dominion and control" over the funds means that it cannot be considered a mere conduit.[53]  *In re Lambertson Truex, LLC*, 485 B.R. 155, 158-59 (Bankr. D. Del. 2011) (quoting *Bonded Fin. Servs. Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

Finally, there is no evidence presented by Camshaft to demonstrate that the Debtor received anywhere close to reasonably equivalent value in exchange for the Camshaft transfers. Sworn declarations from the Debtor's current director indicate that the $533 million transferred to Camshaft comprised over 90% of Camshaft's regulatory assets under management, and that nothing in the Debtor's bank accounts show that any return was received from these investments.[54]  Camshaft argues that in the Third Circuit, "so long as there is some chance that a contemplated investment will generate a positive return . . . value has been conferred."  *In re R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996).  However, the Third Circuit has clarified that the standard set forth in *In re R.M.L.* requires courts to consider "whether, 'based on the circumstances that existed at the time' of the transfer, it was 'legitimate and reasonable' to expect some value accruing to the debtor."  *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006) (quoting *In re R.M.L.* 92 F.3d at 152)).  Given Ravindran's testimony, it strains credulity to suggest that it was reasonable for him to suggest that he would receive reasonably equivalent value—Ravindran himself testified that he had no idea why he was transferring money to Camshaft, that he had never heard of Camshaft, and that he did not conduct any due diligence before authorizing the transfers.[55]

The Debtor has likewise shown a reasonable probability of success on its claim against Riju Ravindran for breach of fiduciary duty.  "The elements of a breach of fiduciary duty claim

---

[53] *See Id.*
[54] Declaration of Timothy Pohl, Adv. D.I. 32-3.
[55] March 14 Hearing Transcript, Adv. D.I. 100-6, at 44-46.

are (1) a fiduciary duty exists and (2) that the fiduciary breached that duty." *In re Tropicana Ent., LLC*, 520 B.R. 455, 470 (Bankr. D. Del. 2014) (quoting *York Linglings v. Roach*, No. 16622, 1999 WL 608850, *2 (Del. Ch. July 28, 1999)). Fiduciary duties include the duties of care, loyalty, and good faith. *In re USA Detergents, Inc.*, 418 B.R. 533, 543 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)). The Defendants argue that Mr. Ravindran was acting on behalf of the Debtor's parent company at the time of the transfers and, therefore, the transfers are not a breach of fiduciary duty because he had an obligation to act on behalf of the parent company.[56] *See Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, at 200 (Del. Ch. 2006) (directors of a subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders). However, this rule does not apply in circumstances where the subsidiary is insolvent or the transfer would render the subsidiary unable to meet its legal obligations. *In re Teleglobe Comms. Corp.*, 493 F.3d 345, 367 (3d Cir. 2007) ("[I]f the subsidiary is insolvent, we require [care and loyalty] in the interest of protecting the subsidiary's creditors."); *N. Am. Cath. Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101-03 (Del. 2007); *Trenwick*, 906 A.2d at 203 n.96. Riju Ravindran owed fiduciary duties to the Debtor, and his testimony clearly indicates that he breached the duty of care owed to the Debtor. Under oath, Ravindran verbally agreed that he "didn't think too much" about why he was directed by his parent company (of which he was a director) to transfer an enormous sum of money to Camshaft, a hedge fund with no demonstrated experience or credibility.[57] He further testified that he asked no questions about the decision to transfer $533 million, did not understand the reason for the transfer, and had never heard of Camshaft at the

---

[56] Adv. D.I. 100-6, at 151.
[57] *Id.* at 43.

21

time he signed the document authorizing the first transfer.[58]  It is difficult to imagine any trier of fact listening to Mr. Ravindran's testimony and without concluding that either he was being untruthful or that he is the most incompetent officer or director of a company in Delaware's history.

In addition to its probability of success on the merits, it is clear that the Debtor faces irreparable harm without some form of injunctive relief.  The missing $533 million is likely the Debtor's only way to pay its creditors.  The Defendants have repeatedly demonstrated willful disregard for the Debtor's attempts to locate these missing funds, which implies they do not have the means to satisfy a $533 million judgment, other than the missing funds.  Moreover, the Defendants have refused to comply with this Court's orders to disclose the location of the funds, necessitating a higher degree of intervention if the Debtor is to have any hope of recovering its assets.

The remainder of the factors also fall in favor of awarding injunctive relief here.  Neither party has shown how the requested injunctive relief may harm additional third parties.  Indeed, the only witness called by the Defendants was Riju Ravindran who, as previously noted, has no idea why the money was transferred from the Debtor, or what the funds were going to be used for.  Clearly, the Debtor is the party that stands to lose the most in these proceedings, an any unforeseen ancillary harm to third parties is insignificant when compared to the Debtor's stake in this action.  Finally, the public interest is served by granting this injunction.  Chapter 11 of the Bankruptcy Code serves the public interest by allowing debtors in financial crises to continue operations while minimizing the economic fallout of their insolvency.  Here, the purposes of the

---

[58] *Id.* at 44-45.

Code, and therefore the public interest, are best served by issuing injunctive relief aimed at preventing further disposition of the disputed assets.

Camshaft argues that it should not be subject to injunctive relief because "they are not the current holder of the . . . funds" and because the Debtor does not allege in the complaint that Camshaft currently holds or controls the funds.[59] This argument cannot be taken seriously. The record in this adversary proceeding is replete with examples of Camshaft deliberately stonewalling any attempt to ascertain the location of the funds—Camshaft refused to provide this information to the Debtor, and it again refused to provide this information when I ordered it to do so. Camshaft's insistence that it does not hold or control the funds could easily be confirmed if it simply identified the location of the $533 million transferred to it by the Debtor. But refusing to identify the location of the funds does nothing to help Camshaft demonstrate that it does not retain control over the funds. To the contrary, Camshaft's brazen insistence on concealing the location and control of this money strongly indicates that it retains some ownership and control over it.

I am satisfied that the Debtor has adequately shown why it is entitled to a prohibitory injunction in this case. Riju Ravindran's testimony shows that he—along with his brother and sister-in-law—acted in concert as the three directors of the Debtor's parent company, which authorized the contested transfers. Thus, I believe it is appropriate to include both Byju Ravindran and Divya Gokulnath in the injunction order, along with the Defendants.

---

[59] Adv. D.I. 100-6, at 44-46.

For the reasons set forth above, the Motion was GRANTED with respect to a prohibitory, not mandatory, injunction.

Dated:  April 3, 2024

_____
JOHN T. DORSEY, U.S.B.J.