UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  | . | Chapter 11 |
| IN RE: | . | |
|  | . | Case No. 24-10140(JTD) |
| BYJU'S ALPHA, INC., | . | |
|  | . | |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtor. | . | |
| . . . . . . . . . . . . . . . . | . | Tuesday, April 9, 2024 |
| BYJU'S ALPHA, INC., | . | |
|  | . | Adv. Proc. No. 24-50013(JTD) |
| vs. | . | |
|  | . | |
| CAMSHAFT CAPITAL FUND, LP; | . | |
| CAMSHAFT CAPITAL ADVISORS, | . | |
| LLC; CAMSHAFT CAPITAL | . | |
| MANAGEMENT, LLC; RIJU | . | |
| RAVINDRAN; and INSPILEARN, | . | |
| LLC. | . | |
| . . . . . . . . . . . . . . . | . | |

TRANSCRIPT OF HEARING RE:
CAMSHAFT DEFENDANTS AND WILLIAM MORTON'S MOTION FOR A STAY
PENDING APPEAL OF ORDERS ON FINDING OF CONTEMPT AND GRANTING
DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

Audio Operator: Electronically Recorded
by Dana L. Moore, ECRO

Transcription Company: Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
(302)654-8080
Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

For the Debtor: Robert S. Brady, Esq.
Kenneth J. Enos, Esq.
YOUNG, CONAWAY, STARGATT
 & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

For the Debtor: Benjamin Finestone, Esq.
Jianjian Ye, Esq.
QUINN, EMANUEL, URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

For Defendant Raju
Ravindran: Joseph Cicero, Esq.
William Chipman, Esq.
CHIPMAN, BROWN, CICERO
 & COLE, LLP
Hercules Plaza
1313 North Market Street
Suite 5400
Wilmington, Delaware 19801

Sheron Korpus, Esq.
KASOWITZ BENSON TORRES, LLP
1633 Broadway
New York, New York 10019

For the Camshaft
Parties/Defendants and
William Morton: Evan T. Miller, Esq.
SAUL EWING, LLP
1201 North Market Street
Suite 2300
Wilmington, Delaware 19899

Pieter Van Tol, Esq.
HOGAN LOVELLS US, LLP
390 Madison Avenue
New York, New York 10017

(Appearances Continued)

APPEARANCES: (Continued)

For GLAS Trust Company,
LLC:                          Peter J. Keane, Esq.
                              PACHULSKI, STANG, ZIEHL
                               & JONES, LLP
                              919 North Market Street
                              17th Floor
                              Wilmington, Delaware 19899

                              Brian Schartz, Esq.
                              KIRKLAND & ELLIS, LLP
                              609 Main Street
                              Houston, Texas 77002

                              Ravi S. Shankar, Esq.
                              KIRKLAND & ELLIS, LLP
                              300 North LaSalle
                              Chicago, Illinois 60654

INDEX

PAGE

ARGUMENT BY MR. VAN TOL                          7

ARGUMENT BY MR. FINESTONE                        16

ARGUMENT BY MR. SHANKAR                          34

FURTHER ARGUMENT BY MR. VAN TOL                  42

COURT DECISION                                   46

(Proceedings commence at 10:05 a.m.)

(Call to order of the Court)

THE COURT: Please be seated. Good morning.

The matter before the Court is a hearing in the matter of BYJU's Alpha, which is Case Number 24-10140, and specifically a request for a stay pending appeal in Adversary Proceeding 24-50013.

Obviously, I am pinch hitting for Judge Dorsey, so you have the B team on the -- on today. But I have had an opportunity to review the papers and the submissions and I appreciate counsel getting them to me in advance of this morning's hearings, so I think I'm up to speed.

Mr. Enos, good morning. It's good to see you.

MR. ENOS: Good morning, Your Honor. Very good to see you, as well. Ken Enos, Young, Conaway, Stargatt & Taylor, on behalf of the debtor, along with my colleagues from Quinn Emanuel, Ben Fine Stone and J.J. Ye.

THE COURT: Welcome.

MR. ENOS: Your Honor, the Court just went through, I think, what we expected to cover today, and you indicated that you had, in fact, reviewed the pleadings. But you know, before -- first off, thank you very much for being available today, we certainly appreciate it.

Before I cede the podium to the movant, do you need any background on the case or anything like that or are you

up to speed?

THE COURT: I don't think so. I've had the opportunity, obviously, to confer with Judge Dorsey, when he had asked that I step in. Plus, in the intervening, you know, day, I've certainly had an opportunity to review the docket in the case, as well as the -- all of the papers that are on for today, which, again, I think are comprehensive and address, certainly, the issues that are before me. So I don't think I require the kind of -- the background. To say that this case is hardly typical is an understatement, but I think I'm as up to speed as I'm going to get.

MR. ENOS: Fantastic, Your Honor.

Then I presume the Court would like to start with the motion for the stay pending appeal.

THE COURT: I believe so.

Also, I would note that the adversary -- or the agenda reflects a matter that's also on for a status conference. I think that's adjourned to a further date. Is that correct?

MR. ENOS: Your Honor, the status conference was at the request of Judge Dorsey, so I would follow your lead, I suppose, on that one.

THE COURT: Judge Dorsey has requested it be adjourned.

MR. ENOS: Okay.

(Laughter)

MR. ENOS: Thank you very much, Your Honor.

Then, with that, I would cede the podium to counsel for Camshaft and Mr. Morton --

THE COURT: Very good.

MR. ENOS: -- since it was their motion.

THE COURT: Good morning, Counsel. Welcome.

MR. VAN TOL: Good morning, Your Honor. Thank you very much. Pieter Van Tol from Hogan Lovells for the Camshaft Defendants and Mr. Morton.

As Your Honor knows, the order for which we seek a stay, there are actually orders: There's the contempt order and then there's the PI order. And I'd like to start with the contempt order because I think it raises some serious due process concerns.

THE COURT: Okay.

MR. VAN TOL: Your Honor, after all the briefing we've had and the supporting opinion from the Court, there is still one thing I think that stands out, and that is that Mr. Morton was not permitted to testify at the contempt hearing.

THE COURT: Well, Mr. Morton was given substantial notice of the contempt hearing, right? More than ten days. He was out of the country. The record indicated that he had left the country on March 4th, on or about March 4th, that was what was reported to Judge Dorsey.

Judge Dorsey, I think pretty clearly, indicated that Mr. Morton should be here, and it was reported to Judge Dorsey that Mr. Morton was ill or hospitalized. And I believe Judge Dorsey asked for some sort of verification of that and none was forthcoming.

MR. VAN TOL: Understood, Your Honor. And on that --

THE COURT: Have I -- I just want -- actually, I'm not being flip. I want to make sure I haven't missed anything or if there is a step because I will freely concede -- and you folks have been much deeper in this than I have -- but I've been playing catch-up.

MR. VAN TOL: You've recapped it, Your Honor.

The thing is, just before, on the eve of the hearing or just before the hearing, Mr. Morton was released from the hospital, but he was not able to come back to the United States because of that and the business he was attending to.

But I think the point is --

THE COURT: Is he back in the United States now?

MR. VAN TOL: He is not, Your Honor.

