# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

### DECLARATION OF BYJU RAVEENDRAN

I, Byju Raveendran, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I submit this declaration (**Declaration**) in support of Riju Ravindran's opposition to the Debtor's and GLAS' Motion. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge as well as knowledge I have gained as the Managing Director and Chief Executive Officer of T&L. I am over the age of 18 and, if called upon to testify, I would testify competently to the facts set forth in this Declaration.

*Introduction*

2.      The primary purpose of submitting this Declaration is to explain what happened to the monies disbursed under the Term Loan B (**TLB**). In paragraph 17 below, I have set out a table in which I have identified the categories of expenses on which the USD 1.168 billion raised through the TLB was spent. Since the USD 533 million (or the so-called 'Alpha Funds') form part of the same USD 1.168 billion raised through the TLB, this explanation I hope will put to rest any concerns the Lenders or anyone else might have over the whereabouts of these Funds. In paragraphs 34-39, I have further explained how the Alpha Funds were in fact utilized and the role that entities like OCI Limited (**OCI**) and Camshaft Capital Fund, LP (**Camshaft**) played in that. But before proceeding into these granular matters, I think it is necessary that I set out the broader context in which I am giving the current Declaration.

3.      The entire case of "fraud" and siphoning of money against Riju Ravindran in the United States is based on one statement that their representative wrote on a paper napkin and attributed to me in their media outreach. And that was a lie. Neither did I say those exact words, nor did I even imply them indirectly. Contrary to what has been said in the media outreach, I never said that *"the money is someplace the Lenders will never find it"*. Instead, at the meeting in question, I wanted to explain to the Lenders that the funds which had been disbursed under the Credit Agreement would be utilised for their intended purpose i.e., legitimate business operations.  As such, those funds would not be available to the Lenders to apply against their claim for accelerated debt.

4.      What began with a blatant lie unsurprisingly spawned many other baseless claims and egregious misrepresentations, not to mention a series of cases filed across multiple legal forums in the US and India to pressurise me into surrendering to the Lenders' illegitimate demands. The Lenders' ill-intentioned lies disseminated in the media or narrated to business journalists have included: 1) presenting fabricated cryptocurrency accounts allegedly containing USD 1 billion in my name; 2) filing unsubstantiated complaints with the Ministry of Corporate Affairs and other Indian regulatory bodies; 3) spooking off our auditors by threatening legal action; 4) threatening journalists who reported favorably about

our company in India; and 5) engaging a public relations firm to systematically disseminate misinformation about my company and me.

5.  I respectfully submit to this court that the present matter has been clouded by misrepresentations presented as facts to all stakeholders. Through this sworn Declaration, I seek to set the record straight by distinguishing fact from fiction, thereby enabling the court to arrive at a just determination based on verified truths rather than unfounded allegations. It is my humble desire to make you aware of who I am, what I do and why. In this Declaration, I explain:

    a.  BYJU's' exponential growth in India between 2015 and 2020;

    b.  BYJU's' expansion outside of India beginning in 2019;

    c.  the external headwinds beyond BYJU's control that affected its overseas expansion beginning early 2022;

    d.  the manner in which monies disbursed under the TLB, including the Alpha Funds, were expended.

### *BYJU's' exponential growth in India between 2015-2020*

6.  I started BYJU's in 2003 with a simple dream - to make quality education accessible to all. As the son of two teachers from a small village school, I understood the transformative power of great teaching. For nearly a decade, I experimented relentlessly, pushing the boundaries of traditional education with every ounce of passion I could give. Ultimately, BYJU's is more than a company – it is my life's mission to ensure no student is left behind. At the peak, I was teaching 25,000 students simultaneously using a six-sided screen in an auditorium - but even that wasn't enough.

7.  Technology became my answer to scale beyond human limitations. When we launched the BYJU's Learning App in 2015, it revolutionized education delivery. Our learning app achieved download numbers previously seen only in entertainment and sports apps - a powerful proof that we had succeeded in making education not only accessible, but also truly engaging. There could be no better metric to prove that we had ignited a love for learning in millions of students. With support from investors who believed in our vision, we grew from a local tutoring firm in Bengaluru (a city in southern India) to a global education company, reaching learners from primary school to professionals. From our bootstrapped beginnings, we achieved what many thought impossible: scaling to USD 200 million in revenue by 2020 while remaining profitable. Around this time, many large investors exited with windfall profits and many others queued up to invest in the company.

