## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC. | ) | Case No. 24-10140 (JTD) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| BYJU'S ALPHA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 24-50013 (JTD) |
| | ) | |
| CAMSHAFT CAPITAL FUND, LP, CAMSHAFT | ) | |
| CAPITAL ADVISORS, LLC, CAMSHAFT | ) | |
| CAPITAL MANAGEMENT, LLC, RIJU | ) | |
| RAVINDRAN, INSPILEARN LLC, AND THINK | ) | |
| AND LEARN PRIVATE LIMITED | ) | |
| | ) | |
| Defendants. | ) | **Re: Adv. D.I. 180 and 210** |

## <u>MEMORANDUM OPINION AND ORDER</u>

BYJU's Alpha ("**<u>Debtor</u>**") commenced this action asserting that the Defendants fraudulently transferred over $500 million of the Debtor's assets in an attempt to defraud the Debtor's creditors.[1]  Defendants Camshaft Capital Fund LP ("**<u>Camshaft Fund</u>**"), Camshaft Capital Advisors LLC ("**<u>Camshaft Advisors</u>**"), and Camshaft Capital Management LLC ("**<u>Camshaft Management</u>**") (together with Camshaft Advisors and Camshaft Management, "**<u>Camshaft</u>**") moved to dismiss the Second Amended Complaint ("**<u>Complaint</u>**") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012.[2]  Defendant Think and Learn Private

---

[1] Second Amended Complaint, Adv. D.I. 151.
[2] Camshaft's Motion to Dismiss Second Amended Complaint, Adv. D.I. 180 ("**<u>Camshaft Motion</u>**").

Limited ( "**T&L**") also moved to dismiss pursuant to Rules 12(b)(2) and 12(b)(5) claiming lack

of personal jurisdiction and insufficient service of process.[3]  For the reasons that follow, the

Motions are denied.

## FACTS ALLEGED IN THE COMPLAINT

Debtor is a Delaware corporation formed on September 27, 2021, by its parent company,

T&L.  Debtor was formed as a special purpose financing vehicle and has never had any active

business operations.

Debtor's ultimate parent, T&L, is a private, limited purpose, foreign company existing

under the laws of India.  T&L is also the parent company of Inspilearn LLC ("**Inspilearn**"), a

Delaware limited liability company.

All three companies do business under the tradename "BYJU's," the self-proclaimed

world's largest education technology conglomerate.  The companies were founded by Byju

Ravindreen, who served as the Chief Executive Officer of T&L.  Byju Ravindreen's younger

brother, Riju Ravindran, served as the sole officer and director of the Debtor until March 3, 2023,

and the sole manager of Inspilearn until February 14, 2024.  Riju Ravindran is also a shareholder

and director of T&L.

Debtor was formed to borrow $1.2 billion in five-year term loans in November 2021 (the

"**Term Loan**") from certain lenders (the "**Lenders**") under a Credit and Guaranty Agreement

(the "**Credit Agreement**"), with GLAS Trust Company LLC ("**GLAS**") serving as the Lenders'

agent.

---

[3] T&L's Motion to Dismiss, Adv. D.I. 210 ("**T&L Motion**") (together with the Camshaft Motion, the
"**Motions**").

Shortly after funding, the Debtor began defaulting on its loan obligations. From March to October 2022, the Debtor and its affiliates failed to satisfy three covenants at least four times.[4] The Lenders entered into a temporary waiver and several forbearance agreements to allow the Debtor time to cure the defaults.[5]  At the same time that the Debtor was negotiating with its Lenders to cure its defaults, it was transferring its largest asset to Camshaft, an apparent sham hedge fund.[6]

On April 27-28, 2022—just weeks after the first two defaults occurred, and after entering into the first forbearance agreement with the Lenders—the Debtor made three wire transfers totaling $318,000,000.00 to Camshaft.[7]  The Debtor made three more wire transfers totaling $215,000,100.00 to Camshaft between July 12 and13, 2022.[8]  The total, $533 million (the "**__Alpha Funds__**"), was exchanged for a subscription to a limited partnership interest in Camshaft Fund (the "**__First Transfer__**"). This left the Debtor with approximately $100 million in available funds across its known bank and brokerage accounts, and approximately $1.194 billion in

---

[4] The first default occurred on March 16, 2022, when T&L failed to provide required financial statements. Complaint ¶45. A second default occurred on April 1, 2022, when Whitehat failed to provide a guarantee. *Id.* at ¶46. A third default occurred on September 13, 2023, when T&L failed to provide comparative figures for the Q1 FY 2022-23 period. *Id.*, at ¶47. The fourth default came when T&L again failed to deliver an audited annual financial statement before its September 27, 2022, deadline. *Id.* at ¶48.

[5] *See id.* at ¶88.

[6] The Complaint provides a lengthy and detailed description of the "sham" characteristics of Camshaft. Camshaft Fund was founded in August 2020 by William Morton ("**__Morton__**"). Morton was a 23-year-old with no formal training, experience, or apparent qualifications in investing and money management. *Id.* at ¶¶5, 65. On state and federal regulatory filings, Camshaft Fund listed the address to a Miami IHOP and a non-working telephone number. *Id.* at ¶¶55-64. Based on Camshaft's Form ADV disclosures and the Debtor's bank statements, it appears that approximately 90% of the Fund's assets under management were directly attributable to the Debtor's $533 million transfer. *Id.*, Ex. 4, at 4 and Ex. 5 at 4.

The Complaint further alleges Debtor failed to undertake even basic due diligence prior to investing with Camshaft.  Camshaft never shared any capital account balances, financial statements, investor statements, or other performance updates or reports with the Debtor.  *Id.*, ¶71.  Riju Ravindran stated that he had never heard of Camshaft Fund prior to April 2022 and did not conduct any due diligence on it.  *Id.* Riju Ravindran and Morton never spoke with one another.  *Id.*  Yet T&L directed Riju Ravindran to transfer the Alpha Funds to the high-risk and unproven hedge fund.

[7] Complaint ¶49.

[8] *Id.*

liabilities (the amount outstanding on the Term Loans).[9]  Neither the transfer nor the true amount of cash on hand was disclosed to the Lenders at this time.[10]

The Debtor and the Lenders continued to attempt to reach a negotiated solution through the summer and fall of 2022.  On October 12, 2022, the Debtor and Lenders entered into a second amendment to the Credit Agreement, memorializing that the outstanding defaults would mature into "Events of Default" if not cured by November 24, 2022.

The defaults remained uncured at the end of November, but the Lenders agreed to forbear through December 1, 2022.[11]  When that forbearance expired, the parties entered into a final forbearance agreement in which the Lenders agreed to forbear from exercising remedies until February 10, 2023.[12]  By this time, the Lenders began telling the Debtor that unless progress towards a resolution was made, the Lenders intended to exercise remedies upon expiration of the latest forbearance agreement.[13]

After the final forbearance agreement expired, the Lenders directed their agent, GLAS, to begin exercising remedies.[14] On March 3, 2023, GLAS accelerated all amounts outstanding – over $1.2 billion in principal and outstanding interest and fees – to become due and payable immediately.  That same day, GLAS took control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Timothy R. Pohl ("**Pohl**"), an experienced restructuring professional, as the Debtor's sole director.  At the direction of GLAS, Pohl then appointed himself as the Debtor's sole officer.[15]

---

[9] *Id.* ¶50-51.
[10] *Id.* ¶¶49, 101.
[11] *Id.* ¶¶91-93.
[12] *Id.* Ex. 8, at 3.
[13] Complaint ¶ 7.
[14] *Id.* ¶ 103.
[15] Complaint ¶ 103.

