## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-50457 (CTG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Hearing: April 11, 2024, at 10:00 a.m. (ET)** |

### DEBTORS' REPLY IN SUPPORT OF THEIR THIRD OMNIBUS (SUBSTANTIVE), FOURTH OMNIBUS (SUBSTANTIVE), AND FIFTH OMNIBUS (SUBSTANTIVE) OBJECTIONS TO PROOFS OF CLAIM ALLEGING WARN LIABILITY

### INTRODUCTION

1.      The responses filed by the International Brotherhood of Teamsters ("IBT") and others[2] confirm that no claimants have valid WARN claims. The undisputed facts and law show Yellow was not an "employer" at the time of the layoffs and, in any event, multiple exceptions apply, precluding WARN liability.  It is clear that Yellow had no reason to believe it would soon be wiped from the face of the earth in late May and early June, roughly 60 days before it began liquidation efforts.  Instead, during that time, Yellow was continuously attempting to achieve the savings from One Yellow necessary for the Company's financial health, while also seeking financing from existing lenders, potential new lenders, and private equity fund Atlas.  Yellow's demise became likely only on July 26, when it became apparent that the damage from the IBT's ill-fated strike threat was irreversible; it delivered WARN notices promptly thereafter.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]     Additional responses have been filed by non-union employees Torres, Martinez, Green, and Hall, who seek to representant a class, Doc. 2836 (the "Torres Resp.", and from various pension and benefit funds, Docs. 2837, 2838, 2839, 2843, 2845, and 2846 (the "Funds Resps.").

2.      If Yellow does not fall within the exceptions and exemptions from the WARN Act,
then no company ever would.  Indeed, the Responses repeatedly rely on evidence and case law
that actually support Yellow's arguments and defeats the Claimants' own positions.  There simply
is no WARN exposure here.

3.      *First*, no claimant can dispute that the Third Circuit's test for whether a company
is a liquidating fiduciary is practical and functional, looking to the extent an entity's conduct
resembles operating as a going concern versus winding up its affairs.  The IBT and others claim
Yellow could not have been a liquidating fiduciary at the time of the layoffs because it had not
filed for Chapter 11, but cannot cite any case holding supporting its position, and their argument
defies the Third Circuit's test of looking at an entity's actual business activities.  Nor can the IBT
show discovery would change any relevant facts; the actions it points to as supporting discovery
only confirm that Yellow had ceased operating as an ongoing going concern.  For example, the
IBT notes that after filing Chapter 11 Yellow sought financing to allow customers to pick up their
freight, IBT Resp. ¶ 9, but that proves the Debtors' point:  if Yellow had been an operating concern
it would have delivered that freight itself, not sought to borrow money so others could pick it up.

4.      *Second*, the IBT is unable to controvert the evidence showing the faltering company
exception applies because Yellow was seeking internal and external capital two months before the
employees would eventually be laid off.  Governing Third Circuit case law instructs courts to look
at the period starting one week before and ending one week after the WARN notices would have
been due, which here would be May 24 to June 7, 2023.  Here, there can be no dispute that Yellow
was actively engaged in negotiations with the IBT to obtain the $22.85 million monthly savings
from One Yellow.  The IBT does not cite any case law holding that such internal financing does
not count for the exception; in fact, this savings fits comfortably within the regulatory definition,

and distinguishing between internal and external financing makes no sense, as achieving either would save a company and prevent the need for layoffs. Moreover, in addition to pursuing One Yellow, Yellow was seeking external financing from existing and new lenders during this period. That, too, as indisputable. Indeed, the IBT cites a Yellow letter from May 30, 2023 explaining that Yellow had "been engaged in ongoing discussions with its lenders throughout last week and the weekend" and "the Company is working with its lenders to try to secure interim relief," expressly confirming that Yellow was actively seeking external financing. Declaration of John Murphy ("Murphy Decl."), Ex. 11.

5.    *Third*, for the unforeseeable business circumstances exception, the IBT cites various stressors on Yellow—all of which resulted from the IBT's own refusal to proceed with One Yellow—but these cannot establish that Yellow should have reasonably foreseen that mass layoffs were *probable* before July 26. For example, the IBT cites Yellow's decision to defer contributions to Central States and the IBT's resulting strike threat, but Yellow had previously deferred contributions in 2009 and 2020 without any need for mass layoffs, and in 2023 these issues were resolved on July 23 when the IBT withdrew its strike threat. The IBT also emphasizes a May 30 letter from Yellow, but that letter simply explains that the Company needed the IBT's agreement to One Yellow to refinance its existing debt, and that the Company was working to secure interim relief from those lenders so that Yellow and the IBT could implement One Yellow. As explained in its Objection, Yellow reasonably believed based on its own negotiating history with the IBT, including the IBT's agreement to the first phase of One Yellow, and basic logic, that the IBT would agree to the rest of the One Yellow initiative allowing refinancing of these loans. The IBT cannot seriously believe its own irrational behavior, where the IBT killed the jobs of 22,000 of its own members, somehow supports its case for WARN liability against the Debtors.