THE COURT: Okay. So he is not at today's hearing, for example.

MR. VAN TOL: He is not, Your Honor.

THE COURT: Okay.

MR. VAN TOL: The point is, Your Honor, you -- I'd like to draw a contrast between Mr. Morton's situation and Mr. Ravindran's situation.

Mr. Ravindran was also unavailable, Your Honor; yet, he was given the opportunity to come on the Zoom and explain his unavailability to lay the predicate for why he should be able to testify. The Court did not require that Mr. Ravindran provide proof that his parents were ill or old or had dementia or he was caring for them. Instead, he was allowed to testify. The predicate foundation was established for why he was unavailable and then he testified.

That same procedure was not followed with respect to Mr. Morton. And we believe that caused a whole host of problems, which we've laid out in our papers, which is Mr. Morton, by not testifying, could then not provide any of the evidence that one would normally want for a contempt hearing, such as what documents do you have, what has been produced, what hasn't been produced, are you available to pay, things of that nature. So we have an incomplete record that was caused by the fact that Mr. Morton did not testify, even though he was willing and able to do so.

THE COURT: Well, we also start, though, with the proposition that Judge Dorsey was not obliged to permit remote testify. As a matter of fact, remote testimony, under the rules, is certainly frowned upon. It requires a finding

of, under Rule 43, extraordinary -- it's not extraordinary circumstances, and you know the word --

MR. VAN TOL: Yes.

THE COURT: -- I forget what it is. So he was certainly not obliged. And there was no fundamental right to testify remotely; as a matter of fact, the rules would indicate the contrary.

MR. VAN TOL: And that's my point, Your Honor, which is that Rule 43 was invoked by counsel for Mr. Ravindran, who was -- Mr. Ravindran was available, he appeared on Zoom. Counsel went through his grounds for unavailability, the Judge heard them. He said Rule 43 had been satisfied, Mr. Ravindran testified.

The problem is that same process was not followed with Mr. Morton. Mr. Morton was available, he had the Zoom information, and he could have gone through that same litany to establish a predicate for his unavailability and he could have testified.

And that, Your Honor, when you're talking about, not just fines, but potential incarceration of a person, the due process concerns are always high, they're always here. Here, they're at the apex, they're as high as they can get. When you're going to put someone in jail or threaten them with jail, they should be afforded the opportunity to be heard.

So that's our first point, Your Honor, which is a serious and we think reversible error on due process.

With regard to the PI, there are two major problems, one of which we delved into with the Judge and the other was more on the papers.

The first one is there's a disconnect between the relief sought in the preliminary injunction versus Camshaft and what is pled in the complaint. What's pled in the complaint is that Mr. Morton no longer has the information -- the funds, that the funds have been the result of subsequent transfers. The interrogatories reflect the same. Mr. Ravindran put in a declaration saying the money is within the BYJU's group. It's not with Mr. Morton, Your Honor. So he's being ordered to do something he can't do, which is he doesn't control the funds, so there's an order telling him not to transfer funds that everyone agrees are not in his possession.

THE COURT: So how is he harmed by an order that tells him to do something he can't do? I'm going to issue an order -- or let's do it the other way. You'll issue an order that I can't dunk. All right? I don't think I'm really harmed and I think that that order is not what's holding me back.

MR. VAN TOL: It's not, Your Honor. But if we spool that out, if I'm aggressive counsel, I can say well,

you know, Judge Shannon hasn't once tried to dunk since that order came out, he's in contempt. So there's no reason to put Mr. Morton in peril for something that is just not something he can even do.

THE COURT: But that's a hypothetical concern. I mean, there's not a -- if he's being told he cannot transfer funds that he doesn't have, then the order is either without meaningful effect -- but I think it's a preliminary injunction issued on an expedited basis and a limited record. So, while there are representations and perhaps untested discovery responses that say I don't have the money, isn't it more accurate to say Judge Dorsey's ruling said wherever this money is, if you have control over it, thou shalt not move it? Is that an un -- I think I'd like to know. Is that an unfair characterization?

MR. VAN TOL: I think that's what the order should say, Your Honor; or, at a minimum, what it should have said is anyone acting in concert because it does refer to other people acting in concert. But the way it's framed now is it bars Mr. Morton from doing something that he just can't do.

The second point, Your Honor, is that we had several defenses to the merits that weren't covered in either the hearing or the supplemental opinion, at least not to -- they didn't get to run to ground.

The first one is -- and Your Honor is familiar with

these defenses, they're the ones raised in every fraudulent transfer case.

THE COURT: Uh-huh.

MR. VAN TOL: We have raised the idea that Camshaft is a mere conduit, akin to a bank. And in response to that, Judge Dorsey, in the supplemental opinion, refers to the fact that Mr. Morton, at certain times, knew where the money was. Well, that's not satisfactory for the purposes of the mere conduit test, which looks at do you have dominion and control over funds. My bank knows how much money I have, they know where it is, but they can't take it out of my account without my permission.

That was the situation here, Your Honor. It's an investment account. The debtor controlled it at all times. Mr. Morton did what they said. He is allowed to invest it, for sure, but that's every investment account. So, here, an investment account is far more like a bank account and like those mere conduit cases. So the fact that there was information about the funds doesn't do it.

Secondly, we raised the defense of reasonably equivalent value, again, another defense Your Honor sees all the time.

THE COURT: Sure.

MR. VAN TOL: In the investment situation, though, the R.M.L. case said something very interesting, which is, if

you are an investment firm and someone goes out to you and says please take my money and invest it, your services are considered reasonably equivalent value, if you are an investment firm.

Mr. Morton is running a hedge fund. There was return on this money, that's reflected in the interrogatories. It doesn't mean -- the law says you don't even have a positive return, you can give someone money and they can lose money, but it's still reasonably equivalent value because you've engaged an investment firm to act on your behalf.

The third claim, Your Honor, goes to the actual fraudulent transfer. And this one we raised at the hearing, but again, it was not fully fleshed out or at all mentioned in the supplemental opinion. And that is the fact that Mr. Pohl -- who is now controlling the debtor, as you know -- put in a first-day declaration. And what he said at Paragraph 56 of his declaration -- and again, I'm paraphrasing, and I have a copy if Your Honor would like it.

Mr. Pohl essentially said, in March of 2013, which is after the initial transfer, the lenders were concerned about where the money was and they asked the -- they asked BYJU's for some information about it. The information they got back was that it was in an account in the U.S. That's what they know. Mr. Pohl stated that that assuaged their

concerns that the money had been dissipated; in other words, they were not concerned.

So, in March of 2023, you have a group of lenders saying fine with us, that transfer is fine. You have them come to court in February 2024 and say that's a fraudulent transfer. Those two don't go together, Your Honor.

The first one makes a lot more sense because this loan had no restrictions on the ability of BYJU's to --

THE COURT: To use it.

MR. VAN TOL: -- take it and invest it. So that was consonant with what they did. The lenders thought it was in an account, Camshaft was in the U.S. And Your Honor, we submit that those two things cannot be reconciled.

So, for those reasons, Your Honor, we think there's at least sufficient identifiable error here, given the standard for a stay, that a stay should issue and we should be able to go to the District Court and pursue our appeal.