8.  In the process of this expansion, BYJU's created over 200,000 jobs and inspired hundreds of entrepreneurs to follow their dreams. Every member of my founding team started as my student.  This company has given me everything I have, and in return, I have dedicated my life to it. My past, present, and future are inextricably linked with BYJU's - and I could not be more grateful for it.

9.    At its peak, BYJU's operated seven content studios across the globe, with three more in the pipeline, employing over 10,000 professionals in content creation alone. We spared no expense in recruiting top-tier talent in technology, ensuring we had the best, regardless of cost. But what truly set us apart was our ability to unite these brilliant minds to create world-class educational content. Our content, built with longevity in mind, has a shelf life of decades, making it a lasting resource for learners.

10.   Indeed, our content is our pride. On *Semrush*, a leading online visibility management platform, BYJU's today boasts an Authority Score of 97, a testament to our credibility, trustworthiness, and influence online. This high score indicates that we are recognized as one of the most authoritative and reliable educational platforms globally. Our organic search traffic has reached an impressive 240 million, marking a 60 percent growth over the past two challenging years. The BYJU's Learning App boasts of an annual renewal rate of 86 percent, which establishes beyond reasonable doubt its impact on its users. Despite the obstacles we have faced, we continue to lead the market, not just in India but also around the world, including countries such as the Philippines and the UAE. Globally, BYJU's stands as the number one platform in online education, all achieved without any investment in marketing over the past two years. This growth and recognition underline the transformative power of our content and the strength of our organic reach. Even today, BYJU's is the world's largest education technology company from India, creating cutting edge learning products, solutions, and personalised training programs to 150 million students around the world. Out of this, millions of students in India are benefiting from free courses that are provided by BYJU's through its Education For All (**EFA**) not-for-profit subsidiary. BYJU's EFA has been instrumental in democratizing access to quality education, reaching out to underprivileged children across India. Even today, nearly seven million underprivileged children in the remotest parts of the country have access to the same premium content and services as BYJU's' paid subscribers, through the company's not-for-profit efforts. With partnerships with multiple state governments, and over 170 Non-Government Organisations, the impact of BYJU's' EFA is far and wide and the initiative today serves as the benchmark for corporate social responsibility (CSR) projects in education.

11.   At the height of BYJU's' growth, the expenditure on employees' salary exceeded approximately USD 600 million annually, and there were at least 100 employees who drew higher salaries than me and my founding partners. The BYJU's group expanded to approximately 85,000 employees worldwide, including more than 37,000 teachers and 15,000 sales staff. It was also a matter of pride for us that BYJU's hired a predominantly female teaching workforce, with over 80 percent of our teachers being women due to our focus on remote learning. When BYJU's expanded its global footprint, we also recruited native speakers in Spanish, Portuguese, and Arabic, ensuring that BYJU's catered to students in multiple languages and regions.

### *BYJU's' expansion outside of India beginning in 2019*

12.   In and around 2019, BYJU's began to expand overseas. We successfully integrated our international acquisitions into the core of BYJU's' operations, with each new addition playing a strategic role in expanding our global footprint. Tangible Play, for example, was effectively acting as the international arm of BYJU's to set up and scale up our operations

in North America. The scale of this expansion explains the USD 300 million burn over time at Tangible Play, as we invested heavily in establishing a robust presence in an extremely competitive but also highly lucrative market.

13. During the pandemic years, BYJU's became a lifeline for education, serving as the primary learning platform for at least 50 million students in India. Before the pandemic, our platform was largely viewed as supplementary for students in metropolitan areas, offering additional support to their formal education. However, for students from smaller towns and rural regions, BYJU's had already been filling gaps in access and resources. The shift brought about by the pandemic further emphasized our Learning App's fundamental role in the larger quest of ensuring equity and equality in education.

14. Further, as part of our growth strategy and keeping in mind that BYJU's was valued by industry leaders at USD 45 billion in anticipation of a potential initial public offering (**IPO**) of T&L's shares, we significantly increased our investments in brand expansion by sponsoring major global sporting events. This included the 2022 ICC Cricket World Cup, along with India's team jerseys, and the 2022 FIFA World Cup. Sponsoring the Cricket World Cup proved to be a highly effective strategy, boosting our visibility not only in India but also in other cricket-playing nations like the UK and Australia. Our FIFA sponsorship, which involved an investment of nearly USD 200 million, was primarily aimed at enhancing brand recognition in key markets such as North America, South America, and Europe. This included securing Lionel Messi as our brand ambassador, positioning us alongside one of the most iconic athletes in the world.