Immediately, T&L's founder and CEO Byju Raveendran reached out to the Lenders, requesting that the parties reengage on a potential resolution. The Lenders were willing to engage, which then prompted several weeks of negotiation. During those negotiations, the Lenders focused on verifying the location of the Debtor's cash.[16]

To that end, on March 16, 2023, T&L posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the representation that the Debtor had the equivalent of well over $500 million in "Cash and Bank" balances as of December 31, 2022.

Unbeknownst to the Lenders, while the negotiations were taking place, Riju Ravindran, under the direction of T&L and with Camshaft's consent and assistance, began to transfer the Debtor's limited partnership interest in Camshaft Fund to Inspilearn. On March 1, 2023, a 100% transfer was processed from the Camshaft Capital Fund Capital Account of the Debtor to Inspilearn LLC (the "**Second Transfer**").[17] The Debtor received no consideration for this transfer.[18] The transfer was finalized on March 31, 2023.[19]

Negotiations broke down and on May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery seeking confirmation that, pursuant to Section 225 of the Delaware General Corporation Law, their exercise of remedies had effectuated their proper control of Debtor.[20]

---

[16] *Id.* ¶ 109.
[17] *Id.* ¶104.
[18] *Id.*
[19] *Id.*
[20] Complaint ¶ 114. *See also GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "**Delaware Action**").

On May 8, 2023, Byju Raveendran told one of the Lenders' advisors that the Debtor no longer had the money and that "the money is someplace the Lenders will never find it."[21]

On May 18, 2023, the Chancery Court issued a Status Quo Order authorizing Pohl to remain in control of the Debtor pending a final case decision and requiring the defendants to provide Pohl with access to and control of the Debtor's open bank and other accounts.

On August 4, 2023, the Chancery Court held a bench trial in the Delaware Action.

On September 5, 2023, GLAS sued Camshaft in Florida state court and moved to expedite discovery to learn the reasons for and circumstances behind the Debtor's transfer of the Alpha Funds, and whether Camshaft still held the funds.  Camshaft opposed discovery and motion practice ensued.

On November 13, 2023, the Chancery Court issued its Final Order and Judgment in the Delaware Action, declaring that GLAS's enforcement steps were valid and effective as to the removal of Riju Ravindran as director and officer of the Debtor and the appointment of Pohl as his replacement.  Pohl promptly began requesting information from Camshaft regarding the Alpha Funds.

On December 4, 2023, Camshaft refused Pohl's requests, noting that the Debtor was no longer a limited partner in the Camshaft Fund.[22]  That same day, Camshaft filed suit against the Debtor in Florida, seeking a declaratory judgment that it would not have to provide any of the requested information or documents to the Debtor.[23]

On February 1, 2024, the Debtor filed its chapter 11 petition in this Court.  On the same day, Riju Ravindran transferred Inspilearn's limited partnership interest in Camshaft Fund to a

---

[21] *Id.* ¶ 115.
[22] *Id.* ¶ 126-127.
[23] *Id.  See Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, Case No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023).

"non-U.S. trust on behalf of Inspilearn," which then redeemed that interest (the "**Third Transfer**").[24]  Riju Ravindran claimed that he caused Inspilearn to effectuate this transfer at the direction of T&L, with Camshaft's assistance and consent.  Camshaft, through its principal, Mr. Morton, refused to appear in this Court and fled the country.

Riju Ravindran's counsel confirmed that his client would refuse to make any disclosures about the whereabouts of the Alpha Funds, arguing "it would likely lead to further unjustified actions by the lenders[.]"[25]

Following the filing of several motions, multiple emergency hearings, a preliminary injunction, the issuance of a bench warrant and ongoing contempt sanctions, both Camshaft and Riju Ravindran eventually began to respond to discovery, revealing the Second and Third Fraudulent transfers.[26]

In response to expedited discovery received from Camshaft and Riju Ravindran, the Debtor filed its First Amended Complaint on February 28, 2024.  Riju Ravindran submitted a declaration on March 5 stating that he had resigned as the manager of Inspilearn on February 14, 2024, and revealed that the Alpha Funds had been transferred again to a "non-U.S. based subsidiary of BYJU's" (the "**Fourth Transfer**").[27]  Riju Ravindran has refused to identify the subsidiary. To date, the Debtor has been unable to identify which T&L subsidiary presently holds the funds.

---

[24] *Id.* at 143-144 Camshaft confirmed the date of this transfer in its discovery responses, but both Camshaft and Ravindran refused to identify the "non-U.S. trust" that received the Alpha Funds on February 1.

[25] *Id.* ¶146.

[26] *See id.* ¶¶ 141-51.  Though much of the turbulent history of this case is not discussed in the Complaint, it certainly informs my analysis. This history is captured in the transcripts of the many hearings that have occurred to date are available on the dockets of both the main bankruptcy case and this adversary proceeding.

[27] *Id.* at ¶149.

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## DISCUSSION

### I.    T&L's Motion to Dismiss

#### A.  Insufficient Service of Process – Rule 12(b)(5)

##### 1.  *Legal Standard*

A defendant may move to dismiss pursuant to Rule 12(b)(5) when a plaintiff fails to properly serve him with the summons and complaint.  Federal Rule of Civil Procedure 12(b)(5) "requires the Court to dismiss any case in which service of process was insufficient." *Hardwire, LLC v. Zero Int'l, Inc.*, 2014 U.S. Dis. LEXIS 146364 at *46-47 (D. Del. Oct. 14, 2024). "In resolving a motion under Rule 12(b)(5), the party making service has the burden of demonstrating its validity when an objection to service is made." *Chow v. Canyon Bridge Cap. Partners, LLC*, 2024 U.S. Dist. LEXIS 129424, at *11-12 (D. Del. July 22, 2024); *see also Grand Entm't Grp., Ltd. V. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993). Service in an adversary proceeding is governed by Federal Rules of Civil Procedure Rule 4(h), made applicable by Federal Rule of Bankruptcy Procedure 7004.