6.      *Fourth*, the facts show that Yellow acted in good faith.  The IBT again relies on the May 30 letter, but that letter shows that Yellow was negotiating with lenders and the IBT to obtain the changes needed for additional financing.  Yellow, again, could not have foreseen that the IBT would continue to irrationally refuse to negotiate through June and July, resulting in the Company's abrupt and surprising end.  Similarly, given the Company's ongoing negotiations with the IBT, internal lenders, external lenders, and private equity fund Atlas through June and July, Yellow had no reason to believe WARN notices were required before the effect of the IBT's strike threat became apparent on July 26.

7.      *Fifth*, the IBT criticizes Yellow's WARN notices, but those notices are supposed to give a "brief statement" on why the the notification period was reduced.  29 U.S.C. § 2102(b)(3).  That is what they did, and the IBT articulates no reason more was required (nor could it).  The IBT also cannot dispute that Third Circuit case law allows other communications to be considered in conjunction with the WARN notice, or that the Company sent communications to employees explaining its negotiations with the union.  The IBT claims these communications were not sent specifically to it but does not claim it was unaware of their content or what practical difference sending the communications to the union offices would have made; nor would any such argument be plausible given the reality that the IBT killed Yellow for reasons knowable only to the IBT.

## ARGUMENT

**A.      The IBT Cannot Rebut That Yellow Was No Longer A Going Concern By July 26, And Thus Was No Longer An Employer.**

8.      The IBT and other claimants first argue that the liquidating fiduciary exception cannot apply because Yellow had not filed for bankruptcy before laying off its employees.  But this position contradicts both WARN's statutory language and Third Circuit precedent, and no case has ever held as much.

9.      The WARN Act defines an employer to only include a "business enterprise." 29 U.S.C. § 2101(a)(1).  Nothing in the statutory text says that all entities that have workers outside of bankruptcy are "employers," or that an entity cannot cease to be a "business enterprise" outside of bankruptcy.  Claimants' interpretation would rewrite the statute to either delete the term "business enterprise" or add that the WARN Act applies to all entities outside of bankruptcy, contrary to basic canons of statutory interpretation. *E.g.*, *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 282 (2018) ("It is not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have intended."); *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words.  It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").

10.      Moreover, the seminal Third Circuit precedent of *In re United Healthcare System, Inc.*, adopted a test that looks to the the entity's actual conduct and activities in determining whether it is a "business enterprise" within the meaning of the statute and thus an "employer." 200 F.3d 170, 176 (3d Cir. 1999).  "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178.  Nothing in *United Healthcare* limits the liquidating fiduciary exception to those who have filed bankruptcy, and the IBT cannot identify any such language.  Instead, Third Circuit precedent looks to whether the entity more closely resembled a going concern or was winding up its affairs at the time of the layoffs—and the facts here show Yellow was doing the latter.

11.     Claimants also cite a footnote in an unpublished, out-of-circuit case *In re Century City Doctors Hospital, LLC*, but that case *affirmed* applying the liquidating fiduciary rule to a company that had filed for bankruptcy before laying off its employees.  2010 WL 6452903, at *1 (B.A.P. 9th Cir. Oct. 29, 2010).  Any discussion regarding the hypothetical of what would have happened if the entity had not filed for Chapter 11 is dicta.  Further, the footnote states that if pre-bankruptcy management had conducted the terminations, then perhaps the entity "could" be an employer and "might have had" WARN Act liability, *id.* at *10 n.9, confirming that *Century City* was not limiting the liquidating fiduciary exception to companies in bankruptcy.

12.     The IBT's arguments on the facts fare no better.  The IBT cannot dispute that Yellow began the process to discontinue accepting new shipment orders on July 24, 2023.  Shipping freight was Yellow's lifeblood.  Once this decision became permanent by July 26, the Company was no longer operating as a going concern.  Moreover, the company's *delivery* of packages had fallen to near zero in the next few days and on July 30—the day it laid off its unionized employees—Yellow had no shipments or customers remaining.  Nor does the IBT refute that by July 26 the employees that remained with Yellow had shifted to liquidating the Company.

13.     The handful of supposed facts concerning Yellow's post-bankruptcy conduct that the IBT cites, IBT Resp. ¶¶ 7-9, further confirms Yellow was no longer an "employer."  As the Third Circuit held, the question is not whether the entity is conducting *any* business activity, but whether that activity was more like a business operating as a going concern, or one winding up its affairs. *United Healthcare*, 200 F.3d at 178.  Here, the facts show Yellow was doing the latter.  For example, the IBT points out the Company sought financing "so that its customers could obtain their freight that remained in the network."  IBT Resp. ¶ 9.  But if Yellow was operating as a going concern, it would have been delivering its customers' freight—the core of its business—not

seeking financing so that others could pick the freight up. The IBT cites Yellow's motions to pay taxes, *id.* ¶ 8, but of course liquidating companies are required to pay taxes. Refusing to pay taxes would have resulted in the government seeking to levy Yellow's assets, preventing it from marketing its assets for sale or maximizing value for stakeholders. Once again, seeking court authority to pay priority taxes in the context of a wind-down is an example of a company liquidating, not operating. The IBT also cites language from other motions, *id.* ¶ 7, but again fails to explain how this shows any ongoing business as opposed to steps necessary for liquidation.