Unless there are any questions, that's all I had, Your Honor.

THE COURT: No, I don't think I have any questions.

MR. VAN TOL: Thank you very much.

THE COURT: Very good.

Response? Does anyone else wish to be heard before I hear from the debtor in response?

(No verbal response)

THE COURT: Very good.

Mr. Finestone, welcome. Good to see you.

MR. FINESTONE: Thank you, Your Honor. Good morning. Ben Finestone, Quinn Emanuel, on behalf of the debtor, Your Honor.

As the Court knows very, very well, a stay pending appeal is an extraordinary remedy. It's a motion for which the movant has the burden. It's a motion for which the movant must establish a sufficient showing of the first two elements of the analysis before the Court needs to reach the third or fourth elements.

Those first two elements include likelihood of success on appeal, but they also include irreparable harm, Your Honor. There was some argument by lawyers about irreparable harm included in the motion, and there was a tiny bit of argument about irreparable harm included in the presentation to Your Honor today, but there wasn't one drop of evidence on irreparable harm.

After this motion was filed, Your Honor, we reached out to the movants and said -- because we anticipated that, for -- in order to possibly meet -- we actually looked at this point as potentially a good thing because, given their burden to establish irreparable harm, we thought this civil fugitive, Your Honor -- and those aren't words that I used carelessly at the first day of this case, but those are words

that I, confidently and with great conviction, use today -- this civil fugitive William Morton is actually going to show up to court and testify.

So we reached out to the movant and said we'd like to depose this civil fugitive before he testifies in support of the motion for a stay pending appeal. The response we got was a deposition is not necessary. And one of the reasons the movants asserted that a deposition was not necessary was because Mr. Morton is not going to testify and he's not going to come into this court, which is a continued pattern of avoiding this court at all costs.

So we withdrew without prejudice our request for a deposition. If the man is not going to testify in support of the motion, we didn't need a deposition. But we also just couldn't imagine how they would submit any evidence about irreparable harm. They haven't in connection with the motion and they haven't attempted to do so today, Your Honor.

With respect to the arguments that they advanced on irreparable harm -- and we'll divide it up, Your Honor, because there's an appeal of two orders: The contempt order that Judge Dorsey issued and also the preliminary injunction order.

First, on the contempt order, the arguments that were made in the papers were focused on the monetary damages with respect to the fines that were accruing --

THE COURT: Uh-huh.

MR. FINESTONE: -- daily for mister -- as a result of Mr. Morton's refusal to disclose the location of these funds. Those are -- there doesn't need to be much argument presented to Your Honor on that one. That's monetary damages. If they somehow prevail on appeal, they will be able to seek the return of those funds.

I will also note that the daily accrual can be stopped any day that Mr. Morton seeks to stop it.

THE COURT: Right. That the contempt could be purged by compliance.

MR. FINESTONE: Your Honor, took -- agreed on the -- yes. And that was my second point. On the risk for civil confinement, that can be purged. And the continued accrual of the monetary fines, that can at least be stopped. And all he has to do, Your Honor, is disclose the location and the whereabouts of these funds.

It's really -- it really is puzzling on this side of the room why this man refuses to disclose the location of these funds. We're not -- it -- the request or the requirement to purge himself is not to, for example, concede fraudulent transfer, it's not to concede liability. It's a discovery issue, Your Honor.

And on the way here -- I don't think this is a laughing matter, but I chuckled to myself on the way here. I

thought of Allen Iverson saying we're talking about practice.

THE COURT: Practice.

MR. VAN TOL: We're talking about a discovery issue, Your Honor, and he is refusing to disclose the locations of these funds. It is the largest -- there were a ton -- and I won't burden Your Honor. There were a ton of red flags and powerful evidence that this was a pre-petition actual intent fraudulent transfer, but -- and I didn't think that, once we filed our voluntary petitions for relief in this court, that that mountain of evidence could ever be primed by additional evidence. But I actually think the post-petition evidence of concealment confirms -- or eliminates any doubt that that the debtor had -- that this was an actual intent fraudulent transfer.

We -- counsel made a couple of points today about how things that are usually -- Your Honor has seen in all of the fraudulent transfer cases. And Your Honor, and this court more generally, has resolved and litigated -- or presided over so many fraudulent transfer cases, counsel is true -- counsel is right about that. But usually the issues that are in dispute are whether there was actual intent, whether there was any value received in exchange. Those are the issues for trial.

One issue for trial that I can't think I've ever seen in a fraudulent transfer trial is where is the subject

of the dispute and --

THE COURT: Where is the *res*?

MR. FINESTONE: For -- yeah, where is *res*, Your Honor? And for some reason, this man refuses to disclose it; to this day, he refuses to disclose it, which is, I think, the largest red flag that I've seen in any fraudulent transfer case, Your Honor.

THE COURT: Let's circle back to Mr. Van Tol's opening argument and point with respect to the sufficiency of process. And I think I'd like you to walk through -- you heard the argument, and it certainly is tracked in the papers -- whether or not a meaningful opportunity was given and whether or not Mr. Morton was unfairly treated by not being afforded an opportunity to testify remotely. I'd like your thoughts.

MR. FINESTONE: Thank you, Your Honor.

And this argument, the lack of the due process, feeds into their argument on likelihood of success.

What I want to do, if Your Honor will give me just a couple of minutes --

THE COURT: Sure.

MR. FINESTONE: -- in our papers, we start with March 1st. And March 1st is the date that the Court gave the order to disclose -- the Court gave the unequivocal and unambiguous order to disclose this information. In our

papers, we had five bullet points that highlighted five opportunities for Mr. Morton to be heard, and I will get to that, and that's the direct response to Your Honor's question. And I will also get to why, even if we zoom in on the March 14th hearing and his ability to testify, there are responses to that.

But what I want to do is rewind even further because I don't think -- I don't think we did Judge Dorsey his due credit in the papers by starting with March 1st. In reality, we filed our petitions on February 1st.

THE COURT: Uh-huh.

MR. FINESTONE: And our first-day hearing was February 5th, Your Honor. And like many debtors, I suspect, who file their cases, they expect -- they unreasonably expect the Bankruptcy Judge to come in and completely be on the debtor's side and accept all of the debtor's recitation of history. It's an unreasonable expectation. And appropriately, Judge Dorsey did not adopt or suggest that he believed everything that counsel was presenting at the first-day hearing.

But one thing that Judge Dorsey did do at the end of that first-day hearing on February 5th is offer some commentary from the bench, which sort of inspired some of comments this morning, which was we're just talking about the locations of the funds, I've listened to everybody argue

today. And the first-day declaration was admitted solely for purposes of that hearing. But Judge Dorsey remarked I don't understand why the location should be in dispute. And he asked the parties to meet and confer about the location of the cash. I think I misspoke a sentence, the location of the cash.

And well, we were very appreciative of those comments, Your Honor, and we emailed counsel to Camshaft the next day or maybe the next day and said, pursuant to Judge Dorsey's request, we'd like to meet and confer about the locations of the funds. And the meet-and-confer request was rejected, they refused to meet and confer.