15. During this time, between 2019 and 2021, we had massively invested in product development. It is also because of this that we were able to launch five 1-on-1 learning products simultaneously in multiple geographies in 2021. The "Learn Station" by BYJU's is a pioneering product that combines computer vision with advanced artificial intelligence, making it the first "phygital" learning solution that is also scalable by design. Unfortunately, due to our current financial difficulties, thousands of Learn Stations are sitting in our inventory rooms with the hope that they will one day brighten the lives and careers of thousands of students across the world.

16. At the crux of all our financial and legal troubles is our TLB, so I must now clearly explain what it entailed and how it was manipulated by certain lenders. Discussions for our TLB began in August 2021, at a time when BYJU's was in a position of significant strength and had multiple financing options on the table. The Credit Agreement, which was entered into in November 2021, was strategically well-timed. Had we delayed the signing by even a month, we would have witnessed the policy changes by the United States Federal Reserve (**the Fed**), which altered the broader macroeconomic environment turning unfavorable and would have surely prompted us to reconsider the timing. At that time, we already had two SPAC (special purpose acquisition company) offers, both valuing the company at over USD 40 billion (*see Exhibits 1 and 2 regarding proposals received by BYJU's from Churchill Capital dated November 2021 and MSD Acquisition Corp. in December 2021 respectively*).

17. The TLB, which was the largest ever raised in Asia, came with light covenants and reflected the confidence investors had in us. Initially, we planned to raise USD 500-750

million, but due to overwhelming demand, we upsized the loan to USD 1.2 billion. To be clear, all key decisions around this loan were either endorsed or celebrated by our existing investors and always received their full approval. It was our bankers, JP Morgan Chase and Morgan Stanley, who approached us with the TLB proposition. Since BYJU's was already being valued above USD 40 billion in our discussion for a possible SPAC listing, we decided to utilise the proceeds of our TLB towards aggressive global organic and inorganic expansion. Subsequently, the total marketing and branding cost for this expansion was more than USD 200 million. The company also completed multiple small global acquisitions and set up offices in seven new countries. Approximately USD 300 million was incurred towards funding the losses incurred in Tangible Play, which was the vehicle for our expansion in North America. Nearly USD 130 million was paid towards the due interest and principal for the TLB. I provide below a complete breakup of the verticals under which the USD 1.168 billion raised through TLB was utilised.

|  | USD Million |
| --- | --- |
| **Net TLB Amount Received (Net of banker fees, OID)** | **1168** |
| Overseas acquisitions | 166 |
| Funding Losses in Tangible Play (Osmo, Disney BYJU'S Early Learn, K12 Intl) | 295 |
| Investments in BYJU'S Future School & Whitehat Jr (US, Brazil, Mexico, UK, Australia) | 216 |
| TLB Interest + principal payments | 130 |
| Marketing (including FIFA, ICC event marketing, Messi & TV ads) | 115 |
| FIFA and other global sponsorships | 86 |
| Learn Stations Investment for Intl Expansion | 90 |
| Funding for Great Learning | 42 |
| Miscellaneous expenses | 28 |

***External headwinds beyond BYJU's' control affected its overseas expansion beginning early 2022***

18.    However, just as we were poised to see the returns on these strategic investments, we were hit by a liquidity crunch. In December 2021, the first signs of a shift in the global financial environment appeared, with the Fed making clear it wants to end its bond-buying program before it raises interest rates. The Fed's new economic projections suggested interest rates, which had been at rock-bottom since March 2020, would now rise in the coming years. Making matters worse, a committed tranche of USD 700 million equity investment did not materialise because the investors did not complete their obligation despite signing binding definitive agreements. This marked the beginning of a downturn we had never experienced before. As first-generation entrepreneurs, we remained optimistically ambitious when a more cautious approach would have served us better.

19.    The situation was further aggravated by our ongoing legal challenges, which prevented us from fully capitalizing on the global branding efforts. As a result, the entire USD 200 million investment in the FIFA World Cup sponsorship and the Messi partnership are now, unfortunately, write-offs.

<u>Change in Lenders' composition</u>

20. TLB is a type of debt that is tradable in the secondary market, which means that the original lenders can sell portions of the loan to other investors. As a result, the lender mix - or the group of institutions holding the loan - can change frequently. This creates a dynamic where parties who did not originally negotiate or underwrite the loan can buy into the debt after it has been issued.

21. Originally, the TLB was held by lenders who took a long-term view on their investment and the company's future (*see Exhibit 3 with the list of original lenders under Term Loan B*).