##### 2.  *Analysis*

Debtor served T&L by serving T&L's subsidiary, Inspilearn on the grounds that the two entities are so closely related that Inspilearn is effectively T&L's alter ego.[28]  Debtor effectuated

---

[28] *See* Summons and Notice of Pretrial Conference ("**Summons**"), Adv. D.I. 152; *see also* Affidavit of Corporate Service, Adv. D.I. 160 and Debtor's Brief in Opposition to T&L's Motion, Adv. D.I. 268 at 7.

service in four ways: (1) personal service; (2) first-class mail; (3) email directed to T&L's current counsel and board members; and (4) mail to T&L's registered address in India.[29]

T&L does not contest that this service occurred. Rather, it disputes that any of these methods of service is sufficient to satisfy both the 1965 Hauge Convention on Service Abroad (the "**Hague Convention**") and Federal Rule of Civil Procedure 4(h).[30]  Specifically, T&L argues that under the Hague Convention, the Debtor was required to serve T&L in India, and that domestic service upon T&L's Delaware subsidiary Inspilearn was insufficient "substitute service" to satisfy Rule 4(h)(1) because Inspilearn is not a general agent of T&L.[31]

Both the United States and India are parties to the Hauge Convention.[32]  Where the Hague Convention applies, a U.S. litigant who serves an Indian party internationally pursuant to Federal Rule of Civil Procedure Rule 4(h)(2) must do so by one of the service methods specifically authorized therein. The primary means of accomplishing service under the Hague Convention is by depositing the summons and complaint with the receiving country's "Central Authority" designated to receive requests for service of documents from other countries.[33]

---

[29] *See id.*; Complaint, Ex. 1, at § 10.1.

[30] In a bankruptcy adversary proceeding, service of process is governed by Bankruptcy Rule 7004, which incorporates the methods authorized by FRCP 4(e)-(j).  *See* Fed. R. Bankr. P. 7004(a).

[31] T&L's Memorandum of Law in Support of Motion to Dismiss, Adv. D.I. 211, at 10-11.

[32] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Status Table, November 15, 1965, 20 U.S.T. 361, (available at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17).

[33] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Art 2, November 15, 1965, 20 U.S.T. 361. Additional methods of service are permissible under Article 10, provided the receiving country has not objected to them. *Id.* at Art. 10. India has objected to alternative service methods and "instead require[s] foreign plaintiffs to effect service through the Central Authority of India." *Merial Ltd. V. CIPLA*, 681 F.3d 1283, 129 (Fed. Cir. 2012).  Debtor concedes that it did not transmit the summons and complaint to the India's designated central authority, the Ministry of Law and Justice. The certificate of service indicates copies of the summons and Complaint were sent by first class mail and email to T&L. *See* Summons, at 2.

Service in accordance with the Hague Convention is only mandatory in the cases in which the Hague Convention applies. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988). If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Convention applies. *Id.* However, the Hague Convention does not apply in cases where service on a domestic agent is valid and complete under both state law and the Due Process Clause of the Fourteenth Amendment. *Id.* at 697, 707 (affirming lower court ruling that under state law service on a foreign defendant could be effectuated through its domestic subsidiary where the parent and the subsidiary are "so closely related that [the subsidiary] is [the parent]'s agent for service of process as a matter of law"). The question, then, is whether Delaware law permits service on a foreign defendant through its domestic subsidiary.

Under Delaware law, "[s]ervice on a subsidiary does not confer jurisdiction over the parent where separate corporate identities are maintained, unless the subsidiary is found to be either the alter ego or the agent of the parent." *Akzona, Inc. v. E. I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984) (internal citations omitted). "In order to find that a subsidiary is the alter ego or instrumentality of the parent, the Plaintiff must prove control by the parent to such a degree that the subsidiary has become its mere instrumentality." *Id.* (internal quotation and citation omitted). "Whether a subsidiary is the agent of the parent involves a determination that the separate corporate identities of the subsidiary and parent are a fiction and that the subsidiary is, in fact, being operated as a department of the parent." *Id.* "The parent must have actual, participatory and total control of the subsidiary." *Id.*[34]

---

[34] Courts have acknowledged in subsequent opinions that the standard applied by the *Akzona* court is more akin to the alter ego standard rather than the standard applicable for determining the existence of an agency relationship. See *British Telecoms. PLC v. IAC/InteractiveCorp*, 356 F. Supp. 3d 405, 412 (D. Del. 2019) ("The analysis conducted in Akzona has been recognized by subsequent courts in this district

T&L argues that the Debtor has not alleged sufficient facts to satisfy this standard here and notes that T&L never appointed Inspilearn as its managing agent, general agent, or otherwise designated it to receive process on its behalf.  But as *Schlunk* makes clear, service is permissible on a domestic subsidiary that operates as an agent by law "notwithstanding [the parent]'s failure or refusal to appoint [the subsidiary] formally as an agent." *Schlunk*, 486 U.S., at 697.

Debtor has included myriad allegations that, if true, would support the conclusion that T&L has "actual, participatory, and total control" over Inspilearn.  These include that:

- T&L employed only a single person -- Riju Ravindran, the brother of T&L founder Byju Raveendran – at both Debtor and Inspilearn, which were both non-operating companies with no business and no other advisors

- T&L controlled all corporate functions of Debtor and Inspilearn and neither subsidiary maintained its own books and records

- T&L made all decisions on behalf of the Debtor and Inspilearn, as evidenced by Riju Ravindran's testimony that as sole officer of the Debtor and Inspilearn he did not "ever make a decision for [himself] over BYJU's Alpha" – "[i]t was always with the parent"

- T&L directed Riju Ravindran to transfer funds from Debtor to Inspilearn and then to its non-US offshore trust [35]

- T&L's founder, CEO, and director, Byju Raveendran, admitted to directing the movement of money from the Debtor to "protect the money"

---

(either explicitly or implicitly) as being more akin to an alter ego analysis than to a conventional agency analysis. *See Upjohn Co. v. Syntro Corp.*, No. CIV. A. 89-107, 1990 U.S. Dist. LEXIS 11512, 1990 WL 79232, at *4 (D. Del. Mar. 9, 1990) (stating that the court in *Akzona* "concluded that the record was insufficient to support a finding that the subsidiary was the alter ago of the parent"); *Sears, Roebuck & Co. v. Sears*, 744 F. Supp. 1297, 1305-06 (D. Del. 1990) (finding that "[t]he Court in *Akzona* . . . did not distinguish the agency and alter-ego theories[;] [h]owever, it did find that absent *total* control of the subsidiary . . . the presence of the subsidiary could not be imputed to the parent for jurisdictional purposes")). However, because (1) the parties both relied on *Akzona*; (2) the parties here made no attempt to discuss what is required under Delaware law to establish an agency, instead relying on either cases discussing the agency law of other states or Delaware alter ego law, and (3) because I find the evidence satisfies the higher burden of establishing alter ego, I find *Akzona* to be instructive here.
[35] Complaint ¶ 27-28.

from the Lenders, stating that he hid the money "someplace the Lenders will never find it"[36]

In essence, the Debtor alleges that T&L and Inspilearn were operating, in all respects, as a single entity at the complete direction and control of T&L's founder Byju Raveendran. These facts, if proven, would support the conclusion that Inspilearn is T&L's alter ego. As such, service on Inspilearn, meets the requirements of Delaware law.

For these reasons, T&L's Motion pursuant to Rule 12(b)(5) for insufficient service of process is denied.

### B. Lack of Personal Jurisdiction – Rule 12(b)(2)

T&L also moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) on the ground that this Court lacks personal jurisdiction.