14.    That Yellow was not an employer when it conducted the layoffs defeats all federal and state WARN claims. This includes any claims under the New Jersey Act, which—like the federal Act—applies only to an "employer." N.J. Stat. Ann § 34:21-2; Obj. ¶ 71. Yellow is unaware of any case law holding that "employer" under the New Jersey Act should be interpreted differently than the federal Act on which it is based,[3] and thus the Court should look to the federal Act for guidance in interpreting the definition of "employer" under the various state Acts.

15.    In sum, the undisputed evidence establishes that Yellow had ceased operating as an ongoing concern before July 30. No discovery will change that conclusion. *See Century City*, 2010 WL 6452903, at *7-10 (affirming denial of claimants' request for discovery into whether entity qualified as an employer, where allegations showed it was not).

---

[3]    To the contrary, courts have interpreted the New Jersey WARN Act as being parallel to the federal Act. *DeRosa v. Accredited Home Lenders, Inc.*, 420 N.J. Super. 438, 453 (App. Div. 2011) ("the New Jersey [WARN] Act was modeled after its federal counterpart, and the two statutes share the same purpose of protecting workers and communities by requiring employers to provide notice of plant closings and mass layoffs"); *Heinz v. Dubell Lumber Co.*, Civil No. 19-8778 (RBK/KMW), at *5 (D.N.J. Nov. 23, 2020) ("The New Jersey WARN Act was modeled after its federal counterpart and they only diverge in the type of damages available. … Because they share the same purpose … New Jersey courts often look to the federal WARN Act regulations and case law for guidance in interpretation the New Jersey Act"); *Ramcharan v. A.F.L. Quality, Inc.*, No. 1:12-CV-07551, 2014 WL 4388579, at *3 (D.N.J. Sept. 5, 2014), on reconsideration in part, No. CIV. 12-7551 RMB/AMD, 2015 WL 4275534 (D.N.J. Apr. 14, 2015) ("The NJ WARN Act, modeled on its federal counterpart, similarly requires that, under certain conditions, employers must provide employees with 60 [now 90] days' notice or, alternatively, severance pay, in the event of a transfer or termination of operations or a mass layoff.").

**B.**     **Yellow Was Actively Seeking Internal And External Financing, And Thus Satisfies The Faltering Company Exception.**

16.     The IBT's argument that the $22.85 million in additional monthly cash that would be generated by One Yellow cannot satisfy the faltering company exception again defies the plain language of Third Circuit precedent and the WARN Act's regulations.  The full scope of financing that can satisfy this exception is expansive: "'financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method.'"  *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 249 (3d Cir. 2008) (quoting 20 C.F.R. § 639.9(a)(1)).  The savings from One Yellow fall well within this language as "internally generated financing" as well as well as "money" and "business through any other commercially reasonable method."

17.     The IBT asserts that "internally generated financing" applies only to money raised from its own employees, IBT Resp. ¶¶ 12-13, but provides no authorities for this nonsensical ipse dixit.  Nor does the IBT dispute that One Yellow savings would have given Yellow "additional money … or business through any other commercially reasonable method."  More generally, the reason for the faltering company exception is that an entity need not provide notice if it can obtain funds to obviate the need for any layoffs.  There is no basis for concluding that those funds cannot be internally generated through a business reorganization.  The IBT's position would lead to the bizarre result that a company would be required to give a WARN notice if it were pursuing internal initiatives to generate $100 million in liquidity, but no WARN notice would be needed if it were pursuing a $100 million loan—even though the amount and effect of the funding on whether the company ultimately lays off employees is the same.

18.     Thus, as a matter of law, the savings from One Yellow satisfy the faltering company exception.  Given that, the IBT provides no arguments on the facts to rebut that the Company was actively seeking savings from One Yellow, had a realistic opportunity to obtain the savings, the savings would have been sufficient to avoid layoffs, and the issuance of a 60-day notice would have ended the Company.  The record is unequivocal that Yellow was constantly seeking to negotiate with the IBT to achieve the savings from One Yellow, and that—based on the parties' history and that 22,000 unionized jobs were at stake—reasonably believed the IBT would eventually agree.