So February 5th, the first-day hearing, Mr. Morton had the opportunity to be heard.

Following the February 5th hearing, at Judge Dorsey's request, they had the opportunity to meet and confer with us. They rejected that request.

We then filed a motion to expedite -- a motion for expedited discovery, in view of their refusal to meet and confer. Judge Dorsey held a hearing on February 16th. This is another opportunity for Mr. Morton to come to court and disclose the existence of the funds or explain to Judge Dorsey why he's refusing to do so.

THE COURT: At this point --

MR. FINESTONE: February --

THE COURT: At this point --

MR. FINESTONE: I'm sorry, Your Honor.

THE COURT: At -- I just want to make sure. At this point, Mr. Morton was in the United States. Is that correct?

MR. FINESTONE: Well, I'm going to be honest. The debtors don't believe -- there has not been a trial on where Mr. Morton has ever been, so --

THE COURT: The only reason I ask --

MR. FINESTONE: Yeah.

THE COURT: -- is because I think that there were affirmative statements made to Judge Dorsey on the 4th that it -- and perhaps I read the transcript too quickly. But it almost seemed as if Mr. Morton left during -- left the country during the hearing, at least if -- as I read the transcript. Have I misread it or, if I --

MR. FINESTONE: You --

THE COURT: -- didn't perceive it accurately? But it seemed from that transcript that, at some point, somebody knew where Mr. Morton was and that that was the time that he left. But I think I'd like to know whether or not you have any color on that.

MR. FINESTONE: Your Honor read the -- has reviewed the record accurately and recited the record accurately. His counsel has represented to the Court that, on March 4th,

during the course -- sorry. I think it's March 1st, Your Honor. Friday March 1st, during the course of that hearing -- it was a hearing at which counsel presented their motion for a protective order so they wouldn't have to give this discovery. And it was a hearing during which Judge Dorsey directed and ordered Mr. Morton to disclose -- by the end of the day, to disclose the information. Counsel has represented to the Court that, at that -- on that day, he left the country via -- it has to be via air, airplane.

And the reason I answered your question technically the way I did before is I don't know how many back-and-forths, if any, occurred prior to March 4th.

THE COURT: Okay.

MR. FINESTONE: But Your Honor reviews -- Your Honor recited --

THE COURT: Fair point.

MR. FINESTONE: -- what's been represented to the Court.

THE COURT: I get it.

MR. FINESTONE: And so there was the February 16th hearing.

There was a February 27th hearing that Judge Dorsey did reference in his memorandum opinion, in which the debtors called for an emergency hearing because, after we got his discovery responses -- which were frivolously designated

"attorneys' eyes only" for no articulable reason -- we asked Judge Dorsey for an emergency hearing, and another opportunity for judge -- for William Morton to appear and say something. He didn't appear at that hearing.

Then we get to the March 1st hearing, which Your Honor has referenced. We then get to the March 4th hearing.

At the March 1st hearing, Judge Dorsey, again, was very lenient -- maybe the wrong word -- but gave Mr. Morton another opportunity to be heard. And he requested that Mr. Morton appear at the March 4th hearing, which was the Monday, which would -- which was in advance of Judge Dorsey entering an order to show cause.

THE COURT: Now that -- again, just so that I understand -- and correct me if I'm wrong. But I believe that Judge Dorsey's rec -- it was essentially a recommendation that Mr. Morton appear. He did not order that he appear for the 4th. I thought that he said it would probably be in his best interests or it would be a good idea if he appeared.

MR. FINESTONE: I --

THE COURT: Do I have the dates right?

MR. FINESTONE: You've got it exactly right, Your Honor.

THE COURT: Okay.

MR. FINESTONE: Mr. Morton didn't take Judge

Dorsey's recommendation. I think it was good advice from the bench, but Mr. Morton chose not to appear at March 4th.

And I just want to stop on March 4th for a minute because we'll obviously get to this allegation of hospitalization, which centers around the March 14th PI hearing.

But staying with the March 4th hearing for a moment, in which Judge Dorsey invited Mr. Morton's attendance, the email that Mr. Morton's counsel sent to chambers over the weekend because -- in an effort to update chambers about whether Mr. Morton was going to attend or not -- and we've attached this to our opposition, Your Honor -- was explained -- one, it said Mr. Morton is not going to attend on March 4th, notwithstanding Judge Dorsey's suggestion.

But it also explained the reason why he wasn't going to attend on March 4th, and it wasn't anything about incapacity or putative hospitalization or fell into a hole, it was none of that, Your Honor. It was he's not coming on March 4th because he's -- he flew to India to deal with BYJU's issues, basically to meet with the alleged fraud -- confidently alleged fraudulent transferee, the ultimate transferee. And he chose -- he basically told the Court that he was choosing to be there, rather than come to court on the March 4th. It wasn't can't make it; it was I've got the

ability to go meet with the fraudulent transferee who wired me 533 million and who I've now told the Court I've wired back to them, or I've got the ability to come to court and be heard on an order -- on the prospective entry of an order to show cause. And this man, in his own discretion and under no duress, chose to be where he was, chose to be with the funds in this hidden place, or chose to be with the party who allegedly has control over the funds. So that's March 4th.

I'm finally -- something you're --

THE COURT: No. Go ahead.

MR. FINESTONE: I'm finally going to get to the question Your Honor asked me because counsel focused -- counsel basically said forget all of that process, let's just focus in on the March 14th hearing.

And I don't have too much to add to Your Honor's responses to that allegation because Your Honor referenced the fact that it is not that mister door -- it's not that Judge Dorsey bolted the doors or turned off the Zoom and didn't let Mr. Morton testify. Judge Dorsey expected the man to come and testify. And when the man said I'm not going to come in person because I've been hospitalized, but I would like to testify via Zoom, Judge Dorsey was open to him testifying via Zoom.

All that Judge Dorsey asked was for counsel to submit some proof of this alleged hospitalization. And we

don't know what Judge Dorsey would have done had that proof had been submitted because Mr. Morton didn't submit anything. It would have been very easy for counsel to email to chambers some proof of hospitalization.

And as Your Honor pointed out this morning, this was a PI hearing. The evidentiary -- it's a total red herring that they -- basically, as I interpreted the argument this morning, the proof couldn't have been submitted because it wouldn't have been admissible because the only way to authenticate the proof would have been had Mr. Morton been on the TV screen. That's a red herring. Nobody had objected to that proof coming in via an email through chambers. Nobody had objected to that proof coming in, in the flexible ways that come in for a preliminary injunction hearing.

And I'll just end on this point by saying we are now -- that was March 14th. Today is -- we're getting pretty close to the time to file our taxes. What's today's date?

MR. ENOS: (Not identified) April 9th.

THE COURT: April 9th.

MR. FINESTONE: April 9th. We're 20 -- we're 3, 4 weeks away from March 14th.

And this proof of hospitalization, not that I think it's dispositive if it magically appears, Your Honor, but nobody has seen any proof of hospitalization. Nobody has seen any proof of subsequent discharge.