22. However, in early 2022, distressed-asset lenders (often referred to as "vulture funds") took advantage of the tradable nature of the TLB. These lenders purposefully increased their shareholding in the TLB by buying it at a discounted price in the secondary market. They achieved this by manipulating market perceptions and artificially driving the price down. Their strategy was not to support the company's recovery but to create conditions where they could profit from a potential default.

23. Although BYJU's consistently made interest payments on time, these distressed-asset lenders sought to trigger a non-monetary default clause within the loan agreement. A non-monetary default can occur due to technical or covenant breaches unrelated to missed payments. In our case, it was due to a delay in filing T&L's audited financial statements. By pushing for a technical default, these lenders aimed to invoke the acceleration clause in the Credit Agreement, which would require BYJU's to immediately repay the full TLB, that was otherwise due in November 2026, along with a hefty penalty, to profit handsomely from the windfall gains derived from the situation. The manipulation of the loan price and the use of legal provisions (non-monetary default and accelerated repayment) were key elements in the Lenders' strategy to exploit the vulnerability of the company, all for their own financial gain, as we continued to fight adverse macroeconomic conditions. Given the widespread negativity propagated by the Lenders through the media, it became nearly impossible for us to raise funds under such challenging circumstances. We had never, nor will we ever, back off from our commitment to settle the loan by the end of 2026.

24. Unfortunately, our equity investors at the time, numbering over 160, were too dispersed to have any significant stake or "skin in the game" to step in and aid, which is exactly what these distressed-asset lenders had been counting on. The Lenders' strategy of exerting pressure on us to deploy equity funds for repayment ultimately backfired and inflicted massive collateral damage on our company.

25. From January 2022 until now, approximately all of the USD 890 million injected into the company has come from the three founders of BYJU's – i.e. my wife (Divya Gokulnath), my brother (Riju Ravindran) and myself – in our personal capacity, through a combination of our wealth and personal loans. In the last 24 months before the insolvency proceedings began in India (being contested in the Supreme Court of India), BYJU's had disbursed approximately over USD 470 million towards payment of salaries of all its employees. We did more than we could to keep BYJU's afloat. But this also marked the beginning of a vicious cycle. The allegation that BYJU's' promoters have siphoned funds from the loan instrument is not just very disturbing and highly defamatory but also substantially and patently false. Riju Ravindran has provided undertakings in litigation proceedings in India

that he has not personally received any portion of the Alpha Funds (*see Exhibits 4 and 5 for the undertakings filed by Riju Ravindran before the Indian National Company Law Appellate Tribunal in Chennai, India*).

26.  On the contrary, these are the facts about how much we (my wife, brother and I) have poured back in the company during this prolonged liquidity crunch situation over the last 30 months:

   a.  Since March 2022, we have together infused nearly USD 890 million into the company.

   b.  Around March 2022, there was no alternative source of funding available to the company.  Post the market downturn in December 2021, nearly USD 700 million of committed equity capital from investors did not come in, resulting in a liquidity crunch. None of BYJU's' shareholders (aside from the promoters) made further equity capital available and in any event, BYJU's did not have any working capital or similar banking facilities that it could draw down on. Therefore, we were effectively the only source of funding available to the company.

   c.  Rising above and beyond the call of duty and sacrificing even the interests of my family, I have continuously invested my personal capital in BYJU's over the last 30 months. The Court will rarely find a parallel among entrepreneurs to the selflessness with which I have pledged my personal assets, including my family home and other properties, to ensure the company's survival and protect the interests of our employees, students, and stakeholders. Today, I am the single largest shareholder in T&L, with a stake that is far greater than that of any other equity investor or lender. I have not just put my skin in the game, I have also poured my soul into building and protecting BYJU's.

   d.  Out of the approximately USD 470 million that was paid as salaries to employees in the last two years, approximately USD 190 million was paid by my brother, Riju Ravindran, from his personal funds.

   e.  The payments made by Riju (as extracted from various bank statements) is attached (*see Exhibit 6 setting out payments made by Riju Ravindran towards salaries of employees of BYJU's*).

   f.  As a result of infusing most of our personal funds into BYJU'S, we are left with very limited personal assets, save for our shareholding in T&L. I have separately disclosed a detailed list of my personal assets in an affidavit to a tribunal in arbitration proceedings seated in Singapore (*see Exhibits 7 and 8 for the affidavits filed by Byju Raveendran in SIAC arbitration no. ARB093/24/RHM*).

   g.  One by one, whenever no alternative was in sight, we sold our assets to keep our company alive. The latest such fire sale was that of my house in Bangalore, the proceeds to which were used to pay salaries and meet some other exigent business needs.

h. I trust that the evidence presented above demonstrates the extraordinary lengths to which my family and I go to honor our financial commitments. So, when I say that we are committed to settling the TLB amount by November 2026, as stipulated in the Credit Agreement, you can rely on my word and previous actions to assure yourself that we will indeed meet that deadline.