### 1. *Applicable Standard*

Federal Rule of Civil Procedure 12(b)(2) provides that a defendant may move to dismiss an action for lack of personal jurisdiction. Fed. R. Civ. Proc. 12. Under Bankruptcy Rule 7004, a court has personal jurisdiction over a defendant if three requirements are met:

> (1) service of process has been made in accordance with Bankruptcy Rule 7004 or Civil Rule 4; (2) the court has subject matter jurisdiction under section 1334 of the [Judicial] Code [28 U.S.C. § 1334]; and (3) exercise of jurisdiction is consistent with the Constitution and the laws of the United States.

*Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 121 (Bankr. D. Del. 2009) (internal citations omitted). As discussed above, I find that service of process was made in accordance with the Rules and thus, the first requirement is satisfied. T&L does not dispute that the second requirement, subject matter jurisdiction, is satisfied, but does argue that the third requirement has not been met.

---

[36] *Id.* ¶ 203.

To satisfy constitutional due process, a defendant must have "purposefully established 'minimum contacts' in the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice,'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). The minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation, *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), such that the defendant has fair warning it may be subject to suit in that forum. *Marten*, 499 F.3d at 296.  A foreign corporation is entitled to due process-based personal jurisdiction protections to the same extent as a United States citizen. *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F. 4th 226, 223 (5th Cir. 2022).

A federal court must have one of two forms of personal jurisdiction to comport with these principles: either general jurisdiction or specific jurisdiction. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984)).[37] Specific jurisdiction exists when the cause of action arises from the defendant's forum related activities. *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016). "In contrast, general jurisdiction does not require [the d]efendant's connections be related to the particular cause of action, but that [d]efendants have continuous or systematic contacts with the forum state." *Gurmessa v. Genocide Prevention in Eth., Inc.*, Civ. Action No.  21-869-RGA, 2023 U.S. Dist. LEXIS 54563, at *4-5 (D. Del. Mar. 29, 2023).  In bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general, not the state in which the bankruptcy court sits. See *Zazzali v. Swenson*

---

[37] Because the bankruptcy rules provide the statutory basis for personal jurisdiction, "the Court need not look to the Delaware long arm-statute, or the case law interpreting it, to determine whether it has personal jurisdiction." *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 317 (Bankr. D. Del. 2005).

*(In re DBSI, Inc.)*, 451 B.R. 373, 376 (Bankr. D. Del. 2011) ("'Where Congress has spoken by authorizing nationwide service of process, . . . the jurisdiction of a federal court need not be confined by the defendant's contact with the state in which the federal court sits.'") (quoting *Pinker,* 292 F.3d at 369) (alteration in original); Fed. R. Bankr. P. 7004(d).

T&L raises three arguments related to personal jurisdiction: (1) that the Court lacks general personal jurisdiction over T&L because it is a foreign entity with no business operations in the United States; (2) that the Court lacks specific jurisdiction over T&L because the contacts relied upon by Debtor are not T&L's contacts, but are contacts of Inspilearn and Ravindran; and (3) that even if minimum contacts were established, an exercise of personal jurisdiction over T&L would be unreasonable.

Debtor responds that this Court could exercise either general or specific jurisdiction over T&L.  General jurisdiction exists, Debtor argues, because the Court has jurisdiction over T&L's subsidiary Inspilearn, which is T&L's alter ego.  Specific jurisdiction exists, according to Debtor, because T&L's creation of U.S. entities for the purpose of engaging in business in the U.S., which business is now the subject of this litigation, amounts to conduct purposefully directed at this forum.

In resolving a motion under Rule 12(b)(2), the plaintiff "bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over the movant." *Id.* citing *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F. Supp. 2d 268, 270-71 (D. Del. 2001). "To meet this burden, the plaintiff must offer facts which 'establish with reasonable particularity' that jurisdiction exists." *Id.*   In considering a Rule 12(b)(2) motion, the Court is not limited to the pleadings, but may consider affidavits submitted by the defendant.  *Id.*; *see also Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 142 fn. 1 (3d Cir. 1992); *Capmark Fin.*

*Grp. Inc. v. Lin (In re Capmark Fin. Grp. Inc.)*, 479 B.R. 330, 338 (Bankr. D. Del. 2012).  "Once

a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of

establishing personal jurisdiction by a preponderance of the evidence."  *Id.*

       2.  *Analysis*

Debtor seeks to establish jurisdiction over T&L through its subsidiary Inspilearn using

the alter ego theory of general personal jurisdiction, "which instructs that, if a subsidiary is

merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the

subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction

(whether general or specific) exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885

F.3d 760, 781 (3d Cir. 2018) (internal citations omitted).  *See also Adtile Techs. v. Perion

Network Ltd.*, 192 F. Supp. 3d 515, 522 (D. Del. 2016) (noting that a parent company may be

subject to personal jurisdiction based on the contacts of its subsidiary under either an agency

theory or alter ego theory).

As discussed above, the Debtor has put forth sufficient allegations to support the

conclusion that Inspilearn is T&L's alter ego.  Additionally, T&L does not dispute that this Court

has personal jurisdiction over Inspilearn, an entity formed under the laws of Delaware.

Accordingly, a finding of jurisdiction pursuant to the theory set forth in *Shuker* appears to be

straightforward.

T&L, however, questions whether *Shuker* remains good law in light of the Supreme

Court's ruling in *Daimler AG v. Bauman*, 571 U.S. 117, 136-37 (2014).  Though *Daimler*

predates *Shuker*, T&L argues that the decisions *Shuker* relies upon in its ruling were all decided

before *Daimler*, in which the Supreme Court held that general jurisdiction over a corporation

only comports with the constitutional limits of due process when the forum is one in which the

corporation is "fairly regarded as at home." *Id.* In support of this argument, T&L cites to

*Rickman v. BMW of N. Am. LLC*, in which the Court stated that:

> [*Shuker's*] view is hard to square with *Daimler*, which disfavored an agency approach for imputing contacts for the purpose of general jurisdiction. *See* 571 U.S. at 135-36. Indeed, multiple courts have interpreted *Daimler* as having "voided [an] agency approach for imputing contacts for the purpose of general jurisdiction." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017); *see also E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 298 n.2 (5th Cir. 2020); *Shujauddin v. Berger Bldg. Prods., Inc.*, Civ. No. 19-876, 2019 U.S. Dist. LEXIS 231997, 2019 WL 9102043, at *1 n.2 (E.D. Pa. June 18, 2019).

*Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 437 (D.N.J. 2021). But as the *Rickman*

Court goes on to state:

> The door remains open, however, as to specific jurisdiction. *Daimler* acknowledged that corporate relationships "may be relevant to the existence of *specific* jurisdiction." 571 U.S. at 135 n.13. Picking up from there, courts have held that corporate relationships can be used to show that the parent purposefully availed itself of the subsidiary's forum. *E. Concrete*, 948 F.3d at 298 & n.3; *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 531-32 (5th Cir. 2014); *see Cunningham v. Cap. Advance Sols., LLC*, Civ. No. 17-13050, 2018 U.S. Dist. LEXIS 197590, 2018 WL 6061405, at *9 (D.N.J. Nov. 20, 2018).