19.     In addition, as an alternative ground, Yellow also was seeking external financing. The first question here is the timing.  While the IBT claims that the court should only look to 60 days before the layoffs, the Third Circuit has "conclude[d] that an employer may validly assert the unforeseeable business circumstances exception unless closing is foreseeable 60 days in advance and within a 14-day window."  *Hotel Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 185 (3d Cir. 1998).  While *Elsinore* concerned the unforeseeable business exception, the Third Circuit based its holding on 20 C.F.R. § 639.7(b), which applies to all notices. 173 F.3d at 185.  Accordingly, *Elsinore's* holding applies to the faltering company exception and instructs the court should look to a two-week period around 60 days before the layoffs occurred, which is 53 to 67 days before the layoffs, which here means between May 24 and June 7. Yellow was actively seeking financing in that window, before that window, and after that window.

20.     Under *Elsinore*, this Court should consider both Yellow's efforts to obtain financing from existing lenders starting May 26, and its efforts with new lender from June 5.  Obj. ¶ 85.  It is undisputed that such discussions continued from June 7 through July, along with Yellow's discussions with private equity fund Atlas, all seeking new financing and liquidity that

would have put Yellow on a solid financial footing and avoided the layoffs.  *Id.*  Indeed, the IBT provides no argument to dispute that the financing Yellow was seeking from new potential lenders from June 5 would not satisfy the faltering company exception.

21.     Even if—despite the binding authority of *Elsinore*—the court looks only to May 30 and earlier, the faltering company exception is still satisfied, as shown by the IBT's "evidence." The IBT repeatedly cites a May 30 letter from Yellow's Bryan Reifsnyder to the IBT's John Murphy, but that letter further demonstrates how Yellow was seeking financing before May 30. That letter states that the "Company has been engaged in ongoing discussions with its lenders through last week and the weekend.  Those discussions are ongoing … ."  Murphy Decl., Ex. 11. Until One Yellow was implemented, the existing lenders were not willing to refinance the Company's debt, and so "the Company is working with its lenders to try to *secure interim relief that will provide a bridge* and enable the Company to secure an agreement with the IBT that facilitates implementation of the Phase II Change of Operations."  *Id.* (emphasis added).  Thus, the IBT's own evidence establishes that Yellow was negotiating with its existing lenders before May 30 and was actively seeking to secure interim liquidity that would have avoided the layoffs. The IBT makes much of the language that "the Company's current condition … will preclude refinancing at this time," but ignores that (1) the Company was seeking "interim relief," that is, additional liquidity and (2) "current condition" meant without One Yellow, and that lenders would have been willing to refinance if One Yellow was implemented.  *Id.*

22.     Beyond this evidence, the IBT also cannot dispute (because it well knows) that in late May, Yellow was negotiating with its existing lenders to modify the loans to improve Yellow's liquidity, which also was another form of financing.  Obj. ¶ 85.  The IBT asserts that Yellow did not have a realistic opportunity for its lenders to provide additional liquidity, IBT Resp. ¶ 22, but

provides zero evidence to support this statement, which simply is incorrect.  If the Company would have been able to implement One Yellow—and it reasonably believed that the IBT would agree to the necessary changes based on the parties' past history and the 22,000 union jobs at stake—then the lenders would have provided new financing.  Only the IBT's truly irrational conduct pushed Yellow over the brink.  Finally, the IBT suggests the lenders might have been willing to provide financing even if Yellow sent WARN notices, IBT Resp. ¶ 23, but this is unsupported and absurd. If Yellow had announced it was laying off virtually all its employees, any lender or other financing source would recognize it would lose any additional money it put into Yellow.

23.     In sum, the IBT provides no factual rebuttal to the savings from One Yellow satisfying the faltering company exception, and its legal arguments contradict the plain language of Third Circuit precedent and the WARN regulations.  Independently, the IBT's own evidence reinforces how Yellow was actively seeking financing from external lenders and could have obtained that money and saved the Company but for the IBT's obstinance.

**C.     That The IBT Would Kill Yellow And 22,000 Union Jobs Was Clearly Unforeseeable.**

24.     In evaluating the unforeseeable business circumstances exception, a company is required to provide notice only where the layoff was probable, meaning more likely than not.  Obj. ¶ 90.  A possibility is not sufficient.  *Id.* ¶ 91.  The Third Circuit has held that layoffs were unforeseeable even when, for example, a company's state regulator had recommended the company be shut down, or when a company's disinterested directors contemplated liquidation.  *Id.*