I'll just say, as counsel to the debtor-in-possession here and not expressing an opinion on whether I, in my individual capacity, believe the allegation of hospitalization, the only thing that matters today, at least for purposes of this motion to stay pending appeal, is that that putative proof wasn't submitted to Judge Dorsey in order to -- in order to premise a request to testify electronically, and it hasn't been submitted to anyone, in any format, in any proceeding since that time, Your Honor.

We haven't even heard the rest of the story, what the hospitalization was about, what bone was broken, was it a -- was it a cold. I don't know. All we've heard is hospitalization and discharge, Your Honor. No proof whatsoever under any standard, Your Honor.

So I'm going to let my -- counsel to the DIP lenders and the -- and our creditors address the likelihood of success on the arguments that they say were not considered, but in substance, just so -- to minimize duplication of the Court [sic].

But I will say, because I just feel the need to --

THE COURT: Well, I think I want to ask --

MR. FINESTONE: Your Honor.

THE COURT: I think I want to ask a question, and if you want to defer to your colleagues -- but it's as much directed, frankly, to Mr. Van Tol because I don't think I

asked it when we were having this discussion. But the motion recites that there are a number of substantive defenses to the ultimate relief requested in the complaint. And this is going to be a softball, so just a heads-up. It's a softball to you, but it's a more direct question to Mr. Van Tol.

I don't -- I guess I'm struggling to perceive how defenses of mere conduit, reasonably equivalent value, or actual fraud and how those come into consideration of the contempt, which is for failure to comply with discovery requests.

MR. FINESTONE: Your Honor is correct. They have nothing to do with the practice analysis, the contempt order. It's just a --

THE COURT: Okay. Okay.

MR. FINESTONE: I'm referencing the Mr. Iverson reference before. So yeah, they have absolutely nothing to do with his refusal to disclose prior to March 14th, they have nothing to do with his refusal to disclose as of today.

And ironically, as I -- the argument I made before, his continued refusals to disclose actually come back around to the ultimately likelihood of success on the fraudulent transfer because it is post-petition concealment. I said to Judge Dorsey at a prior hearing -- because there have been a lot of hearings in this case, notwithstanding this argument that there's been no due process. I said I think it's time

to petition the State Legislature to add a new badge of fraud because we already include concealment of the transaction, concealment of where the money is sent, but there's a new one now, which is continued concealment during the pendency of the action, of where the *res* is, Your Honor.

So it has nothing to do with the contempt order. It, arguably, fits into the preliminary injunction order because Judge Dorsey considered likelihood of success.

THE COURT: So noted

MR. FINESTONE: But where I want to defend Judge Dorsey and the Court because it is just made up, Your Honor, that Judge Dorsey didn't consider that stuff, I remember in my own blood and I confirmed it in the transcript, we cited a judge -- we argued a Judge Walrath case that stood for the proposition that, even if it did somehow comply with the credit agreement, that's not a statutory defense to Section 548 or 544. Of course it can continue to be a fraudulent transfer.

I remember Judg Dorsey asking counsel, man-to-man asking counsel but even if it complied with the credit agreement, that's not -- that doesn't hold as much weight even as a data point if the debtor was in default of the credit agreement, right? There was discourse. Counsel may not like the way Judge Dorsey ruled or came out, but to say that the Court didn't consider it, to attack the work and the

analysis that was done, which has all been confirmed in a subsequent memorandum opinion that Judge Dorsey entered, I take --

THE COURT: I have that.

MR. FINESTONE: -- exception to that.

The mere conduit argument is also -- there was significant evidence that Judge Dorsey listened very close to about the fact that there was a lot of risk in investing in Camshaft.

If you look at Camshaft's brochure, which was admitted into evidence for the preliminary injunction hearing, which Judge Dorsey admitted, it talks about Camshaft can do whatever it wants with the funds and you can't complain because you are acknowledging you are investing in a risky, highly leveraged investment fund.

That's not a bank, Your Honor. When we put money in Mellon Bank or when we put money in -- I don't follow all the bank mergers and acquisitions. But when we put money in the bank, we're not authorizing that mere conduit to go invest in crazy things like IHOP franchises or whatever else it is that Mr. Morton might have invested in. So this mere -- Judge Dorsey heard testimony about this. And to say that Judge Dorsey didn't consider it I think is without any basis in the record.

The last one, Your Honor, is reasonably equivalent

value. Judge Dorsey heard testimony and I remember Judge Dorsey remarked about the testimony. It is -- putting aside what a sham of a hedge fund it appears Camshaft to be, such that even the investment into Camshaft received less than reasonably equivalent value, putting that aside and just pretending, Your Honor, that Camshaft was Vanguard or Camshaft was Fidelity, it is -- there was un-controversy -- uncontroverted testimony and it's been conceded in this case that, whatever the worth of that investment interest is, the debtor doesn't own it. And so you can invest in Vanguard. But if you end up not owning van -- your interest in Vanguard, you've got nothing. This was a -- this was a transfer for zero. Forget reasonably equivalent value, forget fair consideration. The debtor has gotten zero.

So to say that Judge Dorsey didn't consider that when the testimony clearly indicated that the debtor was left with nothing, no basis supported in the record.

THE COURT: Okay.

MR. FINESTONE: Last comment, Your Honor. They obviously don't come here with a bond. So, assuming that they made any showing on likelihood of success, which they have not, and assuming that they even tried to make a showing on irreparable harm, which they chose not to do because the civil fugitive won't come to Wilmington, Delaware, they haven't posted a bond.

And I thought, Your Honor, do they have the ability to post a bond. It seems like they do, Your Honor. And if they were willing to post a bond of $533 million and put it in the bankruptcy court registry, then the debtor has -- withdraws its opposition to this motion, Your Honor. Thank you.

THE COURT: Very good.

MR. FINESTONE: Any questions before I sit down?

THE COURT: No, sir.

MR. FINESTONE: Thank you, Your Honor.

THE COURT: Thank you.

Good morning, Counsel.

MR. SHANKAR: Good morning, Your Honor. Ravi Shankar from Kirkland & Ellis.

Your Honor, I represent GLAS Trust Company, which is the agent of the lenders that originally loaned the $1.2 billion to the debtor, including the $533 million, Your Honor, that ultimately found its way to Camshaft, and which Camshaft then, on the petition date, moved offshore to an undisclosed trust, which is a foundation principle of the contempt order here.

That money, Your Honor, is a critical source of recovery for these lenders. They're owed over $1.4 million as of the petition date. The 533 million slug is, obviously, a material component of those funds.

And I wanted to underscore, Your Honor, and build on a few of the points that Mr. Finestone raised.

Almost a year ago, before the petition date, GLAS and the lenders began doing absolutely everything in their power to identify the location, whereabouts, and use of the five hundred plus million dollars.

Mr. Van Tol references a cash verification exercise that took place in March of 2023. Your Honor, I have -- it is hard to comprehend just how roundabout the cash verification has taken place in the course of these proceedings. We are told, under redacted documents, that money appears to exist. We don't know where the money is, we don't know who controls the money, and we have no idea what form or substance the money lives in.

And so, when Mr. Van Tol says that the lenders learned about the existence of the money back in March, what he omits is that Mr. Pohl's declaration further goes on to say that, two months later, litigation was brought in the State of Delaware in the Chancery Court; that, in August of last year, that is when Mr. Pohl finally identified the identity of Camshaft, after undertaking an extensive review of bank statements; and that, within weeks of Mr. Pohl's identification of Camshaft, GLAS brought litigation against Camshaft in Florida State Court.