27. I must respectfully submit that the current wave of litigation against the company serves neither the Lenders' interests nor ours. By impeding our operations and diverting crucial resources to legal battles, it diminishes our ability to generate the very revenues needed for repayment. A thriving BYJU's is in everyone's best interest - it ensures the Lenders receive their due repayment while preserving the value of the company they invested in. Allowing us to focus on our core business rather than defending against multiple legal actions would create a genuine win-win outcome for all parties involved.

### *T&L's audit delay*

28. Even as we kept expanding rapidly outside India, the global macroenvironment continued to deteriorate to our disadvantage. That said, after the Credit Agreement was signed and during the course of 2022, the change in composition of the lenders represented by GLAS led to a dramatic and adverse change in their behavior towards T&L. As a result, the Lenders seized upon minor technical defaults by T&L under the Credit Agreement to apply tremendous pressure on T&L and its management.

29. One of these technical defaults was the delay in providing the audited financial statements for the financial year ending 31 March 2022 (**FY '22 Audit**). Under the terms of the Credit Agreement, the FY '22 Audit was to be delivered to GLAS by 27 September 2022. However, a delay in providing the audited financial statements for the financial year ending 31 March 2021 (**FY '21 Audit**) delayed the subsequent FY '22 Audit.

30. Under the Credit Agreement, the FY '21 Audit was not required to be delivered to the Lenders by a specific deadline. It was common understanding at the time of entry into the Credit Agreement that the FY '21 Audit would be delayed. This delay was, *inter alia*, due to the time the auditors required to keep track of T&L's rapidly growing business. Further, the auditors were applying considerable scrutiny to T&L given its high profile and because of allegations by one of the lenders called Goldentree that the company had committed fraud. Even so, T&L delivered the FY '21 Audit to the Lenders on 30 August 2022. In fact, the audit report was clean, meaning the allegation was found to be false.

31. The delay in the FY '21 Audit had knock-on effects on the timelines for the FY '22 Audit. The FY '22 Audit could not commence until the FY '21 Audit had been completed, and T&L's business had grown rapidly in the interim. Under Indian law, companies are required to prepare a consolidated financial statement, which includes the financial information of all their subsidiaries and associate companies. Such consolidation of accounts was a time-intensive exercise and resulted in a delay. T&L was also in the process of merging a few of its subsidiaries with and into it, which required clearances from various regulatory authorities. For its part, T&L placed these reasons for delay on record before the Registrar of Companies in India. In fact, the T&L management proposed changing the auditors of the company in order to speed up the completion of the FY '22 Audit; however, this proposal did not receive approval from the company's board of directors at the time.

32. However, on 29 August 2022, in view of the purported delay in provision of the financial statements of T&L for FY '22, the Lenders asserted that T&L breached the Credit Agreement and asked for various documents under the Credit Agreement. In response, I made several presentations before the Lenders, offered to take questions and provided significant disclosures that far exceeded T&L's obligations under the Credit Agreement. Despite this cooperation, the Lenders asserted that events of default had occurred under the Credit Agreement on the ground that the financial information had not been provided. I believe these technical defaults could have been remedied had the Lenders provided T&L with additional time.

33. The chain reaction of the Lenders filing in Delaware led to our three board members, along with the auditor, resigning. BYJU's had to, for the first time ever, lay off its employees because the funds kept drying up month after month. I can endure the destruction of my own ambitions; that burden is mine to bear. Over the last two decades, I have made immense personal sacrifices to build and rebuild BYJU's. However, when the malicious intent of others jeopardises the futures of approximately 85,000 employees, it becomes a pain too profound to accept.

***The Alpha Funds were utilised for a legitimate commercial purpose***

34. The Movants allege that BYJU's' utilisation of the Alpha Funds through two entities – Camshaft and OCI – was not for a legitimate commercial purpose. I explain below how these entities legitimately utilised the Alpha Funds, which did not violate the Credit Agreement in any manner.