*Id.* at 436-38. Thus, assuming, *arguendo*, that T&L is correct about the strength of *Shuker*, the

Debtor could still establish that specific jurisdiction exists over T&L by establishing that T&L

has (1) purposefully directed its activities at the forum; (2) the litigation arises out of or relates to

at least one of those activities; and (3) the exercise of jurisdiction otherwise comport[s] with fair

play and substantial justice. *Weiser Law Firm, P.C. v. Hartleib*, No. 23-1889, 2024 U.S. App.

LEXIS 32691, at *6-7 (3d Cir. Dec. 26, 2024) (stating the requirements for specific jurisdiction).

To that end, the Debtor argues that the Complaint alleges the following facts relating to

T&L's activities within the forum:

- T&L created the Debtor, a Delaware corporation with its principal place of business in the State of Illinois.[38]

---

[38] Complaint ¶ 32.

- T&L created Inspilearn, a wholly owned subsidiary which is a Delaware limited liability company.[39]

- T&L created and used the Debtor, a special purpose financing vehicle, as the borrower under a Credit and Guaranty Agreement for the Term Loan.[40]

- T&L served as a guarantor for the Term Loan.[41]

- T&L offered three of its Delaware subsidiaries as guarantors for the Term Loan.[42]

- T&L engaged two U.S. banks as Joint Lead Arrangers and Joint Bookrunners for its efforts of borrowing money primarily from the U.S. capital market.[43]

- T&L submitted itself to the jurisdiction of the U.S. District Court for the Southern District of New York in "any action or proceeding arising out of or relating to" the Credit Agreement.[44]

- T&L instructed the Debtor, through Ravindran as sole director, to transfer over $533 million of the loan proceeds to Camshaft Fund in exchange for the LP Interest.[45]

- T&L instructed Ravindran to transfer the LP Interest to Inspilearn after Ravindran had been removed as director and officer of the Debtor.[46]

- The transfer agreement was governed by U.S. law.[47]

- On the date of the Petition, T&L instructed Ravindran, as manager of Inspilearn, to transfer the LP Interest to an offshore, Dubai-based entity.[48]

T&L does not dispute that these actions demonstrate that it purposefully directed its activities at the forum or that the litigation "arises out of" or "relates to" these contacts. Instead, T&L simply

---

[39] *Id.* ¶ 36.
[40] *Id.* ¶38.
[41] *Id.*
[42] *Id.*
[43] *Id.,* Ex. 1, at 2.
[44] Complaint, Ex. 1, at §10.9(c).
[45] *Id.* ¶¶49, 152-54.
[46] *Id.* ¶104-06.
[47] Debtor's Opposition to T&L's Motion, Adv. D.I. 268, Ex. 9.
[48] *Id.* ¶143.

reiterates its objection to Debtor's reliance on actions taken by Inspilearn or Ravindran, asserting that T&L did not appoint either as its agent. But no finding regarding agency needed. As discussed above, Debtor has alleged sufficient facts to suggest that Inspilearn was T&L's alter ego. I therefore find that both the first and second elements of the specific jurisdiction test are satisfied.

T&L contends that the final requirement of the specific jurisdiction test is not satisfied, arguing that even if the requisite minimum contacts exist, the Court should refrain from exercising specific jurisdiction here because it is unreasonable and does not comport with traditional notions of fair play and substantial justice. The exercise of personal jurisdiction must be "reasonable under the circumstances of the particular case." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

Where the plaintiff makes a *prima facie* showing of minimum contacts, the burden then shifts to defendants to "'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 321 (Bankr. D. Del. 2005) (quoting *Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993)). "The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy." *Id.* In deciding whether a defendant has met this burden, courts consider the following factors: (1) the burden on defendants of litigating in the United States; (2) the interest of the United States in adjudicating the dispute; (3) the plaintiff's interest in obtaining the relief sought; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.*

T&L argues that requiring it to defend this action in Delaware would impose an exorbitant and unreasonable financial burden on T&L because all of its witnesses are located in India or Dubai and it is already being forced to expend millions of dollars litigating with the Debtor in state court in Delaware and New York, as well as litigating with GLAS in the action it commenced against T&L in India.  I am not persuaded.

While T&L has perhaps established that litigating in the United States is an inconvenience, it has not demonstrated that the exercise of jurisdiction over it would be unreasonable.  "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987).  Considering the extensive allegations in the Complaint suggesting T&L's use of a U.S. subsidiary to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.

T&L's Motion to dismiss based on lack of personal jurisdiction is therefore denied.

## II.    Camshaft's Motion to Dismiss – Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) serves to test the sufficiency of the complaint, and a court's role is to determine whether the plaintiff is entitled to offer evidence in support of its claims.  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000); *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). To survive a motion to dismiss, a plaintiff must allege well-pleaded facts with sufficient detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Third Circuit has adopted a two-part analysis that courts must employ when deciding a motion to dismiss for failure to state a claim. *Fowler*, 578 F.3d at 210. "First, the factual and legal elements of a claim should be separated" with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions." *Id*. at 210-11. Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679); *Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, Nos. 09-11582 & 11-53885, 2012 WL 5360945, at *3 (Bankr. D. Del. Oct. 31, 2012). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 679. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)). This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**A. Initial Transferee Status – Section 550**

Camshaft first argues it is not a proper defendant to the Debtor's fraudulent transfer claims (Counts I through III of the Complaint), pursuant to Section 550 of the Bankruptcy Code.

Section 550 provides that the trustee may only recover an avoided fraudulent transfer from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). The term "initial transferee" is not defined in the Bankruptcy Code, but courts in the Third

Circuit have adopted the "dominion and control" or "conduit" test as a "defense to avoidance . . .

for those entities which are 'mere conduits' of the avoided transfers." *In re Parcel Consultants*,

287 B.R. 41, 46-47 (Bankr. D.N.J. 1992).

Camshaft argues that none of the Camshaft defendants qualifies as an initial transferee

with respect to the Transfers.  Specifically, it argues that there is nothing in the Complaint that

would support the conclusion that (1) Camshaft Fund was anything more than a "mere conduit;"

and (2) Camshaft Advisors and Camshaft Management ever had possession of the transferred

funds at all.  Debtor responds that the "mere conduit" defense is an affirmative defense that

cannot properly be considered on a 12(b)(6) motion to dismiss.

"As a general matter, a motion to dismiss measures the allegations set forth in the

complaint against the elements of a plaintiff's *prima facie* case. The availability of a potential

affirmative defense is not generally cognizable on a motion to dismiss."  *Miller v. Nelson (In re

Art Inst. of Phila. LLC)*, Nos. 18-11535 (CTG), 20-50627 (CTG), 2022 Bankr. LEXIS 68, at *20

(Bankr. D. Del. Jan. 12, 2022).  "There is an exception to that principle, however, for cases in

which the availability of the affirmative defense is apparent based on the plaintiff's own factual

allegations."  *Id.*  Camshaft argues this case falls within this exception and that the mere conduit

defense is clear from the face of the Complaint because the Complaint fails to allege that

Camshaft had dominion and control over the funds at issue.  I disagree.