25.     Given this precedent, the facts here fall far short of showing that the mass layoffs were foreseeable.  As *Elsinore* holds, the relevant time period is the two-week period around the day that is 60 days before the layoffs—which would be from May 24 and June 7.  *Supra* ¶ 15.  The IBT cannot dispute that, during that period, Yellow was receiving and accepting orders for, and

delivering, over 40,000 packages daily, consistent with its standard business, and had $157 million in liquidity on June 5.  Obj. ¶ 93.  Overall the business was stable.  IBT cites only two pieces of evidence during this period.  IBT Resp. ¶ 35.  The first is the May 30 letter discussed previously, which shows that Yellow was actively seeking financing and committed to continuing negotiations with the IBT to implement the changes necessary for One Yellow to proceed.  Murphy Decl., Ex. 11; *supra* ¶ 17.  The second is the Union rejecting this proposal on June 5.  But the IBT does not dispute—and indeed the Murphy Declaration confirms, ¶¶ 12-19—that Yellow and IBT's negotiating history often consisted of hard bargaining over changes that eventually led to agreement, a pattern and expectation hardly unique in the history of union-company relationships. Obj. ¶¶ 92-97.  Again, Yellow (like any company would) reasonably expected that the IBT would act rationally and save 22,000 unionized jobs by agreeing to the changes necessary for One Yellow. No rational person would have expected the IBT to kill Yellow and sacrifice 22,000 of its own members in the process—which, unfortunately for all, is exactly what the IBT did.

26.    Looking after the period dictated by *Elsinore*, the events are insufficient to show that mass layoffs become probable before July 26.  The IBT cites Yellow seeking contribution deferrals, Central States refusing, and Yellow deferring contributions, but ignores that Yellow previously deferred contributions in 2009 and 2020, Obj. ¶¶ 19, 21, yet the IBT, Central States, and the Company were able to negotiate a solution.  Moreover, these same parties agreed to a deferral on July 23, 2023, although it turned out to be too late.  The IBT also points to its own strike threat but ignores that in 2014 when the IBT could have gone on strike, it and the Company instead worked out an agreement.  *Id.* ¶ 20.  In response to the IBT's strike threat, on July 19, Yellow sought a temporary restraining order and preliminary injunction against any strike, Obj. ¶ 44; there was no reason for the Company to do any this if Yellow were unlikely to be saved.

27.    In fact, here, the IBT withdrew its strike threat on July 23, 2023.  Thus, despite Central States' benefit suspension and the IBT's strike threat, the Company reasonably believed the parties could reach agreement to preserve Yellow and 22,000 union jobs.  The chances of mass layoffs when the IBT issued the strike threat on July 17 was far less than in *Elsinore* (when the company's regulator recommended it be shut down), or in *In re AE Liquidation II*, 866 F.3d 515 (3d Cir. 2017) (when the company's disinterested directors were contemplating liquidation).

28.    The IBT also cites Yellow on July 24 starting the process to discontinue accepting new shipments.  Notably, the time between July 24 and the July 30 layoffs was only 6 days, less time than the cases cited by the IBT, IBT Resp. ¶ 34.  Regardless, beyond that, the IBT admits that it and Yellow were still meeting on July 24 and 25.  *See* Murphy Decl. ¶ 55.  Yellow provided the IBT information on its communications with the government, hoping the IBT's influence might increase the chance of intervention to help save Yellow.  The Company would not have done this if there was no longer a chance to keep Yellow alive; that layoffs did not become probable until July 26 is consistent with the facts and precedent.  And on July 26, Yellow needed time to prepare WARN notices for 30,000 employees, which were then promptly sent on July 28 and July 30.

29.    The minutes from Yellow's July 26 board meeting reinforce that mass layoffs were not probable until that date.  Those minutes explains that the Company and the IBT had been negotiating, with the IBT making its purported final offer on July 25.  The Company believed based on that offer that the IBT would finally support the changes necessary for one Yellow.  But a combination of its customer exodus, liquidity losses, and additional lender demands for reserves meant that obtaining the financing necessary for the Company's continued survival was unlikely.  Even then, the Company kept encouraging the IBT to reach out to the federal government for help, though the pace of the liquidity decline meant that any solution would need to be immediate.

30.     The Torres claimants, on their part, cite Yellow's June 27, 2023 complaint against the IBT for breaches of the CBA, Torres Resp. at 24-25, but again this cannot show that layoffs were *probable*.  That complaint's allegations recognized the truth—that the IBT's president was leading Yellow and 22,000 unionized jobs down a path toward destruction.  But Yellow was doing everything in its power to avoid that result, including the lawsuit itself, as well as negotiating with the IBT and trying to secure additional sources of liquidity.  For the reasons explained, Yellow reasonably believed those efforts would succeed, as they had in 2009, 2020, and other times.

**E.     Yellow's WARN Notices Satisfy The Statute And Regulations.[4]**

31.     In determining whether a WARN notice is satisfactory, courts "have looked to the purposes underlying the WARN Act and determined whether those purposes were satisfied under the circumstances by the notice that was given to the employees." *Schmelzer v. Office of Compliance*, 155 F.3d 1364, 1369 (Fed. Cir. 1998).  The statute expressly states that an entity "shall give a ***brief*** statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3) (emphasis added).  That is exactly what Yellow did.  As the IBT admits, Yellow's notice explained that it "had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so."  IBT Resp. ¶ 30; Obj. ¶ 108.  "These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice if further excused because the business is being liquidated." *Id.*  Thus, Yellow's notice was unlike those in *In re Tweeter OPCO, LLC*, which simply cited "the elimination of some services to our customers" and "adverse business conditions," without explaining why these meant the company could not provide notice earlier.  453 B.R. 534 (Bankr. D. Del. 2011).  Instead, Yellow's notice explained that it was pursuing transactions to secure funds

---

[4]     If the Court finds that Yellow was not an "employer" at the time of the layoffs, then the WARN Act does not apply at all and the content of Yellow's WARN notices is irrelevant.

that would have prevented the need to close the business—and thus any need to send WARN notices—but had been unable to complete these transactions.