There is a long history here, Your Honor. And it's

hard for me to even explain it without having lived it all because some of my gray hairs now are as a result of this case.

THE COURT: I'll trade you.

(Laughter)

MR. SHANKAR: I ...

(Laughter)

MR. SHANKAR: You're putting me on a tough spot there, Your Honor.

THE COURT: Ah, I'm busting your chops. You may proceed.

MR. SHANKAR: But I emphasize that case in Florida because of what happened after it.

So, back then, we had suspicions. We at least knew that, as of 2022, the money had been moved into Camshaft. We didn't know if Camshaft still had the money or not. Today, based on the discovery taking place in this case, when that litigation was filed, Camshaft had the money. It was there. There was an LP interest on account of the five hundred plus million dollars that the discovery that has been uncovered so far shows existed in Camshaft.

So, when I mentioned a moment ago, Your Honor, that Camshaft moved the funds offshore, they did that on the petition date, in the face of litigation brought against them in Florida State Court, fraudulent transfer claims for actual

fraud and constructive fraudulent transfer, seeking the return of that very same *res*.

They moved the money intentionally, in the face of litigation that had identified them. It was a brazen move, it was an unlawful move. And it tells me, Your Honor, everything you need to know about William Morton's motivations coming into this case before we even get to everything that's happened over the past two months.

Your Honor, I've heard Mr. Van Tol say that Camshaft is a mere conduit. When we learned about Camshaft back in August, we undertook an extensive sweeping investigation into what exactly Camshaft is because, other than being a piece of a car in a motor -- that's what a "camshaft" is when I traced its origin -- we had no idea what this hedge fund was or who Mr. Morton was.

They are arguing as if Camshaft were a legitimate hedge fund. We have put forth a mountain of evidence that they were located out of an IHOP, that they're misrepresenting who their employees are. Their most recent Form ADV filed with the SEC as of a couple of weeks ago says there's only one employee, who I presume is Mr. Morton. Everyone else seems to have resigned. Their fund administrator Apex also resigned after the TRO papers and PI papers were filed in this case.

So they say they're a mere conduit, which is an odd

defense when the allegations are that they are a sham, to say we are not actually a hedge fund, but we are a bank. And Your Honor, you're not like a bank; you're either registered as a bank or you're not registered as a bank. You can be somewhat like a bank. And I can't take out my Camshaft card and go to my local IHOP and withdraw funds on will. They are not like a bank.

And when you see the steps that William Morton has taken to conceal the funds in this case, what it tells me is that part of the above-market payment they got was for William Morton to facilitate the ongoing efforts in this case; that the reason a hedge fund is chosen, such as Camshaft, isn't for it's investment thesis, it's not to grow your returns. It's because they are willing to take the steps that no other respectable fund would take.

It gets worse, Your Honor. Judge Dorsey obviously issued his contempt order. We still don't know where the funds are.

More recently, on Thursday of last week, the debtor served a subpoena on Apex Fund Services for documents. Apex is Camshaft's custodian of records. This was after the debtor filed and GLAS filed their opposition papers to Camshaft's motion. As Camshaft's custodian of records, Apex maintains the register of Camshaft Funds Limited Partners. It will know where the money went on February 1st because,

when you transfer limited partnership interests and then you withdraw the funds from those LP interests, there are back-end entries that show the movement of the LP interests. So, if Camshaft is not going to comply with its obligations, Apex should comply. And we have no reason to expect that they wouldn't comply.

One day later, Your Honor, it's a Friday night. I have put my kids down for bed. And I see the email from Mr. Van Tol of Camshaft's motion to quash that subpoena in the New York District Court. So their response to a lawful subpoena to their own fund administrator that is going to know where the funds are, setting aside Mr. Morton's own failure to hold accountability and disclose this information, is to move to quash the subpoena that is going to shed light on the movement of the money.

And they attached to that motion a letter from counsel to Apex threatening litigation if it complies with a lawful subpoena issued against it. They claim the information is commercial sensitive. I have -- it befuddles me, Your Honor, why the name of the movant of the funds would be commercially sensitive. I doubt it. And what I can't help but wonder is: What is Camshaft covering up? Because it must be good if they are going to go to these lengths.

And I worked through, Your Honor, that background, not only to give you a sense of what we, as the lender group

here, have been living for the past year, but also because I think it circles back to the motion to stay and it picks up on a point Your Honor made at the outset of your questioning to Mr. Van Tol about where is the irreparable harm because there really is a bind that they find themselves in, and that bind is fatal to their motion.

If Camshaft doesn't have the money, then there is no irreparable harm. It is being asked to comply with status quo order, a freezing order that does not impose any affirmative obligations on their client. And it would be like telling me, Your Honor, don't move the $533 million. I have no capacity to do it anyways. And while, theoretically, I suppose we could spin out hypothetical scenarios where it may matter, it practically doesn't. And in the context of the history of this case, it makes sense.

On the other hand, because irreparable harm is not just a one-sided consideration, it's a balancing of the irreparable harms on both sides, everything Camshaft has done since the petition date says to us that they must have some sort of interest or some stake in keeping those funds concealed and keeping the funds hidden.

Mr. Van Tol says that Mr. Ravindran has sworn that the money is within the BYJU's enterprise. We have a lot of questions, Your Honor, about where the funds are. But it also doesn't really answer the question because we don't know

if Camshaft is still investing those funds. We don't know what current arrangements exist between Camshaft and the other defendants here.

And Judge Dorsey, living this history, as we lived the history of this case, is able to draw his own inferences around the credibility of the evidence that comes in and what are the reasonable inferences to draw in the context of a preliminary injunction hearing. And that's why, Your Honor, to us, it is so vital that the orders remain in force pending appeal.

I don't think they'll succeed. I don't think the appeals have any merit to them. But what I see Camshaft asking for -- and I'll note, Your Honor, that Mr. Ravindran is not seeking relief from the appeal; that the one Camshaft said is actually in control of the money, they have not filed this motion. Camshaft filed this motion after waiting two weeks from Judge Dorsey's order, Camshaft filed it.

And what it says to us is that they're looking for impunity to continue to unlawfully move the funds and work with their coconspirators at BYJU's to dissipate half a billion dollars. Half a billion dollars went missing. And this is not the appropriate case for a stay pending appeal. And we would ask the Court to continue to exercise oversight of those funds through the preliminary injunction order.

THE COURT: Very good.

Mr. Van Tol, response?

MR. VAN TOL:  Thank you, Your Honor.

I'd like to start with the last point that was made because it goes to one of the arguments that Mr. Finestone made.  And Your Honor put it succinctly:  Where is the *res*?

The evidence in this case, Your Honor, including sworn answers to interrogatories and the most recent declaration from Mr. Ravindran, establishes one fact:  It's not with Mr. Morton.  Mr. Ravindran says he saw evidence showing that the money is available with the group.  He's talking about BYJU's, Your Honor.

THE COURT:  I read Mr. Ravindran's declaration.