*T&L engaged OCI prior to Credit Agreement*

35. OCI is a private company incorporated under the laws of England and Wales. It is engaged in the business of supply chain procurement. In this role, it assists businesses across a variety of sectors with product / material sourcing, logistics, commercial supply and sales contract negotiations.

36. BYJU's was introduced to OCI in and around April 2021. BYJU's availed credit from OCI for its international expansion and business purposes, including marketing expenses, purchase of equipment, etc. To this end, OCI routinely entered into agreements directly with third-party vendors and executed purchases on behalf of BYJU's for a fee. Once the purchases were made, OCI would provide the details of the purchases to BYJU's and specify the timelines within which it had to be reimbursed by BYJU's for the purchases it made on behalf of BYJU's. As security for repayment of the amounts expended by OCI on its behalf, BYJU's would provide bank-guarantee equivalents to OCI, especially in cases where the amounts paid on behalf of BYJU's were high and exceeded a specified threshold. If BYJU's made payments to OCI within agreed timelines, the bank guarantee would be returned to BYJU's. If repayment was not made, OCI had the right to encash the bank guarantee equivalent.

*BYJU's engaged Camshaft and OCI to deploy capital overseas*

37. After the funds under the TLB were provided to the Debtor, BYJU's undertook several strategic acquisitions of companies in various overseas markets, including Epic, Neuron,

GeoGebra, Northwest and Superset. BYJU's was looking for a financially efficient structural solution to procure the goods and services it required. To this end, BYJU's had initially approached reputed financial institutions such as JP Morgan Chase and Mitsubishi UFJ Financial Group (*see Exhibit 9 in relation to the structure proposed with JP Morgan Chase*). However, these discussions took a considerable amount of time and BYJU's was keen to deploy the capital as quickly as possible. At that point, we had strict timelines with respect to our obligations regarding the 2022 FIFA World Cup and were also keen to achieve our expansion plans before the scheduled 2023 IPO. Therefore, in the interest of time, the Debtor entered into an agreement with Camshaft and acquired a limited partnership interest

38.    At the time, OCI had already been providing BYJU's with cash-based solutions on a smaller scale, as stated above. Between November 2021 (i.e., after the Credit Agreement was entered into) and March 2023, OCI provided outsourced procurement services to T&L and its subsidiaries in relation to the procurement of IT equipment, such as electronic tablets, and advertising (including marketing *via* various media). Akin to the structure described above, Camshaft made credit available to OCI under promissory notes pursuant to agreements between Camshaft and OCI.

39.    In order to secure various purchases made by OCI towards media, advertisement and other allied business purposes, OCI had a right of set-off against the Alpha Funds. OCI set-off its outstanding dues against the Alpha Funds as a result of BYJU's' inability to reimburse OCI.

40.    Neither I, nor any of the founders of T&L, has personally received any portion of the Alpha Funds or any of the funds disbursed under the Credit Agreement.

41.    I sincerely hope that this Declaration clarifies that the Alpha Funds were utilised for legitimate commercial purposes, and dispels any notion that I or any of the founding members of BYJU'S siphoned these funds for personal gain.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of October, 2024, in Dubai, United Arab Emirates.

Byju Raveendran

**LIST OF EXHIBITS TO THE DECLARATION OF BYJU RAVEENDRAN IN SUPPORT OF RIJU RAVINDRAN'S OPPOSITION TO THE DEBTOR'S AND GLAS' MOTION**

| Sr. No. | Particulars | Exhibit Reference |
|---------|-------------|-------------------|
| 1. | Slide deck for a SPAC offer from Churchill Capital to BYJU's dated November 2021 | 1 |
| 2. | Slide deck for a SPAC offer from MSD Acquisition Corp. to BYJU's dated December 2021 | 2 |
| 3. | List of original lenders under the Term Loan B | 3 |
| 4. | Undertaking filed by Riju Ravindran before the National Company Law Appellate Tribunal, Chennai, India dated 31 July 2024 | 4 |
| 5. | Undertaking filed by Riju Ravindran before the National Company Law Appellate Tribunal, Chennai, India dated 1 August 2024 | 5 |
| 6. | List of payments made by Riju Ravindran towards the salaries of the employees of BYJU's | 6 |
| 7. | Disclosure Affidavit filed by Byju Raveendran in a Singapore International Arbitration Centre arbitration dated 18 April 2024 | 7 |
| 8. | Supplementary Disclosure Affidavit filed by Byju Raveendran in a Singapore International Arbitration Centre arbitration dated 29 April 2024 | 8 |
| 9. | Proposed structure with JP Morgan Chase | 9 |