Camshaft misunderstands the pleading burdens.  "To be a 'mere conduit,' a <u>defendant</u>

must establish that it lacked dominion and control over the transfer because the payment simply

passed through its hands and it had no power to redirect the funds to its own use."  *In re Lenox

Healthcare, Inc.*, 343 B.R. 96, 103 (Bankr. D. Del. 2006) (internal quotation and citations

omitted) (emphasis added).  Thus, a <u>plaintiff</u> has no obligation to plead anything about dominion

and control and its failure to do so typically will not prove the affirmative defense.  It is only where a plaintiff includes allegations in its complaint that are incompatible with the conclusion that a defendant had dominion and control – for example, that the defendant was obligated to use the funds received for a third party – then the defense would be established on the face of the complaint.  This is not what occurred here.

Here, the Debtor has not included any allegations that would contradict the conclusion that Camshaft had dominion and control over the Alpha Funds.  Camshaft points to the Debtor's allegations that the Alpha Funds were listed as "Cash and Bank" on Debtor's 2022 financial reports as evidence that the Debtor, and not Camshaft, always maintained control of the funds.  But when the context is considered, it is clear that the intended purpose of those allegations is simply to convey the lengths to which defendants went to conceal that the funds had been moved away from the Debtor.  Read in its entirety, the Complaint here does not allege facts that establish that Camshaft was a mere conduit.

Camshaft also argues that Camshaft Advisors and Camshaft Management were not initial transferees because there are no allegations in the Complaint that the Debtor made the initial transfer of the Alpha Funds to either entity.  Debtor responds that because the Complaint alleges that all the Camshaft entities were created by and are under the complete control of their founder Mr. Morton, it is reasonable to infer that all the entities may have possessed the requisite dominion and control to be considered initial transferees.  I agree.

The facts of this case are quite unique.  As noted above, Debtor has made extensive factual allegations in support of its assertion that the Camshaft entities are a sham.  While the precise details regarding the involvement of Camshaft Management and Camshaft Advisors are unclear at this stage of the case, there is more than enough support for the conclusion that those

entities, like Camshaft Fund, were simply a tool for their founder, Mr. Morton, to perpetrate a

fraud.  Thus, unlike a case in which no allegations regarding gross misuse of the corporate form

in this manner have been made, Camshaft Management and Camshaft Advisors are, at this stage

of the case, proper defendants.[49]

### B.  Actual Fraudulent Transfer (Count I)

Count I of the Complaint asserts a claim for actual fraudulent transfer under Sections

544(b) and 548(a)(1)(A) of the Bankruptcy Code and applicable state law (Fla. Stat. §

725.105(a)(a) and 6 Del. C. § 1304(a)(1)) for all four of the Transfers.[50]  Camshaft has moved to

dismiss Count I on the grounds that the Debtor cannot establish fraudulent intent as a matter of

law.

To state a claim for actual fraudulent transfer, the plaintiff must allege that there was a

transfer of an interest in debtor's property made with an actual intent to hinder, delay, or defraud

its creditors. 11 U.S.C. § 548(a)(1)(A). "For an actual fraudulent transfer claim to survive a

motion to dismiss, the plaintiff must allege facts that, taken as true, establish direct or

circumstantial evidence of intent to defraud." *Friedman v. Wellspring Capital Mgmt., LLC (In re*

*SportCo Holdings, Inc.)*, Nos. 19-11299, 20-50554 (JKS), 2021 Bankr. LEXIS 2848, at *33

(Bankr. D. Del. Oct. 14, 2021). In the absence of direct evidence, claimants may rely on "'badges

of fraud' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence

gives rise to an inference of intent." *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent*

*Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021).   The badges of fraud that courts often

---

[49] *But see*, *Opioid Master Tr. II v. Argos Cap. Appreciation Master Fund LP (In re Mallinckrodt PLC)*,
Nos. 20-12522 (JTD), 22-50435 (JTD), 2024 Bankr. LEXIS 2058 (Bankr. D. Del. Sep. 5, 2024)
 (dismissing investment managers on motion for summary judgment where evidence showed that they
never had possession of the funds and, at best, had "broad powers of authority" over the funds they
managed).

[50] Complaint ¶ 156.

consider include: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).[51]  "The presence or absence of any single badge of fraud is not conclusive," and "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (internal citations omitted).  Moreover, while the existence of a single badge of fraud "may cast suspicion of the transferor's intent," *In re Fedders* 11 *N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009), "a confluence of several badges of fraud in one transaction [ ] generally provides conclusive evidence of an actual intent to defraud." *Merrill Lynch Business Fin. Srvs., Inc. v. Kupperman*, 441 F. App'x 938, 941 (3d Cir. 2011) (citations omitted).

Here, Debtor asserts that it has pled fraudulent intent through both circumstantial and direct evidence.  As direct evidence of intent, Debtor points to its allegations that the Debtor's founder, Byju Raveendran, informed counsel for the Lenders that "the money is someplace the lenders will never find it."[52]  As circumstantial evidence of intent, Debtor asserts it has pled facts sufficient to support the conclusion that at least six badges of fraud were present.  Specifically, Debtor has alleged that:

---

[51] States that have enacted the Uniform Fraudulent Transfers Act, including Delaware and Florida, have codified the badges of fraud.  *See* 6 *Del. C.* § 1304(b) (codifying the "badges of fraud"); Fla. Stat. § 726.105(2) (same).

[52] *Id.* ¶¶ 10, 115.

- The transfers to Camshaft Fund were concealed from the Lenders;

- The transfers were of substantially all of the Debtor's assets—over 80% of its liquid assets;

- The assets were (and continue to be) concealed;

- The Debtor received less than reasonably equivalent value – having received only an interest in a sham hedge fund in exchange for $533 million cash and then nothing in exchange for that interest with respect to the later transfers;

- The Debtor became insolvent as a result of the Transfers --having over $1.2 billion in liabilities against less than a tenth of that amount in assets;

- The Debtor made the Transfers shortly after incurring substantial debt – the First Transfer was made a mere six months after the Debtor incurred the $1.2 billion term loan. Then, after conceding that four Events of Default had occurred and within three weeks of the forbearance agreement expiring—at which point their loan would be called and GLAS would take control—the Debtor carried out the Second Transfer to Inspilearn;

- Ravindran and T&L continue to control the Alpha Funds through T&L's unidentified non-U.S. based subsidiary;

- The Defendants have gone to extreme and prolonged lengths to conceal and misrepresent critical details about the transfers, even finding themselves in contempt of court for refusing to disclose the location of the funds.[53]

Camshaft nevertheless argues that the Debtor cannot establish fraudulent intent as a matter of law for two reasons: (1) the Transfers were not prohibited under the Credit Agreement; and (2) the "undisputed facts" in the record negate any inference of improper intent.  Camshaft is wrong on both points.

Camshaft first argues that the Debtor's allegations of fraudulent intent are insufficient as a matter of law because the initial transfer was completely consistent with the corporate purpose of the Debtor and the terms of the Credit Agreement.  Specifically, Camshaft argues that the Credit Agreement expressly contemplates the use of the Loan proceeds for investment purposes

---

[53] Complaint ¶ 158.

and does not include any restriction on investment vehicles such as hedge funds like Camshaft, even though it does forbid other types of investments. Because the Transfers aligned with the parties' expectations, Camshaft asserts, the circumstances surrounding the Transfers cannot be used to establish fraudulent intent. I disagree.