32.    IBT claims that the content of the WARN notice must be true, IBT Resp. ¶ 29, and Yellow's WARN notice was 100% true.  Yellow had sought for months to complete transactions various transactions to secure funds that would have allowed it to continue in business.  The most important of these transactions was negotiating with the IBT to proceed with One Yellow.  Beyond that, Yellow negotiated with its existing lenders, new potential lenders, and private equity fund Atlas for investments that would have provided additional liquidity.  As none of these transactions closed—primarily because of the IBT's obstinance and surprising willingness to sacrifice 22,000 unionized jobs—Yellow lacked the funds to continue operating.

33.    The various claimants' arguments that the WARN Notices should have provided more detail (violating WARN's dictate that the notices be "brief") are meritless.  For example, the IBT faults the notice for not mentioning Atlas, IBT Resp. ¶ 31, but does not cite any case law requiring an entity to name the institutions from which it is seeking financing.  The notice is statutorily required to be a "brief statement," not describe the minutiae of each transaction.  The IBT provides no explanation of how Yellow telling its union employees that it had been seeking financing from Atlas would make any difference; indeed, the name would have been meaningless to them.  *Schmelzer*, 155 F.3d at 1369 (holding that even if a technical defect in a WARN notice existed, former employee had no claim where he was not prejudiced by the defect).  The IBT admits that the notice included the information important to workers: a brief statement as to why notice could not be provided earlier, and the key facts that the closure was permanent, all employees were being terminated, and no bumping or other job rights were available.  Obj. ¶ 108.

34.     Finally, Third Circuit precedent is clear that the sufficiency of the WARN notice is considered in light of other communications made to employees.  Obj. ¶ 109.  To the extent any employees desired additional detail not required by the statute, Yellow's communications before the formal WARN notice provided detail on union negotiations, deferral of pension contributions, need to progress with One Yellow, and other topics.  Obj. ¶ 110.  Specifically, Yellow sent several written communications to its employees in June and July 2023 explaining the situation.  Hawkins Decl. ¶¶ 69, 71, 75-78, 96.  These communications explained the need to complete One Yellow, discussed the militant talk of IBT President Sean O'Brien, and stated that "the reality is that, until the IBT leadership stops the posturing and deals with the reality of the current situation, he is leading you down a road to ruin."  *Id.* ¶ 69.  As "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire [] industry, Yellow has recently been operating at a loss as it continues to serve its customers."  *Id.* ¶ 75.  Yellow offered a wage increase to the IBT to "clear[] a path to advance One Yellow.  All stakeholders – lenders, shareholders, employees, and customers need to see progress."  *Id.* ¶ 96.

35.     Disregarding the Third Circuit law, the IBT raises two meritless arguments.  The first is that Yellow did not formally send these to the IBT, IBT Resp. ¶ 32, but IBT does not claim it was unaware of these communications or their content or identify any prejudice.  *See Schmelzer*, 155 F.3d at 1369.  Second, the IBT faults some letters for being sent before the strike threat, Resp. ¶ 32, but those communications informed employees of the negotiations and why Yellow was deferring payments to Central States, for employees interested in that information.  Moreover, this argument does not apply to the letter sent July 20, after the strike threat, explaining how progress on One Yellow was needed for all stakeholders, including lenders and customers.  Obj. ¶ 110.

36.    The Torres claimants emphasize that notice was provided post-termination, Torres Resp. at 14-15, but have no response to the express Third Circuit and regulatory language allowing after-the-fact notice, Obj. ¶ 106.  Thus, this argument is meritless.  The Torres claimants also complain that Yellow supposedly did not provide information to California government agencies, Torres Resp. at 13, but in fact Yellow was in contact with the California Employment Development Department on August 7, 2023, which requested various information relating to the layoffs.  Thus, the relevant California agency was well aware of the layoffs.