MR. VAN TOL:  Where the *res* is, is not something Mr. Morton knows, Your Honor.  It's with BYJU's.  So we have to deal in facts.

I understand inferences from facts, I understand credibility determinations.  But at a preliminary stage, the only evidence is that Camshaft transferred the money to a company called Inspilearn; Inspilearn, in turn, transferred it to another entity.  And there may be transfers after that of which Mr. Morton is not aware.  So this is not really about where is the *res*.  This is about punishing Mr. Morton.

Now Mr. Finestone raised the colloquy that we had about Mr. Morton's deposition.  And to be fair, what I said was Mr. Morton is not appearing for a deposition because we

don't see the need for a deposition. We don't see the need for a deposition because, as Your Honor knows, on a stay application, you are looking at what happened below. The record is frozen. There's no need to supplement the record.

I also want to assuage any concern Your Honor has about chronology because --

THE COURT: Well, let me ask you a question on that.

MR. VAN TOL: Certainly.

THE COURT: Much of the predicate for the entry of the contempt order was, in fact, Mr. Morton's failure to appear. And the parties have briefed a different vision of whether or not a meaningful opportunity was afforded to Mr. Morton to either appear in person or remotely, to appear to be given notice about what the hearing is actually about and to be given a meaningful opportunity to come in.

I agree with you that, as a general proposal, that a stay pending appeal motion is not usually an evidentiary hearing because we have the record below and we are applying the facts from -- or the standards from Revel to the facts that have been established.

But I think you'd have to acknowledge that the tone in the room might be materially different if Mr. Morton was sitting there, requesting the opportunity to go up to the witness stand to explain why he was sick, why he failed to

comply, what -- the questions or open issues that were there when Judge Dorsey entered his order that -- I mean, this is not necessarily, again, a typical case, as I said. This is a case where someone has been the subject of a contempt order for failure to appear. I think, if I were to put words in Mr. Finestone's mouth, it would be "an opportunity was afforded" to Mr. Morton to appear or to provide sworn testimony, and he has consistently declined. How do I deal with that?

MR. VAN TOL: Well, Your Honor, two responses:

The first is I'm familiar with that very situation you're talking about because it comes up when one is trying to purge contempt.

THE COURT: Uh-huh.

MR. VAN TOL: You bring your client in and you say please tell the Court why the contempt was purged. That's not the situation. We are on, essentially, an appellate record where we are challenging the original order, which leads to my second point.

That original order had severe consequences attached to it, including a bench warrant. I would submit that, if Mr. Morton were here today, Your Honor, he'd be in lockup.

THE COURT: Yes, he would.

MR. VAN TOL: So the harm has been done, Your

Honor, at the initial failure to provide due process. And I say that with all respect to Judge Dorsey. I understand His Honor's order, but we respectfully disagree with it.

And this goes to a point that I want to make sure -- you mentioned Atmospherics. At the March 1st hearing, Mr. Morton left the hearing before -- and I emphasize "before" -- mister -- Judge Dorsey said I suggest you show up on the following Monday, March 4th. So Mr. Morton had prearranged plans. And one does not just jump on a plane in 2024 and go overseas. He had prearranged plans. He left before the suggestion by Judge Dorsey. So I don't want there to be some idea that Mr. Morton heard the suggestion and then feld to some jurisdiction. That is not what happened.

Your Honor, moving on to another point that was made by counsel, which is: I think they're dancing around this issue of Mr. Pohl's declaration. They're being quite clever. They're talking about the second transfer and the third transfer and Mr. Morton's potential involvement in those.

If you look at the complaint, there is one allegation for liability made against Camshaft, and that is as an initial transferee. So what the Court should be looking at is, at the time of the initial transfer, was there evidence of actual fraud. And the fact that Mr. Pohl put in his declaration that the lenders were satisfied where the

money was as of March 2023 shows that they cannot meet their burden. They try to avoid it by saying well, there were later transfers and maybe Mr. Morton knows about those. That's not the basis of the liability, Your Honor.

The last thing I'll talk about, Your Honor -- and I successfully made it through without mentioning Allen Iverson -- is the bond. It's unusual to be asking for a bond for a preliminary injunction that is maintaining the status quo because there aren't any damages yet, so I don't even know how one would calculate the bond. So I would submit that, in an equitable setting, where one is getting equitable relief, a bond is not appropriate. And most of the cases that I've seen on a bond deal with damages.

THE COURT: Okay.

MR. VAN TOL: Thank you, Your Honor,.

THE COURT: Very good. I've heard enough.

The matter that's before the Court is the request for a stay pending appeal with respect to both an order on finding of contempt and an order granting a motion for a preliminary injunction, both of which have been entered by Judge Dorsey. I will deny the request for a stay pending appeal.

I note, as a threshold matter, that I appreciate, counsel on both sides, their patience with bringing me up to speed on a complex record. And again, I thought the

submissions were particularly comprehensive and helpful on an issue that, again, is hardly typical. So, again, I appreciate your patience with me while I am pinch hitting for Judge Dorsey.

I would further note that, as reflected in Footnote 4 of the motion, there is at least a fuzziness about this Court's authority, given the pendency of a pending appeal, to deal with a request for a stay pending appeal. And I am familiar with the case law that counsel has identified in Footnote 4.

I've always struggled with that concept of divestment. And I understand it is a principle that affords a measure of certainty and addresses the risk of inconsistent adjudication. But again, in this instance, it seems to me both appropriate and consistently -- consistent with the Bankruptcy Court's jurisdiction that jurisdiction remains and lies here for purposes of a consideration of a stay pending appeal, notwithstanding the concept of divestment as a practical matter.

Again, either Judge Dorsey or me, in his stead, is in the best position, as a threshold matter, to consider a request for a stay pending appeal. And I think our case law reflects that proposition as a general rule. But we are in a somewhat fuzzy area, for lack of a better phrase, but I wanted to address that issue up front.

As counsel noted, a request for a stay pending appeal is extraordinary relief. It is not a standard grant that the Court provides, but in fact, a party seeking a stay pending appeal carries a heavy burden to demonstrate entitlement to appeal.

Judge Ambro, in the Revel decision, offered a gloss on the standard, four factors. Those factors are, again, not in dispute, and both parties have ably addressed them in their papers. They are:

Whether the stay applicant has made a strong showing of likelihood of success on the merits.

The second is whether or not the applicant will be irreparably injured absent a stay.

The second, whether -- or the third is whether or not the issuance of the stay will substantially issue -- will substantially injure other parties interested in the proceeding.

And the final factor is the public interest.

Judge Ambro, in the Revel decision, provided a -- kind of a gloss on that and, essentially, placed all of the judicial focus on the first two factors, treating them as a sliding scale, where, if a party has a high likelihood of success on the merits, then the showing for irreparable harm is relatively reduced. Conversely, if the party demonstrates a significant risk of irreparable harm, then the showing of

the likelihood of success is, perhaps, lesser.

I am satisfied here, based on the record before me and, again, the parties' comprehensive submissions, as well as Judge Dorsey's memorandum opinion, which supplements his ruling dated April 3rd, 2024, that the movants have not carried their burden with respect to either likelihood of success on the merits or irreparable harm; and, therefore, the Court does not reach the two further factors. The application will be denied.