As a threshold matter, the issue Camshaft raises – whether the Transfers were of the kind contemplated by the Credit Agreement – is one of fact. Much of the Complaint includes allegations that directly contradict Camshaft's assertion that the Transfers made were of the type contemplated by the parties when they entered into the Loan. *See, e.g.*, Complaint ¶¶ 52-71, 78-81 (alleging that the Debtor transferred virtually all of its assets to a "sham hedge fund" without conducting any due diligence); *id.* ¶¶ 80-81 (alleging the partnership interests received were illiquid and not the type of investment (cash equivalent or marketable securities) contemplated under the Credit Agreement). At this stage of the case, I must accept these well-pled allegations as true.

But even assuming that was not the case, Camshaft is also incorrect about the law. "A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties." *In re EBC I Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006). The fact that the Credit Agreement contemplates investments does not preclude a claim for fraudulent transfer. *See In re Pinto*, 89 B.R. 486, 497-98 (Bankr. E.D. Pa. 1988) ("Any *otherwise legal* transfer may be avoided under § 548 if the requirements of that section are otherwise met[.]"). Consequently, even if it could be determined from the face of the Credit Agreement that the Transfers were consistent with its terms, that would not preclude the Debtor from asserting this claim.

Camshaft next argues that the "undisputed facts" negate Debtor's allegations of fraudulent intent, pointing to various ambiguities, contradictions, or discrepancies in the record

with respect to specific allegations.  *See, e.g.*, Camshaft's Brief at 4 (arguing that it is "obvious"

that Mr. Raveendran's statements about the location of the money, "if they were in fact made,"

referred to the Second Transfer, not the First Transfer).  But despite Camshaft's characterization

to the contrary, these facts have not yet been fully developed and are, in this nascent form,

subject to multiple interpretations.  Such facts cannot be resolved on a motion to dismiss.  *See*

*Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) ("On a motion to dismiss, a court must

"accept all factual allegations in the complaint as true and view them in the light most

favorable to the plaintiff.") (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d

Cir. 2008)).

　　　　For these reasons Camshaft's Motion is denied with respect to Count I.

## C.  Constructive Fraudulent Transfer (Counts II and III)

　　　　In Counts II and III of the Complaint, the Debtor asserts claims for constructive

fraudulent transfer pursuant to Sections 544(b) and 548 (a)(1)(B) of the Bankruptcy Code and

applicable state law (*e.g.*, Fla. Stat. §§726,105(1)(b) and 726.106(1), 6 Del. C. §§ 1304(a)(2) and

1305(a)).  Count II addresses the four Transfers and Count III addresses the fees collected by

Camshaft Management and Camshaft Advisors (the "**Fees**").

　　　　"This Court evaluates claims of constructive fraud under the notice pleading standard of

Fed. R. Civ. Pro. 8(a)(2)."  *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA*

*Publ'g, LLC)*, 602 B.R. 256, 266 (Bankr. D. Del. 2019).  "At the motion to dismiss stage, to

plead adequately a constructive fraud claim all that is needed is an allegation that there was a

transfer for less than reasonably equivalent value at a time when the Debtors were insolvent."  *Id.*

(alterations omitted).

1.  *Exculpation and Indemnification*

Camshaft first moves to dismiss both counts on the grounds that exculpation and

indemnification provisions in the parties' Second Amended and Restated Limited Partnership

Agreement ("**LPA**") act as a bar to all claims against Camshaft that do not involve bad faith,

intentional misconduct, or gross negligence.  As constructive fraudulent transfer claims have no

scienter element, Camshaft argues, they do not constitute the kind of misconduct that would

vitiate an exculpation provision.

While I am not convinced that it would be appropriate to consider the LPA at all at this

stage of the case,[54] even if I were to do so, it would not help Camshaft.  As the Debtor notes, a

pre-petition debtor does not have the capacity to waive fraudulent transfer claims asserted by a

trustee or debtor in possession under the Bankruptcy Code.  As this Court has explained in *PAH*

*Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*,

> Post-petition avoidance actions "can only be brought by the trustee after the
> petition is filed . . . and the [pre-petition debtor] does not own the right to pursue
> a fraudulent transfer claim in bankruptcy." *Official Comm. of Unsecured*
> *Creditors v. UMB Bank (In re Residential Capital, LLC)*, 497 B.R. 403, 414
> (Bankr. S.D.N.Y. 2013). It follows that the pre-petition debtor may not waive such
> claims either. The avoidance powers under the Code are within the unique
> purview of the trustee, and courts have noted that "prior to bankruptcy a debtor
> may not waive bankruptcy rights that inure to the benefit of unsecured creditors
> not a party to that waiver." *Minnesota Corn Processors, Inc. v. American*
> *Sweeteners, Inc. (In re American Sweeteners Inc.)*, 248 B.R. 271, 276 (Bankr.
> E.D. Pa. 2000).

2016 Bankr. LEXIS 2810, at *53-54 (Bankr. D. Del. June 20, 2016).  Accordingly, even assuming,

*arguendo*, that the exculpation provision did operate as a bar to a constructive fraudulent transfer

---

[54] Debtor argues that the LPA should not be considered because it is outside the scope of the Complaint.
Debtor further argues that Camshaft should be precluded from relying on the LPA now because it refused
to produce it in discovery.  While I am inclined to agree with the Debtor, particularly on the latter issue, I
need not decide the issue because, as noted above, the LPA is irrelevant.

claim in another context, it does not serve as a bar to the claim asserted here.  The case cited by

Camshaft in support of its argument does not alter this conclusion.  *See O'Toole v. McTaggart (In*

*re Trinsum Grp., Inc.)*, 466 B.R. 596, 618 (Bankr. S.D.N.Y. 2012) (noting, with respect to a

breach of fiduciary duty claim, that allegations that a director authorized a constructive fraudulent

transfer would not be enough to avoid an otherwise valid exculpation provision because "with

respect to misconduct or violations of the law, it is only when there has been 'intentional

misconduct or a knowing violation of law' that the exculpation provision does not protect a

director from personal liability.").

## 2.  *Reasonably equivalent value*

Camshaft next moves to dismiss the constructive fraudulent transfer claims on the basis

that the Debtor has not adequately alleged a lack of reasonably equivalent value.

"[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly

what it gave.'" *VFB LLC v. Campbell Soup. Co.*, 482 F.3d 624, 631 (3d Cir. 2008); *Walker v.*

*Sonafî Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010). To sufficiently plead

a lack of reasonably equivalent value, a plaintiff must present some information about the value

the debtor received in exchange for the transfer. Courts conduct a two-part inquiry to evaluate

whether the debtor received reasonably equivalent value: (i) "whether the debtor received any

value [for the transfer] at all," and (ii) if so, whether that value was "reasonably equivalent" to

the value of the transfer.  *Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L.,*

*Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149, 152 (3d. Cir. 1996); *Kirschner v. J.P. Morgan Chase,*

*N.A. (In re Millennium Lab Holdings II, LLC)* 2019 Bankr. LEXIS 646, at *13 (Bankr. D. Del.

Feb. 28, 2019).

With respect to the transfers at issue in Count II, Debtor has alleged that it did not receive reasonably equivalent value because in exchange for $533 million in cash, the Debtor received limited partnership interests in Camshaft Fund, which it alleges is a sham hedge fund run by an unqualified portfolio manager that, at the time, had its principal place of business listed as a Miami IHOP with no working telephone number. Debtor further alleges that the limited partnership interests it received were not registered under the securities laws, were illiquid securities subject to significant restrictions on resale and transferability and required Debtor to pay to Camshaft exorbitant fees and expenses that were well above market.[55]

Camshaft argues that Debtor's allegations are insufficient to establish a lack of reasonably equivalent value as a matter of law because (1) the investment services purchased had objective value; and (2) Camshaft's interrogatory responses demonstrate that the investment had positive return. I disagree.

While Camshaft attempts to frame its argument as one of law, Camshaft has only raised issues of fact. Even if it were proper to consider the evidence cited by Camshaft on a motion to dismiss,[56] the evidence would, at best, establish that the Debtor received something (as opposed to nothing), which would only satisfy the first part of the Third Circuit's test. It does nothing to satisfy the balance of the inquiry, which is whether that value is reasonably equivalent to the value of what was given by the debtor. See *Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149, 152 (3d. Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court

---

[55] Complaint ¶¶ 55-79, 168.

[56] Interrogatory responses are generally considered beyond the scope of the record on a motion to dismiss. *See, e.g.*, *Intercept Pharms., Inc. v. Fiorucci*, Civil Action No. 1:14-cv-1313-RGA, 2017 U.S. Dist. LEXIS 8026, at *4 (D. Del. Jan. 20, 2017) ("Defendant points to nothing in his pleading that provides support for his 'bald assertions.' Instead, Defendant points to his interrogatory responses, which constitute extraneous information that I will not consider for the purposes of this 12(b)(6) motion.").

must make an express factual determination as to whether the debtor received any value at all.").
*See also Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) ("If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.").   The latter inquiry is one that is almost always a question of fact and therefore not amenable to resolution on a motion to dismiss.   *See EPLG I, LLC v. Citibank, N.A. and U.S. Bank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 327 (Bankr. D. Del. 2012) (noting that the Third Circuit requires application of a "totality of the circumstances" test and holding that the issue of reasonably equivalent value required a factual determination "that cannot be made on a motion to dismiss").

### 3.  *Failure to Plead*

With respect to the transfers at issue in Count III (the Fees), Camshaft argues that the claim should be dismissed because the Debtor has not alleged the date or amount of fees charged with the necessary specificity.   I disagree.

As noted above, constructive fraudulent transfer claims are subject to the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure which only require a short and plain statement of the claim, as compared to Rule 9, which requires that claims be stated with particularity.   *See Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. 2010) (Unlike a claim for actual fraudulent transfer, a claim for constructive fraudulent transfer need only be pled pursuant to requirements of Rule 8(a).); Fed. R. Civ. Proc. 8.  *See also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("The Rules demand only a short and plain statement of the claim showing that the pleader is entitled to

relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.") (internal citations and quotations omitted).

While the averments set forth in the section of the Complaint entitled "Count III" (beginning with paragraph 177) reference the Fees in general terms, paragraph 76 of the Complaint includes a chart of estimated Fees broken down by month and amount.[57]  Although the Fees claimed by the Debtor are estimates, the estimates were based on Camshaft's disclosure that the management fee is paid monthly and equal to 3% per annum of the beginning capital account balance for each month, calculated using the quarterly account statements that Camshaft produced.[58]  Camshaft fails to explain the exact manner in which it believes Debtor's estimates are insufficient, and I find that they are not.  Given that the precise details about the Fees charged by Camshaft should already be in Camshaft's possession, I find that the allegations with respect to Count III are more than sufficient to provide Camshaft with fair notice of the charges against it.  *See McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016) (where information is exclusively within defendant's control, a plaintiff "may plead allegations based upon information and belief, so long as he does not rely on boilerplate and conclusory allegations, and he accompanies his legal theory with allegations that make his theoretically viable claim plausible").

For these reasons, Camshaft's Motion is denied with respect to Count III of the Complaint.

### D.  Declaratory Judgment

Camshaft next moves to dismiss Count VIII of the complaint.  In Count VIII, Debtor seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, that (i) the Second Transfer,

---

[57] Complaint ¶76.
[58] *Id.*

as well as any subsequent transfer or disposition of the Alpha Funds, were ultra vires, void ab initio, and/or otherwise without force and effect, and that (ii) the Alpha Funds are property of the estate under section 541 of the Bankruptcy Code.[59]

Camshaft argues that the basis of the Debtor's claim in Count VIII is that Inspilearn and Riju Ravindran acted without proper authority, not that Camshaft acted without proper authority. Thus, Camshaft, it contends, has no interest in the outcome. Further, Camshaft argues that because it has not asserted any rights or interest in the Alpha Funds, as against the Camshaft Defendants, there is no actual controversy or need to adjudicate adverse legal interests. Debtor responds that the Second Transfer involves the Debtor's transfer of the Camshaft limited partnership interest, the disposition of which Camshaft is inherently interested.

I am satisfied that Camshaft is an appropriate party to this claim. Camshaft clearly has a legal interest in the matters at issue in Count VIII of the Complaint, even if it chooses not to take action with respect to that interest at this time. At this early stage of the litigation, the extent of Camshaft's participation in the events that form the basis of this claim remain unclear. Accordingly, its Motion with respect to Count VIII is denied.

### E.  Willful Violation of the Automatic Stay

In Count XI of the Complaint, Debtor asserts a claim for willful violation of the automatic stay with respect to the two transfers that it alleges occurred post-petition. Specifically, Debtor alleges that on the same day Debtor filed its chapter 11 petition, "Ravindran, T&L, and Inspilearn, with Camshaft's assistance, caused Inspilearn to transfer the Debtor's property to an offshore trust. Upon information and belief, they executed the transfer after learning of the

---

[59] Complaint ¶ 229.

Debtor's bankruptcy filing, in violation of the bankruptcy stay" imposed by Section 362(a)(3) of the Code.[60]

Camshaft has moved to dismiss this claim on the grounds that (1) the Debtor's pleading is conclusory and improperly based on information and belief; and (2) Debtor's allegations conflict with "undisputed evidence" that the transfer at issue was made before the petition was filed.  I am not persuaded on either point.

First, allegations based upon information and belief are permissible where the facts at issue are peculiarly within defendants' possession.  *See McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d. Cir. 2016).  Second, much like the evidence cited by Camshaft in support of its other arguments, the evidence offered here only raises questions of fact that cannot be resolved at this stage of the case.  Accordingly, Camshaft's Motion with respect to Count XI is denied.

## CONCLUSION

For the reasons set forth above, the Motions are DENIED.

It is SO ORDERED.

Dated:  February 27, 2025

JOHN T. DORSEY, U.S.B.J.

---

[60] Complaint ¶ 248.