37.    Claimants also assert that Yellow should have given WARN notices sooner, but earlier notice would have affirmatively harmed employees and all of Yellow's other stakeholders. Through May, June, and July through the 26th Yellow was actively seeking to negotiate with existing lenders, potential new lenders, a private equity fund, and—most importantly—the IBT to save the Company.  Sending out a mass layoff notice to virtually all employees would have spelled doom, guaranteeing the loss of all jobs.  The Third Circuit has expressly rejected interpretations of the WARN Act that would require frequent or precipitate WARN notices as these would increase the chance of layoffs, harming the employees the WARN Act seeks to protect.  Obj. ¶ 67. Here, Yellow reasonably believed it would be able to save the Company until July 26, when it became apparent that the loss of customers from the IBT's strike threat was irreparable.  From then Yellow needed a few days to prepare the notices to thousands of employees and sent them promptly a few days later.  As the Third Circuit has explained, companies "in financial distress will frequently be forced to make difficult choices on how best to proceed, and those decisions will almost always involve the possibility of layoffs if they do not pan out exactly as planned."  *AE Liquidation II*, 866 F.3d at 530.  Arguments that WARN notices should have gone out sooner or been more detailed ignore the facts and contradict Third Circuit case law.

**F.      Yellow Acted In Objective And Subjective Good Faith At All Times.**

38.      The Torres plaintiffs argue that Yellow must present evidence that it considered whether to send WARN notices 60 days before the layoffs, Torres Resp. at 23, but this argument is unsupported by any case law and contradicts Third Circuit precedent.  There is no evidence in cases such as *AE Liquidation* or *Elsinore* finding that the entity contemplated whether to give earlier WARN notices, yet the Third Circuit held that WARN Act exceptions applied.  *Elsinore*, 173 F.3d at 187; *AE Liquidation II*, 866 F.3d at 531-34.  This argument particularly makes no sense for the unforeseeable business circumstances exception—as the strongest circumstances for that exception applying are (as here) where the entity had no idea that it would collapse two months later and thus no reason to contemplate mass layoffs or documentation related thereto.

39.      The IBT's argument against Yellow's good faith defense rehashes their prior points, which Yellow has responded to throughout this brief.  The facts and evidence establish that Yellow reasonably believed it was complying with the WARN Act.  In May, June, and July, Yellow actively engaged in negotiations with the IBT, its existing lenders, new potential lenders, and private equity fund Atlas.  While the IBT repeatedly met Yellow's good faith efforts with intransigence, Yellow reasonably believed based on the parties' history, employer-union dynamics generally, and what should have been the IBT's own self-interest in preserving union jobs, that the IBT would agree to the changes necessary to implement One Yellow.  Instead, to Yellow's surprise, the IBT pushed the Company past the brink at the cost of 22,000 unionized jobs.  Such an irrational action was not foreseeable.  When the facts showed on July 26 that the damage the IBT inflicted was irreparable, Yellow promptly sent WARN notices with the required information to its employees.  There was nothing more that Yellow could have done to save the Company or its employees' careers.

**G.      The Severance Agreements Which Certain Employees Signed Are Fully Enforceable, and Claimants Cite No Authorities To The Contrary.**

40.      The Torres claimants voluntarily signed severance agreements paying them severance in exchange for releasing their claims.  Obj. ¶ 114-17.  They accepted the money but now seek to break their agreements.  Torres Resp. at 29-35.  But they lack any authority to invalidate their voluntary promises.  The Torres plaintiffs cite provisions from the New Jersey Act that rights to severance cannot be waived, but there was no waiver here; instead, these employees voluntarily agreed to a settlement.  Torres Resp. at 29-30.  Similarly, they cite a federal provision regarding WARN liability being reduced by voluntary payments, but that is irrelevant to the circumstances here, which involve a settlement.  *Id.* at 30-31.  The Fifth Circuit rejected this same argument in *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexciana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).  Most importantly, claimants do not cite a single New Jersey or federal court decision overriding a settlement and it is hard to believe that Congress or any state legislature would consider any remedy incapable of settlement.

41.      Claimants' arguments that the settlements were procured by "fraud" are frivolous.  They baldly assert a "slam-dunk case" for WARN liability, which is obviously incorrect given the arguments in Yellow's Objection and this Reply.  They also cite that the settlement agreement denies that Yellow was liable for WARN Act liability, but this is true of virtually every settlement that denies liability for the conduct at issue.  Again, Yellow had and has perfectly valid reasons for denying such liability.  The only "fraud" here is from these Claimants—who signed settlements resolving their claims and accepted consideration for it, only to turn around, disavow signed contracts, and seek more—imposing substantial additional costs on the estate in the process.

42.      Unable to cite a single case of their own, the Torres claimants attempt to rewrite the facts and holdings of Yellow's directly on-point authority.  For example, the Seventh Circuit

has expressly held that "WARN Act claims can be waived as part of a voluntarily signed general release." *Ellis v. DHL Exp. Inc.*, 633 F.3d 522, 528 (7th Cir. 2011) (collecting cases). In reaching this holding, the Seventh Circuit rejected the arguments against voluntariness that the Torres claimants make here, such as that workers had a short time to decide whether to sign the agreement and they were under economic pressure. *Id.* at 527; *see also IAM*, 199 F.3d at 799 ("the affected employees waived their WARN Act claims when they accepted valid releases in exchange for the enhanced separation package"). The Torres claimants cannot overcome this clear case law, especially when they cannot cite any to support their positions.

**H.    The Funds Acknowledge They Lack Direct WARN Act Claims.**

43.    Finally, Yellow's Objection explains that the Third Circuit holds that health and welfare or pension funds lack standing to bring WARN Act claims. Obj. ¶ 111-13. The claimant funds do not dispute this binding precedent, but claim they are not bringing WARN Act claims. Instead, these claimants argue that *if* unionized employees can recover under the WARN Acts, such recoveries would constitute "compensation" for which Yellow would be required to make contributions to the funds under collective bargaining agreements and ERISA. *E.g.*, Doc. 2843 at 6 (arguing its claims "arise from contract and ERISA and are not preempted by the WARN Act"). The claimant funds' reconstituted argument fails for at least two reasons.

44.    *First*, under the funds' argument, the funds could be owed contributions only if unionized employees recover under the WARN Acts. As explained in Yellow's Objection and this Reply, Yellow has no liability to unionized employees under federal or state WARN Acts, and thus likewise has no liability to any claimant funds.

45.    *Second,* liability under the WARN Act is not "compensation" or "wages." Congress designed WARN liability to be "in effect a liquidated damages provisions [sic], designed

to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings." S. Rep. No. 62, 100th Cong. 1st Sess. 24 (1987); *see also United Mine Workers of Am. Int'l Union v. Martinka Coal Co.*, 45 F. Supp. 2d 521, 530 (N.D. W. Va. 1999) (quoting and relying on this legislative history); *Geelan v. Mark Travel, Inc.*, 2006 WL 8445200, at *6 (D. Minn. Sept. 22, 2006) (same, collecting cases); *see also Shannon v. Computer Assocs. Int'l, Inc.*, 45 P.3d 345, 354 (Ariz. Ct. App. 2002) ("WARN Act provisions can be viewed as punitive or deterrent because, in essence, employers are penalized by not using the notice provisions because they must pay affected workers wages although no work was done."). WARN does not "compensate for past services." *Aaron v. Brown Group, Inc.*, 80 F.3d 1220, 1225 (8th Cir. 1996); *United Paperworkers Int'l Union v. Specialty Paperboard*, Inc., 999 F.2d 51, 55 (2d Cir. 1993). Likewise, courts have recognized that WARN Act liability is not "wages," as WARN liability is not based on labor or services actually performed. *E.g.*, *Calixto*, 113 N.E.3d aat 333 (Mass. 2018); *Randolph v. Constellium Rolled Prods. Ravenswood, LLC*, 2016 WL 633402, at *4 (S.D. W.Va. Feb. 17, 2016). As the Third Circuit has held, while the WARN Act uses the phrase "back pay," that is "simply as a label to describe the daily rate of damages payable." *United Steelworkers of Am., AFL-CIO-CLC v. North Star Steel Co.*, 5 F.3d 39, 43 (3d Cir. 1993).[5]

46. Accordingly, as WARN liability is not "compensation" or "wages," it does not fall within the definitions of the participation agreements on the which claimant funds rely. E.g., Doc. 2843 ¶ 10 (alleging certain debtors agreed to remit contributions on behalf of employees for "compensation"). Therefore, even if the Debtors had WARN exposure to the actual employees (they do not), the funds' claims would fail for this independent reason.

---

[5]    While Central States cites *In re Powermate Holding Corp.*, 394 B.R. 765, 771 (Bankr. D. Del. 2008), that case did not consider the nature of WARN liability as being liquidated damages intended to punish, instead of provide compensation, and thus is not persuasive, especially in light of the numerous cases cited in the text holding that WARN liability does not provide compensation.

## CONCLUSION

There is no WARN liability here.  If Yellow does not fall within any of the exceptions, no company ever would.  All of the Claimants' arguments lack merit.  Yellow respectfully requests that the Court permit a reasonable period for the parties to engage in discovery and set a trial date,[6] after which the Debtors' Objections to all WARN claims should be sustained.

Dated:  April 9, 2024
Wilmington, Delaware

/s/ Peter J. Keane

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |

Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:     ljones@pszjlaw.com
         tcairns@pszjlaw.com
         pkeane@pszjlaw.com

Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     patrick.nash@kirkland.com
         david.seligman@kirkland.com
         michael.slade@kirkland.com

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

---

[6]  The Debtors' proposed scheduling order is attached as Exhibit A hereto.  Claimants the State of Wisconsin, Central Pennsylvania, and Local 710 Pension Funds have confirmed their agreement to this proposed schedule. The Debtors provided it to the WARN claimants (in both the claims objections and adversary proceedings) on March 19, in the hope of reaching agreement.  The Debtors also hosted a Zoom call on April 3, 2024, in an effort to solicit consensus.  But the claimants did not engage on the meet and confer call and have not engaged since. Accordingly, the Debtors respectfully request that the Court enter the proposed schedule attached as Exhibit A. Resolving these disputes is critical to creditor recoveries, and they should not take significant time to resolve.