In finding that there is not irreparable harm, again, the record before me indicates that the -- that Mr. Morton, in particular, is not likely to suffer irreparable harm by the continued imposition of the order. Compliance with the order would purge the contempt appearance. And again, to the extent that he pursues his appeal and prevails on that appeal, any monetary obligations associated with the appeal would be obviously subject to reversal, as well. So I'm not satisfied, again, based upon the record before me, that there is any showing of irreparable harm here.

Likewise, in connection with the likelihood of success on the merits, the parties' submissions focus heavily on the adequacy of sufficiency of process afforded to Mr. Morton and Camshaft in connection with the orders that were provided. And I appreciate, frankly, my limited opportunity to get up to speed, counsel's walking through a history that

dates from prior to March 1.

But even absent that, I am satisfied, having reviewed intensely the record from May -- March 1, March 4th, March 14th that Mr. Morton, in particular, was afforded certainly meaningful opportunity and notice of the relief that the Court would be considering at the hearings that it held and, likewise, that he had a full and fair opportunity to participate.

I note that the parties' submissions -- or the movant focuses heavily on good for the goose, good for the gander kind of argument with respect to the fact that Mr. Ravindran was afforded the opportunity to testify remotely, but that courtesy was not extended to Mr. Morton. I don't believe that that moves the needle at all.

Rule 43, made applicable to proceedings in bankruptcy, provides that it is essentially extraordinary relief for the Court to order or otherwise -- order or authorize the taking of remote testimony. The fact that Judge Dorsey found that that burden had been met in connection with Mr. Ravindran does not entitle Mr. Morton to similar treatment.

Likewise, the record indicates that the Court was advised that Mr. Morton was unavailable due to hospitalization and a routine and standard request or proof of that circumstance was requested. As a practical matter,

compliance with the rule requires that kind of a showing in order to demonstrate that the relief is appropriate and that remote testimony should be and could be afforded.

And again, the record indicates that there was no meaningful response to the Court's inquiry with respect to the veracity or the foundation of the contention that Mr. Morton was unable to travel or otherwise unable to participate directly with the hearing.

Likewise, the Court notes that the issues with respect to the significant -- or the substantive merit defenses as to mere conduit, reasonably equivalent value, and actual fraud go, obviously, to the merits of the litigation and don't meaningfully bear upon the contempt order that is the subject of a request for a stay. But to the extent even that they apply to the preliminary injunction, again, I view the preliminary injunction as essentially a stay or a freeze order, rather than findings on the merits that fraudulent conveyances, in fact, occurred and that relief is being ordered. So I don't believe that issues with respect to consideration of the merits defenses bear heavily on the success on appeal.

And likewise, the Court has had an opportunity, again, to review as best I could on the record that's been developed the issues that were here. And Judge Dorsey issued a contempt order based upon a party's failure to provide

responsive information and testimony consistent with valid discovery orders and requests that go to the heart of these proceedings. And his failure to do so required -- didn't simply contemplate, but it required the Court to take a further, frankly, extraordinary step of imposing the sanctions that are here.

So, based upon the record before me, I am satisfied that the movant has not carried its burden with respect to a demonstration of a likelihood of success on the merits of the proceeding. And likewise, I find that the movant has not demonstrated that irreparable harm will ensue in the absence of a stay.

I do not then reach the question of a bond.

And likewise, based upon my reading of Revel, the Court need not seriously reach the remaining two factors. Although, to the extent I were required to do so, I would find that they weight lightly in the analysis, but certainly weigh against issuance of a stay.

So I would ask that the parties confer and submit promptly an order denying the application for a stay pending appeal and I would entertain that order under certification.

Are there any questions?

UNIDENTIFIED: No, Your Honor. Thank you.

THE COURT: All right. Mr. Von Tol.

(No verbal response)

THE COURT: Counsel? Mr. Enos?

MR. ENOS: Nothing from us, Your Honor.

THE COURT: All right. I appreciate everyone's time. And again, I appreciate your patience with me in bringing --

MR. ENOS: Your Honor?

THE COURT: -- me up to speed.

MR. ENOS: I apologize.

THE COURT: Mr. Enos.

MR. ENOS: Can I just interject real quick? A housekeeping matter.

THE COURT: Yeah.

MR. ENOS: The second item on the agenda, I know Your Honor said that Judge Dorsey requested that be adjourned. However, the parties were able to reach an agreement on scheduling.

THE COURT: Oh, great.

MR. ENOS: Obviously, it would be subject to the Court's availability. I rise just to say which chambers should we reach out to.

THE COURT: I would reach out to Judge Dorsey's chambers.

MR. ENOS: Okay.

THE COURT: If there is an issue that it requires

coverage, I would be happy to accommodate. But if you'll start with Ms. Haney, she will be able to give you whatever dates are necessary. And again, if it remains with me, then you can expect that we'll coordinate internally, we'll get back in touch with parties, and we'll deal with that.

If the parties have consensus with respect to scheduling, start with Judge Dorsey. You can memorialize a form of order. If that all works, I'm sure he'd be happy to entertain it and consider it under a certification of counsel. But again, if there's a need for prompt consideration or anything going on this week, I'd ask that you reach out to my chambers. Okay?

MR. ENOS: Thank you very much, Your Honor.

THE COURT: All right. Thank you, Mr. Enos.

MR. ENOS: I fear Judge Dorsey's chambers has blocked me at this point, but I'll reach out to them.

THE COURT: Very good.

Mr. Van Tol.

MR. VAN TOL: Sorry, Your Honor. Just briefly. I was remiss in not joining Mr. Finestone in thanking Your Honor for jumping in and hearing this. We much appreciate it. Thank you.

THE COURT: Happy to oblige.

All right. With that, we are adjourned.

Oh, Counsel?

MR. KORPUS: Just one minute, Your Honor.

THE COURT: Yes.

MR. KORPUS: Sheron Korpus, Kasowitz Benson Torres, counsel for Mr. Ravindran.

We did have some discussions on the status conference, but I don't want to get ahead of Mr. Dorsey -- of Judge Dorsey because he called for the status conference, and I don't know if he wants a hearing date or doesn't want a hearing date. I guess that maybe we should just reach out to him and find out what he wants.

THE COURT: I think I would reach out to Judge Dorsey's chambers. And again, the -- we specifically discussed that yesterday. While we were conferring, I pulled up the agenda and I noted that there was a status conference. Since the status conference is prospective and I'm just covering today's hearing, it didn't seem to make sense to have me deal with that, and it's going to deal with his own calendar.

So I would suggest that counsel reach out to chambers. If there are dates that are needed, they will be provided. If there is anything that I can do to be of assistance or if I need to assist with further proceedings, I would be happy to do so and we'll give you the schedule and you may inquire.

MR. KORPUS: Thank you, Your Honor.

THE COURT: Thank you, Mr. Korpus.

Anything else?

UNIDENTIFIED: No.

THE COURT: All right. With that, we are adjourned. Thank you, Counsel.

(Proceedings concluded at 11:10 a.m.)

\*\*\*\*\*

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____    April 11, 2024

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable